STEPHEN M. TILLERY (*pro hac vice* forthcoming)
stillery@koreintillery.com
STEVEN M. BEREZNEY (Bar No. 329923)
sberezney@koreintillery.com
GARRETT R. BROSHUIS (Bar No. 329924)
gbroshuis@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Attorneys for Plaintiffs Taylor Smart and Michael Hacker, Individually and on Behalf of All Those Similarly Situated

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION**

| | |
|---|---|
| TAYLOR SMART AND MICHAEL HACKER, Individually and on Behalf of All Those Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association;<br><br>Defendant. | CASE NO.<br><br>**CLASS ACTION**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Taylor Smart and Michael Hacker (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action complaint alleging antitrust violations and bringing other legal and equitable claims. Plaintiffs allege as follows:

## INTRODUCTION

1. Defendant National Collegiate Athletic Association ("NCAA" or "Defendant") and its member schools have engaged in an illegal buyer's-side monopsony by conspiring to fix the compensation of an entire category of college baseball coaches at zero. Not one penny for what generally amounts to full-time (and sometimes more than full-time) work. This action seeks to end that illegal restraint.

2. Just as the NCAA member schools compete on the ballfield, they also compete with each other for college baseball coaches. For years, Defendant and its member schools have agreed to a bylaw that has restricted NCAA Division I schools to three paid baseball coaches. At the same time, Defendant and its member schools have agreed in another bylaw to allow the member schools to hire an additional baseball coach. But the coach cannot be paid.

3. The bylaw calls this coach a "volunteer" coach. In reality, that means that skilled coaches must provide very valuable services for free. These coaches generally perform many of the same job duties as the paid coaches and work alongside the paid coaches with the same players during the same practices and road trips and in the same set of offices. Yet they cannot even receive health insurance, housing, or other benefits, much less an actual salary in exchange for work performed.

4. These agreements amount to cartel agreements: a naked horizontal restraint amongst competitors to purposefully restrict competition in the labor market for college baseball coaching services. The very purpose and actual effect of this horizontal agreement was (and is) to fix and suppress prices so as to make them unresponsive to a competitive marketplace and to place these coaches' compensation at zero. This amounts to an unlawful restraint under antitrust laws, and it is illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1. In fact, a similar NCAA rule regarding restricted-earnings coaches was invalidated over 20 years ago in *Law v. N.C.A.A.*, 134 F.3d 1010 (10th Cir. 1998).

5. This suit seeks to recoup the damages sustained by these coaches as a result of these collusive and illegal practices. It seeks nationwide antitrust treble damages from the restricted competition for labor and resultant suppressed salaries. It also seeks to enjoin the NCAA and its members from engaging in this conduct again so that these talented coaches can be fairly compensated for the valuable work performed. And it seeks relief from other violations of law, as well as equitable relief.

**PARTIES, JURISDICTION, AND VENUE**

6. Plaintiff Taylor Smart, an individual, is a resident of Arizona. He worked as a volunteer coach at the University of Arkansas from 2018 to 2020.

7. Plaintiff Michael Hacker, an individual, is a resident of California. He worked as a volunteer coach at the University of California, Davis from 2019 to 2021.

8. Defendant NCAA is an unincorporated association that maintains its principal place of business in Indianapolis, Indiana. It has around 1,100 member schools. Its membership includes the public and private universities and colleges that conduct major athletic programs in the United States.

9. Various other persons and entities, including NCAA member schools, engaged in concert with the named defendant in the conduct alleged herein, and are co-conspirators.

10. Plaintiffs bring this class action pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, for violations of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1337 (commerce and antitrust regulation).

11. The Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5,000,000 in this class action, and some members of the Proposed Class are citizens of a state different from the Defendant.

12. Plaintiffs' state-law claims are closely related to the federal claims and form part of the same case or controversy. The Court has supplemental subject matter jurisdiction with respect to state-law claims pursuant to 28 U.S.C. § 1367.

13. Defendant's conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce. Defendant and its member schools transact substantial business in multiple states. Defendant and its member schools routinely use instruments of interstate commerce, such as interstate railroads, highways, waterways, wires, wireless spectrum, and the U.S. mail, to carry out their operations.

14. Venue is proper in this District because Defendant and some of its members reside, are found, and have agents in this District as provided in 28 U.S.C. § 1391(b) and (c) and in § 4 of the Clayton Act, 15 U.S.C. § 15. Alternatively, venue is proper under § 12 of the Clayton Act, 15 U.S.C. § 22, because Defendant and some of its members can be found in this District or transacts business in this District. A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. The bylaw at issue applies to volunteer coaches who have worked, or presently work, for NCAA member institutions in this District, the NCAA sanctions Division I baseball events that regularly take place in this District, including games played by local members, and one Plaintiff and other members of the Proposed Class reside or work in this District.

15. This Court has personal jurisdiction over Defendant pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, for the same reason that venue is proper under that Clayton Act provision. It also has personal jurisdiction because, among other things, Defendant transacts substantial, continuous business in this State and District; participates in organizing intercollegiate athletic contests that take place in this State and District, as well as licensing and selling merchandise and products in this State and District, and profiting from televising NCAA-sanctioned events that take place in this State and District; it has substantial contacts in this State and District and several of its members reside in this State and District; and it is engaged in an illegal anti-competitive scheme that was directed at, and had the intended effect of causing injury to, persons residing in, located in, or doing business throughout the United States, including in this State and District.

16. Several NCAA Division I member schools are found within this State and District. During all relevant times, those member schools have participated in the NCAA cartel that has enacted the illegal horizontal restraint at issue in this case.

**CLASS ACTION ALLEGATIONS**

17. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, as a class action on behalf of the following:

> All persons who worked as a "volunteer coach" in college baseball at an NCAA Division I school from the beginning of the statute of limitations period, as determined by the Court, through judgment in this matter.

18. While Plaintiffs do not know the exact size of the Proposed Class, Plaintiffs are informed and believe that the Proposed Class includes over 100 members residing in various parts of the United States. The class is so numerous that joinder of all members is impracticable.

19. Plaintiffs' claims are typical of the claims of other members of the Proposed Class. Plaintiffs and the members of the Proposed Class were subject to the same or similar employment restraints and compensation practices arising out of Defendant's common course of illegal conduct. Plaintiffs and the Proposed Class have sustained similar types of damages as a result of these common practices.

20. Common questions of fact or law exists, and they predominate over any individualized questions. They include, *inter alia*:

a. Whether Defendant's conduct violates the antitrust laws;

b. Whether by enacting the bylaw, Defendant engaged in a contract, combination, or conspiracy to unreasonably restrain trade by capping the amount of compensation paid to an entire category of coaches;

c. Whether that conduct caused Plaintiffs and Proposed Class members to earn less than what they would have in a truly competitive market;

d. Whether Plaintiffs and the Proposed Class suffered antitrust injury or were threatened with injury;

e. Whether Plaintiffs and the Proposed Class are entitled to damages and injunctive relief, and the type and scope of that relief;

f. Whether Defendant and its member schools were unjustly enriched by their conduct, and whether Plaintiffs and Proposed Class members are entitled to restitution, quantum meruit, or other common law relief;

g. Whether Defendant and its member schools violated other state laws, including California's Unfair Competition Law.

21. Plaintiffs will fairly and adequately protect the interests of class members in that their interests are aligned, and Plaintiffs have retained counsel competent and experienced in class-action litigation, including antitrust litigation.

22. A class action is superior to other methods of adjudication. Joinder is impracticable, and the prosecution of separate actions by individual class members would impose heavy burdens upon the courts and Defendant and create a risk of: (a) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendant; and (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

23. Conversely, a class action would save time, effort, and expense and assure uniformity of decision for persons similarly situated without sacrificing procedural unfairness or any undesirable result. Plaintiffs do not anticipate any difficulty in the management of this action as a class action, and the Proposed Class has a high degree of cohesion.

24. Defendant has acted or refused to act—and continues to act—on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole.

## FACTUAL ALLEGATIONS

### A. The NCAA and college baseball.

25. College sports have enjoyed tremendous revenue growth over the last two decades. In 2021, the NCAA itself earned $1.15 billion. That does not include the amount earned by the NCAA's members individually. In 2019, the NCAA Division I member schools generated close to $16 billion in athletics revenue collectively, some but not all of which are derived from ticket sales.

26. As the business of college sports has flourished, so too has NCAA college baseball grown. In 2022, the University of Arkansas drew an average of 10,376 fans to each home baseball game, for a total of 363,153 fans. That narrowly edged out Louisiana State University's baseball team, which drew an average of 10,365 fans per game and a total of 362,759.

27. By comparison, the University of Arkansas men's basketball team—also a top-level and popular program—drew less than 300,000 fans in a recent year, meaning that their college baseball team drew more total fans than their college basketball team (though college baseball plays more games per year than basketball).

28. That is just the regular season attendance. At the end of each season, the NCAA hosts a baseball tournament that begins with 64 teams. Teams play the first round at 16 regional sites. The winner of each regional advances to one of eight super regional series. In 2021, one of the eight super-regional series in drew 40,140 fans over three games, for an average of 13,380 fans per game. The other seven super-regional series were well-attended as well.

29. The final eight teams of the post-season tournament then advance to the NCAA's College World Series in Omaha. The NCAA's 2022 College World Series drew over 366,000 fans, which was a record. That amounts to 24,407 fans per game.

30. All College World Series games are broadcast nationally on ESPN's networks. ESPN contracted for the right to air the College World Series games as part of a $500 million broadcast deal that also gives ESPN the broadcast rights for college baseball, women's college basketball, college softball, and other NCAA championship events.

31. The earlier rounds of the NCAA's post-season baseball tournament are also televised. In 2022, ESPN televised all games from the NCAA baseball super regionals.

32. The 2019 College World Series championship game was the most watched baseball game on ESPN that year, drawing more viewers than any professional game aired on ESPN. In 2022, the College World Series averaged 1.1 million viewers per game on ESPN. The first game of the championship series averaged 1.63 million viewers and peaked at 1.9 million viewers.

**B. The illegal unpaid coaching position.**

33. The NCAA, as an unincorporated association of member schools, has adopted three divisions, with Division I being the top tier division and the division at issue in this case. The most talented athletes at the collegiate level are concentrated in the markets for Division I sports. Division I essentially *is* the relevant market for elite college sports. The NCAA and its members have long adopted and enforced rules that regulate college sports. These rules concern everything from how the games are played to standards of amateurism to rules governing the size of athletic squads and coaching staffs.

34. Currently, around 300 NCAA Division I member schools have baseball teams. These schools compete with each other not only on the field, but also in the market for skilled labor, i.e., for coaches. To pursue their competitive goals, the NCAA's member institutions compete with each other in hiring coaches for athletic teams, including for assistant baseball coaches.

35. Defendants place importance on the hiring of coaches who will make their programs competitive and help draw high-level players to their universities. A competitive program will, in turn, elevate the overall profile of the university and allow the university to benefit in many ways.

36. An individual wishing to pursue a coaching career in Division I baseball has no choice but to seek employment at an NCAA member institution; these member institutions are the sole participants in this market.

37. In a proper labor market, each school would openly compete for coaches and pay them the salaries that the market commanded.

38. For instance, the member schools compete for head college baseball coaches, and the salaries of head college baseball coaches has increased. Some Division I head baseball coaches now earn over $1 million per year. The head coach at the University of Tennessee earns an annual salary of $1.5 million, while the head coach at the University of Arkansas earns $1.25 million annually. The salaries of the paid assistant coaches have likewise increased at many schools. The two paid assistants at the University of Arkansas, for instance, earn $300,000 and $225,000 annually, along with other benefits.

39. Despite this competition for services, the NCAA and its member schools have set a cap on the number of paid coaches, and have agreed to cap the compensation for one type of assistant baseball coach at zero. This artificial restraint prevents these unpaid assistant coaches from receiving compensation in accord with what the open market commands.

40. The NCAA and its member schools reached this agreement in their bylaws. The NCAA constitution provides that member schools will enact legislation that governs the conduct of the members' athletic programs. The member schools agree to administer their athletics programs in accordance with the constitution, bylaws, and other legislation made by the association.

41. The bylaws and related legislation are thus proposed, drafted, voted upon, and agreed upon by NCAA members, who are horizontal competitors in the market at issue.

42. The NCAA's bylaws limit each member school to only three paid baseball coaches. NCAA Bylaw 11.7.6. Given the demands of the sport, Division I schools have recognized that baseball programs need another coach.

43. The schools therefore agreed to another NCAA bylaw that allows for an additional baseball coach to be hired by Division I members. But that coach cannot be paid.

44. The bylaw calls this coach a "Volunteer Coach." NCAA Bylaw 11.01.6. The member schools, as horizontal competitors, have specifically conspired to agree that this coach may "not receive compensation or remuneration from the institution's athletics department or any organization funded in whole or in part by the athletics department or that is involved primarily in the promotion of the institution's athletics program (e.g., booster club, athletics foundation association)."

45. The same bylaw prohibits the volunteer coach from receiving more than two complimentary tickets (i.e., for friends or family) to home baseball games and prohibits the coach from receiving *any* tickets to other sports events hosted by the school (i.e., basketball or football). It also does not allow for meals to be provided, other than for "meals incidental to organized team activities (e.g., pre- or postgame meals, occasional meals, but not training table meals) or meals provided during a prospective student-athlete's official or unofficial visit" to the school.

46. Per the agreement, the member schools cannot pay for housing for the coach. They also cannot pay for health insurance or other employment benefits that the coaches would generally receive in an open market.

47. Upon information and belief, the vast majority of Division I baseball programs use this unpaid coaching position, and the bylaws are strictly enforced. Member institutions have no choice but to comply with these bylaws or face penalties. The NCAA employs a staff to ensure compliance with and to enforce bylaws and other legislation, and it expects the member schools, who likewise have a compliance department, to self-report any instance of noncompliance. Penalties can include fines, scholarship reductions, recruiting restrictions, or even bans from competition.

48. These unpaid coaches perform most of the same duties as the paid coaches, and it is generally a full-time job. During many weeks, it requires more than 40 hours of work. During training periods, they spend many hours each workday preparing for practice and working with players before, during, and after practice. During the season, they often spend significant time helping the team prepare for future opponents and assisting in forming strategy plans, and they travel with the team and participate in all pregame, postgame, and in-game activities. Some serve as first-base coaches during games while also specializing in overseeing an area of defense, such as being the outfield or infield coach. Others will serve as the hitting or pitching coach. Regardless, the services unpaid coaches provide have great value.

49. Per the bylaw, these unpaid coaches cannot recruit players, which limits the skills that these coaches could otherwise acquire to help boost their coaching resumes. They do, however, generally attend festivities held when the school hosts potential players on official and unofficial recruiting visits.

50. The result is a coach who performs significant valuable work, and who would be paid for that work in a competitive market, but who cannot be paid for that work.

51. Indeed, the bylaw prevents the coaches from even making the minimum wages required by federal and state wage-and-hour laws. In the absence of this rule, the coaches (who are not exempt from wage-and-hour laws) would at least earn wages in accord with these laws. Due to the value of their coaching services and the need for the services, Plaintiffs are informed and believe that

these coaches would earn more than the minimum wage—and in many cases much more—in an open, competitive market.

52. By adopting this rule, the NCAA and its member schools, acting as a buyer's cartel, have created an unreasonable restraint among themselves that insulates them from competition for the services of potential coaches on the member schools' baseball coaching staffs. It results in a restraint on price competition between and among member institutions for baseball coaching services, which has had and continues to have a substantially adverse effect on competition in the labor market for these coaches.

53. The bylaw has an anticompetitive effect—the NCAA adopted it to reduce voluntary coaches' salaries to $0. This bylaw was (and is) successful in artificially lowering the price of coaching services. Plaintiffs and class members suffered antitrust injury by receiving compensation materially below what they would have received in a free marketplace uncontaminated by NCAA's naked restraint on trade.

54. This horizontal restraint amongst competitors amounts to price fixing in the labor market. The relevant market in this case is the nationwide labor market for baseball coaches in NCAA Division I.

55. NCAA and member schools have the power to restrain volunteer coach compensation in any way and at any time they wish, without any meaningful risk of diminishing their market dominance. That is because volunteer coaches have no reasonable substitutes for their services. Possible alternatives, like NCAA Division II and III, the National Association of Intercollegiate Athletics ("NAIA"), the National Christian College Athletic Association ("NCCAA"), and the major professional sports leagues are not viable or reasonable substitutes. Limited numbers of baseball coaching positions exist at the professional level, and the demands of professional coaching differ from coaching at the collegiate level. Volunteer coaches have nowhere else to go but Division I for those looking to provide their services in the elite, amateur collegiate level. Even lower amateur levels are not reasonably comparable. Division II and III schools are less athletically competitive and lack the resources of Division I schools. Similarly, NAIA's website claims that NCAA schools "spend an average of 60 percent more on athletics."

56. As a result, these coaches have been denied the benefits of free and open competition, as the level of compensation has been fixed at a level below what would be earned in a free and competitive market. Competition has been restricted and lessened, the non-compensation cap does not respond to normal free market forces, and the coaches have been unable to freely negotiate with member schools for services and have been forced to provide services at the fixed and reduced rate of zero.

57. The effect on compensation impacts all similarly situated employees because it significantly decreases the competition for college baseball assistant coaches and prevents them from receiving compensation for the work performed.

58. This market is national in scope. The restraint applies to all member schools, and coaches often leave a school in one part of the country to accept employment in another region. Further, the member schools frequently engage in competitive play with other member schools across state lines, including for baseball, and the games are frequently broadcast across state lines.

59. Over the past several years, the NCAA's member schools have repeatedly upheld this bylaw. Most recently in 2019, a proposal was made to amend the bylaws to allow Division I baseball programs to hire an additional paid assistant coach. In a vote, the NCAA's member schools rejected the proposal. The third assistant coach that nearly all programs employ thus remained unpaid.

60. NCAA and its member schools lack any procompetitive justifications in support of the bylaw.

61. First, the bylaw does not promote the retention of entry-level coaching positions because the bylaw does nothing to ensure that coaches with substantial experience will not fill the position.

62. Second, cost-cutting is not a valid procompetitive justification, and coaches have less incentive to improve their performance if their salaries are capped (at $0). Moreover, capping volunteer coach salaries would not necessarily equalize the amount of money Division I schools would be permitted to spend on their baseball programs. There is no reason to think that the money saved by a school on the salary of a volunteer coach would not be put into another aspect of the

school's baseball program, such as equipment or facilities or even another coach's salary, thereby increasing inequity in that area.

63. Third, the bylaw does not help maintain competitive balance between the member schools. Member schools can already spend different amounts of money on facilities and on their coaches, with the larger schools often being able to pay substantially higher salaries and attract more qualified coaches than smaller schools. Moreover, without a draft for players like in professional leagues, the talent level of players can often be aggregated at a small handful of teams instead of being spread throughout the various member schools to achieve competitive parity. Both of these factors have a far greater negative impact on competitive balance than paying volunteer coaches a salary.

**C. The effect of Defendant's illegal conduct on Plaintiffs.**

*Taylor Smart*

64. The University of Arkansas hired Plaintiff Taylor Smart as a baseball coach in the summer 2018. He worked as a "volunteer coach" from summer 2018 until after the 2020 season.

65. Mr. Smart possessed valuable coaching skills gained from playing college and professional baseball and from previously serving as the graduate assistant baseball coach at the University of Arizona.

66. Mr. Smart's duties included being an on-field coach during games. The University of Arkansas hired him to be the first-base coach when the team batted during games. He also had responsibilities for overseeing the team's baserunning and catchers; for being the team's assistant hitting coach; for helping break down video for hitters; for writing scouting reports; and for developing practice plans and helping run practices.

67. Mr. Smart considered this job to be a full-time coaching job. He worked out of the same offices as the paid coaches and believes he worked comparable hours to them, often 5 or 6 days per week. On practice days, he would often arrive to the stadium around mid-morning and practice would not conclude until late afternoon. On game days, the days could be much longer. The team traveled significant distances for away games, and he traveled to these away games just like the paid coaches.

68. Mr. Taylor had to work a second job, as a camp coordinator for the school, to earn money. But this job was in addition to his job as the volunteer assistant baseball coach. He was not compensated for his job as the volunteer assistant baseball coach. He did not receive housing, and did not receive health insurance or other employment benefits. And once the Covid-19 pandemic began, Mr. Taylor could not even earn money from the second job as a camp coordinator because camps could not take place. This exacerbated the inequities of the NCAA's restraint in the market: the other assistant coaches on paid salaries continued to receive their salaries and benefits once the 2020 season was canceled.

69. Defendant and its member schools' conspiracy greatly harmed Mr. Smart. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market, and from being paid at least the wages required by wage-and-hour laws. But for the illegal and unfair restraints put in place, Mr. Smart would have received greater remuneration for his services as a college baseball coach than he received.

*Michael Hacker*

70. The University of California, Davis hired Plaintiff Michael Hacker as a baseball coach in early fall 2019. He worked as a "volunteer coach" from then until after the 2021 season.

71. Mr. Hacker possessed valuable coaching skills gained from playing college and professional baseball and from previously serving as an assistant baseball coach at a junior college and serving in other prior coaching roles.

72. Mr. Hacker's duties included being the pitching coach. This meant that he was responsible for developing and overseeing the pitchers—approximately half the team—during practices and games. He also had responsibility for developing practice plans and helping run practices, and for breaking down video and putting together plans for opponents.

73. Mr. Hacker considered this job to be a full-time coaching job. He worked out of the same offices as the paid coaches and believes he worked comparable hours to them, often 5 or 6 days per week. On practice days, he would often arrive to the stadium around mid-to-late morning and practice would not conclude until late afternoon. Even on non-practice days, he would sometimes have to oversee players while they attended study hall. On game days, the days could be much longer.

The team traveled significant distances for away games, and he traveled to these away games just like the paid coaches.

74. Mr. Hacker had to work additional jobs, by for instance giving private lessons to kids and overseeing youth baseball teams, to earn money. But this work was in addition to his job as the volunteer assistant baseball coach. He was told that he would also be able to coordinate camps at the school to earn money but was unable to do so because of the COVID-19 pandemic.

75. He was not compensated for his job as the volunteer assistant baseball coach. He did not receive housing, and did not receive health insurance or other employment benefits.

76. Defendant and its member schools' conspiracy greatly harmed Mr. Hacker. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market, and from being paid at least the wages required by wage-and-hour laws. But for the illegal and unfair restraints put in place, Mr. Hacker would have received greater remuneration for his services as a college baseball coach than he received.

**COUNT I – Violations of Section 1 of the Sherman Act**
**(Brought by Plaintiffs on Behalf of the Class)**

77. Plaintiffs repeat, re-allege and incorporate by reference the preceding paragraphs of this Complaint as if more fully set forth herein.

78. Defendant and others entered into and engaged in unlawful agreements in restraint of the trade and commerce described above. These actions violated and continue to violate Section 1 of the Sherman Act, 15 U.S.C. § 1. Since at least four years before the filing of this action, the trusts formed by Defendant's cartel have restrained trade and commerce in violation of Section 1 of the Sherman Act, and the behavior continues today.

79. This combination and conspiracy by the NCAA and its members schools (which possess a dominant position in the relevant market) has resulted in, and will until restrained continue to result in, anti-competitive effects, including *inter alia*: (a) fixing the compensation of Plaintiffs and the Proposed Class at artificially low levels, since Plaintiffs and class members have been unable to negotiate for compensation, and have been unable to receive even the minimum wages required by

state and federal wage-and-hour laws; and (b) eliminating or suppressing, to a substantial degree, competition among Defendants for skilled labor in the market.

80. As a direct and proximate result of Defendant's combinations and contracts to restrain trade, suppress salaries, and eliminate competition for skilled labor, Plaintiffs and members of the Proposed Class have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits.

81. As a result, Plaintiffs and the Proposed Class have suffered damages in an amount to be proved at trial.

82. Defendant's agreements or conspiratorial acts were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of Defendant's affairs.

83. Defendant's agreements, combinations and/or conspiracies violate Section 1 of the Sherman Act, whether under a *per se*, "quick look," or "rule of reason" analysis.

84. Defendant's agreements or conspiracies have no procompetitive effect or purposes, or alternatively, less restrictive rules can be implemented to achieve any purported procompetitive objectives.

85. Plaintiffs and the Proposed Class seek three times their damages caused by Defendant's violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendant from ever again entering into similar agreements in violation of Section 1 of the Sherman Act.

**COUNT II – Quantum Meruit Under Various State Laws**
**(Brought by Plaintiffs on Behalf of the Class)**

86. Plaintiffs repeat, re-allege and incorporate by reference the preceding paragraphs of this Complaint as if more fully set forth herein.

87. In permitting and ultimately hiring these coaches as "volunteer" coaches, Defendant and its member schools expected and requested these coaches to perform valuable services.

88. These "volunteer" coaches performed and continue to perform these services, for which compensation is expected—and is in fact required by wage-and-hour laws. They were not amateur coaches and expected and expect to be paid for all work performed.

89. Defendant and its member schools benefited and continue to benefit from these services. These coaches are needed for Defendant and its member schools to field Division I college baseball teams, and to continue to allow Defendant and its member schools to engage in baseball competition that draw fans and that are broadcast by paying television providers. Yet Defendant and its member schools have not compensated Plaintiffs and the Proposed Class for these services.

90. Under quantum meruit, Defendant owes Plaintiffs and class members the compensation that the parties would expect in the open market, in a system in which the "volunteer" coaches could freely negotiate for compensation, or at least the amounts required by wage-and-hour laws.

**COUNT III – Unjust Enrichment Under Various State Laws**
**(Brought by Plaintiffs on Behalf of the Class)**

91. Plaintiffs repeat, re-allege and incorporate by reference the preceding paragraphs of this Complaint as if more fully set forth herein.

92. By not permitting the compensation of "volunteer" coaches, and by ultimately not compensating them for their services, Defendant and its member schools have been aware that they are receiving services without paying for them, and accepted and retained this benefit under circumstances that are inequitable or unjust, i.e., by depriving Plaintiffs and the Proposed Class of compensation that would be called for on the open market and by refusing to even pay the minimum wages required by state and federal wage-and-hour laws.

93. Plaintiff and class members are thus entitled to restitution for this unjust enrichment in an amount to be determined at trial.

**COUNT IV – Violation of California's Unfair Competition Law**
**(Brought by Plaintiffs on Behalf of the Class)**

94. Plaintiffs repeat, re-allege and incorporate by reference the preceding paragraphs of this Complaint as if more fully set forth herein.

95. The conduct of Defendant and its member schools violates Section 17200, *et seq.*, of the California Business and Professions Code.

96. The conduct is unfair, unlawful, or fraudulent because, *inter alia*, it violates state and federal antitrust laws and state and federal wage-and-hour laws.

97. Further, the conduct is unfair because it deprives Plaintiffs and members of the Proposed Class of basic economic rights, offends public policy, and is immoral, oppressive, or unscrupulous, including the right to earn a bargained-for wage in exchange for work performed, at a rate at what the market demands, or at least at a rate that wage-and-hour laws require.

98. The conduct has caused and is causing damage and irreparable injury to Plaintiffs and class members. Plaintiffs and class members are entitled to disgorgement of Defendant's profits and injunctive relief and restitution, plus interest and attorneys' fees pursuant to California Code of Civil Procedure § 1021.5.

**COUNT V – Declaratory Judgment Act**
**(Brought by Plaintiffs on Behalf of the Class)**

99. Plaintiffs repeat, re-allege and incorporate by reference the preceding paragraphs of this Complaint as if more fully set forth herein.

100. There is an actual case or controversy within the court's jurisdiction.

101. Plaintiffs and members of the Proposed Class are entitled to a declaration that Defendant and its members' relevant bylaws are illegal under various state and federal laws, including but not limited to antitrust laws and wage laws, and to follow-on relief that flows from this declaration and that the Court deems proper.

**Prayer for Relief**

WHEREFORE, Plaintiffs, on their own and on behalf of all other similarly situated persons, seek the following relief:

- Certification of the Proposed Class, as set forth above, pursuant to Rule 23 of the Federal Rules of Civil Procedure;
- A finding that Defendant has violated Section 1 of the Sherman Act by engaging in an illegal trust, contract, combination, or conspiracy, and that Plaintiffs and class members have been damaged and injured in their business and property as a result of this violation;
- A finding that the alleged combinations and conspiracy be adjudged and decreed as violations of the Sherman Act;
- Actual damages in an amount to be determined at trial;
- Treble damages awarded under the Sherman Act to Plaintiffs and class members for the damages sustained by them as a result of Defendant's conduct;
- An award of quantum meruit to Plaintiffs and class members under various state laws for the value of the services provided, or at least for the amount of compensation that would have been required to be paid by wage-and-hour laws;
- Restitution to Plaintiffs and class members for the amount of unjust enrichment that has taken place under various state laws;
- Restitution and disgorgement of benefits under California's Unfair Competition Law;
- Judgment entered against Defendant for the amount to be determined and as permitted by law and equity;
- Designation of Plaintiffs as class representatives and designation of counsel of record as Class Counsel;
- Pre-judgment and post-judgment interest as permitted by law;
- A declaratory judgment that the practices complained of herein are unlawful;
- An injunction enjoining Defendant from continuing or reinstating its unfair and unlawful policies and practices as described within this Complaint;

- Reasonable attorneys' fees and costs of the action;
- Reasonable incentive awards for the Plaintiffs;
- Such other relief as the Court shall deem just and proper.

**Demand for Jury Trial**

Pursuant to Federal Rule of Civil Procedure Rule 38(a), Plaintiffs demand a jury trial as to all issues triable by a jury.

DATED: November 29, 2022

By: */s/ Garrett R. Broshuis*
KOREIN TILLERY, LLC
Stephen M. Tillery (*pro hac vice* forthcoming)
Steven M. Berezney
Garrett R. Broshuis

*Attorneys for Plaintiffs*