CAROLYN HOECKER LUEDTKE (State Bar No. 207976)
carolyn.luedtke@mto.com
JUSTIN P. RAPHAEL (State Bar No. 292380)
Justin.Raphael@mto.com
CHRISTOPHER CRUZ (State Bar No. 346128)
Christopher.Cruz@mto.com
JAVIER KORDI (State Bar No. 348358)
Javier.Kordi@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:(415) 512-4000
Facsimile:(415) 512-4077

*Attorneys for Defendant National
Collegiate Athletic Association*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAYLOR SMART AND MICHAEL HACKER, individually and on behalf of all those similarly situated, <br><br>          Plaintiffs, <br><br>     vs. <br><br> NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association, <br><br>          Defendants. | Case No. 2:22-cv-02125 <br><br> **DEFENDANT NCAA'S NOTICE OF MOTION AND MOTION TO DISMISS MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Judge:    Hon. William B. Shubb <br> Courtroom: 5 <br> Date:     May 15, 2023 <br> Time:     1:30 p.m. |

**NOTICE OF MOTION AND MOTION TO DISMISS**

PLEASE TAKE NOTICE that, on May 15, 2023, at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 5 of this Court, located at 501 I Street, Sacramento, California, Defendant National Collegiate Athletic Association ("NCAA") will, and hereby does, move this Court pursuant to Federal Rule of Procedure 12 for an order dismissing Plaintiffs' Complaint in the event that this Court denies the NCAA's concurrent motion to transfer this case to the United States District Court for the Southern District of Indiana pursuant to 28 U.S.C. § 1404(a) for the convenience of the parties and witnesses and in the interest of justice.

This Motion is based upon the following Memorandum of Points and Authorities, all other materials supporting this Motion, all pleadings on file, and any other matter submitted before or at the hearing on the Motion.

DATED:  February 24, 2023    MUNGER, TOLLES & OLSON LLP

By:  */s/Carolyn Hoecker Luedtke*
      CAROLYN HOECKER LUEDTKE

*Attorneys for Defendant National Collegiate Athletic Association*

1

## TABLE OF CONTENTS

Page

2

3  I.    INTRODUCTION...............................................9

4  II.   RELEVANT BACKGROUND.......................................13

5        A.   The NCAA and the Challenged Bylaws...................13

6        B.   Plaintiff Smart Agreed To Volunteer As A Coach At
             Arkansas............................................14

7

8        C.   Plaintiff Hacker Agreed To Volunteer As A Coach At
             UC Davis............................................15

9  III.  LEGAL STANDARDS..........................................16

10 IV.   ARGUMENT.................................................17

11       A.   Plaintiffs' Federal Antitrust Claim Should Be
             Dismissed...........................................17

12
             1.   Plaintiffs Have Failed to Allege Causal
13                Antitrust Injury...............................17

14           2.   Plaintiffs Have Failed to State an Antitrust
                 Claim Under the Rule of Reason.................19

15
         B.   Plaintiffs' Restitution-Based Claims Should Be
16            Dismissed...........................................26

17           1.   The Law of the State Where Each Plaintiff
                 Worked as Volunteer Coach Applies to His Claim...26
18
             2.   Plaintiffs' Unjust Enrichment Claims Should Be
19                Dismissed......................................29

20               (a)  Plaintiff Hacker's Unjust Enrichment
                     Claim Should Be Dismissed..................29
21
                 (b)  Plaintiff Smart's Unjust Enrichment Claim
22                    Should Be Dismissed........................31

23           3.   Plaintiffs' Quantum Meruit Claims Should Be
                 Dismissed......................................32
24
                 (a)  Plaintiff Hacker's Quantum Meruit Claim
25                    Should Be Dismissed........................32

26               (b)  Plaintiff Smart's Quantum Meruit Claim
                     Should Be Dismissed........................33

27

28

DEFENDANT NCAA'S MOTION TO DISMISS

4.    Plaintiffs Lack Standing to Assert Claims Under the Laws of States Where They Did Not Work as Volunteer Coaches........................34

C.    Plaintiffs' UCL Claims Should Be Dismissed...........36

      1.    Plaintiff Smart Has No UCL Claim.................36

      2.    Plaintiffs Have Failed to Plead a UCL Claim......36

            (a)   Unlawful Prong...........................36

            (b)   Fraudulent Prong.........................39

            (c)   Unfair Prong.............................39

      3.    Plaintiffs' Restitution Claim Under the UCL Should Be Dismissed............................41

D.    Plaintiffs' Declaratory Judgment Claim Should Be Dismissed...........................................43

V.   CONCLUSION..............................................45

DEFENDANT NCAA'S MOTION TO DISMISS

1

**TABLE OF AUTHORITIES**

2

Page(s)

3

FEDERAL CASES

4

*In re Adobe Sys., Inc. Privacy Litig.*,
   66 F. Supp. 3d 1197 (N.D. Cal. 2014) ..........................36

*Agnew v. NCAA*,
   683 F.3d 328 (7th Cir. 2012) ................................21

*AliveCor, Inc. v. Apple Inc.*,
   592 F. Supp. 3d 904 (N.D. Cal. 2022) ........................24

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*,
   190 F.3d 1051 (9th Cir. 1999) ...............................18

*Anderson v. Apple Inc.*,
   500 F. Supp. 3d 993 (N.D. Cal. 2020) ........................43

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .........................................17

*Astiana v. Hain Celestial Grp., Inc.*,
   783 F.3d 753 (9th Cir. 2015) ................................30

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
   9 F.4th 1102 (9th Cir. 2021) ................................27

*Bayer v. Neiman Marcus Grp., Inc.*,
   861 F.3d 853 (9th Cir. 2017) ............................45, 46

*Beaver v. Tarsadia Hotels*,
   816 F.3d 1170 (9th Cir. 2016) ...............................38

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .........................................17

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
   532 F.3d 1111 (10th Cir. 2008) ..............................22

*Carlin v. DairyAmerica, Inc.*,
   978 F. Supp. 2d 1103 (E.D. Cal. 2013) .......................29

*Casas v. Victoria's Secret Stores, LLC*,
   2015 WL 13446989 (C.D. Cal. Apr. 9, 2015) ...................42

*Catlin v. Washington Energy Co.*,
   791 F.2d 1343 (9th Cir. 1986) ...............................18

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*City of Los Angeles v. Lyons*,
   461 U.S. 95 .................................................17

*City of Oakland v. Oakland Raiders*,
   20 F.4th 441 (9th Cir. 2021) ...........................18, 19

*City of Oakland v. Oakland Raiders*,
   445 F. Supp. 3d 587 (N.D. Cal. 2020) ......................19

*City of San Jose v. Office of the Comm'r of Baseball*,
   776 F.3d 686 (9th Cir. 2015) ..............................41

*Corley v. FedEx Ground Package Sys. Inc.*,
   2022 WL 1805435 (C.D. Cal. June 2, 2022) ..................45

*Datel Holdings Ltd. v. Microsoft Corp.*,
   712 F. Supp. 2d 974 (N.D. Cal. 2010) ......................25

*Dawson v. NCAA*,
   932 F.3d 905 (9th Cir. 2019) ..........................38, 39

*Doe I v. Wal-Mart Stores, Inc.*
   572 F.3d 677 (9th Cir. 2009) ..............................31

*Fieger v. Mich. Supreme Court*,
   553 F.3d 955 (6th Cir. 2009) ..............................46

*Flores v. EMC Mortg. Co.*,
   997 F. Supp. 2d 1088 (E.D. Cal. 2014) .....................45

*Friends of Roeding Park v. City of Fresno*,
   848 F. Supp. 2d 1152 (E.D. Cal. 2012) .....................17

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
   386 F.3d 485 (2d Cir. 2004) ...............................22

*In re German Auto. Mfrs. Antitrust Litig.*,
   497 F. Supp. 3d 745 (N.D. Cal. 2020), aff'd, 2021 WL
   4958987 (9th Cir. Oct. 26, 2021) ..........................22

*Goldstein v. GM LLC*,
   445 F. Supp. 3d 1000 (S.D. Cal. 2020) .....................36

*Guzman v. Polaris Indus. Inc.*,
   49 F.4th 1308 (9th Cir. 2022) .............................43

*Hammerling v. Google LLC*,
   2022 WL 2812188 (N.D. Cal. July 18, 2022) .................45

*Hennessey v. NCAA*,
   564 F.2d 1136 (5th Cir. 1977) .................12, 23, 26, 34

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) ............................21, 26

*Jones v. Micron Tech. Inc.*,
   400 F. Supp. 3d 897 (N.D. Cal. 2019) ........................36

*Kamakahi v. Am. Soc. for Reprod. Med.*,
   2013 WL 1768706 (N.D. Cal. Mar. 29, 2013) ..................22

*Kelsey K. v. NFL Enters., LLC*,
   254 F. Supp. 3d 1140 (N.D. Cal. 2017), aff'd, 757 F.
   App'x 524 (9th Cir. 2018) ...................................20

*Lorenzo v. Qualcomm Inc.*,
   603 F. Supp. 2d 1291 (S.D. Cal. 2009) ......................41

*Mai v. Supercell Oy*,
   2023 WL 25713 (N.D. Cal. Jan. 3, 2023) .....................41

*Maya v. Centex Corp.*,
   658 F.3d 1060 (9th Cir. 2011) ..............................17

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ...............................29

*Md. Cas. Co. v. Pac. Coal & Oil Co.*,
   312 U.S. 270 (1941) ........................................45

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
   354 F.3d 661 (7th Cir. 2004) ...............................24

*MH Pillars Ltd. v. Realini*,
   277 F. Supp. 3d 1077 (N.D. Cal. 2017) ......................30

*Mohammed v. Am. Airlines, Inc.*,
   2019 WL 3577160 (N.D. Cal. Aug. 6, 2019) ...................44

*Mort v. United States*,
   86 F.3d 890 (9th Cir. 1996) ................................42

*Nacarino v. Chobani, LLC*,
   2021 WL 3487117 (N.D. Cal. Aug. 9, 2021) ...................43

*In re Napster, Inc. Copyright Litig.*,
   354 F. Supp. 2d 1113 (N.D. Cal. 2005) ......................44

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
   513 F.3d 1038 (9th Cir. 2008) ....................21, 22, 24

*O'Connor v. Uber Techs., Inc.*,
   58 F. Supp. 3d 989 (N.D. Cal. 2014) ........................37

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ......................................21

*Or. Prescription Drug Monitoring Program v. United States DEA*,
   860 F.3d 1228 (9th Cir. 2017) .............................35

*Paladin Assocs., Inc. v. Montana Power Co.*,
   328 F.3d 1145 (9th Cir. 2003) .............................25

*Paskenta Band of Nomlaki Indians v. Crosby*,
   2016 WL 1587233 (E.D. Cal. Apr. 20, 2016) .................30

*Plush Lounge Las Vegas LLC v. Hotspur Resorts Nevada Inc*,
   2008 WL 11338198 (C.D. Cal. Sept. 23, 2008), aff'd
   sub nom., 371 F. App'x 719 (9th Cir. 2010) ...............25

*Reilly v. Apple Inc.*,
   578 F. Supp. 3d 1098 (N.D. Cal. 2022) .................21, 23

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
   471 F. Supp. 3d 981 (N.D. Cal. 2020) ......................20

*Richardson v. Se. Conf.*,
   2020 WL 1515730 (N.D. Ill. Mar. 30, 2020) .............31, 33

*Rock v. NCAA*,
   928 F. Supp. 2d 1010 (S.D. Ind. 2013) .....................21

*Rojas v. Bosch Solar Energy Corp.*,
   386 F. Supp. 3d 1116 (N.D. Cal. 2019) .................30, 36

*Rose v. NCAA*,
   346 F. Supp. 3d 1212 (N.D. Ill. 2018) .................32, 33

*Rustico v. Intuitive Surgical, Inc.*,
   993 F.3d 1085 (9th Cir. 2021) .........................27, 28

*Schmidt v. Ford Motor Co.*,
   972 F. Supp. 2d 712 (E.D. Pa. 2013) .......................33

*Senne v. Kansas City Royals Baseball Corp.*,
   934 F.3d 918 (9th Cir. 2019) ..................27, 28, 29, 30

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020) ..........................42, 43

*Sprewell v. Golden State Warriors*,
   266 F.3d 979 (9th Cir. 2001) ..............................17

*Stearns v. Select Comfort Retail Corp.*,
  2009 WL 1635931 (N.D. Cal. June 5, 2009) .....................18

*Streamcast Networks, Inc. v. Skype Techs., S.A.*,
  547 F. Supp. 2d 1086 (C.D. Cal. 2007) .......................25

*In re Super Premium Ice Cream Distrib. Antitrust Litig.*,
  691 F. Supp. 1262 (N.D. Cal. 1988) ..........................26

*Tanaka v. Univ. of S. Cal.*,
  252 F. 3d 1059 (9th Cir. 2001) ..........................24, 25

*United States v. E. I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956) .........................................26

*Van Mourik v. Big Heart Pet Brands, Inc.*,
  2018 WL 1116715 (N.D. Cal. Mar. 1, 2018) ....................36

*In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*,
  601 F. Supp. 3d 625 (C.D. Cal. 2022) ........................44

STATE CASES

*Bardin v. DaimlerChrysler Corp.*,
  136 Cal. App. 4th 1255 (2006) ...............................40

*Chavez v. Whirlpool Corp.*,
  93 Cal. App. 4th 363 (2001) .................................42

*Day v. Alta Bates Med. Ctr.*,
  98 Cal. App. 4th 243 (2002) .................................34

*Dinosaur Dev., Inc. v. White*,
  216 Cal. App. 3d 1310 (1989) ............................31, 32

*Earhart v. William Low Co.*,
  25 Cal. 3d 503 (1979) .......................................34

*Graham v. Bank of Am., N.A.*,
  226 Cal. App. 4th 594 (2014) ................................40

*Hedging Concepts, Inc. v. First All. Mortg. Co.*,
  41 Cal. App. 4th 1410 (1996) ...................24, 34, 42, 45

*Hodge v. Superior Court*,
  145 Cal. App. 4th 278 (2006) ................................42

*KBX, Inc. v. Zero Grade Farms*,
  2022 Ark. 42, 639 S.W.3d 352 ................................35

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) .................................42, 44

*Kwikset Corp. v. Superior Court.*,
  51 Cal. 4th 310 (2011) ......................................41

*Peterson v. Cellco P'ship*,
  164 Cal. App. 4th 1583 (2008) ..............................30

*Port Med. Wellness, Inc. v. Conn. Gen. Life Ins. Co.*,
  24 Cal. App. 5th 153 (2018) ................................34

*Sullivan v. Oracle Corp.*,
  51 Cal. 4th 1191 (2011) ....................................37

*Trickett v. Spann*,
  2020 Ark. App. 552, 613 S.W.3d 773 ....................29, 33

**FEDERAL STATUTES**

Declaratory Judgment Act, 28 U.S.C. § 2201..............13, 44, 45

Sherman Act § 1 ..............................................18

**STATE STATUTES**

Cal. Bus. & Prof. Code. § 17200...............................38

California's Unfair Competition Law ("UCL").............13, passim

Consumer Legal Remedies Act...................................43

**FEDERAL RULES**

Rule 12(b)(1)................................................17

Rule 12(b)(6)................................................17

**OTHER AUTHORITIES**

*Division I Proposal 2022-28: Athletics Personnel and*
  *Recruiting – Limitations on the Number of Coaches and*
  *Off-Campus Recruiters and Recruiting Coordination*
  *Functions*,
  https://web3.ncaa.org/lsdbi/search/proposalView?id=10
  6853 (last visited Feb. 23, 2023) ..........................15

1          **MEMORANDUM OF POINTS AND AUTHORITIES**

2 **I.    INTRODUCTION**

3          In sports, teams must play by the same rules.  Sports leagues

4 of all kinds have rules about how many players and coaches each

5 team can have.  The NCAA's Division I is no different.  The

6 colleges and universities that compete against each other in

7 Division I decided that each Division I baseball team may have

8 only three paid coaches.  The Plaintiffs in this case allege that

9 such a commonsense rule was, in fact, an antitrust conspiracy.

10 Each Plaintiff agreed to be a volunteer coach at a Division I

11 university that had three paid coaches but now seeks payment from

12 the NCAA for their work even though they allege that they were

13 hired by universities, not the NCAA.  In short, Plaintiffs allege

14 that (1) antitrust law prohibits members of a sports league from

15 deciding how many coaches each team can pay, (2) that they are

16 entitled to compensation for work that they agreed to provide as

17 volunteers knowing that they would not receive pay, and (3) that

18 the NCAA should be responsible for paying them even though they

19 were hired by a university.  Those allegations do not state a

20 claim.  In the event that the Court does not grant the NCAA's

21 concurrently filed motion to transfer the case to the Southern

22 District of Indiana where the NCAA has its headquarters and where

23 its witnesses reside, the Court should dismiss Plaintiffs' claims.

24          **Federal Antitrust Claims.**  Plaintiffs have not pled a claim

25 that the NCAA bylaws limiting Division I baseball teams to three

26 paid coaches are an unlawful antitrust conspiracy.

27          <u>No Causal Antitrust Injury</u>.  Plaintiffs failed to allege

28 causal antitrust injury, which is a required element of their

antitrust claim. Plaintiffs assert in conclusory terms that they would have earned more if the NCAA's bylaws permitted Division I baseball teams to pay four coaches rather than three. Complaint ("Compl.") ¶¶ 69, 76. However, Plaintiffs do not allege facts regarding why or how that would be so. Critically, Plaintiffs do not allege that the universities that hired them as volunteer coaches (or any other Division I college or university) would have hired them as paid coaches if the NCAA's bylaws permitted it. Thus, all Plaintiffs have alleged is that *some* volunteer coaches might have been paid more if the NCAA's bylaws had permitted four paid Division I baseball coaches per team. That does not state an antitrust claim as to the Plaintiffs *themselves*. Courts in this Circuit have dismissed federal antitrust claims for failure to allege facts explaining how the alleged restraint harmed the individual plaintiffs. This Court should do the same where Plaintiffs have not explained how they would have been better off if the NCAA had not adopted the bylaws they are challenging. That pleading deficiency requires dismissal of their federal antitrust claim regardless of what level of scrutiny applies to that claim.

<u>Failure to Define a Relevant Market</u>. Even if Plaintiffs have alleged causal antitrust injury, they have not pled a claim under the "rule of reason" because they have failed to allege that the NCAA has market power in a proper relevant market. The rule of reason requires Plaintiffs to define a market in order to show that they have market power. Plaintiffs' antitrust claim makes no sense if the NCAA's Division I members lack market power over coaches. If coaches have alternatives to coaching in NCAA Division I, then it would make no sense for Division I members to

-10-

try to suppress the coaches' compensation as Plaintiffs allege. Coaches would simply seek better pay elsewhere, defeating the purported scheme.

Plaintiffs' alleged market limited to coaching baseball in NCAA Division I is improperly narrow because it excludes coaches' alternatives to coaching in Division I.  As the Fifth Circuit observed in upholding a bylaw limiting the number of assistant coaches football and basketball teams could employ, there are "many opportunities for coaches to pursue their vocations in addition to those now partially limited with Division I members of the NCAA: colleges which are in other divisions of the NCAA; colleges which are not in the NCAA; professional teams; and high schools." *Hennessey v. NCAA*, 564 F.2d 1136, 1154 (5th Cir. 1977). Indeed, Plaintiff Hacker switched from coaching junior college baseball to being a volunteer coach.  Compl. ¶ 71.  If volunteer coaches wanted to earn salaries, they could similarly switch to coaching elsewhere.  Plaintiffs have not alleged plausible reasons why paid alternatives for working as volunteer coaches in Division I are not in the relevant market.  Thus, they have not plead a claim under the rule of reason.

**State Law Claims.**  Plaintiffs also have failed to plead state law claims for unjust enrichment and quantum meruit.  Although those claims vary from state to state (and Plaintiffs do not specify which state's law applies), their gravamen is that the plaintiff provided a benefit to the defendant with the expectation of payment for doing so.  Plaintiffs do not allege that they expected payment from anyone, let alone from the NCAA, when they agreed to work as *volunteers.*  Nor do Plaintiffs allege how their

-11-

coaching at one university conferred a benefit on the NCAA, a

membership organization of more than 1,000 colleges and

universities that serves an organizing function for

intercollegiate athletics.  Plaintiffs have therefore failed to

allege claims for unjust enrichment or quantum meruit.

**UCL Claims.**  Plaintiffs' claims under California's Unfair

Competition Law ("UCL") fail for numerous reasons.  To begin, the

UCL does not apply to Plaintiff Smart's coaching at the University

of Arkansas, which he does not allege had any connection to

California.  Moreover, because Plaintiffs have not pled an

antitrust violation, they cannot borrow one to state a UCL claim.

Plaintiffs have not alleged a UCL claim against the NCAA premised

on violations of wage and hour laws, either.  Plaintiffs have not

alleged that the NCAA hired them, let alone employed them; to the

contrary, they allege that they were "hired" by the universities

where they coached.  Compl. ¶¶ 64, 70.  Plaintiffs also have not

alleged any "fraudulent" statement by the NCAA that could support

a UCL claim.

**Declaratory Judgment Claim.**  Plaintiffs have not pled a claim

under the Declaratory Judgment Act.  Plaintiffs cannot obtain a

declaration that the NCAA is violating the law because they have

not alleged any violation.  Further, Plaintiffs cannot obtain a

declaration that the NCAA's current bylaws are unlawful because

they have not alleged that they currently are, or want to be,

Division I coaches.  Plaintiffs cannot ask this Court to

adjudicate bylaws in the abstract.

This Court should transfer Plaintiffs' claims to the Southern District of Indiana.  However, if the Court does not do so, it should dismiss Plaintiffs' claims for failure to state a claim.

## II.   **RELEVANT BACKGROUND**[1]

### A.   **The NCAA and the Challenged Bylaws**

The NCAA is a member association of more than 1,000 colleges and universities.  Compl. ¶ 8.  More than 300 of those institutions compete in Division I sports, including baseball. *Id.* ¶ 34.  The NCAA's member colleges and universities "adopted and enforced rules that regulate college sports."  *Id.* ¶ 33. Naturally, those rules "concern everything from how the games are played to standards of amateurism to rules governing the size of athletic squads and coaching staffs."  *Id.*  Indeed, like the members of many other associations of athletic competitors, the NCAA's member colleges and institutions that compete in Division I have adopted rules that "limit each member school to only three paid baseball coaches."  Compl. ¶ 42 (citing NCAA Division I Bylaw 11.7.6).

However, the NCAA's Division I members have also agreed to enable colleges and universities to retain additional personnel to provide additional instruction and support to baseball student-athletes.  Thus, the Division I bylaws permit baseball teams to have one "volunteer coach."  Compl. ¶¶ 43-44.  As the name suggests, Division I members cannot pay a volunteer baseball coach.  To ensure that a volunteer coach is not simply a fourth

---

[1] This Motion recites the facts as alleged in Plaintiffs' Complaint without conceding their truth.

paid coach that would violate the three-paid-coach limit, the
Division I bylaws specify that minimal, incidental non-cash
benefits such as two complementary tickets to home baseball games
or meals with the team before or after games do not make a
volunteer coach a paid coach.  Compl. ¶ 45.  In January 2023, the
NCAA's Division I membership amended the Division I bylaws to
permit four paid coaches in baseball and eliminate the volunteer
coach position effective July 2023.[2]

    **B.**   **Plaintiff Smart Agreed To Volunteer As A Coach At
Arkansas**

    According to Plaintiffs' Complaint, "[t]he University of
Arkansas hired Plaintiff Taylor Smart as a baseball coach in the
summer 2018," and he served as a "volunteer coach" from that time
until after the 2020 season.  Compl. ¶ 64.  Plaintiffs do not
allege that Smart accepted the volunteer coach position without
knowing that it would be unpaid.  To the contrary, he alleges that
NCAA bylaws prohibited Arkansas from paying him as a volunteer.
Compl. ¶ 43.  Plaintiffs allege that, as a volunteer coach, Smart
had responsibilities for "overseeing the team's baserunning and
catchers; for being the team's assistant hitting coach; for
helping break down video for hitters; for writing scouting
reports; and for developing practice plans and helping run
practices."  *Id.* ¶ 66.  Plaintiffs do not allege that the NCAA had
anything to do with assigning, directing or monitoring these

---

[2] *See Division I Proposal 2022-28: Athletics Personnel and
Recruiting – Limitations on the Number of Coaches and Off-Campus
Recruiters and Recruiting Coordination Functions,*
https://web3.ncaa.org/lsdbi/search/proposalView?id=106853 (last
visited Feb. 23, 2023).

responsibilities or selected Smart to be a volunteer coach at Arkansas.

Plaintiffs allege that "[b]ut for the illegal and unfair restraints put in place, Mr. Smart would have received greater remuneration for his services as a college baseball coach than he received." *Id.* ¶ 69. Plaintiffs, however, do not allege that the University of Arkansas or any other Division I institution would have hired Smart as a paid coach if the challenged bylaws were not in place.

C.   **Plaintiff Hacker Agreed To Volunteer As A Coach At UC Davis**

Plaintiffs' Complaint alleges that "[t]he University of California, Davis hired Plaintiff Michael Hacker as a baseball coach in early fall 2019." Compl. ¶ 70. Prior to that time, Hacker had served "as an assistant baseball coach at a junior college" and in "other prior coaching roles." *Id.* ¶ 71. Plaintiffs allege that Hacker was a volunteer baseball coach at UC Davis "until after the 2021 season." *Id.* ¶ 70. According to the Complaint, Hacker's duties as a volunteer coach at UC Davis "included being the pitching coach" as well as "developing practice plans and helping run practices, and for breaking down video and putting together plans for opponents." *Id.* ¶ 72. Plaintiffs do not allege that the NCAA had anything to do with assigning, directing or monitoring these responsibilities or selected Hacker to be a volunteer coach at UC Davis. Plaintiffs allege that "[b]ut for the illegal and unfair restraints put in place, Mr. Hacker would have received greater remuneration for his services as a college baseball coach than he received." *Id.* ¶ 76.

-15-

But Plaintiffs do not allege that UC Davis or any other Division I institution would have hired Smart as a paid coach if the challenged bylaws were not in place.

## III. <u>LEGAL STANDARDS</u>

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[L]abels and conclusions" or "a formulaic recitation of the elements of a cause of action" do not suffice. *Twombly*, 550 U.S. at 555. Thus, the court may disregard "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). Dismissal is also warranted where a complaint "lacks a cognizable legal theory" or "'relief is barred' for some legal reason." *Friends of Roeding Park v. City of Fresno*, 848 F. Supp. 2d 1152, 1160 (E.D. Cal. 2012) (quotations omitted).

Dismissal is warranted under Rule 12(b)(1) when a plaintiff fails to "alleg[e] an actual case or controversy" sufficient to confer Article III standing. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011)(quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101(1983))("Though lack of statutory standing requires dismissal for failure to state a claim, lack of Article III standing requires dismissal for lack of subject matter jurisdiction").

1   IV.   **ARGUMENT**

2       A.   **Plaintiffs' Federal Antitrust Claim Should Be Dismissed**

3           Plaintiffs have failed to allege a violation of Section 1 of

4   the Sherman Act because they have not alleged that the NCAA's

5   bylaws caused them any injury, which is a required element to

6   their claim.  In addition, Plaintiffs have failed to plead an

7   antitrust claim under a "rule of reason" theory because they have

8   not alleged a proper relevant antitrust market.

9           1.   **Plaintiffs Have Failed to Allege Causal Antitrust**
                 **Injury**

10

11          Plaintiffs have failed to allege a federal antitrust claim

12  because they have not alleged "causal antitrust injury", which is

    "an essential element of any remedy under the Sherman Act."

13  *Catlin v. Washington Energy Co.*, 791 F.2d 1343, 1347 (9th Cir.

14  1986).  An antitrust plaintiff must "allege some credible injury

15  caused by the unlawful conduct." *Am. Ad Mgmt., Inc. v. Gen. Tel.*

16  *Co. of California*, 190 F.3d 1051, 1056 (9th Cir. 1999).  Claims of

17  injury "where causation is highly speculative are not an

18  appropriate basis for an antitrust claim." *Stearns v. Select*

19  *Comfort Retail Corp.*, 2009 WL 1635931, at *13 (N.D. Cal. June 5,

20  2009); *see City of Oakland v. Oakland Raiders*, 20 F.4th 441, 459

21  (9th Cir. 2021) (affirming dismissal of antitrust claim where

22  alleged theory of injury was "too speculative to establish

23  antitrust standing").

24          For example, in *City of Oakland v. Oakland Raiders*, after the

25  Raiders moved to Las Vegas, the City of Oakland alleged that NFL

26  bylaws restricting the number of NFL teams violated the antitrust

27  laws.  The district court dismissed the claim because "Oakland had

28

not plausibly alleged that, but for the limited number of teams, Oakland would still have an NFL team." *City of Oakland v. Oakland Raiders*, 445 F. Supp. 3d 587, 601 (N.D. Cal. 2020).  The Ninth Circuit affirmed dismissal because "[t]he City ha[d] not alleged—and there is no way of knowing—what would have occurred in a more competitive marketplace."  20 F.4th at 459.  The Raiders' complaint did not answer questions critical to establishing that the challenge bylaw had caused it harm:  "Would new teams have joined the NFL?  Would they have found Oakland attractive?  Would the Raiders have left Oakland in any event?  Would the Raiders have stayed in the Bay Area, but not in Oakland?" *Id.* at 460*.*

Plaintiffs' allegations of causal antitrust injury here are equally deficient because they do not include facts connecting the challenged bylaws to the individual plaintiffs' alleged injury. Each Plaintiff alleges in conclusory terms that, "[b]ut for the illegal and unfair restraints put in place, [the Plaintiff] would have received greater remuneration for his services as a college baseball coach than he received."  Compl. ¶¶ 69, 76.  However, neither Plaintiff alleges any facts explaining how or why he would have received more compensation if the NCAA's bylaws did not limit Division I institutions to three paid baseball coaches.  Plaintiff Hacker does not allege that UC Davis would have hired him as a fourth paid assistant coach if NCAA bylaws did not prohibit Division I institutions from having four paid coaches.  Nor does Plaintiff Smart allege that the University of Arkansas would have hired him as a fourth paid assistant coach if NCAA bylaws did not prohibit Division I institutions from having four paid coaches.

Absent such allegations, Plaintiffs have merely alleged that some volunteer baseball coaches or coaches in general as a group would have earned more if the challenged bylaws did not exist. However, "[g]eneralized accusations of wrongdoing against [coaches] as a whole do not suffice" to allege antitrust injury. *Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1148 (N.D. Cal. 2017), *aff'd,* 757 F. App'x 524 (9th Cir. 2018) (dismissing antitrust claim alleging conspiracy to suppress earnings of NFL cheerleaders). "To survive dismissal, the complaint needs factual allegations that state a plausible claim for relief specifically as to plaintiff[s]" Hacker and Smart. *Id.* The Complaint here fails to do so because it does not allege that either Plaintiff would have been hired as a paid assistant baseball coach in Division I if the challenged bylaws did not exist. *See Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 997-98 (N.D. Cal. 2020) (dismissing antitrust claim where "Plaintiffs have failed to plausibly allege in a non-conclusory manner that they themselves have been injured").

Plaintiffs' failure to plead causal antitrust injury requires dismissal of their federal antitrust claim regardless of whether that claim is evaluated under a *per se*, "quick look" or "rule of reason" standard of scrutiny. *See* Compl. ¶ 83.

### 2.   Plaintiffs Have Failed to State an Antitrust Claim Under the Rule of Reason

Even if Plaintiffs had pled causal antitrust injury, their claim under the "rule of reason," Compl. ¶ 83, would still warrant dismissal because Plaintiffs have not pled a relevant antitrust market. *See Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1106 (N.D.

-19-

Cal. 2022) ("Where a complaint fails to adequately allege a relevant market underlying its antitrust claims, those claims must be dismissed."); *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1123 (9th Cir. 2018) (affirming dismissal of antitrust claim where "proposed product markets are 'facially unsustainable' because they fail to include many reasonabl[y] interchangeab[le] products") (quotations omitted); *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (claim is subject to dismissal where it is "apparent from the face of the complaint that the alleged market suffers a fatal legal defect").

"The rule of reason requires courts to conduct a fact-specific assessment of market power and market structure ... to assess the [restraint]' s actual effect on competition." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). "[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market" because "[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Id.* at 2285. Thus, under the rule of reason, a plausible market definition is "an essential predicate to the entire case." *Reilly*, 578 F. Supp. 3d at 1106 (dismissing antitrust claim for, among other things, failure to allege an adequate market); *see also Rock v. NCAA*, 928 F. Supp. 2d 1010, 1016, 1020-1023 (S.D. Ind. 2013) (granting motion to dismiss antitrust claim challenging cap on number of scholarships on Division I football and basketball teams for failure to plead a proper relevant market); *see also Agnew v. NCAA*, 683 F.3d 328, 345-47 (7th Cir. 2012) (same).

"To survive a motion to dismiss, 'the market must encompass the product at issue as well as all economic substitutes for the

product.'"  *In re German Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d 745, 756 (N.D. Cal. 2020), *aff'd*, 2021 WL 4958987 (9th Cir. Oct. 26, 2021) (quoting *Newcal Indus.*, 513 F.3d at 1045).  In economic terms, "the outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and the substitutes for it."  *Id.*  Here, Plaintiffs allege that NCAA Division I institutions are buyers of services sold by coaches, so the relevant market must include all buyers of coaching services "who are seen by sellers as being reasonably good substitutes." *Kamakahi v. Am. Soc. for Reprod. Med.*, 2013 WL 1768706, at *10 (N.D. Cal. Mar. 29, 2013); *see also Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008).

Market definition focuses on substitutes because they constrain efforts to harm competition.  *See Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) ("The relevant market is defined as all products "reasonably interchangeable by consumers for the same purposes," because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level."). If volunteer coaches can switch to other coaching opportunities, then it would make little sense for Division I member institutions to exploit coaches as Plaintiffs allege.  The coaches would simply coach elsewhere.

In upholding an NCAA bylaw capping the number of coaches on Division I football and basketball teams, the Fifth Circuit explained:  "There are, indeed, many opportunities for coaches to pursue their vocations in addition to those now partially limited

with Division I members of the NCAA: colleges which are in other divisions of the NCAA; colleges which are not in the NCAA; professional teams; and high schools." *Hennessey*, 564 F.2d at 1154. In fact, Plaintiffs' own Complaint identifies "[p]ossible alternatives" such as "Division II and III, the National Association of Intercollegiate Athletics ('NAIA'), the National Christian College Athletic Association ('NCCAA') and the major professional sports leagues.'" Compl. ¶ 55. Plaintiffs' Complaint does not plead facts supporting a plausible inference that a volunteer coach would not switch to one of these other more highly compensated positions. Plaintiffs' Complaint, in fact, alleges the opposite: that Plaintiff Hacker switched to serving as a volunteer coach after "serving as an assistant baseball coach at a junior college and serving in other prior coaching roles." Compl. ¶ 71.

Plaintiffs' "failure to address or analyze these plausible alternatives is fatal to [their] proposed market definition," *Reilly*, 578 F. Supp. 3d at 1108, and thus to their ability to show that the NCAA had market power to harm coaches. Plaintiffs' attempt to allege why other coaching jobs are not in the market even though volunteer coaches could—and Plaintiff Hacker did—switch between them consists of four sentences in paragraph 55 of their complaint. They claim:

> Limited numbers of baseball coaching positions exist at the professional level, and the demands of professional coaching differ from coaching at the collegiate level. Volunteer coaches have nowhere else to go but Division I for those looking to provide their services in the elite, amateur collegiate level. Even lower amateur levels are not reasonably comparable. Division II and III schools are less athletically competitive and lack the resources of Division I schools. Similarly, NAIA's website claims that NCAA schools "spend an average of 60 percent more on athletics."

Compl. ¶ 55.   But, as addressed specifically below, none of these threadbare allegations follows the legal standards for defining a relevant market.

*First*, Plaintiffs allege that "[v]olunteer coaches have nowhere else to go but Division I for those looking to provide their services in the elite, amateur college level." Compl. ¶ 55. Defining the market in terms of volunteer coaches' preferences to coach in Division I violates the well-settled principle that "[c]onsumers do not define the boundaries of the market; the products or producers do." *Newcal Indus.,* 513 F.3d at 1045; *see also AliveCor, Inc. v. Apple Inc.*, 592 F. Supp. 3d 904, 914 (N.D. Cal. 2022) ("To avoid a fatal legal defect, the relevant market must be a 'product market,' rather than a market whose boundaries are delineated by consumers."). Judge Easterbrook has explained why: "Suppose that a well-conducted survey shows that vanilla is people's favorite flavor of ice cream, and by a large margin.  It would not follow that vanilla ice cream is a separate market, because if its price rises any other ice cream producer could make more vanilla and less chocolate or pistachio." *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 665 (7th Cir. 2004).

Thus, in *Tanaka v. Univ. of S. Cal.*, 252 F. 3d 1059, 1063 (9th Cir. 2001) the Ninth Circuit held that a district court properly dismissed an antitrust claim premised on an alleged market limited to participating in intercollegiate soccer in Los Angeles "because [she] wanted to be close to her family." The Ninth Circuit explained that the "personal preference to remain in the Los Angeles area is irrelevant to the question of whether Los Angeles is an area of effective competition for the services of women's intercollegiate

-23-

soccer players." *Id.* Here, Plaintiffs' personal preference to "provide their services in the elite, amateur college level," Compl. ¶ 55 are irrelevant to the definition of the relevant market. *See Plush Lounge Las Vegas LLC v. Hotspur Resorts Nevada Inc*, 2008 WL 11338198, at *8 (C.D. Cal. Sept. 23, 2008), *aff'd sub nom.*, 371 F. App'x 719 (9th Cir. 2010) (dismissing antitrust claim defining market limited to particular area based on "Plaintiff's desire to offer its product in that location"); *Streamcast Networks, Inc. v. Skype Techs., S.A.*, 547 F. Supp. 2d 1086, 1095 (C.D. Cal. 2007) (improper to define market based on allegation that "many users may personally prefer FastTrack's features" where there was "no indication that users are unwilling to 'patronize' other networks and/or that they would not switch from FastTrack/Sharman Networks/Kazaa to another provider or network").

*Second*, Plaintiffs allege that "Division II and III schools are less athletically competitive and lack the resources of Division I schools." Compl. ¶ 55. This allegation improperly defines the market in terms of quality and price rather than substitutability. A "market is composed of products that have reasonable interchangeability for the purposes for which they are produced— price, use and qualities considered." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1163 (9th Cir. 2003); *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 996 (N.D. Cal. 2010) ("Reasonable interchangeability means all products which could be used for the same general purpose, despite functional or price differences among them.").

Accordingly, "[c]ourts have repeatedly rejected efforts to define markets by price variances or product quality variances." *In*

-24-

re Super Premium Ice Cream Distrib. Antitrust Litig., 691 F. Supp. 1262, 1268 (N.D. Cal. 1988) ("Such distinctions are economically meaningless where the differences are actually a spectrum of price and quality differences."). For example, the Supreme Court held that cellophane was in the same market as other flexible wrapping "despite cellophane's advantages" because "it has to meet competition from other materials in every one of its uses." United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 399 (1956). Plaintiffs similarly cannot define a market limited to jobs coaching baseball in Division I by alleging that those jobs are better than other baseball coaching jobs. Even if other coaching "opportunities may not be as rewarding, either financially or emotionally, to many coaches, the fact of their existence must be taken into account in measuring the 'market power' of the NCAA Division I teams and the economic effects of the rule." Hennessey, 564 F.2d at 1154.

Third, Plaintiffs allege that "[l]imited numbers of baseball coaching exist at the professional level, and the demands of professional coaching differ from coaching at the collegiate level." Compl. ¶ 55. Plaintiffs fail to allege any facts supporting this conclusory assertion, or explaining why coaching professional baseball is not a substitute simply because it is different or more demanding. "Such distinctions are economically meaningless where the differences are actually a spectrum of price and quality differences." Super Premium Ice Cream, 691 F. Supp. at 1268; see also Hicks, 897 F.3d at 1122 (affirming dismissal of antitrust claim alleging market for advertising during live golf broadcasts where plaintiffs "provide no explanation why this group of fans is

distinct for advertising purposes from the typical group of golf fans").

Plaintiffs' failure to allege a relevant antitrust market is fatal to their rule of reason claim.  Unless and until Plaintiffs plead a proper relevant market, their federal antitrust claim cannot proceed unless they abandon their rule of reason theory and instead assume the burden to prove that the challenged bylaws limiting the number of paid coaches are "so plainly anticompetitive that courts need undertake only a cursory examination before imposing antitrust liability." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1113 n.6 (9th Cir. 2021).

**B.   Plaintiffs' Restitution-Based Claims Should Be Dismissed**

In addition to a federal antitrust claim, Plaintiffs allege restitution-based claims for (1) quantum meruit and (2) unjust enrichment "Under Various State Laws."  Plaintiffs have not stated those claims.

> **1.   The Law of the State Where Each Plaintiff Worked as Volunteer Coach Applies to His Claim**

"A district court considering state law claims brought in federal court must utilize the choice-of-law rules of the forum state — here, California." *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 928 (9th Cir. 2019).  California courts have "adopted and consistently applied the so-called 'governmental interest' analysis as the appropriate general methodology for resolving choice-of-law questions." *Rustico v. Intuitive Surgical, Inc.*, 993 F.3d 1085, 1091 (9th Cir. 2021).  "This approach generally involves three steps:

> First, the court must determine whether the substantive laws of California and the foreign jurisdiction differ

-26-

> on the issue before it. Second, if the laws do differ, then the court must determine what interest, if any, the competing jurisdictions have in the application of their respective laws.  If only one jurisdiction has a legitimate interest in the application of its rule of decision, there is a "false conflict" and the law of the interested jurisdiction is applied. But if more than one jurisdiction has a legitimate interest, the court must move to the third stage of the analysis, which focuses on the comparative impairment of the interested jurisdictions. This third step requires the court to identify and apply the law of the state whose interest would be the more impaired if its law were not applied.

*Id.*  "[W]hen conducting the governmental interest analysis," a court must "recognize that a state ordinarily has the predominant interest in regulating conduct within its borders."  *Senne*, 934 F.3d at 934.  Thus, for example, in *Senne*, the plaintiffs (represented by Plaintiffs' counsel here) alleged that minor league baseball players were undercompensated for their work. Applying the governmental interest test, the Ninth Circuit held that "Arizona law should apply to the work performed in Arizona, and Florida law to the work performed in Florida."  *Id.* at 933.

Similarly, here, under California's governmental interest test, the law of the state where the Plaintiff was hired as a volunteer coach—which is the only state where each Plaintiff allegedly worked—governs that Plaintiff's state law claims.[3]  For Plaintiff Hacker, the analysis is straightforward.  Hacker alleges that he was hired as a volunteer coach by UC Davis.  Compl. ¶¶ 7, 70.  He does not allege that he worked as a volunteer coach

---

[3] Although Plaintiffs allege that they "traveled significant distances for away games," Compl. ¶¶ 67, 73, Plaintiffs do not allege that they worked in any state other than California or Arkansas.  This Motion therefore does not need to address what law applies to coaches' work at away games.

in any state other than California.  Accordingly, California law should apply to his restitution claims related to his work as a volunteer coach.

Plaintiff Smart alleges that the University of Arkansas hired him as a volunteer coach.  Compl. ¶¶ 6, 64.  He does not allege that he worked as a volunteer coach in any state other than Arkansas.  The Ninth Circuit has "held that the elements for a quantum meruit claim . . . 'vary materially from state to state.'" *Senne*, 934 F.3d at 933 (quoting *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 591 (9th Cir. 2012)).  California and Arkansas law also differ with respect to unjust enrichment.  Under California law, "unjust enrichment cannot be the basis for a separate and free-standing claim for relief," *Carlin v. DairyAmerica, Inc.*, 978 F. Supp. 2d 1103, 1118 (E.D. Cal. 2013), whereas Arkansas law recognizes a claim for unjust enrichment where, among other things, "the plaintiff provided the improvements to the *property* of the defendant, who received the benefit of them," *Trickett v. Spann*, 2020 Ark. App. 552, 613 S.W.3d 773, 777  (emphasis added).

Arkansas has a much stronger interest than California in regulating Plaintiff Smart's work within Arkansas borders at the University of Arkansas.  A "state ordinarily has the predominant interest in regulating conduct within its borders," *Senne*, 934 F.3d at 934, and Plaintiffs' complaint does not identify any reason why California would have any interest at all in regulating work at the University of Arkansas.  Thus, "California's governmental interest test yields a clear answer: the laws of [Arkansas] should apply to the work performed wholly within [its] boundaries."  *Senne*, 934 F.3d at 936.

### 2.   Plaintiffs' Unjust Enrichment Claims Should Be Dismissed

#### (a)   Plaintiff Hacker's Unjust Enrichment Claim Should Be Dismissed

"[T]here is not a standalone cause of action for 'unjust enrichment'" under California law. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015).  Rather, unjust enrichment "describe[s] the theory underlying a claim that a defendant has been unjustly conferred a benefit through mistake, fraud, coercion, or request." *Id*.  Plaintiff Hacker's unjust enrichment claim therefore fails as a matter of law.

Some courts applying California law have construed a claim for unjust enrichment as "a quasi-contract claim seeking restitution." *Paskenta Band of Nomlaki Indians v. Crosby*,  2016 WL 1587233, at *7 (E.D. Cal. Apr. 20, 2016).  Plaintiff Hacker has not stated an unjust enrichment claim under that theory, either.

The elements of a quasi-contract claim are "(1) a defendant's receipt of a benefit and (2) unjust retention of that benefit at the plaintiff's expense." *MH Pillars Ltd. v. Realini*, 277 F. Supp. 3d 1077, 1094 (N.D. Cal. 2017) (citing *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008)).  To plead the first element, a complaint must "identif[y]" a specific monetary sum received by the defendant and traceable to the plaintiff.  *Rojas v. Bosch Solar Energy Corp.*, 386 F. Supp. 3d 1116, 1130 (N.D. Cal. 2019) (dismissing unjust enrichment claim against solar panel manufacturer because plaintiff did not allege "any fact suggesting that [defendant] received any part of the purchase price Plaintiffs paid" to a third-party contractor to install the panels); *see also Doe I v. Wal-Mart Stores, Inc.* 572 F.3d 677, 685

(9th Cir. 2009) (affirming dismissal of claim that "Wal-Mart was unjustly enriched at Plaintiffs' expense by profiting from relationships with suppliers that Wal-Mart knew were engaged in substandard labor practices" because "the connection between Plaintiffs and Wal-Mart here is simply too attenuated").

Here, the Complaint does not identify any sum of money that the NCAA received from Hacker's work as a volunteer coach for UC Davis.  The Complaint alleges that the NCAA earns significant revenues, but does not allege facts tracing any of those revenues to Hacker's coaching.  *See Richardson v. Se. Conf.*, 2020 WL 1515730, at *13 (N.D. Ill. Mar. 30, 2020) ("the benefit that Richardson claims to have conferred upon the NCAA is too attenuated from his own actions to state a claim for unjust enrichment under Florida law") (dismissing unjust enrichment claim against NCAA).

Even if the Complaint had identified a "benefit" that Hacker conferred on the NCAA, "[t]he fact that one person benefits another is not, by itself, sufficient to require restitution" in quasi-contract.  *Wal-Mart Stores,* 572 F.3d at 684.  To obtain restitution under quasi-contract, "[i]t must ordinarily appear that the benefits were conferred by mistake, fraud, coercion or request." *Dinosaur Dev., Inc. v. White*, 216 Cal. App. 3d 1310, 1316 (1989). "[O]therwise, though there is enrichment, it is not unjust." *Id*. (no unjust enrichment where "defendants made no direct request to plaintiff, nor are they coercing plaintiff to construct the access road").

Here, Plaintiff Hacker has not alleged that the NCAA requested that he work as a volunteer coach or coerced him to do

so.   Hacker alleges that he worked as a junior college baseball coach and then accepted UC Davis's offer to coach as a volunteer. Compl. ¶ 71.  He does not allege that he failed to understand that UC Davis would not pay him to serve as a volunteer coach; after all, Plaintiff alleges that NCAA bylaws prohibited UC Davis from paying him.  As a knowing volunteer who had no reason to expect payment, he cannot assert a claim that it would be unjust to not to pay him as a volunteer coach.  *See Rose v. NCAA*, 346 F. Supp. 3d 1212, 1229 (N.D. Ill. 2018) (dismissing unjust enrichment claim against NCAA where "Plaintiffs have not alleged that either the Big Ten or the NCAA requested that Plaintiffs play football for Purdue" or "that they expected Defendants to pay their medical expenses while at Purdue").

### (b)   *Plaintiff Smart's Unjust Enrichment Claim Should Be Dismissed*

Plaintiff Smart has not pled an unjust enrichment claim under Arkansas law regarding volunteering as a coach at the University of Arkansas.  Under Arkansas law, a plaintiff must prove "(1) that the plaintiff provided the improvements to the property of the defendant, who received the benefit of them; (2) that the circumstances were such that the plaintiff reasonably expected to be paid the value of the improvements by the defendant; (3) that the defendant was aware the plaintiff was providing such improvements with the expectation of being paid and accepted the improvements; and (4) the reasonable value of the improvements received by the defendant."  *Trickett*, 613 S.W.3d at 777.  Smart has not pled the first element because his Complaint does not allege that his worked improved any property of the NCAA or that

the NCAA received anything of value from his volunteer coaching.
*See id.* ("For a court to find unjust enrichment, a party must have
received something of value to which the party is not entitled and
which the party must restore."); *Schmidt v. Ford Motor Co.*, 972 F.
Supp. 2d 712, 721 (E.D. Pa. 2013) (under Arkansas law, "[t]he
'benefit' must be conferred by the plaintiff directly—indirect
benefits bestowed by third parties will not support a claim for
unjust enrichment"); *Richardson*, 2020 WL 1515730, at *12
(dismissing unjust enrichment claim where complaint merely alleged
NCAA "obtained a benefit and that the plaintiff was in some
roundabout way damaged.").

     Nor has Smart pled facts supporting an inference that he
"reasonably expected to be paid."  *Trickett*, 613 S.W.3d at 777.
Plaintiffs' complaint alleges that NCAA bylaws prohibited the
University of Arkansas from paying Smart as a volunteer coach.
Compl. ¶ 43.  Having accepted the volunteer coaching position
knowing he would not receive payment, Plaintiff Smart has no
unjust enrichment claim for payment now.  *Rose*, 346 F. Supp. 3d at
1229.

### 3.   Plaintiffs' Quantum Meruit Claims Should Be Dismissed

#### (a)  Plaintiff Hacker's Quantum Meruit Claim Should Be Dismissed

     Plaintiff Hacker has not pled a quantum meruit claim under
California law regarding volunteering as a coach at UC Davis.
Under California law, "[t]he requisite elements of quantum meruit
are (1) the plaintiff acted pursuant to an explicit or implicit
request for the services by the defendant, and (2) the services
conferred a benefit on the defendant." *Port Med. Wellness, Inc. v.*

*Conn. Gen. Life Ins. Co.*, 24 Cal. App. 5th 153, 180 (2018)
(internal citations and quotations omitted).

Plaintiff Hacker has not pled the first element of his
quantum meruit claim because he has not pled that the NCAA
requested that he volunteer as a coach.  *See Day v. Alta Bates
Med. Ctr.*, 98 Cal. App. 4th 243 (2002) (lawyer had no quantum
meruit claim against hospital that did not request his services).
Further, Plaintiff Hacker has not pled the second element of his
quantum meruit claim because, as explained above, he has not pled
that he conferred any benefit on the *NCAA*.  *Id.* at 248 (no quantum
meruit claim absent proof that "the services rendered were
intended to and did benefit the defendant").  *Cf. Earhart v.
William Low Co.*, 25 Cal. 3d 503, 515 (1979) ("compensation for a
party's performance should be paid by the person whose request
induced the performance").  Finally, Plaintiff Hacker's allegation
that UC Davis hired him as a volunteer coach precludes a claim of
quantum meruit against the NCAA because "it is well settled that
there is no equitable basis for an implied-in-law promise to pay
reasonable value when the parties have an actual agreement
covering compensation." *Hedging Concepts, Inc. v. First All.
Mortg. Co.*, 41 Cal. App. 4th 1410, 1419 (1996).

> (b)  *Plaintiff Smart's Quantum Meruit Claim Should
>       Be Dismissed*

Plaintiff Smart, a former volunteer coach at the University
of Arkansas, has failed to plead a quantum meruit claim.  Under
Arkansas law, "[q]uantum meruit is a claim for unjust enrichment
that does not involve the enforcement of a contract."  *KBX*, *Inc.
v. Zero Grade Farms*, 2022 Ark. 42, 639 S.W.3d 352, 365.  As

explained above, Plaintiff Smart has not pled an unjust enrichment

claim, so he has not pled a quantum meruit claim, either.

### 4. Plaintiffs Lack Standing to Assert Claims Under the Laws of States Where They Did Not Work as Volunteer Coaches

Plaintiffs lack Article III standing to assert claims on

behalf of volunteer coaches who worked in states other than

California and Arkansas.  Plaintiff Hacker only alleges working as

a volunteer coach in California and Plaintiff Smart only alleges

working as a volunteer coach in Arkansas.  Plaintiffs nevertheless

purport to represent a nationwide class of volunteer coaches

"Under Various State Laws."  Compl. pp. 15 & 16.  As noted, the

law of the State where a volunteer coach worked applies to that

coach's state law claims.  *See supra* Part IV.B.1.  Thus,

Plaintiffs are trying to assert claims on behalf of other coaches

under the laws of states where Plaintiffs never coached to which

they do not allege any connection.

Plaintiffs lack standing to assert such claims.  "Article III

requires a plaintiff to demonstrate standing for *each claim* he

seeks to press."  *Or. Prescription Drug Monitoring Program v.*

*United States DEA*, 860 F.3d 1228, 1233 (9th Cir. 2017) (emphasis

added, internal citation mark and alterations omitted); *see also*

*In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1218

(N.D. Cal. 2014) ("Article III standing is . . . claim- and

relief-specific.").  "Courts in the Ninth Circuit have

consistently held that a plaintiff in a putative class action

lacks standing to assert claims under the laws of states other

than those where the plaintiff resides or was injured."  *Jones v.*

*Micron Tech. Inc.*, 400 F. Supp. 3d 897, 908 (N.D. Cal. 2019);

*Goldstein v. GM LLC*, 445 F. Supp. 3d 1000, 1021 (S.D. Cal. 2020) ("Plaintiffs do not have standing to bring claims under the laws of states where they have alleged no injury, residence, or other pertinent connection.").

Accordingly, where named plaintiffs lack any connection to certain states, courts regularly dismiss class claims as to members of the putative class whose claims are governed by the laws of those states. *See Rojas* 443 F. Supp. 3d at 1070 ("the majority of courts in this district have held that in a putative class action, claims arising under the laws of states in which no named plaintiff resides should be dismissed for lack of standing at the motion to dismiss stage"); *Van Mourik v. Big Heart Pet Brands, Inc.*, 2018 WL 1116715, at *1 (N.D. Cal. Mar. 1, 2018) ("District courts in our circuit have dismissed state law class claims for lack of standing before the class certification stage where no named plaintiff resides in or otherwise interacted with the state."); *Goldstein*, 445 F. Supp. 3d at 1021 ("the nationwide unjust enrichment claims . . . on behalf of the 'nationwide class,' must be dismissed because the California Plaintiffs lack Article III standing to assert claims under those other states' laws").

Plaintiffs have not alleged any connection between their work as volunteer coaches and any state other than California or Arkansas.  Plaintiffs therefore lack standing to assert claims as to coaches who did not work in California or Arkansas.  Those claims must be dismissed.

1    **C.    Plaintiffs' UCL Claims Should Be Dismissed**

2         **1.    Plaintiff Smart Has No UCL Claim**

3         Plaintiff Smart has no claim under California's Unfair

4    Competition Law because he does not allege that he worked in

5    California or has any other connection to California.   "Neither

6    the language of the UCL nor its legislative history provides any

7    basis for concluding the Legislature intended the UCL to operate

8    extraterritorially."  *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191,

9    1207 (2011).   Courts applying California law have therefore held

10   that the UCL does not apply to claims based entirely on work

11   performed outside of California.   *Id.* at 1209 (UCL did not "not

12   apply to overtime work performed outside California" even where

13   defendant employer was headquartered in California); *O'Connor v.*

14   *Uber Techs., Inc.*, 58 F. Supp. 3d 989, 1007 (N.D. Cal. 2014) ("the

15   UCL does not apply to work performed outside California by out-of-

16   state Plaintiffs based on the employer's failure to reimburse the

17   Plaintiffs for employment related expenses or to pay them

18   gratuities they were owed").   Plaintiff Smart cannot assert a

19   claim under California's Unfair Competition Law when he does not

20   allege that he worked in California or has any connection to

21   California.

22        **2.    Plaintiffs Have Failed to Plead a UCL Claim**

23        The UCL proscribes any "unlawful, unfair or fraudulent

24   business act or practice." Cal. Bus. & Prof. Code. § 17200.   As

25   such, "[t]he UCL operates as a three-pronged statute."  *Beaver v.*

26   *Tarsadia Hotels*, 816 F.3d 1170, 1177 (9th Cir. 2016).   Plaintiffs

27   have failed to allege a UCL claim under any prong.

28                   *(a)   Unlawful Prong*

1    Plaintiffs make the conclusory allegation that the NCAA's
2    conduct is unlawful under the UCL because "it violates state and
3    federal antitrust laws and state and federal wage-and-hour laws."
4    Compl. ¶ 96.  Plaintiffs have not pled any violation of these
5    laws.  For reasons already explained, Plaintiffs have not alleged
6    a violation of federal antitrust law, *see* Part I *supra*, and
7    Plaintiffs do not identify any "state" antitrust laws that they
8    allege were violated.

9    Plaintiffs also have not alleged any violation of "state and
10   federal wage-and-hour laws."  Compl. ¶ 96.  Tellingly, Plaintiffs
11   have not identified any such laws in the Complaint.  Nor have
12   Plaintiffs alleged any facts as to why the NCAA—a membership
13   organization with more than 1,000 member institutions—should be
14   considered an employer of Plaintiffs and other volunteer baseball
15   coaches at what they allege are some 300 Division I institutions
16   nationwide, Compl. ¶ 34.  *See Dawson v. NCAA*, 932 F.3d 905, 911
17   (9th Cir. 2019) (affirming dismissal on the pleadings of claim
18   that NCAA employed student-athletes).  Plaintiffs do not allege
19   that the NCAA "'hire[s] and fire[s],' or exercise[s] any other
20   analogous control, over [volunteer baseball coaches]."  *Id.* at
21   910.  To the contrary, Plaintiffs specifically allege that "[t]he
22   University of Arkansas hired Plaintiff Taylor Smart," Compl. ¶ 64,
23   and that "[t]he University of California, Davis hired Plaintiff
24   Michael Hacker," *id.* ¶ 70.

25   Plaintiffs also do not allege that the NCAA "choose[s] the
26   [coaches] on any Division I [baseball] team, nor that they engage
27   in the actual supervision of the [coaches]' performance."  *Dawson*,
28   932 F.3d at 910.  Plaintiffs allege that each institution hired

each Plaintiff to carry out different duties, a decision that they do not connect to the NCAA in any way.  Plaintiffs allege that Plaintiff Smart worked as an "assistant hitting coach," Compl. ¶ 66, whereas Plaintiff Hacker worked as "the pitching coach," id. ¶ 72.  Plaintiff Smart allegedly had responsibility for "overseeing the team's baserunning and catchers" as well as for "helping break down video for hitters; for writing scouting reports; and for developing practice plans and helping run practices."  Id. ¶ 66.  By contrast, Plaintiff Hacker's allegedly had responsibility "for developing and overseeing the pitchers—approximately half the team—during practices and games" as well as "for developing practice plans and helping run practices, and for breaking down video and putting together plans for opponents." Id. ¶ 72.  Plaintiffs do not allege that the NCAA assigned these responsibilities, directed or monitored how Plaintiffs carried them out or assessed their performance in doing so.

"Rather, the allegations of the complaint, taken as true, demonstrate that the NCAA functions as a regulator…."  Dawson v. NCAA, 932 F.3d at 910.  Plaintiffs allege that the "NCAA Constitution provides that member schools will enact legislation that governs the conduct of the members' athletic programs"; that "[t]he member schools agree to administer their athletics programs in accordance with the constitution, bylaws, and other legislation made by the association"; and that "[t]he bylaws and related legislation are [] proposed, drafted, voted upon, and agreed upon by NCAA member."  Compl. ¶¶ 40-41.  Thus, Plaintiffs' Complaint alleges that the NCAA is an association of member institutions that have "adopted and enforced rules that regulate college

sports."  *Id.* ¶ 33.  However, Plaintiffs have not alleged that the NCAA employs the coaches, which of course it does not.  Plaintiffs thus have not alleged that the NCAA has violated any wage-and-hour laws and thus cannot allege a UCL claim based on such violations.

### (b)   Fraudulent Prong

Plaintiffs' Complaint does not allege any facts to support their claim that the NCAA's conduct is "fraudulent" under the UCL.  "The fraud prong of the UCL may be shown if members of the public are likely to be deceived." *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 613 (2014) (internal quotation omitted) (affirming dismissal of UCL claim for failure to "adequately state a claim for a fraudulent business practice").  Plaintiffs do not identify any deceptive statement or conduct by the NCAA.  *See Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255, 1275 (2006) (affirming dismissal of UCL fraud claim for failure to allege defendant "made any representation of any kind, much less any misrepresentation").  Nor do Plaintiffs allege that they relied on any statement by the NCAA to their detriment, which is another required element of their UCL claim under the fraudulent prong. *See Kwikset Corp. v. Superior Court.*, 51 Cal. 4th 310, 326-27 (2011); *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1303-04 (S.D. Cal. 2009).  Plaintiffs simply have not alleged anything about deception or fraudulent conduct by the NCAA.

### (c)   Unfair Prong

Having failed to allege conduct violating the unlawful or fraudulent prongs of the UCL, Plaintiffs cannot state a UCL claim simply by labeling the NCAA's conduct "unfair."  Courts have held that "where the unfair business practices alleged under the unfair

-39-

prong of the UCL overlap entirely with the business practices addressed in the fraudulent and unlawful prongs of the UCL, the unfair prong of the UCL cannot survive if the claims under the other two prongs of the UCL do not survive." *Mai v. Supercell Oy*, 2023 WL 25713, at *6 (N.D. Cal. Jan. 3, 2023) (quotations omitted).

In particular, Plaintiffs' failure to plead their antitrust claim precludes them from having alleged an unfair competition claim based on those laws. Under the law of this Circuit, "[i]f the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason[,]…the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers. *City of San Jose v. Office of the Comm'r of Baseball*, 776 F.3d 686, 691-92 (9th Cir. 2015) ("An independent claim under California's UCL is therefore barred so long as MLB's activities are lawful under the antitrust laws."). The reason for that rule is that "permit[ting] a separate inquiry into essentially the same question under the [UCL] would only invite conflict and uncertainty and lead to the enjoining of procompetitive conduct." *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001); *Cf. Casas v. Victoria's Secret Stores, LLC*, 2015 WL 13446989, at *4 n.7 (C.D. Cal. Apr. 9, 2015) ("even if the UCL applies to wage-and-hour claims, and even if a practice that is not unlawful can be unfair, the Court struggles to see how Plaintiffs, *as non-consumer employees*, can possibly satisfy one of the *consumer* unfairness tests").

### 3. Plaintiffs' Restitution Claim Under the UCL Should Be Dismissed

Regardless of whether Plaintiffs have standing to assert a UCL claim or have pled facts to state such a claim, the Court should dismiss their claim for UCL restitution for two reasons.

*First*, the Court lacks equitable jurisdiction over Plaintiffs' UCL claim because they have not pled "that [they] lack[] an adequate remedy at law." *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (citing *Mort v. United States*, 86 F.3d 890, 892 (9th Cir. 1996)).

"California courts have held that 'the UCL provides only for equitable remedies.'" *Sonner*, 971 F.3d at 839 n.2 (quoting *Hodge v. Superior Court*, 145 Cal. App. 4th 278 (2006)); *see also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003) ("A UCL action is equitable in nature; damages cannot be recovered."). "[R]estitution is the only monetary remedy expressly authorized" for a private plaintiff under the UCL. *Id.* at 1146. Accordingly, under the law of this Circuit, a plaintiff must allege that he or she "lacks an adequate remedy at law before securing equitable restitution for past harm under the UCL." *Sonner*, 971 F.3d at 844. Where a plaintiff seeks the same relief in damages that the plaintiff seeks in restitution, the plaintiff does not lack an adequate remedy at law and cannot obtain UCL restitution. *See id.* (dismissing UCL claim that did "not allege that [the plaintiff] lacks an adequate legal remedy" and sought the "same sum in equitable restitution" that it "requested in damages to compensate her for the same past harm"). That is true regardless of whether the plaintiff's claim for damages would

-41-

succeed.  *Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308 (9th Cir. 2022) (dismissing UCL clam seeking restitution where the plaintiff could have pursued a damages remedy under the Consumer Legal Remedies Act for the same alleged harm even though the CLRA claim was time-barred).

These precedents preclude this Court's equitable jurisdiction over Plaintiffs' UCL claim for restitution.  As in *Sonner*, Plaintiffs do not allege that they lack an adequate remedy at law. *See Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1009 (N.D. Cal. 2020) ("Under *Sonner*, the plaintiffs are required, at a minimum, to plead that they lack an adequate remedy at law, which they have not done ") (dismissing UCL restitution claim).  Moreover, Plaintiffs' Complaint appears to seek numerous legal remedies under the federal antitrust laws and state laws for the same harm that they seek to remedy with an equitable order from this Court under the UCL:  the compensation they allegedly would have earned but for the allegedly unlawful conduct.  *See Nacarino v. Chobani, LLC,* 2021 WL 3487117, at *12 (N.D. Cal. Aug. 9, 2021) (dismissing UCL claim for restitution where plaintiff fails to allege any specific facts—e.g., that she would receive less compensation via damages than restitution— showing that damages under [other laws] are necessarily inadequate or incomplete); *In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 601 F. Supp. 3d 625, 769 (C.D. Cal. 2022) (collecting cases).

*Second*, Plaintiffs have failed to plead a claim for restitution under the UCL because they have not alleged any legal interest in money that they demand the NCAA restore to them. *Korea Supply*, 29 Cal. 4th at 1146.  "The object of restitution is

to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Id.*  Plaintiffs do not allege that the NCAA possesses any funds in which they have an ownership interest.  *E.g.*, *In re Napster, Inc. Copyright Litig.*, 354 F. Supp. 2d 1113, 1127 (N.D. Cal. 2005) (dismissing claim for restitution where counterclaim plaintiff did not allege that counterclaim defendants "are in possession of funds in which [counterclaim plaintiff] has an ownership interest"); *Mohammed v. Am. Airlines, Inc.*,  2019 WL 3577160, at *5 (N.D. Cal. Aug. 6, 2019) (dismissing employee's UCL claim against supervisor for restitution of wages allegedly owed by employer because "[e]ven if plaintiff did have an ownership interest in these wages, plaintiff does not allege that [his supervisor] personally withheld these wages from him").

**D.**   **Plaintiffs' Declaratory Judgment Claim Should Be Dismissed**

Plaintiffs fifth cause of action asserts a claim under the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking a declaration that "relevant bylaws are illegal under various state and federal laws, including but not limited to antitrust laws and wage laws." Compl. ¶ 101.  Plaintiffs have failed to state a claim for such a declaration under the Declaratory Judgment Act.

*First*, Plaintiffs have no claim under the Declaratory Judgment Act because they have not pled any violations of the law. "A declaratory judgment is not a theory of recovery." *See Flores v. EMC Mortg. Co.*, 997 F. Supp. 2d 1088, 1111 (E.D. Cal. 2014). It "merely offers an additional remedy to litigants." *Id.*  Thus, "if the underlying claims are dismissed, ... then there is no

basis for any declaratory relief." *Hammerling v. Google LLC*, 2022 WL 2812188, at *17 (N.D. Cal. July 18, 2022); *see also Flores*, 997 F. Supp. 2d at 1112 ("purported declaratory relief fails given dismissal of other claims").

*Second*, Plaintiffs have failed to allege facts supporting standing to issue a declaratory judgment regarding the legality of the challenged bylaws because they allege only that they *were* volunteer coaches, not that they *are*, *will be* or *want to be* coaches who are subject to the challenged bylaws.  A Declaratory Judgment Act claims requires a "substantial controversy, between parties having adverse legal rights, or sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941). Plaintiffs have not alleged such a controversy because they have "provided no basis upon which to conclude declaratory relief might affect [the NCAA's] behavior towards [them]."  *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 868 (9th Cir. 2017) (plaintiffs lacked standing to seek declaratory judgment as to legality of contract that no longer bound them); *see also Corley v. FedEx Ground Package Sys. Inc.*, 2022 WL 1805435, at *5 (C.D. Cal. June 2, 2022) ("A declaration that FedEx's current and future conduct violates California law would not have any effect on Corley, as Corley no longer works for FedEx and does not express any intent to do so in the future.").

It does not matter whether "the relief sought pertains to an ongoing policy."  *Bayer*, 861 F.3d at 868.  "The mere existence of an ongoing policy is insufficient to establish that a plaintiff challenging that policy has standing to attack all its future

-44-

1  applications." *Id.* Neither Plaintiff alleges that "the conduct

2  complained of in this action presently affects him or can

3  reasonably be expected to affect him in the future," so neither

4  Plaintiff has standing to seek a declaration that the challenged

5  conduct is unlawful. *Id.*; *see also Fieger v. Mich. Supreme Court*,

6  553 F.3d 955, 962 (6th Cir. 2009) ("In the context of a

7  declaratory judgment action, allegations of past injury alone are

8  not sufficient to confer standing.").

9  **V.   CONCLUSION**

10     In the event that the Court does not grant the NCAA's motion

11  to transfer, the Court should dismiss Plaintiffs' claims.

12  Respectfully submitted,

13  DATED:  February 24, 2023      MUNGER, TOLLES & OLSON LLP

14

15                         By:    */s/Carolyn Hoecker Luedtke*

16                                CAROLYN HOECKER LUEDTKE

17                                *Attorneys for Defendant National*
                                   *Collegiate Athletic Association*

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT NCAA'S MOTION TO DISMISS