1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10
                                   ----oo0oo----
11

12   TAYLOR SMART AND MICHAEL                No. 2:22-cv-02125 WBS
     HACKER, Individually and on             KJN
13   Behalf of All Those Similarly
     Situated,
14
                    Plaintiffs,
15
          v.
16                                           MEMORANDUM AND ORDER RE:
                                             DEFENDANT'S MOTION TO
     NATIONAL COLLEGIATE ATHLETIC            TRANSFER AND MOTION TO
17   ASSOCIATION, an unincorporated          DISMISS
     association,
18                  Defendant.

19

20   JOSEPH COLON, SHANNON RAY,
     KHALA TAYLOR, PETER ROBINSON,
21   KATHERINE SEBBAME, and PATRICK          No. 1:23-cv-00425 WBS
     MEHLER, individually and on             KJN
22   behalf of all those similarly
     situated,
23
                    Plaintiffs,
24
          v.
25
     NATIONAL COLLEGIATE ATHLETIC
26   ASSOCIATION, an unincorporated
     association,
27
                    Defendant.

28
                                      1

----ooOoo----

1

2          Plaintiffs in these related cases brought these

3    putative class actions against the National Collegiate Athletic

4    Association ("NCAA"), alleging the NCAA and its member schools

5    illegally conspired to fix the compensation of a category of

6    Division I coach at $0.  (Smart Compl. (Smart Docket No. 1);

7    (Colon First Am. Compl. ("Colon Compl.") (Colon Docket No. 19).)

8          Plaintiffs Taylor Smart and Michael Hacker

9    (collectively "Smart Plaintiffs"), who seek to represent

10   volunteer baseball coaches, assert claims for (1) violation of §

11   1 of the Sherman Act, 15 U.S.C. § 1; (2) quantum meruit under

12   various state laws; (3) unjust enrichment under various state

13   laws; (4) violations of California's Unfair Competition Law

14   ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.; and (5)

15   declaratory judgment under the Declaratory Judgment Act, 28

16   U.S.C. § 2201.  (See generally Smart Compl.)

17         Plaintiffs Joseph Colon, Shannon Ray, Khala Taylor,

18   Peter Robinson, Katherine Sebbame, and Patrick Mehler, who seek

19   to represent volunteer coaches in sports other than baseball,

20   assert one claim for violation of § 1 of the Sherman Act, 15

21   U.S.C. § 1.  (See generally Colon Compl.)

22         Before the court are defendant's motions to transfer

23   the cases to the Southern District of Indiana (Smart Docket No.

24   6; Colon Docket No. 26) and motions to dismiss (Smart Docket No.

25   7; Colon Docket No. 27).

26   I.   Factual Allegations[1]

27   _____

28         [1]  Because many of the allegations in the complaints are
     identical, the court will frequently cite only to the Smart

2

1          The NCAA is an unincorporated association with its
2    principal place of business in Indianapolis, Indiana.  (Smart
3    Compl. ¶ 8.)  There are around 1,100 member schools within the
4    NCAA.  (Id. ¶ 8.)  The NCAA and its member schools adopt and
5    enforce the rules regulating college sports.  (Id. ¶ 33.)  There
6    are three divisions within the NCAA.  (Id.)  The top division is
7    Division I.  (Id.)  There are approximately 350 Division I
8    schools.  (Colon Compl. ¶ 28.)  Anyone who wishes to coach for a
9    Division I team must work for an NCAA member school.  (Smart
10   Compl. ¶ 36.)

11          College sports and the NCAA have grown enormously over
12   the past decades.  (Id. ¶ 25.)  In 2019, NCAA Division I member
13   schools generated close to $16 billion in athletics revenue.
14   (Id. ¶ 25.)  In 2021, the NCAA itself earned $1.15 billion.  (Id.
15   ¶ 25.)  College baseball, the sport represented in the Smart
16   case, has shared in the increased growth and popularity of the
17   NCAA.  (Id. ¶ 26.)  For example, in 2019, the College World
18   Series championship game was the most watched baseball game that
19   year on ESPN, including professional games aired on ESPN.  (Id. ¶
20   32.)  The 2022 NCAA College World Series drew a record crowd of
21   over 366,000 fans.  (Id. ¶ 29.)  In 2022, an average of 10,376
22   people attended each home baseball game at the University of
23   Arkansas, the school where Plaintiff Smart worked as a volunteer
24   coach.  (Id. ¶ 26.)

25          The sports represented in the Colon case have likewise
26   shared in the growth and popularity of the NCAA.  (Colon Compl. ¶
27

28   Complaint or the Colon Complaint for convenience.

3

31.)  For example, the 2022 17-game Women's College World Series drew an average of 1.2 million viewers per game on ESPN.  (Id.)  The NCAA volleyball final also drew 1.2 million viewers on ESPN.  (Id.)  In 2022, 4,224 athletes competed at the Division I outdoor track and field 2022 Track and Field Championships.  (Id.)

Division I coaches can earn sizeable salaries.  (Smart Compl. ¶ 38.)  The head baseball coach at the University of Arkansas, where Plaintiff Smart coached, earns an annual salary of over $1 million per year.  (Id. ¶ 33.)  The head softball coach at the University of Oklahoma earns an annual salary of $1.625 million.  (Colon Compl. ¶ 35.)  Both the head wrestling coach at the University of Iowa and the head track coach at the University of Georgia earn annual salaries greater than $500,000.  (Id.)  The two paid assistant baseball coaches at the University of Arkansas earn $225,000 and $300,000 per year along with other benefits.  (Smart Compl. ¶ 33.)  Coaching salaries are also increasing.  (Colon Compl. ¶ 39.)  For example, from 2013 to 2018, the salaries of softball coaches at schools in the five biggest conferences increased by an average of 62 percent.  (Id.)

Division I sports are limited to a specific number of paid coaches per team.  (Colon Compl. ¶ 44.)  Through the adoption of NCAA Bylaw 11.01.06 (the "Bylaw"), NCAA member schools agreed to allow one additional coach – the "Volunteer Coach."[2]  (Id.)  Prior to January of 2023, this coach could not be paid.  (Id.)  There were also numerous other restrictions on

---

[2]    In January 2023, after the Smart Plaintiffs in the filed their Complaint, but before the Colon Plaintiffs, the NCAA amended the Division I bylaws to eliminate the volunteer coach position effective July 2023 and permit four paid baseball coaches.

the volunteer coach position, including: in what circumstances the member school was allowed to provide meals to the volunteer coach; prohibiting paying for housing, health insurance, or other employment benefits; and forbidding volunteer coaches from recruiting players.  (Smart Compl. ¶¶ 45-46, 49.) Notwithstanding these restrictions on the volunteer coach position, these coaches generally worked over 40 hours per week and performed most of the same duties as paid coaches, such as attending all practices and games, traveling for away games, and preparing game strategies.  (Id. ¶ 48.)

Plaintiff Smart and Plaintiff Hacker worked as volunteer baseball coaches.  Plaintiff Smart worked as a volunteer coach at the University of Arkansas from 2018 to 2020. (Id. ¶ 64.)  Plaintiff Smart's duties included being the first-base coach during games, the team's assistant hitting coach, and developing as well as helping run practice.  (Id. ¶ 66.) Plaintiff Hacker worked as a volunteer coach at the University of California, Davis from 2019 to 2021.  (Id. ¶ 70.)  Plaintiff Hacker's duties included being the pitching coach and developing as well as helping run practice.  (Id. ¶ 72.)  Both plaintiffs allege that they worked five to six days per week and traveled to away games.  (Id. ¶ 67, 73.)

Plaintiff Colon worked as a volunteer wrestling coach at Fresno State University from 2017-2022.  (Colon Compl. ¶ 7.) Plaintiff Ray worked as a volunteer track and field coach at Arizona State University from 2019 to 2021.  (Id. ¶ 8.) Plaintiff Taylor continues to work as a softball coach at San Jose State University, where she began coaching as a volunteer

5

coach in 2022.  (Id. ¶ 9.)  Plaintiff Robinson worked as a volunteer swimming and diving coach at the University of Virginia from 2019 to 2021.  (Id. ¶ 10.)  Plaintiff Sebbane worked as a volunteer softball coach at the University of Pittsburgh from 2019 to 2021.  (Id. ¶ 11.)  Plaintiff Mehler continues to work as a men's soccer coach at American University, where he began coaching as a volunteer coach in 2019.  (Id. ¶ 12.)

## II.   Motion to Transfer

"A defendant for whom venue is proper but inconvenient may move for a change of venue under 28 U.S.C. § 1404(a)." Action Embroidery Corp. v. Atl. Embroidery, Inc., 368 F.3d 1174, 1181 (9th Cir. 2004); 28 U.S.C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.")  The purpose of this provision "is to prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'"  Van Dusen v. Barrack, 376 U.S. 612, 616 (1964).

The moving party has the burden of showing that transfer is appropriate.  Williams v. Bowman, 157 F. Supp. 2d 1103, 1106 (N.D. Cal. 2001); cf. Jones v. GNC Franchising, Inc., 211 F.3d 495, 499 (9th Cir. 2000) (noting that defendant failed to meet burden of showing that the alternative forum was more appropriate).  Because the statute contemplates transfer "to any other district or division where it might have been brought," see 28 U.S.C. § 1404(a), defendant must first make a threshold showing that venue and jurisdiction would be proper in the

6

district to which it seeks transfer.  Vu v. Ortho-McNeil Pharm., Inc., 602 F. Supp. 2d 1151, 1155 (N.D. Cal. 2009); see also F.T.C. v. Watson Pharm., Inc., 611 F. Supp. 2d 1081, 1090 (C.D. Cal. 2009) ("For transfer under § 1404(a), the threshold issue is whether the case 'might have been brought' in the proposed venue.").  Here, it is undisputed that venue and jurisdiction would be proper in the Southern District of Indiana because the case involves a question of federal law and the NCAA is headquartered in Indianapolis, which is within that district.  (Smart Mot. Transfer at 4-5 (Docket No. 6); Colon Mot. Transfer at 7 (Docket No. 7).)

Next "the [c]ourt must evaluate three elements: (1) convenience of the parties; (2) convenience of the witnesses; and (3) interests of justice." Anza Tech., Inc. v. Toshiba Am. Elec. Components, No. 2:17-cv-01688 WBS DB, 2017 WL 6538994, at *2 (E.D. Cal. Dec. 21, 2017) (quoting Safarian v. Maserati N. Am., Inc., 559 F. Supp. 2d 1068, 1071 (C.D. Cal. 2008)) (quotations omitted).  This analysis may include a number of factors, such as the plaintiff's choice of forum, the parties' contacts with the forum, the contacts relating to the plaintiff's cause of action in the chosen forum, the differences in the costs of litigation in the two forums, the ease of access to the evidence, and the feasibility of consolidating other claims.  Jones, 211 F.3d at 498-99; Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 843 (9th Cir. 1986).  Section 1404(a) affords district courts broad discretion "to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." Jones, 211 F.3d at 498 (quoting Stewart Org. v. Ricoh

1    Corp., 487 U.S. 22, 29 (1988)) (internal quotation marks

2    omitted).

3         The court finds the balance of factors does not weigh

4    in favor of transfer.  First, in considering convenience of the

5    parties, courts generally accord "great weight" to the

6    plaintiff's choice of forum.  Lou v. Belzberg, 834 F.2d 730, 739

7    (9th Cir. 1987).  However, when an individual represents a class,

8    the named plaintiff's choice of forum receives less weight.  Id.;

9    Hawkins v. Gerber Prods. Co., 924 F. Supp. 2d 1208, 1214-15 (S.D.

10   Cal. 2013) ("In part, the reduced weight on plaintiff's choice of

11   forum in class actions serves as a guard against the dangers of

12   forum shopping, especially when a representative plaintiff does

13   not reside within the district.").  A plaintiff's choice of forum

14   also receives less weight where the operative facts have not

15   occurred within the forum and the forum has no particular

16   interest in the parties or subject matter.  Id. at 1215 (citing

17   Pac. Car & Foundry Co. v. Pence, 403 F.2d 949, 954 (9th Cir.

18   1968)).

19        Here, both cases are putative class actions in which

20   plaintiffs seek to represent classes of volunteer coaches from

21   across the country.  Plaintiff Hacker's job as a baseball coach

22   at UC Davis, which is within this district, gave rise to the

23   Smart litigation.  Plaintiff Hacker continues to reside in the

24   district.  Plaintiff Colon's job as a wrestling coach at Fresno

25   State University, which is also within this district, gave rise

26   to Colon litigation.  Thus, while plaintiffs' choice of forum

27   receives less weight because it is a class action, the fact that

28   these named plaintiffs worked in this district overcomes any

8

inference of forum shopping.  See Lou, 834 F.2d at 739; Hawkins
v. Gerber Prods. Co., 924 F. Supp. 2d 1208, 1214-15 (S.D. Cal.
2013).

Second, as for convenience to witnesses, "[c]onvenience
of nonparty witnesses 'is often the most important factor [in the
section 1404(a) analysis]." Tolentino v. Mossman, No. 2:07-cv-
1243 GEB DAD, 2008 WL 1787752, at *1 (E.D. Cal. Apr. 18, 2008)
(quoting A.J. Indus., Inc. v. U.S. Dist. Ct., 503 F.2d 384, 389
(9th Cir. 1974)); see also Welenco, Inc. v. Corbell, No. 2:13—cv-
287 KJM CKD, 2014 WL 130526, at *7 (E.D. Cal. Jan. 14, 2014)
(citation omitted).  Defendant states that party witnesses will
include NCAA employees, all of whom are based in Indianapolis.
(Smart Mot. Transfer at 8; Colon Mot. Transfer at 9-10.)  While
this may well be true, defendant has not identified any specific
witnesses.  See Williams, 157 F. Supp. 2d at 1108 ("To
demonstrate the inconvenience of witnesses, the moving party must
identify relevant witnesses, state their location and describe
their testimony and its relevance.").  On the other hand, counsel
for plaintiffs represent that Mr. Hacker, as both a named
plaintiff and potential class representative, wishes to be
present in court for the pretrial proceedings.  Keeping these
cases in this court, only some twenty miles from his residence,
would make it much easier for him to do so.

Third, the court must consider the "interests of
justice," which may incorporate factors including judicial
efficiency, familiarity with governing law, and any local
interest in the controversy.  While plaintiffs in both cases
assert federal claims, the Smart Plaintiffs also allege

1  violations of California's UCL, Cal. Bus. & Prof. Code §§ 17200

2  et seq.  Although it can be said that a federal judge in Indiana

3  would also be able to apply California law, it cannot be ignored

4  that a court in California would likely be more familiar with

5  these state statutes and that California would have a stronger

6  interest in their proper interpretation and enforcement.

7  　　　　Because defendant has failed to make the requisite

8  "strong showing of inconvenience to warrant upsetting the

9  plaintiff's choice of forum," Decker Coal, 805 F.2d at 843, the

10  court finds transfer of these cases is not appropriate under 28

11  U.S.C. § 1404(a).

12  III. Motion to Dismiss

13  　　　　A.　　Legal Standard

14  　　　　Federal Rule of Civil Procedure 12(b)(6) allows for

15  dismissal when the plaintiff's complaint fails to state a claim

16  upon which relief can be granted.  See Fed. R. Civ. P. 12(b)(6).

17  "A Rule 12 (b)(6) motion tests the legal sufficiency of a claim."

18  Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  The inquiry

19  before the court is whether, accepting the allegations in the

20  complaint as true and drawing all reasonable inferences in the

21  plaintiff's favor, the complaint has alleged "sufficient facts

22  . . . to support a cognizable legal theory," id., and thereby

23  stated "a claim to relief that is plausible on its face," Bell

24  Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In deciding

25  such a motion, all material allegations of the complaint are

26  accepted as true, as well as all reasonable inferences to be

27  drawn from them.  Id.

28  　　　　"In order to survive a motion to dismiss under Rule

1  12(b)(6), an antitrust complaint 'need only allege sufficient

2  facts from which the court can discern the elements of an injury

3  resulting from an act forbidden by the antitrust laws.'" Cost

4  Mgmt. Servs. Inc. v. Wash. Nat. Gas Co., 99 F.3d 937, 950 (9th

5  Cir. 1996) (citation omitted).

6      B.   Sherman Act § 1 (Claim 1)[3]

7          Section 1 of the Sherman Act provides: "Every contract,

8  combination in the form of trust or otherwise, or conspiracy, in

9  restraint of trade or commerce among the several States, or with

10 foreign nations, is declared to be illegal."  15 U.S.C. § 1.

11 "Although on its face, Section 1 appears to outlaw virtually all

12 contracts, it has been interpreted as 'outlaw[ing] only

13 unreasonable restraints' of trade."  In re Nat'l Football

14 League's Sunday Ticket Antitrust Litig., 933 F.3d 1136, 1149-50

15 (9th Cir. 2019) (quoting State Oil Co. v. Khan, 522 U.S. 3, 10

16 (1997)).  "Because § 1 . . . only [prohibits] restraints effected

17 by a contract, combination, or conspiracy, the crucial question

18 is whether the challenged anticompetitive conduct stems from an

19 independent decision or from an agreement, tacit or express."

20 Twombly, 550 U.S. at 553 (citations and internal quotations

21 omitted); see Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., 20

22 F.4th 466, 479 (9th Cir. 2021) ("To establish a conspiracy, the

23 available evidence must tend 'to exclude the possibility that the

24 alleged conspirators acted independently.'") (citation and

25 internal quotations omitted).

26          The court will first address whether plaintiffs have

27  _____

28      [3]   Both Smart Plaintiffs and Colon Plaintiffs assert a
    claim under § 1 of the Sherman Act.

adequately alleged antitrust injury before addressing whether plaintiffs have adequately pled a claim under § 1 of the Sherman Act.

### 1.   Antitrust Injury

Antitrust injury is a "substantive element of an antitrust claim, and the fact of injury or damage must be alleged at the pleading stage." Somers v. Apple, Inc., 729 F.3d 953, 963 (9th Cir. 2013); see City of Oakland, 20 F.4th at 456 ("antitrust injury -- is mandatory") (citation omitted).  There are four requirements for antitrust injury: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." Id. (quoting Am. Ad Mgmt. v. Gen. Tel. Co. of Cal., 190 F.3d 1051, 1055 (9th Cir. 1999) (quotations omitted).

Here, plaintiffs allege that they suffered antitrust injury because their compensation -- $0 -- is below the compensation they would have received in a competitive market. (Smart Compl. ¶ 53; Colon Compl. ¶¶ 68-69.)  "Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit." NCAA v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 107-08 (1984) (citing Standard Oil Co. v. United States, 221 U.S. 1, 52-60 (1911)); cf. In re High-Tech Emp. Antitrust Litig., 856 F. Supp. 2d 1103, 1123 (N.D. Cal. 2012) ("The Ninth Circuit has held that, where . . . an employee is the direct and intended object of an employer's anticompetitive conduct, that employee has standing to sue for antitrust injury.") (citing Ostrofe v. H.S. Crocker Co.,

1    Inc., 740 F.2d 739, 742-43 (9th Cir. 1984)) (additional citations

2    omitted).  Cf. Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d

3    979, 988 (9th Cir. 2000) ("When horizontal price fixing causes

4    buyers to pay more, or sellers to receive less, than the prices

5    that would prevail in a market free of the unlawful trade

6    restraint, antitrust injury occurs.").

7         Defendant argues that plaintiffs' antitrust allegations

8    are conclusory because neither plaintiff alleges facts showing

9    that he would have received more compensation without the Bylaw.[4]

10   (See Smart Mot. Dismiss at 18 (Docket No. 7); Colon Mot. Dismiss

11   at 9-10 (Docket No. 27).)  Defendant likewise contends that

12   plaintiffs do not allege that their respective teams would have

13   hired them as a paid assistant coach.[5]  (Smart Mot. Dismiss at

14   18; Colon Mot. Dismiss at 10-11.)  In drawing all inferences in

15   plaintiffs' favor, as the court must at this stage, it is not

16        [4]   The cases upon which defendant relies are
17   distinguishable.  (See Mot. Dismiss at 17-19.)  For example, in
     City of Oakland v. Oakland Raiders, 20 F.4th 441 (9th Cir. 2012),
18   Oakland argued that it suffered antitrust injury because, absent
     the challenged practice, Oakland would have either retained the
19   Raiders or acquired another team.  See id. at 559.  The Ninth
     Circuit rejected Oakland's argument, explaining: "[T]here is no
20   way of knowing [] what would have occurred in a more competitive
     marketplace.  Would new teams have joined the NFL?  Would they
21   have found Oakland attractive?"  Id.  Here, by contrast,
     plaintiffs' alleged injury is far less speculative.  Both
22   plaintiffs were hired as Division I baseball coaches but did not
     receive a salary because of the Bylaw.  That an already employed
23   baseball coach would be paid a salary over $0 absent the
     challenged conduct is a far less speculative injury than whether
24   a specific city would be selected to host one of only thirty-two
     NFL teams.

25        [5]   As discussed at oral argument, allegations that
26   plaintiffs would have been hired but for the Bylaw are different
     than allegations that plaintiffs would have been compensated.
27   Because plaintiffs were all hired as volunteer coaches, the issue
     here is whether they would have been paid, not whether they would
28   have been hired.

1   implausible that plaintiffs would have been paid a salary above

2   $0 but for the NCAA's adoption of the Bylaw.  See Cost Mgmt., 99

3   F.3d at 950 ("[A]n antitrust complaint need only allege

4   sufficient facts from which the court can discern the elements of

5   an injury") (citation omitted).

6        Moreover, allegations of horizontal price fixing

7   premised on the creation of the volunteer coach position are

8   sufficient to show antitrust injury.  See Bd. of Regents, 468

9   U.S. at 107-08 ("Restrictions on price and output are the

10  paradigmatic examples of restraints of trade that the Sherman Act

11  was intended to prohibit.");  In re High-Tech, 856 F. Supp. 2d at

12  1123 (employee has suffered antitrust injury where it is the

13  "direct and intended object of employer's anticompetitive

14  conduct").  Therefore, the court finds plaintiffs have plausibly

15  alleged antitrust injury.

16              2.   Sherman Act § 1

17       To state a claim under § 1 of the Sherman Act, a

18  plaintiff must show: "(1) a contract, combination or conspiracy;

19  (2) that unreasonably restrained trade under either a per se rule

20  of illegality or a rule of reason analysis; and (3) that

21  restraint affected interstate commerce."  Optronic, 20 F.4th at

22  479 (quoting Tanaka v. USC, 252 F.3d 1059, 1062 (9th Cir. 2011)

23  (quotations omitted)).  Here, the first and third factors are

24  easily satisfied.

25       The NCAA, in concert with its member schools, agreed to

26  adopt the Bylaw.  See Hennessey v. NCAA, 564 F.2d 1136, 1147 (5th

27  Cir. 1977) ("[C]onceptually the adoption and execution of the

28  NCAA [b]ylaw can be seen as the agreement and concert of action

of the various members of the association, as well as that of the association itself . . . ." ); Bd. of Regents, 468 U.S. at 106 ("[S]ince as a practical matter all member institutions need NCAA approval, members have no real choice but to adhere to the NCAA's television controls."). Further, the NCAA is a national organization where players, coaches, and teams travel across states. See Hennessey, 564 F.2d at 1151 ("[T]he employment market for collegiate coaches is multi-state, if not national, and []the [b]ylaw has the effect of reducing the movement of coaches between institutions located in different states."). Therefore, this claim rests on what analysis to apply and whether plaintiffs have adequately alleged anticompetitive effects under that analysis.

"Courts have established three categories of analysis -- per se, quick-look, and Rule of Reason -- for determining whether actions have anticompetitive effects . . . ." Agnew v. NCAA, 683 F.3d 328, 335 (7th Cir. 2012) (citing Cal. Dental Ass'n v. FTC, 526 U.S. 756, 779 (1999)). "The per se rule condemns practices that 'are entirely void of redeeming competitive rationales.'" Law v. NCAA, 134 F.3d 1010, 1016 (10th Cir. 1998) (citation omitted). "Horizonal price fixing and market allocation are per se Section 1 violations." Optronic, 20 F.4th at 479 (citations omitted). By contrast, the Rule of Reason "requires a court to 'conduct a fact-specific assessment of market power and market structure' to assess a challenged restraint's 'actual effect on competition.'" NCAA v. Alston, 141 S. Ct. 2141, 2160 (2021) (quoting Ohio v. Am. Express Co., 138 S. Ct. 2274, 2284 (2018)). The quick-look analysis is "a truncated

15

1   rule of reason analysis."  In re NCAA I-A Walk-On Football

2   Players Litig., 398 F. Supp. 2d 1144, 1150 (W.D. Wash. 2005)

3   (citing FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 459-61

4   (1986)).  "[T]he 'quick-look' analysis . . . is used where the

5   per se framework is inappropriate, but where 'no elaborate

6   industry analysis is required to demonstrate the anticompetitive

7   character of . . . an agreement,' and proof of market power is

8   not required."  Agnew, 683 F.3d at 336 (quoting Bd. of Regents,

9   468 U.S. at 109).

10          Here, plaintiffs allege there was a horizontal

11  agreement to fix price because the Bylaw capped the salary of the

12  volunteer coach position at $0.  Generally, such an agreement

13  would be a per se violation of § 1 as horizontal price fixing.

14  See Bd of Regents, 568 at 100 ("Horizontal price fixing and

15  output limitation are ordinarily condemned as a matter law under

16  an 'illegal per se' approach because the probability that these

17  practices are anticompetitive is so high . . . .") (citation

18  omitted); see also Law, 134 F.3d at 1018 ("By agreeing to limit

19  the price which NCAA members may pay for the services of

20  restricted-earnings coaches, [the rule at issue] . . . .

21  constitutes the type of naked horizontal agreement among

22  competitive purchasers to fix prices usually found to be illegal

23  per se.").

24          However, in NCAA v. Board of Regents of University of

25  Oklahoma, 468 U.S. 85 (1984), the Supreme Court announced that

26  "it would be inappropriate to apply a per se rule" to cases

27  involving the NCAA because it is "an industry in which horizonal

28  restraints on competition are essential if the product is to be

16

available at all." Id. at 100-01 ("What the NCAA and its member institutions market . . . is competition itself -- contests between competing institutions.  Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed.").  Thus, in the context of the NCAA, courts typically apply a quick-look analysis.  See, e.g., Alston, 141 S. Ct. at 2157 ("[A] quick look will often be enough to approve the restraints 'necessary to produce a game'") (citation omitted); Law v. NCAA, 134 F.3d 1010, 1020 (10th Cir. 1998) (adopting quick-look approach in case challenging restriction on assistant coaches' salaries); Agnew, 683 F.3d at 336 (suggesting that the quick-look approach is "the appropriate method for analyzing whether the NCAA's actions have had an anticompetitive effect").  As such, a quick-look analysis is appropriate here.

"Under a quick look rule of reason analysis, anticompetitive effect is established . . . where the plaintiff shows that a horizontal agreement to fix prices exists, that the agreement is effective, and that the price set by such an agreement is more favorable to the defendant than otherwise would have resulted from the operation of market forces." Law, 134 F.3d at 1020 (citing Gary R. Roberts, The NCAA, Antitrust, and Consumer Welfare, 70 Tul. L. Rev. 2631, 2636-39 (1996)).  As discussed above, plaintiffs allege that the NCAA and its member schools established the additional coaching position as a "volunteer" position and set the salary at $0.  (Smart Compl. ¶¶ 43-45; Colon Compl. ¶¶ 44-46.)  Moreover, "since as a practical matter all member institutions need NCAA approval, members have

17

1  no real choice but to adhere to the NCAA's [rules]."  Bd. of

2  Regents, 468 U.S. at 106.  Plaintiffs' allegations of both the

3  large salaries received by coaches as well as the overall

4  increase in coach salaries creates a strong inference that the

5  Bylaw was effective.  Therefore, the court concludes that under a

6  quick look analysis plaintiffs have alleged facts sufficient to

7  show a violation of § 1 of the Sherman Act.[6]

8        Defendant argues that plaintiffs cannot sustain their §

9  1 Sherman Act claim because they failed to plead a relevant

10  market.  (Smart Mot. Dismiss at 19; Colon Mot. Dismiss at 12, 14-

11  18.)  Defendant contends that Division I cannot be a relevant

12  market because it does not include other available coaching

13  opportunities such as those at the high school or professional

14  levels.  (Smart Mot. Dismiss at 20-21; Colon Mot. Dismiss at 16-

15  18.)  However, under Regents, proof of market power is not

16  required under a quick look analysis.[7]  See Bd. of Regents, 468

17  ──────────────────────────

18        [6]   The issue of whether the NCAA may cap coaches' salary
   was last addressed over 25 years ago.  Law v. NCAA, 902 F. Supp.
19  1394 (D. Kan. 1995), aff'd 134 F.3d 1010 (10th Cir. 1998),
   involved a rule promulgated by the NCAA which capped the
   compensation of a specific category of Division I basketball
20  coach.  See 134 F.3d at 1015.  The rule was found to violate § 1
   of the Sherman Act.  Id. at 1024.  In so finding, both the
21  District Court and the Tenth Circuit applied a quick-look
   analysis.  Law, 902 F. Supp. at 1405; Law, 134 F.3d at 1020.  Law
22  was related to two other NCAA price-fixing cases: Hall v. NCAA,
   No. 2:94-cv-02392, and Schreiber v. NCAA, No. 2:95-cv-02026.
23
        [7]   The Supreme Court's conclusion that proof of market
24  power is not required under the quick look analysis does not mean
   that "the existence of a relevant market cannot be dispensed with
25  altogether . . . . [as] [i]t is the existence of a commercial
   market that implicates the Sherman Act in the first instance."
26  See Agnew, 683 F.3d at 337.  Rather, not requiring proof of
   market power means that "the conduct itself is sufficient
27  evidence of the requisite market power.  No elaborate industry
   analysis, market definitions, or complicated testimony of high-
28  priced expert economists will be required to establish what the

18

1    U.S. at 109.  Further, courts have upheld relevant market

2    definitions which distinguish between levels in the sports

3    context.  See e.g., Rock v. NCAA, No. 1:12-cv-1019, 2013 WL

4    4479815, at *11-13 (S.D. Ind. Aug. 16, 2013) ("[A]t least in the

5    context of sports, some courts have accepted a relevant market

6    definition based on a quality distinction of one league over

7    another, particularly where that distinction results in increased

8    revenue and opportunities for the participants."); see id.

9    (collecting cases).[8]

10          At this stage, plaintiffs' allegations that the market

11   for Division I coaches is distinct from the market for high

12   school and professional coaches are sufficient.  See Newcal

13   Indus., Inc. v. Ikon Office Sols., 513 F.3d 1038, 1045 (9th Cir.

14   2008) ("[Because] the validity of the 'relevant market' is

15   typically a factual element, alleged markets may survive scrutiny

16   under Rule 12(b)(6) subject to factual testing by summary

17   judgment or trial.") (citations omitted).

18          In the Colon case, defendant additionally argues that:

19   (1) plaintiffs did not specifically identify any relevant product

20   market; and (2) plaintiff improperly included coaching positions

21   _____

22   defendants' conduct already clearly proves."  Roberts, The NCAA,
     Antitrust, and Consumer Welfare, supra, at 2639.

23          [8]   Such a distinction is logical given the variation in
     professional opportunities, revenue, competition, and types of
24   duties between the divisions in college sports, high school
     sports, and professional sports.  Cf. Newcal Indus., Inc. v. Ikon
25   Office Sols., 513 F.3d 1038, 1046 (9th Cir. 2008) ("The outer
     boundaries of a product market are determined by the reasonable
26   interchangeability of use or the cross-elasticity of demand
     between the product itself and substitutes for it.") (quoting
27   Brown Shoe v. United States, 370 U.S. 294, 325 (1962) (quotations
     omitted).
28

                                   19

1  in all sports, even though a coaching position in one sport is

2  not a substitute for a coaching position in a different sport.

3  (Colon Mot. Dismiss at 12, 14-16.)   The court rejects both

4  arguments.   First, plaintiffs did specify a relevant product

5  market -- the market for Division I coaches.   Second, the court

6  does not read the Colon Complaint to suggest that plaintiffs

7  believe coaches in one sport are substitutes for coaches in any

8  other sport.   To the contrary, plaintiffs sufficiently alleged

9  that defendant determines the number of paid coaches per sport

10 and plaintiffs were each seeking to be paid for the coaching

11 position in their particular sport.

12        For the reasons stated above, plaintiffs have alleged

13 facts sufficient to show a violation of § 1 of the Sherman Act.

14 Accordingly, defendant's motions to dismiss the Sherman Act claim

15 in both <u>Smart</u> and <u>Colon</u> will be denied.[9]

16    C.    <u>Quantum Meruit and Unjust Enrichment</u> (Claims 2 and 3)[10]

17        Smart Plaintiffs assert claims for quantum meruit and

18 unjust enrichment under various state laws.[11]   (Smart Compl. ¶¶

19 86-93.)   Because the named plaintiffs are from California

20

21        [9]    As discussed above, Colon Plaintiffs' § 1 Sherman Act
   claim is their sole claim.

22

23        [10]   The claims for quantum meruit and unjust enrichment are
   only asserted by Smart Plaintiffs.

24        [11]   "[Q]uantum meruit . . . rests upon the equitable theory
25 that a contract to pay for services rendered is implied by law
   for reasons of justice."   <u>Hedging Concepts, Inc. v. First All.</u>
   <u>Mortg. Co.</u>, 41 Cal. App. 4th 1410, 1149 (2nd Dist. 1996).   <u>See</u>
26 <u>also</u> <u>Servewell Plumbing, LLC v. Summit Contractors, Inc.</u>, 362
   Ark. 598, 612 (2005) ("Unjust enrichment is an equitable
27 doctrine" which represents "the principle that one person should
   not be permitted unjustly to enrich himself at the expense of
28 another.").

1  (Plaintiff Hacker) and Arkansas (Plaintiff Smart), the court

2  considers both California and Arkansas law, and because the

3  claims for quantum meruit and unjust enrichment are similar the

4  court will address them together.  See McBride v. Boughton, 123

5  Cal. App. 4th 379, 387 (1st Dist. 2004) (unjust enrichment is

6  "synonymous with restitution"); City of Oakland v. Oakland

7  Raiders, 83 Cal. App. 5th 458, 477-78 (2nd Dist. 2022) ("Whether

8  termed unjust enrichment, quasi-contract, or quantum meruit, the

9  equitable remedy of restitution when unjust enrichment has

10  occurred 'is an obligation . . . created by the law without

11  regard to the intention of the parties . . . .'") (citations

12  omitted); KBX, Inc. v. Zero Grade Farms, 2022 Ark. 42, at *20

13  (2022) ("Quantum meruit is a claim for unjust enrichment that

14  does not involve the enforcement of a contract.") (citation

15  omitted).

16        Under both California and Arkansas law, a plaintiff

17  cannot sustain a claim under either theory, quantum meruit or

18  unjust enrichment, where there is an enforceable contract.  See

19  Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc., 94

20  Cal. App. 4th 151, 172 (4th Dist. 2001) ("[A] quasi-contract does

21  not lie where . . . express binding agreements exist and define

22  the parties' rights."); Servewell, 362 Ark. at 612 ("[T]he

23  concept of unjust enrichment has no application when an express

24  written contract exists.").  See also Hedging Concepts, 41 Cal.

25  App. 4th at 1149 ("[I]t is well settled that there is no

26  equitable basis for an implied-in-law promise to pay reasonable

27  value when the parties have an actual agreement covering

28  compensation."); Paracor Fin., Inc. v. Gen. Elec. Cap. Corp., 96

1  F.3d 1151, 1167 (9th Cir. 1996) (under California law, unjust

2  enrichment "does not lie when an enforceable, binding agreement

3  exists defining the rights of the parties") (citation omitted);

4  Deutsche Bank Nat'l Tr. Co. v. Austin, 2011 Ark. App. 531, at *7

5  (2011) ("Courts will only imply a promise to pay for services

6  where they were rendered in such circumstances as authorized the

7  party performing them to entertain a reasonable expectation of

8  their payment by the party beneficiary.") (citation omitted).

9        Here, it is alleged that Smart Plaintiffs agreed to

10  work for their respective NCAA member baseball teams as volunteer

11  coaches.[12]  Smart Plaintiffs do not allege, even in the

12  alternative, that they worked as volunteer coaches without a

13  contract.  Thus, assuming they had contracts with their

14  respective schools, the existence of these contracts makes their

15  restitution claims unavailable.[13]  See Cal. Med. Ass'n, 94 Cal.

---

16      [12]   Smart Plaintiffs make no allegations that they believed
17  they would be paid coaches or that they were unaware of the
    restrictions on non-salary benefits.

18      [13]   Plaintiff Hacker argues, for the first time in the
19  Opposition, that he was coerced into taking the position as a
    volunteer coach.[13]  (Smart Opp'n Mot. Dismiss at 29, 31 (Docket
20  No. 18).)  Plaintiff Hacker is correct that, under California
    law, coercion can provide the basis for their restitution claims.
21  See Cal. Lab. Code § 1720.4(a) ("An individual shall be
    considered a volunteer only when his or her services are offered
22  freely and without pressure and coercion, direct or implied, from
    an employer."); Carlin v. DairyAmerica, Inc., 978 F. Supp. 2d
23  1103, 1118 (E.D. Cal. 2013) (Ishii, J.) ("[R]estitution may be
24  awarded where the defendant obtained a benefit from the plaintiff
    by fraud, duress, conversion, or similar conduct.") (citation
25  omitted).  Nevertheless, the court must reject the coercion
    argument for two reasons.  First, Plaintiff Hacker never
26  expressly asserted a theory of coercion in the Complaint.
    Second, the allegations in the Complaint, even indirectly, do not
27  support a theory of coercion.

28

1  App. 4th at 172; Servewell, 362 Ark. at 612.

2          For the reasons stated above, the court finds that

3  Smart Plaintiffs have failed to allege facts sufficient to

4  support their claims for quantum meruit and unjust enrichment.[14]

5          D.   UCL (Claim 4)[15]

6          Smart Plaintiffs assert a claim under California's UCL

7  alleging that defendant's conduct violated both antitrust and

8  wage-and-hour laws.  (Smart Compl. ¶ 94-98.)  As an initial

9  matter, Plaintiff Smart did not allege any facts suggesting that

10  he worked as a volunteer baseball coach in California or that he

11  has any other connections to the state.  Thus, Plaintiff Smart

12  has no claim under California's UCL.  See Sullivan v. Oracle

13  Corp., 51 Cal. 4th 1191, 1207 (2011) ("Neither the language of

14  the UCL nor its legislative history provides any basis for

15  concluding the Legislature intended the UCL to operate

16  extraterritorially.").  Smart Plaintiffs contend that discovery

17  will ultimately show that Plaintiff Smart worked in California

18  during away games.  While that may be so, the Complaint itself

19  contains no allegation that Plaintiff Smart performed any work as

20  a baseball coach for the University of Arkansas in California.

21  Accordingly, the court will evaluate plaintiffs' UCL claim as to

22  only Plaintiff Hacker.

23          "California's UCL[] prohibits 'any unlawful, unfair, or

24  _____

25          [14]   Both Smart Plaintiffs and defendant advance arguments
about choice of law issues as this is a putative nationwide class
26  action.  However, because this order dismisses the two claims
arising out of both California and Arkansas law, the court need
27  not address these choice of law concerns.

28          [15]   The UCL claim is asserted only by Smart Plaintiffs.

1  fraudulent business act or practice.'"). Castaneda v. Saxon

2  Mortg. Servs., Inc., 687 F. Supp. 2d 1191, 1202 (E.D. Cal. 2009)

3  (Shubb, J.) (quoting Cel-Tech Commc'ns, Inc. v. L.A. Cellular

4  Tel. Co., 20 Cal. 4th 163, 187 (1999)). The UCL "establishes

5  three varieties of unfair competition -- acts or practices that

6  are (1) unlawful, (2) unfair, or (3) fraudulent." Cel-Tech

7  Commc'ns, 20 Cal. 4th at 180. "Each prong of the UCL is a

8  separate and distinct theory of liability." Perea v. Walgreen

9  Co., 939 F. Supp. 2d 1026, 1040 (C.D. Cal. 2013). "A plaintiff

10  must state with reasonable particularity the facts supporting the

11  statutory elements of the violation." Khoury v. Maly's of Cal.,

12  Inc., 14 Cal. App. 5th 612, 619 (2nd Dist. 1993). Here,

13  Plaintiff Hacker brings claims under the unlawful and unfair

14  prongs of the UCL.

15       1.  Unlawful Prong

16       "To state a claim under the unlawful prong of the UCL,

17  a plaintiff must plead: (1) a predicate violation, and (2) an

18  accompanying economic injury caused by the violation." Roper v.

19  Big Heart Pet Brands, Inc., 510 F. Supp. 3d 903, 921 (E.D. Cal.

20  2020) (Drozd, J.) (citation and quotations omitted). "By

21  proscribing 'any unlawful' business practice, section 17200

22  borrows violations of other laws and treats them as unlawful

23  practices that the unfair competition law makes independently

24  actionable." Cel-Tech Commc'ns, Inc., 20 Cal. 4th at 180

25  (internal quotations omitted).

26       Plaintiff Hacker asserts two predicates for his claim

27  under the UCL's unlawful prong: antitrust laws and wage-and-hour

28  laws. (Smart Compl. ¶ 96.) Because Smart Plaintiffs have

1  adequately pled their Sherman Act claim, Plaintiff Hacker has

2  also adequately pled his unfair competition claim as premised on

3  the antitrust violations.  See Name.Space, Inc. v. Internet Corp.

4  for Assigned Names & Numbers, 795 F.3d 1124, 1134 (9th Cir. 2015)

5  ("Statutory liability can be premised on antitrust or trademark

6  violations.").  And because the antitrust theory is clearly

7  sufficient, the court need not address the wage-and-hour theory.

8            2.   Unfair Prong

9            Plaintiff Hacker asserts the same antitrust and wage-

10  and-hour predicates for his claim under the UCL's unfair prong.

11  (Smart Compl. ¶ 96.)  Plaintiff Hacker also asserts a restitution

12  claim under the "unfair" prong of the UCL for depriving

13  plaintiffs of "the right to earn a bargained-for wage in exchange

14  for work performed . . . ."  (Id. ¶ 97.)

15            a.   Statutory Violations

16            "To show a business practice is unfair, the plaintiff

17  must show the conduct 'threatens an incipient violation of an

18  antitrust law, or violates the policy or spirit of one of those

19  laws because its effects are comparable to or the same as the

20  violation or the law, or otherwise significantly threatens or

21  harms competition.'"  Byars v. SCME Mortg. Bankers, Inc., 109

22  Cal. App. 4th 1134, 1147 (4th Dist. 2003) (quoting Cel-Tech

23  Commc'ns, Inc., 20 Cal. 4th at 186).  Here, as discussed above,

24  the court already found that Plaintiff Hacker has adequately pled

25  his UCL claim under the unlawful prong as premised on alleged

26  antitrust violations.  Thus, Plaintiff Hacker has also adequately

27  pled his UCL claim under the unfair prong as to the same alleged

28  antitrust violations.  See Cel-Tech Commc'ns, Inc., 20 Cal. 4th

at 186 (conduct is "unfair" where it "threatens an incipient violation of an antitrust law").

b.   Restitution

"California Business and Professions Code § 17203 provides that restitution is an available remedy under the UCL 'to restore any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.'"  Linde, LLC v. Valley Protein, LLC, No. 1:16-cv-00527 DAD, 2019 WL 3035551, at *20 (E.D. Cal. July 11, 2019) (quoting Cal. Bus. & Prof. Cod § 17203).  However, a plaintiff "must establish that she lacks an adequate remedy at law before securing equitable restitution for past harm under the UCL . . . ."  Sonner v. Premier Nutrition Corp., 971 F.3d 834, 844 (9th Cir. 2020) (citations omitted) (dismissing plaintiff's claims for equitable restitution under California's UCL because the operative complaint did not allege that the plaintiff lacked an adequate legal remedy, and the plaintiff sought the same amount in both equitable restitution and damages for the same past harm); see also Guthrie v. Transamerica Life Ins. Co., 561 F. Supp. 3d 869, 875 (N.D. Cal. 2021) ("[A] plaintiff must, at a minimum, plead that she lacks adequate remedies at law if she seeks equitable relief.") (collecting cases).

Here, Plaintiff Hacker acknowledges that he cannot seek restitution under the UCL for the same money he would receive for his claims at law.  (Smart Opp'n Mot. Dismiss at 45 (Docket No. 18).)  Nevertheless, he contends that his restitution claim should be allowed to proceed because, "if, for some reason, [his] claims at law fail[,] . . . . [he] would lack an adequate legal

1  remedy . . . ."  (Id.)  In support of this proposition, Plaintiff

2  Hacker relies on Coleman v. Mondelez International Inc., 554 F.

3  Supp. 3d 1055, 1065 (C.D. Cal. 2021).  In Coleman, the district

4  court denied a motion to dismiss the plaintiff's UCL claim,

5  finding that the plaintiff had adequately plead that she lacked

6  an adequate remedy at law because she "may ultimately not attain"

7  the monetary damages sought at law.  Id. at 1065.

8       However, as recognized by multiple district courts,

9  Coleman was decided before Guzman v. Polaris Industries Inc., 49

10  F.4th 1308 (9th Cir. 2022).  In Guzman, the Ninth Circuit held

11  that a plaintiff has an adequate remedy at law even where those

12  claims can no longer be pursued because they are time barred by

13  the statute of limitations.  Id. at 1312.  Thus, the court

14  concluded that the plaintiff "could not bring his equitable UCL

15  claim in federal court because he had an adequate legal remedy in

16  his time-barred [underlying] claim."  Id. at 1311.

17       Since Guzman, multiple district courts have declined to

18  follow Coleman.  See, e.g., Clevenger v. Welch Foods Inc., No.

19  20-cv-01859 CJC, 2022 WL 18228288, at *6 (S.D. Cal. Dec. 14,

20  2022) ("Plaintiffs cannot allege that they have an inadequate

21  remedy at law where their claim for monetary damages . . . seeks

22  redress for the exact same harm, in the exact same amount, as

23  their claims for restitution."); Stafford v. Rite Aid Corp., No.

24  17-cv-1340 TWR, 2012 WL 2876109, at *5 (S.D. Cal. Apr. 10, 2023)

25  (dismissing claims for equitable relief where plaintiff failed to

26  plausibly allege that he lacks an adequate remedy at law).  This

27  court also finds the reasoning in Coleman unpersuasive in the

28  light of the Ninth Circuit's binding decision in Guzman.

1  Plaintiff Hacker cannot plead that he lacks an adequate remedy at
2  law because he may lose on his legal claims.

3      Plaintiff Hacker also argues that his injunctive relief
4  claims under the UCL should proceed even though defendant amended
5  the Bylaw after Smart Plaintiffs filed their complaint.  (Smart
6  Opp'n Mot. to Dismiss at 14, 44.)  Effective July 2023, the
7  volunteer coach position in NCAA Division I will be eliminated,
8  and member teams will be permitted an additional paid coach.
9  (Id.)  While Smart Plaintiffs seek a permanent injunction to
10  enjoin defendant from implementing a rule similar to the Bylaw,
11  they have not pled any facts to suggest that they are likely to
12  be harmed in the future.  See Lujan v. Defenders of Wildlife, 504
13  U.S. 555, 564 ("Past exposure to illegal conduct does not in
14  itself show a present case or controversy regarding injunctive
15  relief if unaccompanied by any continuing, present adverse
16  effects.") (citing City of L.A. v. Lyons, 461 U.S. 95, 102
17  (1983)) (additional citation, internal quotations, and
18  punctuation omitted); see also Kurshan v. Safeco Ins. Co. of Am.,
19  --- F. Supp. 3d ---, 2023 WL 1070614, at *4 (E.D. Cal. Jan. 27,
20  2023) (Drozd, J.) (finding plaintiff lacked standing to seek
21  injunctive relief where he "ha[d] pled no facts alleging a
22  likelihood of future harm").[16]

23      Notably, neither Plaintiff Hacker nor Plaintiff Smart
24  has alleged any facts indicating that he is seeking another
25  position as a Division I baseball coach.  Moreover, even if

26      [16]    Nothing in Judge Drozd's decision in Roper v. Big Heart
    Pet Brands, Inc., 510 F. Supp. 3d 903 (E.D. Cal. 2020) (holding
27  that after Sonner a plaintiff may request injunctive relief in
    addition to claims for legal remedies), leads to a contrary
28  result.

1   either plaintiff had expressed an interest in coaching Division I

2   college baseball again in the future, such allegations would be

3   insufficient.  See Lujan, 504 U.S. at 564 ("'[S]ome day'

4   intentions -- without any description of concrete plans . . . do

5   not support a finding of the 'actual or imminent' injury that our

6   cases require.").  Because Smart Plaintiffs fail to allege facts

7   sufficient to show a likelihood of future harm, their claim for

8   injunctive relief under the UCL must be dismissed.  Cf. Roper v.

9   Big Heart Pet Brands, Inc., 510 F. Supp. 3d 903, 918 (E.D. Cal.

10  2020) (Drozd, J.) ("[T]he allegations of the complaint are

11  'sufficient to suggest a likelihood of future harm amenable to

12  injunctive relief.'") (citations omitted).

13          For the foregoing reasons, defendant's motion to

14  dismiss Plaintiff Hacker's UCL claim under both the unlawful and

15  unfair prongs as premised on antitrust law violations will be

16  denied.  However, the court will grant the motion as to (1) the

17  UCL claim brought by Plaintiff Smart and (2) the UCL claim for

18  restitution and injunctive relief.

19          E.    Declaratory Judgment (Claim 5)[17]

20          Smart Plaintiffs seek declaratory relief under the

21  Declaratory Judgment Act, 28 U.S.C. § 2201.  (Smart Compl. ¶¶ 99-

22  101.)  Under the Federal Declaratory Judgment Act, "[i]n a case

23  of actual controversy . . . any court of the United States . . .

24  may declare the rights and other legal relations of any

25  interested party seeking such declaration, whether or not further

26  relief is or could be sought."  28 U.S.C. § 2201(a).

27  ─────────────────

28          [17]    The declaratory judgment claim is only asserted by
     Smart Plaintiffs.

To determine whether a declaratory judgment is appropriate, the court must (1) "inquire whether there is an actual case or controversy within its jurisdiction" and (2) "decide whether to exercise its jurisdiction by analyzing the factors set out in Brillhart v. Excess Insurance Co., 316 U.S. 491 (1942), and its progeny." Principal Life Ins. Co. v. Robinson, 394 F.3d 665, 669 (9th Cir. 2005). Under Brillhart, potentially relevant factors include avoiding duplicative litigation, avoiding needless determination of state law issues, and considering whether the declaratory action will serve a useful purpose in clarifying the legal relations at issue. Id. at 672. The court's decision of whether to exercise jurisdiction "is discretionary, for the Declaratory Judgment Act is 'deliberately cast in terms of permissive, rather than mandatory, authority.'" Gov't Emps. Ins. Co. v. Dizol, 133 F.3d 1220, 1223 (9th Cir. 1998) (citation omitted).

"A case or controversy exists justifying declaratory relief only when 'the challenged ... activity ... is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the ... parties.'" Bayer v. Neiman Marcus Grp., Inc., 861 F.3d 853, 867 (9th Cir. 2017) (citations omitted). Thus, "[t]he difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act . . . . is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a

1    declaratory judgment."  Md. Cas. Co. v. Pac. Coal & Oil Co., 312

2    U.S. 270, 273 (1941) (citation omitted).  "[A] declaratory

3    judgment merely adjudicating past violations of federal law -- as

4    opposed to continuing or future violations of federal law -- is

5    not an appropriate exercise of federal jurisdiction."  Bayer, 861

6    F.3d at 868 (citing Green v. Mansour, 474 U.S. 64, 74 (1985)).

7         Here, the Bylaw was repealed in January 2023.  (See

8    Smart Mot. Dismiss at 14.)  The Complaint includes no allegation

9    that either named plaintiff is coaching or has imminent plans to

10   coach for any NCAA member school.  Therefore, Smart Plaintiffs

11   have not alleged any facts showing that "the parties have [a]

12   relationship beyond this litigation."  Bayer, 861 F.3d at 868

13   (finding claim for declaratory relief moot where plaintiff "has

14   produced no evidence to show the conduct complained of in this

15   action presently affects him or can reasonably be expected to

16   affect him in the future") (citations omitted).

17        Smart Plaintiffs contend that defendant's conduct is

18   continuing to cause harm since they "have been unable to

19   negotiate for compensation."  (Smart Opp'n Mot. Dismiss at 46;

20   Smart Compl. ¶¶ 79, 98.)  However, these conclusory allegations

21   speak only to the failure to negotiate compensation for past

22   harms.  They do not sufficiently allege any ongoing harm,

23   particularly where plaintiffs have alleged no facts showing that

24   plaintiffs and defendant have any form of ongoing relationship.

25   See Bayer, 861 F.3d at 868.  Accordingly, Smart Plaintiffs have

26   failed to allege facts sufficient to support a claim under the

27   Declaratory Judgment Act.

28   ///

1    IT IS THEREFORE ORDERED that defendant's motions to

2 transfer venue (Smart Docket No. 6; Colon Docket No. 26) be, and

3 the same hereby are, DENIED.

4    IT IS FURTHER ORDERED that defendant's motion to

5 dismiss the <u>Colon</u> Complaint (Colon Docket No. 27) be, and the

6 same hereby is, DENIED.

7    IT IS FURTHER ORDERED that defendant's motion to

8 dismiss the <u>Smart</u> Complaint (Smart Docket No. 7) be, and the same

9 hereby is, DENIED IN PART and GRANTED in PART.  Defendant's

10 motion to dismiss is DENIED as to Smart Plaintiffs' claim for

11 violations of the Sherman Act § 1 (Claim 1) and California's UCL

12 as brought by Plaintiff Hacker under the unfair and unlawful

13 prongs (Claim 4).  Defendant's motion to dismiss is GRANTED as to

14 all other claims in the <u>Smart</u> Complaint.

15    Smart Plaintiffs are granted 14 days from the date of

16 this Order to file an Amended Complaint if they can do so

17 consistent with this Order.

18 Dated:  July 27, 2023

19 WILLIAM B. SHUBB
   UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25

26

27

28

32