GARRETT R. BROSHUIS (State Bar No. 329924)
gbroshuis@koreintillery.com
KOREIN TILLERY, LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Attorneys for Plaintiffs Taylor Smart and Michael
Hacker, Individually and on Behalf of All Those
Similarly Situated [additional attorneys listed on
signature page]

DENNIS STEWART (State Bar No. 99152)
dstewart@gustafsonqluek.com
GUSTAFSON GLUEK PLLC
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (612) 333-8844
Facsimile: (612) 339-6622

Attorneys for Plaintiffs Joseph Colon, Shannon Ray,
Khala Taylor, Peter Robinson, Katherine Sebbane,
and Patrick Mehlert, Individually and on Behalf of
All Those Similarly Situated [additional attorneys
listed on signature page]

CAROLYN HOECKER LUEDTKE
(State Bar No. 207976)
carolyn.luedtke@mto.com
JUSTIN P. RAPHAEL
(State Bar No. 292380)
Justin.Raphael@mto.com
CHRISTOPHER CRUZ
(State Bar No. 346128)
Christopher.Cruz@mto.com
JAVIER KORDI
(State Bar No. 348358)
Javier.Kordi@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Flr
San Francisco, CA 94105-2907
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077

Attorneys for Defendant National
Collegiate Athletic Association, an
Unincorporated Association.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAYLOR SMART AND MICHAEL HACKER, Individually and on Behalf of All Those Similarly Situated,<br><br>Plaintiffs,<br>v.<br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association,<br>Defendant. | No. 2:22-cv-02125 WBS KJN<br><br>Hon. William B. Shubb<br>(assigned to Chief Magistrate Judge Kendall J. Newman for discovery matters)<br><br>**JOINT STATEMENT REGARDING DISCOVERY DISPUTE** |
| JOSEPH COLON, SHANNON RAY, KHALA TAYLOR, PETER ROBINSON, KATHERINE SEBBANE, and PATRICK MEHLERT, individually and on behalf of all those similarly situated,<br><br>Plaintiffs,<br>v.<br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association,<br>Defendant. | No. 1:23-cv-00425 WBS KJN<br><br>Oct. 24, 2023, 9:00 a.m., Courtroom 25 |

Plaintiffs[1] and Defendant National Collegiate Athletic Association ("NCAA") submit this Joint Statement Regarding Discovery Disagreement pursuant to Local Rule 251. Concurrent with this Statement, Plaintiffs are filing a notice of motion and motion. The cases involve claims brought by putative classes of coaches who worked without pay at NCAA Division I schools, pursuant to an NCAA bylaw that established the position known as "volunteer coach" and prohibited schools from compensating coaches in that position. Plaintiffs claim that the prohibition violated the Sherman Antitrust Act, 15 U.S.C § 1, which Defendant denies. The dispute at issue here concerns document requests and interrogatories seeking two categories of information:

> 1) Information identifying (a) coaches who worked in the volunteer coach position in various sports at Division I schools, and (b) compensation data of paid assistant coaches in those sports at those schools during the relevant period; and

> 2) Documents and communications from members of the NCAA's governance boards and committees who are employed by schools or athletic conferences, not the NCAA, that relate to proposed and enacted changes to the bylaws at issue in this case.

In response to document requests and interrogatories seeking this information, the NCAA took the position that the requested documents are not within its possession, custody, or control, the information sought by the interrogatories is not available to it, and the NCAA has declined to request or collect this information from its member schools or from athletic conferences. Based on the NCAA's representations, Plaintiffs do not presently argue that the documents and information are currently within the NCAA's "possession" or "custody"—only that the documents and information are within the NCAA's "control" and are available to it.

Therefore, the questions before the Court on this motion are whether any requested documents are within the NCAA's "control" for purposes of Federal Rule of Civil Procedure 34(a)(1) and whether the requested information is "available" to the NCAA for purposes of Federal Rule of Civil Procedure 33(b)(1)(B).[2]

---

[1] The term "Plaintiffs" refers collectively to all the plaintiffs named in the *Smart* action and the *Colon* action unless otherwise indicated.

[2] The dispute regarding coaches' identifying and salary information implicates the following RFPs

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

## I.    DETAILS OF THE MEET-AND-CONFER CONFERENCES

The parties met and conferred in good faith multiple times—both by videoconference and by correspondence—to try to resolve this dispute.  These efforts started in early August at the Rule 26(f) conference and continued up until recently when the parties agreed that they were at an impasse and the matter was ripe for the Court's resolution.

On the issue of the identities of volunteer and assistant coaches and assistant coach compensation, there was a general recognition that this information would be relevant in the case. The NCAA's counsel stated that the NCAA does not have any current or historical documents or information gathered in any centralized source that would identify volunteer or assistant coaches at Division I member schools or individual assistant coach compensation. The NCAA's counsel stated that this is not information that is reported to the NCAA by member schools.  Instead, the NCAA's counsel stated that member schools provide to the NCAA head coach identities, head coach compensation, aggregated assistant coach compensation, and assistant coach count (without identifying information or individualized compensation ladders).  The NCAA offered to produce this information in spreadsheets that would be generated by the NCAA's team with access to its databases.

Plaintiffs stated that the NCAA was in "control" of the requested identifying and salary information, and identified the specific bylaws that give the NCAA the right to collect the requested information from its member schools.  Plaintiffs also stated to the NCAA that in an antitrust case that Plaintiffs believe is very similar to this one, *Law v. NCAA*, 167 F.R.D. 464, 469-70 (D. Kan. 1996), the NCAA was ordered to obtain the relevant compensation data from its member schools, and according to Plaintiffs did so successfully, which allowed both parties in

---

and Interrogatories, which are attached as exhibits to the enclosed Declaration of Michael Lieberman ("Lieberman Decl.").  In particular, the dispute regarding coaches' identifying and salary information implicates RFPs 1, 2, and 25 in the *Smart* case (*see* Ex. A to Lieberman Decl.); Interrogatories 1, 2, and 3 in the *Smart* case (*see* Ex. B to Lieberman Decl.); RFPs 15 and 17 in the *Colon* case (*see* Ex. C to Lieberman Decl.); and Interrogatories 1 and 2 in the *Colon* case (*see* Ex. D to Lieberman Decl.).  The dispute regarding members of NCAA's governance boards and committees implicates the universe of custodians for all document requests in both cases.

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1 | *Law* to use that data for their respective contentions on alleged damages.  Plaintiffs further asked

2 | whether, setting aside the issue of custody and control, the NCAA would be willing to facilitate

3 | the production or gathering of this information from its member schools.

4 | The NCAA maintained its position that it did not have control over its member schools and

5 | would not have a mechanism by which to require the information from its member schools.  The

6 | NCAA also declined to request that its member schools provide the information or to otherwise

7 | facilitate collection.  The NCAA stated that to the extent the Plaintiffs want this information in

8 | discovery, Plaintiffs need to seek it through appropriate discovery vehicles such as third party

9 | discovery.  Plaintiffs disagreed and maintained that the NCAA has control over the relevant

10 | documents and information, and in all events should facilitate the collection of the information,

11 | leaving the parties at an impasse.

12 | On the issue of documents and other communications of NCAA committee or board

13 | members—who generally are employed by athletic conferences or member schools, not the

14 | NCAA, and who generally do not have NCAA email accounts—the NCAA again stated that it

15 | could not and would not collect or produce documents or communications from persons serving

16 | on NCAA governance boards or committees who are not employed by the NCAA, based on its

17 | position that such documents would not be in the NCAA's possession, custody, or control.  The

18 | NCAA explained that it would collect documents from relevant custodians who are employed by

19 | the NCAA and act as liaisons to relevant boards and committees as well as collecting documents

20 | from any shared document repositories for relevant boards and committees. Plaintiffs stated that

21 | NCAA board and committee members act on behalf of the NCAA when they act within the scope

22 | of their duties as members of the NCAA's governing boards and committees, and that the NCAA

23 | therefore has control over documents related to those duties.  The parties disagreed and an impasse

24 | was reached.

25 | The NCAA responded to the *Smart* Plaintiffs' initial document requests on September 16

26 | (*see* Ex. J to Lieberman Decl.) and the *Colon* Plaintiffs' initial document requests on

27 | September 22 (*see* Ex. K to Lieberman Decl.) and maintained its position described in earlier meet

28 | and confers and described above.  The NCAA anticipates responding to the *Smart* interrogatories

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1   on October 25 and the *Colon* interrogatories on October 26 consistent with the positions outlined

2   in the meet and confer process.

3        The parties agreed that this dispute was crystallized and ripe for Court intervention.

4   **II.    THE NATURE OF THE ACTION AND PERTINENT FACTS**

5        **A.    Plaintiffs' Position:**

6        In these two related cases, current and former Division I college sports coaches allege that

7   the NCAA and its Division I member schools unlawfully agreed to suppress their compensation,

8   in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

9        The NCAA is an unincorporated association of colleges and universities ("member

10   schools") that conduct athletic programs. The NCAA's member schools are organized into three

11   Divisions, with Division I schools offering the highest number and quality of opportunities for

12   participation in intercollegiate athletics. NCAA's Division I member schools generally compete

13   with each other in the labor market for coaches for their athletics teams, including on salary and

14   benefits. The NCAA and its Division I member schools, however, agreed not to compete on salary

15   and benefits for certain assistant coaches, and to instead cap the compensation for those coaches at

16   $0. This restraint is codified in the NCAA Division I Bylaws ("Bylaws"), which prohibit

17   compensation to these coaches. The Bylaws refer to this wage-fixed coach as a "volunteer" coach,

18   in contrast with other assistant coaches who schools are free to compensate, and do compensate,

19   for their work. Plaintiffs allege that the "volunteer" coaches are generally full-time employees

20   performing substantially the same duties as their paid counterparts and that, absent the wage-fixing

21   scheme, these coaches would be compensated for their work. They allege that these coaches, who

22   worked alongside their paid assistant coach counterparts, would have been paid a competitive

23   salary that, at a minimum, conformed with applicable wage and hour laws.

24        The *Smart* Plaintiffs filed their complaint on November 29, 2022, alleging that, in

25   Defendant's bylaws, the NCAA and its member schools agreed to allow member schools to hire

26   four baseball coaches, but unlawfully agreed to cap the compensation for one of those four

27   coaches at $0. *See* Ex. E to Lieberman Decl., 2022-23 NCAA Division I Manual ("Bylaws"), at

28   Bylaw 11.7.6 and Bylaw 11.01.6. This coach is called a "volunteer" coach in the bylaw, and the

*Smart* Plaintiffs seek to certify a class of baseball coaches who coached in that role. They allege that the vast majority of Division I baseball programs have hired such coaches, and the bylaws are strictly enforced. Plaintiffs further allege that these unpaid coaches perform most of the same duties as the paid coaches, and it is generally a full-time job. The result is a coach who performs significant valuable work, and who would be paid for that work in a competitive market, but who was not paid as a result of an illegal wage-fixing conspiracy among the NCAA and its member schools. These bylaws prevent the coaches from even making the minimum wages required by federal and state wage-and-hour laws. The *Smart* Plaintiffs allege that the NCAA and its member schools, acting as a buyer's cartel, have created an unreasonable restraint among themselves that insulates them from competition for the services of potential coaches on the member schools' baseball coaching staffs.

The *Colon* Plaintiffs filed their initial Complaint on March 21, 2023 (ECF No. 1) and their Amended Complaint on May 4, 2023. ECF No. 19. The *Colon* Plaintiffs worked as "volunteer" coaches in the sports of wrestling, track and field, softball, swimming and diving and men's soccer, and they similarly contend that the above-cited NCAA bylaws unlawfully suppressed their compensation in violation of Section 1 of the Sherman Act. They seek to certify a class of volunteer coaches in sports other than baseball, including approximately 25 women's sports and 20 men's sports.[3] The *Colon* plaintiffs allege that absent the wage-fixing scheme, they would have received substantial salary and benefits, commensurate with the salary and benefits received by paid assistant coaches in the same sports at the same member schools, instead of receiving no compensation for their work. The *Colon* case was related to the *Smart* case and is proceeding on the same pretrial schedule as *Smart*. On July 27, 2023, Judge Shubb denied the NCAA's motions

---

[3] This is similar to the coach classes that were certified in the above-mentioned *Law* case, which was litigated on a coordinated basis through trial to a Plaintiffs' verdict with two other assistant coach class actions, namely, *Schreiber v. NCAA* (baseball coaches) and *Hall v. NCAA* (coaches in all other sports). *See Law v. NCAA*, 902 F. Supp. 1394, 1398 at n.2 (D. Kan. 1995).

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1    to dismiss Plaintiffs' Sherman Act claims. On September 14, 2023, Judge Shubb denied the

2    NCAA's motion for clarification and/or reconsideration.

3         A few months after the *Smart* Plaintiffs filed their complaint, the NCAA's Division I

4    council—upon the recommendation of two NCAA governance committees—voted to amend the

5    bylaws at issue to eliminate the "volunteer" coaching position and permit it to now be a paid

6    position. A prior proposal to amend the bylaws at issue failed in 2019.

7         **B.     Defendant's Position:**

8         The NCAA is a membership association of more than 1,000 colleges and universities.

9    More than 300 of those institutions are members of Division I.  Plaintiffs allege that Division I

10   institutions fielded teams in approximately 20 men's sports and 25 women's sports.  The *Smart*

11   case involves allegations related to men's baseball.  The *Colon* case involves allegations regarding

12   cross country, golf, ice hockey, lacrosse, soccer, swimming and diving, tennis, indoor track,

13   outdoor track, wrestling, field hockey, rowing, softball, volleyball, and others.

14        Plaintiffs allege that the NCAA together with its members have long adopted and enforced

15   rules that regulate college sports, which concern everything from how the games are played to

16   standards of amateurism to rules governing the size of athletic squads and coaching staffs.  Indeed,

17   like the members of many other associations of athletic competitors, the NCAA's member

18   colleges and institutions that compete in Division I have adopted rules that provide for a limited

19   number of paid coaches in each sport.  *See* NCAA Division I Bylaw 11.7.5.  The bylaws authorize

20   programs in each sport to hire a specific number of coaches.

21        The NCAA's Division I members have also agreed to enable colleges and universities to

22   retain additional personnel to provide additional instruction and support to student-athletes.  Thus,

23   the Division I bylaws permitted teams to have one volunteer coach.  As the name suggests,

24   Division I members could not pay a volunteer coach.  The Division I bylaws prohibited teams

25   from offering volunteer coaches compensation beyond minimal, incidental non-cash benefits such

26   as complementary tickets or meals in connection with their team's competitions.

27        In January 2023, the NCAA's Division I membership amended the Division I bylaws to

28

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1  permit an additional paid coach in Division I sports (other than FBS football and basketball) and

2  eliminated the volunteer coach position effective July 1, 2023.

3      Plaintiffs allege that they volunteered as coaches at various Division I institutions in

4  various sports at various times.  The institutions at which Plaintiffs allegedly worked as a

5  volunteer coach span the country and the Plaintiffs allegedly coached a variety of different

6  Division I sports.

7  **III.  THE PARTIES' ARGUMENTS**

8      **A.  Plaintiffs' Arguments**

9          **1.  Information regarding the identities and compensation paid to Division I coaches is within the NCAA's "control" and is "available" to**

10         **the NCAA.**

11     The first dispute concerns (a) identifying information about Division I volunteer coaches

12 and (b) information about the compensation paid to other Division I coaches in the relevant sports.

13 Plaintiffs requested documents and propounded interrogatories on these topics, seeking documents

14 and information sufficient to identify the individuals who worked as Division I "volunteer"

15 coaches in the relevant sports (*i.e.* the identities of the putative class members) and to show the

16 compensation paid to other, non-wage-fixed assistant coaches. *See supra* n. 2 (identifying specific

17 requests). There is no dispute that this information exists; there is no dispute that this information

18 is held by NCAA's own member schools (who are the NCAA's alleged co-conspirators); and

19 there is no dispute that this information is relevant to both identifying class members and

20 calculating damages—*i.e.*, calculating how much class members would have been paid absent the

21 illegal agreement to pay them nothing. Instead, the dispute here centers on whether the requested

22 documents are within the NCAA's "control," such that the NCAA must produce them under Fed.

23 R. Civ. P. 34(a)(1), and whether the requested information is "available" to the NCAA, such that it

24 must "furnish the information" under Fed. R. Civ. P. 33(b)(1)(B).

25     Importantly, this is not the first time a court has been asked to resolve this question—and

26 the last time around, the court called the NCAA's position "frivolous." In *Law v. NCAA*, the

27 plaintiffs challenged an NCAA wage-fixing scheme that was functionally identical to the wage-

28

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

fixing scheme at issue here.[4] The *Law* plaintiffs requested that the NCAA produce identifying and salary information for Division I coaches, just as Plaintiffs here have requested. *See Law v. NCAA*, 167 F.R.D. 464, 469 (D. Kan. 1996). The NCAA sought a protective order, claiming (as it does here) that it could not require its member schools to provide the requested information and that the information "was as available to [plaintiffs] as it is to the NCAA." *Id.* at 469-70 & n.9. The district court pointedly rejected that argument, calling the NCAA's position "frivolous and inconsistent with defense counsel's obligations as officers of the Court." *Id.* at 470. The court further observed that "the approach advocated by the NCAA (that plaintiffs be required to travel to approximately 300 Division I institutions and secure the requested information through subpoenas and depositions) was the single most time-consuming and expensive procedure through which the requested information could be obtained -- not just for plaintiffs but for the member institutions and the NCAA itself." *Id.* at 470. The district court accordingly denied the NCAA's request for a protective order and granted the plaintiffs' motion to compel. *Id.* at 470-71. The NCAA successfully collected the requested information from its member schools and produced that information to the plaintiffs.[5]

The same result should follow here. *First*, the NCAA is required to produce the requested documents because they are within its "possession, custody, or control." Fed. R. Civ. P. 34(a)(1). *Second*, the NCAA is required to furnish the requested information because that information is

---

[4] The bylaw at issue in *Law* designated certain Division I coaches as "restricted earnings coaches" and capped their salaries at $16,000. *See Law*, 134 F.3d at 1020-21. Likewise here, the challenged bylaw designated certain Division I coaches as "volunteer coaches" and capped their salaries at $0. Judge Shubb's order denying the NCAA's motion to dismiss noted the similarity between the two cases. *See* Mem. and Order re: Def.'s Mot. to Transfer and Mot. to Dismiss ("MTD Order"), ECF 38 at 18 n.6.

[5] The district court in *Law* issued various sanctions in connection with this discovery dispute, and some of those discovery sanctions were vacated in *Univ. of Texas at Austin v. Vratil*, 96 F.3d 1337 (10th Cir. 1996). The *Vratil* decision expressly did not disturb the district court's orders with respect to the NCAA's discovery obligations. *See* 96 F.3d at 1341 n.4 ("[N]othing in this order should be read as granting relief to the NCAA from its obligations under [the district court's] order.").

"available" to it. Fed. R. Civ. P. 33(b)(1)(B). For either or both reasons, the NCAA is required to provide Plaintiffs with the requested documents and information, just as it did in *Law*.

### a. The NCAA has "control" over the requested documents under Rule 34.

Federal Rule of Civil Procedure 34 obligates a party to produce relevant, non-privileged documents in its "possession, custody, or control." Fed. R. Civ. P. 34(a)(1). Even accepting the NCAA's representation that the requested documents are not currently in its "possession" or "custody," the documents are in the NCAA's "control" because the Division I Bylaws give the NCAA the legal right to obtain those documents from its member schools.

"It is well settled that a party need not have actual possession of documents to be deemed in control of them." *City of Colton v. Am. Promotional Events, Inc.*, No. 09-cv-06630, 2011 WL 13223968, at *2 (C.D. Cal. Nov. 28, 2011) (internal quotation marks omitted). "Control is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999). "The fact that documents are in the physical possession of a third party custodian does not eliminate the responsibility of a responding party to search and produce those documents when the party has the legal right to obtain the documents on demand." *City of Colton*, 2011 WL 13223968, at *2.

A contract between a party and a non-party "that provides a legal right to access a third party's documents gives a party 'control' over such records." *Albornoz v. Wal-Mart Assoc., Inc.*, No. 22-cv-01229, 2023 WL 4373672, at *2 (E.D. Cal. July, 6, 2023) (Baker, M.J.). The law considers bylaws a type of enforceable contract. *See Lee v. Fisher*, 70 F.4th 1129, 1138 (9th Cir. 2023) (en banc) (noting bylaws are considered contracts).[6] This is true as to bylaws from voluntary, unincorporated associations like the NCAA. *See Williams v. Univ. Med. Ctr. of S. Nevada*, 688 F. Supp. 2d 1134, 1143 (D. Nev. 2010) ("[A]n unincorporated association's bylaws

---

[6] *See also Swisher v. Collins*, 409 Fed. Appx. 139, 141 (9th Cir. 2011) (affirming summary judgment in defendant's favor on breach of contract claim based on alleged violation of bylaws); *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 361 (D.C. 2005) ("It is well established that the formal bylaws of an organization are to be construed as a contractual agreement between the organization and its members.").

constitute a contract between the association and its members, and as between members in their relation to the association.") (collecting cases from various states).[7] Collegiate bylaws between a university and its associated athletic conference have been held to be enforceable contracts too. *Mountain East Conference v. Franklin Univ.*, No. 21-cv-104, 2023 WL 2415277, at *4 (N.D. W.Va. Mar. 8, 2023) (holding that plaintiff NCAA Division II conference's bylaws and constitution "establish a binding contract between" the conference and member school and granting summary judgment to conference on its breach of contract claim); *Rutgers, The State University v. American Athletic Conference*, No. 12-cv-7898, 2013 WL 5936632, at *8 (D.N.J. Oct. 31, 2013) (stating that "the Conference Bylaws constituted a contractual agreement between the Parties," and enforcing forum selection clause in same).

The NCAA's Division I Bylaws establish an enforceable contract between the NCAA and its member schools. The NCAA does not argue otherwise. And because the Bylaws constitute an enforceable contract, the proper interpretation of the Bylaws is "a question of law" for the Court. *Kassbaum v. Steppenwolf Prods., Inc.*, 236 F.3d 487, 490 (9th Cir. 2000); *see also Harrison v. Thomas*, 761 N.E.2d 816, 818 (Ind. 2002) ("[C]onstruction of the terms of a written contract is a pure question of law for the court."). The NCAA's arguments about the meaning of the Bylaws are just that—arguments—and the Court does not owe them (or the NCAA's declaration) any more deference than any other party's litigating position about the meaning of a written contract. *See United States v. Unruh*, 855 F.2d 1363, 1376 (9th Cir. 1987) ("We have condemned the practice of attempting to introduce law as evidence."). The NCAA's arguments carry weight only to the extent they are persuasive.

---

[7] *See also Andrews Farms v. Calcot, Ltd.*, 693 F. Supp. 2d 1154, 1159 n.2 (E.D. Cal. 2010) ("The constitution and rules and by-laws of a voluntary unincorporated association constitute a contract between the association and its members, and the rights and duties of the members as between themselves and in their relation to the association, in all matters affecting its internal government and the management of its affairs, are measured by the terms of such constitution and by-laws.") (quoting *Am. Soc. of Composers, Authors & Publishers v. Superior Court*, 207 Cal. App. 2d 676, 689 (Cal. Ct. App. 2d Dist. 1962)).

1    The Bylaws grant the NCAA the legal right to obtain documents from its member schools

2  that contain the requested identifying and salary information. This is clear both from specific

3  provisions that require member schools to submit these documents to the NCAA upon request, as

4  well as from more general provisions that give the NCAA sweeping authority to obtain documents

5  of all kinds from its member schools. The NCAA's argument that it is powerless to obtain these

6  documents from its member schools is as implausible and inconsistent with the Bylaws as it was

7  in *Law*.

8    Starting with specifics, the plain text of Bylaw 11.7.1 requires member schools to certify to

9  the NCAA the identity and coaching-category designation of each of their coaches, including their

10  "volunteer" coaches:

11    "**Designation of Coaching Category. [A]** An individual who coaches and either
   is uncompensated or receives compensation or remuneration of any sort from the
12    institution … *shall be designated* as a head coach, assistant coach, *volunteer coach*,
   graduate assistant coach or student assistant coach *by certification of the*
13    *institution*."

14  Ex. E to Lieberman Decl., Bylaw 11.7.1 (emphasis added). Because this Bylaw requires member

15  schools to identify, designate, and certify their coaches to the NCAA, the NCAA has the "legal

16  right" to obtain the information, and therefore has "'control' over such records." *Albornoz*, 2023

17  WL 4373672, at *2.

18    The NCAA does not dispute that Bylaw 11.7.1 requires its member institutions to

19  designate each of their coaches and certify that designation, and it does not dispute that the

20  certified information includes the identities of volunteer coaches.  The NCAA instead hinges its

21  argument on a wildly implausible reading of the Bylaw:  According to the NCAA, Bylaw 11.7.1

22  does not require schools to certify anything *to the NCAA*, but only requires "the member school

23  [to] certify *to itself* that is has done this designation." *See infra* Part III.B.1 (emphasis added).

24  That reading should be rejected out-of-hand.  A certify-to-yourself requirement makes no sense

25  and would serve no purpose—especially if, as the NCAA seems to suggest, the NCAA is

26  powerless to obtain or examine the certifications.  The far better reading is that the NCAA's

27  member schools must make the certification to the body that enforces the rules regarding

28

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

coaches—*i.e.*, the NCAA.[8]  In any event, the NCAA has "control" even under its own reading of the bylaw:  The NCAA admits that Bylaw 11.7.1 requires member schools to certify the information *somewhere*, and the NCAA's Declaration of Kevin Lennon ("Lennon Decl.") admits that the Bylaws "allow the NCAA to seek information [from member schools] to enforce its rules."  Lennon Decl. at ¶ 32; *see also* Answer (ECF 47) at ¶ 47, *Colon v. NCAA*, No. 23-cv-00425 (filed Aug. 31, 2023) (admitting power to investigate compliance with Bylaws). The NCAA therefore has the power to enforce Bylaw 11.7.1's certification requirement by obtaining and examining those certifications.

The same is true with respect to compensation information for paid assistant coaches—*i.e.*, assistant coaches not designated as "volunteer" coaches. Bylaw 20.2.4.17 expressly commands member schools to "submit financial data … to the NCAA on an annual basis," including "[s]alary and benefits data for *all athletics positions*." Ex. E to Lieberman Decl., Bylaw 20.2.4.17 (emphasis added).  In the required submission to the NCAA, each school must include, for all athletics positions, "base salary, bonuses, endorsements, media fees, camp or clinic income, deferred income and other income contractually guaranteed by the institution." *Id.* That is the exact information Plaintiffs seek here.

Indeed, the NCAA has previously acknowledged that Bylaw 20.2.4.17 provides it with contractual authority to obtain this salary information from its member schools upon demand. In yet another antitrust case against the NCAA, the plaintiffs argued that the NCAA had "control" over certain of its members' documents that were *not* expressly addressed in the Bylaws. *See In re*

---

[8] The NCAA claims that Bylaw 11.7.1's "certify to yourself" nature is clear by contrast to Bylaw 12.1.1.1.2.2.  *See infra* Part III.B.1; *see also* Ex. E to Lieberman Decl., Bylaw 12.1.1.1.2.2.  That contention is doubly mistaken.  First, 12.1.1.1.2.2 is not a certification requirement at all—it addresses situations in which schools are required to "notify[]" or "report[]" something, and so is not the supposed counterexample that NCAA suggests it is.  The NCAA has not identified a single certification requirement that expressly specifies a recipient, and not even the NCAA claims that they are *all* certifications to nobody.  Second, Bylaw 12.1.1.1.2.2 actually confirms that when the Bylaws do not specify a certification recipient, the recipient is the NCAA.  That bylaw addresses situations in which a school must update the NCAA regarding a certification made under a different bylaw (12.1.1.1.2.1).  That latter bylaw, like Bylaw 11.7.1, does not specify any recipient for its certification requirement—and yet the recipient *must be* the NCAA, as a school could not "update" the NCAA about a certification it made only to itself.

*NCAA Student-Athlete Name & Likeness Litig.*, No. 09-cv-01967, 2012 WL 161240 (N.D. Cal. Jan. 17, 2012) ("*O'Bannon*"). Specifically, the plaintiffs sought "template likeness release/consent forms, television and licensing contracts, copyright policies, and broadcasting manuals." *Id.* at *2. In successfully opposing the plaintiffs' motion to compel, the NCAA contrasted the absence of a bylaw addressing those documents with the Bylaw at issue here, which the NCAA acknowledged gave it authority to demand coaching salary data from its members:

> When the NCAA is able to require its members to make certain documents or information available to it, this is because it is empowered to do so by specific legislative provisions…. For example, Bylaw [20.2.4.17][9] requires a member institution to "submit financial data detailing revenues, expenses and capital related to its intercollegiate athletics program to the NCAA on an annual basis in accordance with the financial reporting policies and procedures."

Def. NCAA's Response to Motions to Compel, *O'Bannon*, 2011 WL 12829026, at *4 (N.D. Cal. filed Nov. 14, 2011). What the NCAA said in that case is just as true here. The NCAA's authority to require its members to submit "[s]alary and benefits data for all athletics positions," Bylaw 20.2.4.17, gives the NCAA "control" over that information, unlike the information requested in *O'Bannon*, which was not covered by any specific bylaw.

Notwithstanding that clear and acknowledged distinction, the NCAA tries to frame the Court's choice in this dispute as a choice between following the *O'Bannon* court and following the *Law* court. *See infra* Part III.B. But those two decisions are perfectly consistent. They apply the same test to different documents. The NCAA did not have to collect and produce the specific documents requested in *O'Bannon* because the Bylaws did not give the NCAA the right to obtain those documents. *O'Bannon*, 2012 WL 161240, at *3. The NCAA *did* have to collect and produce the information requested in *Law* because the Bylaws *do* give the NCAA the right to obtain that information. *Law*, 167 F.R.D. at 469-70. The *O'Bannon* and *Law* courts reached different conclusions not because they viewed the civil rules differently, but because the information the *O'Bannon* plaintiffs sought was different from the information the *Law* plaintiffs

---

[9] The Bylaw was previously codified in a different chapter of the Division I manual.

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1    sought.  The documents that Plaintiffs seek here are the ones at issue in *Law*, not the ones at issue

2    in *O'Bannon*.

3          The NCAA concedes that it receives and possesses some coaching compensation data

4    pursuant to Bylaw 20.2.4.17, but maintains that its databases do not include *individualized*

5    assistant coach compensation. Rather, the NCAA states that it has individualized compensation

6    data for head coaches but not assistant coaches, for whom it has data only in the aggregate for

7    each school and sport (*e.g.*, the combined compensation for all paid assistant softball coaches at a

8    given school).  Even if true, the NCAA's position confuses "possession" with "control." The fact

9    that the NCAA does not currently have individualized assistant-coach compensation information

10   in its "possession" does not speak to whether the NCAA has this information within its "control."

11   As explained, documents are in the NCAA's "control" as long as it has the "legal right" to obtain

12   those documents from its member schools, and the Bylaws unequivocally require member schools

13   to report their coaching compensation data "for all athletics positions" to the NCAA. Whether the

14   schools have, historically, done this only at the aggregate level is irrelevant. The Bylaws give the

15   NCAA the contractual right to demand more particularized data: the "base salary, bonuses,

16   endorsements, media fees, camp or clinic income, deferred income and other income contractually

17   guaranteed by the institution," "for all athletics positions." Bylaw 20.2.4.17.  The NCAA suggests

18   that the phrase "salary and benefits data for all athletics positions," Bylaw 20.2.4.17(b), refers to

19   salary and benefits data for all athletics positions combined into one figure, *see infra* Part III.B.1,

20   but that cannot be correct, as the NCAA elsewhere admits that schools report coaching salaries

21   separately from salaries for other athletics staff, and within the coaching category, report head

22   coaching salaries separately from assistant coaching salaries.[10]

23   _____

24   [10] The NCAA's diversion into the "Agreed-Upon Procedures," *see infra* Part III.B.1, is unavailing
     and, indeed, self-defeating.  For starters, the "Agreed-Upon Procedures" are just procedures by
25   which the submitted salary information is verified by accountants, not some kind of interpretation
     or alteration of the Bylaws.  *See* Ex. B to Lennon Decl., at 4 ("The report shall be subject to annual
26   agreed-on verification procedures … and conducted by a qualified independent accountant.").  In
     any event, the Agreed-Upon Procedures support Plaintiffs' reading of the Bylaws because they
27   direct the independent accountant to analyze *individualized coaching salary data*, not aggregate
     data.  *See id.* at 34 ("Obtain and inspect a listing of coaches employed by the institution and
28

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1       The NCAA has offered to prepare and produce a spreadsheet with aggregate assistant

2   coach compensation data, but that is insufficient to satisfy its production obligations. For starters,

3   the NCAA admits that its proposed spreadsheet contains *no information* about volunteer

4   coaches—not the identities of volunteer coaches, not the schools who employed volunteer

5   coaches, not the sports in which volunteer coaches were employed, and not even any aggregate

6   data about the number of volunteer coaches. The NCAA agrees that this information about

7   volunteer coaches is relevant, but refuses to collect or provide any of it. As for assistant coach

8   salary data, the NCAA's proposal to provide that information only in the aggregate will needlessly

9   complicate both parties' ability to construct the type of school-specific coaching salary model used

10  by the parties to examine and compute damages in *Law*.  For example, by providing only one data

11  point per sport and school instead of separate data points for each individual coach, NCAA's

12  proposal would artificially reduce the size of the data set available to the parties' experts and

13  thereby compromise the rigor of the analysis which may be brought to bear on estimating what the

14  volunteer coaches would have earned absent the wage-fixing agreement.  In other words, the

15  NCAA appears to be trying to force Plaintiffs to conduct a less robust analysis, presumably with

16  the intention of then attacking that analysis as insufficiently robust.  This strategy mis-serves the

17  basic aim of the civil rules—"to secure the just, speedy, and inexpensive determination of every

18  action and proceeding," Fed. R. Civ. P. 1—and instead unnecessarily and self-servingly seeks to

19  force Plaintiffs to estimate damages based on second-best information.

20      In addition to the specific provisions cited above, the NCAA has sweeping authority to

21  obtain all kinds of information and documents upon demand from its member schools. Courts

22  have repeatedly held that defendants have "control" over documents when they have a contractual

23  right to obtain those documents during investigations or audits. For example, in *Doe v. AT&T*

24  *Western Disability Benefits Program*, No. 11-cv-4603, 2012 WL 1669882, at *4 (N.D. Cal. May

25  14, 2012), the contract between the defendant and the third-party entities gave the defendant "the

26   

27  related entities during the reporting period.  Select a sample of coaches' contracts…. Compare and
    agree the financial terms and conditions of each selection to the related coaching salaries, benefits,

28  and bonuses recorded by the institution….").

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1   right to conduct … full and comprehensive inspections or audits" of documents in various subject

2   areas. *Id.* The court concluded that this audit provision gave the defendant a legal right to demand

3   access to the documents, and therefore "control" over those documents for discovery purposes,

4   even absent an active audit:  "The documents and information that fall within these inspection and

5   audit provisions therefore fall within the ambit of Defendant's discovery duties under Rules 33

6   and 34." *Id.*;[11] *accord Lofton v. Verizon Wireless (Vaw) LLC*, No. 13-cv-05665, 2014 WL

7   10965261, at *2 (N.D. Cal. Nov. 25, 2014) (provisions allowing for unrestricted access to

8   documents during an audit gave defendant "control" over those documents in discovery).

9           The Bylaws grant NCAA similar authority here. For example, Bylaw 19.2.3—titled

10   "Responsibility to Cooperate"—states that, when the NCAA conducts an investigation, a member

11   institution must make "a full and complete disclosure of relevant information, including timely

12   production of materials or information requested, and in the format requested." Ex. E to

13   Lieberman Decl.., Bylaw 19.2.3.  Similarly, Bylaw 8.01.3 states that member schools "shall

14   comply with all applicable rules and regulations of the [NCAA]" and "shall cooperate fully with

15   any enforcement efforts." Ex. E to Lieberman Decl., Bylaw 8.01.3.  Likewise, Bylaw 20.10.1.5

16   makes it "the responsibility of each member institution to cooperate with the [NCAA's]

17   infractions process." Ex. E to Lieberman Decl., Bylaw 20.10.1.5.  These obligations extend to

18   investigations related to the volunteer coach rule; indeed, the NCAA admitted in its Answer that it

19   has used its investigative authority to conduct enforcement proceedings related to alleged

20   violations of the rules governing volunteer coaches. *See* Answer (ECF 47) at ¶ 47, *Colon v. NCAA*,

21   No. 23-cv-00425 (filed Aug. 31, 2023). In short, the NCAA has broad contractual authority to

22   require its members to produce documents and information for investigative purposes, including

23   for investigations related to the volunteer coach rule at issue here. That contractual right gives the

24   NCAA control over those documents. *See Doe*, 2012 WL 1669882, at *4; *Lofton*, 2014 WL

25   10965261, at *2.

26

27   _____

[11] The NCAA's response to *Doe* largely addresses a distinct part of the court's holding unrelated
28   to the defendant's audit rights.

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1    The NCAA's Lennon Declaration acknowledges that "[t]hese bylaws allow the NCAA to

2    seek information to enforce its rules," but argues that the bylaws are inapplicable because NCAA

3    has not opened an investigation. *See* Lennon Decl. at ¶¶ 31-32.  But this essentially concedes the

4    control point—the NCAA *could* use these bylaws to get the information requested if the NCAA

5    chose to. The federal procedural rules regarding "control" should not be eviscerated based on

6    NCAA's mere whim.

7    Indeed, the case for "control" here is even stronger than in cases like *Doe* and *Lofton*,

8    where the third parties that possessed the documents were vendors not involved in any alleged

9    wrongdoing. Here, in contrast, the NCAA's member schools are alleged co-conspirators in the

10   unlawful wage-fixing scheme. *See* MTD Order at 1 ("Plaintiffs … [allege] the NCAA and its

11   member schools illegally conspired to fix the compensation of a category of Division I coach at

12   $0."). The fact that the NCAA and its members coordinated their efforts to enact and enforce the

13   Bylaws at issue here demonstrates that they can coordinate their efforts to collect and produce the

14   requested documents—and that doing so is a far superior option to forcing Plaintiffs "to travel to

15   approximately 300 Division I institutions and secure the requested information through subpoenas

16   and depositions." *Law*, 167 F.R.D. at 470. The NCAA should therefore be required to produce

17   compensation and identifying information for Division I coaches in the sports at issue in these

18   cases.[12]

19   **b.  The requested information is "available" to the NCAA under Rule 33.**

20   Alternatively, the NCAA also must furnish the requested identifying and salary

21   information in response to Plaintiffs' Rule 33 interrogatories. Under Rule 33, an association "must

22   furnish information" in response to interrogatories if that information is "available" to the

23

24

25   [12] The NCAA contends that Plaintiffs "cast doubt on" their Sherman Act claim "by arguing that
     the NCAA controls member institutions," because the Sherman Act "only applies to agreements

26   between *separate* entities."  *See infra* Part III.B.1 (citing *Copperweld Corp. v. Indep. Tube Corp.*,
     467 U.S. 752 (1984)).  That is obviously wrong.  Plaintiffs are arguing that the NCAA has legal

27   control over the specific documents at issue here, not that it "controls member institutions" in
     some broad sense or that all NCAA schools are a single entity.

28

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1   association. Fed. R. Civ. P 33(b)(1)(B). A party's obligation under Rule 33 sweeps more broadly

2   than its obligation under Rule 34—*i.e.*, information may be "available" to a party for purposes of

3   Rule 33 even if the information is not in its "possession, custody, or control" for purposes of Rule

4   34. *See, e.g.*, Wright & Miller, 8B Fed. Prac. & Proc. Civ. § 2177 (3d ed.) ("In answering

5   interrogatories, a party is charged with knowledge of what its agents know, or what is in records

6   available to it, or even, for purposes of Rule 33, information others have given it on which it

7   intends to rely in its suit.").

8          In *Law*, for example, the court ordered the NCAA to furnish information about coaching

9   salaries in response to interrogatories, holding that "[s]uch information is clearly 'available' to the

10   NCAA … under any reasonable construction of the concept of availability." *Law*, 167 F.R.D. at

11   476. In words that are equally true today, the court explained that the requested information was

12   "available" to the NCAA under Rule 33 because "[t]he NCAA routinely seeks such information,

13   and NCAA members routinely supply it, for purposes related to the governance of intercollegiate

14   athletics and the achievement of associational objectives." *Id*. When the NCAA objected that the

15   specific information sought was not in its "possession, custody or control," the court explained

16   that the "NCAA's position in this regard is ill conceived" because "it confuses Rule 34 (which

17   utilizes 'possession, custody or control' as the test of a party's obligation to produce documents

18   and other tangible things) with Rule 33 (which utilizes a more elastic standard of 'availability' as

19   the test of a party's duty to answer interrogatories)." *Id.* at 477. Here too, NCAA's sweeping

20   authority to obtain identifying and salary information about its member schools' coaches makes

21   that information "available" to NCAA and requires it to furnish that information to Plaintiffs.

22          The NCAA's efforts to distinguish *Law*, *see infra* Part III.B, are unavailing.  The NCAA

23   first claims that *Law*'s ruling with respect to the NCAA's discovery obligations was undermined

24   by later proceedings in the Tenth Circuit. That is simply wrong. As noted above, *see supra* n. 5,

25   the Tenth Circuit's opinion addressed different issues and different parties, and it expressly did not

26   disturb the district court's ruling that the NCAA had to collect and produce coaches' salary

27   information: "[N]othing in this order should be read as granting relief to the NCAA from its

28   obligations under [the district court's] order."  *Vratil*, 96 F.3d at 1341 n.4.  The NCAA also

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1  suggests, in the vaguest of terms, that it collects less financial information from its member

2  schools today than it collected at the time of *Law*.  Even if this were true, however, it would be

3  irrelevant:  The question is not what the NCAA collects or collected as a matter of routine, but

4  what it has the power to collect—and the NCAA does not identify any change in the Bylaws that

5  stripped it of power it had at the time of *Law*.  To the contrary, Bylaw 11.7.1 has been on the

6  books since 1992 (years before the decision in *Law*), and Bylaw 20.2.4.17, enacted in 2009, gives

7  the NCAA *more* power to obtain financial data from schools than it had at the time of *Law*.

8      Courts in this district have reached the same conclusion as *Law* with respect to Rule 33's

9  breadth. For example, in *Thomas v. Cate*, 715 F. Supp. 2d 1012 (E.D. Cal. 2010), a party objected

10  to an interrogatory "on the grounds that the information requested therein is not in [its] custody,

11  possession, or control." *Id.* at 1032. The court overruled the objection and ordered the party to

12  respond to the interrogatory, explaining that an absence of "custody, possession, or control" is

13  "not a valid basis for an objection to an interrogatory request" because "Rule 33 imposes a duty on

14  the responding party to secure all information *available* to it." *Id.* Likewise here, even if the

15  documents Plaintiffs requested are deemed to not be in NCAA's "possession, custody or control"

16  for purposes of Rule 34, the NCAA still must furnish the requested identifying and salary

17  information in response to Plaintiffs' interrogatories because that information is "available" to the

18  NCAA.

19          **2.      Documents in the hands of members of key NCAA governing boards**
                      **and committees are within the NCAA's control.**
20

21      The second dispute concerns documents and communications in the hands of members of

22  the NCAA's key governing boards and committees, which NCAA refuses to collect and produce

23  on the basis that those persons are employees of the NCAA's member schools and conferences

24  rather than the NCAA itself. Regardless of whether they are NCAA employees, however, these

25  board and committee members perform NCAA business and make decisions on behalf of the

26  NCAA.  They are accordingly within the NCAA's control when they act within the scope of their

27  duties as members of the NCAA's governing boards and committees. Documents that relate to

28  those persons' NCAA duties are therefore within the NCAA's control.

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1    "[A] party responding to a Rule 34 production request is under an affirmative duty to seek

2    that information reasonably available to it from its employees, agents, or others subject to its

3    control." *S. California Edison Co., et al. v. Greenwich Ins. Co.*, No. 22-cv-05984, 2023 WL

4    5506018, at \*6 (C.D. Cal. July 17, 2023). Courts have therefore required companies and

5    unincorporated associations to search for and produce the records of members of a party's

6    governing boards because such persons are within the party's control when acting in their

7    governing capacity. *See Miniace v. Pac. Martime Ass'n*, No. 04-cv-03506, 2006 WL 335389, at \*2

8    (N.D. Cal. Feb. 13, 2006) (compelling production of documents from association's board

9    members); *Adidas Am., Inc. v. TRB Acquisitions LLC*, No. 15-cv-2113, 2019 WL 7630941, at \*2

10   (D. Or. Feb. 6, 2019) ("The Court has repeatedly ordered Plaintiffs to search the documents of

11   Board members."); *Adidas Am., Inc.*, No. 15-cv-2113, 2019 WL 7630793, at \*3 (D. Or. Aug. 2,

12   2019) (compelling search and production of documents of company board members); *Royal Park*

13   *Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-cv-04394, 2016 WL 5408171, at \*1

14   (S.D.N.Y. Sept. 27, 2016) (same).

15       "The NCAA governance structure consists of legislative bodies made up of volunteers

16   from member schools. These legislative bodies, as well as a group of committees, govern each

17   division and set Association-wide policy." Ex. F to Lieberman Decl., Governance.  In a very real

18   sense, the NCAA *is* these legislative bodies and committees, which come together and make all

19   decisions on behalf of the NCAA about how the NCAA will operate and what rules will govern

20   the conduct of its members schools.  As the NCAA itself explains, "Division I's committee

21   structure *oversees everything* from championships administration and sport oversight to strategic

22   planning and the overall health of Division I."  Ex. G to Lieberman Decl., Division I Governance.

23   Over the last five years, the NCAA's governing committees and boards have repeatedly debated

24   the bylaws at issue in this case. In 2019, a proposed amendment that would have eliminated the

25   "volunteer" coaching position for certain sports failed to pass. In 2022, an amendment was again

26   proposed. This time, the amendment had the backing of an official NCAA governing committee

27   called the Division I Transformation Committee. In its Final Report on changes that the

28   Transformation Committee believed were needed, the committee opined that the bylaw should be

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1   repealed to "create fairer and more equitable Division I athletics competition." Ex. H to Lieberman

2   Decl., Division I Transformation Committee Final Report, at 20. Another NCAA governing body,

3   the influential Division I Council, agreed; it remarked that "[e]liminating the volunteer coach

4   designation … will help better support student-athletes." Ex. I to Lieberman Decl.,

5   NCAA_SMART_0000017, at 018. The amendment went to a membership vote and passed in

6   February 2023.

7          The discussions by official members of key governing committees about these possible

8   amendments to the bylaws are highly relevant. The NCAA will likely defend this case based on its

9   argument that the bylaw was supposedly needed to preserve competition. Yet in an official report

10  from its Transformation Committee, it has already admitted otherwise. If it has made such

11  admissions in an official report, then other admissions made by board and committee members in

12  non-public communications likely exist as well.  The NCAA attempts to distance itself from its

13  own committee and board members, characterizing them as

14         Receiving those communications is essential. *See Adidas Am., Inc.*, 2019 WL 7630793, at

15  *3 (compelling search and production of documents of company board members who attended

16  meeting discussing change in company policy at issue). When members of committees discuss a

17  bylaw in their official capacity as committee members, they are acting in a governance role on

18  behalf of the NCAA. Yet the NCAA's position is that it will collect and produce such documents

19  only if a staff member of the NCAA has them, *i.e.*, if the NCAA staff member was copied on the

20  communications. That means that if the co-chair of the Transformation Committee, Julie Cromer

21  (director of athletics at Ohio University), sent an email to the other co-chair of the Transformation

22  Committee, Greg Sankey (commissioner of the Southeastern Conference), about the proposed

23  amendments to the bylaws at issue, those communications would not be captured. Highly relevant

24  communications will almost assuredly be missed as a result. And that information is within the

25  NCAA's control and should be searched for and produced. *See Miniace*, 2006 WL 335389, at *2

26  (compelling production of documents from association's board members).

27         The NCAA's stated concern about "how the NCAA and the member institution will handle

28  privileged materials" is easily managed.  At the outset, this concern does not apply to the coach

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1   identifying and salary information discussed above, which could not possibly be privileged.  As

2   for any privileged communications by or among NCAA board and committee members, Plaintiffs

3   would have no problem with member schools performing a privilege review before providing

4   those communications to the NCAA, as they presumably do in the normal course.

5            *            *            *            *            *            *

6            The NCAA is trying to have it both ways: to maintain the ability to demand materials from

7   its members to defend its case (pursuant to its authority under the Bylaws) while at the same time

8   refusing to request materials from its members that Plaintiffs need to prosecute their case. If the

9   NCAA has its way, Plaintiffs will be forced to collect this material from the NCAA's 300+

10   Division I schools, spread across all fifty states. That would be highly burdensome, resulting in a

11   huge number of subpoenas aimed at highly relevant, commonsense documents, which could lead

12   to enforcement procedures initiated in courts across the country, and that may end up being

13   transferred to this Court pursuant to Rule 45. It would be, as the *Law* court put it, "the single most

14   time-consuming and expensive procedure through which the requested information could be

15   obtained."  *Law*, 167 F.R.D. at 470.

16            A far more efficient course would be for the NCAA to gather this information. Per its own

17   bylaws, this information is within its control under Rule 34 and is available to it under Rule 33.

18   Indeed, if the NCAA can gain access to its members' documents for its defense, then it can also

19   gain access to documents for Plaintiffs' prosecution.

20            The NCAA's warning that enforcing a discovery order against it might be "complicated,"

21   *see infra* Part III.B.3, need not worry the Court.  For starters, the *Law* case provides a complete

22   answer:  The NCAA professed the same powerlessness to collect salary information in that case,

23   and yet when the rubber met the road, the NCAA collected and produced the same data that

24   Plaintiffs seek here.[13]  There is no reason to doubt that the NCAA can do it again.  And in any

25

26   _____

[13] In *Law*, when the NCAA initially requested this data from its member schools, it enclosed a

27   "memorandum [that] was transparently designed to discourage responses."  *Law*, 167 F.R.D. at

    471; *see id.* at 477.  Upon further court order, however, the NCAA made a bona fide effort to

28   collect, and did collect, the requested information.

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1  event, the NCAA's position proves far too much: If the hypothetical possibility of non-compliance

2  by a third-party custodian was enough for a defendant to prevail in these circumstances, then no

3  court could *ever* order a defendant to produce documents in its "control" but not in its

4  "possession." That, of course, is not the law. If the NCAA makes a bona fide effort to collect the

5  information pursuant to its Bylaws and a court order, and member schools refuse to comply *en*

6  *masse*, the parties can address the issue at that time. For now, however, what matters is that Rules

7  33 and 34 require the NCAA to gather and produce the requested documents and information from

8  the requested custodians.

9  **B.   Defendant's Arguments**

10  To support their motion, Plaintiffs have the burden to show that the NCAA controls or has

11  access to documents and information wholly in the possession of colleges and universities around

12  the country. Plaintiffs have not met, and cannot meet, that burden.

13  The NCAA is an unincorporated association of more than 1,000 member institutions.

14  NCAA Division I includes more than 300 colleges and universities, many of which are

15  instrumentalities of sovereign states. These institutions organize their own athletic teams, make

16  their own decisions about who to hire and how much to compensate them, and maintain their own

17  records regarding those decisions. Declaration of Kevin Lennon (" Lennon Decl.") ¶ 14. NCAA

18  staff in Indianapolis do not hire or compensate coaches. They facilitate the membership's

19  decisions regarding the rules for NCAA sports. Lennon Decl. ¶ 9. The NCAA does not control

20  the documents maintained by member institutions and those documents are not available to the

21  NCAA as if the NCAA itself possessed them.

22  That is why another district court in this Circuit applying Ninth Circuit law rejected a very

23  similar motion to compel and denied class plaintiffs' motion seeking to force the NCAA to

24  procure and produce documents and answer interrogatories with information in the possession of

25  Division I member institutions. *In re NCAA Student-Athlete Name & Likeness Litig.*, No. 09-CV-

26  01967 CW (NC), 2012 WL 161240 (N.D. Cal. Jan. 17, 2012) (hereinafter the "O'Bannon

27  Decision"). In the O'Bannon Decision, after reviewing arguments similar to those made by

28  Plaintiffs above, Magistrate Judge Cousins held: "Plaintiffs have failed to establish that the

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1  NCAA has 'control' of its member institutions and that the particular information they seek about

2  member institutions is 'available' to the NCAA, the NCAA cannot be compelled to produce

3  documents or information that it does not already possess." *Id.* at *1.  The court further noted that

4  it was "not convinced that if it were to order the NCAA to survey its members for more

5  information that there would be any remedy if the member institutions refused to comply." *Id.* at

6  *5.

7        This Court should follow the O'Bannon Decision applying Ninth Circuit law rather than

8  the decision in the *Law* case, cited by Plaintiffs above.  *First*, the court in the *Law* case rested its

9  decision in part on its conclusion that NCAA member institutions were "the real parties in

10 interest."  The Tenth Circuit, however, held that the district court "erred in characterizing the

11 unserved, nonparty petitioners as 'real parties in interest' for discovery purposes, and acted

12 without jurisdiction in ordering them to respond to interrogatories propounded under Rule 33."

13 *Univ. of Texas at Austin v. Vratil*, 96 F.3d 1337, 1340 (10th Cir. 1996).[14]  Thus, the *Law* case is

14 hardly sound precedent for the order Plaintiffs seek here.

15       *Second*, the Court in the *Law* case—issued in 1996—found that the information sought

16 was "available" to the NCAA because, at the time, "[t]he NCAA routinely s[ought] such

17 information, and NCAA members routinely suppl[ied] it, for purposes related to the governance of

18 intercollegiate athletics and the achievement of associational objectives."  167 F.R.D. at 476.

19 Plaintiffs here have not demonstrated that this is the case for the information sought by this motion

20 today.  To the contrary, the NCAA's declaration explains that the NCAA does not seek and

21

22 [14] NCAA does not assert *Vratil* granted the NCAA relief from the discovery obligations of *Law*, as
   Plaintiffs suggest, *supra* III.A.1.b. Instead, *Vratil* held *Law* committed an analytical error in

23 holding "member institutions are not third party strangers to this proceeding. They are the real
   parties in interest." *Law*, 167 F.R.D. at 477; *Vratil* 96 F.3d at 1340.  The *Law* court relied on this

24 erroneous premise to rebut the NCAA's argument that information held by member schools "need
   not actually be *disclosed* unless it has the legal authority to require that it be produced from

25 members whom it characterizes as third party strangers to this proceeding." *Law*, 167 F.R.D. at
   476.  The holding in *Law* might stand; but this portion of the court's reasoning does not. *Vratil* 96

26 F.3d at 1341 ("The district court's reference to state NCAA Division I members as 'real parties in
   interest' for discovery purposes is VACATED.").  Even if *Law* remained persuasive in the Tenth

27 Circuit, it would be incompatible with the Ninth Circuit's test for "control," defined as a "legal
   right" to make demands.  *Infra*, Part III.B.1.

28

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1   member institutions do not generally provide to the NCAA the information that Plaintiffs have

2   demanded the NCAA compile from more than 300 Division I member institutions.  Lennon Decl.

3   ¶ 4.  Because of that difference in fact, the NCAA does not "admit[] that the requested information

4   is available" as it did in the *Law* case.  The information is not available within the meaning of the

5   rule, as the Court in the O'Bannon Decision held.

6          In addition to lacking authority, Plaintiffs' request would result in significant enforcement

7   issues.  Plaintiffs have not explained how the Court would enforce an order to the NCAA to

8   procure documents and information from more than 300 member institutions across the country,

9   including sovereign state entities, when the NCAA has no authority to compel those institutions to

10  cooperate with production or to provide accurate information.  According to Plaintiffs' own

11  authority, the Court would lack jurisdiction to require the member institutions themselves to

12  produce the discovery absent an enforceable subpoena.  *Univ. of Texas at Austin*, 96 F.3d at 1340.

13  Accordingly, the discovery order that Plaintiffs seek could only be enforced against the NCAA,

14  which lacks the power under NCAA bylaws to demand the documents and information Plaintiffs

15  are seeking.  It would be wholly unfair for the Court to hold the NCAA responsible for member

16  institutions' failure to respond to a request for information that the NCAA bylaws do not require

17  them to provide to the NCAA.  Moreover, even if a member institution voluntarily agrees to

18  respond, the institution may have privileged or other highly sensitive information that it would be

19  inappropriate for the NCAA to review and that the member institution objects to producing.  Thus,

20  Plaintiffs seek an order requiring the NCAA to collect information that it may not even be in a

21  position to review or produce.  Plaintiffs provide no plan for how member institutions' rights

22  could be protected or how any disputes over member institutions' objections would be resolved.

23         The proper course is for Plaintiffs to use subpoenas under Rule 45 to obtain information

24  from non-party athletic conferences and/or member institutions.  Any burden of seeking relief

25  from hundreds of institutions is a problem of Plaintiffs' own making.  All Plaintiffs alleged in their

26  Complaints that "a class action would save time, effort and expense."  *Smart* ECF 1 ¶ 23; *see also*

27  *Colon* ECF 19 ¶ 26.  Plaintiffs made the decision to file sweeping class actions that encompass

28  dozens of sports and span more than 300 schools across fifty states.  Having alleged claims on

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

behalf of a putative nationwide class, Plaintiffs cannot now complain that obtaining information to identify class members or prove their alleged damages would require too much effort and too much expense because it would require seeking information from colleges and universities across the country.  There is no basis to put the Plaintiffs' discovery burden on the NCAA.

### 1.   The NCAA Does Not Control Documents Maintained By Member Institutions.

There is no dispute that the NCAA does not have possession or custody of the documents requested.  So, this motion to compel documents turns on whether the NCAA has "control" over any documents in the possession of its member schools that identify volunteer coaches, identify assistant coaches, or identify assistant coach compensation for 2018 to the present.  The NCAA does not have this control.

The parties agree that under Ninth Circuit law, "[c]ontrol is defined as the legal right to obtain documents upon demand."  *In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999) (quoting *United States v. Int'l Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989) ("*IUPIW*")).  "The party seeking production of the documents … bears the burden of proving that the opposing party has such control."  *IUPIW*, 870 F.2d at 1452.  Proof of "theoretical control is insufficient; a showing of actual control is required."  *In re Citric Acid*, 191 F.3d at 1107 (quoting *IUPIW*, 870 F.2d at 1453-54).  The Ninth Circuit has required proof of legal control because "[o]rdering a party to produce documents that it does not have the legal right to obtain will oftentimes be futile, precisely because the party has no certain way of getting those documents."  *Id.* at 1108.  Accordingly, a party does not have control over documents possessed by another entity when that entity "could legally—and without breaching any contract—continue to refuse to turn over such documents."  *Id.*

Thus, in *IUPIW*, the Ninth Circuit affirmed a district court's decision denying enforcement of a subpoena by the Department of Labor demanding that a national union produce "election records of local unions affiliated with" the union.  870 F.2d at 1451.  The Ninth Circuit noted that "[n]o section of the IUPIW constitution expressly gives the International the right to obtain locals' delegate election records upon demand" and rejected the government's argument that the national

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1    union's right to do so could be discerned by "read[ing] several disparate provisions of the

2    constitution together …." *Id.* at 1453.  The Court also rejected the argument that the national

3    union controlled local affiliates' documents because it had the general power to revoke the

4    affiliates' membership in the union.  *Id.*  Nowhere do Plaintiffs address this controlling case.

5         Similarly, in the *NCAA Student-Athlete Name & Likeness Litigation*, Magistrate Judge

6    Cousins held that the NCAA did not control documents in the possession of NCAA members

7    under the standards set forth in *IUPIW*.  The Court reasoned that "[n]either the NCAA

8    Constitution nor the Bylaws grants the NCAA the right to take possession of its members'

9    documents" and that "the fact that the NCAA can take enforcement action against member

10   institutions that violate NCAA rules does not mean that the NCAA has power to compel members

11   to produce the documents sought in this litigation."  2012 WL 161240, at *3.

12        The same is true here.  The Declaration of Kevin Lennon explains that, outside of an

13   investigation into individual violations of NCAA bylaws, not applicable here, the NCAA

14   Constitution and Bylaws do not give the NCAA the power to demand that member institutions

15   provide information on the existence or identity of volunteer coaches or salary information for the

16   assistant coaches they hire.  Lennon Decl. ¶ 16.  The NCAA explained this multiple times in meet

17   and confer, and now provides a sworn declaration.  Plaintiffs provide no basis for the Court to find

18   that this is incorrect.  Even if the NCAA's bylaws were an enforceable contract, which is not

19   established, Plaintiffs have not met their burden of identifying any provision of those bylaws that

20   give the NCAA the right to demand the information requested outside the context of an

21   enforcement investigation.

22        The bylaws that Plaintiffs do identify above do not give the NCAA a right to collect the

23   information at issue.  Contrary to Plaintiffs' assertion, the NCAA's bylaws related to data

24   collection do not operate in the way an enforceable contract would between the NCAA and its

25   member schools.  The NCAA cannot compel member institutions to abide by the expectations set

26   forth in the bylaws, including the expectation that member institutions will provide information to

27   the NCAA as requested in the bylaws.  Thus, while the bylaws "allow the NCAA to seek

28   information to enforce its rules" these bylaws do not give the NCAA control over member

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1   institutions or their data outside that context, and here, the NCAA has no basis to seek the

2   requested information through an enforcement proceeding.  Lennon Declaration at ¶ 32.  This

3   means that the proper interpretation of the bylaws is not a question of law for the Court.  Indeed,

4   Plaintiffs' assertions regarding the powers of the NCAA under the bylaws are incorrect.

5       *First*, Plaintiffs first point to Division I Bylaw 11.7.1, which requires member schools to

6   designate coaching staff "as a head coach, assistant coach, volunteer coach, graduate assistant

7   coach or student assistant coach by certification of the institution."  This Bylaw required each

8   member school to designate for each person on the coaching staff what category of coach that

9   coach was meant to be.  Where the Bylaw says "by certification of the institution," this means that

10  the member school must certify to itself that it has done this designation.  Lennon Decl. ¶ 19.

11  There is no provision in the Bylaw that requires the school to report this certification to the

12  NCAA.  Lennon Decl. ¶ 20. This is consistent with other Bylaws like 13.14.5, 14.01.1, and

13  14.4.3.1.4.1 that require certifications but do not require reporting of those certifications.  Lennon

14  Decl. ¶ 21.  And it is in contrast to bylaws like Bylaw 12.1.1.1.2.2 that define how information

15  related to amateur certifications will be handled and to whom they will be transmitted.[15]  Lennon

16  Decl. ¶ 22.

17      Plaintiffs do not identify anything in this Bylaw that entitles the NCAA to ask for coach

18  identifying information for assistant or volunteer coaches.  "Courts interpreting the legal control

19  test require a specific means by which the information can be obtained ...."  *Seifi v. Mercedes-Benz*

20  *U.S.A., LLC*, No. 12-CV-05493-TEH (JSC), 2014 WL 7187111, at *4 (N.D. Cal. Dec. 16, 2014)

21  (denying motion to compel production of documents possessed by third party).  But Plaintiffs do

22

23  [15] Bylaw 12.1.1.1.2.2 states, "If an institution receives additional information or otherwise has
    cause to believe that a prospective student-athlete's amateur status has been jeopardized, the

24  institution is responsible for promptly notifying the NCAA Eligibility Center of such information.
    Further, an institution is responsible for promptly reporting to the NCAA Eligibility Center all

25  discrepancies in information related to a student-athlete's amateurism certification."  Bylaw
    12.1.1.1.2.2 thus specifies that member institutions are required to provide the NCAA with

26  information related to amateur certifications.  Plaintiffs mistakenly infer that because Bylaw
    12.1.1.1.2.2 follows after Bylaw 12.1.1.1.2.1 that Bylaw 12.1.1.1.2.1 also requires reporting to the

27  NCAA.  However, the silence on reporting requirements in Bylaw 12.1.1.1.2.1 is because there are
    no reporting requirements for Bylaw 12.1.1.1.2.1.

28

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1   not identify any mechanism in Bylaw 11.7.1 for the NCAA to obtain the information they seek.

2   *See Micron Tech., Inc. v. Tessera, Inc.*, No. C06-80096 MISC.JW (HRL), 2006 WL 1646133, at

3   *2 (N.D. Cal. June 14, 2006) (subpoenaed party had no control over documents possessed by

4   another entity where there was "no evidence of any contract between the two companies that gives

5   [the subpoenaed party] the right to demand documents from" the other entity).

6   *Second*, Plaintiffs similarly misread Bylaw 20.2.4.17, which asks member institutions to

7   submit to the NCAA "financial data detailing operating revenues, expenses and capital related to

8   its intercollegiate athletics program to the NCAA on an annual basis in accordance with the

9   financial reporting policies and procedures."  Those "reporting policies and procedures" are

10  spelled out in annual "Agreed-Upon Procedures."  Lennon Decl ¶ 26.  For 2023, the Agreed-Upon

11  Procedures provide a list of expense categories, with the preface that: "Expenses for the athletics

12  program will vary among institutions; however, typical sources of intercollegiate athletics

13  expenses are outlined (each followed by a comprehensive definition) below."  Lennon Decl. ¶ 27.

14  For the expense category of "Coaching Salaries, Benefits and Bonuses paid by the University and

15  Related Entities," the Agreed-Upon Procedures define this category as:

16  
17          Input compensation, bonuses and benefits paid to all coaches reportable on the university
            or related entities W-2 and 1099 forms, as well as non-taxable benefits (1098T), inclusive
            of:
18                  • Gross wages and bonuses.
19                  • Taxable and non-taxable benefits include: allowances, speaking fees, retirement,
                    stipends, memberships, media income, tuition reimbursement/exemptions (for self
                    or a dependent) and earned deferred compensation, including those funded by the
20                  state.

21  Lennon Decl. Ex. B (Agreed-Upon Procedures excerpt, available online at

22  https://ncaaorg.s3.amazonaws.com/ncaa/finance/NCAAFIN_AgreedUponProcedures.pdf).

23  The Agreed-Upon Procedures only define the coach compensation, bonuses, and benefits

24  expense category as that which is "paid to all coaches," not individual coaches.  Consistent with

25  that, the NCAA collects aggregate-level compensation data on all assistant coaches.  Lennon Decl.

26  ¶¶ 24, 30.  Although Plaintiffs note that the Agreed-Upon Procedures direct an independent

27  accountant to "[o]btain and inspect a listing of coaches employed by the institution and related

28  entities during the reporting period," this is an independent accountant hired by and working for

1   the member institution, and neither the bylaws nor the Agreed-Upon Procedures mandate that

2   schools disclose such listings for the NCAA.  Lennon Decl. Ex. B at 34.  Ultimately, the NCAA

3   does not see or have in its control whatever listings, if any, are created by member institutions.

4   Finally, the Agreed-Upon Procedures limit the compensation data reported to that found on the

5   entities W-2 and 1099 forms, which would not require any reporting about volunteer coaches.[16]

6          *Third*, unable to identify any bylaw that "expressly gives" the NCAA the right to obtain

7   the records they seek here as required under *IUPIW*, 870 F.2d at 1453, Plaintiffs insist generally

8   that "the NCAA has sweeping authority to obtain all kinds of information and documents upon

9   demand from its member schools."  They cite Bylaws 19.2.3, 8.01.3, and 20.10.1.5, that apply

10  "when the NCAA conducts an investigation" or pursues the "infractions process."  But that is not

11  what is happening here.  The NCAA is not seeking information to enforce its rules.  Lennon Decl.

12  ¶ 32. There is no NCAA investigation or infractions process.  Lennon Decl. ¶ 32.  *Plaintiffs* are

13  seeking information to pursue *their* case.  Nothing in the bylaws Plaintiffs cite gives the NCAA

14  the right to obtain that information outside the context of an enforcement proceeding, which is not

15  at issue here.  *Seifi*, 2014 WL 7187111, at *4 (rejecting argument that National Highway

16  Transportation and Safety Administration regulations requiring production of documents created

17  control where "NHTSA could only require the production of the requested documents under

18  circumstances not present here; namely, if an NHTSA investigation is pending").

19         Plaintiffs' reliance on the NCAA's general ability to enforce its bylaws is an argument that

20  the Ninth Circuit rejected in *IUPIW*, where it held that the national union's ability to dissolve local

21  unions did not give the national union the right to demand documents from the local affiliates.

22  The Ninth Circuit found nothing in the provisions of the union constitution reflecting any "intent

23  to authorize the International to use dissolution or charter revocation as a means to obtain locals'

24  records."  *IUPIW*, 870 F.2d at 1453.  Citing this part of the *IUPIW* decision, the Court in the

25

26  ―――――――――――――
    [16] Plaintiffs insinuate that the NCAA "acknowledged" in the *NCAA Student-Athlete Name &*
27  *Likeness Litigation* that it has the power to request the records Plaintiffs seek in this litigation.  But
    Plaintiffs do not identify anywhere in the briefing in that case where the NCAA said this.  It did
28  not.  It merely identified the bylaw that it has explained above.

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1   O'Bannon Decision echoed that holding and explained that "the fact that the NCAA can take

2   enforcement action against member institutions that violate NCAA rules does not mean that the

3   NCAA has power to compel members to produce the documents sought in this litigation." 2012

4   WL 161240, at *3.  Plaintiffs here similarly do not identify anything in the NCAA's bylaws

5   suggesting that the NCAA membership empowered NCAA staff to impose sanctions on member

6   institutions that violate NCAA rules in order to enable NCAA staff to collect documents sought in

7   litigation against the association.

8       Plaintiffs mischaracterize *Doe v. AT&T Western Disability Benefits Program*, No. C-11-

9   4603 DMR, 2012 WL 1669882, at *4 (N.D. Cal. May 14, 2012).  *Doe* involved a former

10   employee's lawsuit against his former employer's short term disability benefits program.  In

11   determining whether the benefits-program defendant had control over documents furnished to the

12   third-party administrator of the program, the court looked to the plain terms of the contract

13   between the defendant and third-party administrator, which provided: "*Any information furnished

14   to* [the third-party administrator]" would "remain [Defendant]'s property.... *All copies of such

15   information*, in written, graphic or other tangible form, s*hall be returned to [Defendant] upon ...

16   [Defendant]'s request.*"  *Id*. at *3 (emphasis in original) (first alteration added).  The contract's

17   audit provisions also "contractually secure[d]" the defendant a nearly unqualified "legal right to

18   demand [the third-party administrator] grant it access to any documents or data related" to a "wide

19   range of audit subject areas."  *Id* at *3-4.  Based on this clear contractual language, the court

20   observed the contract (1) "grants Defendant extensive ownership rights over information and

21   documents created during the claims administration process,"  *id*. at *3, and (2) permitted the

22   defendant to obtain the third parties' records "pursuant" to its sweeping audit rights.  *Id*. at *5.

23   The Bylaws do not include any provisions analogous to those in *Doe*.  None of three bylaws

24   Plaintiffs cite for their comparison to *Doe*—Bylaws 19.2.3, 8.01.3, or 20.10.1.5—grant the NCAA

25   "extensive ownership rights" or the authority to conduct audits at-will.

26       Nor do they contain a provision like the one that supported a finding of control in *Lofton v.

27   Verizon Wireless (VAW) LLC*, No. 13-CV-05665-YGR (JSC), 2014 WL 10965261, at *1 (N.D.

28   Cal. Nov. 25, 2014).  In that case, the court found that Verizon controlled information in

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1  possession of third-party vendors where Verizon's contract with the vendors provided that

2  "Verizon's access to all information in [the vendors'] possession or control regarding Verizon

3  accounts ... is to be completely unrestricted." *Id.*  There is no comparable provision in the bylaws

4  providing that the NCAA has unrestricted access to documents possessed by member institutions.

5      Ultimately, Plaintiffs' assertion that the NCAA controls NCAA member institutions is at

6  war with their theory of the case.  Plaintiffs assert claims under Section 1 of the Sherman Act.

7  That statute only applies to agreements "between *separate* entities."  *Copperweld Corp. v. Indep.*

8  *Tube Corp.*, 467 U.S. 752, 768 (1984) (emphasis in original).  For that reason, "a parent and a

9  subsidiary over which the parent has legal control cannot conspire to restrain trade."  *Bell Atl. Bus.*

10 *Sys. Servs. v. Hitachi Data Sys. Corp.*, 849 F. Supp. 702, 706 (N.D. Cal. 1994); *see also Am.*

11 *Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 194 (2010) (parent and wholly owned

12 subsidiary cannot conspire because they "are controlled by a single center of decisionmaking and

13 they control a single aggregation of economic power").  Thus, by arguing that the NCAA controls

14 member institutions, Plaintiffs cast doubt on their claim that the NCAA could have conspired with

15 its member institutions.

16          **2.      Member Institutions' Hiring And Benefit Information Is Not**
17          **"Available" To The NCAA.**

18      Plaintiffs are also incorrect that the NCAA must collect its more than 300 Division I

19 member institutions' hiring and salary information to answer interrogatories.  That information is

20 not "available" to the NCAA under Federal Rule of Civil Procedure 33.  Facing nearly identical

21 arguments, the Court in the O'Bannon Decision rejected class plaintiffs' motion to compel the

22 NCAA to respond "on behalf of its members as to interrogatories" because "Plaintiffs have failed

23 to establish that the information they seek from member institutions is 'available' to the NCAA."

24 2012 WL 161240, at *5.

25      Just so here.  "[I]n answering interrogatories" pursuant to Fed. R. Civ. P. 33, "a party is

26 charged with knowledge of what its agents know, or what is in records available to it, or even, for

27 purposes of Rule 33, information others have given it on which it intends to rely in its suit."

28 *Ferguson v. Wilcher*, No. 17 CV 5777 RGK (ASx), 2019 WL 3017670, at *1 (C.D. Cal. Apr. 3,

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1   2019) (quoting 8B Fed. Prac. & Proc. Civ. § 2177 (3d ed.)).  But information is not available

2   simply because a party could try to get it from another entity.  Information is "available" to a

3   responding party when it is held, for example, by an attorney of the responding party, *id.* (citing

4   *Oklahoma v. Tyson Foods, Inc.*, 262 F.R.D. 617, 629 (N.D. Okla. 2009)), a subsidiary of a

5   corporate responding party, *In re ATM Fee Antitrust Litig.*, 233 F.R.D. 542, 545 (N.D. Cal. 2005),

6   or an agent over which the responding party may exercise control.  *Id.* (quoting *Brunswick Corp.*

7   *v. Suzuki Motor Co.*, 96 F.R.D. 684, 686 (D.C. Wis. 1983)).  Here, member institutions are not

8   attorneys, subsidiaries, or agents of the NCAA.

9          Even if information is in theory "available," which it is not here, a responding party need

10   not engage in an "extensive search" or undertake unduly laborious or expensive efforts to obtain

11   such information.  *See Gorrell v. Sneath*, 292 F.R.D. 629, 639 (E.D. Cal. 2013); *Lynn v. Monarch*

12   *Recovery Mgmt., Inc*., 285 F.R.D. 350, 357 (D. Md. 2012).  Asking the NCAA to somehow collect

13   this information from all 300 plus Division I member institutions for twenty plus sports over a

14   period of years when there is no bylaw or other legislative mandate to do so would be unduly

15   laborious and expensive and it is not clear how the NCAA would ensure the information provided

16   was accurate.

17          In the O'Bannon Decision, Magistrate Judge Cousins held that the information from

18   member institutions that the class plaintiffs demanded that the NCAA provide was not available

19   because "Plaintiffs have not proven that the NCAA has a legal right to acquire this specific

20   information from its members."  2012 WL 161240, at *5.  As explained above, the same is true

21   here.

22          *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1032 (E.D. Cal. 2010) does not show, as Plaintiffs

23   assert, that "[c]ourts in this district have reached the same conclusion" as in the *Law* case.  *Thomas*

24   did not involve an association at all.  It involved an interrogatory to the Governor of California

25   regarding information about parole hearings for individuals convicted of murder.  The Court

26   rejected the Governor's objection to the interrogatory because "[w]here an interrogatory is

27   directed at a party that is a governmental entity, Rule 33(b)(1)(B) requires the party to furnish

28

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1   information 'available' to an officer or agent of the governmental entity."  *Id.*  That principle has

2   no application here.  And, as discussed above, the *Law* case is inapposite here.

3       **3.      There Is No Mechanism To Enforce An Order Requiring The NCAA To Obtain Hiring And Compensation Documents And Information From Membership Institutions.**

4

5           The lack of any provision in the NCAA's bylaws to demand from member institutions the

6   documents and information Plaintiffs seek means that enforcing any order requiring the NCAA to

7   obtain that information would be complicated at best.  That is one reason why the Court in the

8   *NCAA Student-Athlete Name & Likeness Litigation* rejected the class plaintiffs request to have the

9   NCAA obtain information from member institutions.  The Court was "not convinced that if it were

10  to order the NCAA to survey its members for more information that there would be any remedy if

11  the member institutions refused to comply."  2012 WL 161240, at *5; *see also In re Citric Acid*,

12  191 F.3d at 1108 ("Ordering a party to produce documents that it does not have the legal right to

13  obtain will oftentimes be futile, precisely because the party has no certain way of getting those

14  documents.").

15          The same is true here.  Plaintiffs' own authority states that the Court would lack authority

16  to order the member institutions to provide the information Plaintiffs are seeking absent an

17  enforceable subpoena.  The Tenth Circuit granted writ relief to NCAA members who had been

18  ordered to respond to interrogatories in the *Law* case against the NCAA.  The Court held that this

19  order "was not authorized by, and is in contravention of, these federal rules concerning discovery"

20  because there is "no procedure for requiring responses from unserved, nonparty members of the

21  association."  *Univ. of Texas at Austin*, 96 F.3d at 1340.  The Court also noted that NCAA member

22  institutions that are "state colleges and universities[] are entitled to Eleventh Amendment

23  immunity from being treated as parties."  *Id.*

24          Thus, if the Court ordered the NCAA to obtain information from member institutions, the

25  NCAA sent a request for the information from member institutions, and member institutions

26  refused to comply (or provided erroneous or incomplete information or just ignored the request),

27  the Court could not order compliance by member institutions absent an enforceable subpoena.

28  Plaintiffs do not explain what other enforcement mechanism would be available.  They pointedly

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1    do not suggest that the Court could impose sanctions on the NCAA for a member institution's

2    failure to provide information to the NCAA, which would be completely unfair and unworkable.

3          Plaintiffs' inability to explain how the discovery order they seek could be enforced

4    reinforces that the order would be improper.  The better procedure is one already provided for in

5    the Federal Rules:  Plaintiffs can issue subpoenas to member institutions to obtain the information

6    they seek.  That would empower the Court to rule on any objections to those subpoenas or, if

7    appropriate, enforce them.  And a subpoena would make the responding member institutions

8    accountable for providing accurate information and the specific information requested, something

9    the NCAA could not ensure.

10                  **4.      Documents In The Possession Of Members Of Relevant NCAA Boards**
                    **And Committees Are Not Within The NCAA's Possession, Custody Or**
11                  **Control.**

12          Next, the NCAA turns to the Plaintiffs' request that the NCAA somehow procure, review,

13    and produce documents in the possession of NCAA board and committee members who are

14    employed by a member institution and used email from the member institution in working with the

15    NCAA.  Again, the NCAA need only produce documents within its "possession, custody, or

16    control."  Fed. R. Civ. P. 34(a)(1).  The same principles set forth above apply—"Control is

17    defined as the legal right to obtain documents upon demand."  *IUPIW*, 870 F.2d at 1452.  "The

18    party seeking production of the documents . . . bears the burden of proving that the opposing party

19    has such control."  *Id.*  Documents and communications in the hands of members of the NCAA's

20    governing boards and committees who are University Presidents, Conference Commissioners, and

21    other employees of athletic conferences and member schools are not within the possession,

22    custody or control of the NCAA.  Those board and committee members are employed by athletic

23    conferences and member schools and use their email accounts from those institutions when

24    conducting NCAA board or committee work.  Lennon Decl. ¶ 37.  Board and committee members

25    are selected to serve on boards and committees by other member institution representatives.

26    Lennon Decl. ¶ 39.  The NCAA has no ability to access emails within those accounts.  *Id.*

27    Plaintiffs do not offer any authority to suggest that the NCAA has control—i.e., a legal right—to

28    access documents and emails in the possession of athletic conferences and member schools.

1   Plaintiffs do not argue that the board and committee members from conferences and member

2   institutions are agents of the NCAA (which they are not).  Indeed, the only employees of the NCAA

3   associated with its boards and committees are the NCAA's staff members serving as liaisons, who

4   have NCAA email accounts, keep documents on NCAA servers, and whose documents and

5   communications the NCAA agreed to produce.  Lennon Decl. ¶ 41.

6         Plaintiffs incorrectly argue that when an individual serves on a board, the corporation or

7   parent organization inherently has control over the individual and their documents.  In support of

8   this proposition, Plaintiffs cite several cases in which motions to compel were granted and

9   required companies to search for and produce the records of members of their governing boards.

10  However, as the caselaw cited by Plaintiffs notes, "[t]his position of control is usually the result of

11  statute, affiliation or employment."  *Miniace v. Pac. Martime Ass'n*, No. C 04-03506 SI, 2006 WL

12  335389, at *2 (N.D. Cal. Feb. 13, 2006).  Indeed, in *Miniace*, the reason why the nonprofit mutual

13  benefit California corporation was found to have control over representatives from member

14  companies serving on the board of directors was because the corporation was granted authority by

15  state statute to remove directors.  *Id.* at n.1.  No statute grants the NCAA similar control over the

16  individuals serving on boards or committees.  In fact, NCAA staff liaisons are not given voting

17  power when it comes to adding or removing members from boards or committees.  Lennon Decl.

18  ¶ 42.  Furthermore, member institutions are not affiliate companies of the NCAA nor does the

19  NCAA employ the individuals from member institutions serving on the NCAA's boards and

20  committees.  Lennon Decl. ¶ 37.  In *Miniace*, the court also denied the motion to compel with

21  regards to former directors, finding that the plaintiffs had not met their burden of proving that the

22  corporation had control over its former directors.  No other case cited by Plaintiffs involves the

23  board of a nonprofit organization composed of representatives from independent institutions.

24        Plaintiffs do not identify any authority for requiring the NCAA to search for and produce

25  documents possessed by board and committee representatives from its member institutions.  In

26  *Adidas America, Inc. v. TRB Acquisitions LLC*, the plaintiffs had already searched the documents

27  of all board members and did not raise any arguments related to control when asked to search for

28  the documents of others that attended the board meetings during the relevant time period.  No.

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1   3:15-CV-2113-SI, 2019 WL 7630793, at *3 (D. Or. Aug. 2, 2019).  That is not the case here.  In

2   Royal *Park Investments SA/NV v. Deutsche Bank National Trust Co.*, the court applied the

3   "practical ability" test to determine whether the company had control over its directors.  No. 14-

4   CV-04394 (AJN) (BCM), 2016 WL 5408171, at *5 (S.D.N.Y. Sept. 27, 2016).  However, the

5   Ninth Circuit has rejected the "practical ability" test.  *In re Citric Acid*, 191 F.3d at 1108.

6        Plaintiffs' only other argument is to tout how relevant these hypothetical communications

7   could be.  But relevance is not the applicable test where the documents are outside the possession,

8   custody, and control of the NCAA.  The Plaintiffs will not be left without any of the documents

9   and communications related to relevant Board and committee work.  As the NCAA has stated, it

10  will produce documents and communications from its employees who serve as liaisons to the

11  relevant boards and committees.  The NCAA will also produce relevant documents from

12  applicable shared drives to which board and committee members had access.

13       Plaintiffs argue that such a production will not include relevant communications, if any

14  exist, that may have taken place exclusively between committee members from member

15  institutions.  So for example, if the President of one large state university who sits on an NCAA

16  committee emailed with the President of another large state university who also sits on an NCAA

17  committee about the volunteer coach bylaw using their university email accounts, that would not

18  be produced.  This is because those documents—if they exist—are simply not in the NCAA's

19  control.  If Plaintiffs believe such documents exist and want to obtain them, then Plaintiffs need to

20  serve a subpoena on the relevant third parties and make the appropriate showing for such a

21  subpoena.  Plaintiffs suggest they will be forced to travel to approximately 300 Division I

22  institutions and secure the requested information through subpoenas and depositions.  Defendants

23  doubt that such travel would be necessary given electronic discovery tools, email with counsel,

24  and videoconference options, and there is no evidence that board and committee members hail

25  from 300 different schools and conferences, but even if it were the case, burden on the requesting

26  party is not an exception to the rule that a responding party only provides documents in discovery

27  that are within its possession, custody, or control.

28

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1    Finally, Plaintiffs' motion fails to address the significant practical problems that would

2    arise from an order that the NCAA somehow procure all responsive documents and

3    communications from persons employed by athletic conferences or member institutions—persons

4    whose files all parties agree are in the possession and custody of third parties, some of whom are

5    state entities.  For example, Plaintiffs do not adequately explain how the NCAA and the member

6    institution will handle privileged materials (i.e., communications between the NCAA committee

7    member and that member's general counsel at the member's school) that may be included in these

8    communications and documents sought by the Plaintiffs.  Plaintiffs suggest that member schools

9    could perform a privilege review before providing communications to the NCAA, though they

10   offer no detail on how privilege disputes would be handled.  Plaintiffs say nothing about how

11   sensitive confidential information that the member institutions may not wish to share with the

12   NCAA will be handled.  And Plaintiffs say nothing about how sensitive confidential information

13   that the member institutions may not wish to share with the NCAA will be handled.  Moreover,

14   many representatives to relevant NCAA committees and boards are university presidents who

15   likely have highly sensitive university materials that the NCAA does not have a right to view.  If

16   the member institution does the collection, review, and designation for production (since the files

17   are in the member institutions possession and have member institution confidential, sensitive, and

18   privileged material), and gives documents designated through some unknown voluntary process to

19   the NCAA, is the NCAA responsible for the accuracy and thoroughness of the production even

20   though it could not review the documents?  Plaintiffs do not say because this would be unfair and

21   improper.  These complications make clear that the only vehicle to accurately ensure a party to

22   this litigation gets complete, accurate, relevant information sought from individuals at schools or

23   athletic conferences that never came into the possession of the NCAA is for a party in this

24   litigation to serve a subpoena on the third-party school or individual.

25   In the end, Plaintiffs seek an unprecedented and sweeping order requiring the NCAA to

26   somehow procure a vast array of information from athletic conferences and member institutions

27   that the NCAA has no right to access, could not ensure was accurate or complete if provided, and

28   if not provided, where the NCAA would have no recourse to obtain it.  There is no authority for a

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

1    Court imposing such a massive an unworkable process on the NCAA.  If this Court so holds, that

2    would create new law—contrary to Ninth Circuit precedent—that would open the door for all

3    membership organizations to have to somehow collect documents and information in discovery

4    from their members to respond to discovery requests even if the membership organization has no

5    procedure or contractual right to collect the information or to ensure that collected information is

6    accurate and complete.

7         Stated simply, Plaintiffs bear the burden of showing the NCAA controls its member

8    institutions with a specific contractual right to compel a vast array of information sought, and the

9    Plaintiffs have not met their burden.

10

11   Respectfully submitted,                FAIRMARK PARTNERS, LLP

12   DATED: October 17, 2023          By:      /s/Michael Lieberman

13                                             MICHAEL LIEBERMAN
                                               JAMIE CROOKS
14                                             (*pro hac vice*)
                                               State Bar No. 310447
15                                             jamie@fairmarklaw.com
                                               MICHAEL LIEBERMAN
16                                             (*pro hac vice*)
                                               DC Bar No. 1033827
17                                             michael@fairmarklaw.com
                                               FAIRMARK PARTNERS, LLP
18                                             1825 7th Street, NW, #821
                                               Washington, DC 20001
19                                             Telephone: (619) 507-4182

20                                             *Attorneys for Plaintiffs Joseph Colon, Shannon
                                               Ray, Khala Taylor, Peter Robinson, Katherine*
21                                             *Sebbane, and Patrick Mehlert, Individually and on*
                                               *Behalf of All Those Similarly Situated*
22

23

24

25

26

27

28

JOINT STATEMENT REGARDING DISCOVERY DISPUTE

KOREIN TILLERY, LLC

By:      */s/ Garrett R. Broshuis*
　　　　　GARRETT R. BROSHUIS
STEPHEN M. TILLERY *(pro hac vice)*
stillery@koreintillery.com
STEVEN M. BEREZNEY (Bar No. 329923)
sberezney@koreintillery.com
GARRETT R. BROSHUIS (Bar No. 329924)
gbroshuis@koreintillery.com
KOREIN TILLERY, LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

*Attorneys for Plaintiffs Taylor Smart and Michael*
*Hacker, Individually and on Behalf of All Those*
*Similarly Situated*

MUNGER, TOLLES & OLSON LLP

By:      */s/Carolyn Hoecker Luedtke*
　　　　　CAROLYN HOECKER LUEDTKE
CAROLYN HOECKER LUEDTKE
(State Bar No. 207976)
carolyn.luedtke@mto.com
JUSTIN P. RAPHAEL
(State Bar No. 292380)
Justin.Raphael@mto.com
CHRISTOPHER CRUZ
(State Bar No. 346128)
Christopher.Cruz@mto.com
JAVIER KORDI
(State Bar No. 348358)
Javier.Kordi@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street,
Twenty-Seventh Floor
San Francisco, California
94105-2907
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077

*Attorneys for Defendant National Collegiate*
*Athletic Association*

1

GUSTAFSON GLUEK PLLC

2

3

DENNIS STEWART
(State Bar No. 99152)
dstewart@gustafsongluek.com

4

DANIEL E. GUSTAFSON
(#202241 pro hac)

5

dgustafson@gustafsongluek.com

6

JOSHUA J. RISSMAN
(#391500 pro hac)

7

jrissman@gustafsongluek.com

8

GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza

9

120 South 6th Street, Suite 2600
Minneapolis, MN 55402

10

Telephone: (612) 333-8844
Facsimile: (612) 339-6622

11

12

*Attorneys for Plaintiffs Joseph Colon, Shannon
Ray, Khala Taylor, Peter Robinson, Katherine*

13

*Sebbane, and Patrick Mehlert, Individually and on
Behalf of All Those Similarly Situated*

14

COLEMAN & HOROWITT, LLP

15

16

DARRYL J. HOROWITT
(State Bar No. 100898)

17

dhorowitt@ch-law.com
COLEMAN & HOROWITT, LLP

18

499 West Shaw, Suite 116
Fresno, CA 93704

19

Telephone: (559) 248-4820
Facsimile: (559) 248-4830

20

21

*Attorneys for Plaintiffs Joseph Colon, Shannon
Ray, Khala Taylor, Peter Robinson, Katherine*

22

*Sebbane, and Patrick Mehlert, Individually and on
Behalf of All Those Similarly Situated*

23

24

25

26

27

28

**JOINT STATEMENT REGARDING DISCOVERY DISPUTE**

KIRBY McINERNEY LLP

ROBERT J. GRALEWSKI, JR.
(State Bar No. 196410)
bgralewski@kmllp.com
MARKO RADISAVLJEVIC
(State Bar No. 306552)
mradisavljevic@kmllp.com
KIRBY McINERNEY LLP
600 B Street, Suite 2110
San Diego, California 92101
Telephone: (619) 784-1442

*Attorneys for Plaintiffs Joseph Colon, Shannon Ray, Khala Taylor, Peter Robinson, Katherine Sebbane, and Patrick Mehlert, Individually and on Behalf of All Those Similarly Situated*

THE LAW OFFICES OF LEONARD B. SIMON P.C.

LEONARD B. SIMON
(State Bar No. 58310)
lens@rgrdlaw.com
THE LAW OFFICES OF LEONARD B. SIMON P.C.
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 818-0644
Facsimile: (619) 231-7423

*Attorneys for Plaintiffs Joseph Colon, Shannon Ray, Khala Taylor, Peter Robinson, Katherine Sebbane, and Patrick Mehlert, Individually and on Behalf of All Those Similarly Situated*