1  STEPHEN M. TILLERY *(pro hac vice)*
      stillery@koreintillery.com
2  STEVEN M. BEREZNEY (Bar No. 329923)
      sberezney@koreintillery.com
3  GARRETT R. BROSHUIS (Bar No. 329924)
      gbroshuis@koreintillery.com
4  **KOREIN TILLERY, LLC**
   505 North 7th Street, Suite 3600
5  St. Louis, MO 63101
   Telephone: (314) 241-4844
6  Facsimile: (314) 241-3525

7  Attorneys for Plaintiffs Taylor Smart and
   Michael Hacker, Individually and on Behalf
8  of All Those Similarly Situated

9

10            **UNITED STATES DISTRICT COURT**

11      **EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION**

12  TAYLOR SMART AND MICHAEL HACKER,     CASE NO. 2:22-cv-02125-WBS-CSK
   Individually and on Behalf of
13  All Those Similarly Situated,        **CLASS ACTION**

14            Plaintiffs,               **NOTICE OF MOTION AND MOTION FOR**
                                        **CLASS CERTIFICATION; MEM. IN**
15      vs.                             **SUPPORT OF MOTION FOR CLASS**
                                        **CERTIFICATION**
16  NATIONAL COLLEGIATE ATHLETIC
   ASSOCIATION, an unincorporated       Date:  March 3, 2025
17  association;                        Time:  1:30 p.m.
                                        Courtroom: 5, 14th Floor
18            Defendant.               Judge:  The Honorable William B.
                                        Shubb
19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**

PLEASE TAKE NOTICE that, on March 3, 2025 at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 5 of this Court, located at 501 I Street, Sacramento, California, Plaintiffs Taylor Smart and Michael Hacker ("Plaintiffs") will, and hereby do, move this Court pursuant to Federal Rule of Civil Procedure 23 for an order certifying this case as a class action.

This Motion is based upon the following Memorandum in Support, all other materials supporting this Motion, all pleadings on file, and any other matter submitted before or at the hearing on this Motion.

DATED: November 1, 2024        Respectfully submitted,


                                    /s/ *Garrett R. Broshuis*
                                KOREIN TILLERY, LLC
                                Stephen M. Tillery (*pro hac vice*)
                                Steven M. Berezney
                                Garrett R. Broshuis

                                *Attorneys for Plaintiffs*

**Pl. Mem. in Support of Motion for Class Certification**

1

## ISSUE TO BE DECIDED

2

3      Whether, pursuant to Rule of Civil Procedure 23, the

4  following proposed class (the "Proposed Class") should be

5  certified:

6      All persons who worked as a "volunteer coach" as defined
       by National Collegiate Athletic Association ("NCAA")
7      Division I Bylaw 11.01.6 in men's baseball from November
       2018 to July 1, 2023 for the following NCAA Division I
8      schools: United States Air Force Academy; University of
       Alabama; University of Albany; Appalachian State
9      University; University of Arizona; Arizona State
       University; University of Arkansas; Arkansas State
10     University; University of Arkansas - Little Rock; West
       Point – United States Military Academy; Auburn
11     University; Austin Peay State University; Brigham Young
       University; Ball State University; Baylor University;
12     Bellarmine University; Belmont University; Binghamton
       University; Boise State University; Boston College;
13     Bradley University; Brown University; Bryant University;
       Bucknell University; California State University –
14     Northridge; California State University – Bakersfield;
       California Polytechnic State University; California State
15     University – Fullerton; University of California –
       Berkeley; California Baptist University; Canisius
16     University; University of Central Arkansas; Central
       Michigan University; College of Charleston; University of
17     North Carolina – Charlotte; Chicago State University;
       University of Cincinnati; Clemson University; Coastal
18     Carolina University; Columbia University; University of
       Connecticut; Coppin State University; Cornell University;
19     Creighton University; Dallas Baptist University;
       Dartmouth College; Davidson College; University of
20     Dayton; Delaware State University; Utah Tech University
       (f/k/a Dixie State); Duke University; East Carolina
21     University; East Tennessee State University; Eastern
       Kentucky University; University of Evansville; University
22     of Florida; Florida Atlantic University; Florida Gulf
       Coast University; Florida International University;
23     Florida State University; Fordham University; California
       State University – Fresno; Furman University; George
24     Mason University; George Washington University;
       University of Georgia; Georgia Southern University;
25     Georgia State University; Georgia Institute of
       Technology; Gonzaga University; Grand Canyon University;
26     Harvard University; University of Hawaii at Manoa;
       Hofstra University; College of the Holy Cross; University
27     of Houston; Indiana University – Purdue University Fort
       Wayne (now known as Purdue University-Fort Wayne);
28     University of Illinois; Illinois State University;

Indiana University; Indiana State University; Iona University; University of Iowa; Jacksonville University; Jacksonville State University; James Madison University; University of Kansas; Kansas State University; Kennesaw State University; Kent State University; University of Kentucky; Louisiana State University; La Salle University; Lafayette College; Lehigh University; Liberty University; Lipscomb University; California State University – Long Beach; University of Louisiana – Lafayette; University of Louisiana -  Monroe; Louisiana Tech University; University of Louisville; Loyola Marymount University; University of Maine; Manhattan College; Marist College; Marshall University; University of Maryland; University of Maryland - Eastern Shore; University of Massachusetts; University of Memphis; Mercer University; University of Miami (Florida); University of Michigan; Michigan State University; Middle Tennessee State University; University of Minnesota; Mississippi State University; University of Missouri; Missouri State University; Monmouth University; Murray State University; North Carolina State University; New Jersey Institute of Technology; United States Naval Academy; University of Nebraska; University of Nevada; University of New Mexico; New Mexico State University; Niagara University; Norfolk State University; University of North Alabama; The University of North Carolina at Chapel Hill; North Carolina Agricultural & Technical State University; University of North Florida; University of Northern Colorado; Northwestern University; University of Notre Dame; The Ohio State University; University of Oklahoma; Oklahoma State University; Old Dominion University; University of Mississippi; University of Oregon; Oregon State University; University of the Pacific; University of Pennsylvania; The Pennsylvania State University; Pepperdine University; University of Pittsburgh; University of Portland; Princeton University; Purdue University; Queens University; University of Rhode Island; Rice University; University of Richmond; Rider University; Rutgers University; California State University – Sacramento; Saint Joseph's University; Saint Louis University; Saint Mary's College; Sam Houston State University; Samford University; University of San Diego; San Diego State University; University of San Francisco; San Jose State University; Santa Clara University; Seattle University; Siena College; University of South Alabama; University of South Carolina; University of South Florida; Southern Illinois University; University of Southern Mississippi; St. Bonaventure University; University of St. Thomas – Minnesota; Stanford University; Stetson University; Stony Brook University; Texas Christian University; Tarleton State University; University of Tennessee; University of Texas; Texas A&M University; University of Texas - San Antonio; Texas State University; Texas Tech University; The Citadel –

Military College of South Carolina; Troy University; Tulane University; University of Alabama – Birmingham;

University of California – Davis; University of California – Irvine; University of California – Riverside; University of California - San Diego; University of California - Santa Barbara; University of Central Florida; University of California – Los Angeles; University of Maryland – Baltimore County; University of Massachusetts – Lowell; University of North Carolina – Greensboro; University of Nevada – Las Vegas; University of Southern California; University of Texas – Arlington; University of Texas - Rio Grande Valley; University of Utah; Utah Valley University; Virginia Commonwealth University; Virginia Military Institute; Valparaiso University; Vanderbilt University; University of Virginia; Virginia Tech University; Wake Forest University; University of Washington; Washington State University; West Virginia University; Western Carolina University; Western Kentucky University; Wichita State University; Wofford College; Yale University. Excluded are the officers, directors, and employees of Defendants, and all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

Pl. Mem. in Support of Motion for Class Certification

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION.............i

ISSUE TO BE DECIDED.........................................ii

Introduction................................................1

Background..................................................4

Legal Standard.............................................16

Argument...................................................17

    I.   The Class Is Sufficiently Definite and Ascertainable.....19

    II.  Numerosity, Typicality, and Adequacy are All
        Satisfied.............................................20

        A. The class members are sufficiently numerous...........20

        B. The proposed class representatives' claims are
           typical...........................................20

        C. The proposed class representatives and their
           counsel will adequately represent the class..........22

    III.Commonality Is Met, and the Common Issues Predominate
        under Rule 23(b)(3)....................................24

        A. Commonality is met under Rule 23(a)..................25

        B. Common issues predominate...........................28

            1.   Liability will be resolved in one stroke for
                all class members, just as in *Law v. NCAA*........29

            2.   Antitrust injury and damages will be
                established classwide...........................40

    IV. A Class Action Is Superior to Other Available Methods. ...49

    V. The Court Should Appoint Korein Tillery and its
       Specific Attorneys as Class Counsel.....................54

CONCLUSION.................................................54

1

**TABLE OF AUTHORITIES**

2

Page(s)

3

**Cases**

4

*Abdullah v. U.S. Sec. Assocs., Inc.*,
   731 F.3d 952 (9th Cir. 2013) ...........................16, 25

5

*Achzinger v. IDS Prop. Cas. Ins. Co.*,
6   772 Fed. App'x 416 (9th Cir. 2019) ........................40

7   *Alcantar v. Hobart Serv.*,
   800 F.3d 1047 (9th Cir. 2015) .............................17

8

*Aldapa v. Fowler Packing Co., Inc.*,
9   323 F.R.D. 316 (E.D. Cal. 2018) ..........................19

10
*Amchem Prods., Inc. v. Windsor*,
11   521 U.S. 591 (1997) ......................................30

12 *Baird v. Cal. Faculty Ass'n*,
   No. CIV S-00-0999, 2000 WL 1028782 (E.D. Cal. July
13   13, 2000) ................................................26

14
*Bateman v. Am. Multi-Cinema, Inc.*,
15   623 F.3d 708 (9th Cir. 2010) .............................17

16 *Brice Yingling v. eBay, Inc.*,
   No. C 09-01733, 2010 WL 11575128 (N.D. Cal. July 16,
17   2010) ....................................................51

18 *In re Capacitors Antitrust Litig. (No. III)*,
   No. 17-md-02801, 2018 WL 5980139 (N.D. Cal. Nov. 14,
19   2018) ....................................................30

20
*In re Cardizem CD Antitrust Litig.*,
21   200 F.R.D. 297 (E.D. Mich. 2001) .........................51

22 *In re Cardizem CD Antitrust Litig.*,
   200 F.R.D. 326 (E.D. Mich. 2001) .........................42

23
*Castro v. Sanofi Pasteur Inc.*,
24   134 F. Supp. 3d 820 (D.N.J. 2015) ........................35

25
*In re College Athlete NIL Litig.*,
26   No. 20-cv-03919, 2023 WL 8372787 (N.D. Cal. Nov. 3,
   2023) ................................................*passim*

27

28

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ........................................40

*In re ConAgra Foods, Inc.*,
  90 F. Supp. 3d 919 (C.D. Cal. 2015) ......................51

*Cummings v. Connell*,
  316 F.3d 886 (9th Cir. 2003) .............................22

*Cummings v. Connell*,
  No. CIV S-99-2176, 1999 WL 1256772 (E.D. Cal. Dec.
  20, 1999) ................................................26

*De Sousa v. Dir. of U.S. Citizenship & Immigr. Servs.*,
  720 F. Supp. 3d 794 (N.D. Cal. 2024) .....................41

*In re DRAM Antitrust Litig.*,
  No M 02-1486, 2006 WL 1530166 (N.D. Cal. June 5,
  2006) ....................................................44

*In re Foreign Exchange Benchmark Rates Antitrust
  Litig.*,
  No. 13-cv-07789-LGS (S.D.N.Y.) .......................23, 24

*Four in One Co., Inc. v. S.K. Foods, L.P.*,
  No. 2:08-cv-3017, 2014 WL 28808 (E.D. Cal. Jan. 2,
  2014) ....................................................30

*Gonzalez v. United States Immigration and Customs
  Enforcement*,
  975 F.3d 788 (9th Cir. 2020) .........................17, 20

*Griffin v. Consol. Commc'ns*,
  No. 2:21-cv-0885, 2022 WL 16836711 (E.D. Cal. Nov. 9,
  2022) ............................................22, 24, 50

*In re High-Tech Emp. Antitrust Litig.*,
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) ............21, 25, 38

*House v. Nat'l Collegiate Athletic Ass'n*,
  545 F. Supp. 3d 804 (N.D. Cal. 2021) .....................41

*In re Hyundai and Kia Fuel Economy Litig.*,
  926 F.3d 539 (9th Cir. 2019) (en banc) ...............22, 29

*Just Film, Inc. v. Buono*,
  847 F.3d 1108 (9th Cir. 2017) ........................21, 24

*Kabasele v. Salon*,
　No. 2:21-cv-1639, 2023 WL 4747691 (E.D. Cal. July 25,
　2023)
　 .........................................20, 22, 24, 50

*Law v. Nat'l Collegiate Athletic Ass'n*,
　134 F.3d 1010 (10th Cir. 1998) .........................*passim*

*Law v. Nat'l Collegiate Athletic Ass'n*,
　185 F.R.D. 324 (D. Kan. 1999) .......................3, 18, 49

*Le v. Zuffa, LLC*,
　No. 2:15CV01045, 2023 WL 5085064 (D. Nev. Aug. 9,
　2023) .................................................24, 35

*Leyva v. Medline Indus. Inc.*,
　716 F.3d 510 (9th Cir. 2013) ...............................28

*In re Live Concert Antitrust Litig.*,
　247 F.R.D. 98 (C.D. Cal. 2007) ............................49

*Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v.*
　*Las Vegas Sands, Inc.*,
　244 F.3d 1152 (9th Cir. 2001) .............................50

*Lytle v. Nutramax Lab'ys*, *Inc.*,
　114 F.4th 1011 (9th Cir. 2024) .........................25, 28

*Meijer, Inc. v. Abbott Lab'ys*,
　No. C 07-5985, 2008 WL 4065839 (N.D. Cal. Aug. 27,
　2008) .................................................44, 48

*In re Mersho*,
　6 F.4th 891 (9th Cir. 2021) ...............................22

*Moore v. James H. Matthews & Co.*,
　682 F.2d 830 (9th Cir. 1982) ...............................44

*Morelock Enters., Inc. v. Weyerhaeuser Co.*,
　No. CV 04-583, 2004 WL 2997526 (D. Or. Dec. 16, 2004) .......52

*In re Nassau Cty. Strip Search Cases*,
　461 F.3d 219 (2d Cir. 2006) ...............................27

*Nat'l Collegiate Athletic Ass'n v. Alston*,
　594 U.S. 69 (2021) .......................................12

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*,
　468 U.S. 85 (1984) ....................................33, 34

*Nitsch v. Dreamworks Animation SKG Inc.*,
  315 F.R.D. 270 (N.D. Cal. 2016) ............................21

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods
  LLC*,
  31 F.4th 651 (9th Cir. 2022) (en banc) .................*passim*

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
  20 F.4th 466 (9th Cir. 2021) ...........................34, 46

*In re Packaged Seafood Prods. Antitrust Litig.*,
  332 F.R.D. 308 (S.D. Cal. 2019) .......................49, 53

*Patel v. Facebook, Inc.*,
  932 F.3d 1264 (9th Cir. 2019) .............................17

*Pulaski & Middleman, LLC v. Google, Inc.*,
  802 F.3d 979 (9th Cir. 2015) ..............................40

*Purple Mountain Trust v. Wells Fargo & Co.*,
  No. 18-cv-03948, 2022 WL 3357835 (N.D. Cal. Aug. 15,
  2022) .....................................................29

*Schwarm v. Craighead*,
  233 F.R.D. 655 (E.D. Cal. 2006) ........................*passim*

*In re Scrap Metal Antitrust Litig.*,
  527 F.3d 517 (6th Cir. 2008) ..............................30

*Senne v. Kansas City Royals Baseball Corp.*,
  934 F.3d 918 (9th Cir. 2019) ...........................17, 28

*Senne v. The Office of the Comm'r of Baseball*,
  No. 14-CV-00608-JCS (N.D. Cal.) ...........................23

*Sidibe v. Sutter Health*,
  333 F.R.D. 463 (N.D. Cal. 2019) ...........................21

*Smilow v. Sw. Bell Mobile Sys., Inc.*,
  323 F.3d 32 (1st Cir. 2003) ...............................39

*In re Static Random Access Memory (SRAM) Antitrust
  Litig.*,
  264 F.R.D. 603 (N.D. Cal. 2009) ...........................44

*Tawfilis v. Allergan, Inc.*,
  No. 815CV00307JLSJCG, 2017 WL 3084275 (C.D. Cal. June
  26, 2017) .................................................35

**Pl. Mem. in Support of Motion for Class Certification**

*Tennessee v. Nat'l Collegiate Athletic Ass'n*,
   718 F. Supp. 3d 756 (E.D. Tenn. 2024) ........................41

*United States ex rel. Terry v. Wasatch Advantage Gr.,*
   *LLC*,
   327 F.R.D. 395 (E.D. Cal. 2018) ............................19

*In re Urethane Antitrust Litig.*,
   768 F.3d 1245 (10th Cir. 2014) .............................42

*Vaquero v. Ashley Furniture Indus., Inc.*,
   824 F.3d 1150 (9th Cir. 2016) ..........................28, 40

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ........................................25

*In re Wash. Mut. Mortgage-Backed Sec. Litig.*,
   276 F.R.D. 658 (W.D. Wash. 2011) ...........................51

*Whiteway v. FedEx Kinko's Off. & Print Servs., Inc.*,
   No. C 05-2320, 2006 WL 2642528 (N.D. Cal. Sept. 14,
   2006) ......................................................39

**Court Rules**

Fed. R. Civ. P. 23(a).........................................24

Fed. R. Civ. P. 23(a)(1).....................................20

Fed. R. Civ. P. 23(a)(2).....................................24

Fed. R. Civ. P. 23(b)(3)................................*passim*

Fed. R. Civ. P. 23(c)(1)(B)..................................54

Fed. R. Civ. P. 23(g)(1)(A)..................................54

**Other Authorities**

Wright & Miller, 13A Fed. Prac. & Proc. Juris. § 3531.4 (3d
   ed.) .......................................................41

7AA Charles Alan Wright, Arthur Miller & Mary Kay Kane,
   Federal Practice and Procedure, § 1781 (3d ed. 2005)..........31, 43

Hovenkamp, Herbert and Areeda, Phillip E., Antitrust Law:
   An Analysis of Antitrust Principles and Their Application, ¶ 394
   (last updated Sept. 2024) ..................................45

1 McLaughlin on Class Actions § 5:37 (21st ed.) ...................44

Pl. Mem. in Support of Motion for Class Certification

6 NEWBERG ON CLASS ACTIONS, § 18.25 (4th ed. 2002) .................30

### Introduction

This case involves a uniform wage fix that directly harmed hundreds of talented baseball coaches. From 1992 to July 2023, the Defendant NCAA's bylaws allowed member schools to hire four baseball coaches. Three of them (the head coach and two assistants) could be paid whatever compensation the free market would give them. But the fourth coach (i.e., the third assistant coach) — who performed many of the same duties as the other paid assistant coaches — had to work for free, even if the free market otherwise would have paid them, solely because of an NCAA rule. *See* NCAA Bylaws 11.7.6; 11.01.6. The NCAA dubbed the uncompensated position the "volunteer" coach, but in reality, it was a classic, across-the-board antitrust violation.

Plaintiffs Taylor Smart and Michael Hacker are two former coaches who worked in that role. They worked as full-time, third assistant baseball coaches without pay. They filed this class action lawsuit alleging that the volunteer coach rule, which the NCAA repealed after Plaintiffs filed this lawsuit, violated the Sherman Act.

The legality of that rule is an up-or-down question for all class members, making this case perfect for class treatment. Every single liability issue is a common one.

- Whether the volunteer coach rule amounted to a conspiracy amongst horizontal competitors has essentially already been admitted: Defendant admitted that member schools compete for coaches, that member schools agreed to the bylaw, and that Defendant and member schools strictly enforced it.

- Whether the volunteer coach rule was anticompetitive will likewise generate just one answer: the rule on its face removed competition for the price of labor for a category of coaches, and common evidence shows that the rule had its intended effect. In just the first year after Defendant repealed the rule, over half of member schools immediately converted the wage-fixed, unpaid position into a paid one, with an average salary of close to $50,000. With the effect of the wage fix still lingering, classic economic theory predicts that many more schools will begin paying the third assistant in future years, and the salary will increase as the effect of competition plays out.

- Whether Defendant has any *legitimate* procompetitive justifications is likewise a common issue. The common evidence collected thus far contradicts Defendant's purported justifications. The NCAA admits in official documents that the rule was not needed at the national level, that repeal would actually lead to "fairer" competition, and that repeal would be beneficial to student athletes and to the coaching industry. The NCAA's own witnesses agreed.

All the remaining issues are likewise common ones that will be proven with common evidence. Whether volunteer coaches suffered an injury and the extent of their damages will be proven using common evidence, namely the NCAA's own admissions, deposition testimony from fact witnesses, and expert opinions by

1  Dr. Daniel Rascher, who is widely regarded as the top expert in

2  sports antitrust and sports economics.

3      Dr. Rascher's declaration in support of this motion explains

4  how he will show that all class members suffered an injury

5  because all of these coaches worked in a fixed market where

6  competition for the price of labor had been removed. He also sets

7  forth a common method of calculating damages by looking at the

8  salaries paid to third assistant coaches after the rule changed.

9  That data is very conservative because the wage fix just ended a

10 year ago and the market continues to suffer from lingering

11 effects, but it is a reasonable, straightforward, and accepted

12 method of computing antitrust damages that applies classwide.

13     Given the predominance of common questions capable of being

14 answered by common evidence, a class action is clearly superior

15 to individual cases. Requiring hundreds of volunteer coaches to

16 individually litigate hundreds of identical lawsuits in courts

17 throughout the United States seeking the same relief based on the

18 same facts is highly inefficient and is exactly what the class

19 action device was intended to prevent. History tells us that this

20 case can and should remain a class action. The last time the NCAA

21 faced a lawsuit about restricting compensation for a category of

22 coaches, the court granted summary judgment on liability, the

23 Tenth Circuit affirmed, and a jury awarded damages for all class

24 members at trial. *Law v. Nat'l Collegiate Athletic Ass'n*, 134

25 F.3d 1010, 1019–20 (10th Cir. 1998); *Law v. Nat'l Collegiate*

26 *Athletic Ass'n*, 185 F.R.D. 324 (D. Kan. 1999) (post-trial order).

27

28

1  Like that case, the NCAA's actions are uniform throughout the

2  country and should be addressed uniformly.

3      Plaintiffs respectfully request that the Court certify this

4  case as a class action, appoint named plaintiffs Taylor Smart and

5  Michael Hacker as Class Representatives, and appoint Plaintiffs'

6  counsel as Class Counsel.

7                              **Background**

8      College sports has become a big and profitable business,

9  with the NCAA itself earning $1.15 billion and the schools

10 collectively earning close to $16 billion in athletic revenue in

11 a recent year.[1] College baseball has likewise grown in popularity,

12 with the NCAA's post-season College World Series drawing over

13 366,000 fans in 2022 (24,407 fans per game).[2]

14     The NCAA has around 300 members with Division I baseball

15 teams.[3] These schools compete with one another, both on the field

16 and when it comes to hiring skilled coaches.[4] In an open labor

17 market, the schools would pay their assistant coaches at

18 competitive rates. But, for nearly 30 years, the NCAA denied this

19 basic right to one category of Division I assistant coaches to

20 their detriment: the "volunteer" coach.

21     The restraint had its genesis in the late 1980s when the

22 NCAA and its members commissioned a Special Committee on Cost

23 Reduction, which concluded that the ███████████████████

24

25 _____

[1] *See* NCAA Answer (ECF No. 40) at ¶ 25.

26 [2] *Id.* at ¶ 29.

27 [3] *Id.* at ¶¶ 2, 34.

[4] *Id.*

28

1 ███████████████████████ [5] In 1991, the NCAA and its members

2 then enacted limits on the number of coaches in several sports

3 for the first time, and made one of these positions a "restricted

4 earnings" position, meaning that one of the assistant coaches was

5 forced to earn an artificially low salary to control costs.[6] But

6 the coaching limits were ████████████████████████████

7 ██████████████ and they cut too deep in many sports.[7] Baseball

8 was the sport that was ████████████ by the legislation,

9 with industry participants indicating at the time that ██████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████████ [8]

13     In response, the NCAA and its members passed another piece

14 of legislation in 1992 to add another coaching position in

15 baseball and other sports.[9] But to stay aligned with the cost-

16 cutting goals of the era, they made this position a "volunteer

17 position," meaning the coach could not be paid.[10]

18     After 1992, the NCAA's bylaws therefore allowed member

19 schools to hire four baseball coaches. The head coach and the

20 first two assistant coaches could be paid whatever the market

21 _____

22 [5] Ex. 2, NCAA_SMART-COLON_0240079 at 0086. Unless otherwise noted,
all exhibits referenced are attached to the Declaration of

23 Garrett Broshuis in Support of Class Certification.

24 [6] For a discussion of the history of the restricted earnings
bylaw, *see Law*, 134 F.3d at 1012-15.

25 [7] Ex. 3, NCAA_SMART-COLON_0247281.

26 [8] *Id.* at 7307, 7309.

27 [9] Expert Declaration of Daniel Rascher ("Rascher Decl.") ¶¶ 100-06

28 [10] *Id.*

1  commanded. But the third assistant coach had to work for free,[11]

2  because the bylaw artificially set the compensation at zero. The

3  bylaw forbid "compensation or remuneration from the institution's

4  athletics department or any organization funded in whole or in

5  part by the athletics department or that is involved primarily in

6  the promotion of the institution's athletics program (e.g.,

7  booster club, athletics foundation association)."[12] Schools could

8  not provide housing, and the coach could not receive more than

9  two complimentary tickets to home baseball games nor *any* tickets

10 to other sports events hosted by the school, like basketball or

11 football.[13] Schools could not provide meals except when

12 "incidental to organized team activities," such as for pre- and

13 post-game meals.[14] Schools could not even provide standard

14

[11] Ex. 4, NCAA_SMART-COLON_0006955 (2018-19 Division I Manual)
(NCAA Bylaws 11.7.6; 11.01.6) Ex. 5, NCAA_SMART-COLON_0015157
(2019-20 Division I Manual) (same) ; Ex. 6, NCAA_SMART-
COLON_0000001 (2020-21 Division I Manual) (same); Ex. 7,
NCAA_SMART-COLON_0000465 (2021-22 Division I Manual) (same); Ex.
8, NCAA_SMART-COLON_0000931 (2022-23 Division I Manual) (same);
Ex. 9, 10/25/23 NCAA Response to Interrogatory Nos. 7, 10
(admitting volunteer coach bylaw for baseball was adopted as
Proposal No. 60 at the 1992 NCAA Convention); *id.* at Response to
Interrogatory No. 6 (admitting volunteer coach bylaw was repealed
in 2023).

[12] *See supra* n.11; *see also* NCAA Answer (ECF No. 40) at ¶¶ 44-45
(admitting Bylaw 11.01.6 includes the quoted language); Ex. 10,
Boyer Dep. at 41:12-17, 144:20-145:19, 245:16-246:12; Ex. 11,
Fraser Dep. at 130:1-131:17, 238:23-239:13; Ex. 12, Tealer Dep.
at 16:16-17:5, 72:25-74:3.

[13] NCAA Answer (ECF No. 40) at ¶ 45; Ex. 8, NCAA_SMART-
COLON_0000931 at 0970 (2022-23 Division I Manual); Ex. 6,
NCAA_SMART-COLON_0000001 at 0061 (2020-21 Division I Manual); Ex.
5, NCAA_SMART-COLON_0015157 at 5164 (2019-20 Division I Manual);
Ex. 4, NCAA_SMART-COLON_0006955 at 7015 (2018-19 Division I
Manual); Ex. 10, Boyer Dep. at 41:18-43:14.

[14] Ex. 9, 10/25/23 NCAA Response to Interrogatory No. 2.

1  benefits, such as health insurance or workers' compensation.[15] The

2  parties in this case have colloquially referred to these various

3  bylaws as the "volunteer coach rule."

4       The Managing Director of Division I testified that "Division

5  I expects bylaw enforcement to be taken seriously."[16] And records

6  indicate that the NCAA vigorously enforced the volunteer coach

7  rule specifically, punishing those who violated it.[17] The NCAA

8  even hired former U.S. Attorney General Alberto Gonzales as its

9  chief hearing officer for its Infractions Committee that dealt

10  with this rule.[18]

11       The services provided by volunteer coaches had substantial

12  value. NCAA documents for nearly 20 years repeatedly state that

13  "Volunteer coaches are involved in the day-to-day coaching of

14  student-athletes, and are an integral part of the sport

---

[15] NCAA Answer (ECF No. 40) at ¶ 46 (admitting that "volunteer coaches were not permitted to receive life insurance, health insurance, disability insurance, or tuition waiver from member schools"); Ex. 10, Boyer Dep. at 43:15-44:2; Ex. 12, Tealer Dep. at 74:5-8.

[16] Ex. 11, Fraser Dep. at 125:15-20.

[17] Ex. 13, NCAA_SMART-COLON_0019670 (volunteer impermissibly had meals during recruit's unofficial visit); Ex. 14, NCAA_SMART-COLON_0019728 (volunteer baseball coach impermissibly received three tickets instead of two tickets for a home baseball game); Ex. 15, NCAA_SMART-COLON_0019775 (assistant coach improperly took volunteer to a game in another sport without making the volunteer pay for it); Ex. 16, NCAA_SMART-COLON_0020631 (violation to pay for volunteer's expenses related to traveling to professional development conference).

[18] Ex. 17, NCAA_SMART-COLON_0226950 at 6952 (volunteer coach infraction regarding women's gymnastics); Ex. 18, NCAA_SMART-COLON_0226939 at 6948 (same); Ex. 11, Fraser Dep. at 114:5-116:12 (testifying that the Committee on Infractions is the "adjudicative body within Division I" that administers penalties for bylaw violations).

1  program."[19] Volunteer coaches worked so long that they were

2  entitled to enroll in health insurance under the Affordable Care

3  Act but were told that they would be fired if they accepted it.[20]

4      In baseball, the volunteer coach was expected to perform a

5  full-time job without pay, as the named plaintiffs demonstrate.

6  Plaintiff Taylor Smart worked as an assistant coach at the

7  University of Arkansas, an NCAA Division I member school.[21] As a

8  former star college player and former professional player, and

9  having already coached in the graduate assistant role at a major

10  university, Mr. Smart possessed valuable coaching skills and was

11  hired to perform critical duties. He performed on-field coaching,

12  serving as the first-base coach during games; he oversaw the

13  team's baserunning and catchers, served as the assistant hitting

14  coach and assistant infield coach, developed scouting reports and

15  practice plans, threw batting practice, broke down all game film

16  and scouting reports for each opponent (~60-70 games per year),

17  and performed many other essential services.[22] He worked

18  approximately 9-10 hours a day for six to seven days per week.[23]

19

20

21  [19] Ex. 19, NCAA_SMART-COLON_0141397 & 1398 at 1404, 1406 (07/16/19
    email Rigney to Steve Mallonee email with attachment); Ex. 20,

22  NCAA_SMART-COLON_0145795 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); Ex. 21,

23  NCAA_SMART-COLON_0145784 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

24  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓).
    [20] Ex. 22, SMART_COLON_THIRD PARTY_0000006114 (08/26/22 email from

25  Miller to Kopp).

26  [21] Ex. 23, Smart Dep. at 15:10-16:4.

27  [22] *Id.* at 91:24-96:9.

28  [23] *Id.* at 96:13-97:8.

1    Shortly before this case was filed, the University of

2  Arkansas averaged over 10,000 fans at each of its more than 30

3  baseball home games.[24] The head baseball coach recently earned

4  ███████████████████, and the two paid assistant coaches earned

5  ████████████████████.[25] Yet while the other two assistant coaches

6  made over a ████████████████████ and received standard

7  benefits,[26] Mr. Smart received no salary for his coaching job, and

8  no health insurance or other benefits, even though he performed

9  similar work.[27]

10    The same is true for Plaintiff Michael Hacker. Mr. Hacker,

11  who worked as an assistant baseball coach at NCAA Division I

12  member school University of California, Davis,[28] also had excelled

13  as a college and professional player and likewise had prior

14  coaching experience.[29] He was hired to serve in a full-time role

15  as the pitching coach at U.C. Davis — a more-than-40-hours-per-

16  week role that made him responsible for overseeing 18 pitchers,

17  or approximately half the team.[30] He was responsible for those

18  pitchers during practices and games (including away games), and

19  he selected the pitches they would throw during games, handled

20  mound visits during games, and decided which pitchers would pitch

21

22  _____

23  [24] NCAA Answer (ECF No. 40) at ¶ 26 (admitting this).

    [25] Ex. 24, SMART_SCHLS_0000000025.

24  [26] Ex. 23, Smart Dep. at 116:8-118:7, 126:9-20, 152:17-153:16.

25  [27] *Id.* at 29:3-18, 97:9-14, 116:25-117:21, 152:17-153:16.

26  [28] Ex. 25, Hacker Dep. at 39:23-40:2.

27  [29] *Id.* at 21:8-23:15, 28:17-30:23, 31:23-37:21.

    [30] *Id.* at 69:7-13.

28

1  during games.[31] Although Mr. Hacker was responsible for

2  approximately half the team, unlike the other two assistant

3  coaches, he did not receive a salary or benefits.[32]

4      The baseball industry had long recognized the inequity and

5  the need for an additional paid coach, and had thus long called

6  for repeal of the volunteer coach rule for baseball.[33] Spurred by

7  these sentiments, the powerhouse Southeastern Conference ("SEC")

8  spearheaded an effort to eliminate the volunteer coach bylaw in

9  baseball in 2018. The formal proposal (Proposal No. 2018-34) went

10  through the NCAA's legislative machinations, and it included

11  softball as another sport where the volunteer coach would be

12  eliminated.[34] The official rationale for the amendment stated that

13  eliminating the volunteer coach in baseball and softball would

14  "enhance student-athlete well-being" and would "allow coaching

15  staffs to better and more adequately serve the needs and

16  interests of their student-athletes by reducing the rising

17  student-athlete to coach ratio in both sports."[35]

18      The NCAA's member schools and conferences voted on the

19  proposal, and it was defeated.[36] Records show that the ban

20  remained in place because a majority of schools did not want to

21  compete on the price of labor. Those voting against the amendment

22  _____
[31] *Id.* at 48:15-17, 68:5-18, 95:10-96:14.

23  [32] *Id.* at 84:15-19, 89:13-90:21, 104:24-105:4.

24  [33]  Ex. 10, Boyer Dep. at 66:4-67:21 (effort had been ongoing).

25  [34] *Id.* at 66:4-67:21, 90:19-91:9, 117:20-118:2, 228:15-24; Ex. 11,
    Fraser Dep. at 150:9-14; Ex. 12, Tealer Dep. at 89:6-11.

26  [35] Ex. 26, NCAA_SMART-COLON_0019530.

27  [36] NCAA Answer (ECF No. 40) at ¶ 59; Ex. 9, 10/25/23 NCAA Response
    to Interrogatory Nos. 5-6.

28

1   (and therefore retaining the market restraint) specifically noted

2   "budget concerns."[37]

3       That cost-saving rationale went against the NCAA's own

4   guidance on legislation. Since 2013, the NCAA Division I Manual

5   has stated, "The commitment to fair competition acknowledges that

6   variability will exist among members, including facilities,

7   geographic locations and resources, and that such variability

8   should not be justification for future legislation."[38] The

9   arguments raised in opposition to repealing the bylaw at issue

10  flatly contradicted this agreed-upon principle.[39]

11      The baseball industry reacted with outrage when the

12  volunteer coach rule repeal was defeated. Vanderbilt coach Tim

13  _____

14  [37] Ex. 27, NCAA_SMART-COLON_0042200 & 2201 (Student-Athlete
    Experience Committee took no position on Proposal No. 2018-34 but
15  raised "budget concerns"); Ex. 28,
    SMART_COLON_THIRD_PARTY_0000038212 (03/06/19 email from Thomas
16  Samuel at Southland Conference raising budgetary concerns over
    Proposal No. 2018-34); Ex. 29, NCAA_SMART-COLON_0028588 at 8588
17  (01/15/21 email from Jennifer Henderson of NCAA stating that

18  ███████████████████████████); Ex. 10, Boyer Dep. at 178:15-179:16; Ex.
19  11, Fraser Dep. at 167:6-170:3, 171:25-173:8, 179:8-180:13.

20  [38] Ex. 30, NCAA_SMART-COLON_0008285 at 8298 (2013-14 Division I
    Manual); Ex. 31, NCAA_SMART-COLON_0001845 at 1867 (2014-15
21  Division I Manual); Ex. 32, NCAA_SMART-COLON_0009571 at 9584
    (2015-16 Division I Manual); Ex. 33, NCAA_SMART-COLON_0010831 at
22  0842 (2016-17 Division I Manual); Ex. 34, NCAA_SMART-
    COLON_0011245 at 1256 (2017-18 Division I Manual); Ex. 4,
23  NCAA_SMART-COLON_0006955 at 6966 (2018-19 Division I Manual); Ex.
    5, NCAA_SMART-COLON_0015157 at 5168 (2019-20 Division I Manual);
24  Ex. 6, NCAA_SMART-COLON_0000001 at 0013 (2020-21 Division I
    Manual); Ex. 7, NCAA_SMART-COLON_0000465 at 0477 (2021-22
25  Division I Manual); Ex. 8, NCAA_SMART-COLON_0000931 at 0943
    (2022-23 Division I Manual); Ex. 35, NCAA_SMART-COLON_0001396 at
26  1407 (2023-24 Division I Manual).
27
    [39] Ex. 11, Fraser Dep. at 173:25-175:5.
28

1  Corbin called the vote, "gross," "sickening," and doomed by

2  "limited thinking."[40] A coach in the Big 12 conference, Jim

3  Schlossnagle, said, "There's literally nothing you can stand on

4  to not vote for this."[41] Meanwhile the head coach at the

5  University of Indiana called the vote "absolute hogwash."[42]

6      The SEC and its member schools felt strongly enough about

7  the need to pay these baseball coaches that they asked for

8  reconsideration.[43] The NCAA's governance committees, however,

9  rejected the attempt and stated that it could not be voted on

10  again until two years later.[44] Hundreds of hardworking baseball

11  coaches and their families continued to suffer as a result.[45]

12      Efforts to eliminate the volunteer coach rule continued in

13  2022 via Proposal No. 2022-28.[46] The NCAA "had not been successful

14  in previous [antitrust] litigation,"[47] including before the

15  Supreme Court in *Nat'l Collegiate Athletic Ass'n v. Alston*, 594

16

17  [40] Ex. 36, SMART_COLON_THIRD_PARTY_0000043201; *cf.* Ex. 37,
SMART_COLON_THIRD_PARTY_0000036456 at 6457 (02/25/19 email from
18  Trace Wilgus of Vanderbilt stating "just thought we were finally
at a point where we could all agree this needed to happen").

19  [41] Ex. 38, SMART_COLON_THIRD_PARTY_0000038523.

20  [42] Ex. 39, SMART_COLON_THIRD_PARTY_0000134698.

21  [43] Ex. 40, NCAA_SMART-COLON_0041651; Ex. 41, NCAA_SMART-
COLON_0041801 (03/01/19 and 09/11/19 Sankey letters); Ex. 10,
22  Boyer Dep. at 122:10-12, 124:14-17; Ex. 11, Fraser Dep. at
180:25-181:2; Ex. 12, Tealer Dep. at 103:16-18, 106:14-16.

23  [44] Ex. 42, NCAA_SMART-COLON_0152091 & 2094 (Division I Council
24  declined to reconsider Proposal No. 2018-34); Ex. 12, Tealer Dep.
at 106:17-24 (confirming two-year reintroduction ban).

25  [45] *See* Ex. 39, SMART_COLON_THIRD_PARTY_0000134698 (volunteer
26  coaches discussing the impact on their families of the vote).

27  [46] Ex. 43, NCAA_SMART-COLON_0019545 (Proposal No. 2022-28).

28  [47] Ex. 11, Fraser Dep. at 254:1-255:4.

1  U.S. 69 (2021) a year before. So "the landscape had changed such

2  that the institutions and the conference personnel were thinking

3  about national regulation differently."[48] The NCAA tasked a

4  committee with identifying unnecessary rules ripe for change.[49]

5  The committee received legal advice from outside counsel,[50] and

6  one of the first rules the committee identified for repeal was

7  the volunteer coach rule.[51] The Proposal's rationale again noted

8  that it would "help provide better support to student-athletes."[52]

9  A noted downside of the proposal mentioned "adding full-time

10 staff member" and "real budget concerns,"[53] once again showing

11 that the concern was about money and not promoting competition.

12      This time, various NCAA committees conceded in official

13 publications that the volunteer coach rule served no meaningful

14 procompetitive purpose. In March 2022, the NCAA's Modernization

15 of Rule Subcommittee stated that the volunteer coach designation

---

16 [48] *Id.*

17 [49] *Id.* at 252:21-253:19.

18 [50] *Id.* at 74:10-75:18.

19 [51] Ex. 44, NCAA_SMART-COLON_0136805 at 6821; Ex. 10, Boyer Dep. at
20 126:1-18, 127:14-128:7; Ex. 11, Fraser Dep. at 72:22-73:10,
   76:18-78:15, 79:19-21, 80:6-24, 206:11-17.

21 [52] Ex. 43, NCAA_SMART-COLON_0019545; *see also* Ex. 9, 10/25/23 NCAA
22 Response to Interrogatory No. 8.

23 [53] Ex. 45, SMART_COLON_THIRD PARTY_0000019162; *cf.* Ex. 46,
   NCAA_SMART-COLON_0186902 (09/20/22 email from King to Wright
   noting schools who ███████████████████████████████████
24 ███████████████████); Ex. 47, SMART_COLON_THIRD_PARTY_0000084378
25 (school thoughts on Proposal 2022-28 with American Univ. saying
   "The financial implications are a concern" and Lafayette saying
26 "real budget concerns"); Ex. 48, SMART_COLON_THIRD
   PARTY_0000023103 (████████████████████████████████████████████
27 ██████████████████████████████████████████████████████████
   ████████████████████████████████).

28

1 ██████████████████████████████████████████

2 ██████████████████████████████████████████

3 ██████████████████████████████████████████

4 ██████████████████."[54] Similarly, the NCAA's Division I

5 Transformation Committee admitted in its January 3, 2023 Final

6 Report that the proposal to eliminate the bylaws at issue was

7 made "[i]n an effort to create fairer and more equitable Division

8 I athletics competition."[55] One of the NCAA's top executives

9 agreed that Proposal 2022-28 was introduced to create a fairer

10 and more equitable Division I, and testified that eliminating the

11 volunteer coach rule while keeping the total number of coaches at

12 four "would lead to that fair competition."[56]

13     The common evidence further establishes no procompetitive

14 justification for the volunteer coach rule. Budgets from Division

15 I member schools range from under $10 million to hundreds of

16 millions of dollars per year,[57] and schools have always spent

17 different amounts on all other personnel and when building

18 facilities.[58] Even with the volunteer coach rule in place, member

19 schools could spend as much money as they desired on head

20 ─────────────────────

21 [54] Ex. 44, NCAA_SMART-COLON_0136805 at 6821; Ex. 11, Fraser Dep. at 206:11-17.

22 [55] Ex. 49, NCAA_SMART-COLON_0125859 & 5860 at 5879; Ex. 11, Fraser
Dep. at 83:14-17, 198:21-200:2; *cf.* Ex. 50, NCAA_SMART-

23 COLON_0081464(Q&A package sent to the D-1 Council recommending
passage of Proposal No. 2022-28 stating that "the subcommittee

24 determined that national regulation designating individuals
as volunteer coaches … in championship subdivision football,

25 swimming and diving, and women's rowing is not necessary.").

26 [56] Ex. 11, Fraser Dep. at 198:25-201:19.

27 [57] *Id.* at 138:6-18.

28 [58] NCAA Answer (ECF No. 40) at ¶ 63.

1  coaches, the other two assistant baseball coaches, strength

2  coaches, trainers, training facilities, and stadiums.[59] These

3  advantages already helped attract top baseball athletes to the

4  bigger schools[60] and explains the bigger conferences' comparative

5  success on the baseball diamond.[61] Moreover, no contemporary,

6  objective data or studies showed that restricting volunteer coach

7  pay in baseball helped competition between member schools.[62]

8      Proposal No. 2022-28 was adopted in January 2023 and made

9  effective July 1, 2023.[63] Notably, this occurred only *after*

10 Plaintiffs filed this lawsuit and was repealed because of

11 potential antitrust exposure.[64]

12     In the first season in which a third assistant baseball

13 coach could be hired and paid, over half of the member schools

14 have hired and paid a third assistant coach, with the average

15 being $50,000 and several paying over six figures.[65] Very often,

16 _____

17 [59] Ex. 10, Boyer Dep. at 59:1-11, 100:18-25, 149:19-25; Ex. 11, Fraser Dep. at 138:20-140:20.

18 [60] Ex. 11, Fraser Dep. at 140:21-141:9.

19 [61] Ex. 10, Boyer Dep. at 56:15-58:19, 59:16-23, 63:24-64:18, 219:8-18, 220:21-221:24.

20
21 [62] *Id.* at 114:17:25, 129:16-130:3; Ex. 11, Fraser Dep. at 144:2-145:8.

22 [63] NCAA Answer (ECF No. 40) at ¶ 2; Ex. 9, 10/25/23 NCAA Response to Interrogatory No. 6; NCAA Mem. in Support of Motion to Dismiss
23 (ECF No. 7) at 14; Ex. 10, Boyer Dep. at 129:7-15; Ex. 11, Fraser Dep. at 188:4-16; Ex. 11, Fraser Dep. at 218:22-24.

24 [64] Ex. 51, SMART_COLON_THIRD PARTY_0000134854 at 4855 (email from
25 E. Price of Pac-12 stating, ███████████████████████████████

26 ██████████████████████████████████████████████████████████

                                                        ).

27 [65] Rascher Decl. ¶¶ 23, 54; Ex. 52, SMART_COLON_THIRD
28 PARTY_0000000002 (04/20/23 University of Florida email stating,

1 it was the exact same individual going from unpaid to paid.[66]

2 Member schools anticipate more schools will begin paying their

3 third assistant coach moving forward once schools are able to

4 better navigate their budgets and accommodate the new situation.[67]

5 This is consistent with well-recognized economic principles that

6 the effects of a wage fix will last for quite some time.[68]

7 **Legal Standard**

8     Plaintiffs must satisfy all of Rule 23(a)'s and one of Rule

9 23(b)'s subsections' requirements. *See Abdullah v. U.S. Sec.*

10 *Assocs., Inc.*, 731 F.3d 952, 956-57 (9th Cir. 2013). Here,

11 Plaintiffs seek certification under Rule 23(b)(3). Rule 23's

12 elements must be met "by a preponderance of the evidence." *Olean*

13 *Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th

14 651, 665 (9th Cir. 2022) (en banc).

15 _____

16 "Within our org hierarchy, we're going to consider these new

17 'volunteer' coaches similar to any entry level coach (i.e., an Assistant Coach I).").

18 [66] Rascher Decl. ¶ 78 (the "single most common previous job").

19 [67] Ex. 53, SMART_COLON_THIRD_PARTY_0000035333 at 5335 (02/11/19

20 email from Batson regarding Proposal No. 2018-34 stating, "While most in the SEC will likely make it a full-time position, many

21 schools may want to start with a no pay or part-time pay and continue to transition to a full-time position ...."); Ex. 54,

22 SMART_COLON_THIRD PARTY_0000033088 (Tealer to Boyer saying it would be a "shock to the system" for all the new hires to happen

23 at once); Ex. 55, SMART_SCHLS_0000002284 (email from Creighton general counsel regarding the volunteer coach, stating that

24 ███████████████████████████████████

25 ); Ex. 56, SMART_COLON_THIRD PARTY_0000134721 (Davidson Fundraising appeal stating that the

26 "volunteer assistant has been a vital member of our coaching staff and integral to our efforts," and asking for contributions

27 to turn it into a $40,000 paid position).

28 [68] Rascher Decl. ¶¶ 137-149.

The trial court has broad discretion when deciding whether to certify a class, *Gonzalez v. United States Immigration and Customs Enforcement*, 975 F.3d 788, 807 (9th Cir. 2020), but a grant of class certification is accorded "noticeably more deference" than a denial, *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1275 (9th Cir. 2019). The trial court abuses its discretion when it relies on improper factors, omits substantial factors, or clearly misweighs the correct factors. *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 926 (9th Cir. 2019); *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010) (overturning denial of class certification).

Plaintiffs need not show that they will prevail on the merits of the claims to certify the class, and a court cannot deny certification because it "considers plaintiff's evidence relating to the common question to be unpersuasive." *Olean*, 31 F.4th at 666–67; *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1053 (9th Cir. 2015) (reversing denial of class certification because district court improperly addressed the merits). Instead, the merits should be examined only to the extent needed to examine Rule 23's requirements. *Olean*, 31 F.4th at 667 (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013)).

**Argument**

This is not the first antitrust class action brought against the NCAA, and not even the first such action brought against the NCAA by a group of coaches alleging wage fixing. In the late 1990s, the NCAA lost a similar class action brought by "restricted earnings" coaches that included baseball coaches. The

1  Tenth Circuit affirmed the NCAA's loss at summary judgment on
2  liability, *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010,
3  1019–20 (10th Cir. 1998), and the plaintiffs prevailed at a trial
4  that resulted in an over $60 million verdict, *see Law v. Nat'l*
5  *Collegiate Athletic Ass'n*, 185 F.R.D. 324 (D. Kan. 1999) (order
6  denying NCAA's post-trial motions). This case is essentially a
7  repeat of that one, as the volunteer coach rule was an outgrowth
8  of the same cost-cutting initiatives. *See supra* pp. 4-6
9  (discussing the related history between the two rules). It can
10 likewise be efficiently resolved as a class case.

11      More recently, a California federal court certified a much
12 more complicated antitrust case as a class action in a case
13 involving NCAA athletes. *In re College Athlete NIL Litig.*, No.
14 20-cv-03919, 2023 WL 8372787, at *5 (N.D. Cal. Nov. 3, 2023).
15 That case involved three classes of tens of thousands of college
16 athletes across many sports presenting several types of potential
17 liability, and yet common issues predominated and the court
18 granted class certification. *Id.* at *25. The "central question"
19 was whether the challenged bylaws violated antitrust laws, and
20 the same expert being used by Plaintiffs here (Dr. Rascher)
21 presented a model showing that "issues of antitrust injury and
22 damages can be resolved with common proof." *Id.*

23      This case is simple by comparison. It has just one cohesive
24 group of coaches in one sport alleging that a wage fix of zero
25 violated antitrust laws. Whether Plaintiffs are right about that
26 can, and should, be resolved at once for all class members.

27

28

**I.     The Class Is Sufficiently Definite and Ascertainable**

"To be eligible for certification, the proposed class must be precise, objective, and presently ascertainable. The proposed class definition need not identify every potential class member from the very start." *United States ex rel. Terry v. Wasatch Advantage Gr., LLC*, 327 F.R.D. 395, 404 (E.D. Cal. 2018) (Mueller, J.) (quotations omitted). "All that is required for class definition is that it set forth common characteristics sufficient to allow a member of that group to identify himself or herself as having a potential right to recover based on the description." *Aldapa v. Fowler Packing Co., Inc.*, 323 F.R.D. 316, 343 (E.D. Cal. 2018) (Drozd, J.) (quotation omitted).

Here, the class definition is definite and ascertainable. *See supra* at ii (providing class definition). It objectively relies on an official designation in the NCAA's bylaws and lists the member schools at issue. Class members will easily know if they are in the class because they will be well aware that they worked for these schools for free as the "volunteer coach" during the relevant time period. Indeed, records produced by the member schools in response to third-party subpoenas have already identified the specific names of most of their volunteer coaches and when they worked. *Wasatch Advantage*, 327 F.R.D. at 421 (finding ascertainably satisfied where court can ascertain whether a person was a based member based on defendants' records). Searches of public records have already filled most of the remaining gaps, and Plaintiffs will further meet and confer

1  with the NCAA and member schools to fill remaining gaps after

2  class certification.

3  **II.  Numerosity, Typicality, and Adequacy Are All Satisfied.**

4       **A.  The class members are sufficiently numerous.**

5       The proposed class should be so numerous that joinder of all

6  members is impracticable. Fed. R. Civ. P. 23(a)(1). While there

7  are no "absolute limitations for determining numerosity," *Schwarm*

8  *v. Craighead*, 233 F.R.D. 655, 660 (E.D. Cal. 2006) (Shubb, J.),

9  "a proposed class of at least forty members presumptively

10 satisfies the numerosity requirement." *Kabasele v. Salon*, No.

11 2:21-cv-1639, 2023 WL 4747691, at *3 (E.D. Cal. July 25, 2023)

12 (Shubb, J.). Based on records received from member schools and

13 other data, over 500 class members have already been identified.

14 *See* Broshuis Decl. ¶ 6. This far exceeds the presumptive

15 threshold. Numerosity is therefore satisfied.

16      **B.  The proposed class representatives' claims are typical.**

17      The typicality inquiry "focuses on the *nature of the claim*

18 of the class representative, and not the specific facts from

19 which it arose." *Gonzalez*, 975 F.3d at 809. Typicality is

20 "permissive and requires nothing more than that a class

21 plaintiff's claims be reasonably coextensive with those of absent

22 class members." *Id.; see also Schwarm*, 233 F.R.D. at 661 (Shubb,

23 J.) (the claims need not be "substantially identical"). Factors

24 that inform the analysis include whether other class members have

25 a similar injury, whether the lawsuit is based on conduct not

26 unique to the named plaintiffs, and whether other class members

27 have been injured by the same conduct. *Gonzalez*, 975 F.3d at 809;

28

1  *Schwarm*, 233 F.R.D. at 661. "[I]n antitrust cases, typicality

2  usually will be established by plaintiffs and all class members

3  alleging the same antitrust violations by defendants." *Sidibe v.*

4  *Sutter Health*, 333 F.R.D. 463, 486 (N.D. Cal. 2019); *Nitsch v.*

5  *Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 274 (N.D. Cal.

6  2016); *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d

7  1167, 1181 (N.D. Cal. 2013); *see also In re College Athlete NIL*

8  *Litig.*, 2023 WL 8372787, at *6.

9      That is exactly the case here. The conduct that the named

10 Plaintiffs challenge is not unique to any class member, and the

11 alleged injuries arise from the same course of conduct.[69] Like all

12 class members, each named Plaintiff worked as a volunteer

13 assistant baseball coach for a Division I school under the same

14 volunteer coach rule. Everyone in the class has the same general

15 grievance: the NCAA's bylaws fixed their compensation at zero,

16 removed competition for their services, and prevented them from

17 getting paid their market value.

18     This Court and many others have found that typicality is

19 satisfied when named plaintiffs and class members were all

20 subject to a uniform policy. *See In re College Athlete NIL*

21 *Litig.*, 2023 WL 8372787, at *6 (typicality satisfied where NCAA

22 restrictions on athletes' names, images, and likenesses

23 challenged because bylaws applied to named plaintiffs and class

24 _____

25 [69] *See Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir.
   2017) ("The requirement of typicality is not primarily concerned
26 with whether each person in a proposed class suffers the same
   type of damages; rather, it is sufficient for typicality if the
27 plaintiff endured a course of conduct directed against the
   class.").

28

1  members); *Kabasele*, 2023 WL 4747691, at *4 (Shubb, J.)

2  (typicality satisfied when same policy applied); *Griffin v.*

3  *Consol. Commc'ns*, No. 2:21-cv-0885, 2022 WL 16836711, at *3 (E.D.

4  Cal. Nov. 9, 2022) (Shubb, J.) (same). The Court should do so

5  again here.

6      C.    **The proposed class representatives and their counsel**

7          **will adequately represent the class.**

8      The test for adequacy asks: (1) do the named plaintiffs and

9  their counsel have any conflicts of interest with other class

10  members;[70] and (2) will the named plaintiffs and their counsel

11  vigorously prosecute the action on the class's behalf? *In re*

12  *Mersho*, 6 F.4th 891, 899-900 (9th Cir. 2021); *In re Hyundai and*

13  *Kia Fuel Economy Litig.*, 926 F.3d 539, 566 (9th Cir. 2019) (en

14  banc); *Schwarm*, 233 F.R.D. at 662 (Shubb, J.).

15      Mr. Smart and Mr. Hacker are adequate class representatives

16  because their interests are aligned with all class members in

17  challenging the lawfulness of the bylaws that eliminated

18  compensation, which prevented class members from receiving

19  market-rate remuneration for work they actually performed. They

20  also align with other class members in proving that the bylaws

21  caused antitrust injury and damaged class members. *In re College*

22  *Athlete NIL Litig.*, 2023 WL 8372787, at *6 (finding same things

23  supported adequacy).

24  _____

25  [70] Denial of class certification on the basis of speculative
    conflicts is disfavored. *Cummings v. Connell*, 316 F.3d 886, 896

26  (9th Cir. 2003). "[T]he conflict must be actual, not
    hypothetical." *In re College Athlete NIL Litig.*, 2023 WL 8372787,

27  at *17 (quoting *Berrien v. New Raintree Int'l, LLC*, 276 F.R.D.
    355, 359 (N.D. Cal. 2011)).

28

Mr. Smart and Mr. Hacker have further demonstrated that they will prosecute this action vigorously: each has responded to interrogatories, searched for and produced responsive documents, assisted counsel with the facts, and been deposed.[71] *See In re College Athlete NIL Litig.*, 2023 WL 8372787, at *6 (finding same things supported adequacy).

Their counsel ("Proposed Class Counsel") also satisfies the adequacy requirement. The National Law Journal has named Korein Tillery one of the top plaintiffs' firms in the country seven times.[72] Korein Tillery has been appointed class counsel in more than fifty class actions and has successfully led some of the country's largest cases.[73] In a case led by the undersigned counsel, Korein Tillery obtained a landmark $185 million settlement on behalf of thousands of minor league baseball players that included important injunctive relief, and that is believed to be one of the five largest wage-and-hour settlements ever. *Senne v. The Office of the Comm'r of Baseball*, No. 14-CV-00608-JCS (N.D. Cal.). Additionally, Korein Tillery (including Mr. Berezney who was the firm's responsible attorney) and its co-counsel developed and litigated an antitrust class action involving the fixing of the foreign-exchange market, obtaining $2.3 billion in court-approved settlements. *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13-cv-07789-LGS (S.D.N.Y.). Both Mr. Broshuis and Mr. Berezney currently serve as

---

[71] Ex. 23, Smart Dep. at 40:23-43:25, 113:3-16; Ex. 25, Hacker Dep. at 60:20-63:19.

[72] *See* Ex. 1 at 1 (firm résumé).

[73] *Id.*

**Pl. Mem. in Support of Motion for Class Certification**

1  co-lead class counsel on behalf of Missouri municipalities in two

2  cases.[74]

3       In short, Proposed Class Counsel is highly qualified, has

4  vigorously prosecuted this case since its filing (including

5  defeating a motion to dismiss and zealously pursuing discovery

6  from the NCAA and hundreds of third parties), and will continue

7  to do so. This suffices to establish adequacy. *See Kabasele*, 2023

8  WL 4747691, at *5 (Shubb, J.) (finding vigorous prosecution

9  element satisfied where counsel was experienced employment and

10 class action litigators and where counsel conducted thorough

11 factual investigation and legal research); *Griffin*, 2022 WL

12 16836711, at *4 (Shubb, J.) (same).

13 **III. Commonality Is Met, and the Common Issues Predominate under**

14     **Rule 23(b)(3).**

15      The remaining element of Rule 23(a) is commonality: whether

16 there are "questions of law or fact common to the class." Rule

17 23(a)(2). This inquiry "often overlap[s]" with Rule 23(b)(3)'s

18 predominance inquiry, so "many courts consider both together,

19 folding the two determinations into one." *Le v. Zuffa, LLC*, No.

20 2:15CV01045, 2023 WL 5085064, at *10 (D. Nev. Aug. 9, 2023)

21 (citing *In re Capacitors Antitrust Litig. (No. III)*, No. 14-CV-

22 03264-JD, 2018 WL 5980139, at *3 (N.D. Cal. Nov. 14, 2018)); *see*

23 *also Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir.

24 2017) (analyzing commonality and predominance jointly).

25

26

27

_____

[74] *Id.* at 2-3.

28

1    This case satisfies Rule 23(a)'s commonality requirement and

2 Rule 23(b)(3)'s predominance requirement because *all* key issues

3 in the case can be resolved with common evidence.

4    **A.    Commonality is met under Rule 23(a).**

5    For commonality to be met, "[i]t is not necessary that all

6 questions of law and fact be common." *Schwarm*, 233 F.R.D. at 660–

7 61 (Shubb, J.). Instead, only a single common question is needed.

8 *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) ("[E]ven

9 a single common question will do."); *Abdullah*, 731 F.3d at 957.

10    The common question must resolve an issue that is central to

11 the validity of the asserted claim in one stroke. *Olean*, 31 F.4th

12 at 663 (citing *Dukes*, 564 U.S. at 350). The Court "is limited to

13 resolving whether the evidence establishes that a common question

14 is *capable* of class-wide resolution, not whether the evidence in

15 fact establishes that plaintiffs would win at trial." *Lytle v.*

16 *Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024).

17    "[C]ourts have consistently held that the very nature of a

18 conspiracy antitrust action compels a finding that common

19 questions of law and fact exist." *In re High-Tech Emp. Antitrust*

20 *Litig.*, 985 F. Supp. 2d at 1180. This is because "[a]ntitrust

21 liability alone constitutes a common question that 'will resolve

22 an issue that is central to the validity' of each class member's

23 claim 'in one stroke.'" *Id.* (quoting *Dukes*, 564 U.S. at 350).

24 That is particularly true when, like here, the case involves

25 standardized conduct by a defendant toward members of the

26 proposed class. *Schwarm*, 233 F.R.D. at 661 (commonality met when

27 defendants had "engaged in standardized practices") (Shubb, J.);

28

**Pl. Mem. in Support of Motion for Class Certification**

1  *see also Baird v. Cal. Faculty Ass'n*, No. CIV S-00-0999, 2000 WL

2  1028782, at *3 (E.D. Cal. July 13, 2000) (Shubb, J.) (certifying

3  class where constitutionality of a law was a common issue);

4  *Cummings v. Connell*, No. CIV S-99-2176, 1999 WL 1256772, at *3

5  (E.D. Cal. Dec. 20, 1999) (Shubb, J.) (certifying class where

6  standardized practices complained of).

7      In the recent NIL antitrust case involving NCAA athletes,

8  the court had little trouble finding commonality because several

9  key questions emerged directly from the legality of the bylaw at

10  issue. *In re College Athlete NIL Litig.*, 2023 WL 8372787, at *5.

11  The questions went to the very "existence of an antitrust

12  violation" and were "common to members of the proposed damages

13  classes," including (1) "whether the challenged rules constitute

14  a horizontal agreement … that caused significant anticompetitive

15  effects …," (2) whether any legitimate procompetitive

16  justifications existed, and (3) whether a less restrictive

17  alternative could have been used to achieve any legitimate

18  procompetitive justification. *Id.* In fact, the NCAA and its co-

19  defendants there did not even dispute that these questions were

20  capable of classwide resolution.

21      Those same common questions are present here because

22  adjudicating the legality of the NCAA's volunteer coach rule will

23  be the same for all class members. The rule applied the same

24  exact way for all schools in the same manner.[75] NCAA concedes

---

[75] Ex. 10, Boyer Dep. at 245:16-22 ("Volunteer coaches were, under
the rule as it existed, not permitted to receive compensation
from the institution for performing the duties and
responsibility" they performed); *id.* ("That applied to member
institutions, all member institutions").

1 this.[76] All Division I member schools had to comply with the rule,

2 and all of these coaches were subjected to it.[77] Plaintiffs'

3 expert has also explained how common evidence can be used to

4 support the theory of liability for all class members.[78]

5    As explained next in the predominance section, all elements

6 of liability will be resolved with common evidence and generate

7 just one answer for all class members, including: (1) whether the

8 volunteer coach rule amounted to a conspiracy amongst horizontal

9 competitors, (2) whether the rule fixing wages at zero was

10 anticompetitive, and (3) whether any *legitimate* procompetitive

11 justifications existed for the rule. *See, e.g.*, *In re College*

12 *Athlete NIL Litig.*, 2023 WL 8372787, at *5 (whether challenged

13 NCAA rules constitute a horizontal agreement that caused

14 significant anticompetitive effects in the relevant markets for

15 student-athlete labor services is a common question). Plaintiffs

16 also establish *infra* that injury and damages will be proven

17 classwide using a commonly accepted methodology.

18

19

_____

20 [76] NCAA Answer (ECF No. 40) at ¶¶ 44-46; Ex. 9, 10/25/23 NCAA
Response to Interrogatory No. 6 (stating Proposal No. 2022-28
21 "adopted and eliminated the volunteer coach position"); NCAA Mem.
in Support of Motion to Dismiss (ECF No. 7) at 14. Even conceded
22 issues can help satisfy commonality and predominance. *In re*
*Nassau Cty. Strip Search Cases*, 461 F.3d 219, 227-29 (2d Cir.
23 2006) (reversing district court that held otherwise).

24 [77] Ex. 10, Boyer Dep. at 23:23-25:25 (discussing investigation and
25 enforcement process); *see supra* nn.16-18 (identifying examples of
enforcement procedures).

26 [78] *See* Rascher Decl. ¶¶ 48-87 (economic evidence relating to
27 competitive effects of the challenged bylaws in relevant labor
market is common to all class members).

28

1    The commonality element requires just one common question

2  that will drive the litigation forward, but in this case, every

3  important issue is common. Commonality is met.

4    **B.    Common issues predominate.**

5    Because Plaintiffs proceed under Rule 23(b)(3), they also

6  must show that the common issues predominate. The predominance

7  inquiry "asks whether the common, aggregation-enabling, issues in

8  the case are more prevalent or important than the non-common,

9  aggregation-defeating, individual issues." *Lytle*, 114 F.4th at

10  1023 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453

11  (2016)). The Court's duty here is "to ensure that individual

12  questions do not 'overwhelm questions common to the class.'"

13  *Senne*, 934 F.3d at 927 (quoting *Comcast Corp. v. Behrend*, 569

14  U.S. 27, 34 (2013)).

15    The mere presence of some important individualized issues,

16  such as damages and affirmative defenses, does not necessarily

17  defeat predominance and prevent a class from being certified.

18  *Olean*, 31 F.4th at 668; *Vaquero v. Ashley Furniture Indus., Inc.*,

19  824 F.3d 1150, 1155 (9th Cir. 2016) (class can be certified even

20  if plaintiffs may have to prove individualized damages at trial);

21  *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)

22  (stating, "the presence of individualized damages cannot, by

23  itself, defeat class certification under Rule 23(b)(3)," and

24  overturning denial of class certification).[79] "[M]ore important

25  questions apt to drive the resolution of the litigation are given

26  ────────────────────

[79] Rule 23 even permits certification of a class that potentially
27  includes more than a de minimis number of uninjured class
members. *Olean*, 31 F.4th at 669.

28

**Pl. Mem. in Support of Motion for Class Certification**

more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *In re Hyundai*, 926 F.3d at 557. Thus, even one common question may be of sufficient importance to predominate. *Id.*

Plaintiffs "must show that the common question relates to a central issue in the plaintiff's claim." *Olean*, 31 F.4th at 665. "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* at 668 (citation and internal quotation marks omitted).

All important issues here are common, including every element of liability, so predominance is satisfied.

### 1. Liability will be resolved in one stroke for all class members, just as in *Law v. NCAA*.

As the Court stated in the motion-to-dismiss order, the elements of a section 1 claim are "(1) a contract, combination or conspiracy; (2) that unreasonably restrained trade …; and (3) that restraint affected interstate commerce." ECF No. 29 at 14. "Each element of a claim need not be susceptible to classwide proof." *Purple Mountain Trust v. Wells Fargo & Co.*, No. 18-cv-03948, 2022 WL 3357835, at *2 (N.D. Cal. Aug. 15, 2022) (citing *Amgen*, 568 U.S. at 468–69)). Yet here, all liability elements will be resolved in one stroke. After all, "[p]redominance is a

1  test readily met in certain cases alleging … violations of the
2  antitrust laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591,
3  625 (1997).

4      As said in another antitrust case in this District, "with
5  the major issues in this case stemming from an alleged
6  overarching conspiracy to [] fix the prices of [labor], a
7  narrowly defined class, and little suggestion there will be
8  individual issues apart from the calculation of individualized
9  damages, the class action will promote efficiency by allowing a
10  number of claims to be litigated simultaneously." *Four in One
11  Co., Inc. v. S.K. Foods, L.P.*, No. 2:08-cv-3017, 2014 WL 28808,
12  at *6 (E.D. Cal. Jan. 2, 2014) (Mueller, J.). Or as put by a
13  court in the recent college athlete NIL case, "The question of
14  whether an antitrust violation under Section 1 exists naturally
15  lends itself to common proof, because that determination turns on
16  defendants' conduct and intent along with the effect on the
17  market, not on individual class members." *In re College Athlete
18  NIL Litig.*, 2023 WL 8372787, at *8 (internal citations omitted).

19      ***Liability element one: Existence of Conspiracy.*** "[P]roof of
20  the *conspiracy* is a common question that is thought to
21  predominate over the other issues of the case." *In re Scrap Metal
22  Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) (citations
23  omitted). "[A]s many courts have noted, the claim of a conspiracy
24  to fix prices inherently lends itself to a finding of …
25  predominance." *In re Capacitors Antitrust Litig. (No. III)*, No.
26  17-md-02801, 2018 WL 5980139, at *5 (N.D. Cal. Nov. 14, 2018); 6
27  NEWBERG ON CLASS ACTIONS, § 18.25 (4th ed. 2002) ("[C]ommon liability

28

1  issues such as conspiracy or monopolization have, almost

2  invariably, been held to predominate over individual issues.");

3  7AA Charles Alan Wright, Arthur Miller & Mary Kay Kane, FEDERAL

4  PRACTICE AND PROCEDURE, § 1781 (3d ed. 2005) ("[W]hether a conspiracy

5  exists is a common question that is thought to predominate over

6  the other issues in the case.").

7       As the Court previously recognized, the "NCAA, in concert

8  with its member schools, agreed to adopt the Bylaw." ECF No. 29

9  at 14. Testimony and the NCAA's own admissions confirmed that the

10  volunteer coach rule applied to all schools in the same manner

11  and fixed the wages of all proposed class members in the same

12  manner.[80] This and other admissions and documents are common

13  evidence showing that (1) the bylaws at issue actually existed;[81]

14  (2) member schools followed those bylaws and did not pay their

15  volunteer assistant baseball coaches;[82] (3) the NCAA enforced

16  those bylaws;[83] and (4) the bylaws were repealed for all schools

17  after this lawsuit was filed.[84] The first element of a section 1

18  violation is thus indisputably a common, predominating issue.

19

20  [80] *See supra* nn.76-77 (quoting Boyer Dep. at 245:16-22, NCAA
    Answer at ¶¶ 44-46, NCAA interrogatory responses, and NCAA Motion

21  to Dismiss).

22  [81] *See supra* n.11, (citing NCAA Division I Manuals containing NCAA
    Bylaws 11.7.6; 11.01.6); NCAA Answer (ECF No. 40) at ¶¶ 44-46.

23

24  [82] *See, e.g.*, Ex. 10, Boyer Dep. at 23, 25 (discussing requirement
    to abide by bylaws and enforcement procedures).

25  [83] *See supra* nn.16-18 (providing examples of enforcement
    proceedings); Ex. 14, NCAA_SMART-COLON_0019728; Ex. 15,

26  NCAA_SMART-COLON_0019775; Ex. 16, NCAA_SMART-COLON_0020631).

27  [84] Ex. 9, 10/25/23 NCAA Response to Interrogatory No. 6; NCAA Mem.
    in Support of Motion to Dismiss (ECF No. 7) at 14.

28

1    ***Liability element two: In interstate commerce.*** The NCAA has

2    already admitted that the conspiracy was national in character,

3    and that it operates in interstate commerce.[85] This too is a

4    common issue that is already satisfied for all class members.

5    ***Liability element three: Unreasonable restraint of trade.***

6    The final liability element, unreasonable restraint of trade,

7    depends in part on "what analysis to apply." ECF No. 29 at 15.

8    Three categories of analysis exist for analyzing a section 1

9    claim. Under the per se rule, certain practices (including

10   horizonal price fixing generally) "are entirely void of redeeming

11   competitive rationales." *Id.* (quoting *Law*, 134 F.3d at 1016).

12   Under the rule of reason, though, a more fact-specific assessment

13   of market power is used to "assess a challenged restraint's

14   'actual effect on competition'" *Id.* (quoting *Alston*, 594 U.S. at

15   81). In between is the "quick look" analysis, where '"no

16   elaborate industry analysis is required to demonstrate the

17   anticompetitive character of … an agreement,' and proof of market

18   power is not required." *Id.* at 16 (quoting *Agnew v. Nat'l*

19   *Collegiate Athletic Ass'n*, 683 F.3d 328, 336 (7th Cir.

20   2012)(quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*,

21   468 U.S. 85, 109 (1984)).

22   In *Law*, the Tenth Circuit held that the quick-look analysis

23   should apply to determine whether a bylaw capping the

24   compensation of a category of coaches violates antitrust laws.

25   *Law*, 134 F.3d at 1020.  This Court agreed with *Law* in this case,

26   ――――――――――――――――――

[85] *See* NCAA Answer, ECF No. 40 at ¶ 13 (admitting that the NCAA

27   conducts its business in interstate commerce); *see also* ECF No.
     29 at 14-15 (finding interstate commerce element met).

28

1 holding previously that "a quick-look analysis is appropriate

2 here." ECF No. 29 at 17.

3      Under quick look, assessing whether a wage fix of zero was

4 anticompetitive presents a common issue. As the Court recognized

5 previously, "the large salaries received" by the other baseball

6 coaches that *could* be paid and "the overall increase in coach

7 salaries" over time "creates a strong inference" that a bylaw

8 that fixed salaries at zero was anticompetitive. ECF No. 29 at

9 18. Evidence such as that is common, and has already been

10 collected. The preliminary analysis of the data shows that the

11 average head coach salary increased significantly throughout the

12 class period, with many making over $1 million and the average

13 reaching close to $200,000 by 2022-23. Rascher Decl. ¶ 30. For

14 the assistant coaches who were paid, the average salary increased

15 as well, reaching $83,453 by that year. *Id.* As one witness

16 explained, there was "no rule or regulation relating to

17 compensation for head coaches," or for two of the assistant

18 baseball coaches, so member schools could (and did) pay as much

19 as they wanted for these positions. Ex. 10, Boyer Dep. at 59:1-6.

20 Meanwhile the third assistant baseball coach, forced to work

21 under the moniker of a "volunteer" assistant coach, had his

22 coaching salary fixed at zero. As the Supreme Court has

23 explained, "members have no real choice but to adhere to the

24 NCAA's [rules]," *Bd. of Regents*, 468 U.S. at 106, and so the

25 bylaw foreclosed competition for labor. That by definition is

26 anticompetitive.

27

28

Plaintiffs' expert, Dr. Rascher, opines that, as a matter of settled economics, that type of wage fix is anticompetitive across the board.[86] The wage fix removed the coaching position from a competitive market, meaning that all schools, no matter how much they had budgeted for the sport of baseball, paid the same for the position: $0.

He further explains that direct evidence already shows that the volunteer coach rule had its intended anticompetitive effect by suppressing compensation. The market has not yet reached equilibrium because it generally takes several years for the effects of a longstanding conspiracy to wear off. Rascher Decl. ¶ 21; *see also Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 488 (9th Cir. 2021) (recognizing that effects of conspiracy can linger even after a conspiracy has ended). But already in the first year after the rule repeal, over half of Division I schools (and a much higher percent of the proposed class) began paying the third assistant baseball coach. That number is quite high for the first year, and many more schools are expected to do so in coming years. Rascher Decl. ¶¶ 21-23.

The "strong inference" of anticompetitive effect that the Court cited in the motion-to-dismiss order is consistent with Supreme Court precedent. "[W]hen there is an agreement not to compete in terms of price or output, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." *Bd. of Regents*, 468 U.S. at 109. Plenty of

---

[86] Rascher Decl. ¶¶ 48-66.

1  common, direct evidence exists to support this inference, and so

2  this is another common predominating issue.[87]

3      Under the truncated quick look analysis, the inquiry will

4  quickly move to whether any *legitimate* procompetitive

5  justifications existed for the wage fix. That too will be common.

6  *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 844–45

7  (D.N.J. 2015) (proposed "procompetitive justifications" are

8  "common issues"); *Zuffa*, 2023 WL 5085064, at *26 (procompetitive

9  justifications presented a common issue).

10      The NCAA has asserted three purported procompetitive

11  justifications: preserving competition between members,

12  increasing coaching resources available to student athletes, and

13  expanding coaching opportunities for prospective coaches. Ex. 9,

14  Response to Interrogatory 9, p. 20. The problem for the NCAA is

15  that their own official documents show just the opposite. When

16  recommending the repeal of the volunteer coach rule, the NCAA

17  Transformation Committee said that the repeal would "create

18  fairer and more equitable Division I athletics competition."[88]

19  That was an important admission that applies class-wide. If the

20  rule's repeal would create fairer competition, the rule itself

21  must necessarily be *less* fair to competition, therefore

22

23  [87] As Dr. Rascher explains, even if the Court instead decides that

24  a more extensive market analysis is needed, that too would
inherently be a common issue resolved with common evidence.

25  Rascher Decl. ¶¶ 67-86. Numerous courts have held that market-
related issues are common across the class. *See, e.g.*, *Tawfilis*

26  *v. Allergan, Inc.*, No. 815CV00307JLSJCG, 2017 WL 3084275, at *11

27  (C.D. Cal. June 26, 2017).

[88] *See supra* n.55.

28

1    contradicting the NCAA's litigation position that there were

2    legitimate procompetitive justifications.

3         Similarly, Defendant's witnesses have confirmed that the

4    volunteer coach rule did not have any real procompetitive

5    justification. One of the NCAA's top executives agreed Proposal

6    2022-28 was part of an effort to create a fairer and more

7    equitable Division I, and that even after the rule change, there

8    was "fair competition in way of the personnel designation."[89]

9    Three knowledgeable witnesses involved in the NCAA legislation

10   testified that they have never seen any data showing that the

11   volunteer coach rule in any way had a positive impact on

12   competition.[90] The NCAA told Congress that coach salaries do not

13   meaningfully impact competition.[91] And witnesses have also already

14   confirmed that member schools had "institutional autonomy" when

15   paying head coaches, strength coaches, directors of operations,

16   and when paying for facilities, which already allowed bigger

17   schools to outcompete smaller schools.[92]

18

19

---

20   [89] Ex. 11, Fraser Dep. at 199:3-201:25.

21   [90] Ex. 10, Boyer Dep. at 114:17-25, 129:16-130:3; Ex. 11, Fraser
     Dep. at 144:22-145:8; Ex. 12, Tealer Dep. at 78:24-79:3, 122:11-
22   14.

23   [91] Ex. 57, NCAA_SMART-COLON_0222135 at 2157 (11/13/06 letter from
     NCAA President Myles Brand to Congressman Thomas stating that
24   "compensation packages are negotiated at arm's length in a very
     competitive environment" and that coach compensation packages are
25   not major contributors to their institutions' athletics budgets).

26   [92] Ex. 11, Fraser Dep. at 138:24-140:20; Ex. 10, Boyer Dep. at
     59:12-16 ("Q: So even with the volunteer coach rule in place, for
27   most of your time at the SEC, the SEC schools were still able to
     outcompete other schools in baseball, correct? A: Yes.").

28

1    Those calling for repeal concluded that the volunteer coach

2  rule was actually *hindering* the development of coaches rather

3  than providing enhanced opportunities as now claimed.[93] The

4  official documents likewise stated that the repeal would be

5  *beneficial* to student athletes.[94] So nobody involved in the rule's

6  repeal actually believed any of these procompetitive

7  justifications. Classwide evidence proves the exact opposite.

8    Plaintiffs will also cite common evidence establishing that

9  objections to revoking the volunteer coach rule focused not on

10 maintaining a competitive level of play but on saving money so

11 that schools did not have to pay people for valuable work

12 performed.[95] The rule was birthed from the cost-cutting

13 initiatives of the late 1980s and early 1990s: they set up a

14

---

15 [93] Ex. 10, Boyer Dep. at 128:12-23 (rule was changed in part to
16 provide "more opportunities for coaching development"); *id.* at
   70:17-71:4.

17 [94] *See supra* n.52; *see also* Ex. 10, Boyer Dep. at 70:5-16
18 (agreeing that changing the rule would be beneficial to college
   athletes because baseball had one of the highest athlete-to-coach
19 ratios); at 128:8-23 (agreeing that the rule was changed in the
   "interest in better supporting student athletes"); Ex. 11, Fraser
20 Dep. at 82:8-83:5, 84:2-17 (agreeing that Transformation
   Committee succeeded in improving student athletes' "well-being"
21 and in "building a faster, fairer, and more equitable Division
   I").
22
   [95] *See* Ex. 11, Fraser Dep. at 171:25-172:25 (budget concerns were
23 an argument against changing the rule in 2019, and some schools
   feared that they would have to start paying the third assistant
24 if their competition did so); Ex. 27, NCAA_SMART-COLON_0042200 &
   2201 (Student-Athlete Experience Committee raised "budget
25 concerns" on Proposal No. 2018-34); Ex. 29, NCAA_SMART-
26 COLON_0028588 (01/15/21 email from J. Henderson of NCAA stating
   that ███████████████████████████████████████

27 ████████████████████████████████████████████████████████
   ███████████████████████).
28

1  committee to reign in escalating costs, they established the

2  restricted earnings coach rule, and the very next year

3  established the volunteer coach rule because they wanted the

4  benefit of additional labor without any increase in costs.[96]

5      That evidence will be common across all class members, which

6  is the primary point on this motion because the purported

7  procompetitive justifications will rise or fall for all class

8  members in one fell swoop. *See In re High-Tech Emp. Antitrust*

9  *Litig.*, 985 F. Supp. 2d at 1204-05 ("The evidence therefore

10 indicates that Defendants sought to enter into anti-solicitation

11 agreements in an effort to stifle increased competition for labor

12 and rising wages," meaning that plaintiffs can prove "antitrust

13 violations on a classwide basis").

14      The Court again need look no further than the *Law* case.

15 There, the Tenth Circuit rejected almost the exact same purported

16 justifications at summary judgment – for all class members. *Law*,

17 134 F.3d at 1021-24 (rejecting arguments that restricting

18 coaches' salaries helped retain entry-level salaries and

19 preserved competition); *see also, e.g.*, *In re College Athlete NIL*

20 *Litig.*, 2023 WL 8372787, at *5 (whether NCAA's procompetitive

21 justifications for challenged NCAA rules are valid is a common

22 question); Rascher Decl. ¶¶ 89-124 (the economic evidence

23 relating to the NCAA's asserted procompetitive justifications is

24 common to all class members).

---

25 [96] *See supra* pp. 4-6; *see also* Rascher Decl. at ¶¶ 92-105; Ex. 58,
26 NCAA_SMART-COLON_0142726 at 2838 (opposing schools noting that
   certain proposals regarding volunteer coach were "contrary to any
27 cost reduction objective" and "against the overwhelming pressures
   of cost containment that we all want").

28

1    Given how *Law* was resolved, it is unlikely that the Court

2  will ever need to adjudge whether less restrictive alternatives

3  existed. But in the event the Court is called to do so, that too

4  will present a common issue because the less restrictive

5  alternative would be a change to the volunteer coach rule that

6  applied classwide. In fact, the NCAA already essentially adopted

7  a less restrictive alternative when it repealed the rule while

8  maintaining overall coaching limits, admitting that the repeal

9  would actually *better* serve competition.[97]

10    *        *        *        *        *        *

11    In sum, all key issues of liability are common, which shows

12  that predominance is met. *See Smilow v. Sw. Bell Mobile Sys.,*

13  *Inc.*, 323 F.3d 32, 40 (1st Cir. 2003) ("[w]here … common

14  questions predominate regarding liability, then courts generally

15  find the predominance requirement to be satisfied even if

16  individual damages issues remain."); *see also Whiteway v. FedEx*

17  *Kinko's Off. & Print Servs., Inc.*, No. C 05-2320, 2006 WL

18  2642528, at *10 (N.D. Cal. Sept. 14, 2006) (quoting same). A wage

19  fix of $0 is just as illegal as the wage fix condemned in the

20  prior coaches case of *Law*, and Plaintiffs respectfully submit

21  that the evidence will support a summary judgment finding in

22  favor of the class on issues of liability, just like in *Law*.

23

24

25

---

26  [97] *See* Ex. 11, Fraser Dep. at 201:20-202:2 (confirming that since
    the "total number" of coaches remained the same, fair competition
27  was preserved because all schools can have the same number of
    coaches).

28

**Pl. Mem. in Support of Motion for Class Certification**

### 2. Antitrust injury and damages will be established classwide.

In some cases, plaintiffs have trouble calculating damages for class members even though other important issues remain common. That, however, does not defeat class certification because the presence of individualized damages is not a reason to deny class certification when liability issues are common. "[T]he rule is clear: the need for individual damages calculations does not, alone, defeat class certification." *Vaquero*, 824 F.3d at 1155.[98]

Regardless, that is not the issue here. Plaintiffs *do* have a reliable, court-accepted method for assessing the magnitude of the antitrust injury and damages, which provides yet another reason why this case is well-suited for class treatment.

### a) All class members suffered antitrust injury.

Antitrust impact "is injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Olean*, 31 F.4th at 666. At class certification, Plaintiffs need not actually prove an injury to all class members but need instead only show that it may be established with classwide evidence. *Id.* at 679. This factor is satisfied "if the plaintiff can point to evidence that each class

---

[98]  *See also Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986-88 (9th Cir. 2015) (reaffirming that this proposition from *Yokoyama* [*v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)] remains the law of this court, even after *Comcast*"); *Achzinger v. IDS Prop. Cas. Ins. Co.*, 772 Fed. App'x 416, 418 (9th Cir. 2019) ("district court abused its discretion" in denying class certification "by giving more weight to potential individual damages disputes than common questions of liability").

member could rely upon in an individual action to show 'antitrust impact of *any* amount.'" *In re College Athlete NIL Litig.*, 2023 WL 8372787, at *8 (quoting *Olean*, 31 F.4th at 679) (emphasis added by district court).

As a threshold matter, the "loss of an opportunity may constitute injury, even though it is not certain that any benefit would have been realized if the opportunity had been accorded." Wright & Miller, 13A FED. PRAC. & PROC. JURIS. § 3531.4 (3d ed.); *see also House v. Nat'l Collegiate Athletic Ass'n*, 545 F. Supp. 3d 804, 816 (N.D. Cal. 2021) (following Wright & Miller § 3531.4). That point is "well-settled." *De Sousa v. Dir. of U.S. Citizenship & Immigr. Servs.*, 720 F. Supp. 3d 794, 801–02 (N.D. Cal. 2024). Another antitrust case involving the NCAA recently reached that conclusion when preliminarily enjoining an NCAA rule that limited athlete compensation: "It is this suppression of negotiating leverage and the consequential lack of knowledge that harms student-athletes." *Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756, 765 (E.D. Tenn. 2024). Here too, all class members were denied the opportunity to bargain for compensation in a competitive market, and the loss of that opportunity is a cognizable, classwide injury for all class members. *Id.; see also* Rascher Decl. ¶ 128 ("Price fixing – or wage fixing as alleged here – harms the entire marketplace, not just those who pay higher prices or receive lower compensation, because it removes competition from the market.").

Beyond that threshold injury, Dr. Rascher has set forth a model that demonstrates that class members suffered classwide

injury to their pocketbooks as well, and the model is capable of
calculating the magnitude of the pecuniary injury that the NCAA's
bylaw caused for each class member. The "prevailing [economic]
view" is that "price-fixing affects all market participants,
creating an inference of class-wide impact." *Olean*, 31 F.4th at
671 (quoting *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254
(10th Cir. 2014)). That inference is "especially strong" when the
conspiracy artificially impacts "the baseline for price
negotiations," *In re Urethane*, 768 F.3d at 1254, or in this case,
completely precludes negotiations by setting the price of labor
at the absolute number of zero. *See In re Cardizem CD Antitrust
Litig.*, 200 F.R.D. 326, 345 (E.D. Mich. 2001) (stating that
arguments to the contrary are "routinely rejected"). Under such
circumstances, "a district court could reasonably conclude 'that
price-fixing would have affected the entire market.'" *Olean*, 31
F.4th at 678 (quoting *In re Urethane*, 768 F.3d at 1255).

As Dr. Rascher explains, "[t]his was a market-wide restraint
that had a direct impact across all schools on the purchasing of
baseball coaching labor." Rascher Decl. ¶ 130.

> On top of the injury caused by the elimination of price
> competition in the marketplace vis-à-vis third assistant
> baseball coaches, class members also suffered direct
> economic injuries in the form of the dollar damages that
> flow from their having performed work without
> compensation, work that would have been compensated
> absent the collusive agreement not to pay these coaches
> prior to 2023-24. This applies even for those "volunteer"
> coaches who performed these jobs in the actual world for
> a school that has not yet hired a third assistant coach .
> . . . Because the services were performed, the injury is
> incurred in the actual world – being denied, via the
> application of monopsony power, access to a competitive
> market through which they could negotiate a fair rate of
> compensation across potential employers for those
> services.

*Id.* ¶¶ 134-35.

Although Plaintiffs can prevail at trial without such evidence, Dr. Rascher found evidence that schools frequently hired their former volunteer coach as the new third assistant coach and immediately began paying them substantial money. *Id.* ¶ 78. Dr. Rascher further found that, of the schools in the data analyzed, 54% have already begun paying the third assistant coach. *Id.* ¶¶ 21-23. And because some smaller Division I schools have been removed from the class definition, his model shows that, once lingering effects are accounted for, 100% of schools in the class would have paid a third assistant coach in the but-for world – i.e., the world that would have existed had the wage fix never been instituted. *See id.* App'x C (identifying schools that would have paid). Thus, according to Dr. Rascher, *every* class member has suffered a pecuniary injury. That model, and how it measures damages, is discussed more in the next section.

In antitrust actions, "the predominance requirement of Rule 23(b)(3) will be satisfied" when "the alleged violation can be shown to arise out of a common course of conduct or have a general effect on the market." 7AA FED. PRAC. & PROC. CIV. § 1781 (3d ed.). Defendant and its members' common conduct – fixing the price for coaching labor at $0 – led to a common injury, and predominance is satisfied.

### b)   Plaintiffs use an accepted classwide damages model.

By extension, that leads to a formulaic calculation of the amount of damages for each class member. Courts "afford plaintiffs relatively broad leeway in constructing a damages

1  model" because "'the vagaries of the marketplace usually deny us

2  sure knowledge of what plaintiff's situation would have been in

3  the absence of the defendant's antitrust violation.'" *In re*

4  *College Athlete NIL Litig.*, 2023 WL 8372787, at *9 (citing

5  *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) and

6  quoting *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S.

7  557, 566 (1981)). Said more simply, Plaintiffs must merely show

8  that their damages methodology is not "so insubstantial as to

9  amount to no method at all." *Meijer, Inc. v. Abbott Lab'ys*, No. C

10  07-5985, 2008 WL 4065839, at *10 (N.D. Cal. Aug. 27, 2008)

11  (quoting *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 697 (D.

12  Minn. 1995)); *see also Moore v. James H. Matthews & Co.*, 682 F.2d

13  830, 836 (9th Cir. 1982) ("[A]n antitrust plaintiff is only

14  obligated to provide the trier-of-fact with some basis from which

15  to estimate reasonably, and without undue speculation, the

16  damages flowing from the antitrust violations.") (citing *Bigelow*,

17  327 U.S. at 264).[99]

18      This relaxed burden applies equally in the context of

19  proving class-wide damages. *See In re DRAM Antitrust Litig.*, No M

20  02-1486, 2006 WL 1530166, at *10 (N.D. Cal. June 5, 2006) ("[A]t

21  the certification stage of an antitrust class action, plaintiffs

22  have a limited burden with respect to showing that individual

23  damages issues do not predominate.") (citation and internal

24  quotation marked omitted); *see also In re Static Random Access*

25

26  [99] *Accord* 1 McLaughlin on Class Actions § 5:37 (21st ed.) ("In
    antitrust cases once the fact of damages is established,

27  plaintiffs have a relaxed burden of proving the amount of
    damages.").

28

1 *Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 615 (N.D. Cal.

2 2009) (similar).

3    In antitrust cases,

4    damage calculations require the determination of the
     economic circumstances that would have existed 'but for'
5    the antitrust violation. In an overcharge case, one must
     compare the actual price to the price that would have
6    prevailed but for the price fixing. … [T]his "but for"
     world does not actually exist because of the antitrust
7    violation. We do not know what the price and output would
     have been in a particular market if the alleged antitrust
8    violation did not occur. As a result, one must infer what
     would have been from known conditions.
9

10 Hovenkamp, Herbert and Areeda, Phillip E., ANTITRUST LAW: AN

11 ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION, ¶ 394 (last

12 updated Sept. 2024).

13    To infer the shape of the but-for world here, "Dr. Rascher …

14 employs the before-and-after methodology, which is widely

15 accepted as a valid method for determining impact and damages in

16 antitrust cases." *In re College Athlete NIL Litig.*, 2023 WL

17 8372787, at *22. The model uses real-world salary figures,

18 produced by member schools in response to subpoenas, from both

19 before and after the volunteer coach rule was officially revoked

20 on July 1, 2023. Rascher Decl. ¶¶ 18-21.

21    The model relies on data that cuts off at the 2023/2024

22 academic year because that was all that could be reasonably

23 collected in advance of this Motion.[100] That data thus encompasses

24

25 ────────────────
[100] The rule at issue was revoked in July 2023, meaning he could
not possibly rely on additional data because it does not yet
26 exist. *In re College Athlete NIL Litig.*, 2023 WL 8372787, at *22
(finding Dr. Rascher's use of one year's worth of data was not
27 problematic because he explained "that his failure to use data
for other years is the result of that data not being available

28

1   just one year's worth of salary information after the NCAA

2   repealed the volunteer coach rule. Using the data from just one

3   year after the repeal "yields a very conservative picture … but

4   it provides a reasonable lower bound estimate of damages." *Id.* ¶

5   24. It is very conservative because "substantial economic

6   evidence" and economic studies have long shown that the effects

7   of a price fix continue to linger for several years after the

8   conspiracy ends. *Id.* ¶ 137. This is especially true the longer

9   the conspiracy exists. *Id.* ¶¶ 138, 149. Here, the alleged

10  conspiracy lasted three decades.

11          Courts have likewise recognized the concept of lingering

12  effects. *See, e.g.*, *Optronic Techs., Inc. v. Ningbo Sunny Elec.*

13  *Co.*, 20 F.4th 466, 488 (9th Cir. 2021) (recognizing that effects

14  of conspiracy last after the conspiracy ends, and allowing a

15  plaintiff to pursue damages for the after-period). Under similar

16  circumstances, Dr. Rascher has observed lingering effects when

17  the NCAA has lifted other limitations, such as those related to

18  amounts paid in scholarships to college athletes. Rascher Decl.

19  ¶¶ 141-48. In those scenarios, it took several years for the

20  affected market in college athletics to reach equilibrium. *Id.*

21          Based on that evidence, Dr. Rascher knows that year-one data

22  is not a complete picture of the but-for world. *Id.* ¶ 149.

23  Schools already have multi-year budget commitments that they must

24  honor, and the effect of competition takes years to play out. *Id.*

25  Thus, while the year-one data shows that 55% of schools paid a

26  third assistant baseball coach at an average of $50,000, well-

27  _____

28  because discovery is still ongoing").

1    accepted principles of economics prove that both numbers will
2    increase in subsequent years "as lingering effects dissipate and
3    price-based competition" increases. *Id.* ¶¶ 21-23.

4       Because the 2023/2024 data does not account for lingering
5    effects, Dr. Rascher constructs a model that *does* account for
6    them — and therefore better represents the but-for world. He uses
7    regression analysis to do so, which is commonly used in antitrust
8    cases. *See Olean*, 31 F.4th at 677 (stating that "regression
9    models have been widely accepted" in antitrust cases). His
10   analysis looks at relevant economic variables, like the amount a
11   school pays to a head baseball coach and assistant coaches, the
12   percentage of a school's peer schools who are already paying a
13   third assistant baseball coach, and the school's total spending
14   on scholarships. Rascher Decl. ¶¶ 158-59. Using these and other
15   variables, Dr. Rascher's model shows which schools during the
16   class period would have paid a third assistant baseball coach in
17   the but-for: all of the schools within the class would have. *Id.*
18   App'x C.

19       That is exactly what the economic analysis should do. If a
20   model looked just at the schools currently paying a third
21   assistant coach, it would dramatically sell the class short:
22   because of lingering effects, the number of schools paying a
23   third assistant coach will almost certainly increase as time goes
24   on. The 2023/2024 data thus does not provide a complete picture
25   of the "but-for" world. A model that *does* take into account
26   lingering effects more accurately captures that but-for world.
27   Importantly, Dr. Rascher expects to have another year of data,

28

from 2024/2025, available to him when doing his final analysis before trial (currently set for December 9, 2025). He anticipates incorporating that data into his model as well, which will allow him to continue to analyze lingering effects.

From there, the calculation of damages is rather straightforward. The model uses the post-repeal salaries paid in 2023/2024 to third assistant baseball coaches (i.e., the role that was formerly the "volunteer" position) as a benchmark. Rascher Decl. ¶ 181. That again makes the analysis conservative because it relies on salaries only in the first year after the wage fix ended. It then adjusts the 2023/2024 salaries to account for how coaching salaries changed throughout the class period. *Id.* ¶ 181. If a school's assistant coaching salaries increased between 2018 and 2023, then that is taken into account when estimating what the third assistant coach (i.e., the "volunteer" coach) would have made in 2018 (or in other years) by deflating the number accordingly. *Id.* The value of the health care benefits is also accounted for. *Id.* ¶ 186. In that manner, the model provides a but-for-world damages estimate for every class member based on real-world data.

The model is not just theoretical. While Dr. Rascher expects to refine the model, and anticipates having another year of data to incorporate, he has already run the model using the 2023/2024 data. It yields a preliminary total damages amount of $53,807,389. Rascher Decl. ¶ 187.

Far from being essentially "no method at all," *Meijer*, 2008 WL 4065839, at *10, Dr. Rascher's common methodology is a

reasonable and reliable means for calculating class-wide damages that is fully consistent with Plaintiffs' theory of liability. Notably, similar expert opinions have been deemed sufficient in antitrust cases. *See In re College Athlete NIL Litig.*, 2023 WL 8372787, at *11-*12 (holding Dr. Rascher's similar analysis regarding NCAA restrictions on name, image, and likeness compensation was sufficient common proof of antitrust impact to support class certification); *In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308, 321 (S.D. Cal. 2019) ("Where plausibly reliable, econometric analysis should be allowed as a means of common proof" regarding antitrust injury). A similar analysis of pre- and post-conspiracy salaries supported a classwide trial verdict for the coaches in *Law* of over $60 million. *Law*, 185 F.R.D. at 327-28 (post-trial order rejecting argument that evidence was insufficient to show classwide injury and damages). Here too, Plaintiffs have proposed a reasonable, classwide method for computing damages that can be used through trial. *See In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 145 (C.D. Cal. 2007) (stating that the "before-and-after methodology has been accepted by numerous courts" and collecting cases). This presents yet another common, predominating issue.

**IV. A class action is superior to other available methods.**

The second part of a Rule 23(b)(3) class action is superiority: whether class treatment "is superior to other available methods for fairly and efficiently adjudicating the controversy." The relevant superiority factors to consider are (1) "the class members' interests in individually controlling the

1  prosecution or defense of separate actions"; (2) "the extent and

2  nature of any litigation concerning the controversy already begun

3  by or against class members"; (3) "the desirability or

4  undesirability of concentrating the litigation of the claims in

5  the particular forum;" and (4) "the likely difficulties in

6  managing a class action." Fed. R. Civ. P. 23(b)(3).

7      All four factors weigh in favor of certification.

8  Application of factors one and three favors litigating the claims

9  in a single forum. Nothing suggests individual class members have

10  any interest in controlling the prosecution of separate actions.

11  Not only have no other similar cases involving baseball coaches

12  been filed as far as Plaintiffs are aware (the *Colon* case

13  expressly excludes baseball coaches), but those class members who

14  wish to direct their own litigation can easily opt-out and do so.

15      The first factor also supports class treatment when there

16  are class members for whom it would be "uneconomical to litigate

17  individually." *Loc. Joint Exec. Bd. of Culinary/Bartender Tr.*

18  *Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir.

19  2001). This Court has similarly recognized that certification is

20  generally favored when class members' individual recovery is

21  "relatively modest." *Kabasele*, 2023 WL 4747691, at *6 (Shubb,

22  J.); *Griffin*, 2022 WL 16836711, at *5 (Shubb, J.); *see also*

23  *Schwarm*, 233 F.R.D. at 664 (Shubb, J.) (finding superiority

24  satisfied when size of the individual claims to class members was

25  too small to justify an individual lawsuit).

26      Such is the case here. While most class members are likely

27  entitled to an amount in the five figures (and some in the six

28

1  figures), the Court should keep in mind the complexity of this

2  litigation. Expert witness fees alone in a case like this are

3  higher than any single class members' damages. Few lawyers (if

4  any), even on contingency, would likely attempt to prove a § 1

5  Sherman Act conspiracy claim against a well-funded, litigation

6  savvy behemoth like the NCAA for an individual claim of this

7  size. *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1033

8  (C.D. Cal. 2015) ("The funds required to marshal the type of

9  evidence, including expert testimony, that is necessary to pursue

10 such a claim against a well-represented corporate defendant would

11 discourage individual class members from filing suit when the

12 expected return is so small.").[101]

13    The second factor — the extent and nature of similar

14 litigation — also favors class certification. The only other

15 similar case (*Colon*) is likewise before this Court and involves

16 sports other than baseball. Plaintiffs here and in *Colon* have

17 attempted to coordinate discovery where appropriate for

18 efficiency. This fact supports factor three because this Court is

19

20 [101] Even if some class members are entitled to significant
   damages, it would not change the certification analysis. "The
21 mere fact that some class members may have suffered significant
   damages does not detract from the overall efficiency and economy
22 of resolving the claims of the entire class in a single action."
   *Brice Yingling v. eBay, Inc.*, No. C 09-01733, 2010 WL 11575128,
23 at *6 (N.D. Cal. July 16, 2010); *see also In re Wash. Mut.
   Mortgage-Backed Sec. Litig.*, 276 F.R.D. 658, 668 (W.D. Wash.
24 2011) (superiority met even though "some of the absent members
   may have large claims"); *In re Cardizem CD Antitrust Litig.*, 200
25 F.R.D. 297, 325 (E.D. Mich. 2001) ("[T]he presence of large
   claimants in a proposed antitrust class and the possibility that
26 some of them might proceed on their own does not militate against
   class certification.").

27

28

1  already currently managing a related a class action involving the

2  same NCAA rule. *See Morelock Enters., Inc. v. Weyerhaeuser Co.*,

3  No. CV 04-583, 2004 WL 2997526, at *5 (D. Or. Dec. 16, 2004) ("It

4  also is desirable to concentrate this litigation in the District

5  of Oregon, where several related cases have been adjudicated.").

6      The fourth and final factor, manageability, also supports

7  class certification. By antitrust class action standards, this is

8  a relatively small one, involving just a few hundred coaches, all

9  of whom coached in a single sport under the same bylaw. Far from

10 being unwieldy, the limited scope yields a cohesive and

11 manageable class that will result in a focused and digestible

12 trial for the jury. NCAA will argue that manageability cannot be

13 established because Plaintiffs must demonstrate that each school

14 would have actually hired each individual class member. This

15 Court already rejected this "substitution effect" theory in its

16 Order denying the NCAA's motion to dismiss. *See* ECF No. 29 at 13

17 & n.5 ("[A]llegations that plaintiffs would have been hired but

18 for the Bylaw are different than allegations that plaintiffs

19 would have been compensated. Because plaintiffs were all hired as

20 volunteer coaches, the issue here is whether they would have been

21 paid, not whether they would have been hired.").

22     As it did in the *NIL* case, the NCAA will nevertheless likely

23 argue that this same "substitution effect" defeats a finding of

24 superiority. But the Court should reject this argument for the

25 same reasons the court in *NIL* rejected it: it is irrelevant and

26 inconsistent with how antitrust law works. As the court in the

27 *NIL* case correctly observed:

28

1
2
3
4
5
6
7
8
9

> In antitrust cases such as this one, injury and damages are determined by comparing, on the one hand, the payments that each class member who falls within the class definition received in the real world with, on the other hand, the payments that *that same class member* would have received in the but-for world. The difference between the two payments represents that class member's injury and damages. For the purpose of this comparison, the identity of the class member does not change between the real world and the but-for world.… Accordingly, the so-called substitutions or displacements that may or may not take place in a hypothetical but-for world are irrelevant to the determination of whether members of the proposed classes suffered antitrust injury.

10

*In re College Athlete NIL Litig.*, 2023 WL 8372787, at *27

11

(citations omitted).

12

Relatedly, superiority has been found when "[a]ny trial —

13

whether it involved a single plaintiff or a class — will involve

14

the same legal questions and evidence regarding Defendants'

15

conduct." *In re Packaged Seafood*, 332 F.R.D. at 329. That is the

16

case here. Whether the volunteer coach rule was an unlawful

17

conspiracy is a legal question shared by all class members. The

18

NCAA presumably would defend the rule using the same fact

19

witnesses and the same supposedly procompetitive justifications

20

in each individual trial. And each class member would likely

21

point to the same evidence of impact and damages: the salaries of

22

baseball coaches both before and after the rule changed. No point

23

would be served forcing federal courts throughout the country to

24

re-litigate what would essentially be the same case. Instead,

25

considerations of efficiency and economy highly weigh in favor of

26

resolving this dispute once for all class members.

27
28

**V.  The Court Should Appoint Korein Tillery and its Specific Attorneys as Class Counsel.**

"An order that certifies a class action … must appoint class counsel under Rule 23(g)." Fed. R. Civ. P. 23(c)(1)(B). Factors include: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class action, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Rule 23(g)(1)(A).

Korein Tillery, and its counsel Garrett R. Broshuis and Steven M. Berezney, seek to be appointed as Class Counsel. As discussed in the adequacy section, *supra* at 24, Plaintiffs' counsel has a track record of success in class actions and antitrust actions. They have vigorously litigated this case to date and will continue to do so.

**CONCLUSION**

Plaintiffs respectfully request that the Court grant their Motion for Class Certification, certify a damages class under Rule 23(b)(3), appoint named Plaintiffs Mr. Smart and Mr. Hacker as Class Representatives, and appoint Korein Tillery, Garrett R. Broshuis, and Steven M. Berezney as Class Counsel.

Pl. Mem. in Support of Motion for Class Certification

DATED: November 1, 2024       Respectfully submitted,


                                  /s/ *Garrett R. Broshuis*
                              KOREIN TILLERY, LLC
                              Stephen M. Tillery (*pro hac vice*)
                              Steven M. Berezney
                              Garrett R. Broshuis

                              *Attorneys for Plaintiffs*


**CERTIFICATE OF SERVICE**

    I hereby certify that on November 1, 2024, I electronically

filed the foregoing with the Clerk of the Court using the CM/ECF

system, which will send notification of such filing to all

attorneys of record registered for electronic filing.

                              /s/ *Garrett R. Broshuis*
                                 Garrett R. Broshuis