# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

---

TAYLOR SMART AND MICHAEL HACKER,
Individually and on Behalf of All Those
Similarly Situated,

**Plaintiffs,**

v.

The National Collegiate Athletic Association,
an Unincorporated Association;

**Defendant.**

---

Case No.  2:22-cv-02125 WBS CSK

**EXPERT DECLARATION OF
DANIEL A. RASCHER IN SUPPORT
OF MOTION FOR CLASS
CERTIFICATION**

November 1, 2024

1   Qualifications .................................................................................................................. 2
2   Scope of Work ................................................................................................................... 3
3   Summary of Opinions........................................................................................................ 8
    3.1   The Anticompetitive Effects of the challenged conduct can be assessed by means of common
    economic proof. ................................................................................................................. 8
    3.2   To the extent Defendant asserts any Procompetitive Justifications, the economic evidence used to
    assess those arguments will be common to all class members. .............................................. 8
    3.3   A proper assessment of damages in this case requires taking the lingering effects of the alleged
    conspiracy into account. ..................................................................................................... 8
    3.4   Class-wide economic evidence shows that all members of the proposed class suffered injuries
    caused by Defendant's challenged conduct. .......................................................................... 9
4   The Data Analyzed and Lingering Effects.......................................................................... 9
5   The Anticompetitive Effects of the Challenged Conduct Can Be Assessed by Means of Common
    Economic Proof. .............................................................................................................. 11
    5.1   Common evidence shows that Defendant and its member schools enacted and enforced a bylaw
    that artificially restricted competition and capped remuneration at zero. ............................. 12
        5.1.1   The need for enforcement of the volunteer coach rule is evidence of its anticompetitive
                effect. .................................................................................................................. 16
        5.1.2   Input markets can require "mirror image" analysis compared to output markets. ............ 20
        5.1.3   Anticompetitive Harm can be demonstrated through a Direct Effects or Indirect Effects
                approach. ............................................................................................................. 20
    5.2   The Direct Effects approach will rely on common evidence to show that the conduct was
    anticompetitive. ............................................................................................................... 23
    5.3   The Indirect Effects approach for identifying relevant markets and demonstrating market power
    to show anticompetitive effects also relies on economic evidence common to all members of the
    proposed class. ................................................................................................................ 31
        5.3.1   Market power and anticompetitive effects can also be demonstrated by common economic
                proof.................................................................................................................... 38
        5.3.2   Barriers to Entry will be established by means of common evidence.............................. 39
        5.3.3   Anticompetitive Effects will be demonstrated by means of common evidence................ 41
6   Any Asserted Procompetitive Justifications and Less Restrictive Alternatives Will Also Be
    Assessed Through Economic Evidence Common to All Members of the Proposed Class........ 42
    6.1   Common evidence shows that the volunteer coach rule was born from Defendant's campaign to
    artificially suppress personnel costs in the 1990s, not to expand coaching opportunities or improve
    coach-to-student ratios...................................................................................................... 43
    6.2   Other asserted Procompetitive Justifications, such as the desire to create entry-level positions or
    to preserve competitive balance, will be assessed with common evidence. ............................ 49
    6.3   Evidence related to Less Restrictive Alternatives is also common to the Class. ..................... 55
7   All Members of the Proposed Class Suffered Injuries Caused by Defendant's Challenged
    Conduct........................................................................................................................... 56
8   Because of the Lingering Effects of a 31-Year Wage Fix, the Market Has Not Yet Reached
    Equilibrium. .................................................................................................................... 59
9   Class-wide Methodologies Are Available for Proving Damages. ........................................ 66
    9.1   A Probit Regression Makes Reliable Predictions of But-for Conduct. .................................. 68
        9.1.1   Data and variables................................................................................................ 70
        9.1.2   Model outcome .................................................................................................... 73
        9.1.3   Goodness of fit.................................................................................................... 74
        9.1.4   Predictions from the model: schools that would likely have paid a third assistant coach in
                2018-19 and 2023-24 ............................................................................................ 76
        9.1.5   Sensitivity Test – Alternative Model ...................................................................... 76
        9.1.6   Applying a cumulative (three-year) probability assumption for assessing long-run conduct ........... 77
    9.2   Damages calculation .......................................................................................................... 80
10  Signature ........................................................................................................................ 85

# 1   QUALIFICATIONS

1.   My name is Daniel A. Rascher.  At the University of San Francisco (USF), I am Professor and Director of Academic Programs for the Master of Science in Sport Management program.  I teach courses in sport economics and finance and applied research methods to graduate students.  I am also a Partner of OSKR, LLC, an economic consulting firm specializing in applying economic analysis to complex legal issues, as well as President of SportsEconomics, LLC, an economic, finance, and marketing research consulting firm focused on the sports industry.  Formerly, I was an Assistant Professor and Associate Professor at USF, an Assistant Professor at the University of Massachusetts, Amherst, and have taught courses at Stanford University, Northwestern University, and the IE Business School in Madrid, Spain.  I was also previously a Principal at LECG, LLC, a provider of expert economic consulting services.

2.   I received a Ph.D.  in Economics from the University of California at Berkeley, having focused on the fields of industrial organization, econometrics, and labor economics.  I have published numerous articles, book chapters, and a textbook in the field of sports economics and finance and have worked on over one hundred consulting projects involving the sports, entertainment, and tourism industries.  I have consulted with counsel for both plaintiffs and defendants on a variety of lawsuits and non-litigation investigations, including the economics of antitrust, class certification, and the estimation of reasonable damages in cases involving athletes and/or sports governing bodies.

3.   Specific to this assignment, I have provided expert testimony and analyses in numerous lawsuits requiring me to understand the economics of NCAA sports.  That includes *O'Bannon v. NCAA*, which was an antitrust suit brought by NCAA athletes challenging restrictions on certain forms of remuneration; *Alston v. NCAA*, which was another antitrust suit brought by NCAA athletes challenging restrictions on certain forms of remuneration; and more recently *House v. NCAA*, which is a pending antitrust suit brought by NCAA athletes related to other compensation restrictions.[1]  I have also consulted for university stakeholders to help them understand the economics of various college athletic departments

---

[1]   No. 4:09-cv-03329 (N.D. Cal.); No. 4:14-md-02541 (N.D. Cal.); and No. 4:20-cv-03919 (N.D. Cal.), respectively.

(and their relation to their universities).  This includes work involving the University of Alabama at Birmingham, the University of San Francisco, and Valparaiso University.  I have also authored or co-authored numerous publications focused on the business of college sports.[2]

4.    I am also certified as a valuation analyst (Certified Valuation Analyst) by the National Association of Certified Valuators and Analysts.  Attached as Appendix A is my curriculum vitae, which includes my qualifications as an expert witness and my testimonial experience, including my publications from the last 10 years and all cases in the last 4 years where I testified at trial or was deposed.

5.    I am being compensated at an hourly rate of $700 per hour, plus reimbursement of expenses.  In my work on this matter, I have been assisted by OSKR staff, working under my supervision and control.  I have no direct financial interest in the outcome of this matter.  I reserve the right to supplement this report.

## 2    SCOPE OF WORK

6.    At issue in this case are NCAA Division I (D1) bylaws which, until Defendant and its member schools repealed them as of July 1, 2023, served to (a) allow schools to hire a third assistant coach[3] in the sport of baseball, but (b) prohibited those schools from providing that coach with virtually any form of remuneration, including a complete ban on providing

---

[2]    These include "Coaching Salary Disparity and Team Performance: Evidence from the Football Bowl Subdivision," with Alex Traugutt, Alan Morse, and Brian Fowler.  *Journal of Applied Business and Economics*, 22(1), 2020; "Cartel Behavior in US College Sports: An Analysis of NCAA Football Enforcement Actions from 1990-2011," with Mark Nagel, Richard Southall, and Nick Fulton.  *Journal of NCAA Compliance*, July-August, 2019; "Because It's Worth It: Why Schools Violate NCAA Rules and the Impact of Getting Caught in Division I Basketball," with Andrey Tselikov, Andrew D. Schwarz, and Mark Nagel.  *Journal of Issues in Intercollegiate Athletics*, 12, 2019; "A Smaller Window to the University: The Impact of Athletic De-Escalation on Status and Reputation," with Michael Hutchinson and Kimi Jennings.  In *Journal of Intercollegiate Sport*, 9(1), June 2016; "Competitive Equity: Can there be Balance between Athletes' Rights and a Level Playing Field?" with Andrew D. Schwarz in E. Comeaux (ed.), *College Athletes' Rights and Well-Being: Critical Perspectives on Policy and Practice*.  Baltimore: Johns Hopkins University Press, (2017); "Neither Reasonable nor Necessary: "Amateurism" in Big-Time College Sports", with Andrew D. Schwarz.  In *Antitrust* (Spring 2000 Special Sports Issue).

[3]    Per Article 11.7.5, Division I baseball teams are currently allowed four coaches total, one head coach and three assistant coaches.  However, until the volunteer coach rule was repealed (effective July 1, 2023), a combination of former Articles 11.01.6, 11.7.6, and 11.7.6.2.3, allowed only the head coach and two assistants to be paid, dubbing the third assistant coach a "volunteer."  Other than a few designated exceptions set forth in former Article 11.01.6, this rule prohibited all forms of compensation, in cash or in kind, from the university to the "volunteer" coach.

that coach with a salary or wage, employment benefits such as health or workers' compensation insurance, social security contributions, or even complimentary tickets to college football games.  As alleged, this rule was enforced by threat of a collective boycott by all D1 schools of any school that chose to provide compensation to their third assistant baseball coach, from 1992 until July 1, 2023.  Since July 1, 2023, schools have been allowed to, and have, provided compensation, both in cash and in kind, to these coaches.

7.   The alleged enforcement of this prohibition of compensation is the sort of collusive conduct that economists consider to be anticompetitive.  As explained in the Class Action Complaint[4] ("Complaint") in this matter:

> "The bylaw calls this coach a 'volunteer' coach.  In reality, that means that skilled coaches must provide very valuable services for free.  These coaches generally perform many of the same job duties as the paid coaches and work alongside the paid coaches with the same players during the same practices and road trips and in the same set of offices.  Yet they cannot even receive health insurance, housing, or other benefits, much less an actual salary in exchange for work performed.

> These agreements amount to cartel agreements: a naked horizontal restraint amongst competitors to purposefully restrict competition in the labor market for college baseball coaching services.  The very purpose and actual effect of this horizontal agreement was (and is) to fix and suppress prices so as to make them unresponsive to a competitive marketplace and to place these coaches' compensation at zero.  This amounts to an unlawful restraint under antitrust laws, and it is illegal under Section 1 of the Sherman Act, 15 U.S.C.  § 1.  In fact, a similar NCAA rule regarding restricted-earnings coaches was invalidated over 20 years ago in *Law v. N.C.A.A.*, 134 F.3d 1010 (10th Cir.  1998)."[5]

8.   Counsel for Plaintiffs ("Smart") have asked me to opine on whether economic evidence and methods could be used to prove the anticompetitive effects of the challenged conduct, antitrust injury, and damages in a way that is common to the members of the proposed class (as defined in the Plaintiffs' accompanying motion for class certification).  They have asked me to include in my assessment whether class-wide impact and damages can be demonstrated by means of common economic evidence.  To perform this task, I have developed a common, formulaic method for calculating each injured class members'

---

[4]   Class Action Complaint, Case 2:22-cv-02125-WBS-KJN, (E.D. Cal. Nov. 29, 2022). ("Complaint").

[5]   Complaint, p. 1.

damages, which I demonstrate in this report.  For the purposes of this assessment, I have been asked to assume as the counterfactual for analysis of impact and damages that the alleged anticompetitive conduct never occurred, i.e., that the rule prohibiting schools from paying their third assistant baseball coach was not added in 1992 and thus as of 2018 (which I understand the statute of limitations determines to be the start of the class period), the market for employment of these coaches had been functioning in an unrestrained fashion for decades.

9.  I understand that Plaintiffs seek to certify the following class:

> "All persons who worked as a 'volunteer coach' as defined by National Collegiate Athletic Association ('NCAA') Division I Bylaw 11.01.6 in men's baseball from November 2018 to July 1, 2023 for the following NCAA Division I schools: United States Air Force Academy; University of Alabama; Albany State University; Appalachian State University; University of Arizona; Arizona State University; University of Arkansas; Arkansas State University; University of Arkansas - Little Rock; West Point – United States Military Academy; Auburn University; Austin Peay State University; Brigham Young University; Ball State University; Baylor University; Bellarmine University; Belmont University; Binghamton University; Boise State University; Boston College; Bradley University; Brown University; Bryant University; Bucknell University; California State University – Northridge; California State University – Bakersfield; California Polytechnic State University; California State University – Fullerton; University of California – Berkeley; California Baptist University; Canisius University; University of Central Arkansas; Central Michigan University; College of Charleston; University of North Carolina – Charlotte; Chicago State University; University of Cincinnati; Clemson University; Coastal Carolina University; Columbia University; University of Connecticut; Coppin State University; Cornell University; Creighton University; Dallas Baptist University; Dartmouth College; Davidson College; University of Dayton; Delaware State University; Utah Tech University; Duke University; East Carolina University; East Tennessee State University; Eastern Kentucky University; University of Evansville; University of Florida; Florida Atlantic University; Florida Gulf Coast University; Florida International University; Florida State University; Fordham University; California State University – Fresno; Furman University; George Mason University; George Washington University; University of Georgia; Georgia Southern University; Georgia State University; Georgia Institute of Technology; Gonzaga University; Grand Canyon University; Harvard University; University of Hawaii at Manoa; Hofstra University; College of the Holy Cross; University of Houston; Indiana University – Purdue University Fort Wayne (now known as Purdue University-Fort Wayne); University of Illinois; Illinois State

5

University; Indiana University; Indiana State University; Iona University; University of Iowa; Jacksonville University; Jacksonville State University; James Madison University; University of Kansas; Kansas State University; Kennesaw State University; Kent State University; University of Kentucky; Louisiana State University; La Salle University; Lafayette College; Lehigh University; Liberty University; Lipscomb University; California State University – Long Beach; University of Louisiana – Lafayette; University of Louisiana - Monroe; Louisiana Tech University; University of Louisville; Loyola Marymount University; University of Maine; Manhattan College; Marist College; Marshall University; University of Maryland; University of Maryland - Eastern Shore; University of Massachusetts; University of Memphis; Mercer University; University of Miami; University of Michigan; Michigan State University; Middle Tennessee State University; University of Minnesota; Mississippi State University; University of Missouri; Missouri State University; Monmouth University; Murray State University; North Carolina State University; New Jersey Institute of Technology; United States Naval Academy; University of Nebraska; University of Nevada; University of New Mexico; New Mexico State University; Niagara University; Norfolk State University; University of North Alabama; The University of North Carolina at Chapel Hill; North Carolina Agricultural & Technical State University; University of North Florida; University of Northern Colorado; Northwestern University; University of Notre Dame; The Ohio State University; University of Oklahoma; Oklahoma State University; Old Dominion University; University of Mississippi; University of Oregon; Oregon State University; University of the Pacific; University of Pennsylvania; The Pennsylvania State University; Pepperdine University; University of Pittsburgh; University of Portland; Princeton University; Purdue University; Queens University; University of Rhode Island; Rice University; University of Richmond; Rider University; Rutgers University; California State University – Sacramento; Saint Joseph's University; Saint Louis University; Saint Mary's College; Sam Houston State University; Samford University; University of San Diego; San Diego State University; University of San Francisco; San Jose State University; Santa Clara University; Seattle University; Siena College; University of South Alabama; University of South Carolina; University of South Florida; Southern Illinois University; University of Southern Mississippi; St. Bonaventure University; University of St. Thomas – Minnesota; Stanford University; Stetson University; Stony Brook University; Texas Christian University; Tarleton State University; University of Tennessee; University of Texas; Texas A&M University; University of Texas - San Antonio; Texas State University; Texas Tech University; The Citadel – Military College of South Carolina; Troy University; Tulane University; University of Alabama – Birmingham; University of California – Davis; University of California – Irvine; University of California – Riverside; University of California - San Diego; University of California - Santa

Barbara; University of Central Florida; University of California – Los Angeles; University of Maryland – Baltimore County; University of Massachusetts – Lowell; University of North Carolina – Greensboro; University of Nevada – Las Vegas; University of Southern California; University of Texas – Arlington; University of Texas - Rio Grande Valley; University of Utah; Utah Valley University; Virginia Commonwealth University; Virginia Military Institute; Valparaiso University; Vanderbilt University; University of Virginia; Virginia Tech University; Wake Forest University; University of Washington; Washington State University; West Virginia University; Western Carolina University; Western Kentucky University; Wichita State University; Wofford College; Yale University."[6]

10. As noted above, I have been asked to opine on whether I can develop and present common methods at a trial for proving class-wide injury and calculating damages to class members based on reliable methodologies. I have developed such methodologies, and I describe them in this report. However, I have not been asked to provide a final version of the damage calculations at this time, as damages to the class should not be finally assessed until after the completion of discovery, when additional data for use in my damages models may be available and additional refinements might be made to the damages models.[7] Thus, the methodologies I lay out in this report are preliminary, and I reserve the right to alter them as more facts and other data becomes available.

11. I am an economist, not a lawyer, and I do not purport to present a legal opinion. In order to properly fit my economic analysis within the framework of antitrust litigation, I have developed an understanding of the use of economic concepts like anticompetitive conduct and procompetitive benefits within antitrust law, but my opinions on these topics remain solely economic and in this report I do not in any way intend to opine on what the law is or should be.

12. I understand that there is a similar case filed on behalf of D1 volunteer coaches in sports other than men's baseball.[8] I offer no opinions here regarding the volunteer coach rule as it applies to sports other than D1 men's baseball.

---

[6]   Complaint, p. 4.

[7]   The analysis presented in this report relies on information produced as of September 20, 2024. I note that there have been additional productions in the weeks leading up to this report that are not included. These very recent productions do not appear to require a change in my methodology and their inclusion would result in only small changes, if any, in the estimates.

[8]   Colon v. NCAA, No. 23-cv-00425-WBS-CSK (E.D. Cal.).

**3    SUMMARY OF OPINIONS**

**3.1    THE ANTICOMPETITIVE EFFECTS OF THE CHALLENGED CONDUCT CAN BE ASSESSED BY MEANS OF COMMON ECONOMIC PROOF.**

13.    Whether using the Direct Effects or Indirect Effects method, class-wide common data show Defendant and its member schools have sufficient market power to affect wages in the relevant market in which Class members provide assistant baseball coaching services.  In doing so, Defendant's and its member schools' alleged conduct caused anticompetitive harm.  Classwide common data also can be used to show class members sell their services in the alleged relevant market for assistant baseball coach labor.

**3.2    TO THE EXTENT DEFENDANT ASSERTS ANY PROCOMPETITIVE JUSTIFICATIONS, THE ECONOMIC EVIDENCE USED TO ASSESS THOSE ARGUMENTS WILL BE COMMON TO ALL CLASS MEMBERS.**

14.    My initial assessment of those justifications proffered to date uses class-wide, common evidence to demonstrate the absence of valid procompetitive justifications.  This includes historical evidence that the challenged conduct was adopted in the 1990s, not to expand coaching opportunities or improve coach-to-student ratios, nor to improve competitive balance, but to collectively cut costs.  Should the Court seek to assess the existence of less restrictive alternatives, the evidence of their availability is also common to all class members.

**3.3    A PROPER ASSESSMENT OF DAMAGES IN THIS CASE REQUIRES TAKING THE LINGERING EFFECTS OF THE ALLEGED CONSPIRACY INTO ACCOUNT.**

15.    Economic research has demonstrated that, once a price fix ends, the market does not necessarily move immediately to its new equilibrium, but instead the effects can continue for several years before the market reaches the new, competitive equilibrium.  Given that the alleged price fix for the "volunteer" coach lasted for 31 years, it is reasonable to believe that it will take many years for the market to reach equilibrium.

**3.4  CLASS-WIDE ECONOMIC EVIDENCE SHOWS THAT ALL MEMBERS OF THE PROPOSED CLASS SUFFERED INJURIES CAUSED BY DEFENDANT'S CHALLENGED CONDUCT.**

16.  As alleged, all class members suffered an injury by virtue of not having the opportunity to provide services in a competitive market, and instead having their pay fixed at $0.  In addition, there exists class-wide methodologies for proving damages, which take into account the lingering effects of the alleged misconduct.  Using one such methodology (a "Probit Regression") on the data available to date reveals that all class members were injured, and aggregate estimated damages are $53,807,389 with $44,369,114 coming from loss of coaches' base salary and $9,438,275 coming from forgone health benefits.

**4  THE DATA ANALYZED AND LINGERING EFFECTS**

17.  For this assignment, I have relied upon documents and data produced in this case, as well as my knowledge of the sports economics literature, my prior studies of the NCAA, and on my knowledge of economics in general.  The materials that I have relied upon are listed in Appendix B.  These materials include documents produced in discovery by the parties and third parties, including historical and contemporary documents, and including deposition testimony.  They also include a large amount of data produced by Defendant and third parties.

18.  It is my understanding that Plaintiffs issued subpoenas to over 300 D1 schools seeking information about the compensation received by baseball coaches during the relevant period and their usage of the volunteer coaching position.  I have analyzed the responses from over 200 schools.  These were schools that produced complete (or nearly complete) data as requested and which provided those data with sufficient time to incorporate them into my analysis in this report.

19.  Of these 211 schools, I have identified 155 that fall within the class definition's list of relevant schools.  Of those falling within the class definition's listing, I have identified 147 that used the volunteer coaching position within the class period, or 95 percent.[9]  For the other schools falling within the class definition, I plan to identify the coaches that they used

---

[9]  There are eight schools listed in the class definition that did not provide sufficient data to determine whether they used the "volunteer" position within the class period, however, based on internet research, I determined they also used a third assistant coach during the damages period.

9

in the volunteer role as more data is produced.  To that end, I have already identified many of the coaches who were in the volunteer role at these additional schools using public data such as the schools' websites, even when the schools have not provided those data.

20.  The schools mostly provided data from the 2018/2019 academic year through the 2023/2024 academic year, even though the volunteer coach rule was in place from 1992 until July 1, 2023.  Thus, the data currently provide a look at only a small slice of the period in which the rule was in place and only a single year after a 31-year-old rule ended.  In my opinion, these data provide useful information that can be reasonably relied upon, but using that single year to capture post-violative conduct is very conservative; the first year of data after the rule ended yields a snapshot of the current state of the world that is almost surely suffering from the lingering effects of 31 years of wage fixing.

21.  The theory of lingering effects of collusive conduct is well-established in the economic literature, and I lay it out in more detail below in Section 8.  To briefly summarize, researchers have demonstrated that, once a price fix ends, the market does not necessarily move immediately to its new equilibrium.  Instead, the effects of the price fix can continue to affect the market.  Research shows that it often takes several years for the market to reach equilibrium, and the longer the price fix was in place, the longer it takes for equilibrium to be reached.  In the primary study of lingering effects, the average duration of the price fixing studied was six years,[10] but in this litigation, the price fix for the "volunteer" coach lasted for 31 years, meaning that it is reasonable to believe that it will take many years for the market to reach equilibrium.

22.  This body of research is consistent with what I have observed when studying other NCAA restraints.  Over the years, the NCAA has loosened several of its restraints in response to court orders, ranging from ending limitations on television broadcasting, ending a prohibition on multi-year Grants-in-Aid (i.e., athletic scholarships also known as GIAs), and ending a cap on the value of grants-in-aid to thousands of dollars below the total cost of attendance, among others.  As these rules were eased, there was a notable effect on first-year conduct, but the full extent of the change (such as the number of schools adopting a

---

[10]    Harrington, Jr., J.E. (2004).  Post-cartel pricing during litigation.  *Journal of Industrial Economics, 52*(4), p. 530.

scholarship rule change) increased over time for each of the anticompetitive rules the NCAA abandoned.  The influence of competition did not lead immediately to the new post-collusive equilibrium, but instead took years to fully play out.  This is consistent with the broader economics research demonstrating that it generally takes years for the effects of a price fix to dissipate.  Again, I discuss this more thoroughly in Section 8 below.

23.  The school data produced in this case currently contain the data for only the first year after the "volunteer" coach rule ended in July 2023.  Yet already in the first year, approximately 54 percent of the D1 schools in the data report have begun paying the third assistant baseball coach position (formerly the "volunteer" coaching position).  Based on the research on lingering effects and my experience with the NCAA, I expect this number to increase in subsequent years.  The average salary for this position was around $50,000, which I expect to also increase as lingering effects dissipate and price-based competition for those coaches' services increases.

24.  To reiterate, it is my opinion that it is reasonable and well accepted in antitrust economics to use the data from the first year after the price fix ends as a means of estimating but-for prices in the first year after the end of a conspiracy.  Doing so yields a very conservative picture of the full impact of the conspiracy on pricing, but it provides a reasonable lower bound estimate of damages.  As is discussed below, in my damages work, I extend the work to take lingering effects into account by means of an estimation of the cumulative probability associated with each school paying its third assistant coach.  It is my intent (and I reserve the right) to use data from subsequent years in my merits expert report (and any supplement thereto) to improve or replace the estimated probabilities with actual data, if available.

## 5    THE ANTICOMPETITIVE EFFECTS OF THE CHALLENGED CONDUCT CAN BE ASSESSED BY MEANS OF COMMON ECONOMIC PROOF.

25.  It is my understanding that there are generally three categories of analyses to assess whether actions have anticompetitive effects under antitrust law: the *per se* rule, the quick look rule, and the rule of reason.  I am not offering an opinion on which of these categories should apply, but I understand that the Court in this matter has concluded that the quick look

analysis applies to this case.[11]  As I understand it, under the quick look analysis, courts have stated that no elaborate industry analysis is required to demonstrate the anticompetitive character of an agreement, and proof of market power is not required.  Nevertheless, when I discuss the nature of the evidence that will be used to show the anticompetitive character of this wage fix, which is common to the class, I also lay out a class-wide methodology to assess the boundaries of the relevant market, should that exercise be needed.

26.  In what follows, I begin with a discussion of the nature of the evidence of harm, including the public acknowledgment that the NCAA engages in conduct that is typical of price-fixing cartels.  I also explain the appropriate economic approach to input markets and how they present a "mirror image" of the more familiar analytical rubrics associated with output markets. Then I explain and demonstrate each of the two approaches economists have developed (one direct, one indirect) to assess the anticompetitive effects of collusive agreements and other anticompetitive conduct.  These approaches are common to all class members, as the challenged conduct applies in a common way to all class members.  The challenged conduct denies every class member the opportunity to participate in a competitive labor market in which they would not be restricted from receiving competitive wages and benefits, as they would be able to do in the but-for world absent such restrictions.

**5.1    COMMON EVIDENCE SHOWS THAT DEFENDANT AND ITS MEMBER SCHOOLS ENACTED AND ENFORCED A BYLAW THAT ARTIFICIALLY RESTRICTED COMPETITION AND CAPPED REMUNERATION AT ZERO.**

27.  The analysis of anticompetitive effects begins with the challenged conduct (the volunteer coaching rule) itself.  In most price-fixing schemes, the existence of a cartel is not obvious, and the existence of the price fix is not readily apparent.  Here, however, Defendant and its member schools are unusual as far as alleged price-fixing cartels go.  Cartels commonly meet in secret and publicly deny the existence of any agreements on price.  In contrast, Defendant and the D1 schools agreed in a very public fashion to band together via a published document (which the NCAA calls a "constitution") and to abide by private bylaws that have the effect of being an explicit wage fix.  As the historical record shows,

---

[11]    Memorandum and Order Re: Defendant's Motion to Transfer and Motion to Dismiss, July 27, 2023 at p. 17.

once the rule was implemented, assistant coaches who had previously been paid to provide coaching services were either terminated or converted into unpaid "volunteers," and this was discussed by the member schools and recorded as meeting minutes. Those minutes also include discussion of the original intent of the rule – to reduce the member schools' collective costs,[12] which is an anticompetitive goal because the schools across D1 are competitors. This also makes this case somewhat different from other cases, where the competitors typically deny having engaged in the alleged misconduct in the first place and have not memorialized their pursuit of an anticompetitive goal as their primary purpose for the alleged misconduct.

28. Price fixing also commonly requires policing and the threat of enforcement. If a cartel is fully successful in its threat to punish firms that "cheat" on the cartel agreement, it may be difficult to identify how it was policed and enforced because the threat of punishment may have been 100% effective, resulting in no evidence of any "cheating" on the cartel (and hence no need for punishment). In the current case, though, the NCAA very publicly employs a "compliance" staff to monitor D1 members' conduct and requires its D1 member schools to do the same.[13] The record contains examples of schools self-reporting even minor violations of the alleged cartel agreement,[14] which they do because the NCAA can impose punishments on schools that break the price-fixing agreements it imposes, and

---

[12]  NCAA_SMART-COLON_0142726 at 2838 ("The employment of a volunteer coach was recommended because it would result in minimum cost to institutions while providing an avenue for a local individual to remain involved in coaching activities… [A]dditional travel and room and board expenses… is contrary to any cost reduction objective of the Council and the Presidents commission… [I]f we cumulate several low-cost increases at each Convention with each sport we are moving against the overwhelming pressures of cost containment that we all want.").

[13]  NCAA's Answer to Plaintiffs' Class Action Complaint, August 31, 2023 at ¶ 47; NCAA's Response to Plaintiffs' First Set of Interrogatories, October 25, 2023, Response to Interrogatory No. 4 at p. 11 (stating that the "NCAA's Enforcement Department provides support for the enforcement of the NCAA's policies, rules, and bylaws"); Deposition of Matt Boyer, August 27, 2024 at 14:5-21, 25:1-26:11; Deposition of Jennifer Fraser, October 2, 2024 at 114:21-124:7.

[14]  NCAA_SMART-COLON_0019670 (volunteer impermissibly had meals during recruit's unofficial visit); NCAA_SMART-COLON_0019728 (volunteer baseball coach impermissibly received three tickets instead of two tickets for a home baseball game); NCAA_SMART-COLON_0019775 (assistant coach improperly took volunteer to a game in another sport without making the volunteer pay for it); NCAA_SMART-COLON_0020631 (violation to pay for volunteer's expenses related to traveling to professional development conference).

punishment is sometimes more severe for schools that fail to self-report.[15]  In the most severe cases, Defendant reserves the right to impose a collective boycott of all other D1 schools on any D1 school found to have grossly broken any of the private price-fixing agreements made among Defendant and its members.  Famously, this rule was used to impose the so-called "Death Penalty" on Southern Methodist University (SMU), leading to a two-year cancellation of its football program after all other D1 schools agreed to a collective boycott of SMU's football program.[16]

29.   To be clear, the existence of these sorts of price-fixing agreements, efforts at monitoring, and threats or actual examples of punishment of cartel members that do not comply with the agreement are all common factors found in successful cartels.  The NCAA is not unusual in sharing these elements; rather, what is unusual is that the NCAA does it very publicly, and in some ways defines its core mission as the development of collective agreements among its members (agreements which include, *inter alia*, various forms of price fixing), and then that the NCAA performs its policing and punishment of any lack of compliance with the agreement in public as well.

30.   While the public nature of this conduct is unusual, the conduct itself is the bread-and-butter economic conduct associated with collective, anticompetitive agreements on price.  Thus, the allegations in this matter can be summarized simply in the language of economics.  This case is about collusion among firms (member schools) sponsoring D1 baseball teams who

---

[15]   NCAA_SMART-COLON_0000931 at 0949-0950 (NCAA 2022-23 Division I Manual stating that, "All members of the NCAA must:... submit annually to the division and the NCAA financial data as determined by the division... comply completely and promptly with the rules and regulations governing the divisional enforcement process and shall cooperate fully in that process as a condition of membership in the Association... An institution's membership in the NCAA may be suspended, terminated, or otherwise disciplined (including loss of or reduction in rights to participate in governance process or financial penalties) for... failure to abide by the principles stated in the constitution or those established by an institution's division."); Jonathan Duncan, Enforcement Self-Study: Operations and Compliance, NCAA (Summer 2016), available at https://ncaa.s3.amazonaws.com/files/enforcement/EWG-self-study-052616-final_20161014.pdf ("Self-reporting violations is an expectation and condition of membership... [S]elf-reporting violations can be a factor in fashioning penalties ... the hearing panel/committee members may consider an institution's self-report or the institution's level of cooperation in an investigation when prescribing penalties." PDF pp. 50-1); The Advantages to Self-Reporting Violations Are Abundant. (2016, July 13). College AD. Available at https://collegead.com/the-advantages-to-self-reporting-violations-are-abundant/.

[16]   "The death penalty – part of the 'repeat violators' rule in official NCAA parlance – wiped out SMU's entire 1987 season and forced the Mustangs to cancel their 1988 campaign as well." Dodds, E. (2015, February 25). The 'Death Penalty' and How the College Sports Conversation has Changed. TIME. Available at https://time.com/3720498/ncaa-smu-death-penalty/.

buy labor (coaching services)[17] from assistant baseball coaches to coach their D1 baseball teams.  For 31 years, Defendant and its member schools had a collusive agreement (via the bylaws) in place that allowed the schools to (a) compensate three coaches – typically a head coach and two assistant coaches – at market value[18] and (b) to hire a fourth coach (the third assistant baseball coach), but unlike the other two assistant baseball coaches, this coach could not receive remuneration.[19]  As competition played out during these decades, salaries and other forms of compensation for the coaches without a pay restriction increased significantly.  By the 2022-23 academic year, the paid head baseball coaches at D1 schools in the data set analyzed had an average salary of $198,042, with some earning as much as ███████ (Texas Tech).  The paid assistant baseball coaches at these schools had an average salary of $83,453, with some earning as much as ███████ (Mississippi State).[20] However, throughout that 31-year period ending in July 2023, the coaches whose pay was capped received zero pecuniary compensation.

31.  As I understand it, this agreement among the schools to cap the third assistant coach's pay at zero was codified in the NCAA's Division I Manual at Bylaws 11.7.6 and 11.01.6.  As those bylaws explain, this coaching position may "not receive compensation or remuneration from the institution's athletics department or any organization funded in whole or in part by the athletics department or that is involved primarily in the promotion of the institution's athletics program (e.g., booster club, athletics foundation association)," and may not receive any food other than for "meals incidental to organized team activities (e.g., pre- or postgame meals, occasional meals, but not training table meals) or meals provided during a prospective student-athlete's official or unofficial visit" to the school.  The schools also cannot pay for housing, for health insurance, or provide other employment benefits that

---

[17]  A labor market is commonly defined as an input market in which firms seek workers and workers seek jobs/use of their skills and compensation from those firms.  This would apply to relationships beyond just those between an employer and an employee.  For example, economically, an input market for independent contractors' services would be a labor market even if those workers lacked employee status.

[18]  Deposition of Jennifer Fraser, October 2, 2024 at 128:6-14, 138:20-140:10, 203:12-15.

[19]  Deposition of Jennifer Fraser, October 2, 2024 at 130:24-131:17, 133:7-20, 215:8-216:3.

[20]  See in backup materials, "Text Cite - Coach Salary Stats Start Year 2022.xlsx."

they generally provide to the other assistant coaches.[21]  I refer to these restrictions collectively as the "volunteer coach rule" in this report.

### 5.1.1  The need for enforcement of the volunteer coach rule is evidence of its anticompetitive effect.

32.  Restraints among competitors that are binding – that is, when they impose conduct on the parties that is contrary to their unilateral economic interests – require policing and enforcement.  This can be a means of distinguishing a pro-competitive agreement, such as the adoption of an industry standard, from anticompetitive conduct, such as price fixing, because a pro-competitive standard, once adopted, can enforce itself.  It may be necessary to provide a means of certification that the product has been manufactured according to the standard, but there is typically no need to punish market participants who choose not to use the standard.[22]  In contrast, anticompetitive agreements are generally not self-enforcing, and thus require threats of punishment to prevent a cartel member from breaking the agreement (i.e., to cheat).  Consequently, cartels typically require some method of monitoring members' conduct to ensure compliance with the cartel and some method to threaten a wayward cartel member with negative consequences in the event of non-compliance.

33.  Defendant and its member schools put these monitoring and enforcement mechanisms in place through the bylaws the NCAA uses to enforce its rules.   The NCAA has stated that the ability to investigate allegations and penalize infractions of NCAA bylaws is critical to the common interest of the NCAA's membership and the preservation of enduring values.[23]

34.  In *Law v. NCAA* (the previous antitrust case involving a bylaw that restricted the compensation for a category of coaches), the NCAA argued to the Tenth Circuit that "a vital part of the NCAA's mission is to limit economic competition between schools."[24]  The Division I manual therefore had several enforcement mechanisms in place to ensure that

---

[21]  NCAA's Answer to Plaintiffs' Class Action Complaint, August 31, 2023 at ¶ 46; Deposition of Matt Boyer, August 27, 2024 at 43:15-44:2; Deposition of Lynda Tealer, October 10, 2024 at 74:5-8.

[22]  As an example, in the United States, Apple is free to use its proprietary "lightning" cable connection for its phones even though other electronics firms use USB standard-sized connections like USB-C.

[23]  NCAA_SMART-COLON_0000001 at 0372 (2020-21 Division I Manual); Deposition of Jennifer Fraser, October 2, 2024 at 112:2-113:10.

[24]  Appellant's Petition for Rehearing and Suggestion for Rehearing En Banc (Law), p. 6.

16

schools did not cheat.  The penalties for violating the bylaw included fines, reductions on scholarships, and even bans from competition.[25]  Defendant has repeatedly admitted that the NCAA and its member schools had compliance departments that investigated possible bylaw violations,[26] and the evidence shows the NCAA enforced the volunteer coach rule.[27] Jenn Fraser, Managing Director of D1 for the NCAA, testified that "Division I expects bylaw enforcement to be taken seriously."[28]

35.  Data produced in discovery also shows the volunteer coach rule was effective.  Of the 89 schools that produced volunteer data for all of the period 2018-2023, 82 of them employed a volunteer coach for at least 12 months during the period, and 73 of them never paid their third coach compensation for coaching.[29]  Further, evidence shows that many of the member schools wanted to provide greater benefits to these coaches over the decades and introduced a variety of amendments to the rule that would have permitted more benefits.[30] For example, in 2018, D1 schools proposed allowing "volunteer" coaches in baseball and softball to receive compensation via Proposal No. 2018-34, but the proposal was defeated.[31]

---

[25]  Deposition of Matt Boyer, August 27, 2024 at 26:12-24, 37:15-22; NCAA's Answer to Plaintiffs' Class Action Complaint, August 31, 2023 at ¶ 47; NCAA_SMART-COLON_0000001 at 0387 (2020-21 Division I Manual at Article 19.9.5).

[26]  NCAA's Answer to Plaintiffs' Class Action Complaint, August 31, 2023 at ¶ 47; NCAA's Response to Plaintiffs' First Set of Interrogatories, October 25, 2023, Response to Interrogatory No. 4 at p. 11; Deposition of Matt Boyer, August 27, 2024 at 14:5-21, 25:1-26:11; Deposition of Jennifer Fraser, October 2, 2024 at 114:21-124:7.

[27]  NCAA_SMART-COLON_0019670; NCAA_SMART-COLON_0019728; NCAA_SMART-COLON_0019775; NCAA_SMART-COLON_0020631.

[28]  Deposition of Jennifer Fraser, October 2, 2024 at 125:15-20.

[29]  See backup materials, Text Cite – "Third Coach Compensation.csv".  It is my understanding that the nine schools showing compensation to class members (Kentucky, Notre Dame, San Diego State, Ball State, Alabama, Boston College, Maine, Elon, and Arkansas-Little Rock) have confirmed these payments were for work at camps or for graduate school rather than compensation for work performed in the role of the "volunteer" coach.

[30]  For example, Proposal No. 2000-117 which sought "to eliminate the compensation restrictions applicable to a volunteer coach." (NCAA_SMART-COLON_0236855 at 6892, 6929 & NCAA_SMART-COLON_0225947 at 6032-33).

[31]  NCAA_SMART-COLON_0019530 at 530–531 (Proposal No. 2018-34 which sought "to add an additional full-time countable coach in baseball and softball by elevating the current volunteer coach position to a full-time countable coach"); NCAA's Answer to Plaintiffs' Class Action Complaint, August 31, 2023 at ¶59; NCAA's Response to Plaintiffs' First Set of Interrogatories, October 25, 2023, Response to Interrogatories Nos. 5 & 6 at pp. 12–13; Deposition of Matt Boyer, August 27, 2024 at 64:25-66:3, 117:9-11, 167:8-17; Deposition of Lynda Tealer, October 10, 2024 at 102:16-24.

36. Prior to 2023, efforts to relax or repeal the restraint were voted down through the NCAA voting process, with opponents typically raising cost or budget concerns,[32] despite the fact that since 2013, the D1 Manual has stated, "The commitment to fair competition acknowledges that variability will exist among members, including facilities, geographic locations and resources, *and that such variability should not be justification for future legislation.*"[33]

37. Anticompetitive cost-cutting is often collectively profitable even when it is not in the unilateral interest of the strongest competitors.[34]  Most notably, the Southeastern Conference (SEC) (which currently consists of sixteen D1 schools and at the time had fourteen), introduced Proposal No. 2018-34.  Many of the SEC's coaches – and other D1 baseball coaches – were publicly supportive of the effort, expressing a desire to pay the third assistant coaching position.  Those speaking in support pointed to the great importance of the work that the volunteer coach was doing as a third assistant because baseball had one

---

[32]  *See* Deposition of Matt Boyer, August 27, 2024 at 178:15-179:16; Deposition of Jennifer Fraser, October 2, 2024 at 167:6-170:3; Deposition of Lynda Tealer, October 10, 2024 at 101:12-102:21; SMART_COLON_THIRD_PARTY_0000038212 (03/06/19 email from Samuel to Batson notes that "there are budgetary concerns with adding additional paid positions in both baseball and softball."); NCAA_SMART-COLON_0042200 & NCAA_SMART-COLON_0042201 (04/18/19 email from Fraser to Stringham-Marquis attaching committee comments re Proposal No. 2018-34 and noting Student-Athlete Experience Committee took no position on the proposal but raised "budget concerns"); NCAA_SMART_COLON_0169970 at 70110 (April 2019 document to DI Legislative Committee noting "budget concerns"); NCAA_SMART-COLON_0028588 at 8588 (01/15/21 email from Jennifer Henderson of NCAA to Jerry Vaughn, Brandy Hataway, D.J. Brown, and Anne Rohlman of NCAA stating that ███████████████████████████████ ████████████████████ SMART_COLON_THIRD PARTY_0000019162 (downside of eliminating volunteer bylaw is "adding full-time staff member").

[33]  Emphasis added.  See NCAA_SMART-COLON_0008285 at 8298 (2013-14 Division I Manual); NCAA_SMART-COLON_0001845 at 1867 (2014-15 Division I Manual); NCAA_SMART-COLON_0009571 at 9584 (2015-16 Division I Manual); NCAA_SMART-COLON_0010831 at 0842 (2016-17 Division I Manual); NCAA_SMART-COLON_0011245 at 1256 (2017-18 Division I Manual); NCAA_SMART-COLON_0006955 at 6966 (2018-19 Division I Manual); NCAA_SMART-COLON_0015157 at 5168 (2019-20 Division I Manual); NCAA_SMART-COLON_0000001 at 0013 (2020-21 Division I Manual); NCAA_SMART-COLON_0000465 at 0477 (2021-22 Division I Manual); NCAA_SMART-COLON_0000931 at 0943 (2022-23 Division I Manual); NCAA_SMART-COLON_0001396 at 1407 (2023-24 Division I Manual).  See also Deposition of Jennifer Fraser, October 2, 2024 at 173:25-175:5.

[34]  As I discuss in Section 6.2, the argument that these collective efforts at cost containment serve to prevent schools like those in the SEC from acquiring the best coaches lacks theoretical economic support.  Rather, as has been shown across multiple sports, at the professional and collegiate levels, the highest revenue teams succeed in attracting the best talent even under price collusion because of non-price competition.  This is known as the "Invariance Principle" in sports economics and is a special case of the more general Coase Theorem.

of the highest student-to-coach ratios in D1 sports.[35]  Yet the vote failed and the NCAA retained the rule for at least another two years because NCAA bylaws prohibited the resubmission of defeated proposals for two years.[36]  In essence, the collective group of D1 schools, acting as a cartel, continued to prevent the schools who wanted to pay the volunteer coach from doing so, thereby continuing to enforce the wage fix.  Discussions leading up to the council's decision mentioned "████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████[37]  Ultimately, ███████████████ were noted in the positions regarding the proposed legislation (Proposal No. 2018-34) as it was defeated.[38]

38.   This is the conduct of a classic monopsonistic cartel, preventing strong competitors from optimizing their use of labor in pursuit of higher collective profits through reduced competition.  The D1 schools with baseball teams, as buyers of these services, compete for this labor.  But through the volunteer coach rule, they artificially reduced schools' ability to compete for this labor through restrictions on the amount that schools could offer a third assistant coach, thereby collusively decreasing the price to zero.  In the but-for world, the third assistant coaches in the class definition would have benefited from greater competition for their labor that would have led to greater remuneration for their labor, as has been the case since July 1, 2023.

39.   This is thus a case of alleged collusion in the labor markets for D1 baseball coaching services resulting, as alleged, in harm to competition.  That harm to competition causes class-wide antitrust injury to members of each class in the form of lost opportunities to (a) have sought out and negotiated competitive compensation for the work they performed, and (b) have been paid as employees, both in terms of wages but also other benefits that flow

---

[35]   Deposition of Matt Boyer, August 27, 2024 at 68:7-71:4, 83:13-23, 88:13-19, 98:4-14; Deposition of Jennifer Fraser, October 2, 2024 at 158:3-159:15, 160:9-14; NCAA_SMART-COLON_0173166 at 3167 (03/01/19 Sankey letter with rationale for changing bylaw, particularly for baseball).

[36]   Deposition of Matt Boyer, August 27, 2024 at 124:23-125:22; Deposition of Lynda Tealer, October 10, 2024 at 106:17-24.

[37]   SMART_COLON_THIRD PARTY_0000033014; NCAA_SMART-COLON_0140536 at 0536.

[38]   SMART_COLON_THIRD_PARTY_0000114139 at 4139; NCAA_SMART-COLON_0042201 at 2201; NCAA_SMART-COLON_0169970 at 9981 & 70110; NCAA_SMART-COLON_0019530.

from employment.  Thus, this is a simple case of alleged collusion resulting in harm to competition causing injury and monetary damages to those providing labor.

### 5.1.2  Input markets can require "mirror image" analysis compared to output markets.

40.  Most labor markets are input markets, meaning that the labor is acquired in order to produce something.  Here, the labor of coaches is being acquired in order to produce D1 baseball.  The process of analysis of an input market proceeds along similar lines as with an output market, but it is important to recognize that a generalized statement that economists or legal scholars make with specific reference to output markets may need to be adjusted with respect to inputs.  Economists often use the phrase "mirror image" to capture the fact that a true statement about an output market (such as the general view that lower prices are better) may need to be reversed in an input case.[39]

41.  Mechanically applying the logic from output markets to input markets will often get backwards the economics underpinning market definition and analysis of anticompetitive conduct.  For example, a collusively depressed *input* price is not inherently good, despite the broad recognition that in *output* markets, a lowered price is one of the benefits of competition.  Either way, the result of a price that is driven away from the competitive equilibrium by means of collusion will result in a transfer of wealth from one group to another; in an input market, the transfer of wealth is from the sellers to the buyers (versus from buyers to sellers in collusive output markets).  Moreover, the mirror image metaphor also captures the fact that in input markets, lower prices may also lead to lower, rather than higher, output.

### 5.1.3  Anticompetitive Harm can be demonstrated through a Direct Effects or Indirect Effects approach.

42.  I provide this analysis to show that at the merits stage of this case, it will be possible to demonstrate, through common economic evidence, that Defendant had sufficient market

---

[39]  Noll, R.G. (2004). "'Buyer Power' and Economic Policy." Antitrust Law Journal, 72(2), pp. 589-624 at 589 ("Thus, buyer power arises from monopsony (one buyer) or oligopsony (a few buyers) and is the mirror image of monopoly or oligopoly.") Niels, G., Jenkins, H., and Kavanagh, J. (2011). Economics for Competition Lawyers. Oxford University Press at p. 166 ("Buyer power has been characterized in one of two ways. The first is 'monopsony power' as the mirror image of monopoly power-a powerful buyer can force prices down below the competitive level by withholding demand.").

power to cause anticompetitive harm,[40] and that it did cause such anticompetitive harm. This demonstration will be done by means of economic evidence common to all class members, rather than having to resort to individualized inquiry of specific class member's individual facts and circumstances. Because questions of market power and competitive harm are, by definition, based on market-wide economic evidence, these issues are assessed by economic evidence common to all class members.

43. One important economic question is whether there exists a common mechanism by which the challenged conduct had impact on class members. Specific to this case, the question can be thought of as whether, but-for the challenged conduct, class members would have otherwise had an opportunity to offer their services to multiple schools competing to provide wages and benefits to acquire the services of third assistant baseball coaches that was not available due to the alleged collusive conduct by Defendant and its member conferences and schools. The answer to that question is "yes" for all class members. This class-wide anticompetitive harm in the form of the lost economic opportunity to compete in a competitive labor market can be shown through common economic evidence.

44. This answer is echoed in the sports economic literature. Kahn (2000) surveys studies that show that employer monopsony in sports markets lowers wages.[41] Kahn cites to evidence that MLB salaries as a percent of revenues fell from about 40 percent in 1985 to 32 percent in 1989 during the collusion period.[42] Blair and Harrison (1992) came to a more general, but similar conclusion:

> "But the monopsonist will not hire this number of units because it is not privately optimal to do so. Private profit maximization will lead the monopsonist to employ the smaller quantity Q2'. As a result, too few resources will be employed - one can see that the value of the marginal product exceeds the social cost, which is measured by the height of the

---

[40] In a direct effects analysis, determining the precise definition of the market in which power is exercised is unnecessary. It suffices to identify the indicia of market power over a labor market in which assistant baseball coaches provide services to identify direct effects, without explicitly determining whether other potential employers beyond D1 schools also compete in that market.

[41] Kahn, L.M. (2000). "The Sports Business as a Labor Market Laboratory." Journal of Economic Perspectives, 14(3), pp. 75-94.

[42] This decline can be seen quite clearly in Exhibit 3 of this report, where I show the lingering effects of conspiracy in baseball wages. Vrooman found the same result ("… the ratio fell back to 32 percent by 1989, due largely to the collusion of MLB owners.") Vrooman, J. (January 1997). "A Unified Theory of Capital and Labor Markets in Major League Baseball." Southern Economic Journal, 63(3), pp.594-619 at 594 FN 1.

supply curve. This means that there are unrealized gains from further trade, i.e., that some social value is forgone by the restricted hiring decision."[43]

45. While this economic conclusion is readily evident from the literature and from the natural experiment that has taken place after the volunteer coach rule was repealed, I will make a formal assessment of whether the challenged conduct caused anticompetitive harm through two common class-wide methodologies: (1) directly (via a method known as "Direct Effects" analysis); and (2) indirectly ("Indirect Effects") through a series of steps including: (a) determining relevant product and geographic markets, and (b) determining market power in the relevant market(s).

46. As a matter of economics,[44] evidence of the conduct's success in causing anticompetitive harm proves the existence of market power in a relevant market. This flows from the economic fact that if two firms collectively have no market power in a given labor market, their collusion to lower wages will simply cause labor to shift to non-collusive employers demanding that labor.[45] Successful collusion, therefore, implies the parties have market power. That is the essence of the Direct Effects approach.[46]

---

[43] Blair, R. D., & Harrison, J. L. (1992). "The Measurement of Monopsony Power. The Antitrust Bulletin," 37(1), pp. 133–150, emphasis removed.

[44] Nowhere in this report do I intend to render a legal opinion. In particular, I am aware that sometimes conduct can be illegal under the antitrust laws regardless of whether a firm is shown to have market power or not. My statement above is an economic one, not a statement about (for example) whether under a *per se* standard, the absence of market power is material to whether conduct is illegal.

[45] I frame this specifically around labor markets, but more generally, market power in any relevant market – input or output – is necessary for potentially anticompetitive conduct to succeed (be profitable) over the long term. To use an output market example, price fixing without market power will tend to cause the firms in question to lose sales to competitors outside of the conspiracy and thus price fixing is generally only profitable if the participants in the agreement have sufficient market power to maintain market share in the face of the price increase.

[46] In some cases, it can be argued that the observed effect just happens to coincide with a more direct cause of the empirical economic evidence. However, I have reviewed the Membership Financial Reporting System data available to me and have ruled out other causal economic factors. For instance, the economics of D1 baseball were stable during the class period. Aggregate team revenues for D1 baseball schools totaled roughly $268.2 thousand in 2019 and $289.5 thousand in 2023. Further, the team revenue CAGR between 2016-2019 (pre-COVID) of 2.9 percent was comparable to the CAGR between 2019-2023 (post-COVID) of 1.9 percent. It is also the case that, even though there is a clear decrease in several financial variables during COVID (academic year 2020), the number of assistant coaches did not show a meaningful decline across the class period. In academic year 2016, there were 611 assistant coach positions across all D1 baseball schools. By academic year 2020, there were a total of 617 assistant coach positions, which did not change in academic year 2021. In fact, the number of assistant coach positions was relatively stable across the entire class period, with a 2016-2019 CAGR of 0.1 percent and a 2019-2023 CAGR of 0.6 percent. In only one year (1.5 percent in academic year

47. The Indirect Effects approach – which involves first defining the relevant markets and determining whether the Defendant has market power – was developed because in many cases it is difficult to identify the direct anticompetitive harm being caused by firms engaging in a restraint, or because the firms participating in the proposed market are only hypothesized as potential monopsonists, were they to price in concert (such as in a merger review which takes place prior to the merger).  In contrast, and as explained above, Defendant admits that all D1 schools previously did agree on a common price[47] and that wage fixing was enforced.[48]  Economists often fall back on indirect effects evidence because most anticompetitive conduct is not carried out in the open, written down in a 400-plus-page agreement like the NCAA's D1 manual that is revised and republished annually, or admitted by Defendant.  In this case, however, these conditions do all exist, so the question can be approached directly.  In what follows, I first employ the Direct Effects approach before turning to the Indirect Effects approach.  I demonstrate that regardless of which approach is utilized, the methodology for assessing competitive effects will be common to all class members and not require individualized inquiry.

**5.2   THE DIRECT EFFECTS APPROACH WILL RELY ON COMMON EVIDENCE TO SHOW THAT THE CONDUCT WAS ANTICOMPETITIVE.**

48. The Direct Effects approach, while used in rule-of-reason cases, is particularly in sync with my understanding of what the Court decided when it used the "quick look" analysis at the motion-to-dismiss stage, stating that "no elaborate industry analysis is required to demonstrate the anticompetitive character" under such circumstances.[49]  The anticompetitive nature of the bylaw at issue in this case is evident from basic economic theory and is confirmed by the Direct Effects approach.

---

2018) did the year-over-year change in assistant coach positions exceed 1.2 percent (in absolute value terms).  Further, the growth rate from 2019 to 2023 was 2.3 percent.

[47]  NCAA's Answer to Plaintiffs' Class Action Complaint, August 31, 2023 at ¶¶ 2, 39, 41–46, 50.

[48]  NCAA_SMART-COLON_0019670 (volunteer impermissibly had meals during recruit's unofficial visit); NCAA_SMART-COLON_0019728 (volunteer baseball coach impermissibly received three tickets instead of two tickets for a home baseball game); NCAA_SMART-COLON_0019775 (assistant coach improperly took volunteer to a game in another sport without making the volunteer pay for it); NCAA_SMART-COLON_0020631 (violation to pay for volunteer's expenses related to traveling to professional development conference).

[49]  Memorandum and Order Re: Defendant's Motion to Transfer and Motion to Dismiss, July 27, 2023 at p. 16.

49.  In assessing anticompetitive harm, economists do not look for market power (and ask in what market that market power was exercised) as a goal in and of itself, but instead, as a step in a process.  The goal of the process is to assess whether the challenged conduct restrained the market through anticompetitive impact on price or output.  Economically, that intermediate step of defining a market may be bypassed where there is sufficient Direct Effects evidence of anticompetitive impact.

50.  As the U.S. Department of Justice and Federal Trade Commission Merger Guidelines explain, "Direct evidence of the exercise of market power can demonstrate the existence of a relevant market in which that power exists."[50]  As Former FTC Commissioner Thomas Rosch explained, Direct Effects analysis allows for "'backing into' the market definition" by seeing where the restraint is binding, and thus, recognizing that location must capture the relevant market in which the restraint had impact.[51]  Economist Carl Shapiro notes "[t]he courts also can simplify antitrust cases and make fewer errors by giving more weight to direct evidence of the economic effects of challenged practices and providing more plaintiffs with a path to success that does not require defining a relevant market."[52]  Further, "IO economists know that the actual economic effects of a practice do not turn on where one draws market boundaries."[53]  Finally, "Defendants have managed to turn market definition into a gating item under the case law, even if there is direct evidence of anticompetitive effects."[54]  Economist Louis Kaplow goes further questioning why defining a market is useful at all in understanding the economic effects of policies or actions taken by firms.[55]

51.  Here, the Direct Effects approach centers on the empirical question of whether the restraints at issue succeeded in keeping the wage payments to class members who provide labor services lower than otherwise would have been (and would be) paid and permitted in

---

[50]  Merger Guidelines.  (2023, December 18).  U.S. Department of Justice and Federal Trade Commission, p. 41.

[51]  The Past and Future of Direct Effects Evidence: Remarks of J. Thomas Rosch before the ABA Section of Antitrust Law's 59th Spring Meeting.  (2011, March 30).  Federal Trade Commission, p. 2.

[52]  Shapiro, C. (2021).  Antitrust: What Went Wrong and How to Fix it.  *Antitrust*, 35(3), pp. 33-45 at 40.

[53]  Shapiro, C. (2021).  Antitrust: What Went Wrong and How to Fix it.  *Antitrust*, 35(3), pp. 33-45 at 40.

[54]  Shapiro, C. (2021).  Antitrust: What Went Wrong and How to Fix it.  *Antitrust*, 35(3), pp. 33-45 at 41.

[55]  Kaplow, L. (2010).  Why (Ever) Define Markets?  *Harvard Law Review*, 124(437), pp 438-517.  He notes that in trying to measure market power, "[n]othing in the market definition process can help," at p. 517.

competitive labor markets, and in precluding coaching opportunities that would otherwise have been (and would be) available in less restrained labor markets.

52. The question for an economist is whether sufficient evidence exists to provide the foundation for the Direct Effects approach – namely, can it be shown that the challenged restraint constrained or is constraining competitive market terms, such as price or output, without going through the Indirect Effects process of defining relevant markets and assessing market power. Here, the evidence of Direct Effects is abundant. The parties agree the conduct occurred. As a result of the conduct, competition for the price of labor was stifled and compensation to coaches was lower than it would have been without the conduct.

53. Direct Effects analysis is particularly useful as a methodology where, as here, there has been a change in the restraining conduct by the Defendant, so that an economist can measure the competitive impact of that change (a natural experiment). By accounting for the potential influence of other factors, an economist can attribute any change in competitive effects to the known change in the restraint. Direct Effects can also be used in a forecast of a potential change in competitive behavior when the impact of a restraint is well understood.

54. The Direct Effects approach benefits in this case from the lifting of the rule recently, which essentially serves as the *beginning* of a natural experiment into the effect of the conduct. Starting with the 2023-24 academic year, schools were allowed to begin paying the third assistant baseball coach. Data analyzed to date reveal that over fifty percent of the schools (that provided data) have already begun to do so, with an average salary of around $50,000. These schools generally are providing employment benefits such as health insurance to these paid coaches as well.[56] Similarly, discovery reveals that among those that have not yet hired a paid third assistant coach, some plan to do so for the 2024-25 academic year.[57]

---

[56] The data produced in this matter frequently show the value of the health insurance benefits provided to paid assistant coaches.

[57] SMART_SCHLS_0000002284 (email from Creighton general counsel regarding the volunteer coach, stating ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ); SMART_COLON_THIRD_PARTY_0000035333 at 5335 (02/11/19 email from Batson to Sankey, Boyer, Vincent, and King re Proposal No. 2018-34 stating "While most in the SEC will likely make it a full-time position, many schools may want to start with a no pay or part-time pay and continue to transition to a full-time

55. As a result, we can observe the immediate conversion of previously price-fixed (at zero) employment positions to paid employment positions as soon as the bylaw repeal became effective in July 2023. This relaxation of a pricing constraint on the pay of the third assistant coach position – and the subsequent market reaction by which the price paid for these coaches increased – provides direct common economic evidence of the degree to which this competition (and as a result, compensation) had been suppressed by the challenged conduct prior to July 1, 2023,[58] i.e., that the conduct was anticompetitive.

56. The wage fixing at issue was in effect for over 30 years. The natural experiment of significantly relaxing the prior restrictions on compensation for assistant baseball coaches has only been in effect for a little more than one academic year, a very short duration by comparison. Based on established economic theory and what I have observed with other NCAA restraints, it is my opinion that the market is nowhere close to equilibrium yet because the effects of the long wage fix continue to linger. Yet it is already readily apparent from the competition that has emerged that Defendant and its members have substantial buyer-side market power in the relevant labor market for their services, however that market is defined.

57. That power allowed them to artificially suppress the competition for services and to artificially set the price for services that were paid by D1 schools for a third assistant baseball coach. Had Defendant and its members not had market power, it would not have been possible to attract full-time coaches willing to work without compensation at jobs many of them now do (sometimes at the same school) at a wage that is already measured in the tens of thousands of dollars (and that will likely increase as the effects of the wage fix subside in coming years). The observed behavior shows that schools primarily have hired their own "volunteer" coaches, other schools' "volunteer" coaches, or someone performing

---

position ...."); Davidson Fundraising Appeal (stating that the "volunteer assistant has been a vital member of our coaching staff and integral to our efforts," and asking for contributions to turn it into a $40,000 paid position).

[58] Importantly, as Plaintiffs allege, damages in this matter relate to the difference between the price actually paid for work performed, and what the but-for price of that work would have been. Answering this question does not require assessing the composition of the labor force or any changes that might have occurred had the alleged misconduct not occurred. See, for example, footnote 5 of the Court's ruling on the Motion to Dismiss which explains: "As discussed at oral argument, allegations that plaintiffs would have been hired but for the Bylaw are different than allegations that plaintiffs would have been compensated. Because plaintiffs were all hired as volunteer coaches, the issue here is whether they would have been paid, not whether they would have been hired." Memorandum and Order Re: Defendant's Motion to Transfer and Motion to Dismiss, p. 13, FN 5.

a non-coaching admin role within Division I.  These categories make up about 3/4 of the hires, with the bulk of the rest coming from lower NCAA Divisions, high school or other non-coaching roles.[59]  To this point, the NCAA's Jenn Fraser testified that "there is no other entity in the world like Division I."[60]  The NCAA's Lynda Tealer testified that, ████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████[61]

58.  Nor was it competitive entry that dislodged that monopsony from its position of dominance, because no such entry into this tier of baseball has occurred; rather it was simply a collusive decision among Defendant and its members to allow more intra-market competition that led to these dramatic increases in wages.  Defendant's monopsony power had been used to the detriment of competition and caused anticompetitive harm to all class members who compete in the relevant labor markets.

59.  The harm from the absence of competition affects all class members, simply by having taken away their opportunity to negotiate a competitive wage for the work they performed.  As just one example consider the case of named Plaintiff Taylor Smart.  The University of Arkansas was previously able to insist that if Mr. Smart wanted to provide coaching services as the third assistant to Arkansas's baseball team, he would have to do so without compensation.  As a factual matter, that is what Mr. Smart did.  He testified that he provided full-time services for the University of Arkansas, often working nine or ten hours per day for six or seven days per week.[62]  He also testified that he was doing critical work for Arkansas' baseball team: serving as the assistant hitting coach; was responsible for the team's baserunning; was responsible for overseeing the team's catchers; set up practice plans; coached first base during games (both home and away); broke down game film of opponents for 65-70 games during the season; created scouting reports for future

---

[59]   See Exhibit 1.  Only 9% of the paid third assistant coaches' prior job was as a coach at a non-NCAA collegiate position or in the minor leagues or overseas baseball.

[60]   Deposition of Jennifer Fraser, October 2, 2024 at 102:8-22.

[61]   Deposition of Lynda Tealer, October 10, 2024 at 65:6-23, 67:22-68:7.

[62]   Deposition of Taylor Smart, September 24, 2024 at 96:10-18.

opponents; did on-campus recruiting, and performed other tasks as needed.[63]  He testified that he was essentially "doing all the same duties if not more than a regular coach."[64]  Mr. Smart also testified that he did the equivalent work of another assistant coach who was paid six figures.[65]  Instead, the NCAA voted down the rule change, and Mr. Smart continued to work without pay.

60.   It wasn't until five years later in 2023, a few years after Mr. Smart left the University of Arkansas, that the NCAA repealed the bylaw.  Once the NCAA stopped enforcing its prohibition on compensation for the third assistant coach, the coach serving in the volunteer coaching slot at Arkansas at the time ███████████████████████████ ████████[66]  This example – and dozens of other similar situations at other D1 schools – provides direct evidence that Defendant and its member schools and conferences had sufficient monopsony power to *severely* depress compensation in the labor market in which Defendant's member schools compete to hire class members.

61.   Another example is the other named Plaintiff, Mike Hacker, who provided similar testimony that he worked full-time without pay.  Like Mr. Smart, Mr. Hacker testified that he performed critical duties, including serving as the pitching coach – meaning he was responsible for overseeing half the team[67] – and decided which pitchers would pitch during games, selected the type of pitches that would be thrown during at-bats, handled mound visits during games, and organized and oversaw the practices for the pitchers.[68]

62.   As I discuss below in Section 6.1, when the volunteer coach rule was enacted in 1992, the parties at the time were in the midst of a grand cost-containment campaign – the same campaign that resulted in the restricted earnings coach rule struck down in *Law v. NCAA* –

---

[63]   Deposition of Taylor Smart, September 24, 2024 at 91:24:-96:9.

[64]   Deposition of Taylor Smart, September 24, 2024 at 95:24-96:1.

[65]   Deposition of Taylor Smart, September 24, 2024 at 89:18-90:13.  Note that Arkansas is a member of the SEC.

[66]   Deposition of Taylor Smart, September 24, 2024 at 166:20-167:4; See also, 2024.01.17 - Univ. of Ark Response to Data Request.pdf.

[67]   "I had half the team that I was responsible for." Deposition of Michael Hacker, October 8, 2024 at 68:5-69:13.

[68]   Deposition of Michael Hacker, October 8, 2024 at 68:5-70:16, 95:10-96:16.

and made clear it was done for purely cost-saving purposes,[69] even acknowledging that such rules were unlikely to influence competitive balance.[70]  But if the cost savings related to the "volunteer" coach rule could have been achieved unilaterally, each school would have had the incentive to do so on its own, and no such collective efforts would have been needed.  It was the fact that competition would have made ending such payments to coaches disadvantageous to the schools that did so unilaterally that made the NCAA's rules against such payments necessary.[71]

63.  For the same reason, if schools could contain costs unilaterally, there would have been no point to repeatedly vote to deny other schools the ability to provide additional benefits to the volunteer coach over the years.  And there would have been no need to vote against Proposal No. 2018-34, which called for repeal of the rule in baseball and softball.  Indeed, those discussing Proposal No. 2018-34 noted such things as "budget concerns."[72]  That concern – that competing for price would actually lead to increased price above zero – was not irrational, but acting on it was anticompetitive.  As a matter of empirical observation of economic reality since the removal of the restraints, there has been sufficient competition for coaches' labor to cause class members' schools to pay salaries to their third assistant

---

[69]  NCAA_SMART-COLON_0142290 is the agenda from the May 30-June 1, 1989, meeting of this special committee, at which the "committee charge" was to be finalized.  According to The NCAA News (the "Official Publication of the National Collegiate Athletic Association"), "███████████████████████████████████████████████████████████████████████  NCAA_SMART-COLON_0142707 at 2710.

[70]  I discuss possible alternative justifications for the rule in Section 6 below, but as was explained in 1993:



From "Observations on the Financial Conditions in Intercollegiate Athletics," part of the "Final Report" (dated June 21, 1993) from the "Special NCAA Committee to Review Financial Conditions in Intercollegiate Athletics (NCAA_SMART-COLON_0237282 at 7335).

[71]  As discussed below in Section 6, the rule changes over 1991-1992 was a two-step process moving the third assistant coach from a paid to an unpaid position.

[72]  NCAA_SMART-COLON_0042200 & 2201 (04/18/19 email from Fraser to Stringham-Marquis noting Student-Athlete Experience Committee took no position on Proposal No. 2018-34 but raised "budget concerns"); SMART_COLON_THIRD_PARTY_0000038212 (03/06/19 email from Thomas Samuel at Southland Conference raising budgetary concerns over Proposal No. 2018-34).

baseball coaches, as a means of competing against other D1 schools.  In other words, the restraint was binding, and held down class members' pay.

64.    The challenged conduct (Defendant's agreement that no NCAA member school can provide any compensation to a third assistant coach in baseball) has led directly to higher profits to member conferences and schools and the absence of such compensation from the conferences or schools to coaches.  There exists common Direct Effects evidence that such agreements have had the continuing anticompetitive effect of prohibiting Division I-quality assistant[73] baseball coaches from receiving a competitive market wage for their labor services and instead acquiescing to work for zero compensation.  The common economic evidence will show that the schools would have made such payments as part of the competitive market process but for the ban on doing so.

65.    In a but-for world in which the class members' conferences or schools *could* have competed for a third assistant baseball coach's services by offering compensation such as wages or other benefits, they *would* have done so.  In the period since the restriction has ended, many class members' schools *have* begun to do so, and economic theory predicts that the competition will increase, more schools will begin paying, and salaries will increase as the market approaches equilibrium in subsequent years.  This is common economic evidence that will demonstrate that the voluntary coach rule lessened competition and compensation for these coaches and thus Defendant and its members had market power.

66.    Prior to the rule change, there was strong support by schools and staff for paying "volunteer" coaches. The SEC was directly involved with the 2018 proposal and stated the benefits and reasons for support including ███████████████████████████████ ██████████████████████████████[74]  Without being able to offer compensation for another countable coach, "volunteer" coaches were reported to be at risk of being lost to other paid positions such as D1 university assistant jobs.[75]  The conditions

---

[73]    As I discuss below in Section 5.3, the most common previous job of a paid third assistant coach was working as the "volunteer" coach at the school they are now being paid by.

[74]    NCAA_SMART-COLON_0173166 at 3167; NCAA_SMART-COLON_0019530 at 9530.

[75]    Holt, B. (2019, April 21). "Coach-pay vote disappoints Van Horn." The Arkansas Democrat-Gazette. Available at https://www.arkansasonline.com/news/2019/apr/21/coach-pay-vote-disappoints-van-horn-201/; Rogers, K. (2019, September 6). "Fight For Third Paid Assistant Receives New Life." D1Baseball. Available at https://d1baseball.com/news/fight-for-third-paid-assistant-receives-new-life/.

of "volunteers" also restricted which potential coaches could comfortably take the position.[76]  In response to these difficulties, head coaches saw the importance of offering another paid position; in some cases, they offered to pursue private fundraising or even pay out of their own salary.[77] ████████████████████████████

████ █ ████████[78] the rule being the only obstacle keeping them from doing so.  As support for the change continued, the NCAA Transformation Committee charged the NCAA Division I Legislative Committee Modernization of the Rules Subcommittee to review existing legislation and they identified the volunteer coach rule as an area where revision or removal could lead to a more sustainable framework.[79]  Notably, the Transformation Committee recognized that ending the rule, not maintaining it, was better for competitive equity.  That committee recommended eliminating the volunteer coach rule "in an effort to create fairer and more equitable Division I athletics competition."[80]

### 5.3    THE INDIRECT EFFECTS APPROACH FOR IDENTIFYING RELEVANT MARKETS AND DEMONSTRATING MARKET POWER TO SHOW ANTICOMPETITIVE EFFECTS ALSO RELIES ON ECONOMIC EVIDENCE COMMON TO ALL MEMBERS OF THE PROPOSED CLASS.

67.    The Direct Effects approach laid out above show the strong common evidence of anticompetitive effects and it is my understanding that in denying Defendant's motion to dismiss, the Court stated that in a quick-look analysis, "proof of market power is not required,"[81] and that the Court further explained that "the conduct itself is sufficient evidence of the requisite market power," so no "elaborate industry analysis, market

---

[76]    Holt, B. (2019, April 21). "Coach-pay vote disappoints Van Horn." The Arkansas Democrat-Gazette. Available at https://www.arkansasonline.com/news/2019/apr/21/coach-pay-vote-disappoints-van-horn-201/; Wilson, M. (2019, May 12). "Do colleges need a third paid baseball assistant? Here's what Tennessee volunteer coach Ross Kivett does." Knox News. Available at https://www.knoxnews.com/story/sports/college/university-of-tennessee/other-sports/2019/05/12/tennessee-vols-baseball-ross-kivett-ncaa-volunteer-assistant/3623664002/.

[77]    Rogers, K. (2020, September 1). "The D1 Mailbag: Answering Some of College Baseball's Burning Questions." D1Baseball. Available at https://d1baseball.com/stories/into-our-inbox-answering-some-of-college-baseballs-burning-questions/; Holt, B. (2019, April 21). "Coach-pay vote disappoints Van Horn." The Arkansas Democrat-Gazette. Available at https://www.arkansasonline.com/news/2019/apr/21/coach-pay-vote-disappoints-van-horn-201/.

[78]    SMART_COLON_THIRD PARTY_0000032893 at 2894.

[79]    NCAA_SMART-COLON_0229683 at 9702; NCAA_SMART-COLON_0233736 at 3741, 3748.

[80]    NCAA_SMART-COLON_0229683 at 9702.

[81]    Memorandum and Order Re: Defendant's Motion to Transfer and Motion to Dismiss, July 27, 2023 at p. 16.

definitions, or complicated testimony of high-priced expert economists will be required to establish what the defendants' conduct already clearly proves."[82]  Nevertheless, in case the Court finds it helpful, I explain below at merits I will be able to present, if needed, common economic evidence defining the relevant labor market and demonstrating monopsony power in that market for an Indirect Effects approach.

68.    My submissions of common economic evidence in prior antitrust cases against Defendant have previously described the relevant (labor) markets in which class members and Defendant participate with respect to athlete labor, one for each sport (and gender, where applicable), for each D1 sport (and for FBS football).  The markets that I have described in these cases over the last 15 years have been consistently adopted by federal courts in California.[83]

69.    In each of those cases, I showed that common evidence would be used to identify and analyze the market, and the courts agreed.  The same is true here.  By its very nature, the identification of the market and an analysis of that market is an inquiry that is done using common evidence for all class members, because markets, including labor markets, are defined through assessment of aggregate supply and demand, not based on individuals' idiosyncratic preferences.

70.    Consistent with the prior athlete cases that I have worked on, Plaintiffs here allege a relevant labor market, for a single sport (baseball), with the key difference being that the market is one for coaching services rather than athletic services.  Nevertheless, the analysis follows a similar path.  In assessing Plaintiffs' proposed relevant labor market, and then assessing the competitive effects of the challenged restraints in that market, I use the

---

[82]    Memorandum and Order Re: Defendant's Motion to Transfer and Motion to Dismiss, July 27, 2023 at p. 18 FN 7.

[83]    *See O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1056, 1070 (9th Cir. 2015) (discussing the market for Division I athletes, which did not include Division II or Division III or professional athletes, and saying that the NCAA did "not take issue with the way that the district court defined" the market); *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 81, 86 (2021) (stating that the district court had defined the market as "athletic services in men's and women's Division I basketball and FBS football," and finding that the "parties do not challenge the district court's definition of the relevant market" before affirming); *See also,* Order Granting Motion for Certification of Damages Classes (House), November 3, 2023 (finding that NCAA's arguments against a proposed market did not defeat class certification because it was a common issue).

common evidence of market-wide supply and demand to assess the labor market in which the challenged restraints are alleged to have caused anticompetitive harm.

71. One place to start for an understanding of the common economic framework that would be used by an economist at trial for defining the relevant labor markets in this case is the Merger Guidelines published jointly by the U.S. enforcement agencies for antitrust, namely the Department of Justice and the Federal Trade Commission.  The most recent version of these Guidelines was published in 2023 and can be found online at the Federal Trade Commission's website.[84]  In the case of an output market, the process starts from the perspective of customers of products sold by the firm (or firms) being studied (whether for a merger review or, as here, in a litigation context), and as the Guidelines state: "Market definition focuses solely on demand substitution factors, that is, on customers' ability and willingness to substitute away from one product or location to another in response to a price increase or other worsening of terms."[85]

72. In a case involving relevant input markets, such as the labor market at issue here, the process is essentially reversed, with the common economic question being what sellers (coaches) would do when faced with a decrease in the terms of remuneration offered by the buyers (schools) for their coaching services.  The relevant product is the labor of assistant coaches in baseball and the evidence for defining the relevant labor markets will be common to the class.  Demand factors in a labor market are not individualized by supplier, but reflect a common, market-wide pricing mechanism, namely that demand for coaching services is derived demand that flows from the downstream demand for quality team performance in college baseball.  Overall demand for quality team performance affects all D1 schools in common, which creates commonality across schools in the derived demand for coaching services.

73. As a first matter, any relevant labor market for assistant baseball coaches is distinct and non-substitutable for coaching services in other sports.  I.e., the athletic services of an assistant college baseball coach are not generally substitutable for the coaching services

---

[84]    See Merger Guidelines.  (December 18, 2023).  U.S.  Department of Justice and Federal Trade Commission. Available at https://www.ftc.gov/system/files/ftc_gov/pdf/2023_merger_guidelines_final_12.18.2023.pdf.

[85]    Merger Guidelines.  (December 18, 2023).  U.S.  Department of Justice and Federal Trade Commission, p.46.

provided in gymnastics or even softball.[86]  Baseball coaches, but also more generally coaches in each sport, provide their labor services in a distinct market formed around a distinct reference labor product.

74.  For similar reasons, the bulk of college baseball assistant coaches are not substitutes for college baseball head coaches.  While, of course, many college baseball head coaches were previously assistant coaches, the jump up to running a team involves a considerably different skillset, which is reflected in the notable difference in compensation.[87]

75.  To assess through common economic evidence whether the college baseball assistant coaching relevant labor market, as defined by Plaintiffs, is economically sound, the next step would be to identify the smallest set of employers[88] that compete for the proposed relevant labor market services under study and assess whether that is sufficient to constrain a reduction in the value of the package of compensation and benefits provided in exchange for such labor market services.  This is often done by means of what is known as a hypothetical monopolist (or monopsonist) "SSNIP" test.[89]  (The same process applies for

---

[86]    Deposition of Taylor Smart, September 24, 2024 at 212:1-15 (testifying that he never considered being a softball coach because it "requires a whole different set of skills" and that he did not "have any experience in that").

[87]    "Large differences in wages may be the result of a combination of factors, such as industry of employment, geographic location, and worker skill." (Torpey, E. (2015, May). "Same occupation, different pay: How wages vary." U.S. Bureau of Labor Statistics. Available at https://www.bls.gov/careeroutlook/2015/article/wage-differences.htm.)  In this case, there is no difference in the industry or geographic location of the head coaches and their assistants.  What the data produced by these schools show is that there were only 28 school-years when the head coach pay was less than the salary of the highest assistant coach.  This represents 28 out of 1,263 school-years or around 2% of all available data.  Similarly, there were 577 school-years when the head coach pay was more than twice as high as the highest assistant coach.  See in backup materials, "Text Cite - Head Coach to Assistant Coach Salary Ratio Summary.xlsx."

[88]    I use the term "employer" here in the economic (and plain language) sense of someone who uses someone else's labor, even though I understand that the restraint at issue in this case, which required all class members to work under the label of a "volunteer" may have resulted in them not being legal employees of the schools in question.

[89]    "SSNIP is a common methodology for defining a relevant antitrust market." *Optronic Tech., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 20 F.4th 466, 482 n.1 (9th Cir. 2021); *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015) ("A common method to determine the relevant geographic market … is to find whether a hypothetical monopolist could impose a 'small but significant nontransitory increase in price' ('SSNIP') in the proposed market.") (citing U.S. Department of Justice & FTC, Horizontal Merger Guidelines). *Trendsettah USA, Inc. v. Swisher Int'l, Inc.*, SACV14-01664, 2016 WL 6822191, at *6 n.3 (C.D. Cal. Jan. 21, 2016) ("The Ninth Circuit regularly uses SSNIP analysis to determine the relevant market in antitrust cases.").

using a SSNIP to assess a geographic market definition.[90])  In a labor market, a SSNIP would actually be a small but significant non-transitory decrease in compensation,[91] where that decrease is measured relative to the compensation that does or would exist absent the challenged restraints.  The test essentially asks if all of the purchasers of the labor services in the proposed market were controlled by a single firm, would that firm be able to impose a small but significant compensation decrease in a profitable fashion.[92]  A hypothetical firm that has or receives market power in a labor market because of challenged conduct in a previously competitive labor market should be able to decrease the compensation for purchasing labor profitably.  In contrast, if the hypothesized set of firms does not constitute a monopsony, but instead faces competition from purchasers of the labor services not included in the original hypothesized set of firms, then a compensation decrease would cause the laborers who provide such services to substitute by selling their labor services outside of the proposed market, thwarting a profitable attempt to decrease compensation.  When this happens, the labor market has been defined too narrowly.  The idea is that if a monopsonist can profitably lower compensation in a labor market by 5 percent (which is the common operationalization of a SSNIP in practice) below the competitive price by controlling the reference labor market product, then that labor market product is in its own market.  If the compensation reduction cannot be profitably imposed, then the process is repeated involving more employers until the relevant labor market is found.

---

[90]    *Netafim Irrigation, Inc.  v. Jain Irrigation, Inc.*, No. 1:21-cv-00540, 2022 WL 2791201, at *5 (E.D. Cal. July 15, 2022) (Ishii, J.) at *6 ("The geographic market inquiry used in the Ninth Circuit does not focus on whether *all* customers in the alleged area purchase solely from sellers within that area.  Rather, the inquiry is whether '*enough* consumers would respond to a SSNIP by purchasing the product from outside the proposed geographic market.'");  *In re Southeastern Milk Antitrust Litig.*, No. 2:08-ND-1000, 2010 WL 8228839, at *2 (E.D. Tenn. Dec. 8, 2010) ("[T]he SSNIP Test is just plain common sense: If a monopsonist buyer within the proposed geographic area artificially suppresses the price he pays for the sellers' product, will that action result in a substantial number of those sellers taking their products outside that proposed geographic area to sell them? If the answer is yes, it follows that the monopsonist buyer cannot *profitably* maintain his suppression of prices paid for the sellers' products.  In that event, the proposed geographic area must be enlarged and the SSNIP analysis repeated until it is determined that the buyer can profitably maintain his suppression of prices.").

[91]    In other cases, I have used the acronym SSNDC in the labor context, but for simplicity here I will stick with the more common SSNIP, but with the recognition that analysis is looking at a decrease in compensation rather than an increase in price.

[92]    See Merger Guidelines.  (December 18, 2023).  U.S. Department of Justice and Federal Trade Commission, Section 4.3.

76.    For assessing this relevant labor market, the "sufficient" level of compensation constraint can be defined by envisioning a hypothetical monopsonist (i.e., a single purchaser) who controls all purchases of D1 assistant coaches and asking whether that monopsonist could profitably decrease the labor market compensation for third assistant coaches below competitive levels, where "competitive levels" means the price that would occur absent the challenged restraints. Or instead, would those third assistant baseball coaches have access to other equivalent paying jobs (to the no-rule level of wage) outside of D1 in sufficient quantities to thwart the attempted wage decrease. In this labor market case, we can think of the competitive level as the wage/salary/benefits that would be paid to the third assistant coach on a D1 college baseball team without a prohibition on what can be paid.

77.    The real-world version of that hypothetical test was run for 31 years and the results were quite clear: coaches acquiesced to the suppressed level of pay ($0) but continued to perform the work for D1 schools rather than substituting away to other options. And then, when the collusion was terminated, many schools hired their existing "volunteer" coach (or an assistant coach from another D1 school), rather than hiring a coach from some team outside of D1. Both of these facts – the success of the collusion across D1 and the absence of hiring from outside of D1 once the collusion came to an end – provide strong evidence that the proposed relevant market (for the labor services of D1 assistant baseball coaches) is economically sound.

78.    On top of this evidence of the success of the restraint, there is also evidence of what happened when the restraint was lifted. If major or minor league baseball coaches were part of the relevant market, when the third assistant coach position moved from artificially capped at $0 to a market-determined rate, there should be a sizable number of coaches entering into D1 baseball coaching from the minors or the majors. In the data provided by schools through discovery, 117 schools began to pay their third assistant coach after enforcement of the volunteer coach rule stopped in July 2023. As shown in Exhibit 1 below, of those coaches, none came from major league baseball and only 5 (4% of the total) were from the minor leagues or baseball leagues outside the United States. Similarly, no D1 (or D2 or D3) head coaches took jobs as third assistant coaches, and only 2 head coaches from smaller college systems (one coached at a junior college and one at an NAIA school) took the position. Rather, the overwhelming majority of third assistant coaches

(91%) were hired from within the NCAA's ambit or from high schools, with the most common job being a D1 assistant coach, "volunteer" or paid (66%), or a Director of Baseball Operations (8%) prior to taking their current job and no other position garnering more than 3%. These data are consistent with the market definition alleged in this matter and inconsistent with the idea that non-NCAA coaching positions are viable substitutes for D1 coaching positions. Moreover, only 3% of the coaches came from D2 or D3, which is also inconsistent with those jobs being reasonable substitutes. The single most common previous job was working as the "volunteer" coach at the school they are now being paid by.[93]

Exhibit 1: Previous Job of Third Assistant Coaches Paid in 2023-24

| Employment Split | Count | Share | Cumulative Share |
|---|---|---|---|
| D1 Assistant | 77 | 66% | 66% |
| Baseball Director | 9 | 8% | 74% |
| D2/D3 Assistant | 4 | 3% | 77% |
| Graduate Assistant | 3 | 3% | 79% |
| High School Head Coach | 3 | 3% | 82% |
| Professional Player | 3 | 3% | 85% |
| Scout | 3 | 3% | 87% |
| Other | 3 | 3% | 90% |
| Student | 2 | 2% | 91% |
| **Subtotal** | **107** | **91%** | **91%** |
| Minor League/Overseas Assistant | 5 | 4% | 96% |
| Other College Assistant | 3 | 3% | 98% |
| Other College Head Coach | 2 | 2% | 100% |

Source:
See backup. Previous positions of coaches from bios available online.

79. The use of a SSNIP test is not only well accepted in cases like these but is common economic evidence which would apply to define the relevant labor markets for all of the

---

[93] I performed a similar analysis of where those coaches' previous jobs were, and it was broadly similar to the set of newly hired third assistant coaches, recognizing that these coaches were subject to the volunteer coach rule, which limited their compensation. None came from major league, minor league, or overseas baseball. Only 1 (2%) had been a head coach at a lower-level, and the rest were either assistant coaches in college, DOBOs, scouts, athletes, or new to baseball coaching entirely. Again, this is consistent with the pleaded market definition and inconsistent with a market definition that includes teams outside of the NCAA's members. See in backup materials, "Text Cite – Alternate Previous Employment.xlsx."

class members.  It is common to all class members because it does not rely on the specifics of any particular "volunteer" coach, nor does it give a different answer for different coaches.  Rather a SSNIP test looks at market-wide data and gives the same answer for all market participants.  Hence, this is the type of common economic evidence that I or any economist could use at a trial to define the relevant labor markets.  Moreover, because we have seen the actual monopsonist run an extreme version of the SSNIP test (where the old wage level was 100 percent lower than the new wage level, rather than 5 percent), the class-wide common evidence makes clear there are no reasonable substitute employers for the college baseball assistant coaches who previously were subject to the "volunteer" coach rule.

### 5.3.1   Market power and anticompetitive effects can also be demonstrated by common economic proof.

80.   As with market definition, the economic evidence needed to establish market power, and that the challenged conduct caused anticompetitive harm through the exercise of that power, will be presented through common economic proof rather than requiring individualized information for each class member.

81.   For example, market power will be indirectly shown, once the relevant labor market is defined, through common economic evidence of the fact that the NCAA and its Division I members command a dominant share in that relevant market.  Indeed, it will be shown that the NCAA and its members are effectively the only purchasers of the class members' services in the relevant labor market so that monopsony power can be easily found.

82.   It is more-or-less self-evident, but the market shares and market concentration in the market for D1 assistant baseball coaches, demonstrate that when conferences compete for coaches, no single conference has a particularly large share of the market (measured in salary) and that the market as a whole is relatively unconcentrated, both hallmarks of a relatively competitive marketplace.  But when all conferences agree on a common wage (such as was the case for third assistant coaches prior to July 1, 2023), then that collective set of D1 schools has 100% market share and the market is perfectly concentrated, as shown in Exhibit 2 below.  This is a sign that when all D1 schools act in concert via a collusive agreement, they have monopsony power in the relevant market.

Exhibit 2: HHI Analysis of Division I Baseball Conferences as Individual Firms vs. as a Single Entity

| Division I Baseball Conference | 2022-2023 Assistant Coach Salary | Market Share | HHI Portion |
|---|---|---|---|
| **Total** | | **100%** | **594.4** |
| **D1 Conferences Collectively** | | **100%** | **10,000.0** |

*Source:*
  *MFRS Data, 2022-23.*

### 5.3.2  Barriers to Entry will be established by means of common evidence.

83.  Defendant's monopsony power is protected by means of strong barriers to entry that prevent other purchasers from entering the relevant Division I labor market, further proving that such monopsony power can be exercised without being checked by substantial new entry.  By its very nature, evidence as to the existence of barriers to entry are inherently

class-wide; here the entry is not focused on coaches, but on employers. To form any new league, whether professional or collegiate, is a daunting task. To succeed, sports leagues need to attract fans, owners, and television networks. While the league can be comprised of owners from the start, often a chicken-and-egg situation develops where networks may want to see fan interest before partnering with a new league and fans may need television coverage to develop a deep rooting interest in the new league. While this is not an insurmountable barrier, and while the scarcity of television outlets has been much reduced since the earlier days of televised sports, a new league can still face difficult barriers to entry because of these network effects.

84. In the case of college sports, these barriers to entry are higher still because entry into a new college sports league requires fans, television networks, and team owners *who also control colleges*. Existing college sports teams have built-in alumni bases, but for a would-be new entrant, the process of starting a college and building a deep alumni network is itself a daunting, multi-year task, which limits the likely candidates for a new college sports league to schools that already exist.[94] In addition, during the period in which the volunteer coach rule was in place, the NCAA rules themselves enhanced this barrier by making it impossible for a school or set of schools to operate within Division I while choosing to create a baseball product using a more competitive compensation system outside of the NCAA's auspices.

85. The strength of this market barrier is best illustrated by the NCAA's so-called "moratorium" from 2007-2011 and the similar two-year moratorium in 2001-02 and 2002-03.[95] Concerned with the high rate of entry of schools into Division I as well as FBS, the

---

[94] In a book to which I contributed a chapter, I explained how rival leagues face other barriers to entry from fans' "switching costs": "The common experience that bonds fans of the same team may mean that, for another league to start up and be successful, it would have to compensate fans (presumably through higher enjoyment) for the 'cost' of learning the new teams and players and tossing out the history of the existing league. This branding factor makes the 'switching costs' for fans very high. A fan would have to learn all of the new teams, players, coaches, rules, and then not mind that there are no natural rivalries. Therefore, incumbent leagues have a natural advantage over potential entrants that grows each year." (Rascher, D. (2008). "Franchise Relocations, Expansions and Mergers in Professional Sports Leagues," in *The Business of Sports, Volume 2: Economic Perspectives on Sport*. Brad Humphreys and Dennis Howard (Eds.). Westport, CT: Praeger Publishers, p. 93.) For some college fans, these switching costs are particularly high, since typically most college graduates do not have multiple choices of alma mater from which to pick a favorite school of which they are alumni.

[95] Copeland, J. (2007, August 27). "Moratorium lets Division I pause to ponder growth." *NCAA*. Available at https://ncaanewsarchive.s3.amazonaws.com/2007/Division-I/moratorium-lets-division-i-pause-to-ponder-growth---08-27-07---ncaa-news.html.

NCAA and its members collectively imposed a ban on new entry for two years, and then did so again for another four years. That the NCAA was concerned, rather than delighted, with this entry into Division I tends to discredit the NCAA's claim that it restricts output in order to encourage this entry. Moreover, to the extent the NCAA argues that the number of schools in Division I or FBS is a measurement of output, this amounted to a collective restriction of output, which further serves as evidence of the NCAA's powerful barriers to competitive entry. In a market with low entry barriers, the refusal of the dominant firm to increase the number of outlets would generally be an opportunity for competitors to grow at the incumbent's expense. In the case of the NCAA moratorium though, schools patiently waited for the 4-year ban on entry to end, and then several new entrants joined Division I and FBS as soon as the collective restrictions on new entry were lifted.

86. Had there been no significant entry barrier, the NCAA's moratorium might have generated entry of a new league of schools to compete against the leagues that comprise the NCAA. Instead, it provided strong evidence of barriers to new entry and direct evidence of the NCAA's market power. The ability to exclude new entry is a textbook example of market power.[96]

### 5.3.3   Anticompetitive Effects will be demonstrated by means of common evidence.

87. Evidence of anticompetitive effects in the relevant markets will also be shown through common economic evidence. In essence, the common economic evidence described in Section 5.2 above on Direct Effects is the same type of common economic evidence of anticompetitive harm in the relevant markets that will apply on a class-wide basis. This common economic evidence will show that the relevant market has experienced anticompetitive effects which deprived all members of the class the economic opportunity to earn a competitive wage as a result of challenged conduct which applied to all class members and caused a severe suppression of economic welfare.

---

[96]   "…Anticompetitive power can be exercised by either of two methods: raising one's own prices or raising competitors' costs. These two methods of exercising market power correspond, respectively, to the 'power to control price' and 'power to exclude competitors' distinction expressed in the du Pont formulation." Krattenmaker, T, G., Lande, R. H., & Salop, S. C. (1987). "Monopoly Power and Market Power in Antitrust Law." *U.S. Department of Justice*. Available at https://www.justice.gov/atr/monopoly-power-and-market-power-antitrust-law#.

**6   ANY ASSERTED PROCOMPETITIVE JUSTIFICATIONS AND LESS RESTRICTIVE ALTERNATIVES WILL ALSO BE ASSESSED THROUGH ECONOMIC EVIDENCE COMMON TO ALL MEMBERS OF THE PROPOSED CLASS.**

88.   As an economist, I have no legal opinion on whether this case involves a *per se* violation of the antitrust laws, quick-look analysis, or full-blown Rule of Reason analysis.  As discussed above, my Direct Effects analysis is consistent with my understanding of the truncated review of anticompetitive effects that flows from a quick-look analysis that, as I understand it, the Court has said applies in this case.

89.   If Defendant has the opportunity to assert procompetitive justifications for the challenged conduct, an economic assessment of those claimed justifications will be made through economic evidence common to all members of the proposed class.  As examined in more detail below, the common evidence I anticipate using to rebut such procompetitive justifications will be in the form of deposition testimony from NCAA witnesses (such as Jenn Fraser and Lynda Tealer), deposition testimony from Matt Boyer of the SEC and other deponents, and documents that NCAA has produced about enacting the volunteer coach rule and the subsequent various efforts to repeal the volunteer coach rule, all of which apply class-wide and are not specific to individual class members.  This follows from the fact that any claimed justifications for the voluntary coach rule will be for that rule itself, and that rule has been applied in the same manner to all D1 assistant baseball coaches since its inception in 1992.

90.   It is my understanding that Defendant has raised three purported procompetitive justifications: preserving competition between members, increasing coaching resources available to college athletes, and expanding coaching opportunities for prospective coaches.[97]  Each of these will be assessed with common evidence.  First, in Section 6.1, I take up the latter two claims, namely that somehow the volunteer coach rule increases coaching resources available to college athletes and expands the number of coaching opportunities.  Then in Section 6.2, I address Defendant's claim that the volunteer coaching rule somehow improves competitive balance within D1 baseball.

---

[97]   NCAA's Response to Plaintiffs' First Set of Interrogatories, October 25, 2023, Response to Interrogatory No. 9, pp. 20-21.

**6.1    COMMON EVIDENCE SHOWS THAT THE VOLUNTEER COACH RULE WAS BORN FROM DEFENDANT'S CAMPAIGN TO ARTIFICIALLY SUPPRESS PERSONNEL COSTS IN THE 1990S, NOT TO EXPAND COACHING OPPORTUNITIES OR IMPROVE COACH-TO-STUDENT RATIOS.**

91.    In the current matter, as I understand it, the NCAA has asserted that the "volunteer" coach rule was implemented as part of a series of changes over 1991-1992.  Specifically, in response to an interrogatory (another form of common evidence), the NCAA responded:



[98]

92.    This is an incomplete and misleading reading of the historical record.  To understand fully what occurred, one must look back at the series of new rules that had been recommended by the "Special Committee on Cost Reduction" established in 1989 that led to the bylaw changes enacted in the 1991-1992 period.[99]  This involved a variety of efforts at collective "cost containment" with the explicit goal of limiting competition for athletes and coaches in order to reduce costs.

93.    The focus, as explained by committee member Donna Lopiano (then Director of Women's Athletics at the University of Texas), was entirely on cutting costs and then making additional adjustments as needed.  These typically involved finding ways to reduce other forms of competition (such as recruiting) to allow a smaller coaching staff to avoid being

---

[98]    NCAA's Response to Plaintiffs' First Set of Interrogatories, October 25, 2023, Response to Interrogatory No. 10, pp. 21-22.

[99]    NCAA_SMART-COLON_0142290 is the agenda from the May 30-June 1, 1989, meeting of this special committee, at which the "committee charge" was to be finalized.  According to The NCAA News (the "Official Publication of the National Collegiate Athletic Association"), ████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████ NCAA_SMART-COLON_0142707 at 2710.

overworked.  Lopiano explained this in a 1990 memo to the NCAA executive director Dick
Schulz:



94.    In other words, competition in the labor markets had increased costs for this input, and the

firms (member schools) expressed a desire to artificially decrease these costs.  No mention

is made of a focus on enhancing consumer demand, nor of enhancing athletic instruction for

athletes or improving competition between member schools on the field of play.  The

Committee summarized that its primary goal was cost-cutting (in the case of coaches this

consisted of a collective agreement to pay fewer coaches).  While it did point to four other

benefits of these cuts in a 1990 Memorandum, these ancillary benefits are not focused on

enhancing aggregate welfare, but instead are focused on de-emphasizing sports and

reducing competition.[101]

95.    In 1991, the NCAA began to implement this plan: cost-cutting that resulted in fewer

coaches providing coaching services.  These cuts faced objections which were overcome, in

part, by arguing that fine-tuning of the restrictions could occur the following year.  It was

then, in 1992, once it was clear the cuts were too severe (having reduced the input of these

useful services), that one coaching position was added back, but with the salary fixed at

zero – the "volunteer" coach position – to ensure the cost of the additional coach (in

---

[100]    NCAA_SMART-COLON_0142567 at 2569.

[101]

(NCAA_SMART-COLON_0141887 at 1889).

baseball, four baseball coaches instead of three) remained at the same level as the more draconian cuts. In essence, the conspirators agreed to allow themselves to receive the benefit of the additional coach (so they could have access to more labor) while fixing the additional cost at zero to maintain the cost-cutting achieved in 1991.

96. This two-stage process is well documented in the annual minutes of the NCAA from this period. In ████████████████████████████████████[102] This proposal imposed a general reduction in the number of coaches in all sports other than football, including dropping baseball down to three paid full-time coaches. One of the three baseball coaches had to work in the role of the so-called "restricted-earnings coach" (which as I understand it, was later found to be an illegal restraint of trade in *Law v. NCAA*). Nowhere in the minutes is there any discussion of demand or quality enhancement or efforts to make more robust the labor market for college coaches. Rather, ████████████████████████ ████████████████████[103]

97. There were several objections, including a concern from the Student-Athlete Advisory Committee (SAAC)[104] that the cuts would lower the quality of baseball instruction. Recognizing that the rules changes cut coaches (sometimes more than one per school), then restored one unpaid position, the supposed justification to increase coaching resources for athletes makes no sense. Moreover, in the world since July 1, 2023, the same number of assistant coaches (three) has been permitted. It is just that the repeal now allows the third assistant coach to be compensated.[105]

---

[102]  NCAA_SMART-COLON_0142989 at 3109.

[103]  John W. Kaiser of St. John's University (New York) stated, ████████████████████████
        NCAA_SMART-COLON_0142989 at 3106.

[104]  Barbara Winsett (Student-Athlete Advisory Committee) is quoted in the minutes as having said:



        ████ (NCAA_SMART-COLON_0142989 at 3109).

[105]  Deposition of Jennifer Fraser, October 2, 2024 at 203:6-15, 216:1-3; Deposition of Lynda Tealer, October 10,
        2024 at 114:21-115:13; NCAA_SMART-COLON_0000001 at 0068–0069 (2020-21 Division I Manual Bylaws
        11.7.6 and 11.7.6.2.3); NCAA_SMART-COLON_0001396 at 1438 (2023-24 Division I Manual Bylaw 11.7.5).

98. Historically, the evidence at the time showed the impact was to reduce, not increase, the quantity of coaches. One objector to this proposal explained:



99. Cedric Dempsey, who at the time was the athletic director at the University of Arizona, but later went on to run the NCAA itself, explained how the process of cost-cutting had harmed baseball in particular:



Dempsey then went on to explain that even if one additional coach were allowed, "University of Arizona would still have a reduction of one full-time and three restricted-earnings coaches."[108]

100. Alan A. Cummings of Stanford University explained that not only would the cuts reduce the quantity of coaches employed, but also would reduce athletic participation:



---

[106] Ronald J. Maestri (University of New Orleans). NCAA_SMART-COLON_0142989 at 3106.

[107] NCAA_SMART-COLON_0142989 at 3106.

[108] NCAA_SMART-COLON_0142989 at 3106.

[109] NCAA_SMART-COLON_0142989 at 3107.

101. Nevertheless, efforts to amend the proposal to allow more coaches in baseball were unsuccessful.[110]  The agreement to artificially cut costs for the coaching input won the day. Once it became clear that the proposal to limit baseball to three coaches was going to pass without amendment, the objectors focused on ensuring that the "fine-tuning" of the rules in the following year (1992) focused on adding back a coach for baseball, this time via the "volunteer" coach since it would ensure that personnel costs remained artificially low.  For example, Glenn S. Patton of the University of Iowa is quoted in the minutes as having said:



[111]

102. In 1992, this fine-tuning occurred.  The NCAA's Executive Director at the time, Richard Schultz, explained that the cuts led to some dissatisfaction, because the goal was to achieve collective cost reductions rather than improving the product:



[112]

103. The fine-tuning proposal was called "Proposal No. 60."  Craig Thompson (commissioner of the Sun Belt Conference), explained that:

---

[110]  "Proposal No. 36-1 … was defeated by Division I, 66-251, three abstentions, roll-call vote" and "Proposal No. 36-2 … was defeated by Division I, 90-233, three abstentions, roll-call vote."  NCAA_SMART-COLON_0142989 at 3106-3107, 3199.

[111]  NCAA_SMART-COLON_0142989 at 3109.

[112]  NCAA_SMART-COLON_0143283 at 3318.



[13]

104. Others who supported the change explained that the prior year's cuts had harmed opportunities for women's coaches[114] and had simply led to too few coaches, with one objector explaining, ███████████████[115]

105. Thus, rather than expanding coaching output, the rule change should be seen in context as having both reduced overall baseball coaching output (down to four total coaches, with a one-year period where it was limited to three) and fixed the price of the fourth coach (i.e., the third assistant coach) at zero. As can be seen from this history, the goal was not to improve competitive balance (a pro-competitive justification that the NCAA also asserts in its response to a different interrogatory[116]); the discovery record from the time establishes

---

[113]  NCAA_SMART-COLON_0143283 at 3420.

[114]  This argument was advanced by Marcia L. Saneholtz (Washington State University), who at the time was president-elect of the National Association of Collegiate Women Athletic Administrators. Ms. Saneholtz also explained that sports with large numbers of participants had suffered from the loss of coaching. NCAA_SMART-COLON_0143283 at 3420.

[115]  Comments from Carl F. Ullrich (Patriot League), NCAA_SMART-COLON_0143283 at 3420.

[116]  NCAA's Response to Plaintiffs' First Set of Interrogatories, October 25, 2023, Response to Interrogatory No. 9, pp. 20-21. ("Without limits on the number of paid coaches that each Division I member institution could hire, member institutions with significant resources could hire many more coaches than institutions with more limited resources, depriving less-resourced institutions of the opportunity to provide their student-athletes with coaches who could make the program competitive and giving highly-resourced institutions an unfair competitive advantage.")

that the actual charge that led to the changes was rather to reduce costs while *limiting any change to competitive balance*.[117]

106. Many in the baseball industry frequently spoke out against the bylaw on this basis when calling for its repeal.  A position with a fixed salary of zero is directly aimed at harming those who take the position by artificially suppressing their salaries.  Some were forced to take second jobs in order to earn money.[118]  And a world without the rule still provides the same number of coaching opportunities – it's just now that the lowest-paid position at each school can actually be paid instead of being fixed at zero.

107. Moreover, had the goal been to improve competitive balance, that effort would have been futile, as the sports economics literature (which I present below) has demonstrated that cost containment is ineffective at improving competitive balance in sports.[119]

**6.2    OTHER ASSERTED PROCOMPETITIVE JUSTIFICATIONS, SUCH AS THE DESIRE TO CREATE ENTRY-LEVEL POSITIONS OR TO PRESERVE COMPETITIVE BALANCE, WILL BE ASSESSED WITH COMMON EVIDENCE.**

108. I understand that in *Law v. NCAA*, the NCAA asserted a variety of alleged procompetitive justifications, including the claim that restricting the earnings of certain assistant coaches was beneficial for competitive balance.  But, as I understand it, these procompetitive justifications were ultimately rejected by the court for all class members:

> "Having concluded that the Rule had a substantially adverse effect upon competition, the Tenth Circuit inquired whether the pro-competitive benefits of the restriction retaining entry level jobs, reducing costs, and maintaining competitive equity justified the anticompetitive effects.  134 F.3d at 1021-24.  The Court of Appeals resolved this question in the negative, noting that ***the NCAA had failed to present evidence that the Rule would be effective over time in creating entry-level positions, reducing deficits, enhancing competition, leveling an uneven playing***

---

[117]  "The Special Committee on Cast Reduction was established by resolution of the l989 NCAA Convention, with the specific charge of recommending means by which to reduce costs in intercollegiate athletics, without denying students access to higher education or significantly altering the competitive balance among NCAA member institutions."  NCAA_SMART-COLON_0142707 at 2710.

[118]  Deposition of Michael Hacker, October 8, 2024 at 85:23-86:2 ("It was a second job that I had to work the baseball camps."); Deposition of Taylor Smart, September 24, 2024 at 151:6-13 (discussing his "second job" of working camps).

[119]  See Section 6.2, immediately below.

*field, or reducing coaching inequities. Id.* It also noted that cost-cutting by itself is not a valid pro-competitive justification."[120]

109. The lack of evidence presented by the NCAA in *Law* that creating a pay-capped coaching position would improve competitive balance is consistent with the sports economic literature's conclusion that such rules do not contribute to improved balance. Those same economic facts also prevented the volunteer coach rule from improving balance in this case, as can be seen by the fact that, once the rule was dropped, no noticeable decrease in competitive balance has been observed.[121]

110. However, this speaks to the merits question, which I understand is premature at the class certification stage of case. Here, rather, the question is whether the evidence that would be used to prove/disprove the supposed procompetitive justifications is common to the class as a whole, or instead requires individualized inquiry into subjective evidence specific to each coach.

111. Because asserted procompetitive justifications must provide market-wide procompetitive benefits, it will necessarily be a common issue, assessed through common economic proof, as to whether any procompetitive benefits actually exist that justify the restraints. Thus, to the extent the NCAA finds evidence that the rule changes in 1991-1992 somehow improved competitive balance (or even were aimed at that goal),[122] this evidence would be the same for all class members. Similarly, should the NCAA seek to assess changes to competitive balance since the rule was abandoned in 2023, that evidence would also be common to all class members.

112. Moreover, common evidence can be used to show that this asserted procompetitive justification is not a *legitimate* justification. The common evidence of the cost-cutting campaign described earlier is part of that evidence. Further common evidence comes in the form of official comments made when the bylaw was repealed: the Transformation

---

[120] *Law v. National Collegiate Athletic Ass'n*, 5 F. Supp. 2d 921 (D. Kan. 1998). Emphasis added.

[121] Deposition of Jennifer Fraser, October 2, 2024 at 220:2-19; Deposition of Lynda Tealer, October 10, 2024 at 136:4-16.

[122] NCAA witnesses have so far been unable to identify any such objective information, data, research, or studies. *See* Deposition of Jennifer Fraser, October 2, 2024 at 144:2-145:8; Deposition of Lynda Tealer, October 10, 2024 at 78:24-79:3, 122:11-14. Neither have witnesses from the member conferences. *See* Deposition of Matt Boyer, August 27, 2024 at 114:17-25, 129:16-130:3.

Committee said that the repeal would "create fairer and more equitable Division I athletics competition."[123] That undercuts any argument that the bylaw was needed to preserve competition.

113. The same holds true regarding a Pac-12 email from January 2023 – the same month the volunteer coach rule was repealed – which said that one reason why the volunteer coach rule was repealed via Proposal No. 2022-28 was because of potential antitrust exposure.[124] Those who unsuccessfully opposed the proposal that ultimately ended the volunteer coach rule (Proposal No. 2022-28) did not do so on grounds that it was going to hurt competition on the field.[125]  Instead, they continued to cite cost concerns.[126]

114. Among other common evidence on which I plan to rely at the merits stage of this case is the vast sports economics literature on the subject of competitive balance, which concludes that eliminating pay caps does not alter the overall distribution of talent within a sport.[127]

---

[123]  NCAA_SMART-COLON_0125859 & NCAA_SMART-COLON_0125860 at 5879; See Also, NCAA_SMART-COLON_0081395 at 1464 (Q&A package sent to the D-1 Council recommending passage of Proposal No. 2022-28 stating that "the subcommittee determined that national regulation designating individuals as volunteer coaches … in championship subdivision football, swimming and diving, and women's rowing is not necessary.").

[124]  SMART_COLON_THIRD_PARTY_0000134854 at 4855 (01/09/23 email between Chris Merino and Erik Price of Pac-12 stating, ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████

[125]  Deposition of Lynda Tealer, October 10, 2024 at 122:7-10.

[126]  Deposition of Matt Boyer, August 27, 2024 at 184:24-186:22; Deposition of Jennifer Fraser, October 2, 2024 at 209:10-212:5; Deposition of Lynda Tealer, October 10, 2024 at 121:12-122:6; SMART_COLON_THIRD_PARTY_0000023103 ████████████████████████████████████████████████████████████████ NCAA_SMART-COLON_0232335 at 2336.

It is worth noting that the final vote on Proposal No. 2022-28 is inconsistent with the argument that the rule was necessary to protect smaller programs from overly vigorous competition from larger programs.  For example, while the ACC (a power conference) voted against Proposal No. 2022-28, ████████████████████████████ ███████████████████████████████████████████████████  See NCAA_SMART-COLON_0252244 at 2261; Deposition of Jennifer Fraser, October 2, 2024 at 213:2-217:25, 218:16-19.

[127]  There is a separate economic question, namely whether a search for competitive balance is even a valid procompetitive justification, since there is no academic consensus among economists that more competitive balance is demand-increasing in any given sport, and some published evidence against that conclusion.  See, for example, Fort, R. (2017). "College Sports Competitive Balance 'Beliefs' and the Rule of Reason: Applied Theory and a Literature Review." *The Antitrust Bulletin*, 62(1), pp. 15-30 at 16. However, given the absence of evidence that the restraint in question improves balance to begin with, the second question is moot.

Defendant's claims in this respect contradict the well-established economic concept known as the Invariance Principle. Simon Rottenberg's Invariance Principle of 1956 stands along with Walter Neale's 1964 Uncertainty of Outcome Hypothesis[128] as key pillars of the competitive balance debate. Dating back to the first sports economics article, in 1956, Simon Rottenberg explained that:

> "…free markets would give as good aggregate results as any other kind of market for industries, like the baseball industry, in which all firms must be nearly equal if each is to prosper. On welfare criteria, of course, the free market is superior to the others, for in such a market each worker receives the full value of his services, and exploitation does not occur."[129]

115. What Rottenberg showed (and which has been corroborated by 60 years of empirical evidence) was that restraints on individual athlete compensation do not change what the industry looks like in terms of competitive balance. Teams end up with essentially the same distributions of talent with or without compensation caps. Thus, the only impact of the restraint is to extract wealth from athletes and give it to teams.

116. Based on the Invariance Principle, well-established economic theory suggests that the elimination of the volunteer coach rules relates to no expected change in competitive balance. Though Rottenberg was working within the context of Major League Baseball, more recent scholarship makes clear that there is also a "college version of the invariance principle …: The distribution of talent in a college sport is invariant to who gets the revenues generated by players; talent moves to its revenue-maximizing use in the sport whether players or athletic departments receive players' MRPs."[130] Other analysis confirms this conclusion, such as work by Professor David Berri which found that even though all of the pre-conditions of the original Invariance Principle did not apply to college sports nevertheless the results still held,[131] extending the reach of Rottenberg's analysis.

---

[128] Neale, W.C. (1964). "The Peculiar Economics of Professional Sports: A Contribution to the Theory of the Firm in Sporting Competition and in Market Competition." *The Quarterly Journal of Economics*, 78(1), pp. 1-14.

[129] Rottenberg, S. (1956). "The Baseball Players' Labor Market." *Journal of Political Economy*, 64(3), pp. 242–258 at 258.

[130] Fort, R. (2011). *Sports Economics*. Third Edition. Pearson, p. 478.

[131] "Competitive Balance… is not primarily controlled by the institutions and policies adopted by the league." Berri, D.J. (2004). Is There a Short Supply of Tall People in the College Game? In J. Fizel & R. Fort (Eds.), *Economics of College Sports*, pp. 211-223. Westport, CT: Praeger Publishers at p. 221.

117. Professor Katie Baird studied the question of whether the NCAA's limits on compensation to athletes had any positive benefit to competitive balance. She found:

> This suggests preliminary support for Rottenberg's invariance principle: where talent goes (and thus competitive balance) is invariant with the degree of restrictions over player pay. No statistically significant change in competitive balance has occurred in college football since greater restrictions over paying athletes have been introduced. ... In short, little evidence supports the claim that NCAA regulations help level the playing field; at best they appear to have had a very limited effect, and, at worst, they have served to strengthen the position of the dominant teams.[132]

118. Professor Jim Peach summarizes the economic literature succinctly:

> Third, there is little evidence that the NCAA rules and regulations have promoted competitive balance in college athletics and no *a priori* reason to think that eliminating the rules would change the competitive balance situation.[133]

119. Specifically, in *O'Bannon*, I concluded that the sports economics literature has found the Invariance Principle applies to college sports as much as in major league sports,[134,135] and that:

---

[132] Baird, K. (2004). "Dominance in College Football and the Role of Scholarship Restrictions." *Journal of Sport Management,* 18(3), pp. 217-235 at 222, 226. Many other studies, primarily focused on athlete compensation in college football, have reached the same conclusion. See Fort, R. (2006). *Sports Economics*. Second Edition. Pearson, pp. 492, 495, 500; Fort, R. (2017). "College Sports Competitive Balance 'Beliefs' and the Rule of Reason: Applied Theory and a Literature Review." *The Antitrust Bulletin*, 62(1), pp. 15-30 at 25, 27; Salaga, S., & Fort, R. (2017). "Structural Change in Competitive Balance in Big-Time College Football." *Review of Industrial Organization*, 50(1), 27–41 at 39; Mills, B. & Winfree, J. (2018). "Athlete Pay and Competitive Balance in College Athletics." *Review of Industrial Organization*, 52, pp. 211-229 at 211.

[133] Peach, J. (2007). "College athletics, universities, and the NCAA." *The Social Science Journal*, 44(1), pp. 11-22 at 21, emphasis added.

[134] Fort, R. (2011). Sports Economics. Third Edition, Pearson, pp. 477-483. Specifically, Fort states "the invariance principle suggests that competitive balance is invariant as to who gets to keep the MRP of players. Under the amateur requirement, the players simply earn less but go to the same athletic department they would otherwise choose." (p. 478).

[135] At trial in *O'Bannon*, the NCAA put forward testimony arguing that work by Professor David Berri (Berri, D.J. (2004). Is There a Short Supply of Tall People in the College Game? In J. Fizel & R. Fort (Eds.), *Economics of College Sports* (pp. 211-223). Westport, CT: Praeger Publishers) somehow disproved that the invariance principle applied to college sports. This is the exact opposite of what Dr. Berri found; instead he found that even though all of the pre-conditions of the original Invariance Principle did not apply to college sports ("…institutions such as free agency or players sales to not exist. Hence one does not expect the Rottenberg Invariance principle to apply" p. 216), nevertheless the underlined results still held ("Competitive Balance… is not primarily controlled by the institutions and policies adopted by the league." p. 221), extending the reach of Rottenberg's theory.

"The facts of college sports are also wholly consistent with the findings in the literature.  In the system that has developed over the many years of the restraint, schools and conferences have found many other ways to compete for players.  Those mechanisms (e.g., skilled head and recruiting coaches, fancy physical facilities) have been quite effective in creating a market structure wherein talent and revenue have already sorted themselves out; a system that allowed schools with more revenue to offer players a higher royalty for their NIL rights would not likely generate any significant change in that relationship."[136]

120. Beyond the economics literature, the NCAA has long known that any rules it adopts have failed to substantially alter the overall distribution of talent in college sports because no matter what is restricted, less efficient means of competition still reach the same general outcome.  Dr. Mark Emmert (former President of the NCAA) concluded that competitive balance is poor in Division I and that the NCAA's rules are not able to create any semblance of competitive balance. [137]

121. Similarly, Bob Bowlsby (former commissioner of the Big 12 conference) explained that "The concept of competitive equity through rules management is largely a mirage.  It hasn't worked at any level."[138]  This awareness was further explained by David Blackburn (former athletic director at UT-Chattanooga):

"'Let's be honest,' Blackburn said. 'Part of the reason for the SEC's success is the money. It allows you to have unbelievable facilities. It allows pay for unbelievable coaches and pay to quickly get rid of the bad ones. And it allows you to recruit the best athletes from all over the

---

[136]  Declaration of Daniel A. Rascher in Support of Motion by Antitrust Plaintiffs for Class Certification (*O'Bannon*), April 24, 2013, pp. 46-47, referencing Berri, D. (2012, March 15). "Would Paying College Players Really Destroy Competitive Balance?" *Freakonomics*. Available at https://freakonomics.com/2012/03/would-paying-college-players-really-destroy-competitive-balance/. ("Teams like Kentucky, North Carolina, Michigan State, and Syracuse – the number one seeds this year  –  would still be great.  Teams with less money would probably not be as great.  And the NCAA – even with paid players – would probably look about the same.").

[137]  Emmert testified in deposition in *Alston*: "… you're very unlikely to ever have a circumstance where a long-term historical commitment to football, for example, is ever going to be exactly the same. So Alabama Birmingham is a Division IA FBS football team, but the school didn't exist 50 years ago. Alabama's been playing football for a hundred years. It's hard to imagine that you can structure any rules that would make it equally probable that Alabama Birmingham's going to be as competitive on a regular basis as Alabama. Should they be able to step on a field and compete against each other on occasion? Yes. And they do."  Deposition of Mark Emmert (*Alston*), October 22, 2014, 116:24-117:13.

[138]  Expert Report of Daniel A. Rascher on Damages Class Certification (*Alston*), February 16, 2016, Appendix C, ¶61 citing Eichelberger, C. (2013, August 30). "College Football Powers Seek Leeway to Flex Muscle through Rules." *Bloomberg*. Available at https://www.bloomberg.com/news/articles/2013-08-30/college-football-powers-seek-leeway-to-flex-muscle-through-rules.

country. When you can fly private jets wherever you want to recruit, it will create some separation.'"[139]

122. Larry Scott (former CEO of the Pac-12 conference) reached a similar conclusion:

> "'I don't think there is an even playing field,' Scott said. 'There's not an even playing field in TV exposure. There's not an even playing field in coaches and coaches salaries. There's not an even playing field in stadiums.'"[140]

123. Indeed, the compensation paid to other coaches and the amount spent on facilities undercuts the claim that preventing schools from providing an existing coach with an average salary of around $50,000 salary will somehow produce procompetitive results.

124. As the NCAA itself has conceded (and multiple witnesses from both the NCAA and SEC have confirmed by deposition), D1 schools for decades have spent whatever they wanted on head coaches, and two assistant coaches in baseball, strength coaches, trainers, training facilities, and stadiums.[141] Consistent with economic theory, one NCAA witness testified that this could, in turn, help attract top baseball athletes to the bigger schools.[142] This is all common evidence that the procompetitive justification related to competitive balance is unsupported by the economic evidence, as restricting the salary of the third assistant coach at zero was unlikely to have any material positive effect on competition given that expenditures in these other areas went unrestricted.

**6.3    EVIDENCE RELATED TO LESS RESTRICTIVE ALTERNATIVES IS ALSO COMMON TO THE CLASS.**

125. Further, if it becomes necessary to consider whether there are substantially less restrictive alternatives for achieving any procompetitive justification that is proven by Defendant, this issue too will be determined through common economic evidence. However, in this case,

---

[139]  Wiedmer, M. (2015, June 14). "Wiedmer: SEC's riches tough to beat." *Times Free Press*. Available at https://www.timesfreepress.com/news/2015/jun/14/wiedmer-secs-riches-tough-beat/.

[140]  Henderson, J. (2011, June 14). "Commissioner Larry Scott wants Pac-12 athletes to get more of the conference pie," *The Denver Post*. Available at https://www.denverpost.com/2011/06/14/commissioner-larry-scott-wants-pac-12-athletes-to-get-more-of-the-conference-pie/.

[141]  NCAA's Answer to Plaintiffs' Class Action Complaint, August 31, 2023 at ¶ 63; Deposition of Matt Boyer, August 27, 2024 at 59:1-11, 100:18-25, 149:19-25; Deposition of Jennifer Fraser, October 2, 2024 at 138:20-140:20; Deposition of Lynda Tealer, October 10, 2024 at 77:9-78:12.

[142]  Deposition of Jennifer Fraser, October 2, 2024 at 140:21-141:9.

there is strong empirical evidence that the less restrictive alternative (always available throughout the period of enforcement) was simply to abandon the cap on the third assistant baseball coach's pay (while keeping the cap on the number of coaches in place), which is what the NCAA did as of July 1, 2023.  This less-restrictive alternative not only exists, but has been put into place, and no harm has befallen college baseball or the labor market in which college baseball coaches are hired.  Jenn Fraser, Managing Director of D1 for the NCAA, testified that the repeal of the bylaw was beneficial because the overall limit on coaches remained the same.[143]  There has been no change in the overall number of coaches permitted per school – meaning that any concerns over "stockpiling" of coaches is unwarranted.  The sole difference is that the third assistant coach's pay is no longer subject to a price fix, and thus they can now be paid, just like the other two assistant coaches have been paid for decades.

126. Moreover, since the volunteer coach rule was repealed, NCAA witnesses testified that no member school, conference, or baseball coach that has argued that revoking that rule has actually damaged competition in baseball or the on-the-field product in baseball[144] nor has school argued that the rule should be reinstated.[145]  Matt Boyer from the SEC similarly testified that repealing the rule would not result in any "significant competitive impact."[146]

127. The evidence from the natural experiment that began in July 2023 – showing an absence of impact on competitive balance – is common to all class members.

## 7    ALL MEMBERS OF THE PROPOSED CLASS SUFFERED INJURIES CAUSED BY DEFENDANT'S CHALLENGED CONDUCT.

128. Price fixing – or wage fixing as alleged here – harms the entire marketplace, not just those who pay higher prices or receive lower compensation, because it removes competition from the market.  The blanket prohibition on compensation to the third assistant baseball coach

---

[143]  Deposition of Jennifer Fraser, October 2, 2024 at 201:2-202:2, 202:14-203:15; Deposition of Lynda Tealer, October 10, 2024 at 118:16-21.

[144]  Deposition of Jennifer Fraser, October 2, 2024 at 220:2-19; Deposition of Lynda Tealer, October 10, 2024 at 136:4-11.

[145]  Deposition of Jennifer Fraser, October 2, 2024 at 220:10-12; Deposition of Lynda Tealer, October 10, 2024 at 136:13-16.

[146]  Deposition of Matt Boyer, August 27, 2024 at 198:10-199:8.

injured every member of the proposed class by denying each of them the ability to bargain for competitive remuneration from Defendant's member schools (which collectively comprise a monopsony), and thereby to enjoy the market-rate of compensation for the labor each actually performed.  As alleged (and acknowledged by Defendant) before the repeal of the rule, no class member could negotiate for competitively determined compensation, nor even bargain for basic employment benefits or other forms of remuneration.

129. From an economic standpoint, a restraint such as this changed the market parameters leading to the observed salary structure, which led to a change in the rate of compensation generally, thus impacting every participant in the market – even for assistant coaches outside of the class.  Thus, the blanket rule harmed all market participants (including all class members), as well as those who may not have even entered the market (because they could not afford to "volunteer") by curtailing competition for labor from third assistant coaches.  But-for the restraints, class members and non-class members alike would have been able to compete for wages and benefits in a market in which their would-be employers competed on price.

130. This was a market-wide restraint that had a direct impact across all schools on the purchasing of baseball coaching labor.  The "volunteer" coach rule led to class members performing coaching services at a price (zero) that was collusively and artificially suppressed.  The historical discussion above shows that, before the cost-cutting measures put in place in 1991 and 1992, some D1 baseball programs had additional paid coaching positions that were eliminated by the new cost-cutting rules.  This is an indication of demand for services at the time of the initial harm, and the same evidence exists from the period immediately after the termination of the volunteer coach rule.  Only between 1992 and 2023 do we see no paid third assistant coaches – because of the anticompetitive conduct of Defendant and its member schools.

131. Given that D1 baseball revenues/attendance have increased dramatically since the early 1990s,[147] one would expect demand for the third assistant coaching position to have grown as well.  Indeed, many Division I baseball programs have increased their expenditures

---

[147]  NCAA's Answer to Plaintiffs' Class Action Complaint, August 31, 2023 at ¶26 (acknowledging that attendance at college baseball games has grown in the past ten years).

significantly since the cost-cutting measures were put in place. But instead of spending some of that money on third assistant baseball coaches, they spent it all elsewhere. Salaries for the head coaches and the two paid assistant coaches increased significantly.

132. Non-coaching personnel such as "Directors of Operations" or "Analysts" or "Coordinators" have been hired.[148] Facilities have been built, expanded, and renovated. But none of those increased expenditures went to the third assistant coach, because the NCAA bylaw prevented it.

133. Since the repeal of the volunteer coach rule, many D1 schools have begun to pay a salary to a third assistant baseball coach, showing the previous restraint was effective at binding schools below their unilateral choice of wage. But for the alleged misconduct, it is my opinion that most D1 schools would have been paying their third assistant coaches in prior years. As discussed below, because the rule has only recently been lifted, the current percentage of schools paying this coach understates the steady-state or equilibrium level that would have prevailed in the but-for world. But even this very preliminary peek at the post-collusive environment suffices to establish that the restraint distorted the market and thereby injured those selling their services in the market.

134. The simple act of being subject to a binding, collusive agreement to pay capped at zero constitutes injury, even without estimating the precise wage rate or establishing which positions would have been paid. Simply from class members having lost the ability to negotiate their wages or benefits because of collusion, they lost economic opportunity, which is itself an injury. On top of the injury caused by the elimination of price competition in the marketplace vis-à-vis third assistant baseball coaches, class members also suffered direct economic injuries in the form of the dollar damages that flow from their having performed work without compensation, work that schools would have paid for absent the collusive agreement not to pay these coaches prior to 2023-24.

135. This applies even for those "volunteer" coaches who performed these jobs in the actual world for a school that has not yet hired a third assistant coach, to the extent the evidence indicates that once the lingering effects of the alleged conspiracy wind down, that school

---

[148]  By rule, these positions cannot perform any coaching duties. As discussed above in Section 5.3, the data produced in this case confirm that the "DOBO" position (Director of Baseball Operations) is a common pre-entry-level position that leads into coaching.

will pay for those labor services going forward.  The specific injury from the collusive restraint relates to being prohibited from being able to negotiate monetary compensation in exchange for performing services – the dollar damages some coaches incurred capture the lost value from some, but not all, of that injury.  Because the services were performed, the injury is incurred in the actual world – being denied, via the application of monopsony power, access to a competitive market through which they could negotiate a fair rate of compensation across potential employers for those services.[149]  Their employers cannot refund the effort and service provided; the appropriate measure of that harm is what a school (or an appropriate peer school) would have paid for the services actually provided (absent collusion), and does not hinge on the question of whether a specific class member would have gotten a specific job in the world without collusion to zero out pay.  Rather the harm is measured as an appropriate estimate of the value of the services actually provided, in a world without collusion to zero out pay.

136. As will be seen from my discussion of the damages methodology, I have built an econometric model that uses class-wide common data to identify schools that would have paid their third assistant coach during the damages period, but for the alleged misconduct.  This model also serves as a means of identifying, using class-wide, common data, the set of schools at which the more general injury – loss of competitive options – can also be described as the specific injury of having a but-for paying job artificially constrained to pay $0.  But first, I discuss the issue of lingering effects in more detail.

## 8    BECAUSE OF THE LINGERING EFFECTS OF A 31-YEAR WAGE FIX, THE MARKET HAS NOT YET REACHED EQUILIBRIUM.

137. There is substantial economic evidence, theoretical and empirical, that the transition into the hiring of third assistant coaches should not be expected to have occurred instantaneously for all schools, but will occur over several years.  The economics literature of competition explains that there are economic reasons for market correction not occurring

---

[149]  It is important to recognize that each class member was harmed by being denied the *ability* to compete for compensation in exchange for work actually performed.  The argument that they might have lost their opportunity to work without compensation but for the restraint (because a school would have eliminated the "volunteer" position and not hired a third assistant coach at all), does not address this theory of harm.

instantly after the breakup of a long-running cartel.  This is often referred to as the "lingering effect"[150] of collusive conduct.

138. Empirical analysis has confirmed a less-than-instantaneous correction in cases studied. Joseph Harrington has written a series of articles on this topic, mostly related to price fixing among output cartels.[151]  He notes that "the post-cartel price series does not reveal a big drop upon the collapse of the cartel but instead a gradual decline over several years,"[152] in reference to a graphite electrode pricing cartel lasting from 1992 to 1997.  Moreover, "in sum, graphite electrode manufacturers after having cartelized and raised price by more than 50%, were still pricing 20% above the pre-cartel level two years after the cartel's demise."[153]  Harrington goes on to explain that his theory describing strategic benefits of not immediately adjusting prices to competitive levels is consistent with prices fully adjusting "as litigation is gradually settled."[154]  Finally, he shows that the effects are greater "the longer the cartel was in place and the more concentrated is the industry."  Typically, price cartels last about six years,[155] yet the compensation cap on coaches by the NCAA lasted from 1992 until 2023: three decades.

139. Marshall and Marx discuss how a vitamin cartel "show[ed] a period of lingering effects on price from the cartel conduct after the period of explicit collusion ended," and that this was present for all vitamin products, lasting several years with the longest time period for the most highly concentrated vitamin market.[156]  Erutku empirically tests data from a retail

---

[150] Marshall, R.C. & Marx, L.M. (2012). *The Economics of Collusion: Cartels and Bidding Rings*. The MIT Press. Section 1.5.

[151] Harrington, Jr., J.E. (2004).  Cartel pricing dynamics in the presence of an antitrust authority. *RAND Journal of Economics, 35*(4), pp. 651-673.  Harrington, Jr., J.E. (2004).  Post-Cartel Pricing During Litigation. *Journal of Industrial Economics, 52*(4), pp. 517-533.  Harrington, Jr., J.E. (2006).  Behavioral screening and the detection of cartels.  Presented at the 11th EU Competition Law and Policy Workshop in Florence, June 2-3, 2006.

[152] Harrington, Jr., J.E. (2004).  Post-Cartel Pricing During Litigation. *Journal of Industrial Economics, 52*(4), pp. 520.

[153] Harrington, Jr., J.E. (2004).  Post-Cartel Pricing During Litigation. *Journal of Industrial Economics, 52*(4), pp. 517-533 at p. 520.

[154] Harrington, Jr., J.E. (2004).  Post-Cartel Pricing During Litigation. *Journal of Industrial Economics, 52*(4), pp. 517-533 at p. 521.

[155] Harrington, Jr., J.E. (2004).  Post-Cartel Pricing During Litigation. *Journal of Industrial Economics, 52*(4), pp. 517-533 at p. 530.

[156] Marshall, R.C. & Marx, L.M. (2012). *The Economics of Collusion: Cartels and Bidding Rings*. The MIT Press, p. 18.

gasoline cartel in Canada and concludes that post-litigation higher pricing (presumably from residual collusion) cannot be ruled out.[157]

140. Within sports, but outside of the NCAA, this process of the slow unwinding of collusion can be seen in the movement of Major League Baseball (MLB) salaries after the end of the reserve clause. MLB went from a pay capped system in 1975 to free agency where many (not all) players could compete in a competitive labor market. As I showed in the *O'Bannon* case (and show again in Exhibit 3 below), MLB players' pay took years to get up to the equilibrium of approximately 50% of revenues.

Exhibit 3: MLB Players' Pay as a Percentage of Total MLB Revenues[158]



Source: Haupert, Michael. "The Economic History of Major League Baseball". EH.Net Encyclopedia, edited by Robert Whaples. December 3, 2007. URL http://eh.net/encyclopedia/article/haupert.mlb.

---

[157] Erutku, C. (2012). "Testing post-cartel pricing during litigation," *Economics Letters*, 116(2012), pp. 339-342 at p. 342.

[158] This exhibit is taken directly from my class certification report in Alston v. NCAA (available on PACER as Case 4:14-md-02541-CW Document 809-62 Filed 04/06/18 Page 91 of 121) where it appeared as Exhibit 7.

141. Within the college sports industry, there have been several major breaks in the usual
conduct of business, some brought about by innovation, some by the termination of
anticompetitive conduct by a court order.  Consider, for example, something as
commonplace today as the Grant-in-Aid (GIA), colloquially known as an athletic
scholarship.  In the early days of college sports, a GIA was considered a form of pay and
was therefore discouraged by the NCAA.  The NCAA lacked enforcement power to
penalize schools until 1948, and even then, its one effort to do so (in 1951) was
unsuccessful.  The SEC adopted athletic scholarships in 1936.  The NCAA formally
allowed them in 1956.  But it was not until 1961 (when the Big Ten finally allowed GIAs),
that the concept was broadly adopted.  In addition, some price rigidities (or "sticky prices")
occur in industries where there are costs to actually changing prices ("menu costs").[159]
These can include the internal managerial costs of changing budgets that can take
substantial time.[160]

142. More recently, when the NCAA's television cartel for football was found to violate the
antitrust laws in the mid-1980s, the thirty-years of collusive impact were not erased
overnight.  The immediate effect of the ruling was to free the FBS schools to compete
amongst each other for television rights and to massively expand industry output.  Rather
than a limited game or two per weekend on one network, now CBS broadcast Big Ten and
Pac-10 games, while ABC broadcast games played by members of the CFA (College
Football Association), which included the SEC, SWC, ACC, Big Eight, WAC, Notre
Dame, and Penn State.[161]  In essence, the monopoly of the NCAA had broken into a
duopoly.  In 1987, the two networks switched between these two groups of schools, but it
wasn't until Notre Dame broke from the CFA ranks in 1990 by signing a separate deal with
NBC, that the system began to move toward the truly more competitive market we know

---

[159]   For a good summary of the scholarly and empirical work in the economics of innovation diffusion, see
Rogers, E.M. (1995). "Diffusion of Innovations," Fourth Edition, The Free Press.

[160]   Mankiw, N.G, & Romer, D. (1991). *Imperfect Competition and Sticky Prices*, MIT Press.

[161]   Dunnavant, K. (2004). *The Fifty-Year Seduction: How Television Manipulated College Football, from the Birth
of the Modern NCAA to the Creation of the BCS*, St. Martin's Press, (herein "Dunnavant") p. 203.

today.[162]  This break up was also helped by the fact that the FTC sued the CFA and ABC in October 1990:

> "[charging] that the CFA had 'entered into restrictive telecast agreements, much like those condemned in Board of Regents … through the collusion with and among its members.'"[163]

143. This is a perfect example of how something which is clearly a less restrictive alternative to previously enjoined conduct could, in turn, be challenged as anticompetitive on its own merits once sufficient time has passed for analysis.  By 1994, the SEC had left the CFA for a CBS contract (a relationship it has only recently ended, moving to having all games on ABC and affiliated cable networks such as ESPN), the Southwest Conference collapsed in the wake of this move, with most of its teams joining the SEC or the Big 8 (which renamed itself the Big 12), and soon the broadcast world began to take the shape we see today, with each conference with its own television contract, negotiated without coordination with its competitors.  This took a decade after the initial antitrust breakup in 1984.

144. One further innovation, the development of the conference-only cable network, was launched in 2006,[164] which in turn triggered a surge of television deals and conference realignment that has left us with the current mix of national network deals with ESPN/ABC, Fox, CBS, and NBC, plus conference networks such as the Big Ten and SEC Network.

145. When the Supreme Court banned the NCAA monopolization of the college football television market, the market did not jump immediately to the current, non-collusive outcome.  As with broadcast TV, it does not make sense to assume that the overhang of over thirty years of collusion should have ended instantaneously.

146. The concept of lingering effects can also be seen when looking at the NCAA's loosening of rules related to name, image, and likeness ("NIL") payments to athletes.  The NCAA had long prohibited such payments but adopted a policy as of July 2021 that permitted them for the first time.  In the first year after this policy change (2021-22), the number and dollar

---

[162]  Dunnavant, p. 216.

[163]  Dunnavant, p. 237.

[164]  Nocera, J.  and Strauss, B.  (2016).  *Indentured: The Inside Story of the Rebellion Against the NCAA,* Penguin Random House, p. 189.

amount of NIL transactions appears to have been substantially less than in the year that followed (2022-23). This assessment is supported by findings from Opendorse (one of the largest platforms in the college athlete NIL space, bringing together athletes and brands), which notes that in year 2 of college athlete NIL, "brand spend grew by nearly 300%," "brand activity is up 220%," and "brand compensation [is] up 144%" compared to year 1.[165] Opendorse has reported that "as it stands today, the market shows no signs of slowing down."[166] As shown in Exhibit 4 below, activity and payments per activity are more than twice as high for year 2 than for year 1.[167]

Exhibit 4: Estimate of Year 2 Versus Year 1 NIL Activity and Payments



*NIL activity and compensation data is based on anonymized transactions from NCAA Division I (DI) student-athletes participating in all sports facilitated or disclosed through Opendorse between July 1, 2022, and June 5, 2023.

147. The same is observed when looking at the loosening of NCAA rules related to what can be included in GIAs (a.k.a. "athletic scholarships"). In August 2015, the NCAA began to allow universities in Division I to offer a scholarship that fully covered the cost of attending

---

[165] "NIL At Two: Two Years of Name, Image and Likeness in College Sports." Opendorse. Available at https://biz.opendorse.com/wp-content/uploads/2023/06/NILatTwo.pdf. Additionally, the engagement rate of athletes is higher than that of influencers in general.

[166] "NIL At Two: Two Years of Name, Image and Likeness in College Sports." Opendorse. Available at https://biz.opendorse.com/wp-content/uploads/2023/06/NILatTwo.pdf.

[167] "NIL At Two: Two Years of Name, Image and Likeness in College Sports." Opendorse. Available at https://biz.opendorse.com/wp-content/uploads/2023/06/NILatTwo.pdf.

the university.[168]  Prior athletic scholarships had not been allowed to include the miscellaneous expenses in the cost-of-living calculations (like money to do laundry, buy toothpaste, etc.), that typically amounted to somewhere between $3,000-$6,000 per year.  In essence, the schools were not permitted to provide scholarships up to the estimated full cost of attending a school.  Once schools *were* free to compete for athletes using these larger scholarships, many of them immediately jumped at the chance to do so.  However, it took several years for other universities to reallocate their budgets or feel the competitive pressure to make the higher investments in their athletes.  I noted this in my work in *Alston v. NCAA.*  In addition, a peer-reviewed research article shows that in the first year, 206 schools of 308 known outcomes adopted cost of attendance (COA) payments.  In the following three years, an additional 48 schools adopted COA payments.[169]

148. In the recent *Hubbard v. NCAA* case, my analysis showed that in the first year in which NCAA D1 schools were allowed to make academic achievement award payments (a.k.a. Alston Awards), the number of schools within the Power 5 and a subset of the Big East conference that chose to make those payments nearly doubled from the first year to the second year, and the dollar amounts more than tripled.

149. Given that studies have shown that longer conspiracies take longer to unwind, and given that what I have observed in the college sports industry as to the direction of this unwinding (i.e., that we see early adopters in the first year followed by a growing number of adopters in subsequent years), it is my opinion that it will be several years before the baseball assistant coach market reaches equilibrium.  In higher education, it is common for budget commitments – including multi-year contracts with head coaches and assistant coaches, and employment contracts with other staff such as directors of player personnel and trainers and strength coaches – to be made more than one year in advance, which can make an instant wage change difficult.  With those multi-year commitments (that were agreed to at a time

---

[168]  Hosick, M.B. (2015, January 18). "Autonomy schools adopt cost of attendance scholarships," NCAA. Available at https://www.ncaa.org/news/2015/1/18/autonomy-schools-adopt-cost-of-attendance-scholarships; Berkowitz, S. & Kreighbaum, A. (2015, August 18). "College athletes cashing in with millions in new benefits." USA Today. Available at https://www.usatoday.com/story/sports/college/2015/08/18/ncaa-cost--attendance-meals-2015/31904839/.

[169]  Ngo, F., Coyner, M., & Lough, N. (2022).  The Financial Behaviors of Chasing Athletic Prestige: Evidence from the NCAA Cost of Attendance Policy.  *The Review of Higher Education*, 45(3), pp. 307-336 at p. 316.

when pay to the third assistant coach was forbidden) in place, it will take time for competition to erase the effects of collusive ban, but eventually as competition *does* play out, more schools will build a payment to the third assistant coach into the budget.

## 9    CLASS-WIDE METHODOLOGIES ARE AVAILABLE FOR PROVING DAMAGES.

150. I have been asked to develop a methodology for estimating damages on a class-wide basis. In addition to the harm to competition and the injury each class member suffered from the absence of competitive opportunities, the challenged conduct caused direct harm and damages to class members by preventing them from receiving compensation that would have been available in the but-for world without the challenged conduct.  As stated above, because discovery is not yet complete, what follows is a demonstration of my proposed methodology for measuring the pecuniary harm to class members, not my final implementation of that methodology nor my final opinion as to the ultimate value of the class-wide damages; I reserve the right to alter both as more facts and other data becomes available.

151. It is my conclusion that such damages can be reasonably estimated on a class-wide basis. Moreover, it is my conclusion, as explained further below, that all or nearly all members of the class would have been compensated for the work they performed as "volunteer" coaches during the damages period.  At the merits stage of this matter, I will use an accepted and reliable econometric model to assess this, which I lay out in what follows.  In the demonstration I present here, the model relies on standard econometric tools and is grounded in the employment and salary data produced by the schools, for the years during the alleged misconduct as well as for the "after period" (relying, for now, on the 2023-24 academic year, i.e., the first year in which the schools are no longer restrained from compensating their third assistant coaches at market rates).  As discussed above, using only one year of post-violative data would underestimate the likelihood of adoption for many schools (leading to a conservative assessment of how many schools will ultimately adopt a paid third assistant coach position) because of the lingering effects of the conspiracy, and I anticipate that I will have an additional year's data (or more) available to me before trial. But it is my opinion that this single year of data can be used to provide a reasonable and reliable means of estimating which schools would have paid their third assistant baseball

coach during the damages period, had the challenged conduct not occurred.  Moreover, as discussed below, I have taken steps to extend the econometric results to estimate the long-term equilibrium, to counter the impact of the lingering effects of the alleged conspiracy on the 2023-24 data.  As more data become available, the need for this extension will lessen, and could, over time, disappear if sufficient years of data become available.  Thus, additional data – both for schools missing from the current years of the production and for additional years beyond 2023-24 – can be used to refine my conclusions and reduce the need to extend the results of the econometric model (rather than use the results directly and without extension).

152. Relying on currently available evidence common to the class, I have developed a methodology that I could use to measure damages on a class-wide basis once discovery is completed.  To estimate damages for class members, I first focus on ascertaining whether but for the challenged conduct, each school at which each of the class members provided their services as a third assistant coach without compensation would instead have been a school that paid the third assistant coach,[170] and then estimate the amount of but-for payments for those who worked at schools that would have paid.

153. While I am not yet in a position to offer final estimates of class-wide damages, I provide the details of the methodology and a demonstration of its application, in the two sections immediately below.  In Section 9.1, I lay out my proposed econometric methodology for identifying the set of schools likely to have adopted a paid third assistant coach position *at equilibrium* in the but-for world.[171]  This analysis includes an adjustment to account for the lingering effects, discussed above and in more detail below.  Then in Section 9.2, I explain my proposed methodology for determining the dollar amount of damages – the but-for salary – for each school identified by the econometric model as likely to have paid their third assistant coach.

---

[170]  Note that this is an economic question that differs from asking whether someone who performed the job is entitled to pay as a matter of law or equity.  I am assessing whether it is more likely than not that each school would have paid someone to perform this job in the but-for world.

[171]  In the course of generating the equilibrium estimate, I also produce a one-year estimate without an adjustment for lingering effects, which can also serve as a conservative lower-bound estimate of damages.

**9.1    A PROBIT REGRESSION MAKES RELIABLE PREDICTIONS OF BUT-FOR CONDUCT.**

154. The first step of my damages methodology is to identify the schools likely to have paid a third-assistant coach in equilibrium in the but-for world.  To do so, I model the economic factors that help identify whether a school would have been paying a third assistant coach during the damages period, by looking at the outcome when schools stopped agreeing not to make such compensation.  This involves a type of regression that determines an outcome when there are only two choices – in this case, the choice to adopt the policy of paying the third assistant coach or the choice not to adopt that policy.

155. One such methodology that employs this type of regression is the well-established econometric modeling technique known as "Probit Analysis" ("probit" is a shortening of the term "probability unit").  Probit models are useful for assessing the likelihood of a binary choice – e.g., whether a school would, or would not, have paid their third assistant baseball coach, absent the restraint at issue in this matter.  In practice, these models are similar to ordinary least squares (OLS) regression, which is also commonly used in impact models in litigation, except in those cases the variable to be explained is usually continuous, predicted outcomes such as prices ranging from $3 to $25, while a probit regression predicts a probability between zero and one.[172]

156. Implementing any form of regression model using the data for the dependent variable (adopting the new policy of paying the third assistant coach) from only 2023-24 (the first year after the NCAA allowed payments to a third assistant coach) understates the full impact of the rule change.  That is, adopting the model's results as if the data are in equilibrium would be highly conservative because the data available for who paid a third assistant coach in 2023-24 cannot reflect the growing trend towards equilibrium that drives delayed adoptions in both general markets and in college sports.  Instead, as I discuss below, I have used the factors that cause a school to immediately adopt (i.e., in the first of the new economic regime) compared to either not immediately adopting (which includes

---

[172]  Probit regression models perform better than OLS when the variable to be explained (the dependent variable) is a 0/1 variable.  As Wooldridge notes, the "limitations of the LPM [linear probability model] can be overcome by using more sophisticated binary response models."  In particular, the probit regression uses a probability distribution that is the "standard normal cumulative distribution function" which ensures that the estimated probabilities are "strictly between zero and one for all values of the parameters" and the independent variables. See Wooldridge, J.M. (2012). Introductory Econometrics: A Modern Approach. Fifth Edition,  pp. 584-85.

both (a) never adopting and (b) adopting in the subsequent year or later) and extend the results to estimate the long-run results absent lingering effects. I anticipate that, given the likelihood that adding information from an additional year (or years) of conduct will be available before trial, that the demonstrated extension for lingering effects can be scaled back in a merits version of this model (or if sufficient data exist, rendered unnecessary), which could further enhance the precision of the results.

157. Specifically, for the lingering effects extension I make (and I discuss below in Section 9.1.6), as part of any probit model, one needs to establish the probability cutoff associated with whether a result (the probability of adoption for each school) is classified as a "yes" or a "no" (yes, the school will adopt, or no, the school will not). When one is confident the data on which the model is calibrated reflects equilibrium conditions, the most common cutoff is simply 50%.[173] I adopt this methodology – however, because the 2023-24 data are all I have available for calibration, I base that 50% cutoff on a cumulative probability of adopting a paid third assistant coach over three years to capture the impact of lingering effects.[174] Based on the methodology laid out in Section 9.1.6, this has the effect of lowering the one-year (non-cumulative) probability threshold to 20.6%, which corresponds to a cumulative three-year probability of 50%. That is, if the model says a given school is 20.6% likely (or higher) to have paid its third assistant coach in 2018-19, if that had been the very first year in which payment was allowed, that corresponds to saying it had a 50% chance (or higher) of having adopted a paid third assistant coach, if that had been allowed at least two years before 2018-19 (so that 2018-19 would have been "Year 3" or later). I interpret the 50% cutoff to mean the school is more likely than not to have started paying its third assistant coach in 2018-19 had the rule never been implemented (or even ended as recently as 2016-17). This provides prediction of the long-run equilibrium outcome consistent with the assumption that the alleged misconduct in this case (imposition of the

---

[173] In *Moussouris v. Microsoft Corp.*, Case No. C15–1483JLR, 311 F. Supp. 3d 1223, 1242 (W.D. Wash. 2018), the court summarized a series of citations as to why "utilization of a 50% threshold is an acceptable method for measuring the 'goodness of fit' in a probit analysis." These included "('Wooldridge Textbook') at 465 (utilizing a 0.5 threshold when computing predicted probability)" and "('Maddala Textbook') at 334 (utilizing a 0.5 threshold to 'count the number of correct predictions')." See Wooldridge, J.M. (2012). Introductory Econometrics: A Modern Approach. Fifth Edition, p. 590 and Maddala, G.S. (1992). Introduction to Econometrics. Second Edition, p. 334.

[174] See section 8 for discussion of lingering effects.

volunteer coach rule) never happened, so that in 2018-19, when the damages period begins, schools have already had decades during which third assistant coaches could have been paid. This element of the model corresponds to the parallel unwinding of lingering effects after the NCAA ending its collusion to prevent schools from paying COA stipends to athletes. I discuss this comparison when I describe the extension of my model, which accounts for lingering effects, in Section 9.1.6.

### 9.1.1 Data and variables

158. To demonstrate how a probit regression model could be used at merits, I have created a model that identifies the economic factors that explain which teams are currently paying a third assistant coach (as of 2023-24, based on data produced through discovery) and which teams are not, and uses today's conduct to calibrate how to predict behavior in other years, conditioning on/controlling for the same economic factors in those other years. I discuss the economic variables I have used in Exhibit 5 below.

Exhibit 5: Variable List

| Variable Name | Description |
|---|---|
| head_coach_pay | Coaching salaries, benefits and bonuses paid by the university and related entities for head coaches, as reported on the MFRS. |
| pay_per_asst_coach | Coaching salaries, benefits and bonuses paid by the university and related entities for assistant coaches, as reported on the MFRS, divided by the Full Time Equivalent number of assistant coaches, as reported on the MFRS. |
| peer_conduct | Percentage of conference peers that adopted the rule change in 2023-24, calculated as adopting schools divided by conference members with non-missing adoption data. |
| multiple_conferences | Indicator variables that takes a value of 1 if the team moved conferences |
| avg_feb_temp | Average February temperature of the state where a team is located. |
| total_gia | Total athletic department Grant-in-Aid spending, as reported on the MFRS. |
| dept_rev_less_exp | Athletic department revenues less expenses. |

159. One of the primary economic factors that I control for in my model is how much each D1 baseball team spent on head and assistant coaches, based on data produced by the NCAA from its Membership Financial Reporting System ("MFRS").[175] This set of variables

---

[175] All of the currently available MFRS data ends at the conclusion of the 2022-23 academic year. For the MFRS-related variables, I use 2022-23 values as explanatory variables for the 2023-24 "adoption" decision (to pay third assistant coach or not).

controls for the level of importance a baseball program (and, by extension, the athletic department) place on attracting top talent to guide the team to victory. How much a school pays its baseball head coach, in particular, often accounts for a large portion of annual team expenditures – in 2023 some teams spent as much as a quarter of their total team-level expenses on head coach salary. This variable is also highly correlated with the total expenditures of an athletic department. As a result, the data show that schools with higher head coach pay tended to be among the first-year adopters of a paid third assistant coach position, making this an excellent independent variable for assessing the probability of a school having paid its third assistant coach in the past, but-for the volunteer coach rule.

160. Assistant coaches' pay serves as a complement to head coach pay. Assistant coaches are represented in the model by two variables combined into a ratio – total assistant coach salary divided by the full-time equivalent ("FTE") number of assistant coaches,[176] which captures a school's historical assistant coach pay per FTE. Assistant coach salaries might not be as large as head coach salaries, however, they represent a team's willingness to pay for coaching talent in the alleged relevant market. When considered simultaneously with head coach pay, the impact of this variable captures the tradeoffs inherent in adding a paid assistant to the budget. These numbers come directly from data reported by schools to the NCAA through the MFRS.

161. The model also gains information about a given school's likelihood of paying its third assistant coach from the observed conduct of the other teams in that school's conference – conference-level propensity to adopt, which I assume to be constant over the years of this analysis. Teams competing in the same conference are peers, who have self-sorted into cohorts of similar stature by performance, goals, and budgets. At the same time, teams within the same conference are competitors which try to maintain a parity of outcomes and competitive balance within the conference. That is, if a team observes some sufficiently large proportion of its conference peers hiring more coaches, the economic outcome is likely to be a decision to do the same to maintain a competitive edge. I calculate this variable as a function based on the ratio of teams with observed conduct of hiring a third

---

[176]    Full-time equivalent assistant coaches are reported in fractions of a position. For example, two coaches working full time would be reported as a 2, while two coaches working half time each would be reported as a 1.

assistant coach in the 2023-24 season to the total number of teams in the conference that have reported their conduct.

162. A related variable is the multiple conference variable. This is an indicator variable that takes on a value of one if the team in question changed conferences during the class period, and zero otherwise. While teams might switch conferences to move down to a lower tier, generally such switches happen because a team wants to move up in the world of college athletics.  This revealed preference of each school provides information that helps the model make more accurate predictions of schools' but-for conduct.

163. Average temperature in February is a state-level measure of temperature in degrees Fahrenheit, which controls for some of the variance in weather conditions among institutions that field baseball teams. This is an intuitively important variable because baseball is an outdoor sport, and traditionally, schools from warmer climates put more stock into their baseball teams.

164. Total sports department GIA is a measure of an institution's athletic Grant-in-Aid spending, that is, the amount of money that an athletic department purports to spend on athletic scholarships for baseball athletes, as reported in MFRS.  This variable essentially acts as a proxy that can dynamically control for, among other things, public-vs-private status and the mix of in-state vs out-of-state students in an athletic department (through amount per scholarship); the number of sports fielded, the presence or absence of a football team, and the difference between FBS and FCS (through the number of scholarships given).

165. Since D1 athletic departments are almost entirely housed within non-profit institutions, they do not behave in a purely profit-maximizing fashion, as a publicly traded business typically does.  It is quite common for an athletic department to spend all revenue it receives, both from external and intra-university sources.  Thus, the final variable, which measures any observed excess of athletic department revenues over expenses (which can be positive or negative, but is very often zero) serves as an indirect measure of factors such as the willingness and ability of the athletic department to go over budget if need be (if negative) or the ability of a department to bring in huge sums of donations (if positive).

### 9.1.2   Model outcome

166. The base model incorporates data from 208[177] Division I baseball teams that have provided
complete responses to Plaintiffs' subpoenas, played Division I baseball during at least one
the academic years covering the class period and have 2022-23 MFRS baseball data.  The
model is statistically significant overall, meaning it is better able to identify which schools
have a tendency to adopt the new policy of paying a third assistant coach, based on the
characteristics of the schools, than a purely random prediction.  The model displays an
excellent level of fit, and when I compare the model's predictions for the schools whose
outcomes are known to their actual conduct, it correctly predicts each school's decision (in
the 2023-24 academic year) to adopt or not adopt for the vast majority of the schools.[178]
Lastly, the model contains variables that are individually statistically significant, meaning
that the school characteristics that the variables represent matter for the schools' decisions
to adopt or not adopt.  The output from this model is presented in Exhibit 6.

Exhibit 6: Probit Model Output

```
Probit regression                          Number of obs =     208
                                           LR chi2(7)    = 120.91
                                           Prob > chi2   = 0.0000
Log likelihood = -82.937609                Pseudo R2     = 0.4216
```

| post_year_conduct | Coefficient | Std. err. | z | P>\|z\| | [95% conf. interval] | |
|---|---|---|---|---|---|---|
| head_coach_pay | 5.35e-06 | 1.78e-06 | 3.00 | 0.003 | 1.85e-06 | 8.84e-06 |
| pay_per_asst_coach | -6.52e-06 | 3.59e-06 | -1.82 | 0.069 | -.0000136 | 5.08e-07 |
| peer_conduct | 2.639947 | .4542203 | 5.81 | 0.000 | 1.749691 | 3.530202 |
| multiple_conferences | .71719 | .3479798 | 2.06 | 0.039 | .0351621 | 1.399218 |
| avg_feb_temp | -.020083 | .0113157 | -1.77 | 0.076 | -.0422613 | .0020953 |
| total_gia | -4.79e-08 | 2.59e-08 | -1.85 | 0.064 | -9.87e-08 | 2.85e-09 |
| dept_rev_less_exp | -3.31e-08 | 2.07e-08 | -1.60 | 0.110 | -7.37e-08 | 7.45e-09 |
| _cons | -.592051 | .4399621 | -1.35 | 0.178 | -1.454361 | .2702588 |

---

[177]  I included in this analysis all schools that provided complete or nearly complete responses to Plaintiffs'
subpoenas, which were reasonable to process in a timely manner before the due date of this report. I exclude
three schools. I exclude Hartford University from the analysis and damages assessment. Hartford announced its
exit from D1 during the class period, and while it competed during the 2023 year, I consider it a poor data point
to use in predicting D1 school conduct. East Carolina didn't report any coaches employed after August 2023.
Alabama A&M didn't report any assistant coach for Fall of 2023 and it didn't report any head coach for Spring
2024. I exclude these schools as their data are incomplete.

[178]  Of the 208 schools whose yes/no decision I know (excluding Hartford), only 10.6% (22/208) are predicted as a
"yes" school (by the model based on 2022-23 school data) when their actual decision (for the first year, 2023-
24) was a "no."

167. The coefficients[179] represent the change in the predicted probability of paying a third assistant, so the more positive the coefficient, the more that economic factor contributes to paying a third assistant coach, and the lower or more negative the coefficient, the more that factor works against paying. Exhibit 6 shows the coefficients for the independent variables, indicating how they contribute to the prediction of hiring. So, for example, having switched conferences during the class period implies an upward effect on the probability of hiring a third assistant coach, after controlling for all of the other independent variables' impacts.

### 9.1.3  Goodness of fit

168. Goodness of fit is a summary statistic describing how closely the actual data comport with a model's predicted values. The model shows strong goodness of fit for a probit regression model. McKelvey and Zavoina's measure of pseudo $R^2$ is most closely related to the usual Ordinary Least Squares $R^2$ as a measure of the goodness of fit.[180] In the base model, it is

---

[179]  While the output of a probit regression model cannot be read exactly the same as an OLS regression's output for which the coefficients predict a linear relationship that is constant at any point in the range of the data), the qualitative relationship is similar – a higher positive coefficient predicts a higher likelihood of adoption. See, for example, "The biggest difference between the [OLS] model and the logit and probit models is that the LPM assumes constant marginal effects for [independent variables], while the logit and probit models imply diminishing magnitudes of the partial effects." (Wooldridge, J.M. (2012). Introductory Econometrics: A Modern Approach. Fifth Edition, p. 594).

[180]  "FAQ: What Are Pseudo R-Squareds?" UCLA: Statistical Consulting Group. Available at https://stats.oarc.ucla.edu/other/mult-pkg/faq/general/faq-what-are-pseudo-r-squareds/. McKelvey, R.D. & Zavoina, W. (1975). A Statistical Model for the Analysis of Ordinal Level Dependent Variables. Journal of Mathematical Sociology. (4)1, pp. 103-120.

0.79.[181,182]  There are several other alternative assessments of goodness of fit.  The model passes each of these tests easily.[183,184,185]

169.  Another key test of the model's effectiveness is simply to see how accurate it is at matching the data that was used to calibrate it, focusing on when the model over-predicts first-year (2023-24) conduct (i.e., when the model says a school should have hired a third assistant coach but the data shows it did not).  Using this metric, the model is correct or conservative 89.4% of the time and over-predicts 10.6% of the time – 22 teams out of 208.[186]

---

[181]  Many peer-reviewed articles in economics use this measure of the goodness of fit of discrete (0,1) models.  Two examples of articles are: Chakraborty, I. & Gantchev, N. (2013). "Does Shareholder Coordination Matter? Evidence from Private Placements." *Journal of Financial Economics*, 108(1).  Also, Redmount, E., Snow, A., & Warren, Jr., R.  (2012), "The Effect of Wage Payment Reform on Workers' Labor Supply, Wages, and Welfare," *Journal of Economic History,* 72(4).

Veall et al., in peer-reviewed published research looking at measures of which model to choose in econometric analysis, note that "the Pseudo-$R^2$ measure due to McKelvey and Zavoina scores consistently well under our criterion." Veall, M.  & Zimmermann, K.  (1996), "Pseudo-$R^2$ Measures for Some Common Limited Dependent Variable Models." *Journal of Economic Surveys,* (10)3, pp. 241-60.

[182]  Alternatively, the Count $R^2$ is simply the count of correct predictions by the model.  In the base model, it is 79.3%.  Greene, W.  & Hensher, D.  (2010), *Modeling Ordered Choices: A Primer*.  Cambridge: Cambridge University Press, p. 129.

[183]  See for example Kennedy, P. (2008). *A Guide to Econometrics*, Sixth Edition, p. 249: "A better measure along these lines is the sum of the fraction of zeros correctly predicted plus the fraction of ones correctly predicted, a number which should exceed unity if the prediction method is of value…." In my base model, this sum is equal to (73/95) + (92/113) = 1.58, which is significantly above 1.

[184]  The pseudo-$R^2$ measure of goodness of fit (that reported by STATA in its standard probit regression output) is likely to be low relative to traditional uses of the term $R^2$.  As noted in Pindyck, R. & Rubinfeld. D. (1997), *Econometric Models and Economic Forecasts*, 4th ed., p. 317, McFadden's pseudo-$R^2$ (which is shown in the output of probit regression in the STATA software) "is not likely to yield an $R^2$ close to 1.  If we were to assume, for example that the true probabilities of an event occurring were uniformly distributed across a given interval, it would be possible to show an upper bound for $R^2$ of 1/3," or 0.33.

[185]  Alternative measures of the goodness of fit produce estimates from my base model that are quite high.  On this, see Morrison, D. (1972), "Upper Bounds for Correlations Between Binary Outcomes and Probabilistic Predictions." *Journal of American Statistical Association*.  67(337), pp. 68-70.  Morrison reiterates this sentiment, stating "When a model generates probabilities for binary outcomes, 'perfect' predictions are not possible (if we regard 'perfect' as the usual $R^2$=1.0 or one hundred percent correct predictions)." He also mentions "running a correlation between actual binary outcomes and probabilistic predictions is perhaps not the best way to evaluate the model that generates the probabilities.  However, we have shown that the resulting $R^2$ from such a correlation can be interpreted and is more meaningful than would be commonly suspected." In my base model, that correlation is 0.68 and is highly statistically significant.

[186]  The 89.4% is comprised of 165 teams that are predicted precisely and an additional 21 teams that are under-predicted (the model says they would not have paid a third assistant coach, but the data show they have).  Under-predictions make my proposed model's predictions conservative.

### 9.1.4  Predictions from the model: schools that would likely have paid a third assistant coach in 2018-19 and 2023-24

170. Once estimated, the probit regression model provides a probability estimate that can be used to predict/forecast what a team would have done in the first year after the rule change with respect to hiring a third assistant coach using the available data to estimate values for the independent variables that the model determines predict outcomes.  Beyond testing the year for which we have data, what makes the probit regression model powerful is that once calibrated, the model can be applied to other years, where actual-world data are not available.  The model does not need to know whether the team did or did not pay in any given year to predict that or any other year's behavior.  Thus, the probit regression model can be used to predict/forecast what those schools would have done in 2018-19.  The inputs (independent variables) measured as of 2018-19[187] are plugged into the model, and the estimated coefficients are applied to generate a prediction of whether or not the school would have paid a third assistant coach in 2018-19.  The same can be done for any year with data measuring the independent variables.

171. I must reemphasize that this model is conservative in the sense that the raw probabilities it generates are not long-run equilibrium results, but rather represent probabilities of first-year adoption.  This will tend to under-predict the number of schools hiring a third assistant coach in equilibrium, because while many schools are in the process of moving *toward* hiring, for calibration purposes those schools are listed as a 0.  By 2018-19, if the rules had allowed schools to hire a third assistant coach going back to the early 1990s, those schools currently moving *toward* hiring would have already gotten there.  See Section 9.1.6 for the details of how I adjust for this by using a cumulative probability rather than a single year's probability.

### 9.1.5  Sensitivity Test – Alternative Model

172. As an additional test, I randomly selected half of the schools for which I have 2023-24 data, re-ran the model, and then reviewed forecast results for all of the teams, including the

---

[187]  The one exception is the conference conduct variable, which remains constant based on 2023-24 conduct. Every school was, by rule, unable to pay its third assistant coach in 2018-19, so this variable cannot be measured in that year. Variables that contain dollar-level values are adjusted using an annual CPI index to be comparable to 2023 nominal dollars.

excluded 2023-24 teams and all of the 2018-19 teams. I did this multiple times using different random samples. Each time, the model performed similarly to the base model, which demonstrates that the results are broadly applicable to all of the schools in the data set and are not being driven by a small set of unusual schools.[188]

### 9.1.6  Applying a cumulative (three-year) probability assumption for assessing long-run conduct

173. As a baseline in Probit regressions, it is common to use a 0.5 probability as the cut-off between the yes and no predictions of the model, as prediction above 50% are more likely than not to exhibit the tested condition (i.e., to pay their third assistant baseball coach).[189] However, as explained in Section 8 above, doing so based solely on one-year of data would understate the long-run equilibrium impact of the rule change, due to lingering effects. To accommodate the lingering effects, it is necessary to estimate the *cumulative* probability of a school adopting over a period of more than one year; for this report's demonstration of the damages methodology, I have used a three-year cumulative effect (extending the probability of first-year adoption that the model predicts to a cumulative probability of adoption within three years). Of course, to the extent more years of data become available through discovery, the need for this extension will decline. For example, if three years of data were going to be available before the close of discovery (which, as I understand it, is unlikely under the current case schedule), no extension to the three-year cumulative effect would be needed, as the actual-world data would already reflect three years of cumulative results.

174. The steady-state conduct of the D1 schools is sometimes captured by year-one data. For example (a) the schools that have already adopted (they are accurately captured as "ones" in the 2023-24 data), and (b) the schools that will never adopt (they are accurately captured as "zeros" in the 2023-24 data). However, there is a third group of schools that did not yet adopt but will do so within a short period of time – these schools are also "zeros" in the

---

[188]  I also tested for additional non-linearities in the relationship between the dependent variable and independent variables using squared terms. These yielded statistically insignificant results, thus the data does not demonstrate an effect from the squared terms that is significantly different from the linear terms.

[189]  See Wooldridge, J.M. (2012). Introductory Econometrics: A Modern Approach. Fifth Edition, p. 590 and Maddala, G.S. (1992). Introduction to Econometrics. Second Edition, p. 334

2023-24 data but are likely to become ones in 2024-25, 2025-26, etc., and importantly there is no way, simply on the face of their first-year decision, to distinguish these "not yet but soon" schools from the "never" schools.

175.  To identify this latter group of schools ("not yet but soon"), I look at the likelihood of adoption over a period of more than one year.  I still use a cutoff of 0.5 probability of adoption, but assess over a period of more than one year (using an estimate of each school's cumulative probability).  This implies a *lower* cutoff for the single-year probability of adoption in the first year than the probit model predicts.

176. As a means of estimating the steady-state conduct of the D1 schools, I use the predicted probability of adopting in the first year and extend that out over more than one year to determine the cumulative probability.  Cumulative probabilities are a basic, long-accepted concept that is frequently used by statisticians and economists when modeling.  For the current demonstration, I adopt a window of three years (and assume that the probability of adopting for a specific school would not change during each year of the analysis prior to the actual adoption[190]).  For example, if a school has a 50% chance of adopting in any given year,[191] then the chance of adopting in the first *two* years is 50% plus (50% times 50%), which sums to 75%, and over the first three years is 75% plus (50% times 25%), which sums to 87.5%.  The first part of that sum represents likelihood of the school adopting in the prior year(s), and the second part represents that likelihood of not adopting in the prior year(s) but then adopting in the final year.  For a school with a 30% chance of adopting in any given year, the chance of adopting in the first two years is 30% plus (70% times 30%), which sums to 51%, and for three years is 51% plus (49% times 30%) which sums to

---

[190]  This assumption of constant likelihood each year, unaffected by previous years, is a standard feature of "survival" models that are used to predict equipment failure, bankruptcy, job loss, and various other topics in economics, finance and other fields (see, for example, Lo, A.W. et al. (2002). "Econometric models of limit-order executions." Journal of Financial Economics, 65(1), pp. 31-71; Rahmouni, M. & Orabi, A. (2018, January). "The Exponential-Generalized Truncated Geometric (EGTG) Distribution: A New Lifetime Distribution," International Journal of Statistics and Probability, 7(1).  In statistics, this is often called a geometric probability distribution, with the cumulative likelihood over more than one period being the geometric cumulative distribution function (see, for example, Walck, C. "Handbook on Statistical Distributions for experimentalists," pp. 75-76, available at https://www.stat.rice.edu/~dobelman/textfiles/DistributionsHandbook.pdf).

[191]  This incorporates the assumption that the probability does not change from year to year, which is a reasonable assumption for schools during the limited number of years in this analysis.

65.7%.  In other words, a cutoff of 30% for the probit predicted probability would identify schools that are more likely than not to adopt within two years.[192]

177. In this demonstration, I have adopted a three-year cutoff.  This corresponds to a single-year threshold of 20.6%.  That is, schools the model predicts have more than a 20.6% chance of paying their third assistant coach within one year are more likely than not (i.e., have a more than 50% chance) to pay their third assistant coach within the first three years after the rule changed.  From this, I assume they were more likely than not to have paid their third assistant coach in 2018-19, assuming the volunteer coach rule had never been enacted.

178. This methodology is consistent with the rate of adoption of COA stipends (discussed above in Section 8).  Based on the peer-reviewed literature,[193] even though not all schools adopted COA in the first academic year they could, eventually 83%[194] of the schools did so and only 17% did not.[195]

179. The decision to adopt COA plays a similar role in terms of competitive response to the recruiting process as does the decision to hire a third assistant coach.  As described in my reports in *O'Bannon*, *Alston*, and *House*, whenever the NCAA imposes caps on athlete remuneration, schools engage in non-price competition by further investing in facilities and coaching in order to help recruit the best athletes.  Thus, increased COA payments or increased coaching payments would have been occurring in similar contexts.

When schools seek to attract the best athletes, they focus their efforts on three forms of expenditure: direct remuneration, facilities, and coaching.  The first is direct payments (in kind or in cash) to athletes.  COA fits into this category.  The second is through facilities, which is not relevant to this yardstick.  But the third is with coaching, and so when schools choose to move from a "volunteer" coach to a paid coach, it improves schools recruiting ability by conveying higher quality.

---

[192]  To get exactly to 50% in two years, the one-year probability threshold is 29.29%. which is also the threshold to get to 75% in four years, or 93.75% in eight years.  The formula for this cumulative probability distribution function is in any standard statistics text.

[193]  Ngo, F., Coyner, M., & Lough, N. (2022).  The Financial Behaviors of Chasing Athletic Prestige: Evidence from the NCAA Cost of Attendance Policy.  *The Review of Higher Education*, 45(3), p. 316.

[194]  257 schools reported as adopting COA as of 2019 out of 308 schools with COA implementation data.

[195]  The single-year threshold of 20.6% (50% cumulative) is conservative relative to using this 17% threshold.

180. With lingering effects dealt with, all that remains is to identify which schools are predicted to have adopted the third coach compensation as of 2018-19 (i.e., had an equilibrium probability of 50% or higher),[196] and then also to assess any new entrants into D1 as to whether the model predicts they will have adopted during the damages period. Those results are presented in Appendix C.

## 9.2    DAMAGES CALCULATION

181. The second step in my damages model is to estimate the compensation that class members' schools would have paid in the but-for world for the labor class members provided in the actual world, when they worked (for no compensation) at the schools that I have determined would have chosen to pay their third assistant coach, but for the challenged conduct. I first estimate a base salary for 2023-24 using actual base salaries for the third assistant coach position in 2023-24.[197] For years before 2023-24, I deflate the base salary amount based on the average compensation change for the other two assistant coach positions (at the same school). For example, if the average base salary of the first two assistant coaches grew by 10% from 2020-21 academic year to 2023-24 academic year when the school hired the third assistant coach, I calculate the but-for 2020-21 salary by reducing the 2023-24 base salary of the third assistant coach by 10%. This adjustment accounts for the fact that assistant coach salaries at Division I schools grew at varying rates of growth across different schools and different years during the damages period. I describe below how I implement this approach, including the process to accommodate missing data points.

182. There are 194 schools that (to date) have produced sufficient 2023-24 salary data for estimating a school-specific damages figure. In this case, if the school (a) hired more than two assistant coaches in 2023-24 academic year (or 2023 or 2024 calendar years) and (b) reported salaries for its assistant coaches, then I take the minimum of those reported salaries

---

[196]    Note that there are 8 schools that have begun paying their third assistant coach as of 2023-2024 which the lingering effects model does not identify as likely to have paid at the start of the damages period: Abilene Christian, Butler, Eastern Illinois, Lamar, North Dakota State, Stephen F. Austin, Toledo and UIC. (See backup, "Probit Model.do") Despite their adoption in the actual world, I do not predict the coaches at these schools suffered measurable damages, because the model does not identify their schools as likely to have adopted in 2018-19.

[197]    Where available, and using an estimate where not, as described in the following paragraphs.

as the baseline for damages; 105 of the 194 schools fall into this category. However, if the school *did not* hire more than two assistant coaches in 2023-24 academic year (or 2023 or 2024 calendar years), then there is no third assistant coach salary to use. For these schools, I check whether the school reported salaries for its assistant coaches, and, for the 89 schools that did, I compute a ratio or "assistant coach relative pay level" based on how much that specific school paid its two assistant coaches relative to how much its peer schools[198] paid their two better paid assistant coaches (i.e., omitting the peer schools' third assistant coach). The product of multiplying this ratio, the assistant coach relative pay level and the peer group's average pay to a third assistant coach is my estimate of the salary level for a third assistant coach at the school. So, if a given school tended to pay 90% as much for the first and second assistant coach than other comparable schools (as assistant coach relative pay level of 0.90), then I model their but-for salary for their third assistant coach as 90% of what those same peer schools paid their third assistant coach.[199]

183. Combined, these first two categories span the 194 schools that reported sufficient payroll data. For the 118 schools that did not report sufficient payroll data, I also rely on a ratio driven by MFRS expense data.[200] In these cases, I compare a different school-specific assistant coach relative pay level: the ratio of the school's MFRS entry for assistant coach pay prior to the change in the volunteer coach rule (i.e., in 2022-23) to the average assistant coach pay for its peer group[201] for that same expense category and year. Because this is prior to the rule change, this establishes a ratio of how much the no-data school tended to pay relative to its peers, and then I assume these school pay their third assistant coach at the same ratio as their peers did in 2023-24.

---

[198] To determine a peer school, first I divide the MFRS data on average allocated baseball team expenditures during the damages period (2018-19 to 2022-23) to divide D1 into ten deciles. I then restrict each decile to just schools that do have salary data for a third assistant coach. For each school, then, their peers are the set of schools with comparable levels of overall baseball expenditure that paid a third assistant coach.

[199] Depending on the decile, the peer groups range in size from 23 schools for the top decile (schools with the highest level of expenditure) down to 1 school for the lowest decile. Generally speaking, it makes sense for there to be fewer peers (i.e., schools paying a third assistant coach) in the lower deciles because by definition, the lower deciles are the lower spenders, and thus less likely to be an early adopter of a new expense.

[200] Of the 118 schools there are nine schools missing from the MFRS dataset. As a result, I do not currently calculate damages for these nine schools. Should these data become available, the model and the damages figure can be easily updated to incorporate these missing data.

[201] Defined as above in footnote {{199 (two FN above).

184. At this point in the process I describe here, for every school predicted to have hired a third assistant coach, I either have their actual 2023-24 payment to a third assistant coach, or a reasonable estimate based on the methodology laid out above. From this, I then backcast those data for each year of the damages period to account for relevant inflation. Here, for the purposes of this report, I am using data estimates, but I anticipate at the merits stage that data I am estimating will have been produced, and so I will ultimately rely on actual 2023-24 MFRS data, even though for this report those data have not yet been produced. Instead, what I do is identify the average rate of growth of assistant coach pay for each of the peer groups (deciles) described above using a standard compound annual growth rate (CAGR) formula. I then grow the 2022-23 MFRS data by this rate to estimate 2023-24 average payments, for each peer group. Then for each year of the damages period, from 2018-19 through 2022-23, I simply determine the ratio of that year's assistant pay for each decile to the estimated 2023-24 value. That results in the following deflation factors.

Exhibit 7: Deflation Factors used in Damages

| Team Expenditure Deciles | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| 1 | 71% | 76% | 72% | 84% | 94% |
| 2 | 81% | 79% | 83% | 91% | 96% |
| 3 | 83% | 86% | 80% | 90% | 96% |
| 4 | 85% | 87% | 82% | 90% | 97% |
| 5 | 78% | 81% | 76% | 93% | 95% |
| 6 | 84% | 84% | 84% | 90% | 96% |
| 7 | 75% | 77% | 79% | 86% | 94% |
| 8 | 73% | 77% | 77% | 84% | 94% |
| 9 | 83% | 83% | 78% | 87% | 96% |
| 10 | 68% | 71% | 71% | 85% | 92% |

*Source:*
*MFRS Data, 2022-23.*

*Notes:*
*Years represent end years (2019 means 2018-19).*
*2024 Expenditure estimated based on CAGR from 2019 - 2023.*

185. The remainder of the calculation is simply a matter of multiplication. The Probit Model, with the three-year cumulative extension, identifies a 1 or a 0 for each school.[202] Similarly, in each year, each school either had 1 or 0 "volunteer" coaches. Those two numbers are multiplied by each other (so only schools with "1" for both tests stay as ones, all others become zeroes) and then for each year, that value is multiplied by the inflation-adjusted value for that year's third assistant coach pay. Any school with a zero for its predicted activity (i.e., not predicted to pay a third assistant coach) or for its actual-world number of "volunteer" coaches (i.e., did not use a "volunteer" in that year) will thus obviously generate zero damages for that year. For all other schools, damages is simply the inflation-adjusted value of the actual (or estimated) pay for their third assistant coach in 2023-24.

186. The analysis above is limited to the coaches' base salaries. Another way in which class members were damaged related to the loss of other employment benefits, which provided to paid third assistant coaches but which the "volunteer" coach was prohibited from receiving. As a conservative estimate of the additional employment benefits that a paid third assistant coach would have received, I estimate the value of each damaged class member's forgone health benefits. To do so, I identify all paid third assistant coaches (i.e., the lowest paid assistant coach) in the data produced by schools for 2023-24, and identify (where available) the value of their health benefits. For those schools, that becomes the 2023-24 base. If a school did not report 2023-24 healthcare benefits, but did provide 2022-23, I used the lowest healthcare value from that earlier year.[203] And for schools with no healthcare data at all, I simply used the average of the known 2023-24 health benefit amount for all schools with data. With this baseline in hand, I deflate these benefits to the appropriate damages year using an index provided by the Bureau of Labor Statistics (BLS).[204]

---

[202] Specifically, the estimated coefficients from the Probit Model, applied to each school's 2018-2019 data (or a later year if the school entered D1 after 2018-2019) and the conference-level propensity to adopt (evaluated at 2023-24 and assumed constant), predicts a probability between 0 and 1, and any school with a probability over the threshold identifies the school as 1 and all other schools as 0.

[203] While this will be for a first or second assistant coach, I have seen no evidence that the value of the health benefits is substantially different among assistant coaches.

[204] "Health insurance for all private industry workers, 12-month percent change, current dollars."

187. The total estimated damages are $53,807,389 with $44,369,114 coming from loss of coaches' base salary and $9,438,275 coming from forgone health benefits.[205]

188. It is important to recognize that in my damages model, I am assessing which schools would have been more likely than not to pay someone to perform the duties of a third assistant baseball coach. This comports with my economic understanding of the but-for world alleged by the Smart Plaintiffs. My model should not be taken as ruling out that as a matter of law, even those who performed work for schools not predicted to pay a third assistant coach (within three years), might still have been damaged when they performed work without pay.[206] For instance, my model assumes three years of lingering effects, which I believe is reasonable, but given that the alleged conspiracy took place for over 30 years, it is possible that it may take longer than three years for the market to reach equilibrium; this would imply that additional schools would have paid the third assistant coach in the but-for world. This is another way my model is conservative.

---

[205] If I were to calculate damages based only the one-year probabilities generated by the probit without adjusting for lingering effects (i.e., using a one-year 50% threshold), base salary damages would total $34,533,009 and benefits would add $6,749,089 for a total of $41,282,098. Separately, the $54 million total includes approximately $3.7 million in damages incurred by schools with missing 2023-24 data that are predicted to pay a third assistant coach. As more data becomes available through discovery, the total estimate will be adjusted to reflect these schools' data.

[206] To reiterate, I have no opinion on anything in this matter that calls for a legal conclusion.

## 10  SIGNATURE

I certify that, to the best of my knowledge and belief:

- The statements of fact in this declaration are true and correct.
- The reported analyses, opinions and conclusions are limited only by the reported assumptions and are my personal, unbiased and professional analyses, opinions and conclusions.
- I have no personal interest or bias with respect to the parties involved.
- My compensation is not contingent on an action or event resulting from the analyses, conclusions or opinions of this report.

DANIEL A. RASCHER declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the preceding is true and correct.

Signed on the 1st of November, 2024, in Lafayette, CA

Daniel A. Rascher

# Appendix A

## DANIEL A. RASCHER, PH.D.

### EDUCATION

B.A., Economics, University of California at San Diego.

Ph.D., Economics, University of California at Berkeley.
Dissertation Title, *Organization and Outcomes: A Study of the Sports Industry*

Certified Valuation Analyst (CVA) by the National Association of Certified Valuators and Analysts

### PRESENT POSITIONS

University of San Francisco
Director of Academic Programs for the Sport Management Program, 2002-current
Professor of Sport Management, 2010-current
Associate Professor of Sport Management, 2005-2010
Assistant Professor of Sport Management, 2000-2005
Adjunct Professor of Sport Management, 1999-2000

- M.A. Course – Sport Economics and Finance
- M.A. Course – Master's Project in Sport Management
- M.A. Course – Sport Business Research Methods

SportsEconomics, LLC (www.sportseconomics.com)
Founder and President, 1998-current

Performed economic analysis for sports industry clients including multiple projects involving the NFL, NBA, NASCAR, NCAA, NHRA, NHL, MLS, ATP, AHL, professional cycling, media companies, sports commissions and government agencies, event management, B2B enterprises, and IHRSA. Specialized in industrial organization, antitrust, valuations, market research, labor issues, financial modeling, strategy, economic impact, and feasibility research.

OSKR, LLC (www.oskr.com)
Co-Founder and Partner, 2008-current

Performed economic analysis for clients involved in sports and other industries, including insurance, technology, automotive, television, and consumer products.

### PREVIOUS ACADEMIC EXPERIENCE

STANFORD UNIVERSITY, taught franchise relocation & stadium financing course, Summer 2020

NORTHWESTERN UNIVERSITY, taught sports economics and finance course, Winter 2014

IE BUSINESS SCHOOL (Madrid, Spain), taught sports economics and finance course, 2010-2013

UNIVERSITY OF MASSACHUSETTS AT AMHERST, Sport Management Department
Assistant Professor, 1997-1998

- * M.S. Courses—Principles of Sport Business Management, Applied Sport Business Management
- * B.S. Courses—Sport Business Finance, Sports Economics

UNIVERSITY OF CALIFORNIA AT BERKELEY, Department of Economics
<u>Teaching Assistant</u>

* Economic Principles & Intermediate Microeconomics.

Institute of Sports Law and Ethics (University of the Pacific).  Board Member, 2011-2017

## PREVIOUS CONSULTING EXPERIENCE

LECG, LLC
<u>Affiliate</u>, 2003-2007; <u>Principal</u>, 2000-2003; <u>Senior Economist,</u> 1998-2000

* Performed economic analysis for sports industry clients including multiple projects involving the NFL, MLB, NBA, NHL, PGA, Formula One racing, CART, and Premier League Football (soccer).  Specialized in industrial organization, antitrust, M&As, valuations, and damages analysis.
* Provided testimony for cases involving sports industry clients, including damages analysis and liability.
* 40% of work related to antitrust litigation, 20% IP and breach of contract damages litigation, 20% merger related, and 20% management consulting.
* 60% of work involved the sports and entertainment industries, 15% involved technology, and 25% in other industries including agriculture, transportation, and energy.

UNIVERSITY OF CALIFORNIA AT BERKELEY, Competitive Semiconductor Manufacturing Program
<u>Visiting Scholar</u>, Institute of Industrial Relations, 1998-2000

<u>Research Fellow</u>, 1995-1997

* Funded by the Alfred P. Sloan Foundation, the CSM study is an interdisciplinary project that analyzes the determinants of high performance in semiconductor manufacturing.
* Research on HR, training, small sample analyses and generalizability of case study results.

NATIONAL ECONOMIC RESEARCH ASSOCIATES, Summer 1994; January-August 1995
<u>Research Assistant</u>

* Research on the energy industry, on transmission pricing, and on the economic damages of contract breaches.

QUANTUM CONSULTING, 1992-1994
<u>Research Assistant</u>

* Developed a model and a software package using spline techniques to weather-normalize energy usage, allowing the PUC to evaluate regulation policies.

## HONORS AND AWARDS

Sonny Vaccaro Impact Award (*College Sport Research Institute, Univ. of South Carolina*), 2023

Outstanding Antitrust Litigation Achievement in Economics (*American Antitrust Institute*), 2021

Lifetime Achievement Award (*Applied Sport Management Association*), 2019

Research Fellow of the *North American Society for Sport Management*, 2009

College of Arts & Sciences Collective Achievement Award, 2009

Innovation Award Winner (for the innovative use of technology in teaching), 2004.  From the *Center for Instruction and Technology*, University of San Francisco.

Research Grant for the Study of Human Resource Systems (*Alfred P. Sloan Foundation*), 1995-1997.

Newton-Booth Fellowship for graduate study at University of California at Berkeley, 1990-1991.

## PEER-REVIEWED JOURNAL ARTICLES

"Who Are Our Fans: An Application of Principal Component-Cluster Technique Analysis to Market Segmentation of College Football Fans," with Kenneth Cortsen, Mark Nagel, and Tiffany Richardson.  *Journal of Applied Sport Management, 13*(1)*,* 2021.

"Economic Development Effects of Major and Minor League Teams and Stadia," with Nola Agha. *Journal of Sports Economics, 21*(1), 2020.

"Is there a Consensus?: An Experimental Trial to Test the Sufficiency of Methodologies Used to Measure Economic Impact," with Giseob Hyun and Mark Nagel.  *Journal of Applied Business and Economics, 22*(11), 2020.

"Coaching Salary Disparity and Team Performance: Evidence from the Football Bowl Subdivision," with Alex Traugutt, Alan Morse, and Brian Fowler.  *Journal of Applied Business and Economics, 22*(1), 2020.

"Cartel Behavior in US College Sports: An Analysis of NCAA Football Enforcement Actions from 1990-2011," with Mark Nagel, Richard Southall, and Nick Fulton.  *Journal of NCAA Compliance*, July-August, 2019.

"The Unique Economic Aspects of Sports," with Joel Maxcy and Andrew D. Schwarz.  *Journal of Global Sport Management* (July, 2019).

"Making a Difference: Bridging the Gap Between the Ivory Tower & the Community." *Journal of Applied Sport Management, 11*(2), 2019.

"Because It's Worth It: Why Schools Violate NCAA Rules and the Impact of Getting Caught in Division I Basketball," with Andrey Tselikov, Andrew D. Schwarz, and Mark Nagel.  *Journal of Issues in Intercollegiate Athletics, 12,* 2019.  *Article of the year in the publication for 2019*.

"Determining fair market value for Duke's Sporting Goods Store," with Michael Goldman.  In *Case Studies in Sport Management, 6*(1), 2017.

"The Beckham Effect: Examining the Longitudinal Impact of a Star Performer on League Marketing, Novelty, and Scarcity," with Stephen Shapiro and Tim DeSchriver.  In *European Sport Marketing Quarterly, 17*(5), 2017.

"What Drives Endorsement Earnings for Superstar Athletes?" with Terence Eddy and Giseob Hyun.  In *Journal of Applied Sport Management*, Vol. 9, No. 2, Summer 2017.

"A Smaller Window to the University: The Impact of Athletic De-Escalation on Status and Reputation," with Michael Hutchinson and Kimi Jennings.  In *Journal of Intercollegiate Sport,* Vol. 9, No. 1, June 2016.

"If We Build It, Will They Come?: Examining the Effect of Expansion Teams and Soccer-Specific Stadiums on Major League Soccer Attendance," with Steve Shapiro and Tim DeSchriver.  In *Sport, Business, and Management: An International Journal,* Vol. 6, No. 2, Spring 2016.

"An Explanation of Economic Impact: Why Positive Impacts Can Exist for Smaller Sports," with Nola Agha.  In *Sport, Business, and Management: An International Journal,* Vol. 6, No. 2, Spring 2016.

"Where is Everyone? An Examination of Attendance at College Football Bowl Games," with Terence Eddy.  In *International Journal of Sport Finance*, Vol. 11, No. 2, February 2016.

"Tracking the Dollars: How Economic Impact Studies can Actually Benefit Managerial Decision Making," with Michael Goldman.  In *Sport & Entertainment Review,* Vol 1, No. 1, February 2015.

"Sport Pricing Research: Past, Present, and Future," with Joris Drayer.  In *Sport Marketing Quarterly*, Vol. 22, No. 3, September 2013.

"The Antitrust Implications of "Paperless Ticketing" on Secondary Markets," with Andrew D. Schwarz.  In *Journal of Competition Law and Economics*, Vol. 9, No. 3, 2013.

"An Examination of Underlying Consumer Demand and Sport Pricing Using Secondary Market Data" with Joris Drayer and Chad McEvoy.  In *Sport Management Review*, Vol. 15, No. 4, November 2012.

"Smooth Operators: Recent Collective Bargaining in Major League Baseball" with Tim DeSchriver, 2012.  In *International Journal of Sport Finance*, 7(2).

"Financial Risk Management:  The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Mark Nagel, and Chad McEvoy.  In *Journal of Sports Economics*, Vol. 13, No. 3, August 2012.

"Factors Affecting the Price of Luxury Suites in Major North American Sports Facilities" with Tim DeSchriver and Steve Shapiro.  In *Journal of Sport Management,* Vol. 26, No. 3, May 2012.

"Free Ride, Take it Easy: An Empirical Analysis of Adverse Incentives Caused by Revenue Sharing" with Matthew Brown, Mark Nagel, and Chad McEvoy.  In *Journal of Sport Management,* Vol. 25, No. 5, September 2011.

"Simulation in Sport Finance," with Joris Drayer.  *Simulation & Gaming: An Interdisciplinary Journal of Theory, Practice, and Research* Vol. 41, No. 2, April 2010.

"Where did National Hockey League Fans go During the 2004-2005 Lockout?: An Analysis of Economic Competition Between Leagues," with Matthew Brown, Mark Nagel, and Chad McEvoy. In *International Journal of Sport Management and Marketing*, Vol. 5, Nos. 1, 2, January 2009.

"The Effects of Roster Turnover on Demand in the National Basketball Association," with Steve Shapiro, Alan Morse, and Chad McEvoy.  In *International Journal of Sport Finance*, Vol. 3, No. 1, February 2008.

"Variable Ticket Pricing in Major League Baseball" with Chad McEvoy, Mark Nagel, and Matthew Brown.  In *Journal of Sport Management*, Vol. 21, No. 3, July 2007.

"Do Fans Want Close Contests?: A Test of the Uncertainty of Outcome Hypothesis in the National Basketball Association" with John Paul Solmes.  In *International Journal of Sport Finance*, Vol. 3, No. 2, August 2007.

"The Use of Simulation Technology in Sport Finance Courses: The Case of the Oakland A's Baseball Business Simulator" with Joris Drayer.  In *Sport Management Education Journal* Vol. 1, No. 1, May 2007.

"Washington "Redskins" – Disparaging Term or Valuable Tradition?: Legal and Economic Issues Concerning *Harjo v. Pro-Football, Inc.*" with Mark Nagel.  In *Fordham Intellectual Property, Media, and Entertainment Law Journal*, Vol. XVII, No. 3, Spring 2007.

"Treatment of Travel Expenses by Golf Course Patrons: Sunk or Bundled Costs and the First and Third Laws of Demand," with Matthew Brown, Chad McEvoy, and Mark Nagel.  In *International Journal of Sport Finance*, Vol. 2, No. 1, February 2007.

"Major League Baseball Anti-Trust Immunity: Examining the Legal and Financial Implications of Relocation Rules" with Mark Nagel, Matthew Brown, and Chad McEvoy.  In *Entertainment and Sports Law Journal,* Vol. 4, No. 3, December 2006.

"The Use of Public Funds for Private Benefit: An Examination of the Relationship between Public Stadium Funding and Ticket Prices in the National Football League" with Matthew Brown and Wesley Ward.  In *International Journal of Sport Finance*, Vol. 1, No. 2, June 2006.

"An Analysis of Expansion and Relocation Sites for Major League Soccer" with Matthew Baehr, Jason Wolfe, and Steven Frohwerk.  In *International Journal of Sport Management,* Vol. 7, No. 1, January 2006.

"Revenue and Wealth Maximization in the National Football League: The Impact of Stadia" with Matthew Brown, Mark Nagel, and Chad McEvoy.  In *Sport Marketing Quarterly*, Vol. 13, No. 4, December 2004.

"NBA Expansion and Relocation: A Viability Study of Various Cities" with Heather Rascher.  In *Journal of Sport Management*, Vol. 18, No. 3, July 2004.

"Does Bat Day Make Cents?: The Effect of Promotions on the Demand for Baseball," with Mark McDonald.  In *Journal of Sport Management*, Vol. 14, No. 1, January 2000.

"The NBA, Exit Discrimination, and Career Earnings," with Ha Hoang.  In *Industrial Relations*, Vol. 38, No. 1, January 1999.

**BOOKS**

"Handbook of Sport Finance" with Mark Nagel.  Edward Elgar Publishing.  (forthcoming).

"Financial Management in the Sport Industry" 4th ed. with Matthew Brown, Mark Nagel, and Chad McEvoy.  Routledge, Inc., (forthcoming).  A textbook.

"Financial Management in the Sport Industry" 3rd ed. with Matthew Brown, Mark Nagel, and Chad McEvoy.  Routledge, Inc., 2021.  A textbook.

"Financial Management in the Sport Industry" 2nd ed. with Matthew Brown, Mark Nagel, and Chad McEvoy.  Routledge, Inc., 2015.  A textbook.

"Financial Management in the Sport Industry" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Holcomb Hathaway, Inc., June 2010.  A textbook.

## BOOK CHAPTERS

"Sporting Goods and Sports Licensing," with Mark Nagel in *The Governance of Sports*, edited by Bonnie Tiell for Human Kinetics, (2024 – 2nd ed., 2020 – 1st ed.).

"The Relevance of a Gamified Football/Soccer Development Platform," with Kenneth Cortsen in *Interactive Sports Technologies: Performance, Participation, Safety*, edited by Michael Filimowicz and Veronika Tzankova for Routledge (2022).

"The application of sports technology and sports data for commercial purposes," with Kenneth Cortsen in *The Use of Technology in Sport – Emerging Challenges,* (2018).

"Valuing Highly Profitable Sports Franchises – A Hybrid Income and Market Approach," in *Sports Business* edited by Kenneth Cortsen (forthcoming).

"The Use of Price-to-Revenue Ratios in Valuing Sports Franchises," in *Sports Business* edited by Kenneth Cortsen (forthcoming).

"Competitive Equity: Can there be Balance between Athletes' Rights and a Level Playing Field?" with Andrew D. Schwarz in E. Comeaux (ed.), *College Athletes' Rights and Well-Being: Critical Perspectives on Policy and Practice.*  Baltimore: Johns Hopkins University Press, (2017).

"Illustrations of Price Discrimination in Baseball" with Andrew D. Schwarz in L. Kahane and S. Shmanske eds., *Economics Through Sports*, Oxford: Oxford University Press, (2012).

"The Expanding Global Consumer Market for American Sports: The World Baseball Classic" with Mark Nagel, Chad McEvoy, and Matt Brown in G. Mildner, and C. Santo, eds., *Sport and Public Policy*, Champaign, IL: Human Kinetics, 2010.

"Franchise Relocations, Expansions, and Mergers in Professional Sports Leagues." In B. Humphreys, and D. Howard, eds., *The Business of Sports*, pp. 67-106.  Westport, CT: Praeger, 2008.

"Collective Bargaining in Sport" with M. Nagel, M. Brown, and C. McEvoy.  In *Encyclopedia of World Sport*, pp.335-339. Great Barrington, MA: Berkshire Publishing, 2005.

"The Role of Stadia in the USA: Wealth Maximization in the National Football League" with Matthew Brown and Mark Nagel in G. Trosien & M. Dinkel (eds.), *Grenzen Des Sportkonsums* (Frontiers of Sport Commerce), Heidelberg, Germany: SRH Learnlife AG, 2003.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," in E. Gustafson and L. Hadley, eds., *Sports Economics: Current Research*, 1999.  Praeger Press.

"A Model of a Professional Sports League," in W. Hendricks (ed.), *Advances in the Economics of Sport*, vol. 2. June 1997, JAI Press, Inc.

## BOOK REVIEWS

"Review of: Much More Than a Game: Players, Owners, and American Baseball Since 1921", by Robert F. Burk in *Journal of Economic Literature*, Vol. 40(3), September 2002, pp. 949-951.

## NON-PEER REVIEWED ARTICLES

"Special Issue Introduction: Name, Image, and Likeness and the National Collegiate Athletic Association," with Steven Salaga, Natasha Brison, Joseph Cooper, and Andy Schwarz in *Journal of Sport Management*, 2023.

"Data Science for Football Business – Clustering Analysis," with Kenneth Cortsen and Bas Schnater in *FCBusiness*, 132, April 2021.

"Competitive Balance in Sports: "Peculiar Economics" over the last Thirty Years," with Andrew D. Schwarz.  In *Competition, 29*(2), Fall 2019.

"How The $200+ Million Settlement For COA Payments Was Calculated," with Andrew D. Schwarz.  In *Athletic Director U.*, May 2017.

"Rich Men's Toys – Applying Valuation Methods to the Business of Professional Sports" in *Valuation Strategies*, March/April 2015.

"Competitive Balance in Sports: "Peculiar Economics" Over the Last Quarter Century," with Andrew. D. Schwarz.  In *Entertainment, Arts, and Sports Law Journal*, 24(1), Spring 2013.

"The Impact on Demand from Winning in College Football and Basketball: Are College Athletes More Valuable than Professional Athletes?" with Chad McEvoy.  In *Selected Proceedings of the Santa Clara University Sports Law Symposium*, September 2012.

"The Economics of Competitive Balance on the Field and in the Courts" in *Selected Proceedings of the Santa Clara University Sports Law Symposium*, 2011.

"5 Themes from 50 Economic Impact Studies" in *SportsEconomics Perspectives*, Issue 5, 2010.

"What is the Value of Control of a Sports Enterprise?: Controlling Interest Premiums in Sports Valuations" in *SportsEconomics Perspectives*, Issue 4, April 2008.

"Executive Interview: Charlie Faas, Executive Vice President and CFO of Silicon Valley Sports and Entertainment." in *International Journal of Sport Finance*, Vol. 2, No. 2, June 2007.

"Executive Interview: Dan Champeau, Managing Director, and Chad Lewis, Analyst with Fitch." in *International Journal of Sport Finance*, Vol. 2, No. 1, February 2007.

"Executive Interview: Dennis Wilcox, Principal with Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A." in *International Journal of Sport Finance*, Vol. 1, No. 4, November 2006.

"Executive Interview: Randy Vataha, Founder of Game Plan, LLC" with Dennis Howard in *International Journal of Sport Finance*, Vol. 1, No. 2, June 2006.

"Executive Interview: Mitchell H. Ziets, President and CEO of MZ Sports, LLC" in *International Journal of Sport Finance*, Vol. 1, No. 1, February 2006.

"The Oakland Baseball Simworld: Enabling Students to Simulate the Management of a Baseball Organization" in *Journal of Sports Economics*, Vol. 6, No. 3, August 2005.

"Examining the Viability of Various Cities for NBA Expansion or Relocation" with Heather Rascher in *SportsEconomics Perspectives*, Issue 2, April 2002.

"Following a Dollar: the economic impact of a sports event is greater than the sum of its parts" by Nola Agha in *SportsTravel Magazine*, Vol. 6, No. 10, November/December 2002. Heather Rascher and Daniel Rascher contributed to the article.

"Real Impact: understanding the basics of economic impact generated by sports events" in *SportsTravel Magazine*, Vol. 6, No. 7, July/August 2002. Reprinted in four regional sports commission newsletters.

"What is the Size of the Sports Industry?," in *SportsEconomics Perspectives*, Issue 1, August 2001.

"Neither Reasonable nor Necessary: "Amateurism" in Big-Time College Sports", with Andrew D. Schwarz. In *Antitrust* (Spring 2000 Special Sports Issue).

"What Brings Fans to the Ballpark?," with Nola Agha in *FoxSportsBiz.com*, Spring 2000.

## RE-PUBLICATIONS

Republication of "Competitive Balance in Sports: "Peculiar Economics" over the last Thirty Years," with Andrew D. Schwarz. In *Entertainment and Sports Law Journal, 31*(1), Winter 2020.

Republication of "Do Fans Want Close Contests? A Test of the Uncertainty of Outcome Hypothesis in the National Basketball Association", with John Paul G. Solmes in *Recent Developments in the Economics of Sport*, ed. Wladimir Andreff; *The International Library of Critical Writings in Economics*, 2011, Sudbury, MA: Jones & Bartlett.

Republication of "Variable Ticket Pricing in Major League Baseball", with Chad McEvoy, Mark Nagel, and Matthew Brown The Business of Sports, ed. Scott Rosner and Kenneth Shropshire, 2011, Elgar Pub., United Kingdom.

Republication of "What Brings Fans to the Ballpark?," with Nola Agha in *Brilliant Results* 2005.

Republication of "What is the Size of the Sports Industry?," in *Brilliant Results* 2005.

Republication of "Neither Reasonable nor Necessary: "Amateurism" in Big-Time College Sports", with Andrew D. Schwarz in *The Economics of Sport, Vol. I*, ed. Andrew Zimbalist; *The International Library of Critical Writings in Economics* 135, 2001, Elgar, Northampton, MA.

**MONOGRAPHS**

"The Effect of Human Resource Systems on Fab Performance," with Clair Brown, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

"Inter-industry Comparisons: Lessons from the Semiconductor Industry," with Rene Kamita, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

"Problem-Solving Structures; A Case Study of Two U.S. Semiconductor Fabs," in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

"Transferability of Case Study Research:  An Example from the Semiconductor Industry," with Clair Brown, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  2nd Interim Report*, 1996.

"Headcount and Turnover," in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  2nd Interim Report*, 1996.

"Training," with Jumbi Edulbehram in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  2nd Interim Report*, 1996.

**WORKING PAPERS & ARTICLES UNDER REVIEW**

"The Impact of COVID-19 on Employment and Output in the Leisure and Tourism Industries," with Lali Odosashvili and Mark Nagel.  *In Review*.  2023.

"Commentary: Maximizing the Emergency Use of Public Stadiums and Arenas," with Mark Nagel and Tiffany Richardson.  2021.

"College Football and Basketball Fans Don't Root for Laundry: A Comparison of the Effect of Winning on Demand between College and Professional Football and Basketball," with Mark Nagel and Giseob Hyun. 2020.

"Optimal Markets for NFL Franchises."  2020.

"Would the Oakland A's Relocation to San Jose Harm the Sharks – A Case Study of Competition Across Professional Sports Teams" with Chad McEvoy, Matt Brown, and Mark Nagel.  2016.

"The Practical Use of Variable Ticket Pricing in Major League Baseball" with Chad McEvoy, Matt Brown, and Mark Nagel.  2012.

"An Analysis and Assessment of Intercollegiate Athletics at the University of San Francisco" with Jeremy Howell.  2011.

"Counting Local Residents in Economic Impact Analysis: New Findings from Sporting Events" with Richard Irwin.  2008.

"Perverse Incentives with the NCAA Basketball Tournament Seeding Process" with Matthew Brown, Chad McEvoy, and Mark Nagel.  2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams" with Matthew Brown, Chad McEvoy and Mark Nagel.  2006.

"Forecasting Model of Airport Economic Impacts" with Alan Rozzi and Christopher Gillis.  2004.

"Psychic Impact of Professional Sports: A Case Study of a City Without Major Professional Sports" with Matthew Brown, Mark Nagel, and Chad McEvoy.  2003.

"The Use of New Technology and Human Resource Systems in Improving Semiconductor Manufacturing Performance", with Clair Brown and Greg Pinnsoneault, Working Paper, University of California at Berkeley, 1999.

**INVITED SPEAKING ENGAGEMENTS**

"Good Morning Walnut Creek: The Economics of Sports," presented by Visit Walnut Creek, 2024.

"Conversations on NIL Complexities," panelist, Name, Image, and Likeness Conference, University of San Francisco Law School, 2024.

"Developments in Private Antitrust Enforcement in Sports," panelist, American Antitrust Institute Annual Private Enforcement Conference, 2024.

"Antitrust Issues in Sports," panelist, Antitrust and Unfair Competition Law conference hosted by the California Lawyers Association, 2024.

"Financial Management in the Sport Industry," guest speaking in Sports Economics, Loyola Marymount University, 2024.

"Sports & Entertainment Districts," panelist, San Jose Chamber of Commerce, 2024.

"Getting into the Sports Industry," panelist, The Young Sports Talent Investment Forum, 2023.

"The Business of Sports."  Lecture at the Oregon Law Summer Sports Institute, University of Oregon, 2023.

"Economics of College Sports," guest speaking in Intercollegiate Sports Management, St. Mary's College, 2023.

"Economics of College Sports," guest speaking in Sports Finance, University of Delaware, 2023.

"Financial Management in the Sport Industry," invited masterclass presentation for Sportin Global, 2023.

"Legal and Economic Issues in the NCAA: A Review of 20 Years of Litigation," with Andy Schwarz and Mark Nagel, University of South Carolina, College Sport Research Institute, 2023.

"The Business of Intercollegiate Sports," invited guest speaker in Andy Dolich's Make Sense of the Madness course on college sports, Stanford University, 2023.

"An Economist Goes to the Game," invited co-host for *New Books Network* podcast, 2022.

"The Business of Sports."  Lecture at the Oregon Law Summer Sports Institute, University of Oregon, 2022.

"Big Stakes Antitrust Trial: In Re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation," panelist at the 31st Golden State Institute Conference (2021).

"Economics of College Sports," guest speaking in Sports Finance, University of Delaware, 2021.

"The Business of Intercollegiate Sports," guest speaking in Issues in Sports Economics, University of West Florida, 2021.

"Professional Sports Franchise Location & Development."  Guest speaker in Sports Law & Ethics course at California Lutheran University.  2021.

"The Business of Sports." Guest speaker at Sport Administration course, University of Louisville, 2021.

"The Business of Sports."  Lecture at the Oregon Law Summer Sports Institute, University of Oregon, 2021.

"Sports Economics, Analytics, and Decision Making - 7 Case Studies," Theme Speaker 1, International Webinar on Sports Management, hosted by Sports Authority of India, Seshadripuram Educational Trust, Seshadripuram Evening Degree College, 2021.

"Economics of College Athletes," guest speaking in Sports Finance, University of Northern Colorado, 2021.

"Sports Antitrust Economics – Raiders & Regents," with Andy Schwarz in Sports Law, University of San Diego Law School, February, 2021.

"Research Thoughts & Methods" in Doctoral Research Seminar, Sport Management Department, University of South Carolina, January, 2021.

"Is there a Consensus?: An Experimental Trial to Test the Sufficiency of Methodologies Used to Measure Economic Impact in Sports."  Keynote Speaker at the 1st International Congress of Iranian Scientific Association of Sport Management, Tehran, Iran in March, 2021.

"Government Impact on Financial Aspects of Sports," at the International Conference on Governance and Integrity in Sport, Saudi Arabia, December, 2020.

"State of Play: Antitrust and the NCAA," panelist on a program hosted by the New York State Bar Association and the California Lawyers Association, November 19, 2020.

"Sports Commercialization and the Global Sports Economy" with Kenneth Cortsen.  Masterclass for Australian Sports Technologies Network, November 17, 2020.

"Economic and Financial Management of U.S. Professional Sports" presented at <u>Loyola University, Seville, Spain</u>, November 12, 2020.

"The Importance of Sound Data Analysis for Decision-Making in the Sports Industry" at <u>Sportin Global Summit</u>.  2020.

"The New Normal of the Sport Industry" at <u>HiVE 24HR Liveathon</u>.  2020.

"Play Time Sessions – A Series of Digital Conference Sessions on Gaming & Esports" presented by <u>GIMA Esports</u>.  2020.

"Practicing as a Sports Lawyer: Antitrust and Beyond."  Sponsored by the <u>American Bar Association's</u> Section of Antitrust Law and Trade, Sports and Professional Associations.  2020.

"Economics of Sports."  Lecture at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2020.

"Economics of College Sports," guest speaking in Sports Finance, <u>University of Delaware</u>, 2020.

"Economics of College Athletes," guest speaking in Sports Finance, <u>University of Northern Colorado</u>, 2020.

"Stadium Financing," guest speaking in Introduction to Sports Business, <u>UCLA's Anderson School of Business</u>, 2019.

"Economics of College Sports," discussion at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2019.

"Forging Industry Partnerships and Engaging in Applied Sport Management Research," with Weight, E., Love, A., McEvoy, C.  Presentation for the <u>Applied Sport Management Conference</u>, 2019.

"Making a Difference: Bridging the Gap Between the Ivory Tower & the Community."  Keynote Address, <u>Applied Sport Management Association</u>, 2019.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2018.

"The Business of Sports", presented at the Sports Business Club at <u>Sonoma State University Business School</u>, May 2018.

"The Business of the Olympics," guest speaker in sports journalism course at Medill School of Journalism at <u>Northwestern University</u>, 2018.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2017.

"College-Sport Research and Litigation: Theory and Practice Leading to Action." Panelist at College Sport Research Institute Symposium at the <u>University of South Carolina</u>, 2017.

"Economics of Sports." Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2016.

"The Business of Intercollegiate Sports," presented in the sport management department's sport law course, University of Toronto, 2016.

"Economics of Sports." Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2015.

"The Business of Intercollegiate Sports" presented in the sport management masters program, University of Arkansas, 2015.

Panelist on "The Future of Intercollegiate Athletics: The Players' Perspective," at the Sports Law and Business Conference at Arizona State University, 2015.

Panelist on "Intersection of Business and Sports Law," at the Sports and Entertainment Law Forum, presented by the University of Oregon Law School, 2015.

"The Economics of College Athletics Departments" presented in the masters in collegiate athletics program, college athletics in a digital era course, University of San Francisco, 2015.

"The Business of Intercollegiate Sports," presented in the sport management department's sport law course, University of Toronto, 2014.

"Economics of Sports." Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2014.

"The Finances of College Sports," presented in Matthew Brown's sport finance course, Ohio University, 2014.

"Antitrust Economics and Sports," presented in Professor Robert Elias's Politics and Sport course, University of San Francisco, 2014.

"The Economics of the Sports Industry," presented to the Haas School of Business, U.C. Berkeley, 2014.

"Economic Impact in Sports." Presentation in the masters in sports business program at New York University (NYU) as part of the Faculty-in-Residence program. 2013.

"Pricing the Game Experience," with Stephen Shapiro and Tim DeSchriver. Invited research presentation at *Sport Entertainment & Venues Tomorrow* conference, 2013, University of South Carolina.

"Academia and the Industry: Opportunities for Meaningful Research Collaboration." Invited panelist at *Sport Entertainment & Venues Tomorrow* conference, 2013, University of South Carolina.

"Sports Sponsorships in 2013," Panelist at Court Vision (Sheppard Mullin Sports Law Speaker Series and SLA). Continuing Legal Education (CLE) units program. 2013.

"Using Contract Law to Tackle the Coaching Carousel – Commentary."  Presented at University of San Francisco, *Sports & Entertainment Law Association*, 2013.

"Sports Economics, Analytics, and Decision Making: 8 Examples." Invited speaker at the *IEG Sports Analytics Innovation Summit*, 2012

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at U.C. Berkeley, Boalt Law School's *Sports and Entertainment Law Society*, 2011.

"Financial Valuation of Sports Assets," presented at the *Sport Management Today Video Conference Series* at the IE Business School, 2011

"Financial Valuation of Sports Assets," presented to the *Sport Management Department* at the University of Northern Denmark, 2011.

"Economic Impact in Sports," presented to the *Sport Management Department* at the University of Northern Denmark, 2011.

"The Economics of the Sports Industry," presented to the *Sports Business Association* at U.C. Irvine, 2011.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at the *Economics Lecture Series* at Sonoma State University Business School, April 2010.

"Economics for Antitrust Lawyers: Application to Class Certification" presented to Lieff Cabraser Heimann & Bernstein for Continuing Legal Education (CLE) units.  November 2009.

"Economics for Antitrust Lawyers: Market Structure and Economic Modeling" presented to Lieff Cabraser Heimann & Bernstein for Continuing Legal Education (CLE) units.  October 2009.

"Sports Stadium Financing in Today's Economy" presented to the Rotary Club of San Jose, May 2009.

"The Economic Impact of Liberty Bowl Memorial Stadium," presented at the University of Memphis, *Issues in College Sports* lecture series (invited panelist), March 2007.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, January 2007.

"Stadium Financing – Dallas Cowboys Case," presented to the MBA Program at the Graduate School of Business, Stanford University, 2006.

"Taking the Gown to Town: Research and Consulting for the Sport Industry."  Invited presentation at the Past President's Workshop, *North American Society for Sport Management*, June 2006.

"Various Topics in Sports Economics," presented at the Wednesday Workshop on Economics Research, California State University, East Bay, 2005.

"Stadium Financing – Dallas Cowboys Case," presented to the MBA Program at the Graduate School of Business, <u>Stanford University</u>, 2005.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, <u>U.C. Berkeley</u>, 2005.

"The Economic Impact of General Aviation Airports: An Econometric Model," presented at <u>Niche Ventures</u> Spring Meeting, 2004.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, <u>U.C. Berkeley</u>, 2004.

"Oral Testimony Regarding California State Senate Bill 193, Student Athletes' Bill of Rights". 2003.  Testimony to the California State Senate Subcommittee on Entertainment.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, <u>U.C. Berkeley</u>, 2003.

"The Use of New Technology and Human Resource Systems in Improving Semiconductor Manufacturing Performance," with Clair Brown and Greg Pinsonneault.  Presented at *The Wharton School*, <u>University of Pennsylvania</u>, 1999.

CONFERENCE PRESENTATIONS

"Is there a Consensus?: An Experimental Trial to Test the Sufficiency of Methodologies Used to Measure Economic Impact," with Giseob Hyun and Mark Nagel.  Presentation at *Applied Sport Management Association*, February 2020.

"Is there a Consensus?: A Test of Methodologies Used to Measure Economic Impact," with Giseob Hyun and Mark Nagel.  Presentation at *Applied Business and Entrepreneurship Association International*, November 2019.

"Because It's Worth It: Why Schools Violate NCAA Rules and the Impact of Getting Caught in Division I Basketball," with Andrey Tselikov, Andrew D. Schwarz, and Mark Nagel.  Presentation at *Applied Business and Entrepreneurship Association International*, November 2018.

"College Football and Basketball Fans Don't Root for Laundry: A comparison of the effect of winning on attendance and television viewership between big-time college football and basketball and the NBA and NFL," with Mark Nagel.  Presentation at *Applied Business and Entrepreneurship Association International*, November 2017.  (voted Best Paper Award for session)

"Financial Valuation of a Sporting Goods Retail Store," with Mark Nagel and Matthew Brown.  Poster presentation at *North American Society for Sport Management*, May 2016.

"Cartel Behavior in United States College Sports: An Analysis of National Collegiate Athletic Association Football Enforcement Actions from 1990 to 2011," with Mark Nagel, Richard Southall, and Nick Fulton.  Presented at *Western Economics Association International*, January 2016.

"The College Basketball Players' Labor Market: *Ex Ante* versus *Ex Post* Valuations" with David Berri and Robert Brown.  Presented at *Western Economics Association International*, July 2015.

"What drives Endorsement Values for Superstar Athletes?" with Terry Eddy and Giseob Hyun. Presented at *Sport Management Association of Australia and New Zealand*, November 2014.

"The Beckham Effect: David Beckham's Impact on Major League Soccer, 2007-2012," with Stephen Shapiro and Tim DeSchriver.  Presented at *North American Society for Sport Management*, May 2014.

"Where is Everyone? An Examination of Consumer Demand for College Football Bowl Games," with Terry Eddy and Rebecca Stewart.  Presented at *Collegiate Sports Research Institute* conference, April 2014.

"If We Build It, Will You Come?: Examining the Effect of Expansion Teams and Soccer-Specific Stadiums on Major League Soccer Attendance," with Stephen Shapiro and Tim DeSchriver. Presented at *North American Society for Sport Management*, May 2013.

"Should San Jose say 'No Way' to the Oakland A's," with Mark Nagel and Matt Brown.  Presented at *North American Society for Sport Management*, May 2013.

Panel member for "Financial Issues in Intercollegiate Sports." Presented at the *Santa Clara University Sports Law Symposium*, 2012.

"What's in a Name?: Does the Amount and Source of Public Financing Impact Team Names?" with Nola Agha and Matt Brown.  Presented at *Western Economics Association International*, July 2012.

"When Can Economic Impact be Positive?  Twelve conditions that explain why smaller sports have bigger impacts" with Nola Agha.  Presented at *Western Economics Association International*, July 2012.

"Reflections on the MLB Collective Bargaining Agreement."  Part of a symposium on the Economics of Labor-Management Relations in Sports Today at *Western Economics Association International*, July 2012.

"The Economics of Competitive Balance on the Field and in the Courts." Presented at the *Santa Clara University Sports Law Symposium*, 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *International Association of Venue Managers*, July 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *TicketSummit*, July 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *Western Economics Association International*, July 2011.

"Financial Risk Management: The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Chad McEvoy, and Mark Nagel.  Presented at *Western Economics Association International*, July 2011.

"A Panel Study of Factors Affecting Attendance at Major League Soccer Contests: 2007-2010" with Tim DeSchriver.  Presented at the *Sport Marketing Association IX* conference in New Orleans, October 2010.

"The NCAA and the Prisoner's Dilemma".  Presented at the *Sports Law Symposium* at the University of Santa Clara Law School, September 2010.

"Financial Risk Management: The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Chad McEvoy, and Mark Nagel.  Presented at *North American Society for Sport Management*, May 2010.

"An Analysis of the Value of Intercollegiate Athletics to its University: Methods".  Presented at the *Scholarly Conference on College Sport*, April 2010.

"Demand, Consumer Surplus, and Pricing Inefficiency in the NFL: A Case Study of the Secondary Ticket Market Using StubHub" with Joris Drayer and Chad McEvoy.  Presented at *North American Society for Sport Management*, May 2009.

"Luxury Suite Pricing in North American Sports Facilities" with Tim DeSchriver.  Presented at *North American Society for Sport Management*, May 2009.

"A Smorgasbord of Lessons Learned from Economic Impact Studies"  Presented at *North American Society for Sport Management*, June 2008.

"Globalization and Sport Finance: What is True and What is Myth?" with Mark Nagel and Ross Booth.  Presented at the *Sport Management Association of Australia and New Zealand*, November 2007.

"Exploring the Myth that a Better Seed in the NCAA Men's Basketball Tournament results in an *ex ante* Higher Payout" with Mark Nagel, Matt Brown, and Chad McEvoy.  Presented at the *Sport Management Association of Australia and New Zealand*, November 2007.

"Oakland A's Baseball Simulator" with Joris Drayer.  Presented at *North American Society for Sport Management*, June 2007.

"Teaching Sport Financial Management: A Symposium" with Timothy DeSchriver, Matthew Brown, and Michael Mondello.  Presented at *North American Society for Sport Management*, June 2007.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, January 2007.

"Practical Strategies for Variable Ticket Pricing in Professional Sports" with Chad McEvoy, Matt Brown, and Mark Nagel.  Presented at *Sport Marketing Association IV*, November 2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams", presented at *Western Economic Association International*, July 2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams", presented at *North American Society for Sport Management*, June 2006.

"Measuring Sponsorship Return on Investment: A Need for Quantitative Analysis" with Matt Brown, Mark Nagel, and Chad McEvoy.  Presented at *Sport Marketing Association III*, November 2005.

"The Use of Economic Impact Analysis for Marketing Purposes" with Dick Irwin and Matt Brown.  Presented at *Sport Marketing Association III*, November 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *Western Economic Association International*, July 2005.

"Public Funds for Private Benefit: Equity Issues in Sport Stadia Funding and the Question of Who Really Pays," with Matt Brown and Mark Nagel.  Presented at *North American Society for Sport Management*, June 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *North American Society for Sport Management*, June 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Accepted by *Sport Management Association of Australia and New Zealand*, Nov. 2004.

"Redskins: Legal, Financial, and Policy Issues relative to Harjo v. Pro-Football, Inc." with Richard Southall, Matt Brown, and Mark Nagel.  Presented at *North American Society for the Sociology of Sport*, Nov. 2004.

"An Analysis of Distance Traveled and Tourism Economic Impact: A Test of the Alchian-Allen Theorem" with Matt Brown, Mark Nagel, and Chad McEvoy.  Presented at *Sport Marketing Association II* conference, Nov. 2004.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *Sport Marketing Association II* conference, Nov. 2004.

"Beyond The Economic Impact Study: Examining Economic Impact Data for Support of the Third Law of Demand" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Presented at *North American Society for Sport Management*, 2004.

"Optimal Variable Ticket Pricing in Major League Baseball" with Mark Nagel, Chad McEvoy, and Matthew Brown.  Presented at *North American Society for Sport Management*, 2004.

"*Clarett v. NFL*: Age Eligibility Rules and Antitrust Law in Professional Sports" with Chad McEvoy, Mark Nagel, and Matt Brown.  Presented at *Sport and Recreation Law Association*, 2004.

"Variable Pricing in Baseball: Or, What Economists Would Just Call 'Pricing'," presented at *Western Economic Association International*, 2003.

"The Impact of Stadia on Wealth Maximization in the National Football League: To Build or Renovate?" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Presented at *North American Society for Sport Management*, 2003.

"Major League Baseball's Antitrust Immunity: Examining the Financial Implications of Relocation Rules," with Matthew Brown and Mark Nagel.  Presented at *Society for the Study of the Legal Aspects of Sport and Physical Activity*, 2003.

"Locational Choice in the NBA: An Examination of Potential Cities for Expansion or Relocation," presented at *North American Society for Sport Management*, 2002.

Panel discussant on the effects of the economy on the business of sports at *Sports Facilities and Franchises Forum*, Dallas, TX 2002 (presented by SportsBusiness Journal).

"Psychic Impact Findings in Sports," presented at *Sport Management Association of Australia and New Zealand*, 2001.

"Locational Choice in the NBA: An Examination of Potential Cities for Expansion or Relocation" presented at *Sport Management Association of Australia and New Zealand*, 2001.

"Psychic Impact as a Decision Making Criterion," presented at the *North American Society for Sport Management*, 2000.

"Economic Impact Methods," presented at the *North American Society for Sport Management*, 2000.

"Valuation of Naming Rights," presented at the *Sports Finance Forum*, 2000.

" 'Amateurism' in Big-Time College Sports," presented at the *Western Economic Association International*, 1999.

"Does Bat Day Make Cents?: The Effect of Promotions on the Demand for Baseball," with Mark McDonald.  Presented at the *17th Annual Consumer Psychology Conference*, 1998.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," presented at the *North American Society for Sport Management Conference*, 1998.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," presented at the *Western Economic Association International*, 1998.

"The NBA, Exit Discrimination, and Career Earnings," presented at the *Western Economic Association International*, 1997.

"Sports Salary Determination," presented at the *International Atlantic Economic Society Conference*, 1997.

"A Model of a Professional Sports League," presented at the *International Atlantic Economic Society Conference*, 1996.

"Transferability of Case Study Research:  An Example from the Semiconductor Industry," presented at the *American Society of Training and Development Conference*, 1996.

**EDITORIAL/REVIEWER BOARDS OF PEER-REVIEWED JOURNALS**

*Frontiers in Sports and Active Living – Sports Management and Marketing,* 2020 – present
*International Journal of Sport Management and Marketing,* 2011 – present
*International Journal of Sports Marketing and Sponsorship,* 2021 – present
*International Journal of Sport Finance,* 2006 – present (founding member)
*Journal of Risk and Financial Management,* 2019 – present
*Journal of Sport Management,* 2003 – present
   Associate Editor, 2010 – 2012
   Co-Editor of Special Issue, 2022
*Journal of Quantitative Analysis in Sports,* 2005 – 2012 (founding member)
*Case Studies in Sport Management,* 2011 – 2019 (founding member)
*Sport Management Review,* 2001 – 2008


## REFEREE FOR PEER-REVIEWED JOURNALS & GRANTING AGENCIES

*American Behavioral Scientist*, 2008
*Applied Economics Letters,* 2018
*Applied Economics,* 2020, 2021
*Axioms,* 2017
*Case Studies in Sport Management,* 2012, 2014a, 2014b, 2015, 2017, 2019
*Communication & Sport*, 2019, 2020
*Contemporary Economic Policy*, 2004, 2021
*Eastern Economic Journal,* 2010
*Economic Inquiry,* 2008, 2010, 2011
*Economics and Business Letters,* 2018
*European Sport Management Quarterly,* 2012, 2020, 2021, 2022
*Frontiers in Sports and Active Living,* 2021a, 2021b, 2022
*Future Internet,* 2019, 2020
*Industrial Relations*, 1993, 2000, 2000, 2001, 2013
*International Journal of Financial Studies,* 2018
*International Journal of Sport Communication,* 2011
*International Journal of Sport Finance,* 2005, 2006a, 2006b, 2006c, 2007a, 2007b, 2008a, 2008b, 2010, 2011, 2012, 2013, 2014a, 2014b, 2014c, 2015, 2017, 2018, 2019, 2022a, 2022b, 2023
*International Journal of Sport Management and Marketing*, 2005, 2010, 2013, 2014, 2017, 2021
*International Journal of Sports Marketing and Sponsorship*, 2016, 2018a, 2018b, 2019, 2021a, 2021b, 2021c, 2021d, 2022, 2023a, 2023b
*International Journal of Sport Policy and Politics,* 2014
*International Review for the Sociology of Sport*, 2012
*Journal for the Study of Sport and Athletes in Education,* 2021a, 2021b
*Journal of Economic Surveys,* 2024
*Journal of Functional Morphology and Kinesiology,* 2018
*Journal of Global Sport Management,* 2018, 2024
*Journal of Industrial Economics*, 1997
*Journal of Intercollegiate Sport*, 2016, 2021, 2022
*Journal of Issues in Intercollegiate Athletics*, 2021
*Journal of Sport Management,* 2001, 2002, 2003a, 2003b, 2004a, 2004b, 2004c, 2004d, 2004e, 2005a, 2005b, 2005c, 2005d, 2006a, 2006b, 2006c, 2006d, 2006e, 2006f, 2006g, 2006h, 2006i, 2007a, 2007b, 2007c, 2007d, 2008a, 2008b, 2008c, 2008d, 2009a, 2009b, 2009c, 2009d, 2009e, 2009f, 2009g, 2010a, 2010b, 2010c, 2010d, 2011a, 2011b, 2013, 2013b,

2014, 2015a, 2015b, 2016a, 2016b, 2016c, 2016d, 2017a, 2017b, 2017c, 2017d, 2018a, 2018b, 2018c, 2018d, 2019a, 2019b, 2019c, 2019d, 2019e, 2020a, 2020b, 2020c, 2020d, 2021, 2023, 2024

*Journal of Sports Economics*, 2003, 2007, 2008a, 2008b, 2009, 2010, 2011, 2012a, 2012b, 2014a, 2014b, 2015a, 2015b, 2016, 2018, 2019a, 2019b, 2021, 2022a, 2022b, 2023

*Journal of Venue and Event Management,* 2012
*Journal of the Quantitative Analysis of Sports*, 2005, 2006a, 2006b, 2007
*Mathematical Problems in Engineering,* 2018
*Perceptual and Motor Skills*, 2009
*Review of Economics and Statistics,* 2017
*Review of Industrial Organization*, 2012, 2013, 2015
*SAGE Open,* 2021
*Soccer & Society*, 2014, 2015, 2020
*Southern Economic Journal*, 2001, 2007a, 2007b
*Sport, Business and Management: An International Journal*, 2011, 2012, 2013, 2017, 2018, 2023a, 2023b

*Sport Management Review*, 2002a, 2002b, 2003a, 2003b, 2003c, 2003d, 2004a, 2004b, 2004c, 2006a, 2006b, 2006c, 2007a, 2007b, 2007c, 2010a, 2010b, 2011, 2015, 2016, 2017, 2020

*Sport Marketing Quarterly*, 2015, 2018
*Sustainability,* 2018, 2021a, 2021b

External review of $250,000 grant proposal for the *Social Sciences and Humanities Research Council of Canada*, 2008

**PROFESSIONAL AFFILIATIONS (CURRENT AND PREVIOUS)**

American Bar Association
American Economic Association
National Association of Certified Valuation Analysts
North American Society for Sport Management
North American Association of Sports Economists
Sport and Recreation Law Association
Sport Marketing Association
Sports Lawyers Association
Western Economic Association International

**TESTIMONY**

Provided economic analysis for preliminary injunction in *23XI v. NASCAR*.  2024.

Provided economic analysis for the settlement in *Carter v. NCAA*.  2024.

Provided expert reports, deposition, and trial testimony in *In Re NFL Sunday Ticket Antitrust Litigation*.  2024.

Provided expert reports, deposition testimony, and settlement analysis in *Hubbard v. NCAA*.  2024.

Provided expert reports, deposition testimony, and settlement analysis in *In Re College Athlete NIL Litigation*.  2024.

Provided deposition and trial testimony regarding liability and economic damages in *San Francisco Federal Credit Union v. San Francisco Municipal Transportation Agency*.  2021.

Provided expert reports and deposition testimony regarding class certification and damages in *Shields et al. v. FINA*.  2021.

Provided expert report pertaining to alleged financial harm from lost career earnings related to RICO claims in *Bowen v. adidas*.  2021.

Provided expert report and trial testimony pertaining to financial harm of alleged mismanagement of professional tennis client in *Mirjana Lucic v. IMG Worldwide.*  2021.

"An Economics Perspective on NIL at the Community College Level" presented at a public hearing of the Senate Bill 206 (Skinner-D, 2019) Statutory Community College Athlete Name, Image, and Likeness Working Group, November 10, 2020.

Provided expert report and deposition pertaining to financial harm of alleged misleading advertising in *The People of the State of California v. Hertz et al.*  2019.

Financial and economic analysis and testimony at a hearing of baseball and *AT&T Park* for Assessment Appeals Board (property tax dispute).  2018.

Provided arbitration testimony on damages regarding an NBA agent and agency in *ISE v. Dan Fegan*.  2018.

Provided trial and deposition testimony and multiple expert reports pertaining to class certification, liability, damages, and injunction issues in college sports in the federal lawsuit *In Re: NCAA Athletic GIA Cap Antitrust Litigation*.  2015-18.

Provided expert report pertaining to damages in auto racing case between a driver and his agent in *Sports Management Network v. Kurt Busch.*  2018.

Public testimony on forecast of economic impact of Rocky Mountain Sports Park on Windsor, CO to the Windsor City Council.  2017.

Provided expert report pertaining to the economics of ticketing and personal seat licenses (PSLs) in *RCN Capital v. Los Angeles Rams.*  2017.

Provided trial testimony (and multiple reports and depositions) on financial harm pertaining to *FTC v. DirecTV.*  2017.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Glickman et al. v. Live Nation et al.*  2016.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Pollard v. AEG Live, et al.*  2016.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Finkelman v. NFL.*  2016.

Provided deposition testimony and submitted two expert reports pertaining to class certification issues in college football in *Rock v. NCAA*.  2014-16.

Submitted an expert report on damages pertaining to an endorsement relationship in *Frank Thomas v. Reebok*.  2015.

Provided deposition testimony and submitted an expert report pertaining to the economic relationship between two boxing entities in *Garcia v. Top Rank, Inc.*  2015.

Provided trial testimony (and multiple reports and depositions) on class certification issues, damages, and antitrust economics in regards to group licensing for former and current college football and basketball players in *O'Bannon et al. v. NCAA*.  2013-14.

Submitted three expert reports regarding lost earnings for a Major League Baseball player in *Backe et al. v. Fertitta Hospitality, LLC et al*.  2013.

Submitted two expert reports on class certification issues in regards to ticket holder lawsuit in *Phillips et al. v. Comcast Spectacor et al*.  2013.

Submitted expert report in a federal case involving defamation of character in the boxing industry (*Pacquiao v. Mayweather Jr. et al.*).  2012.

Provided deposition testimony and prepared expert report regarding an alleged sponsorship breach of contract in motorsports (*Vici Racing, LLC v. T-Mobile USA, Inc.*).  2012.

Prepared expert witness testimony on trade secrets case involving the sports consulting industry (*Sport Management Research Institute v. Keehn*).  2011.

Provided deposition testimony on the value of a minor league baseball team and related damages from an alleged breach of a facility lease permit (*Long Beach Armada v. City of Long Beach*). 2011.

Provided deposition testimony on the value of athlete endorsements in a breach of contract case involving an NBA player and a charter school business in an arbitration proceeding (*D Wade's Place v. Dwyane Wade*).  2010.

Provided deposition testimony on the value of athlete endorsements in a breach of contract case involving an NBA player and a restaurant investment in a state court proceeding (*Rodberg v. Dwyane Wade*).  2010.

Submitted two reports and provided deposition and arbitration testimony regarding damages related to how media coverage has impacted an NFL team's brand (*Kiffin v. Raiders*).  2009.

Submitted expert report, rebuttal report, gave deposition and trial testimony in federal court (*Adderley et al. v NFLPA & NFLPI*).  2008.

Public testimony on economic impact of a Major League Soccer stadium in San Jose to the San Jose City Council.  2008.

Public testimony on economic impact of six sports and cultural events in San Jose to the San Jose City Council.  2007.

Submitted expert report, rebuttal report, and testified at arbitration hearing on the financial valuation of Major League Soccer (*Rothenberg v. Major League Soccer, LLC*). 2006.

Named expert witness for a Major League Baseball club to analyze a punitive damages claim from an injury at a baseball game (*Bueno v. Rangers*). 2006.

Prepared expert testimony on liability and damages related to the operations of a minor baseball league on behalf of the league's owner (*Don Altman et al., v. Jeffrey Mallet, et al.*). Case was settled prior to deposition. 2004.

Public testimony on economic impact of an existing and new professional football stadium in Irving, TX to the Irving City Council (two council meetings). 2004.

Testimony on college athletics regarding Senate Bill 193 to the California State Senate Subcommittee on Entertainment. 2003.

Public testimony on economic impact of a downtown entertainment district in Sacramento to the Sacramento City Council (two council meetings). 2003.

Determination of IP valuation and damages from a clothing endorsement alleged breach of contract for PGA Tour player (*Stankowski v. Bugle Boy*). Submitted expert report. Case was settled prior to deposition. 2000.

Deposition testimony in breach of contract matter concerning sponsorship damages analysis in the auto racing industry (*Parente v. Della Penna Racing*). 2000.

Public testimony on forecast of economic impact of Pan Am Games on San Antonio to the San Antonio City Council. 1999.

Updated October 2024

# Appendix B

# Appendix B

## Documents Relied Upon

**Legal Filings and Guidelines**

Appellant's Petition for Rehearing and Suggestion for Rehearing En Banc (Law).

Class Action Complaint, November 29, 2022.

Defendant's Response to Plaintiffs' First Set of Interrogatories to Defendant NCAA, October 25, 2023.

Memorandum and Order Re: Defendant's Motion to Transfer and Motion to Dismiss, July 27, 2023.

Merger Guidelines, 2023 revision.

NCAA's Answer to Plaintiffs' Class Action Complaint, August 31, 2023.

Order Granting Motion for Certification of Damages Classes (House), November 3, 2023.

The Past and Future of Direct Effects Evidence: Remarks of J. Thomas Rosch before the ABA Section of Antitrust Law's 59th Spring Meeting, March 30, 2011.

**Expert Reports and Exhibits**

Declaration of Daniel A. Rascher in Support of Motion by Antitrust Plaintiffs for Class Certification (O'Bannon), April 24, 2013.

Expert Report of Daniel A. Rascher on Damages Class Certification (Alston), February 16, 2016, Appendix C.

Expert Report of Daniel A. Rascher on Damages Class Certification (Alston), February 16, 2016, Exhibit 7.

**Depositions**

Deposition of Jennifer Fraser, October 2, 2024.

Deposition of Lynda Tealer, October 10, 2024.

Deposition of Mark Emmert (Alston), October 22, 2014.

Deposition of Matt Boyer, August 27, 2024.

Deposition of Michael Hacker, October 8, 2024.

Deposition of Taylor Smart, September 24, 2024.

## Case Texts

Alston v. NCAA, No. 4:14-md-02541 (N.D. Cal.).

Colon v. NCAA, No. 23-cv-00425-WBS-CSK (E.D. Cal.).

House v. NCAA, No. 4:20-cv-03919 (N.D. Cal.).

Moussouris v. Microsoft Corp., Case No. C15–1483JLR, 311 F. Supp. 3d 1223, 1242 (W.D. Wash. 2018).

Law v. National Collegiate Athletic Ass'n, 5 F. Supp. 2d 921 (D. Kan. 1998).

Nat'l Collegiate Athletic Ass'n v. Alston, 594 U.S. 69, 81, 86 (2021).

Netafim Irrigation, Inc. v. Jain Irrigation, Inc., No. 1:21-cv-00540, 2022 WL 2791201, at *5 (E.D. Cal. July 15, 2022).

O' Bannon v. NCAA, No. 4:09-cv-03329 (N.D. Cal.).

O'Bannon v. Nat'l Collegiate Athletic Ass'n, 802 F.3d 1049, 1056, 1070 (9th Cir. 2015).

Optronic Tech., Inc. v. Ningbo Sunny Elec. Co., Ltd., 20 F.4th 466, 482 n.1 (9th Cir. 2021).

Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd., 778 F.3d 775, 784 (9th Cir. 2015).

Southeastern Milk Antitrust Litig., No. 2:08-ND-1000, 2010 WL 8228839, at *2 (E.D. Tenn. Dec. 8, 2010).

Trendsettah USA, Inc. v. Swisher Int'l, Inc., SACV14-01664, 2016 WL 6822191, at *6 n.3 (C.D. Cal. Jan. 21, 2016).


## Literature, Articles, and Publications

Baird, K. (2004). "Dominance in College Football and the Role of Scholarship Restrictions." Journal of Sport Management, 18(3).

Berri, D. J. (2004). "Is There a Short Supply of Tall People in the College Game?" In J. Fizel & R. Fort (Eds.), Economics of College Sports. Westport, CT: Praeger Publishers.

Blair, R. D., & Harrison, J. L. (1992). "The Measurement of Monopsony Power." The Antitrust Bulletin, 37(1).

Chakraborty, I. & Gantchev, N. (2013). "Does Shareholder Coordination Matter? Evidence from Private Placements." Journal of Financial Economics, 108(1).

Dunnavant, K. (2004). The Fifty-Year Seduction: How Television Manipulated College Football, from the Birth of the Modern NCAA to the Creation of the BCS, St. Martin's Press.

Erutku, C. (2012). "Testing post-cartel pricing during litigation," Economics Letters, 116(2012).

Fort, R. (2006). Sports Economics. Second Edition. Pearson.

Fort, R. (2011). Sports Economics. Third Edition. Pearson.

Fort, R. (2017). "College Sports Competitive Balance 'Beliefs' and the Rule of Reason: Applied Theory and a Literature Review." The Antitrust Bulletin, 62(1).

Greene, W. & Hensher, D. (2010), Modeling Ordered Choices: A Primer. Cambridge: Cambridge University Press.

Harrington, Jr., J.E. (2004).  "Post-Cartel Pricing During Litigation."  Journal of Industrial Economics, 52(4).

Harrington, Jr., J.E. (2004). "Cartel pricing dynamics in the presence of an antitrust authority." RAND Journal of Economics, 35(4).

Harrington, Jr., J.E. (2006). Behavioral screening and the detection of cartels. Presented at the 11th EU Competition Law and Policy Workshop in Florence, June 2-3, 2006.

Kahn, L. M. (2000). "The Sports Business as a Labor Market Laboratory." The Journal of Economic Perspectives, 14(3).

Kaplow, L. (2010). "Why (Ever) Define Markets?" Harvard Law Review, 124(437).

Kennedy, P. (2008). A Guide to Econometrics, Sixth Edition.

Lo, A.W. et al. (2002). "Econometric models of limit-order executions." Journal of Financial Economics, 65(1)

Maddala, G.S. (1992). Introduction to Econometrics. Second Edition.

Mankiw, N.G, & Romer, D. (1991). Imperfect Competition and Sticky Prices, MIT Press.

Marshall, R.C. & Marx, L.M. (2012). The Economics of Collusion: Cartels and Bidding Rings. The MIT Press.

McKelvey, R.D. & Zavoina, W. (1975). "A Statistical Model for the Analysis of Ordinal Level Dependent Variables." Journal of Mathematical Sociology. (4)1.

Mills, B. & Winfree, J. (2018). "Athlete Pay and Competitive Balance in College Athletics." Review of Industrial Organization, 52.

Morrison, D. (1972), "Upper Bounds for Correlations Between Binary Outcomes and Probabilistic Predictions." Journal of American Statistical Association. 67(337).

Neale, W.C. (1964). "The Peculiar Economics of Professional Sports: A Contribution to the Theory of the Firm in Sporting Competition and in Market Competition." The Quarterly Journal of Economics, 78(1).

Ngo, F., Coyner, M., & Lough, N. (2022). "The Financial Behaviors of Chasing Athletic Prestige: Evidence from the NCAA Cost of Attendance Policy." The Review of Higher Education, 45(3).

Niels, G., Jenkins, H., & Kavanagh, J. (2011). Economics for Competition Lawyers. Oxford University Press.

Nocera, J. and Strauss, B. (2016).  Indentured: The Inside Story of the Rebellion Against the NCAA, New York: Penguin Random House.

Noll, R. G. (2005). "'Buyer Power' and Economic Policy." Antitrust Law Journal, 72(2).

Peach, J. (2007). "College athletics, universities, and the NCAA." The Social Science Journal, 44(1).

Pindyck, R. & Rubinfeld. D. (1997). Econometric Models and Economic Forecasts. Fourth Edition.

Rahmouni, M. & Orabi, A. (2018, January). "The Exponential-Generalized Truncated Geometric (EGTG) Distribution: A New Lifetime Distribution," International Journal of Statistics and Probability, 7(1).

Rascher, D. (2008). "Franchise Relocations, Expansions and Mergers in Professional Sports Leagues." in The Business of Sports, Volume 2: Economic Perspectives on Sport. Brad Humphreys and Dennis Howard (Eds.). Westport, CT: Praeger Publishers.

Redmount, E., Snow, A., & Warren, Jr., R. (2012), "The Effect of Wage Payment Reform on Workers' Labor Supply, Wages, and Welfare." Journal of Economic History, 72(4).

Rogers, E.M. (1995). "Diffusion of Innovations," Fourth Edition, The Free Press.

Rottenberg, S. (1956). "The Baseball Players' Labor Market." Journal of Political Economy, 64(3).

Salaga, S., & Fort, R. (2017). "Structural Change in Competitive Balance in Big-Time College Football." Review of Industrial Organization, 50(1).

Shapiro, C. (2021). "Antitrust: What Went Wrong and How to Fix it." Antitrust, 35(3).

Veall, M. & Zimmermann, K. (1996), "Pseudo-R2 Measures for Some Common Limited Dependent Variable Models." Journal of Economic Surveys, (10)3.

Vrooman, J. (January 1997). "A Unified Theory of Capital and Labor Markets in Major League Baseball." Southern Economic Journal, 63(3).

Wooldridge, J.M. (2012). Introductory Econometrics: A Modern Approach. Fifth Edition.

## Produced Bates-Numbered Documents

NCAA_SMART-COLON_0000001

NCAA_SMART-COLON_0000465

NCAA_SMART-COLON_0000931

NCAA_SMART-COLON_0001396

NCAA_SMART-COLON_0001845

NCAA_SMART-COLON_0006955

NCAA_SMART-COLON_0008285

NCAA_SMART-COLON_0009571

NCAA_SMART-COLON_0010831

NCAA_SMART-COLON_0011245

NCAA_SMART-COLON_0015157

NCAA_SMART-COLON_0019530

NCAA_SMART-COLON_0019670

NCAA_SMART-COLON_0019728

NCAA_SMART-COLON_0019775

NCAA_SMART-COLON_0020631

NCAA_SMART-COLON_0028588

NCAA_SMART-COLON_0042200

NCAA_SMART-COLON_0042201

NCAA_SMART-COLON_0081395

NCAA_SMART-COLON_0125859

NCAA_SMART-COLON_0125860

NCAA_SMART-COLON_0140536

NCAA_SMART-COLON_0141887

NCAA_SMART-COLON_0142290

NCAA_SMART-COLON_0142567

NCAA_SMART-COLON_0142707

NCAA_SMART-COLON_0142726

NCAA_SMART-COLON_0142726

NCAA_SMART-COLON_0142989

NCAA_SMART-COLON_0143283

NCAA_SMART-COLON_0169970

NCAA_SMART-COLON_0173166

NCAA_SMART-COLON_0225947

NCAA_SMART-COLON_0229683

NCAA_SMART-COLON_0232335

NCAA_SMART-COLON_0232977

NCAA_SMART-COLON_0232978

NCAA_SMART-COLON_0232979

NCAA_SMART-COLON_0232980

NCAA_SMART-COLON_0232981

NCAA_SMART-COLON_0233736

NCAA_SMART-COLON_0234691

NCAA_SMART-COLON_0236855

NCAA_SMART-COLON_0237282

NCAA_SMART-COLON_0252244

SMART_COLON_THIRD PARTY_0000019162

SMART_COLON_THIRD PARTY_0000032893

SMART_COLON_THIRD PARTY_0000033014

SMART_COLON_THIRD PARTY_0000134854

SMART_COLON_THIRD_PARTY_0000023103

SMART_COLON_THIRD_PARTY_0000035333

SMART_COLON_THIRD_PARTY_0000038212

SMART_COLON_THIRD_PARTY_0000114139

SMART_SCHLS_0000002284


**Produced Documents (Reviewed in Native Format)**

School Subpoena Document Responses – Full List Included in Backup Materials


**Third Party Sources**

BLS CPI for All Urban Consumers (CPI-U) Series Id: CUUR0000SA0

Davidson Fundraising Appeal

https://12thman.com/sports/baseball/coaches/2019

https://12thman.com/sports/baseball/coaches/2020

https://12thman.com/sports/baseball/coaches/2021

https://12thman.com/sports/baseball/coaches/2022

https://12thman.com/sports/baseball/coaches/2023

https://12thman.com/sports/baseball/coaches/2024

https://aamusports.com/sports/baseball/coaches/2021

https://aamusports.com/sports/baseball/coaches/2022

https://aamusports.com/sports/baseball/coaches/2024

https://acusports.com/sports/baseball/roster/2024

https://acusports.com/sports/baseball/roster/coaches/casey-demko/1333

https://alcornsports.com/sports/baseball/coaches/2019

https://alcornsports.com/sports/baseball/coaches/2020

https://alcornsports.com/sports/baseball/coaches/2021

https://alcornsports.com/sports/baseball/coaches/2022

https://alcornsports.com/sports/baseball/coaches/2023

https://alcornsports.com/sports/baseball/coaches/2024

https://appstatesports.com/sports/baseball/coaches/2019

https://appstatesports.com/sports/baseball/coaches/2020

https://appstatesports.com/sports/baseball/coaches/2021

https://appstatesports.com/sports/baseball/coaches/2022

https://appstatesports.com/sports/baseball/coaches/2023

https://appstatesports.com/sports/baseball/coaches/2024

https://arizonawildcats.com/sports/baseball/roster/coaches/toby-demello/5854

https://arkansasrazorbacks.com/coach/bobby-wernes/

https://arkansasrazorbacks.com/sport/m-basebl/roster/#coaches

https://athletics.bellarmine.edu/sports/baseball/coaches/2023

https://athletics.bellarmine.edu/sports/baseball/coaches/2024

https://auburntigers.com/sports/baseball/roster/season/2024/staff/everett-teaford

https://bamastatesports.com/sports/baseball/roster/2019

https://bamastatesports.com/sports/baseball/roster/2020-21

https://bamastatesports.com/sports/baseball/roster/2021

https://bamastatesports.com/sports/baseball/roster/2022

https://bamastatesports.com/sports/baseball/roster/2023

https://bamastatesports.com/sports/baseball/roster/2024

https://baylorbears.com/news/2023/6/30/baseball-bsbs-jim-blair-named-assistant-coach

https://baylorbears.com/sports/baseball/roster/2024

https://baylorbears.com/sports/baseball/roster/coaches/jim-blair/2406

https://bcuathletics.com/sports/baseball/coaches/2019

https://bcuathletics.com/sports/baseball/coaches/2020

https://bcuathletics.com/sports/baseball/coaches/2022

https://bcuathletics.com/sports/baseball/coaches/2023

https://bgsufalcons.com/sports/baseball/coaches/2019

https://bgsufalcons.com/sports/baseball/coaches/2020

https://bgsufalcons.com/sports/baseball/coaches/2021

https://bgsufalcons.com/sports/baseball/coaches/2022

https://bgsufalcons.com/sports/baseball/coaches/2023

https://bgsufalcons.com/sports/baseball/coaches/2024

https://binghamtonbearcats.com/sports/baseball/coaches/2019

https://binghamtonbearcats.com/sports/baseball/coaches/2020

https://binghamtonbearcats.com/sports/baseball/coaches/2023

https://binghamtonbearcats.com/sports/baseball/coaches/2024

https://biz.opendorse.com/wp-content/uploads/2023/06/NILatTwo.pdf

https://broncosports.com/sports/baseball/coaches/2020

https://brownbears.com/sports/baseball/coaches/2019

https://brownbears.com/sports/baseball/coaches/2020

https://brownbears.com/sports/baseball/coaches/2021

https://brownbears.com/sports/baseball/coaches/2022

https://brownbears.com/sports/baseball/coaches/2023

https://brownbears.com/sports/baseball/coaches/2024

https://bryantbulldogs.com/sports/baseball/roster/2020#sidearm-roster-coaches

https://bryantbulldogs.com/sports/baseball/roster/2021#sidearm-roster-coaches

https://bryantbulldogs.com/sports/baseball/roster/2022#sidearm-roster-coaches

https://bryantbulldogs.com/sports/baseball/roster/2023#sidearm-roster-coaches

https://bryantbulldogs.com/sports/baseball/roster/2024#sidearm-roster-coaches

https://byucougars.com/staff/tyler-coolbaugh

https://calbears.com/sports/baseball/coaches/2019

https://calbears.com/sports/baseball/coaches/2020

https://calbears.com/sports/baseball/coaches/2021

https://calbears.com/sports/baseball/coaches/2022

https://calbears.com/sports/baseball/coaches/2023

https://calbears.com/sports/baseball/coaches/2024

https://catamountsports.com/sports/baseball/coaches/2019

https://catamountsports.com/sports/baseball/coaches/2020

https://catamountsports.com/sports/baseball/coaches/2021

https://catamountsports.com/sports/baseball/coaches/2022

https://catamountsports.com/sports/baseball/coaches/2023

https://catamountsports.com/sports/baseball/coaches/2024

https://cbulancers.com/sports/baseball/coaches/2019

https://cbulancers.com/sports/baseball/roster/coaches/alec-olsen/570

https://ccsubluedevils.com/sports/bsb/coaches/index

https://charlotte49ers.com/sports/baseball/coaches/2019

https://charlotte49ers.com/sports/baseball/coaches/2020

https://charlotte49ers.com/sports/baseball/coaches/2021

https://charlotte49ers.com/sports/baseball/coaches/2022

https://charlotte49ers.com/sports/baseball/coaches/2023

https://charlotte49ers.com/sports/baseball/coaches/2024

https://citadelsports.com/sports/baseball/roster/coaches/tag-montague/1568

https://clemsontigers.com/sports/baseball/roster/

https://cmuchippewas.com/sports/baseball/roster/coaches/aaron-hilt/980

https://cmuchippewas.com/sports/baseball/roster/coaches/doug-walters/981

https://cofcsports.com/staff-directory/sawyer-bridges/340

https://cofcsports.com/staff-directory/sawyer-bridges/340

https://collegead.com/the-advantages-to-self-reporting-violations-are-abundant/

https://coppinstatesports.com/sports/baseball/coaches/2019

https://coppinstatesports.com/sports/baseball/coaches/2020

9

https://coppinstatesports.com/sports/baseball/coaches/2021

https://coppinstatesports.com/sports/baseball/coaches/2022

https://coppinstatesports.com/sports/baseball/coaches/2023

https://coppinstatesports.com/sports/baseball/coaches/2024

https://csusports.com/sports/baseball/coaches/2019

https://csusports.com/sports/baseball/coaches/2020

https://csusports.com/sports/baseball/coaches/2021

https://csusports.com/sports/baseball/coaches/2022

https://csusports.com/sports/baseball/coaches/2023

https://csusports.com/sports/baseball/coaches/2024

https://d1baseball.com/news/fight-for-third-paid-assistant-receives-new-life/

https://d1baseball.com/stories/into-our-inbox-answering-some-of-college-baseballs-burning-questions/

https://dartmouthsports.com/sports/baseball/coaches/2019

https://dartmouthsports.com/sports/baseball/coaches/2020

https://dartmouthsports.com/sports/baseball/coaches/2021

https://dartmouthsports.com/sports/baseball/coaches/2022

https://dartmouthsports.com/sports/baseball/coaches/2023

https://dartmouthsports.com/sports/baseball/coaches/2024

https://data.bls.gov/pdq/SurveyOutputServlet

https://davidsonwildcats.com/sports/baseball/coaches/2024

https://daytonflyers.com/sports/baseball/coaches/2024

https://dbupatriots.com/sports/baseball/coaches/2019

https://dbupatriots.com/sports/baseball/coaches/2020

https://dbupatriots.com/sports/baseball/coaches/2021

https://dbupatriots.com/sports/baseball/coaches/2022

https://dbupatriots.com/sports/baseball/coaches/2023

https://dbupatriots.com/sports/baseball/coaches/2024

https://dsuhornets.com/sports/baseball/coaches/2021

https://dsuhornets.com/sports/baseball/coaches/2023

https://dsuhornets.com/sports/baseball/coaches/2024

https://ecupirates.com/sports/baseball/coaches/2019

https://ecupirates.com/sports/baseball/coaches/2020

https://ecupirates.com/sports/baseball/coaches/2021

https://ecupirates.com/sports/baseball/coaches/2022

https://ecupirates.com/sports/baseball/coaches/2023

https://ecupirates.com/sports/baseball/roster/2024

https://eiupanthers.com/sports/baseball/coaches/2024

https://eiupanthers.com/sports/baseball/roster/coaches/brad-merritt/1455

https://eiupanthers.com/sports/baseball/roster/coaches/curt-courtwright/646

https://eiupanthers.com/sports/baseball/roster/coaches/j-d-pulfer/1456

https://ekusports.com/sports/baseball/roster/2024

https://ekusports.com/sports/baseball/roster/coaches/j-d-davis/1653

https://famuathletics.com/sports/baseball/coaches/2020

https://famuathletics.com/sports/baseball/coaches/2021

https://famuathletics.com/sports/baseball/coaches/2022

https://famuathletics.com/sports/baseball/coaches/2023

https://famuathletics.com/sports/baseball/coaches/2024

https://fausports.com/sports/baseball/coaches/2019

https://fausports.com/sports/baseball/coaches/2020

https://fausports.com/sports/baseball/coaches/2021

https://fausports.com/sports/baseball/coaches/2022

https://fausports.com/sports/baseball/coaches/2023

https://fausports.com/sports/baseball/coaches/2024

https://fduknights.com/sports/baseball/coaches/2019

https://fduknights.com/sports/baseball/coaches/2020

https://fduknights.com/sports/baseball/coaches/2024

https://fgcuathletics.com/sports/baseball/coaches/2024

https://fgcuathletics.com/sports/baseball/roster/coaches/steve-mckee/5228

https://fightingillini.com/sports/baseball/roster/coaches/curt-courtwright/1162

https://fightingirish.com/coach/ryan-munger/

https://fiusports.com/sports/baseball/coaches/2019

https://floridagators.com/sports/baseball/coaches/2024

https://floridagators.com/sports/baseball/roster/coaches/david-kopp/1754

https://freakonomics.com/2012/03/would-paying-college-players-really-destroy-competitive-balance/

https://fred.stlouisfed.org/series/CPIAUCSL

https://fullertontitans.com/sports/baseball/roster/2024

https://fullertontitans.com/staff-directory/jake-pavletich/37

https://gamecocksonline.com/sports/baseball/roster/coach/joey-holcomb/

https://gamecocksonline.com/sports/baseball/roster/season/2024/

https://gculopes.com/sports/baseball/coaches/2024

https://gculopes.com/sports/baseball/roster/coaches/paul-panaccione/2052

https://geauxcolonels.com/sports/baseball/coaches/2019

https://geauxcolonels.com/sports/baseball/coaches/2020

https://geauxcolonels.com/sports/baseball/coaches/2021

https://geauxcolonels.com/sports/baseball/coaches/2022

https://geauxcolonels.com/sports/baseball/coaches/2023

https://geauxcolonels.com/sports/baseball/coaches/2024

https://georgiadogs.com/sports/baseball/roster/2024

https://georgiadogs.com/sports/baseball/roster/coaches/brock-bennett/3032

https://georgiastatesports.com/sports/baseball/roster/2024

https://goairforcefalcons.com/sports/baseball/coaches/2019

https://goairforcefalcons.com/sports/baseball/coaches/2020

https://goairforcefalcons.com/sports/baseball/coaches/2021

https://goairforcefalcons.com/sports/baseball/coaches/2022

https://goairforcefalcons.com/sports/baseball/coaches/2023

https://goairforcefalcons.com/sports/baseball/coaches/2024

https://goarmywestpoint.com/sports/baseball/coaches/2019

https://goarmywestpoint.com/sports/baseball/coaches/2020

https://goarmywestpoint.com/sports/baseball/coaches/2024

https://goarmywestpoint.com/sports/baseball/roster/coaches/franklin-jennings/1862

https://goaztecs.com/sports/baseball/roster/season/2023/staff/ryan-kirby

https://goaztecs.com/staff/tony-tarasco

https://gobearcats.com/sports/baseball/coaches/2022

https://gobearcats.com/sports/baseball/coaches/2024

https://gobearcats.com/staff-directory/tom-winske/1823

https://gobearkats.com/sports/baseball/roster/coaches/kyle-simonds/1064

https://gobison.com/sports/baseball/coaches

https://gobison.com/sports/baseball/roster/coaches/trent-keefer/2238

https://gobluehose.com/sports/baseball/roster/2023

https://goblueraiders.com/sports/baseball/coaches/2024

https://gobonnies.com/sports/baseball/roster/2019

https://gobonnies.com/sports/baseball/roster/2020

https://gobonnies.com/sports/baseball/roster/2021

https://gobonnies.com/sports/baseball/roster/2022

https://gobonnies.com/sports/baseball/roster/2023

https://gobonnies.com/sports/baseball/roster/2024

https://goboxers.com/sports/baseball/coaches/2019

https://goboxers.com/sports/baseball/coaches/2020

https://goboxers.com/sports/baseball/coaches/2021

https://goboxers.com/sports/baseball/coaches/2022

https://goboxers.com/sports/baseball/coaches/2023

https://goboxers.com/sports/baseball/coaches/2024

https://gobroncs.com/sports/baseball/roster/2022

https://gobroncs.com/sports/baseball/roster/2024

https://gobulldogs.com/sports/baseball/coaches/2023

https://gobulldogs.com/sports/baseball/coaches/2024

https://gocamels.com/sports/baseball/coaches/2024

https://gocamels.com/sports/baseball/roster/2024

https://gocards.com/sports/baseball/coaches

https://gocards.com/sports/baseball/roster/coaches/adam-vrable/2640

https://goccusports.com/sports/baseball/coaches/2019

https://goccusports.com/sports/baseball/coaches/2020

https://goccusports.com/sports/baseball/coaches/2021

https://goccusports.com/sports/baseball/coaches/2022

https://goccusports.com/sports/baseball/coaches/2023

https://goccusports.com/sports/baseball/coaches/2024

https://gocolumbialions.com/sports/baseball/roster/coaches/canyon-kyle/3202

https://gocreighton.com/sports/baseball/roster/2024#sidearm-roster-coaches

https://gocrimson.com/sports/baseball/roster/coaches/kyle-decker/2487

https://godeacs.com/sports/baseball/coaches/2019

https://godeacs.com/sports/baseball/coaches/2020

https://godeacs.com/sports/baseball/coaches/2021

https://godeacs.com/sports/baseball/coaches/2022

https://godeacs.com/sports/baseball/coaches/2023

https://godeacs.com/sports/baseball/coaches/2024

https://goducks.com/sports/baseball/roster/2019

https://goducks.com/sports/baseball/roster/2020

https://goducks.com/sports/baseball/roster/2021

https://goducks.com/sports/baseball/roster/2022

https://goducks.com/sports/baseball/roster/2023

https://goducks.com/sports/baseball/roster/2024

https://goducks.com/sports/baseball/roster/coaches/marcus-hinkle/3631

https://goduke.com/sports/baseball/coaches/2019

https://goduke.com/sports/baseball/coaches/2020

https://goduke.com/sports/baseball/coaches/2021

https://goduke.com/sports/baseball/coaches/2022

https://goduke.com/sports/baseball/coaches/2023

https://goduke.com/sports/baseball/coaches/2024

https://gofrogs.com/sports/baseball/coaches/2024

https://gofrogs.com/sports/baseball/roster/coaches/dave-lawn/1404

https://gogriffs.com/sports/baseball/coaches/2019

https://gogriffs.com/sports/baseball/coaches/2020

https://gogriffs.com/sports/baseball/coaches/2021

https://gogriffs.com/sports/baseball/coaches/2022

https://gogriffs.com/sports/baseball/coaches/2023

https://goheels.com/sports/baseball/roster/coaches/jason-howell/3708

https://gohighlanders.com/sports/baseball/coaches/2019

https://gohighlanders.com/sports/baseball/coaches/2020

https://gohighlanders.com/sports/baseball/coaches/2021

https://gohighlanders.com/sports/baseball/coaches/2022

https://gohighlanders.com/sports/baseball/coaches/2023

https://gohighlanders.com/sports/baseball/coaches/2024

https://gohofstra.com/sports/baseball/coaches/2019

https://gohofstra.com/sports/baseball/coaches/2020

https://gohofstra.com/sports/baseball/coaches/2021

https://gohofstra.com/sports/baseball/coaches/2022

https://gohofstra.com/sports/baseball/coaches/2023

https://gohofstra.com/sports/baseball/coaches/2024

https://goholycross.com/sports/baseball/coaches/2020

https://gohuskies.com/sports/baseball/coaches/2019

https://gohuskies.com/sports/baseball/coaches/2020

https://gohuskies.com/sports/baseball/coaches/2021

https://gohuskies.com/sports/baseball/coaches/2022

https://gohuskies.com/sports/baseball/coaches/2023

15

https://gohuskies.com/sports/baseball/coaches/2024

https://goislanders.com/sports/baseball/coaches/2019

https://goislanders.com/sports/baseball/coaches/2020

https://goislanders.com/sports/baseball/coaches/2021

https://goislanders.com/sports/baseball/coaches/2022

https://goislanders.com/sports/baseball/coaches/2023

https://goislanders.com/sports/baseball/coaches/2024

https://gojacks.com/sports/baseball/roster/2019

https://gojacks.com/sports/baseball/roster/2020

https://gojacks.com/sports/baseball/roster/2021

https://gojacks.com/sports/baseball/roster/2022

https://gojacks.com/sports/baseball/roster/2023

https://gojacks.com/sports/baseball/roster/2024

https://gojagsports.com/sports/baseball/roster/2019

https://gojagsports.com/sports/baseball/roster/2020

https://gojagsports.com/sports/baseball/roster/2021

https://gojagsports.com/sports/baseball/roster/2022

https://gojagsports.com/sports/baseball/roster/2023

https://gojagsports.com/sports/baseball/roster/2024

https://gojaspers.com/sports/baseball/coaches/2019

https://gojaspers.com/sports/baseball/coaches/2020

https://gojaspers.com/sports/baseball/coaches/2021

https://gojaspers.com/sports/baseball/coaches/2022

https://gojaspers.com/sports/baseball/coaches/2023

https://gojaspers.com/sports/baseball/coaches/2024

https://gojsutigers.com/sports/baseball/coaches/2019

https://gojsutigers.com/sports/baseball/coaches/2020

https://gojsutigers.com/sports/baseball/coaches/2021

https://gojsutigers.com/sports/baseball/coaches/2022

https://gojsutigers.com/sports/baseball/coaches/2023

https://goldengrizzlies.com/sports/baseball/coaches/2019

https://goldengrizzlies.com/sports/baseball/roster/coaches/jared-helmic/2846

https://goleathernecks.com/sports/baseball/coaches/2019

https://goleathernecks.com/sports/baseball/coaches/2022

https://goleathernecks.com/sports/baseball/coaches/2023

https://goleopards.com/sports/baseball/coaches/2020

https://goleopards.com/sports/baseball/coaches/2024

https://goleopards.com/staff-directory/scott-boches/557

https://golobos.com/sports/baseball/roster/season/2018-19/

https://golobos.com/sports/baseball/roster/season/2019-20/

https://golobos.com/sports/baseball/roster/season/2020-21/

https://golobos.com/sports/baseball/roster/season/2021-22/

https://golobos.com/sports/baseball/roster/season/2022-23/

https://golobos.com/sports/baseball/roster/season/2023-24/

https://gomastodons.com/sports/baseball/roster/2019

https://gomastodons.com/sports/baseball/roster/2020

https://gomastodons.com/sports/baseball/roster/2021

https://gomastodons.com/sports/baseball/roster/2022

https://gomastodons.com/sports/baseball/roster/2023

https://gomastodons.com/sports/baseball/roster/2024

https://gomatadors.com/sports/baseball/roster/coaches/youngjin-yoon/1225

https://gopack.com/sports/baseball/coaches/2019

https://gopack.com/sports/baseball/coaches/2020

https://gopack.com/sports/baseball/coaches/2021

https://gopack.com/sports/baseball/coaches/2022

https://gopack.com/sports/baseball/coaches/2023

https://gopack.com/sports/baseball/coaches/2024

https://gophersports.com/sports/baseball/coaches/2019

https://gophersports.com/sports/baseball/coaches/2020

https://gophersports.com/sports/baseball/coaches/2021

https://gophersports.com/sports/baseball/coaches/2022

https://gophersports.com/sports/baseball/coaches/2023

https://gophersports.com/sports/baseball/coaches/2024

https://goprincetontigers.com/sports/baseball/coaches

https://goprincetontigers.com/sports/baseball/coaches/2020

https://goprincetontigers.com/sports/baseball/coaches/2022

https://goprincetontigers.com/sports/baseball/coaches/2023

https://gopsusports.com/sports/baseball/roster/season/2019/staff/sean-moore

https://gopsusports.com/sports/baseball/roster/season/2024

https://gopsusports.com/staff/will-jauss

https://goracers.com/sports/baseball/coaches/2019

https://goracers.com/sports/baseball/coaches/2020

https://goracers.com/sports/baseball/coaches/2021

https://goracers.com/sports/baseball/coaches/2022

https://goracers.com/sports/baseball/coaches/2023

https://goracers.com/sports/baseball/coaches/2024

https://goredbirds.com/sports/baseball/roster/coaches/derek-parola/1425

https://goredfoxes.com/sports/baseball/coaches/2019

https://goredfoxes.com/sports/baseball/coaches/2020

https://goredfoxes.com/sports/baseball/coaches/2021

https://goredfoxes.com/sports/baseball/coaches/2022

https://goredfoxes.com/sports/baseball/coaches/2023

https://goredfoxes.com/sports/baseball/coaches/2024

https://gorhody.com/sports/baseball/roster/2019

https://gorhody.com/sports/baseball/roster/2020

https://gorhody.com/sports/baseball/roster/2021

https://gorhody.com/sports/baseball/roster/2022

18

https://gorhody.com/sports/baseball/roster/2023

https://gorhody.com/sports/baseball/roster/2024

https://goriverhawks.com/sports/baseball/coaches/2019

https://goriverhawks.com/sports/baseball/coaches/2020

https://goriverhawks.com/sports/baseball/coaches/2021

https://goriverhawks.com/sports/baseball/coaches/2022

https://goriverhawks.com/sports/baseball/coaches/2023

https://goriverhawks.com/sports/baseball/coaches/2024

https://gorunners.com/sports/baseball/coaches/2024

https://goseattleu.com/sports/baseball/roster/2019

https://goseattleu.com/sports/baseball/roster/2020

https://goseattleu.com/sports/baseball/roster/2021

https://goseattleu.com/sports/baseball/roster/2022

https://goseattleu.com/sports/baseball/roster/2023

https://goseattleu.com/sports/baseball/roster/2024

https://goshockers.com/sports/baseball/roster/2019

https://goshockers.com/sports/baseball/roster/2020

https://goshockers.com/sports/baseball/roster/2021

https://goshockers.com/sports/baseball/roster/2022

https://goshockers.com/sports/baseball/roster/2023

https://goshockers.com/sports/baseball/roster/2024

https://gostanford.com/sports/baseball/roster/season/2019

https://gostanford.com/sports/baseball/roster/season/2020

https://gostanford.com/sports/baseball/roster/season/2021

https://gostanford.com/sports/baseball/roster/season/2022

https://gostanford.com/sports/baseball/roster/season/2023

https://gostanford.com/sports/baseball/roster/season/2024

https://gosycamores.com/sports/baseball/coaches/2024

https://gosycamores.com/sports/baseball/roster/coaches/kevin-bowers/1043

19

https://gotigersgo.com/sports/baseball/roster/coaches/connor-manola/3770

https://gotigersgo.com/sports/baseball/roster/coaches/cory-barton/3769

https://gousfbulls.com/news/2023/6/13/kunkel-returns-to-usf-baseball-as-associate-head-coach.aspx

https://gousfbulls.com/sports/baseball/roster/2022

https://gousfbulls.com/sports/baseball/roster/2024

https://gousfbulls.com/sports/baseball/roster/coaches/chris-cates/4965

https://gousfbulls.com/sports/baseball/roster/coaches/chris-johns/4958

https://goutrgv.com/sports/baseball/roster/2019

https://goutrgv.com/sports/baseball/roster/2020

https://goutrgv.com/sports/baseball/roster/2021

https://goutrgv.com/sports/baseball/roster/2022

https://goutrgv.com/sports/baseball/roster/2023

https://goutrgv.com/sports/baseball/roster/2024

https://gouvu.com/sports/baseball/coaches/2020

https://gouvu.com/sports/baseball/coaches/2021

https://gouvu.com/sports/baseball/roster/coaches/kade-kryzsko/2085

https://goxavier.com/sports/baseball/coaches/2019

https://goxavier.com/sports/baseball/coaches/2020

https://goxavier.com/sports/baseball/coaches/2021

https://goxavier.com/sports/baseball/coaches/2022

https://goxavier.com/sports/baseball/coaches/2023

https://goxavier.com/sports/baseball/coaches/2024

https://gozags.com/sports/baseball/coaches/2024

https://gozags.com/sports/baseball/roster/coaches/evan-wells/608

https://gseagles.com/sports/baseball/coaches/2019

https://gseagles.com/sports/baseball/coaches/2020

https://gseagles.com/sports/baseball/coaches/2021

https://gseagles.com/sports/baseball/coaches/2022

https://gseagles.com/sports/baseball/coaches/2023

https://gseagles.com/sports/baseball/roster/2024

https://gseagles.com/sports/baseball/roster/coaches/josh-minjarez/1554

https://gsutigers.com/sports/baseball/coaches/2019

https://gsutigers.com/sports/baseball/coaches/2020

https://gsutigers.com/sports/baseball/coaches/2021

https://gsutigers.com/sports/baseball/coaches/2022

https://gsutigers.com/sports/baseball/coaches/2023

https://gsutigers.com/sports/baseball/coaches/2024

https://gwsports.com/sports/baseball/roster/2024

https://gwsports.com/sports/baseball/roster/coaches/bryan-liriano-hernandez/848

https://gwusports.com/sports/baseball/coaches

https://hailstate.com/sports/baseball/coaches/2019

https://hailstate.com/sports/baseball/coaches/2020

https://hailstate.com/sports/baseball/coaches/2021

https://hailstate.com/sports/baseball/coaches/2022

https://hailstate.com/sports/baseball/coaches/2023

https://hailstate.com/sports/baseball/coaches/2024

https://hailstate.com/sports/baseball/roster/coaches/justin-parker/2831

https://hailstate.com/sports/baseball/roster/coaches/kyle-cheesebrough/2568

https://hartfordhawks.com/sports/baseball/coaches/2021

https://hawkeyesports.com/sports/baseball/roster/season/2024-25/coach/mitch-boe-coach/

https://herdzone.com/sports/baseball/coaches/2019

https://herdzone.com/sports/baseball/coaches/2020

https://herdzone.com/sports/baseball/coaches/2021

https://herdzone.com/sports/baseball/coaches/2022

https://herdzone.com/sports/baseball/coaches/2023

https://herdzone.com/sports/baseball/coaches/2024

https://hokiesports.com/sports/baseball/roster/season/2019

https://hokiesports.com/sports/baseball/roster/season/2020

https://hokiesports.com/sports/baseball/roster/season/2021

https://hokiesports.com/sports/baseball/roster/season/2022

https://hokiesports.com/sports/baseball/roster/season/2023

https://hokiesports.com/sports/baseball/roster/season/2024

https://hornetsports.com/sports/baseball/roster/2023

https://hornetsports.com/sports/baseball/roster/2024

https://huskers.com/sports/baseball/roster/season/2023

https://huskers.com/sports/baseball/roster/season/2024

https://ionagaels.com/sports/baseball/coaches/2020

https://ionagaels.com/sports/baseball/coaches/2023

https://ionagaels.com/sports/baseball/coaches/2024

https://iuhoosiers.com/sports/baseball/coaches/2021

https://iuhoosiers.com/sports/baseball/coaches/2022

https://jaxstatesports.com/sports/baseball/coaches/2020

https://jaxstatesports.com/sports/baseball/coaches/2024

https://jaxstatesports.com/sports/baseball/roster/coaches/anthony-silkwood/1181

https://jaxstatesports.com/sports/baseball/roster/coaches/brian-sharp/1180

https://judolphins.com/sports/baseball/coaches/2024

https://kuathletics.com/sports/baseball/roster/2019

https://kuathletics.com/sports/baseball/roster/2020

https://kuathletics.com/sports/baseball/roster/coaches/tyler-hancock/3

https://lamarcardinals.com/sports/baseball/coaches/2019

https://latechsports.com/sports/baseball/coaches/2019

https://latechsports.com/sports/baseball/coaches/2020

https://latechsports.com/sports/baseball/coaches/2021

https://latechsports.com/sports/baseball/coaches/2022

https://latechsports.com/sports/baseball/coaches/2023

https://latechsports.com/sports/baseball/coaches/2024

https://lehighsports.com/sports/baseball/coaches/2019

https://lehighsports.com/sports/baseball/coaches/2020

https://lehighsports.com/sports/baseball/coaches/2021

https://lehighsports.com/sports/baseball/coaches/2022

https://lehighsports.com/sports/baseball/coaches/2023

https://lehighsports.com/sports/baseball/coaches/2024

https://lemoynedolphins.com/sports/baseball/coaches/2024

https://letsgopeay.com/sports/baseball/coaches/2023

https://letsgopeay.com/sports/baseball/coaches/2024

https://libertyflames.com/sports/baseball/coaches/2024

https://libertyflames.com/sports/baseball/roster/coaches/andrew-kowalo/2274

https://lindenwoodlions.com/sports/baseball/coaches/2023

https://lindenwoodlions.com/sports/baseball/coaches/2024

https://lionsports.net/sports/baseball/roster/2019

https://lionsports.net/sports/baseball/roster/2020

https://lionsports.net/sports/baseball/roster/2021

https://lionsports.net/sports/baseball/roster/2022

https://lionsports.net/sports/baseball/roster/2023

https://lionsports.net/sports/baseball/roster/2024

https://lmulions.com/sports/baseball/roster/coaches/travis-buck/5839

https://longwoodlancers.com/sports/baseball/coaches/2023

https://longwoodlancers.com/sports/baseball/coaches/2024

https://lsusports.net/sports/bsb/roster/coach/marc-wanaka/

https://mcneesesports.com/sports/baseball/coaches/2019

https://mcneesesports.com/sports/baseball/coaches/2020

https://mcneesesports.com/sports/baseball/coaches/2021

https://mcneesesports.com/sports/baseball/coaches/2022

https://mcneesesports.com/sports/baseball/coaches/2023

https://mcneesesports.com/sports/baseball/coaches/2024

https://mercerbears.com/sports/baseball/coaches/2024

https://mercerbears.com/sports/baseball/roster/coaches/matt-williams/3159

https://mercerbears.com/sports/baseball/roster/coaches/tanner-gordon/2940

https://mgoblue.com/sports/baseball/coaches/2024

https://mgoblue.com/sports/baseball/roster/staff/josh-phegley/68

https://mgoblue.com/staff-directory/tyler-graham/3900

https://miamihurricanes.com/sports/baseball/roster/season/2023-24/

https://miamiredhawks.com/sports/baseball/coaches/2019

https://miamiredhawks.com/sports/baseball/coaches/2024

https://missouristatebears.com/sports/baseball/coaches/2024

https://missouristatebears.com/sports/baseball/roster/coaches/geoff-jimenez/1206

https://monmouthhawks.com/sports/baseball/coaches

https://mountathletics.com/sports/baseball/coaches/2019

https://mountathletics.com/sports/baseball/coaches/2020

https://mountathletics.com/sports/baseball/coaches/2021

https://mountathletics.com/sports/baseball/coaches/2022

https://mountathletics.com/sports/baseball/coaches/2023

https://mountathletics.com/sports/baseball/coaches/2024

https://msuspartans.com/sports/baseball/coaches/2019

https://msuspartans.com/sports/baseball/coaches/2020

https://msuspartans.com/sports/baseball/coaches/2021

https://msuspartans.com/sports/baseball/coaches/2022

https://msuspartans.com/sports/baseball/coaches/2023

https://msuspartans.com/sports/baseball/coaches/2024

https://mutigers.com/sports/baseball/coaches/2019

https://mutigers.com/sports/baseball/coaches/2021

https://mutigers.com/sports/baseball/roster/coaches/jason-hagerty/2099

https://mutigers.com/sports/baseball/roster/coaches/ricky-meinhold/2458

https://mvsusports.com/sports/baseball/coaches/2019

https://mvsusports.com/sports/baseball/coaches/2020

https://mvsusports.com/sports/baseball/coaches/2021

https://mvsusports.com/sports/baseball/coaches/2022

https://mvsusports.com/sports/baseball/coaches/2023

https://mvsusports.com/sports/baseball/coaches/2024

https://navysports.com/sports/baseball/coaches/2019

https://navysports.com/sports/baseball/coaches/2020

https://navysports.com/sports/baseball/coaches/2021

https://navysports.com/sports/baseball/coaches/2022

https://navysports.com/sports/baseball/coaches/2023

https://navysports.com/sports/baseball/coaches/2024

https://ncaa.s3.amazonaws.com/files/enforcement/EWG-self-study-052616-final_20161014.pdf

https://ncaanewsarchive.s3.amazonaws.com/2007/Division-I/moratorium-lets-division-i-pause-to-ponder-growth---08-27-07---ncaa-news.html

https://ncataggies.com/sports/baseball/coaches

https://ncataggies.com/sports/baseball/roster/coaches/cliff-allred/582

https://nccueaglepride.com/sports/baseball/coaches/2019

https://nccueaglepride.com/sports/baseball/coaches/2020

https://nccueaglepride.com/sports/baseball/coaches/2021

https://nevadawolfpack.com/sports/baseball/coaches/2019

https://nevadawolfpack.com/sports/baseball/coaches/2020

https://nevadawolfpack.com/sports/baseball/coaches/2021

https://nevadawolfpack.com/sports/baseball/coaches/2022

https://nevadawolfpack.com/sports/baseball/coaches/2023

https://nevadawolfpack.com/sports/baseball/coaches/2024

https://njithighlanders.com/sports/baseball/coaches/2019

https://njithighlanders.com/sports/baseball/coaches/2024

https://nkunorse.com/sports/baseball/roster/2019

https://nkunorse.com/sports/baseball/roster/2024

https://nmstatesports.com/sports/baseball/coaches/2019

https://nsudemons.com/sports/baseball/roster/2019

https://nsudemons.com/sports/baseball/roster/2020

https://nsudemons.com/sports/baseball/roster/2021

https://nsudemons.com/sports/baseball/roster/2022

https://nsudemons.com/sports/baseball/roster/2023

https://nsudemons.com/sports/baseball/roster/2024

https://nsuspartans.com/sports/baseball/coaches/2021

https://nsuspartans.com/sports/baseball/coaches/2024

https://nuhuskies.com/sports/baseball/roster/2019

https://nuhuskies.com/sports/baseball/roster/2020

https://nuhuskies.com/sports/baseball/roster/2021

https://nuhuskies.com/sports/baseball/roster/2022

https://nuhuskies.com/sports/baseball/roster/2023

https://nuhuskies.com/sports/baseball/roster/2024

https://nusports.com/sports/baseball/coaches/2024

https://nusports.com/sports/baseball/roster/coaches/ben-keizer/3384

https://odusports.com/sports/baseball/roster/season/2022

https://odusports.com/sports/baseball/roster/season/2024

https://odusports.com/staff/ryan-fineman

https://ohiobobcats.com/sports/baseball/roster/2019

https://ohiobobcats.com/sports/baseball/roster/2020

https://ohiobobcats.com/sports/baseball/roster/2021

https://ohiobobcats.com/sports/baseball/roster/2022

https://ohiobobcats.com/sports/baseball/roster/2023

https://ohiobobcats.com/sports/baseball/roster/2024

https://ohiostatebuckeyes.com/sports/baseball/coaches/2024

https://ohiostatebuckeyes.com/sports/baseball/roster/coaches/buck-taylor/1249

https://okstate.com/sports/baseball/roster/2019

https://okstate.com/sports/baseball/roster/2020

https://okstate.com/sports/baseball/roster/2021

https://okstate.com/sports/baseball/roster/2022

https://okstate.com/sports/baseball/roster/2023

https://okstate.com/sports/baseball/roster/2024

https://olemisssports.com/sports/baseball/coaches/2024

https://olemisssports.com/sports/baseball/roster/coaches/chris-cleary/557

https://omavs.com/sports/baseball/coaches/2019

https://omavs.com/sports/baseball/coaches/2020

https://omavs.com/sports/baseball/coaches/2021

https://omavs.com/sports/baseball/coaches/2022

https://omavs.com/sports/baseball/coaches/2023

https://omavs.com/sports/baseball/coaches/2024

https://omavs.com/staff-directory/michael-bradshaw/4452

https://oruathletics.com/sports/baseball/roster/2019

https://oruathletics.com/sports/baseball/roster/2020

https://oruathletics.com/sports/baseball/roster/2021

https://oruathletics.com/sports/baseball/roster/2022

https://oruathletics.com/sports/baseball/roster/2023

https://oruathletics.com/sports/baseball/roster/2024

https://osubeavers.com/sports/baseball/coaches/2024

https://pepperdinewaves.com/sports/baseball/coaches/2024

https://pepperdinewaves.com/sports/baseball/roster/coaches/cole-mahoney-bruer/647

https://pittsburghpanthers.com/sports/baseball/roster/2021

https://pittsburghpanthers.com/sports/baseball/roster/2024

https://pittsburghpanthers.com/staff-directory/devin-mesoraco/3668

https://portlandpilots.com/sports/baseball/roster/2019

https://portlandpilots.com/sports/baseball/roster/2020

https://portlandpilots.com/sports/baseball/roster/2021

https://portlandpilots.com/sports/baseball/roster/2022

https://portlandpilots.com/sports/baseball/roster/2023

https://portlandpilots.com/sports/baseball/roster/2024

https://purduesports.com/sports/baseball/roster/2019

https://purduesports.com/sports/baseball/roster/2020

https://purduesports.com/sports/baseball/roster/2021

https://purduesports.com/sports/baseball/roster/2022

https://purduesports.com/sports/baseball/roster/2023

https://purduesports.com/sports/baseball/roster/2024

https://purpleeagles.com/sports/baseball/coaches/2022

https://purpleeagles.com/sports/baseball/coaches/2023

https://purpleeagles.com/sports/baseball/coaches/2024

https://pvpanthers.com/sports/baseball/roster/2019

https://pvpanthers.com/sports/baseball/roster/2020

https://pvpanthers.com/sports/baseball/roster/2021

https://pvpanthers.com/sports/baseball/roster/2022

https://pvpanthers.com/sports/baseball/roster/2023

https://pvpanthers.com/sports/baseball/roster/2024

https://queensathletics.com/sports/baseball/roster/2023

https://queensathletics.com/sports/baseball/roster/2024

https://ragincajuns.com/sports/baseball/coaches/2019

https://ragincajuns.com/sports/baseball/coaches/2020

https://ragincajuns.com/sports/baseball/coaches/2021

https://ragincajuns.com/sports/baseball/coaches/2022

https://ragincajuns.com/sports/baseball/coaches/2023

https://ragincajuns.com/sports/baseball/coaches/2024

https://ramblinwreck.com/sports/m-basebl/roster/season/2018-19/

https://redstormsports.com/sports/baseball/roster/2019

https://redstormsports.com/sports/baseball/roster/2020

https://redstormsports.com/sports/baseball/roster/2021

https://redstormsports.com/sports/baseball/roster/2022

https://redstormsports.com/sports/baseball/roster/2023

https://redstormsports.com/sports/baseball/roster/2024

https://riceowls.com/sports/baseball/roster/2023

https://riceowls.com/sports/baseball/roster/coaches/dc-arendas/2925

https://roarlions.com/sports/baseball/coaches/2021

https://roarlions.com/sports/baseball/coaches/2022

https://roarlions.com/sports/baseball/coaches/2024

https://rolltide.com/sports/baseball/roster/coaches/mike-morrison/1567

https://rutgersnewarkathletics.com/sports/baseball/roster/coaches/marquay-mayo/1181

https://sacredheartpioneers.com/sports/baseball/coaches/2024

https://saintpeterspeacocks.com/sports/baseball/roster/2019

https://saintpeterspeacocks.com/sports/baseball/roster/2020

https://saintpeterspeacocks.com/sports/baseball/roster/2021

https://saintpeterspeacocks.com/sports/baseball/roster/2022

https://saintpeterspeacocks.com/sports/baseball/roster/2023

https://saintpeterspeacocks.com/sports/baseball/roster/2024

https://samfordsports.com/sports/baseball/roster/2019

https://samfordsports.com/sports/baseball/roster/2020

https://samfordsports.com/sports/baseball/roster/2021

https://samfordsports.com/sports/baseball/roster/2022

https://samfordsports.com/sports/baseball/roster/2023

https://samfordsports.com/sports/baseball/roster/2024

https://scarletknights.com/sports/baseball/roster/2019#sidearm-roster-coaches

https://scarletknights.com/sports/baseball/roster/2020

https://scarletknights.com/sports/baseball/roster/2021

https://scarletknights.com/sports/baseball/roster/2022

https://scarletknights.com/sports/baseball/roster/2023

https://scarletknights.com/sports/baseball/roster/2024

https://seminoles.com/sports/baseball/roster/2024

https://seminoles.com/sports/baseball/roster/coaches/brad-vanderglas/435

https://semoredhawks.com/sports/baseball/coaches/2019

https://semoredhawks.com/sports/baseball/coaches/2020

https://semoredhawks.com/sports/baseball/coaches/2021

https://semoredhawks.com/sports/baseball/coaches/2022

https://semoredhawks.com/sports/baseball/coaches/2023

https://semoredhawks.com/sports/baseball/coaches/2024

https://sfajacks.com/sports/baseball/coaches/2024

https://sfajacks.com/staff-directory/rusty-pendergrass/607

https://shupirates.com/sports/baseball/coaches/2024

https://sienasaints.com/sports/baseball/roster/2019

https://sienasaints.com/sports/baseball/roster/2020

https://sienasaints.com/sports/baseball/roster/2021

https://sienasaints.com/sports/baseball/roster/2022

https://sienasaints.com/sports/baseball/roster/2023

https://sienasaints.com/sports/baseball/roster/2024

https://siusalukis.com/sports/baseball/roster/coaches/jake-ryan/923

https://sjsuspartans.com/sports/baseball/roster/season/2019

https://sjsuspartans.com/sports/baseball/roster/season/2020

https://sjsuspartans.com/sports/baseball/roster/season/2021

https://sjsuspartans.com/sports/baseball/roster/season/2022

https://sjsuspartans.com/sports/baseball/roster/season/2023

https://sjsuspartans.com/sports/baseball/roster/season/2024

https://sjuhawks.com/sports/baseball/coaches/2019

https://sjuhawks.com/sports/baseball/coaches/2020

https://sjuhawks.com/sports/baseball/coaches/2021

https://sjuhawks.com/sports/baseball/coaches/2022

https://sjuhawks.com/sports/baseball/coaches/2023

https://sjuhawks.com/sports/baseball/coaches/2024

https://sjuhawks.com/staff-directory/lee-saverio/285

https://slubillikens.com/sports/baseball/coaches/2024

https://slubillikens.com/sports/baseball/roster/coaches/jason-eary/2054

https://smcgaels.com/sports/baseball/coaches/2019

https://smcgaels.com/sports/baseball/coaches/2020

https://smcgaels.com/sports/baseball/coaches/2021

https://smcgaels.com/sports/baseball/coaches/2022

https://smcgaels.com/sports/baseball/coaches/2023

https://smcgaels.com/sports/baseball/coaches/2024

https://soonersports.com/sports/baseball/roster/2024

https://soonersports.com/sports/baseball/roster/coaches/russell-raley/912

https://southernmiss.com/sports/baseball/roster/2019

https://southernmiss.com/sports/baseball/roster/2020

https://southernmiss.com/sports/baseball/roster/2021

https://southernmiss.com/sports/baseball/roster/2022

https://southernmiss.com/sports/baseball/roster/2023

https://southernmiss.com/sports/baseball/roster/2024

https://southernmiss.com/sports/baseball/roster/coaches/ladd-rhodes/1827

https://ssuathletics.com/sports/baseball/roster/2019

https://stats.ncaa.org/rankings/national_ranking?academic_year=2005.0&division=1.0&ranking_period=1
3.0&sport_code=MBA&stat_seq=210.0

https://stats.ncaa.org/rankings/national_ranking?academic_year=2006.0&division=1.0&ranking_period=1
2.0&sport_code=MBA&stat_seq=210.0

https://stats.ncaa.org/rankings/national_ranking?academic_year=2007.0&division=1.0&ranking_period=1
3.0&sport_code=MBA&stat_seq=210.0

https://stats.ncaa.org/rankings/national_ranking?academic_year=2008.0&division=1.0&ranking_period=1
7.0&sport_code=MBA&stat_seq=496.0

https://stats.ncaa.org/rankings/national_ranking?academic_year=2009.0&division=1.0&ranking_period=1
6.0&sport_code=MBA&stat_seq=496.0

https://stats.ncaa.org/rankings/national_ranking?academic_year=2010.0&division=1.0&ranking_period=16.0&sport_code=MBA&stat_seq=496.0

https://stats.ncaa.org/rankings/national_ranking?academic_year=2011.0&division=1.0&ranking_period=17.0&sport_code=MBA&stat_seq=496.0

https://stats.ncaa.org/rankings/national_ranking?academic_year=2012.0&division=1.0&ranking_period=35.0&sport_code=MBA&stat_seq=496.0

https://stats.ncaa.org/rankings/national_ranking?academic_year=2013.0&division=1.0&ranking_period=40.0&sport_code=MBA&stat_seq=496.0

https://stats.ncaa.org/rankings/national_ranking?academic_year=2014.0&division=1.0&ranking_period=43.0&sport_code=MBA&stat_seq=496.0

https://stats.ncaa.org/rankings/national_ranking?academic_year=2015.0&division=1.0&ranking_period=95.0&sport_code=MBA&stat_seq=496.0

https://stats.ncaa.org/rankings/national_ranking?academic_year=2016.0&division=1.0&ranking_period=100.0&sport_code=MBA&stat_seq=496.0

https://stats.ncaa.org/rankings/national_ranking?academic_year=2017.0&division=1.0&ranking_period=98.0&sport_code=MBA&stat_seq=496.0

https://stats.ncaa.org/rankings/national_ranking?academic_year=2018.0&division=1.0&ranking_period=95.0&sport_code=MBA&stat_seq=496.0

https://stats.ncaa.org/rankings/national_ranking?academic_year=2019.0&division=1.0&ranking_period=93.0&sport_code=MBA&stat_seq=496.0

https://stats.ncaa.org/rankings/national_ranking?academic_year=2020.0&division=1.0&ranking_period=23.0&sport_code=MBA&stat_seq=496.0

https://stats.ncaa.org/rankings/national_ranking?academic_year=2021.0&division=1.0&ranking_period=96.0&sport_code=MBA&stat_seq=496.0

https://stats.ncaa.org/rankings/national_ranking?academic_year=2022.0&division=1.0&ranking_period=90.0&sport_code=MBA&stat_seq=496.0

https://stats.ncaa.org/rankings/national_ranking?academic_year=2023.0&division=1.0&ranking_period=94.0&sport_code=MBA&stat_seq=496.0

https://stats.ncaa.org/rankings/national_ranking?academic_year=2024.0&division=1.0&ranking_period=108.0&sport_code=MBA&stat_seq=496.0

https://stats.oarc.ucla.edu/other/mult-pkg/faq/general/faq-what-are-pseudo-r-squareds/

https://stonehillskyhawks.com/sports/baseball/roster/2023

https://stonehillskyhawks.com/sports/baseball/roster/2024

https://stonybrookathletics.com/sports/baseball/roster/2019

https://stonybrookathletics.com/sports/baseball/roster/2020

https://stonybrookathletics.com/sports/baseball/roster/2021

https://stonybrookathletics.com/sports/baseball/roster/2022

https://stonybrookathletics.com/sports/baseball/roster/2023

https://stonybrookathletics.com/sports/baseball/roster/2024

https://tarletonsports.com/sports/baseball/coaches/2022

https://tarletonsports.com/sports/baseball/coaches/2023

https://tarletonsports.com/sports/baseball/coaches/2024

https://texaslonghorns.com/sports/baseball/coaches/2019

https://texaslonghorns.com/sports/baseball/coaches/2020

https://texaslonghorns.com/sports/baseball/coaches/2021

https://texaslonghorns.com/sports/baseball/coaches/2022

https://texaslonghorns.com/sports/baseball/coaches/2023

https://texaslonghorns.com/sports/baseball/coaches/2024

https://texastech.com/sports/baseball/roster/coaches/joe-hughes/109

https://texastech.com/sports/baseball/roster/coaches/matt-gardner/3630

https://thesundevils.com/sports/baseball/roster/2024

https://time.com/3720498/ncaa-smu-death-penalty

https://towsontigers.com/sports/baseball/coaches/2023

https://towsontigers.com/sports/baseball/coaches/2024

https://tribeathletics.com/sports/baseball/coaches/2019

https://tribeathletics.com/sports/baseball/coaches/2020

https://tribeathletics.com/sports/baseball/coaches/2021

https://tribeathletics.com/sports/baseball/coaches/2022

https://tribeathletics.com/sports/baseball/coaches/2023

https://tribeathletics.com/sports/baseball/coaches/2024

https://tsusports.com/sports/baseball/coaches/2019

https://tsusports.com/sports/baseball/coaches/2020

https://tsusports.com/sports/baseball/coaches/2021

https://tsusports.com/sports/baseball/coaches/2022

https://tsusports.com/sports/baseball/coaches/2023

https://tsusports.com/sports/baseball/coaches/2024

https://uabsports.com/sports/baseball/coaches/2019

https://uabsports.com/sports/baseball/coaches/2020

https://uabsports.com/sports/baseball/coaches/2024

https://uabsports.com/sports/baseball/roster/coaches/alan-kunkel/1686

https://uabsports.com/sports/baseball/roster/coaches/bj-green/2075

https://uabsports.com/sports/baseball/roster/coaches/brandon-moore/1881

https://uabsports.com/staff-directory/brad-moss/775

https://ualbanysports.com/sports/baseball/coaches/2019

https://ualbanysports.com/sports/baseball/coaches/2020

https://ualbanysports.com/sports/baseball/coaches/2021

https://ualbanysports.com/sports/baseball/coaches/2022

https://ualbanysports.com/sports/baseball/coaches/2023

https://ualbanysports.com/sports/baseball/coaches/2024

https://uapblionsroar.com/sports/baseball/coaches/2023

https://uapblionsroar.com/sports/baseball/coaches/2024

https://ucasports.com/staff-directory/curtis-kellogg/1359

https://ucdavisaggies.com/sports/baseball/coaches/2024

https://ucdavisaggies.com/sports/baseball/roster/coaches/andrew-ayers/8621

https://ucdavisaggies.com/sports/baseball/roster/coaches/sky-valenzuela/6121

https://ucdavisaggies.com/sports/baseball/roster/coaches/zack-thornton/6120

https://ucfknights.com/sports/baseball/roster/season/2019

https://ucfknights.com/sports/baseball/roster/season/2020

https://ucfknights.com/sports/baseball/roster/season/2021

https://ucfknights.com/sports/baseball/roster/season/2022

https://ucfknights.com/sports/baseball/roster/season/2023

https://ucfknights.com/sports/baseball/roster/season/2024

https://ucirvinesports.com/sports/baseball/coaches/2019

https://ucirvinesports.com/sports/baseball/coaches/2020

https://ucirvinesports.com/sports/baseball/coaches/2021

https://ucirvinesports.com/sports/baseball/coaches/2022

https://ucirvinesports.com/sports/baseball/coaches/2023

https://ucirvinesports.com/sports/baseball/coaches/2024

https://uclabruins.com/news/2019/1/9/baseball-david-berg-returns-to-ucla-as-undergrad-assistant-coach

https://uclabruins.com/sports/baseball/coaches/2024

https://uclabruins.com/sports/baseball/roster/coaches/david-berg/3551

https://ucsbgauchos.com/sports/baseball/coaches/2019

https://ucsbgauchos.com/sports/baseball/coaches/2020

https://ucsbgauchos.com/sports/baseball/coaches/2021

https://ucsbgauchos.com/sports/baseball/coaches/2022

https://ucsbgauchos.com/sports/baseball/coaches/2023

https://ucsbgauchos.com/sports/baseball/coaches/2024

https://ucsdtritons.com/sports/baseball/coaches/2021

https://ucsdtritons.com/sports/baseball/coaches/2022

https://ucsdtritons.com/sports/baseball/coaches/2023

https://ucsdtritons.com/sports/baseball/coaches/2024

https://uhcougars.com/sports/baseball/coaches/2024

https://uhcougars.com/sports/baseball/roster/coaches/matt-reida/1529

https://uicflames.com/sports/baseball/coaches/2024

https://uicflames.com/staff-directory/daniel-dulin/2536

https://ukathletics.com/sports/baseball/roster/season/2024/coach/nick-ammirati/

https://ulmwarhawks.com/sports/baseball/coaches/2019

https://ulmwarhawks.com/sports/baseball/coaches/2020

https://ulmwarhawks.com/sports/baseball/coaches/2021

https://ulmwarhawks.com/sports/baseball/coaches/2022

https://ulmwarhawks.com/sports/baseball/coaches/2023

https://ulmwarhawks.com/sports/baseball/coaches/2024

https://umassathletics.com/sports/baseball/coaches/2019

https://umassathletics.com/sports/baseball/coaches/2020

https://umassathletics.com/sports/baseball/coaches/2021

https://umassathletics.com/sports/baseball/coaches/2022

https://umassathletics.com/sports/baseball/coaches/2023

https://umassathletics.com/sports/baseball/coaches/2024

https://umbcretrievers.com/sports/baseball/coaches/2024

https://umbcretrievers.com/staff-directory/matt-lubaszewski/385

https://umeshawksports.com/sports/baseball/coaches/2023

https://umeshawksports.com/sports/baseball/coaches/2024

https://umterps.com/sports/baseball/coaches/2024

https://umterps.com/sports/baseball/roster/coaches/tommy-gardiner/2510

https://uncabulldogs.com/sports/baseball/coaches/2019

https://uncabulldogs.com/sports/baseball/coaches/2020

https://uncabulldogs.com/sports/baseball/coaches/2022

https://uncabulldogs.com/sports/baseball/coaches/2023

https://uncbears.com/sports/baseball/roster/2019

https://uncbears.com/sports/baseball/roster/2020

https://uncbears.com/sports/baseball/roster/2021

https://uncbears.com/sports/baseball/roster/2022

https://uncbears.com/sports/baseball/roster/2023

https://uncbears.com/sports/baseball/roster/2024

https://uncgspartans.com/sports/baseball/coaches/2020

https://uncgspartans.com/sports/baseball/coaches/2021

https://uncgspartans.com/sports/baseball/coaches/2022

https://uncgspartans.com/sports/baseball/coaches/2023

https://uncgspartans.com/sports/baseball/coaches/2024

https://uncwsports.com/sports/baseball/coaches/2021

https://uncwsports.com/sports/baseball/coaches/2022

https://uncwsports.com/sports/baseball/coaches/2024

https://unfospreys.com/sports/baseball/coaches/2022

https://unfospreys.com/sports/baseball/coaches/2023

https://unlvrebels.com/sports/baseball/coaches/2024

https://unlvrebels.com/sports/baseball/roster/coaches/chris-prescott/3337

https://unoprivateers.com/sports/baseball/coaches/2019

https://unoprivateers.com/sports/baseball/coaches/2020

https://unoprivateers.com/sports/baseball/coaches/2021

https://unoprivateers.com/sports/baseball/coaches/2022

https://unoprivateers.com/sports/baseball/coaches/2023

https://unoprivateers.com/sports/baseball/coaches/2024

https://usctrojans.com/sports/baseball/coaches/2021

https://usctrojans.com/sports/baseball/coaches/2024

https://usctrojans.com/sports/baseball/roster/coaches/andy-jenkins/7073

https://usdtoreros.com/sports/baseball/roster/2019

https://usdtoreros.com/sports/baseball/roster/2020

https://usdtoreros.com/sports/baseball/roster/2021

https://usdtoreros.com/sports/baseball/roster/2022

https://usdtoreros.com/sports/baseball/roster/2023

https://usdtoreros.com/sports/baseball/roster/2024

https://usfdons.com/sports/baseball/roster/2023

https://usiscreamingeagles.com/sports/baseball/roster/2023

https://usiscreamingeagles.com/sports/baseball/roster/2024

https://utahtechtrailblazers.com/sports/baseball/roster/2021#sidearm-roster-coaches

https://utahtechtrailblazers.com/sports/baseball/roster/2022#sidearm-roster-coaches

https://utahtechtrailblazers.com/sports/baseball/roster/2023#sidearm-roster-coaches

https://utahtechtrailblazers.com/sports/baseball/roster/2024#sidearm-roster-coaches

https://utahutes.com/sports/baseball/roster/coaches/troy-squires/3631

https://utrockets.com/sports/baseball/coaches/2024

https://utrockets.com/sports/baseball/roster/coaches/matt-phipps/1366

https://utsports.com/sports/baseball/coaches/2024

https://utsports.com/sports/baseball/roster/coaches/richard-jackson/4868

https://valpoathletics.com/sports/baseball/coaches/2020-21

https://valpoathletics.com/sports/baseball/coaches/2022-23

https://vcuathletics.com/sports/baseball/coaches/2024

https://vcuathletics.com/sports/baseball/roster/coaches/andrew-llewellyn/722

https://virginiasports.com/sports/baseball/roster/season/2018-19/

https://virginiasports.com/sports/baseball/roster/season/2019-20/

https://virginiasports.com/sports/baseball/roster/season/2020-21/

https://virginiasports.com/sports/baseball/roster/season/2021-22/

https://virginiasports.com/sports/baseball/roster/season/2022-23/

https://virginiasports.com/sports/baseball/roster/season/2023-24/

https://vmikeydets.com/news/2023/8/8/vmi-baseball-announces-two-additions-to-coaching-staff.aspx?print=true

https://vmikeydets.com/sports/baseball/roster/coaches/alex-crosby/1318

https://vucommodores.com/coach/tyler-shewmaker/

https://vucommodores.com/sports/baseball/roster/season/2023-24/

https://wagnerathletics.com/sports/baseball/coaches/2019

https://wagnerathletics.com/sports/baseball/coaches/2020

https://wagnerathletics.com/sports/baseball/coaches/2021

https://wagnerathletics.com/sports/baseball/coaches/2022

https://wagnerathletics.com/sports/baseball/coaches/2023

https://wagnerathletics.com/sports/baseball/coaches/2024

https://winthropeagles.com/sports/baseball/roster/2019#sidearm-roster-coaches

https://winthropeagles.com/sports/baseball/roster/2020#sidearm-roster-coaches

https://winthropeagles.com/sports/baseball/roster/2021#sidearm-roster-coaches

https://winthropeagles.com/sports/baseball/roster/2022#sidearm-roster-coaches

https://winthropeagles.com/sports/baseball/roster/2023#sidearm-roster-coaches

https://winthropeagles.com/sports/baseball/roster/2024#sidearm-roster-coaches

https://wkusports.com/sports/baseball/coaches/2020

https://wmubroncos.com/sports/baseball/coaches/2019

https://wmubroncos.com/sports/baseball/coaches/2020

https://wmubroncos.com/sports/baseball/coaches/2022

https://wmubroncos.com/sports/baseball/coaches/2023

https://wmubroncos.com/sports/baseball/coaches/2024

https://woffordterriers.com/sports/baseball/coaches/2024

https://woffordterriers.com/sports/baseball/roster/coaches/hudson-byorick/1255

https://wsucougars.com/sports/baseball/coaches/2021

https://wsucougars.com/sports/baseball/coaches/2024

https://wsucougars.com/staff-directory/eric-hutting/5771

https://wvusports.com/sports/baseball/coaches/2024

https://wvusports.com/sports/baseball/roster/coaches/jacob-garcia/2316

https://www.arkansasonline.com/news/2019/apr/21/coach-pay-vote-disappoints-van-horn-201/

https://www.bloomberg.com/news/articles/2013-08-30/college-football-powers-seek-leeway-to-flex-
    muscle-through-rules

https://www.bls.gov/careeroutlook/2015/article/wage-differences.htm

https://www.denverpost.com/2011/06/14/commissioner-larry-scott-wants-pac-12-athletes-to-get-more-of-
    the-conference-pie/

https://www.gochoctaws.com/staff-directory/zack-ingram/435

https://www.justice.gov/atr/monopoly-power-and-market-power-antitrust-law#

https://www.knoxnews.com/story/sports/college/university-of-tennessee/other-
    sports/2019/05/12/tennessee-vols-baseball-ross-kivett-ncaa-volunteer-assistant/3623664002/

https://www.kstatesports.com/sports/baseball/roster/coaches/thomas-hughes/2606

https://www.linkedin.com/in/everett-teaford-47b157189/

https://www.linkedin.com/in/isaiah-paige-50a35914a/

https://www.linkedin.com/in/john-lyons-harrison-745a3211a/

https://www.linkedin.com/in/steven-mooney-96928421b/

https://www.liuathletics.com/sports/baseball/coaches/2020

https://www.ncaa.org/news/2015/1/18/autonomy-schools-adopt-cost-of-attendance-scholarships

https://www.ncei.noaa.gov/access/monitoring/climate-at-a-glance/statewide/time-series

https://www.stat.rice.edu/~dobelman/textfiles/DistributionsHandbook.pdf

https://www.timesfreepress.com/news/2015/jun/14/wiedmer-secs-riches-tough-beat/

https://www.usatoday.com/story/sports/college/2015/08/18/ncaa-cost--attendance-meals-2015/31904839/

https://www.weather.gov/wrh/Climate?wfo=hfo

https://www.weather.gov/wrh/Climate?wfo=lwx

https://yalebulldogs.com/sports/baseball/coaches/2024

https://ysusports.com/sports/baseball/coaches/2019

https://ysusports.com/sports/baseball/coaches/2020

# Appendix C

Appendix C - List of Schools Predicted to Adopt

| School | Adoption Academic Year | Observed Conduct | Predicted Probability | Three-Year Cumulative Probability |
|---|---|---|---|---|
| Air Force | 2019 | | 44.5% | 82.9% |
| Alabama | 2019 | 1 | 98.8% | 100.0% |
| Albany | 2019 | | 32.8% | 69.6% |
| Appalachian State | 2019 | | 53.9% | 90.2% |
| Arizona | 2019 | 1 | 99.3% | 100.0% |
| Arizona State | 2019 | 1 | 93.5% | 100.0% |
| Arkansas | 2019 | 1 | 100.0% | 100.0% |
| Arkansas State | 2019 | 0 | 55.0% | 90.9% |
| Arkansas-Little Rock | 2019 | 0 | 83.4% | 99.5% |
| Army | 2019 | 1 | 55.2% | 91.0% |
| Auburn | 2019 | 1 | 100.0% | 100.0% |
| Austin Peay | 2019 | 1 | 25.9% | 59.3% |
| BYU | 2019 | 1 | 71.9% | 97.8% |
| Ball State | 2019 | 0 | 42.0% | 80.5% |
| Baylor | 2019 | 1 | 99.3% | 100.0% |
| Bellarmine | 2021 | 0 | 54.4% | 90.5% |
| Belmont | 2019 | 1 | 26.9% | 60.9% |
| Binghamton | 2019 | 0 | 42.6% | 81.1% |
| Boise State | 2020 | | 45.7% | 84.0% |
| Boston College | 2019 | 0 | 70.6% | 97.5% |
| Bradley | 2019 | 0 | 72.4% | 97.9% |
| Brown | 2019 | | 32.1% | 68.7% |
| Bryant | 2019 | | 27.2% | 61.5% |
| Bucknell | 2019 | | 23.9% | 56.0% |
| CS Northridge | 2019 | 1 | 76.3% | 98.7% |
| CSU Bakersfield | 2019 | 1 | 88.8% | 99.9% |
| Cal Poly | 2019 | 0 | 60.8% | 94.0% |
| Cal State Fullerton | 2019 | 1 | 61.6% | 94.3% |
| California | 2019 | | 99.0% | 100.0% |
| California Baptist | 2019 | 1 | 51.3% | 88.5% |
| Canisius | 2019 | 0 | 23.1% | 54.6% |
| Central Arkansas | 2019 | 1 | 23.6% | 55.4% |
| Central Michigan | 2019 | 1 | 24.1% | 56.2% |
| Charleston | 2019 | 1 | 24.6% | 57.2% |
| Charlotte | 2019 | | 25.3% | 58.3% |
| Chicago State | 2019 | | 77.0% | 98.8% |
| Cincinnati | 2019 | 1 | 82.9% | 99.5% |
| Clemson | 2019 | 1 | 84.6% | 99.6% |
| Coastal Carolina | 2019 | | 78.4% | 99.0% |
| Columbia | 2019 | 1 | 65.5% | 95.9% |
| Connecticut | 2019 | 0 | 91.7% | 99.9% |
| Coppin State | 2019 | | 35.2% | 72.8% |
| Cornell | 2019 | 0 | 40.2% | 78.7% |

| | | | | |
|---|---|---|---|---|
| Creighton | 2019 | 0 | 20.8% | 50.2% |
| DBU | 2019 | | 97.8% | 100.0% |
| Dartmouth | 2019 | | 49.7% | 87.3% |
| Davidson | 2019 | 0 | 44.8% | 83.2% |
| Dayton | 2019 | 1 | 57.2% | 92.1% |
| Delaware State | 2019 | 0 | 26.5% | 60.3% |
| Dixie State | 2021 | | 78.8% | 99.0% |
| Duke | 2019 | 1 | 85.4% | 99.7% |
| East Carolina | 2019 | | 95.3% | 100.0% |
| East Tennessee State | 2019 | 0 | 73.6% | 98.2% |
| Eastern Kentucky | 2019 | 1 | 27.6% | 62.1% |
| Evansville | 2019 | 0 | 77.4% | 98.8% |
| Florida | 2019 | 1 | 100.0% | 100.0% |
| Florida Atlantic | 2019 | | 39.2% | 77.6% |
| Florida Gulf Coast | 2019 | 1 | 59.7% | 93.4% |
| Florida Intl | 2019 | 0 | 26.7% | 60.6% |
| Florida State | 2019 | 1 | 99.5% | 100.0% |
| Fordham | 2019 | 0 | 45.2% | 83.5% |
| Fresno State | 2019 | 0 | 65.7% | 96.0% |
| Furman | 2019 | | 54.3% | 90.5% |
| George Mason | 2019 | 0 | 45.9% | 84.2% |
| George Washington | 2019 | 1 | 49.9% | 87.4% |
| Georgia | 2019 | 1 | 93.3% | 100.0% |
| Georgia Southern | 2019 | 1 | 48.0% | 86.0% |
| Georgia State | 2019 | 1 | 52.4% | 89.2% |
| Georgia Tech | 2019 | 0 | 98.6% | 100.0% |
| Gonzaga | 2019 | 1 | 79.5% | 99.1% |
| Grand Canyon | 2019 | 1 | 82.4% | 99.5% |
| Harvard | 2019 | 1 | 36.6% | 74.6% |
| Hawaii | 2019 | 1 | 50.1% | 87.6% |
| Hofstra | 2019 | | 24.5% | 56.9% |
| Holy Cross | 2019 | 0 | 29.8% | 65.4% |
| Houston | 2019 | 1 | 99.3% | 100.0% |
| IPFW | 2019 | | 32.3% | 69.0% |
| Illinois | 2019 | 1 | 97.6% | 100.0% |
| Illinois State | 2019 | 1 | 66.6% | 96.3% |
| Indiana | 2019 | 0 | 84.0% | 99.6% |
| Indiana State | 2019 | 1 | 68.3% | 96.8% |
| Iona | 2019 | 1 | 25.3% | 58.2% |
| Iowa | 2019 | 1 | 98.6% | 100.0% |
| Jacksonville | 2019 | | 36.0% | 73.7% |
| Jacksonville State | 2019 | 1 | 33.0% | 69.9% |
| James Madison | 2019 | 0 | 36.7% | 74.7% |
| Kansas | 2019 | 1 | 80.2% | 99.2% |
| Kansas State | 2019 | 1 | 98.6% | 100.0% |
| Kennesaw State | 2019 | 0 | 55.3% | 91.1% |
| Kent State | 2019 | 0 | 30.7% | 66.8% |
| Kentucky | 2019 | 1 | 98.6% | 100.0% |
| LSU | 2019 | 1 | 100.0% | 100.0% |

2

| | | | | |
|---|---|---|---|---|
| La Salle | 2019 | | 51.0% | 88.2% |
| Lafayette | 2019 | 1 | 28.4% | 63.3% |
| Lehigh | 2019 | 0 | 26.7% | 60.5% |
| Liberty | 2019 | 1 | 72.9% | 98.0% |
| Lipscomb | 2019 | 1 | 70.5% | 97.4% |
| Long Beach State | 2019 | 0 | 55.0% | 90.9% |
| Louisiana Lafayette | 2019 | | 75.6% | 98.6% |
| Louisiana Monroe | 2019 | | 61.4% | 94.3% |
| Louisiana Tech | 2019 | | 25.9% | 59.3% |
| Louisville | 2019 | 1 | 100.0% | 100.0% |
| Loyola Marymount | 2019 | 1 | 54.9% | 90.8% |
| Maine | 2019 | 0 | 47.3% | 85.4% |
| Manhattan | 2019 | 1 | 21.2% | 51.0% |
| Marist | 2019 | 0 | 46.2% | 84.4% |
| Marshall | 2019 | | 65.5% | 95.9% |
| Maryland | 2019 | 1 | 78.5% | 99.0% |
| Maryland-Eastern Shore | 2019 | 0 | 26.8% | 60.8% |
| Massachusetts | 2019 | | 39.1% | 77.5% |
| Memphis | 2019 | 1 | 68.6% | 96.9% |
| Mercer | 2019 | 1 | 66.4% | 96.2% |
| Miami (FL) | 2019 | 1 | 82.5% | 99.5% |
| Michigan | 2019 | 1 | 92.6% | 100.0% |
| Michigan State | 2019 | | 81.6% | 99.4% |
| Middle Tennessee | 2019 | 0 | 32.2% | 68.8% |
| Minnesota | 2019 | | 96.6% | 100.0% |
| Mississippi State | 2019 | 1 | 100.0% | 100.0% |
| Missouri | 2019 | 1 | 97.1% | 100.0% |
| Missouri State | 2019 | 1 | 67.2% | 96.5% |
| Monmouth | 2019 | 0 | 33.9% | 71.2% |
| Murray State | 2019 | | 24.3% | 56.5% |
| NC State | 2019 | | 93.2% | 100.0% |
| NJIT | 2019 | 1 | 73.2% | 98.1% |
| Navy | 2019 | | 66.8% | 96.3% |
| Nebraska | 2019 | 1 | 67.1% | 96.4% |
| Nevada | 2019 | | 49.2% | 86.9% |
| New Mexico | 2019 | | 66.6% | 96.3% |
| New Mexico State | 2019 | 0 | 70.7% | 97.5% |
| Niagara | 2019 | 0 | 21.4% | 51.5% |
| Norfolk State | 2019 | 0 | 21.4% | 51.4% |
| North Alabama | 2019 | 1 | 50.7% | 88.0% |
| North Carolina | 2019 | 1 | 94.4% | 100.0% |
| North Carolina A&T | 2019 | 1 | 22.1% | 52.7% |
| North Florida | 2019 | 0 | 54.7% | 90.7% |
| Northern Colorado | 2019 | | 91.7% | 99.9% |
| Northwestern | 2019 | 1 | 77.0% | 98.8% |
| Notre Dame | 2019 | 1 | 68.8% | 97.0% |
| Ohio State | 2019 | 1 | 97.6% | 100.0% |
| Oklahoma | 2019 | 1 | 92.9% | 100.0% |
| Oklahoma State | 2019 | | 99.8% | 100.0% |

| | | | | |
|---|---|---|---|---|
| Old Dominion | 2019 | 1 | 80.1% | 99.2% |
| Ole Miss | 2019 | 1 | 100.0% | 100.0% |
| Oregon | 2019 | 1 | 99.8% | 100.0% |
| Oregon State | 2019 | 1 | 98.0% | 100.0% |
| Pacific | 2019 | | 65.6% | 95.9% |
| Penn | 2019 | 0 | 36.2% | 74.0% |
| Penn State | 2019 | 1 | 66.0% | 96.1% |
| Pepperdine | 2019 | 1 | 47.3% | 85.4% |
| Pittsburgh | 2019 | 1 | 94.4% | 100.0% |
| Portland | 2019 | | 60.4% | 93.8% |
| Princeton | 2019 | | 39.5% | 77.8% |
| Purdue | 2019 | | 87.5% | 99.8% |
| Queens University | 2023 | | 47.3% | 85.3% |
| Rhode Island | 2019 | | 40.4% | 78.8% |
| Rice | 2019 | 1 | 46.4% | 84.6% |
| Richmond | 2019 | 0 | 39.6% | 78.0% |
| Rider | 2019 | 0 | 22.5% | 53.4% |
| Rutgers | 2019 | | 80.2% | 99.2% |
| Sacramento State | 2019 | | 77.9% | 98.9% |
| Saint Joseph's | 2019 | 1 | 55.7% | 91.3% |
| Saint Louis | 2019 | 1 | 68.4% | 96.8% |
| Saint Mary's | 2019 | | 63.1% | 95.0% |
| Sam Houston State | 2019 | 1 | 37.7% | 75.8% |
| Samford | 2019 | | 64.1% | 95.4% |
| San Diego | 2019 | | 38.3% | 76.5% |
| San Diego State | 2019 | 1 | 38.2% | 76.4% |
| San Francisco | 2019 | 0 | 64.0% | 95.3% |
| San Jose State | 2019 | | 42.4% | 80.9% |
| Santa Clara | 2019 | 0 | 65.8% | 96.0% |
| Seattle | 2019 | | 71.4% | 97.7% |
| Siena | 2019 | | 24.6% | 57.1% |
| South Alabama | 2019 | 1 | 72.7% | 98.0% |
| South Carolina | 2019 | 1 | 95.1% | 100.0% |
| South Florida | 2019 | 1 | 61.9% | 94.5% |
| Southern Illinois | 2019 | 1 | 74.7% | 98.4% |
| Southern Mississippi | 2019 | 1 | 71.5% | 97.7% |
| St Bonaventure | 2019 | | 55.0% | 90.9% |
| St. Thomas - Minnesota | 2022 | 0 | 23.5% | 55.2% |
| Stanford | 2019 | | 99.1% | 100.0% |
| Stetson | 2019 | 0 | 46.6% | 84.8% |
| Stony Brook | 2019 | | 81.8% | 99.4% |
| TCU | 2019 | 1 | 100.0% | 100.0% |
| Tarleton | 2021 | | 57.1% | 92.1% |
| Tennessee | 2019 | 1 | 97.6% | 100.0% |
| Texas | 2019 | | 100.0% | 100.0% |
| Texas A&M | 2019 | | 98.5% | 100.0% |
| Texas San Antonio | 2019 | 0 | 22.0% | 52.5% |
| Texas State | 2019 | 1 | 46.6% | 84.7% |
| Texas Tech | 2019 | 1 | 100.0% | 100.0% |

| The Citadel | 2019 | 1 | 65.9% | 96.0% |
|---|---|---|---|---|
| Troy | 2019 | 0 | 62.0% | 94.5% |
| Tulane | 2019 | 0 | 75.1% | 98.5% |
| UAB | 2019 | 1 | 30.0% | 65.7% |
| UC Davis | 2019 | 1 | 52.2% | 89.0% |
| UC Irvine | 2019 | | 63.9% | 95.3% |
| UC Riverside | 2019 | | 64.8% | 95.6% |
| UC San Diego | 2021 | | 61.3% | 94.2% |
| UC Santa Barbara | 2019 | | 73.4% | 98.1% |
| UCF | 2019 | | 72.0% | 97.8% |
| UCLA | 2019 | 1 | 99.9% | 100.0% |
| UMBC | 2019 | 1 | 27.5% | 62.0% |
| UMass Lowell | 2019 | | 35.4% | 73.0% |
| UNC Greensboro | 2019 | | 82.9% | 99.5% |
| UNLV | 2019 | 1 | 44.4% | 82.8% |
| USC | 2019 | 1 | 98.6% | 100.0% |
| UT-Arlington | 2019 | 0 | 78.7% | 99.0% |
| UT-Rio Grande Valley | 2019 | | 73.6% | 98.2% |
| Utah | 2019 | 1 | 92.0% | 99.9% |
| Utah Valley | 2019 | 1 | 79.8% | 99.2% |
| VCU | 2019 | 1 | 50.6% | 87.9% |
| VMI | 2019 | 1 | 72.3% | 97.9% |
| Valparaiso | 2019 | 0 | 60.3% | 93.7% |
| Vanderbilt | 2019 | 1 | 100.0% | 100.0% |
| Virginia | 2019 | | 99.8% | 100.0% |
| Virginia Tech | 2019 | | 90.7% | 99.9% |
| Wake Forest | 2019 | | 95.8% | 100.0% |
| Washington | 2019 | | 100.0% | 100.0% |
| Washington State | 2019 | 1 | 95.9% | 100.0% |
| West Virginia | 2019 | 1 | 97.6% | 100.0% |
| Western Carolina | 2019 | | 72.8% | 98.0% |
| Western Kentucky | 2019 | 1 | 46.0% | 84.3% |
| Wichita St | 2019 | | 97.0% | 100.0% |
| Wofford | 2019 | 1 | 70.2% | 97.4% |
| Yale | 2019 | 0 | 43.1% | 81.6% |