STEPHEN M. TILLERY *(pro hac vice)*
    stillery@koreintillery.com
STEVEN M. BEREZNEY (Bar No. 329923)
    sberezney@koreintillery.com
GARRETT R. BROSHUIS (Bar No. 329924)
    gbroshuis@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Attorneys for Plaintiffs Taylor Smart and
Michael Hacker, Individually and on Behalf
of All Those Similarly Situated

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| TAYLOR SMART AND MICHAEL HACKER, Individually and on Behalf of All Those Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association; <br><br> Defendant. | CASE NO. 2:22-cv-02125-WBS-CSK <br><br> <u>**CLASS ACTION**</u> <br><br> **PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND MEMORANDUM IN SUPPORT** <br><br> Date:  April 28, 2025 <br> Time:  1:30 p.m. <br> Courtroom: 5, 14th Floor <br> Judge:  The Honorable William B. Shubb |

**NOTICE OF MOTION AND MOTION FOR**

**PRELIMINARY APPROVAL OF SETTLEMENT**

Please take notice that, on April 28, 2025 at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 5 of this Court, located at 501 I Street, Sacramento, California, Plaintiffs Taylor Smart and Michael Hacker ("Plaintiffs") will, and hereby do, move this Court pursuant to Federal Rule of Civil Procedure 23 for an order granting preliminary approval of a class settlement. *See* Broshuis Decl., Ex. 2 (attaching the proposed Settlement Agreement) (hereafter the "Settlement Agreement"). This Motion is based upon the following Memorandum in Support, all other materials supporting this Motion, all pleadings on file, and any other matter submitted before or at the hearing on this Motion.

DATED: March 24, 2025           Respectfully submitted,


                                    /s/ *Garrett R. Broshuis*
                                KOREIN TILLERY, LLC
                                Stephen M. Tillery (*pro hac vice*)
                                Steven M. Berezney
                                Garrett R. Broshuis

                                *Attorneys for Plaintiffs*

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT....................................................i

Introduction.......................................................1

Factual and Procedural Background..................................3

Summary of the Proposed Settlement.................................7

Legal Standard....................................................13

Argument..........................................................15

  I.   A Certifiable Settlement Class Exists Under FRCP 23. .....15

     A. The Class is Sufficiently Definite and Ascertainable. 15

     B. Numerosity is satisfied. ............................ 15

     C. Commonality is Met. ................................. 16

     D. Typicality is satisfied. ............................ 17

     E. Adequacy is satisfied. .............................. 19

        1. Named Plaintiffs Are Adequate Class Representatives. ................................. 19

        2. Named Plaintiffs' Counsel Is Adequate. ........... 20

     F. Common Issues Predominate under Rule 23(b)(3). ....... 22

     G. A Class Action Is Superior. .......................... 27

     H. Rule 23(c)(2) Notice Requirements. ................... 29

  II.  Rule 23(e) Fairness: All *Churchill* Factors Support Preliminary Approval. .................................30

     A. Negotiation of the Settlement Agreement. ............. 32

     B. The strength of Plaintiffs' case and the risks, expense, and complexity of continued litigation. ..... 32

     C. Relief provided by the settlement. ................... 35

     D. Stage of proceedings and amount of discovery. ........ 39

     E. Experience and views of counsel. ..................... 41

     F. Government participation and reaction of class members are inapplicable. ............................ 42

    G. Attorneys' Fees. .................................... 42

  III. The Court Should Set a Schedule for Final Approval. ......45

CONCLUSION...................................................45

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aldapa v. Fowler Packing Co., Inc.*,
   323 F.R.D. 316 (E.D. Cal. 2018) ...........................15

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) .......................................23

*Baird v. Cal. Faculty Ass'n*,
   No. CIV S-00-0999, 2000 WL 1028782 (E.D. Cal. July
   13, 2000) ...............................................16

*In re Bluetooth Headseat Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) ..............................43

*In re Capacitors Antitrust Litig. (No. III)*,
   No. 17-md-02801, 2018 WL 5980139 (N.D. Cal. Nov. 14,
   2018) ...................................................24

*Carlin v. DairyAmerica, Inc.*,
   380 F. Supp. 3d 998 (E.D. Cal. 2019) ..............20, 35, 36

*Castro v. Sanofi Pasteur Inc.*,
   134 F. Supp. 3d 820 (D.N.J. 2015) .........................26

*In re Cathode Ray Tube (Crt) Antitrust Litig.*,
   MDL No. 1917, 2015 WL 9266493 (N.D. Cal. Dec. 17,
   2015) ...................................................37

*Churchill Vill. v. Gen. Elec.*,
   361 F.3d 566 (9th Cir. 2004) ..............................29

*In re College Athlete NIL Litig.*,
   No. 20-cv-03919, 2023 WL 8372787 (N.D. Cal. Nov. 3,
   2023) .................................................*passim*

*Cummings v. Connell*,
   No. CIV S-99-2176, 1999 WL 1256772 (E.D. Cal. Dec.
   20, 1999) ...............................................16

*Edwards v. Nat'l Milk Producers Federation*,
   No. 11-cv-04766, 2017 WL 3623734 (N.D. Cal. June 26,
   2017) ...................................................37

*In re Endosurgical Prods. Direct Purchaser Antitrust Litig.*,
   No. SACV 05-8809, 2008 WL 11504857 (C.D. Cal. Dec.
   31, 2008) ...............................................32

*Evans v. Zions Bancorporation, N.A.*,
   No. 2:17-cv-01123, 2022 WL 16815301 (E.D. Cal. Nov.
   8, 2022) ...............................................43

*Evans v. Zions Bancorporation, N.A.*,
   No. 2:17-cv-01123, 2022 WL 3030249 (E.D. Cal. Aug. 1,
   2022) ...............................................*passim*

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
   No. 13-cv-07789-LGS (S.D.N.Y.) ...........................21

*Four in One Co., Inc. v. S.K. Foods, L.P.*,
   No. 2:08-cv-3017, 2014 WL 28808 (E.D. Cal. Jan. 2,
   2014) ...............................................24

*Four in One Co., Inc. v. S.K. Foods, L.P.*,
   No. 2:08-cv-3017, 2014 WL 4078232 (E.D. Cal. Aug. 18,
   2014) ...............................................37

*In re Glumetza Antitrust Litig.*,
   No. C 19-05822, 2022 WL 327707 (N.D. Cal. Feb. 3,
   2022) ...............................................37

*Gonzalez v. United States Immigration and Customs Enforcement*,
   975 F.3d 788 (9th Cir. 2020) ..........................17, 18

*In re Google Play Developer Antitrust Litig.*,
   No. 20-cv-05792, 2024 WL 150585 (N.D. Cal. Jan. 11,
   2024) ...............................................37

*Griffin v. Consol. Commc's*,
   No. 2:21-cv-0885, 2022 WL 16836711 (E.D. Cal. Nov. 9,
   2022) ...............................................*passim*

*Griffin v. Consol. Commc's*,
   No. 2:21-cv-0885, 2023 WL 3853643 (E.D. Cal. June 6,
   2023) ...............................................43

*In re GSE Bonds Antitrust Litig.*,
   No. 19-cv-1704, 2019 WL 6842332 (S.D.N.Y. Dec. 16,
   2019) ...............................................38

*In re High-Tech Emp. Antitrust Litig.*,
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) ...................16, 25

*In re High-Tech Employee Antitrust Litig.*,
  No. 11-cv-02509, 2015 WL 5159441 (N.D. Cal. Sept. 2,
  2015) ...................................................37

*In re Hyundai and Kia Fuel Economy Litig.*,
  926 F.3d 539 (9th Cir. 2019) (en banc) .................*passim*

*Just Film, Inc. v. Buono*,
  847 F.3d 1108 (9th Cir. 2017) ..............................18

*Kabasele v. Ulta Salon, Cosmetics & Fragrance, Inc.*,
  No. 2:21-cv-1639, 2023 WL 4747691 (E.D. Cal. July 25,
  2023) ..................................................*passim*

*Kabasele v. Ulta Salon, Cosmetics & Fragrance, Inc.*,
  No. 2:21-cv-1639, 2024 WL 477221 (E.D. Cal. Feb. 7,
  2024) .................................................14, 43

*Kim v. Allison*,
  8 F.4th 1170 (9th Cir. 2021) ..............................31

*Kimbo v. MXD Group, Inc.*,
  No. 2:19-cv-00166, 2020 WL 4547324 (E.D. Cal. Aug. 6,
  2020) .............................................26, 29, 30

*Kimbo v. MXD Group, Inc.*,
  No. 2:19-cv-00166, 2021 WL 492493 (E.D. Cal. Feb. 10,
  2021) .................................................20, 33

*Law v. Nat'l Collegiate Athletic Ass'n*,
  134 F.3d 1010 (10th Cir. 1998) ............................26

*In re LDK Solar Sec. Litig.*,
  No. C 07-5182, 2010 WL 3001384 (N.D. Cal. July 29,
  2010) .....................................................38

*Leyva v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013) ..............................23

*Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v.
  Las Vegas Sands, Inc.*,
  244 F.3d 1152 (9th Cir. 2001) .............................27

*Lytle v. Nutramax Lab'ys, Inc.*,
  114 F.4th 1011 (9th Cir. 2024) ............................22

*Martinelli v. Johnson & Johnson*,
    No. 2:15-cv-01733, 2022 WL 4123874 (E.D. Cal. Sept.
    9, 2022) ...............................................34

*McIntosh v. Katapult Holdings, Inc.*,
    No. 21-cv-07251, 2024 WL 5118192 (S.D.N.Y. Dec. 13,
    2024) .................................................38

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ..............................38

*Meijer, Inc. v. Abbott Labs.*,
    No. C 07-5985, 2011 WL 13392313 (N.D. Cal. Aug. 11,
    2011) .................................................20

*Mejia v. Walgreen Co.*,
    No. 2:19-cv-00218, 2020 WL 6887749 (E.D. Cal. Nov.
    24, 2020) .............................................36

*Mejia v. Walgreen Co.*,
    No. 2:19-cv-00218, 2021 WL 1122390 (E.D. Cal. Mar.
    24, 2021) ..........................................20, 44

*In re Mersho*,
    6 F.4th 891 (9th Cir. 2021) ...............................19

*Morelock Enters., Inc. v. Weyerhaeuser Co.*,
    No. CV 04-583, 2004 WL 2997526 (D. Or. Dec. 16, 2004) .......28

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ............................34

*In re Nassau Cty. Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006) ...............................17

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
    221 F.R.D. 523 (C.D. Cal. 2004) ........................39, 41

*Olean*, 31 F.4th at 668.......................................23

*Park v. Carlyle/Galaxy San Pedro, L.P.*,
    No. CV 09-00793, 2009 WL 10669742 (C.D. Cal. Oct. 8,
    2009) .................................................32

*Ray v. NCAA*,
    Case No. 1:23-cv-00425-WBS (E.D. Cal. Mar. 11, 2025) ....*passim*

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ..................13, 35, 37, 41

*Sandoval Ortega v. Aho Enters., Inc.*,
    No. 19-cv-00404, 2021 WL 5584761 (N.D. Cal. Nov. 30,
    2021) ...............................................33, 42

*Schwarm v. Craighead*,
    233 F.R.D. 655 (E.D. Cal. 2006) .......................*passim*

*In re Scrap Metal Antitrust Litig.*,
    527 F.3d 517 (6th Cir. 2008) ..............................24

*Senne v. The Office of the Comm'r of Baseball*,
    No. 14-CV-00608-JCS (N.D. Cal.) ...........................21

*Sidibe v. Sutter Health*,
    333 F.R.D. 463 (N.D. Cal. 2019) ...........................18

*Smilow v. Sw. Bell Mobile Sys., Inc.*,
    323 F.3d 32 (1st Cir. 2003) ...............................26

*In re Syncor ERISA Litig.*,
    516 F.3d 1095 (9th Cir. 2008) .............................13

*In re Tableware Antitrust Litig.*,
    No. C-04-3514, 2007 WL 4219394 (N.D. Cal. Nov. 28,
    2007) .....................................................37

*In re Toys R Us-Del., Inc.-Fair & Accurate Credit
    Transactions Act (FACTA) Litig.*,
    295 F.R.D. 438 (C.D. Cal. 2014) ...........................38

*Vaquero v. Ashley Furniture Indus., Inc.*,
    824 F.3d 1150 (9th Cir. 2016) .............................23

*Vasquez v. Coast Valley Roofing, Inc.*,
    266 F.R.D. 482 (E.D. Cal. 2010) ...........................32

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) .............................43

*In re Warner Commc's Sec. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35
    (2d Cir. 1986) ............................................34

*Whiteway v. FedEx Kinko's Off. & Print Servs., Inc.*,
    No. C 05-2320, 2006 WL 2642528 (N.D. Cal. Sept. 14,
    2006) .....................................................26

**Court Rules**

Fed. R. Civ. P. 23(c)(2)(B)................................29, 30

Fed. R. Civ. P. 23(e).......................................13

Rule 23(b)(3)...............................................27

**Other Authorities**

7AA Charles Alan Wright, Arthur Miller & Mary Kay Kane,
    FEDERAL PRACTICE AND PROCEDURE, § 1781 (3d ed. 2005)..............24

Connor & Lande, *Not Treble Damages: Cartel Recoveries
    are Mostly Less than Single Damages*, 100 IOWA L. REV.
    1997, 1998 (2015) .......................................38

4 NEWBERG ON CLASS ACTIONS § 13.15 (5th ed.) .....................45

6 NEWBERG ON CLASS ACTIONS, § 18.25 (4th ed. 2002) ...............24

**Motion for Preliminary Approval of Settlement**

1

### Introduction

2      After over two years of hard-fought litigation, the parties

3  have reached a proposed settlement agreement that provides

4  essentially complete relief to around 1,000 assistant college

5  baseball coaches. The $49.25 million proposed fund amounts to

6  well over 90% of Plaintiffs' and class members' alleged damages.

7  That is a uniquely strong result by antitrust standards, and

8  Plaintiffs ask that the Court grant preliminary approval of the

9  proposed settlement so the process of getting money to these

10  coaches can soon begin.

11      "[A]t the preliminary approval stage, the court need only

12  determine whether the proposed settlement is within the range of

13  possible approval, and resolve any glaring deficiencies in the

14  settlement agreement before authorizing notice to class members."

15  *Kabasele v. Ulta Salon, Cosmetics & Fragrance, Inc.*, No. 2:21-cv-

16  1639, 2023 WL 4747691, at *6 (E.D. Cal. July 25, 2023) (Shubb,

17  J.). The settlement easily meets this standard. On average, class

18  members will receive close to $36,000 *per year* that they coached

19  in the volunteer role. The actual payouts will be school specific

20  using the salary data provided by schools, and many class members

21  who coached multiple years at larger schools will receive six

22  figures. Simply put, the settlement results in an outstanding and

23  impressive recovery for the class.

24      This is especially true in light of the very real risks

25  Plaintiffs faced in continuing this litigation. Plaintiffs would

26  have been required to overcome all three of the remaining major

27  litigation hurdles: class certification, summary judgment, and

28

1  trial. The NCAA contested class certification and filed a *Daubert*

2  motion seeking to exclude Plaintiffs' sole liability and damages

3  expert. And the NCAA pursued a procompetitive justification

4  affirmative defense with three separate theories. Plaintiffs

5  remain confident that they would have succeeded at class

6  certification and at summary judgment and trial, but if the NCAA

7  succeeded at any one of those three stages, the class would have

8  recovered *nothing*. Instead, these hardworking coaches are set to

9  receive nearly the entire amount of compensation allegedly owed.

10     The Court should also have little difficulty certifying the

11  Settlement Class. Even before settlement, when litigating

12  Plaintiffs' now-moot motion for class certification, most of the

13  Rule 23(a)-(b) factors went uncontested. The few concerns raised

14  by Defendant in opposition to class certification do not apply in

15  the settlement context because there will be no trial if the

16  settlement is approved. *In re Hyundai and Kia Fuel Economy*

17  *Litig.*, 926 F.3d 539, 558 (9th Cir. 2019) (en banc). In any

18  event, the Court recently certified a class in the related case

19  that involved volunteer coaches in other sports, *Ray v. NCAA*,

20  Case No. 1:23-cv-00425-WBS, (E.D. Cal. Mar. 11, 2025), ECF No.

21  128, and it should likewise certify the proposed Settlement Class

22  here. All class members were subjected to the same

23  anticompetitive NCAA rule, and this settlement seeks to

24  compensate them for the alleged harm that they suffered as a

25  result of that rule. The Court should also appoint the named

26  Plaintiffs as class representatives and their counsel as class

27  counsel.

28

**Motion for Preliminary Approval of Settlement**

The proposed manner of notice — via U.S. mail and e-mail to class members — will be effective under the circumstances. The form of the notices, attached as exhibits to the Proposed Order ("Proposed Notice"), is easy to understand and provides class members all they need to make an informed decision regarding participation in the settlement. It includes a summary of the litigation, the terms of the settlement, an explanation of the right to object or opt out, and sources to obtain more information regarding the litigation and the settlement. The Court has approved similar notices. All of Rule 23's requirements are met.

The settlement of this case will provide relief to hundreds of baseball coaches. The Court should preliminarily approve it so that the next steps towards providing that relief can be taken.

### Factual and Procedural Background

Defendant NCAA has around 300 members with Division I baseball teams.[1] From 1992 to July 2023, the NCAA's bylaws allowed member schools to hire four baseball coaches. Three of them (the head coach and two assistants) could be paid whatever compensation the free market would give them. But the fourth coach could not be paid pursuant to an NCAA rule. *See* NCAA Bylaws 11.7.6; 11.01.6.

The NCAA dubbed the coach the "volunteer" coach. The NCAA's bylaw forbid "compensation or remuneration from the institution's athletics department or any organization funded in whole or in part by the athletics department or that is involved primarily in

---

[1] *See* NCAA Answer (ECF No. 40) at ¶¶ 2, 34.

**Motion for Preliminary Approval of Settlement**

1  the promotion of the institution's athletics program (e.g.,

2  booster club, athletics foundation association)."[2] Schools could

3  not provide housing, and the coach could not receive more than

4  two complimentary tickets to home baseball games, nor *any* tickets

5  to other sports events hosted by the school, like basketball or

6  football.[3] Schools could not provide standard benefits, such as

7  health insurance or workers' compensation.[4]

8     Plaintiffs Taylor Smart and Michael Hacker are two former

9  baseball coaches who served in that role.[5] They brought their case

10  in November 2022 on behalf of a class, alleging that the

11  volunteer coach rule violated the Sherman Act.[6] A few months after

12  this lawsuit was filed, the NCAA repealed the volunteer coach

13  rule with an effective date of July 1, 2023.[7]

14     The NCAA moved to dismiss the Complaint in February 2023.[8]

15  Several months later, the Court granted that motion in part and

16  denied it in part, with Plaintiffs' federal Sherman Act § 1

17  claims surviving.[9] Defendant then filed its Answer, raising seven

18  affirmative defenses.[10] The defense most heavily litigated was the

19  NCAA's position that procompetitive justifications exist for the

20

21  [2] (ECF No. 63 at 6 nn.11–12.)

22  [3] (ECF No. 63 at 6 n.13.)

    [4] (ECF No. 63 at 6 n.15.)

23

    [5] (ECF No. 63 at 6 nn.21, 28.)

24  [6] (ECF No. 1.)

25  [7] (ECF No. 63 at 6 n.63.)

26  [8] (ECF No. 7.)

    [9] (ECF No. 29.)

27

    [10] (ECF No. 40.)

28

1  volunteer coach rule.[11] NCAA also moved for reconsideration,[12]

2  which the Court denied in September 2023.[13]

3      The parties engaged in extensive discovery. Plaintiffs and

4  their counsel collected and produced print and electronic

5  documents, including e-mails and text messages from the named

6  Plaintiffs. Broshuis Decl. at ¶ 7. Mr. Smart produced 752

7  documents totaling 1,382 pages. *Id.* Mr. Hacker produced 129

8  documents totaling 351 pages. *Id.* The NCAA produced 11,750

9  documents containing 278,132 pages, which Plaintiffs also

10 reviewed. *Id.*

11     Plaintiffs issued over 300 subpoenas to the NCAA's member

12 Division I schools to collect data related to the compensation

13 being paid to their baseball coaches. *See* Broshuis Decl. at ¶ 8.

14 Plaintiffs so far have received complete responses from over 200

15 schools, including over 8,000 documents that Plaintiffs and their

16 expert reviewed. *Id.*

17     The parties have deposed many key fact witnesses. The NCAA

18 deposed both Mr. Smart and Mr. Hacker. *Id.* at ¶ 9. Plaintiffs'

19 counsel also attended the six depositions of the named plaintiffs

20 in the related *Ray v. NCAA* case, No. 1:23-cv-00425 WBS (E.D.

21 Cal.) (hereafter "*Ray*") challenging the same volunteer coach rule

22 in sports other than baseball. *Id.* Plaintiffs deposed two NCAA

23 employees and two third-party witnesses. *Id.*

24

25

---

26 [11] (ECF No. 40 at 23 (Seventh Affirmative Defense).)

27 [12] (ECF No. 34.)

28 [13] (ECF No. 43.)

The parties also deposed the expert witnesses. Plaintiffs submitted an expert declaration from Dr. Daniel Rascher in support of their motion for class certification.[14] Dr. Rascher is the top sports economist in the country and is widely respected for his work in college athletics. Using the information obtained from the subpoenas to member schools, Dr. Rascher concluded that "all members of the proposed class suffered injuries."[15] The NCAA deposed Dr. Rascher and filed a motion to exclude him under *Daubert*,[16] attaching a report from its sole rebuttal expert, Dr. Jee-Yeon Lehmann.[17] Plaintiffs deposed Dr. Lehmann on January 23, 2025. *See* Broshuis Decl. at ¶ 10.

The parties previously attempted mediation with a mediator, but were unsuccessful. *See* Broshuis Decl. at ¶ 11. The parties resumed settlement discussions after further discovery. *Id.* Before reaching an agreement, the parties had the benefit of extensive expert analyses derived from the subpoenaed school data, and the parties had engaged in class certification briefing. That data informed the parties' renewed settlement discussions. After daily, arms-length negotiations, the parties settled this case on January 31, 2025 — the same day that Plaintiffs' reply brief in support of their motion for class certification and their *Daubert* opposition brief were due. *Id.* The Court then stayed the deadlines for these papers pending its

---

[14] (ECF No. 64-2.)

[15] (*Id.* § 3.4.)

[16] (ECF No. 67.)

[17] (ECF No. 67-5.)

**Motion for Preliminary Approval of Settlement**

1  ruling on this motion and ordered this motion to be filed no

2  later than March 24, 2025.[18]

3  <center>**Summary of the Proposed Settlement**</center>

4    ***The Class to be Settled.*** The proposed settlement

5  contemplates the Court certifying the following Rule 23(b)(3)

6  class for settlement purposes only:

7      All persons who, pursuant to NCAA Division I Bylaw

8      11.7.6, served as a "volunteer coach" in college baseball
     at an NCAA Division I school from November 29, 2018 to

9      July 1, 2023.[19]

10    ***The Settlement Fund and Plan of Allocation.*** The NCAA has

11  agreed to pay $49.25 million into a common settlement fund from

12  which class members will be paid after deduction for court-

13  approved attorneys' fees, costs, expenses, and incentive awards.

14  If approved, and assuming the maximum off-the-top deductions, the

15  $49.25 million settlement fund will be allocated as follows: (a)

16  an amount allocated for payments to class members of $32,794,850;

17  (b) $14,775,000 for Plaintiffs counsel's fees and up to $1.5

18  million for costs and expenses incurred; (c) an estimated amount

19  of $30,150 to pay the settlement administrator and $35,000 to pay

20  the economist for work on settlement administration; (d)

21  incentive awards for the two class representatives of $7,500

22  each; and (e) a contingency fund of $100,000.

23    The amount of each class member's settlement payment will

24  vary according to the number of years worked and the school for

25  which he worked. Plaintiffs have asked their expert, Dr. Rascher,

26  ─────────────────────
   [18] (ECF No. 71 at 2.)

27  [19] *See* Settlement Agreement § 2.29. The Settlement Agreement is
   found at Exhibit 2 to the Broshuis Declaration.

28

1  to calculate individual settlement recovery amounts for each

2  class member using a methodology substantially similar to the one

3  he used to calculate damages in his declaration filed in support

4  of Plaintiffs' motion for class certification.[20] Vastly

5  simplified, Dr. Rascher first estimated base salaries using

6  "actual base salaries for the third assistant coach position in

7  2023," making sure to "deflate the base salary amount based on"

8  how much the compensation changed for the other two paid

9  assistants over time.[21] If a school did not produce sufficient

10 data, Dr. Rascher uses data from peer schools; to do this, he

11 places schools within peer deciles.[22] That ensures that the

12 estimate of damages is school-specific.

13      To account for one additional employment benefit that the

14 third assistant coaches likely would have received, Dr. Rascher

15 estimates the value of health benefits that were not provided but

16 that likely would have been provided.[23] As with the base salary

17 computation, he deflates the value of these benefits to ensure

18 that he is measuring the value that would have been provided

19 during the relevant year.[24] *See also* Rascher Prelim. Approval

20 Decl. at ¶¶ 4-12 (explaining allocation formula).

21      Other than providing taxpayer identification numbers (and

22 updating addresses), no claim form will be needed to receive the

23 money owed. The default is to send checks to a class member's

---

24 [20] (ECF No. 64-2.)

25 [21] (*Id.* ¶ 181; *see also id.* ¶ 184.)

26 [22] (*Id.* ¶ 183.)

27 [23] (*Id.* ¶ 186.)

28 [24] (*Id.*)

last known address. Because of the amount being sent, FedEx will
be used to send the checks. Class members will have the
opportunity to update their addresses, or to select a secure
electronic payment option. *See* Fenwick Decl., Ex. C (Proposed
Longform Notice) at 1 and ¶ 11. It is the parties' desire to pay
every class member what they are owed under the settlement. In
the event certain class members cannot be paid (if, for example,
they do not cash their checks), their allocated share will be
paid *pro rata* to class members who did cash their checks in a
second distribution. *See id.* ¶ 11. If that process at some point
becomes impracticable, the residue will go to a related charity
under the doctrine of *cy pres*. The parties have selected the
American Baseball Coaches Association ("ABCA") as the *cy pres*
recipient. Settlement Agreement at ¶ 2.8. ABCA has over 15,000
members in all 50 states and 41 countries focusing on amateur
baseball coaching at the college, high school, youth, and travel
levels. Broshuis Decl. at ¶ 15. ABCA's purposes are, *inter alia*,
"to assist in the educational development of amateur baseball
coaches" and to "promote excellence in the coaching of baseball."
*Id.* Not a penny of the $49.25 million fund will revert to the
NCAA.

    ***The Proposed Form and Manner of Notice***. Plaintiffs seek
notice to be provided to the class in the forms proposed. *See*
Exs. A-C to Proposed Order. Plaintiffs propose that the
Settlement Administrator send notice via email, and a postcard
summary notice via first-class U.S. mail, and the long-form
notice will also be posted on the settlement website. See Fenwick

1  Decl. at ¶¶ 6-14. The Settlement Administrator will use

2  forwarding addresses and other standard best practices to try to

3  ascertain the class member's current address. *Id.* at ¶¶ 10-14.

4      The notice forms are written in plain and understandable

5  language. They describe the litigation, the terms of the

6  settlement, and each class member's options under the proposed

7  settlement. *See* Exs. A-C to Proposed Order. They clearly explain

8  the opt-out rights and repercussions: anyone who timely submits

9  an opt-out form will not be bound by the judgment, will not be

10 entitled to settlement benefits, and will be deemed to have never

11 participated in this litigation. *Id.* The forms also clearly

12 explain class members' right to object to the proposed

13 settlement, their option to participate in the case through

14 counsel of their choosing at their own expense, and the dates for

15 objecting or opting out. *Id.* They will advise class members of

16 the date the Court sets for the final approval hearing and that

17 the date is subject to change without further notice to the class

18 such that class members should check the Court's docket and/or

19 the settlement website for updates. *Id.* They advise class members

20 who make a timely objection that they are welcome to attend to

21 make their voice heard. *Id.*

22     The notice forms also provide contact information for class

23 counsel should class members have questions. They provide a link

24 to a case website created by the Settlement Administrator where

25 class members can easily access the long-form notice and other

26 important documents in the case. *Id.* The notice forms also

27 provide instructions as to how class members can access the case

28

**Motion for Preliminary Approval of Settlement**

1  docket directly, either in person or via PACER. *Id.* Via the

2  website, class members will be able to update their addresses as

3  well, or enter information allowing an electronic payment. *See*

4  Fenwick Decl. at ¶ 14.

5      ***The Releases***. In exchange for the benefits provided under

6  the settlement, participating Rule 23(b)(3) class members agree

7  to release the NCAA from:

8          any and all claims of the Plaintiffs and Class Members
           who do not opt out of the Settlement that were asserted
9          or could have been asserted against Released Parties for
           the Class Period arising out of the facts alleged in the
10         Litigation, known or unknown, including for avoidance of
           doubt, any claim for unpaid wages, benefits, or bonuses,
11         or any claim for damages for lost opportunities,
           interference with contract, or restraint of trade.
12         Plaintiff Released Claims include, without limitation,
           any claims for compensation, benefits, penalties or any
13         other recovery on the theory that Plaintiffs or Class
           Members who do not opt out of the Settlement were
14         employees of, or contractors for, any Released Parties,
           and thus include, without limitations, claims under state
15         and federal minimum wage laws, the federal Fair Labor
           Standards Act, state and local wage and hour statutes and
16         laws, including without limitation any claims under the
           California Labor Code and California Labor Code section
17         2698 et seq. specifically as well as California Business
           & Professions Code section 17200 and equivalent statutes
18         from other states that could have been asserted based on
           the facts alleged in the Litigation.
19
20  Settlement Agreement ¶ 2.24.

21      The NCAA also agrees to release participating Rule 23(b)(3)

22  class members from: "all claims and counterclaims that Defendant

23  asserted or could have asserted against Plaintiffs arising out of

24  the facts alleged in the Litigation, known or unknown."

25  Settlement Agreement ¶ 2.11.

26      The releases are limited to claims relating to the volunteer

27  coach rule and the claims that "could have been asserted" based

28  on the facts of the operative complaint.

**Attorneys' Fees, Costs, and Incentive Awards.** The Settlement Agreement allows Plaintiffs' counsel to petition for up to one-third of the maximum settlement amount as attorneys' fees. But, as discussed further below, Plaintiffs' counsel intends to petition for fees of 30%, along with actual costs and expenses. *See* Broshuis Decl. at ¶ 18. Plaintiffs' counsel plans to petition for reimbursement of up to $1.5 million in costs and expenses incurred – counsel has currently expended approximately $1.32 million on costs. *Id.* at ¶ 19.

Plaintiffs will petition for incentive awards of $7,500 for the two class representatives. *Id.* at ¶ 19. If approved, the incentive awards will be in addition to any distribution that they are otherwise entitled to under the settlement to reflect the time and effort that each put into representing the class, as well as the professional and reputational risk incurred by bringing this litigation.

**Settlement Administration Fees and Proposed Administrator.** Plaintiffs recommend the Court appoint the professional class action administration firm Kroll Settlement Administration as the "Settlement Administrator" to assist Plaintiffs' counsel in effectuating the notice program and handling claims administration. Plaintiffs' counsel engaged in a robust vetting process before selecting Kroll. Plaintiffs' counsel requested bids from Kroll and two other experienced class action administration firms. *See* Broshuis Decl. at ¶ 16. Counsel carefully assessed the bids received from all firms. In deciding which firm to endorse, counsel considered not only each firm's

1 estimated cost, but also its staffing, years of experience, and
2 expertise in administering class actions of this size and nature.
3 Kroll has estimated administration costs of $30,150, which in
4 counsel's experience is reasonable and in line with
5 administration costs in other class actions of this size and
6 nature. *Id.*[25] Kroll intends to work with Dr. Daniel Rascher to
7 determine the payment amounts; Dr. Rascher estimates that his
8 firm's costs will amount to $35,000. Rascher at ¶ 13. Plaintiffs
9 intend to request that $65,150 be set aside to pay these combined
10 administrative costs.

11                          **Legal Standard**

12      The Ninth Circuit has "a strong judicial policy that favors
13 settlements, particularly where complex class action litigation
14 is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101
15 (9th Cir. 2008); *see also Rodriguez v. W. Publ'g Corp.*, 563 F.3d
16 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the
17 product of an arms-length, non-collusive negotiated resolution.")
18 (citation omitted). The settlement of class actions requires
19 court approval. *See* Fed. R. Civ. P. 23(e) ("[t]he claims, issues
20 or defenses of a certified class may be settled only with the
21 court's approval.").

22      "Approval under 23e involves a two-step process in which the
23 Court first determines whether a proposed class action settlement
24 deserves preliminary approval and then, after notice is given to

25 ────────────────────────────
   [25] The settlement administration estimate includes assumptions
26 regarding the number of hours the Settlement Administrator is
   required to expend on tasks, *inter alia*, responding to class
27 member inquiries and tax reporting. The actual hours and in turn
   the true cost of settlement administration may vary.
28

1 class members, whether final approval is warranted." *Kabasele v.*

2 *Ulta Salon, Cosmetics & Fragrance, Inc.*, No. 2:21-cv-1639, 2024

3 WL 477221, at *1 (E.D. Cal. Feb. 7, 2024) (Shubb, J.) (quoting

4 *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523,

5 525 (C.D. Cal. 2004)). "Preliminary approval authorizes the

6 parties to give notice to putative class members of the

7 settlement agreement and lays the groundwork for a future

8 fairness hearing, at which the court will hear objections to (1)

9 the treatment of this litigation as a class action and (2) the

10 terms of the settlement." *Kabasele v. Ulta Salon, Cosmetics &*

11 *Fragrance, Inc.*, No. 2:21-cv-1639, 2023 WL 4747691, at *2 (E.D.

12 Cal. July 25, 2023) (Shubb, J.); *Evans v. Zions Bancorporation,*

13 *N.A.*, No. 2:17-cv-01123, 2022 WL 3030249, at *1 (E.D. Cal. Aug.

14 1, 2022) (Shubb, J.).

15    "Where the parties reach a settlement agreement prior to

16 class certification, the court must first assess whether a class

17 exists." *Kabasele*, 2023 WL 4747691, at *2 (citing *Staton v.*

18 *Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003)); *Griffin v.*

19 *Consol. Commc's*, No. 2:21-cv-0885, 2022 WL 16836711, at *1 (E.D.

20 Cal. Nov. 9, 2022) (Shubb, J.) (same). Second, this Court "must

21 carefully consider whether a proposed settlement is fundamentally

22 fair, adequate, and reasonable, recognizing that it is the

23 settlement taken as a whole, rather than the individual component

24 parts, that must be examined for overall fairness." *Kabasele*,

25 2023 WL 4747691, at *2 (citing *Staton*, 327 F.3d at 952); *Griffin*,

26 2022 WL 16836711, at *2 (same).

27

28

1          **Argument**

2 **I.    A Certifiable Settlement Class Exists Under FRCP 23.**

3      Plaintiffs seek to certify a Settlement Class to effectuate

4 the benefits of the Settlement. During the recent briefing on

5 class certification that occurred pre-settlement, only

6 predominance under Rule 23(b)(3) was disputed. And recently the

7 Court certified a litigation class in the related case of *Ray*,

8 Case No. 1:23-cv-00425-WBS, ECF No. 128. For purposes of this

9 Motion, all factors are satisfied, and the Court should certify

10 the proposed Settlement Class.

11      **A.    The Class is Sufficiently Definite and Ascertainable.**

12      "All that is required for class definition is that it set

13 forth common characteristics sufficient to allow a member of that

14 group to identify himself or herself as having a potential right

15 to recover based on the description." *Aldapa v. Fowler Packing

16 Co., Inc.*, 323 F.R.D. 316, 343 (E.D. Cal. 2018) (Drozd, J.)

17 (quotation omitted). Here, the Settlement Class definition is

18 definite and ascertainable. *See supra* at 7 (providing Settlement

19 Class definition). Class members will know if they worked as the

20 "volunteer coach" during the relevant time period, and Plaintiffs

21 have already constructed a class list based on subpoenaed and

22 publicly available data.

23      **B.    Numerosity is satisfied.**

24      While there are no "absolute limitations for determining

25 numerosity," *Schwarm v. Craighead*, 233 F.R.D. 655, 660 (E.D. Cal.

26 2006) (Shubb, J.), "a proposed class of at least forty members

27 presumptively satisfies the numerosity requirement." *Kabasele v.*

28

1   *Salon*, No. 2:21-cv-1639, 2023 WL 4747691, at *3 (E.D. Cal. July

2   25, 2023) (Shubb, J.). The class list shows around 1,000 class

3   members. Broshuis Decl. ¶ 8. This far exceeds the presumptive

4   threshold. Numerosity is therefore satisfied.

5       **C.  Commonality is Met.**

6      "[C]ourts have consistently held that the very nature of a

7   conspiracy antitrust action compels a finding that common

8   questions of law and fact exist." *In re High-Tech Emp. Antitrust*

9   *Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013). This is

10   because "[a]ntitrust liability alone constitutes a common

11   question that 'will resolve an issue that is central to the

12   validity' of each class member's claim 'in one stroke.'" *Id.*

13   (quoting *Dukes*, 564 U.S. at 350). That is particularly true when,

14   like here, the case involves standardized conduct by a defendant

15   toward members of the proposed class. *Schwarm*, 233 F.R.D. at 661

16   (commonality met when defendants had "engaged in standardized

17   practices") (Shubb, J.); *see also Baird v. Cal. Faculty Ass'n*,

18   No. CIV S-00-0999, 2000 WL 1028782, at *3 (E.D. Cal. July 13,

19   2000) (Shubb, J.) (certifying class where constitutionality of a

20   law was a common issue); *Cummings v. Connell*, No. CIV S-99-2176,

21   1999 WL 1256772, at *3 (E.D. Cal. Dec. 20, 1999) (Shubb, J.)

22   (certifying class where standardized practices complained of).

23      In the recent NIL antitrust case involving NCAA athletes,

24   the court found commonality met because several key questions

25   emerged directly from the legality of the bylaw at issue. *In re*

26   *College Athlete NIL Litig.*, No. 20-cv-03919, 2023 WL 8372787, at

27   *5 (N.D. Cal. Nov. 3, 2023). The questions included (1) "whether

28

the challenged rules constitute a horizontal agreement … that

caused significant anticompetitive effects …," (2) whether any

legitimate procompetitive justifications existed, and (3) whether

a less restrictive alternative could have been used to achieve

any legitimate procompetitive justification. *Id.*

Those same common questions are present here for the

proposed Settlement Class because adjudicating the legality of

the NCAA's volunteer coach rule would be the same for all class

members. The rule applied the same way for all schools in the

same manner.[26] All Division I member schools had to comply with

the rule, and all of these coaches were subjected to it.

Commonality is met. *See Ray*, Case No. 1:23-cv-00425-WBS, ECF No.

128 at 13 (finding commonality met).

**D.    Typicality is satisfied.**

Typicality is "permissive and requires nothing more than

that a class plaintiff's claims be reasonably coextensive with

those of absent class members." *Gonzalez v. United States*

*Immigration and Customs Enforcement*, 975 F.3d 788, 809 (9th Cir.

2020); *see also Schwarm*, 233 F.R.D. at 661 (Shubb, J.) (the

claims need not be "substantially identical"). Factors that

inform the analysis include whether other class members have a

similar injury, whether the lawsuit is based on conduct not

unique to the named plaintiffs, and whether other class members

---

[26] *See* NCAA Answer (ECF No. 40) at ¶¶ 44–46 (admitting this); NCAA
Mem. in Support of Motion to Dismiss (ECF No. 7) at 14. Even
conceded issues can help satisfy commonality and predominance. *In
re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 227–29 (2d Cir.
2006) (reversing district court that held otherwise).

1 have been injured by the same conduct. *Gonzalez*, 975 F.3d at 809;

2 *Schwarm*, 233 F.R.D. at 661. "[I]n antitrust cases, typicality

3 usually will be established by plaintiffs and all class members

4 alleging the same antitrust violations by defendants." *Sidibe v.*

5 *Sutter Health*, 333 F.R.D. 463, 486 (N.D. Cal. 2019).

6     That is exactly the case here. The conduct that the named

7 Plaintiffs challenge is not unique to any class member, and the

8 alleged injuries arise from the same course of conduct.[27] Like all

9 class members, each named Plaintiff worked as a volunteer

10 assistant baseball coach for a Division I school under the same

11 volunteer coach rule. Everyone in the class has the same general

12 grievance: the NCAA's bylaws fixed their compensation at zero,

13 removed competition for their services, and prevented them from

14 getting paid their market value.

15     This Court and many others have found that typicality is

16 satisfied when named plaintiffs and class members were all

17 subject to a uniform policy. *See Ray*, Case No. 1:23-cv-00425-WBS,

18 ECF No. 128 at 14; *In re College Athlete NIL Litig.*, 2023 WL

19 8372787, at *6 (typicality satisfied where NCAA restrictions on

20 athletes' names, images, and likenesses challenged because bylaws

21 applied to named plaintiffs and class members); *Kabasele*, 2023 WL

22 4747691, at *4 (Shubb, J.) (typicality satisfied when same policy

23 applied); *Griffin v. Consol. Commc'ns*, No. 2:21-cv-0885, 2022 WL

24  

25 [27] *See Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir. 2017) ("The requirement of typicality is not primarily concerned with whether each person in a proposed class suffers the same

26 type of damages; rather, it is sufficient for typicality if the

27 plaintiff endured a course of conduct directed against the class.").

28  

**Motion for Preliminary Approval of Settlement**

16836711, at *3 (E.D. Cal. Nov. 9, 2022) (Shubb, J.) (same). The Court should do so again here.

### E.    Adequacy is satisfied.

The test for adequacy asks: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members; and (2) will the named plaintiffs and their counsel vigorously prosecute the action on the class's behalf? *In re Mersho*, 6 F.4th 891, 899–900 (9th Cir. 2021); *In re Hyundai and Kia Fuel Economy Litig.*, 926 F.3d 539, 566 (9th Cir. 2019) (en banc); *Schwarm*, 233 F.R.D. at 662 (Shubb, J.).

### 1. Named Plaintiffs Are Adequate Class Representatives.

Mr. Smart and Mr. Hacker are adequate class representatives. Their interests are aligned with that of the class because they have been harmed in the same manner as all class members. Both have prosecuted this action vigorously: each has responded to interrogatories, searched for and produced responsive documents, assisted counsel with the facts, and been deposed. *See In re College Athlete NIL Litig.*, 2023 WL 8372787, at *6 (finding same things supported adequacy). Both also approved the settlement offer that Plaintiffs' counsel thereafter accepted on the class's behalf. Broshuis Decl. at ¶ 11. In addition, Mr. Hacker attended the hearing on Defendant's motion to dismiss. *Id.* at ¶ 5.

The fact that Mr. Smart and Mr. Hacker seek an incentive award of $7,500 each does not impact their adequacy. "[T]he Ninth Circuit has specifically approved the award of 'reasonable incentive payments,' and other courts in this Circuit have found $5,000 to be "presumptively reasonable." *Kabasele*, 2023 WL

4747691, at *4 (citing *Staton*, 327 F.3d at 977-78; *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008) (Shubb, J.); and others); *Evans*, 2022 WL 3030249, at *4 (same); *Kimbo v. MXD Group, Inc.*, No. 2:19-cv-00166, 2021 WL 492493, at *11 (E.D. Cal. Feb. 10, 2021) (Shubb, J.) (granting final approval of $5,000 incentive payment). This Court and others have awarded higher incentive payments, which are common in antitrust cases such as this one. *Mejia v. Walgreen Co.*, No. 2:19-cv-00218, 2021 WL 1122390, at *10 (E.D. Cal. Mar. 24, 2021) (Shubb, J.) (granting final approval to $7,500 incentive payment); *accord Carlin v. DairyAmerica, Inc.*, 380 F. Supp. 3d 998, 1019 (E.D. Cal. 2019) (Ishii, J.) (granting $45,000 incentive awards each to four current named plaintiffs); *Meijer, Inc. v. Abbott Labs.*, No. C 07-5985, 2011 WL 13392313, at *3 (N.D. Cal. Aug. 11, 2011) ($60,000 incentive award to each named plaintiff in $52 million settlement in § 2 Sherman Act case).

In short, Mr. Smart's and Mr. Hacker's interests are aligned with the class and they have put in the work to usher in a great result for the class.

### 2. Named Plaintiffs' Counsel Is Adequate.

Named Plaintiffs' counsel also satisfies the adequacy requirement. The National Law Journal has named Korein Tillery one of the top plaintiffs' firms in the country seven times.[28] Korein Tillery has been appointed class counsel in more than fifty class actions and has successfully led some of the

---

[28] *See* Broshuis Decl. at ¶ 3, (citing Broshuis Ex. 2 at 1 (Korein Tillery résumé)).

country's largest cases.[29] In a case led by the undersigned

counsel, Korein Tillery obtained a landmark $185 million

settlement on behalf of thousands of minor league baseball

players that included important injunctive relief, and that is

believed to be one of the five largest wage-and-hour settlements

ever. *Senne v. The Office of the Comm'r of Baseball*, No. 14-CV-

00608-JCS (N.D. Cal.). Additionally, Korein Tillery (including

Mr. Berezney, who was the firm's responsible attorney) and its

co-counsel developed and litigated an antitrust class action

involving the fixing of the foreign-exchange market, obtaining

$2.3 billion in court-approved settlements. *In re Foreign

Exchange Benchmark Rates Antitrust Litig.*, No. 13-cv-07789-LGS

(S.D.N.Y.). Both Mr. Broshuis and Mr. Berezney currently serve as

co-lead class counsel on behalf of Missouri municipalities in two

cases.[30]

     In short, Plaintiffs' counsel is highly qualified, has

vigorously prosecuted this case since its filing (including

defeating a motion to dismiss and zealously pursuing discovery

from the NCAA and hundreds of third parties), and will continue

to do so. To date, Korein Tillery has devoted over 7,400 hours to

this case, with Mr. Broshuis contributing over 1,700 hours and

Mr. Berezney contributing over 1,500 hours. *See* Broshuis Decl. at

¶ 17.[31] This suffices to establish adequacy. *See Kabasele*, 2023 WL

---

[29] *Id.*

[30] *Id.*

[31]  Nearly 2,000 hours of additional time has been spent
collecting documents from 300+ NCAA Division I schools via
subpoena after the Court denied Plaintiffs' motion to compel NCAA
to produce relevant records. *See* ECF No. 55 at 11)

**Motion for Preliminary Approval of Settlement**

4747691, at *5 (Shubb, J.) (finding vigorous prosecution element satisfied where counsel was experienced employment and class action litigators and where counsel conducted thorough factual investigation and legal research); *Griffin*, 2022 WL 16836711, at *4 (Shubb, J.) (same); *Evans*, 2022 WL 3030249, at *4 (Shubb, J.) (finding vigorous prosecution element satisfied where counsel dedicated thousands of hours to the case and engaged in extensive discovery).

### F.   Common Issues Predominate under Rule 23(b)(3).

"Because Rule 23(a)(3) already considers commonality, the focus of the Rule 23(b)(3) predominance inquiry is on the balance between individual and common issues." *Evans*, 2022 WL 3030249, at *5. The predominance inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). Because this case has settled, predominance and manageability concerns are lessened because there is no threat of individualized issues overwhelming a trial. *In re Hyundai*, 926 F.3d at 558 ("A class that is certifiable for settlement may not be certifiable for litigation if the settlement obviates the need to litigate individualized issues that would make a trial unmanageable.").

The mere presence of some important individualized issues, such as damages and affirmative defenses, does not necessarily defeat predominance and prevent a class from being certified.

1  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31

2  F.4th 651, 668 (9th Cir. 2022); *Vaquero v. Ashley Furniture*

3  *Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016); *Leyva v.*

4  *Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).[32] "[M]ore

5  important questions apt to drive the resolution of the litigation

6  are given more weight in the predominance analysis over

7  individualized questions which are of considerably less

8  significance to the claims of the class." *In re Hyundai*, 926 F.3d

9  at 557. Thus, even one common question may be of sufficient

10  importance to predominate. *Id.*

11      All important issues here are common for the Settlement

12  Class, including every element of liability,[33] so predominance is

13  satisfied. *See Ray*, Case No. 1:23-cv-00425-WBS, ECF No. 128, at

14  24-25 (finding predominance met). "Predominance is a test readily

15  met in certain cases alleging . . . violations of the antitrust

16  laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

17  "The question of whether an antitrust violation under Section 1

18  exists naturally lends itself to common proof, because that

19  determination turns on defendants' conduct and intent along with

20  the effect on the market, not on individual class members." *In re*

21  *College Athlete NIL Litig.*, 2023 WL 8372787, at *8 (internal

22  citations omitted). Or, as said in another antitrust case in this

23

---

24  [32] Rule 23 even permits certification of a class that potentially
    includes more than a de minimis number of uninjured class

25  members. *Olean*, 31 F.4th at 669.

26  [33]  The elements of a section 1 claim are "(1) a contract,
    combination or conspiracy; (2) that unreasonably restrained trade

27  …; and (3) that restraint affected interstate commerce." (ECF No.
    29 at 14.)

28

**Motion for Preliminary Approval of Settlement**

District, "with the major issues in this case stemming from an
alleged overarching conspiracy to [] fix the prices of [labor], a
narrowly defined class, and little suggestion there will be
individual issues apart from the calculation of individualized
damages, the class action will promote efficiency by allowing a
number of claims to be litigated simultaneously." *Four in One
Co., Inc. v. S.K. Foods, L.P.*, No. 2:08-cv-3017, 2014 WL 28808,
at *6 (E.D. Cal. Jan. 2, 2014) (Mueller, J.).

   ***Liability element one: Existence of Conspiracy.*** "[P]roof of
the *conspiracy* is a common question that is thought to
predominate over the other issues of the case." *In re Scrap Metal
Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) (citations
omitted). "[A]s many courts have noted, the claim of a conspiracy
to fix prices inherently lends itself to a finding of . . .
predominance." *In re Capacitors Antitrust Litig. (No. III)*, No.
17-md-02801, 2018 WL 5980139, at *5 (N.D. Cal. Nov. 14, 2018); 6
Newberg on Class Actions, § 18.25 (4th ed. 2002) ("[C]ommon liability
issues such as conspiracy or monopolization have, almost
invariably, been held to predominate over individual issues."); 
7AA Charles Alan Wright, Arthur Miller & Mary Kay Kane, Federal
Practice and Procedure, § 1781 (3d ed. 2005) ("[W]hether a conspiracy
exists is a common question that is thought to predominate over
the other issues in the case.").

   ***Liability element two: In interstate commerce.*** The NCAA has
already admitted that the conspiracy was national in character,

1  and that it operates in interstate commerce.[34] This too is a

2  common issue that is already satisfied for all class members.

3      ***Liability element three: Unreasonable restraint of trade.***

4  The final liability element, unreasonable restraint of trade,

5  also presents a common issue for the proposed Settlement Class.

6  As the Court recognized previously, "the large salaries received"

7  by the other baseball coaches that *could* be paid and "the overall

8  increase in coach salaries" over time "creates a strong

9  inference" that a bylaw that fixed salaries at zero was

10 anticompetitive. (ECF No. 29 at 18.) Evidence such as that is

11 common, and has already been collected. And Plaintiffs' expert,

12 Dr. Daniel Rascher, opines that, as a matter of settled

13 economics, that type of wage fix is anticompetitive across the

14 board.[35] The wage fix removed the coaching position from a

15 competitive market, meaning that all schools, no matter how much

16 they had budgeted for the sport of baseball, paid the same for

17 the position: $0.

18     Adjudicating Defendant's alleged procompetitive

19 justifications would also present a common issue. The purported

20 procompetitive justifications would rise or fall for all class

21 members in one fell swoop. *See In re High-Tech Emp. Antitrust*

22 *Litig.*, 985 F. Supp. 2d at 1204-05 ("The evidence therefore

23 indicates that Defendants sought to enter into anti-solicitation

24 agreements in an effort to stifle increased competition for labor

25

26 [34] NCAA Answer, ECF No. 40 at ¶ 13 (admitting that the NCAA
   conducts its business in interstate commerce); ECF No. 29 at 14-

27 15 (finding interstate commerce element met).

28 [35] (ECF No. 64-2, Rascher Am. Decl. ¶¶ 48-66.)

1    and rising wages," meaning that plaintiffs can prove "antitrust

2    violations on a classwide basis"); *Castro v. Sanofi Pasteur Inc.*,

3    134 F. Supp. 3d 820, 844–45 (D.N.J. 2015) (proposed

4    "procompetitive justifications" are "common issues"); *In re*

5    *College Athlete NIL Litig.*, 2023 WL 8372787, at *5 (whether

6    NCAA's procompetitive justifications for challenged NCAA rules

7    are valid is a common question); *cf. Law v. Nat'l Collegiate*

8    *Athletic Ass'n*, 134 F.3d 1010, 1020–24 (10th Cir. 1998)

9    (rejecting arguments that restricting coaches' salaries helped

10   retain entry-level salaries and preserved competition).

11        In the related case of *Ray*, the Court recently found

12   predominance satisfied. Case No. 1:23-cv-00425-WBS, ECF No. 128,

13   at 24-25. With all key issues of liability being common, the

14   Court should find the same for purposes of this Settlement Class.

15   *See Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st

16   Cir. 2003) ("[w]here … common questions predominate regarding

17   liability, then courts generally find the predominance

18   requirement to be satisfied even if individual damages issues

19   remain."); *see also Whiteway v. FedEx Kinko's Off. & Print*

20   *Servs., Inc.*, No. C 05-2320, 2006 WL 2642528, at *10 (N.D. Cal.

21   Sept. 14, 2006) (quoting same); *Kimbo v. MXD Group, Inc.*, No.

22   2:19-cv-00166, 2020 WL 4547324, at *5 (E.D. Cal. Aug. 6, 2020)

23   (Shubb, J.) (predominance satisfied where "the claims brought by

24   the proposed Settlement Class all arise from defendants' same

25   conduct").

26

27

28
                                          26      NO. 2:22-cv-02125-WBS-CSK

### G.    A Class Action Is Superior.

The second part of a Rule 23(b)(3) class action is superiority: whether class treatment "is superior to other available methods for fairly and efficiently adjudicating the controversy." The relevant superiority factors to consider are (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

All four factors weigh in favor of certification. Application of factors one and three favors litigating the claims in a single forum. Nothing suggests individual class members have any interest in controlling the prosecution of separate actions. No other similar cases involving baseball coaches been filed as far as Plaintiffs are aware (the *Ray* case expressly excludes baseball coaches). *Griffin*, 2022 WL 16836711, at *5 (Shubb, J.) (citing lack of concurrent litigation as supporting superiority); *Evans*, 2022 WL 3030249, at *5 (Shubb, J.) (same). Moreover, those class members who wish to direct their own litigation can easily opt-out and do so.

The first factor also supports class treatment when there are class members for whom it would be "uneconomical to litigate individually." *Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001). While most class members are likely entitled to an amount

1  in the five figures (and some in the six figures), the Court

2  should keep in mind the complexity of this litigation. Expert

3  witness fees alone in a case like this are higher than any single

4  class members' damages.

5      The second factor — the extent and nature of similar

6  litigation — also favors class certification. The only other

7  similar case (*Ray*) is likewise before this Court and involves

8  sports other than baseball. Plaintiffs here and in *Ray* have

9  attempted to coordinate discovery where appropriate for

10 efficiency. This fact supports factor three because this Court is

11 already currently managing a related a class action involving the

12 same NCAA rule. *See Morelock Enters., Inc. v. Weyerhaeuser Co.*,

13 No. CV 04-583, 2004 WL 2997526, at *5 (D. Or. Dec. 16, 2004) ("It

14 also is desirable to concentrate this litigation in the District

15 of Oregon, where several related cases have been adjudicated.").

16     The fourth and final factor, manageability, also supports

17 class certification. By antitrust class action standards, this is

18 a relatively small one, involving around 1,000 coaches, all of

19 whom coached in a single sport under the same bylaw. This yields

20 a cohesive and manageable class. And, again, manageability

21 concerns are reduced when class certification is sought in a

22 settled case. *In re Hyundai*, 926 F.3d at 558.

23     The class action device is also the superior method for

24 resolving this dispute because each class member would likely

25 point to the same evidence in individual trials. Considerations

26 of efficiency and economy highly weigh in favor of resolving this

27 dispute once for all class members.

28

**Motion for Preliminary Approval of Settlement**

1    In sum, the Court should hold that a certifiable class for
2    purposes of settlement exists.

3    **H.    Rule 23(c)(2) Notice Requirements.**

4    "Rule 23(c)(2) governs both the form and content of a
5    proposed notice." *Kabasele*, 2023 WL 4747691, at *6. With regard
6    to the form of notice, "[n]otice is satisfactory if it generally
7    describes the terms of the settlement in sufficient detail to
8    alert those with adverse viewpoints to investigate and to come
9    forward and be heard." *Churchill Vill. v. Gen. Elec.*, 361 F.3d
10   566, 575 (9th Cir. 2004).

11   The proposed notice forms do just that. *See* Proposed Order,
12   Exhibits A-C. They explain the proceedings, define the scope of
13   the class, inform class members of the binding effect of the
14   class action, and explain what the settlement provides and how
15   much each class member can expect to receive in compensation. The
16   forms further explain the opt-out procedure, the procedure for
17   objecting to the settlement, and the date and locations of the
18   final approval hearing. This Court has approved of class notices
19   containing these things. *Kabasele*, 2023 WL 4747691, at *6;
20   *Griffin*, 2022 WL 16836711, at *5 *Evans*, 2022 WL 3030249, at *6;
21   *Kimbo*, 2020 WL 4547324, at *6. In short, the forms provide class
22   members with everything they need to make an informed decision.

23   With regard to the method of notice, Rule 23 requires "the
24   best notice that is practicable under the circumstances,
25   including individual notice to all members who can be identified
26   through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Notice
27   must be "reasonably certain to inform the absent members of the

28

plaintiff class," but actual notice is not required. *Kabasele*,
2023 WL 4747691, at *6 (quoting *Silber v. Mabon*, 18 F.3d 1449,
1454 (9th Cir. 1994)); *Griffin*, 2022 WL 16836711, at *5 (same).

Plaintiffs have selected Kroll Settlement Administration to
serve as the Settlement Administrator. Pursuant to the notice
plan, the Settlement Administrator will direct a longform notice
to all class members with a last-known email address. Fenwick
Decl. ¶¶ 6-7. Given that the class is comprised largely of
younger men born and raised in the age of computer technology,
electronic communications are well-suited for the case. *See* Fed.
R. Civ. P. 23(c)(2)(B) (expressly contemplating notice via
"electronic means"). The administrator will also send a first-
class U.S. mail postcard notice to each class member at his or
her last known address based on the records obtained via document
subpoenas, from performing additional searches, and from
following best practices to identify updated addresses. *Id.* ¶¶ 8-
13. The administrator will also create a settlement website that
will contain the full longform notice, and a toll-free number for
class members to ask questions and learn about the settlement.
*Id.* ¶¶ 14-15. These different methods of notice will assuredly
reach as many class members as is "practicable under the
circumstances." This Court has approved of a similar notice plan,
*Kimbo*, 2020 WL 4547324, at *6, and should do so again here.

**II.  Rule 23(e) Fairness: All *Churchill* Factors Support
Preliminary Approval.**

After finding that the Rule 23(a) and (b) factors are met,
the Court next determines whether the settlement is fair,

adequate, and reasonable. *Kabasele*, 2023 WL 4747691, at *7;

*Griffin*, 2022 WL 16836711, at *6. The Ninth Circuit's "*Churchill*"

factors guide the fairness analysis:

> (1) The strength of the plaintiff's case; (2) the risk,
> expense, complexity, and likely duration of further
> litigation; (3) the risk of maintaining class action
> status throughout the trial; (4) the amount offered in
> settlement; (5) the extent of discovery completed and
> the stage of the proceedings; (6) the experience and
> views of counsel; (7) the presence of a governmental
> participant; and (8) the reaction of the class members
> of the proposed settlement.

*Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021) (citing

*Churchill*, 361 F.3d 566).

   "Because some of these factors cannot be considered until

the final fairness hearing, at the preliminary approval stage,

the court need only determine whether the proposed settlement is

within the range of possible approval, and resolve any glaring

deficiencies in the settlement agreement before authorizing

notice to class members." *Kabasele*, 2023 WL 4747691, at *6

(citations omitted); *accord Evans*, 2022 WL 3030249, at *6. "This

generally requires consideration of whether the proposed

settlement discloses grounds to doubt its fairness or other

obvious deficiencies, such as unduly preferential treatment of

class representatives or segments of the class, or excessive

compensation of attorneys." *Kabasele*, 2023 WL 4747691, at *6.

Courts typically start by examining the process that led to the

settlement to ensure that they are the result of arms-length

bargaining and then turn to the settlement agreement's

substantive terms. *Id.*; *Griffin*, 2022 WL 16836711, at *6.

### A.    Negotiation of the Settlement Agreement.

The settlement was reached as a result of arms-length negotiations occurring over several months. *See* Broshuis Decl. at ¶ 11; *Griffin*, 2022 WL 16836711, at *7 (Shubb, J.) (accepting counsel's representation of settlement reached by arms-length negotiation following 10 months of investigation and informal discovery). The parties mediated the case with a mediator last summer, but were unsuccessful. The parties then proceeded with thorough formal discovery. *See* Broshuis Decl. ¶¶ 7-10. After the parties exchanged class certification briefs, and before Plaintiffs' reply in support of its motion for class certification was due, settlement talks resumed. Counsel for each party negotiated intensely until an agreement in principle was reached on January 31, 2025. *See* Broshuis Decl. at ¶ 11.

### B.    The strength of Plaintiffs' case and the risks, expense, and complexity of continued litigation.

"Another relevant factor is the risk of continued litigation balanced against the certainty and immediacy of recovery from the Settlement." *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 489 (E.D. Cal. 2010) (Wanger, J.). "It has been held proper to take the bird in hand instead of a prospective flock in the bush." *Id.* In determining risk, numerous courts have recognized that "antitrust class actions are notoriously complex, protracted, and bitterly fought." *Park v. Carlyle/Galaxy San Pedro, L.P.*, No. CV 09-00793, 2009 WL 10669742, at *6 (C.D. Cal. Oct. 8, 2009); *In re Endosurgical Prods. Direct Purchaser Antitrust Litig.*, No. SACV 05-8809, 2008 WL 11504857, at *7 (C.D. Cal. Dec. 31, 2008) (quotations omitted).

1    This case is no different. Because Plaintiffs' motion for
2    class certification was contested, certification was far from
3    certain. Whatever ruling this Court made would almost certainly
4    be appealed by the losing party, which would have caused
5    additional expense and delay. *Evans*, 2022 WL 3030249, at *7
6    (Shubb, J.) (citing similar factors in risk analysis); *Kimbo*,
7    2021 WL 492493, at *5 (Shubb, J.) (same).

8    The first two *Churchill* factors "weigh in favor of approving
9    settlement when the defendant has plausible defenses that could
10   have ultimately left class members with a reduced or non-existent
11   recovery." *See Sandoval Ortega v. Aho Enters., Inc.*, No. 19-cv-
12   00404, 2021 WL 5584761, at *6 (N.D. Cal. Nov. 30, 2021) (citing
13   *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993,
14   999 (N.D. Cal. 2015)).

15   Here, the NCAA alleged that three procompetitive
16   justifications for the volunteer coach rule existed: preserving
17   competition between members, increasing coaching resources
18   available to student athletes, and expanding coaching
19   opportunities for prospective coaches. (ECF No. 63-10 at p. 20.)
20   While Plaintiffs do not believe that any of these justifications
21   would have prevailed on summary judgment or at trial for the
22   reasons briefed in their motion for class certification, the
23   entire class would have recovered nothing had the NCAA
24   nevertheless prevailed on any one of these three theories.

25   The NCAA's *Daubert* motion seeking to exclude Plaintiffs'
26   expert, Dr. Rascher, created additional litigation risk. The NCAA
27   attacked his damages model at the class certification stage and

28

**Motion for Preliminary Approval of Settlement**

1  presumably would have raised the same arguments at summary

2  judgment and trial. Plaintiffs again do not believe that the

3  NCAA's attacks would have persuaded either the Court or a jury.

4  But Plaintiffs acknowledge there was at least some risk that the

5  NCAA would prevail in some or all of their attacks on the damages

6  model at any of the three major remaining stages of this case. If

7  that had happened, the Court or the jury could have found that

8  Plaintiffs had not proven any damages at all, or could have

9  reduced the damages to a much lower amount than the current

10  settlement figure. *Martinelli v. Johnson & Johnson*, No. 2:15-cv-

11  01733, 2022 WL 4123874, at *4 (E.D. Cal. Sept. 9, 2022) ("[B]oth

12  sides have retained expert witnesses, which, should this case go

13  to trial, makes it virtually impossible to predict with any

14  certainty which testimony would be credited, and ultimately,

15  which expert version would be accepted by the jury.") (England,

16  Jr., J.).[36] "Indeed, the history of antitrust litigation is

17  replete with cases in which antitrust plaintiffs succeeded at

18  trial on liability, but recovered no damages, or only negligible

19  damages, at trial, or on appeal." *In re NASDAQ Market-Makers*

20  *Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998) (citing

21  examples). In short, Plaintiffs are confident that they would

22

23  ───────────────────────

24  [36] *See also In re Warner Commc's Sec. Litig.*, 618 F. Supp. 735,
    744-45 (S.D.N.Y. 1985) ("Undoubtedly, expert testimony would be
25  needed to fix not only the amount, but the existence of actual
    damages. In this 'battle of experts,' it is virtually impossible
26  to predict with any certainty which testimony would be credited,
    and ultimately, which damages would be found to have been caused
27  by actionable, rather than the myriad nonactionable factors . . .
    .") (citation omitted), *aff'd*, 798 F.2d 35 (2d Cir. 1986).

28

1   have succeeded, but success at trial, let alone on class

2   certification and summary judgment, was not assured.

3       **C.   Relief provided by the settlement.**

4       When assessing the relief provided by the settlement, there

5   is no "particular formula" to be used. *Rodriguez*, 563 F.3d at

6   965. Instead, the "court's determination is nothing more than an

7   amalgam of delicate balancing, gross approximations and rough

8   justice." *Id.* "In determining whether a settlement agreement is

9   substantively fair to the class, the court must balance the value

10  of expected recovery against the value of the settlement offer.

11  This inquiry may involve consideration of the uncertainty class

12  members would face if the case were litigated to trial."

13  *Kabasele*, 2023 WL 4747691, at *8 (citations omitted); *Griffin*,

14  2022 WL 16836711, at *7 (same). The Court also compares the

15  settlement amount to the maximum amount of damages recoverable in

16  a successful litigation. *Kabasele*, 2023 WL 4747691, at *8. Some

17  courts have considered the amount recovered as the "most

18  important consideration[ ] of any class settlement." *Carlin*, 380

19  F. Supp. 3d at 1011.

20      By any measure, the settlement fund provides exceptional

21  relief for an antitrust case and makes the class members nearly

22  whole. The NCAA has agreed to establish a settlement fund of

23  $49.25 million. Dr. Rascher previously calculated potential

24  damages of $53.8 million; his model remains largely the same for

25  purposes of settlement, but when alleged violations after the

26  July 2023 rule change are excluded (which posed some additional

27  steps to prove), he estimates that the Settlement Class's overall

28

1  actual damages would amount to approximately $49.79 million.

2  Rascher Decl. ¶¶ 9-10. That includes any additional coaches who

3  were not in the original class definition proposed at class

4  certification, who had low potential damages because they coached

5  at schools with the lowest baseball budgets (which also generally

6  had the lowest coaching salaries). The $49.25 million settlement

7  fund amounts to 91.5% of his original damages number, or

8  approximately 99% of his revised number. *Id.* It amounts to an

9  average of about $36,000 *per year* per class member. *Id.* ¶ 12. And

10  since coaches often served in this role for multiple years, many

11  coaches will receive six-figure payments. *See id.* ¶ 12 (providing

12  estimates for Plaintiffs, who coached for two years).

13      That recovery is far better than the typical settlement.

14  "Courts regularly approve class settlements where class members

15  recover less than one quarter of the maximum potential recovery

16  amount." *Carlin*, 380 F. Supp. 3d at 1011. This Court has approved

17  lesser settlements:

18      • *Kabasele*, 2023 WL 4747691, at *8 (granting preliminary

19        approval to settlement that was around 27.22% of

20        potential damages);

21      • *Evans*, 2022 WL 3030249, at *7 (granting preliminary

22        approval to settlement that was more than 25% of the

23        class's best-case recovery);

24      • *Mejia v. Walgreen Co.*, No. 2:19-cv-00218, 2020 WL

25        6887749, at *10 (E.D. Cal. Nov. 24, 2020) (Shubb, J.)

26        (granting preliminary approval to settlement that was

27        around 22% of potential damages).

28

Moreover, antitrust cases in particular often settle for far less:

- *Rodriguez*, 563 F.3d at 964–65 (affirming approval: 30% of single estimated damages);

- *Four in One Co., Inc. v. S.K. Foods, L.P.*, No. 2:08-cv-3017, 2014 WL 4078232, at *9 (E.D. Cal. Aug. 18, 2014) (Mueller, J.) (final approval: 2.4% of damages);

- *In re Google Play Developer Antitrust Litig.*, No. 20-cv-05792, 2024 WL 150585, at *2 (N.D. Cal. Jan. 11, 2024) (final approval: 36–38% of single damages);

- *In re Glumetza Antitrust Litig.*, No. C 19-05822, 2022 WL 327707, at *3–*4 (N.D. Cal. Feb. 3, 2022) (final approval: 0.43-0.77% of single damages from Assertio; 16.7-30% from Lupin; and 33-60% from Bausch);

- *Edwards v. Nat'l Milk Producers Federation*, No. 11-cv-04766, 2017 WL 3623734, at *7 (N.D. Cal. June 26, 2017) (final approval: 28.7% of damages);

- *In re Cathode Ray Tube (Crt) Antitrust Litig.*, MDL No. 1917, 2015 WL 9266493, at *5–*6 (N.D. Cal. Dec. 17, 2015) (final approval: 0.4875% of damages);

- *In re High-Tech Employee Antitrust Litig.*, No. 11-cv-02509, 2015 WL 5159441, at *4 (N.D. Cal. Sept. 2, 2015) (final approval: 14% of single damages estimate);

- *In re Tableware Antitrust Litig.*, No. C-04-3514, 2007 WL 4219394, at *3 (N.D. Cal. Nov. 28, 2007) (final approval: 4.2% of single damages);

1  • *In re GSE Bonds Antitrust Litig.*, No. 19-cv-1704, 2019
2     WL 6842332, at *4 (S.D.N.Y. Dec. 16, 2019) (10.9% to
3     21.3% of total possible recovery was reasonable);
4  • Connor & Lande, *Not Treble Damages: Cartel Recoveries*
5     *are Mostly Less than Single Damages*, 100 Iowa L. Rev.
6     1997, 1998 (2015) (analyzing settlements in 71 private
7     cartel cases decided in 1990–2014 and finding median
8     average settlement was 37% of single damages).[37]

9       This is not a meager coupon settlement that class members
10 will promptly forget; it provides impressive monetary relief that
11 will substantially help hundreds of hardworking people. The
12 $49.25 million settlement fund is non-reversionary. All money
13 will be distributed to class members after payment of attorneys'
14 fees and costs. After the first distribution, if any money
15 remains in the fund because some class members cannot be located
16 or some checks remain uncashed, the remainder will be distributed
17 *pro rata* to class members who cashed their initial checks. If at
18 some point that process becomes economically infeasible, the

19

20

21 [37]  Courts in non-antitrust cases approve settlements for even
    less amounts. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d
22 454, 459 (9th Cir. 2000) (finding settlement providing plaintiffs
    16.6% of their potential recovery to be "fair and adequate"); *In*
23 *re Toys R Us-Del., Inc.-Fair & Accurate Credit Transactions Act*
    *(FACTA) Litig.*, 295 F.R.D. 438, 453–54 (C.D. Cal. 2014) (final
24 approval: 3% of possible recovery ($391 million value on exposure
    up to $13.05 billion)); *In re LDK Solar Sec. Litig.*, No. C 07-
25 5182, 2010 WL 3001384, at *2 (N.D. Cal. July 29, 2010) (final
    approval: 5% of damages); *McIntosh v. Katapult Holdings, Inc.*,
26 No. 21-cv-07251, 2024 WL 5118192, at *10 (S.D.N.Y. Dec. 13, 2024)
27 (collecting securities class action cases approving settlements
    of 3.8% to 7% of total damages).

28

1  remainder will be donated to a related charity — the American

2  Baseball Coaches Association — under the doctrine of *cy pres*.

3      Each class member's individual recovery will be calculated

4  via the same formula using data regarding the number of years

5  worked, the schools at which they worked, and average salaries

6  for other paid assistant coaches at that school and other similar

7  schools within their conference based on program expenditures.

8  *See* Rascher Decl. at ¶¶4–5, 8. All class members are treated

9  equitably under Dr. Rascher's model, and no class members will

10  unfairly benefit at the expense of others.

11      In short, there is no way to characterize this result as

12  anything less than outstanding. This *Churchill* factor strongly

13  weighs in favor of approval.

14      **D.    Stage of proceedings and amount of discovery.**

15      The extent of discovery is also sometimes relevant in that a

16  court is more likely to approve of a settlement if most of the

17  discovery is completed because it suggests the parties reached a

18  compromise based on a full understanding of the legal and factual

19  issues. *DIRECTV*, 221 F.R.D. at 527 (quoting 5 Moore's Federal

20  Practice, § 23.85[2][e] (Matthew Bender 3d ed.)).

21      Here, substantial discovery took place over the course of

22  many months that was sufficient for the parties to make an

23  informed decision. Both Mr. Smart and Mr. Hacker produced

24  documents. *See* Broshuis Decl. at ¶ 7. The NCAA produced over

25  278,132 pages of documents, which Plaintiffs reviewed. *Id.*

26  Plaintiffs also served and received responses to interrogatories

27  and requests for admissions. *Id.* at ¶ 6. Plaintiffs issued over

28

300 subpoenas to member schools for information on baseball coaches compensation and had received complete responses from over 200, including over 8,000 documents that Plaintiffs also reviewed. *Id.* at ¶ 8. Plaintiffs received enough information for Dr. Rascher to run a regression model that proved both antitrust injury and damages classwide. *See* ECF No. 64-2.

The parties already deposed most of the key fact witnesses. The NCAA deposed both Mr. Smart and Mr. Hacker. *See* Broshuis Decl. at ¶ 9. Plaintiffs deposed two of the NCAA employees most knowledgeable about the volunteer coach rule and the efforts by the NCAA to repeal it after Plaintiffs filed this lawsuit — Jenn Fraser and Lynda Tealer. *Id.* Plaintiffs also deposed Matt Boyer — the SEC employee most directly responsible for an earlier failed effort in 2018 to repeal the volunteer coach rule. Plaintiffs then deposed Jeremiah Carter — a member of the NCAA Modernization of Rule Subcommittee tasked with recommending the repeal of unnecessary bylaws, including the volunteer coach rule. *Id.*

The parties were similarly able to adequately gauge the strength of each side's expert. Plaintiffs' sole expert, Dr. Rascher, submitted a detailed declaration (ECF Nos. 63-60, 64-2) and was deposed. Plaintiffs then received a detailed report from the NCAA's sole rebuttal expert, Dr. Jee-Yeon Lehmann (ECF No. 67-5), and deposed her, Broshuis Decl. at ¶ 10.

Given the extensive discovery completed, this factor strongly favors approval.

### E.    Experience and views of counsel.

"Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *DIRECTV*, 221 F.R.D. at 528. Indeed, "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *Rodriguez*, 563 F.3d at 967.

All parties here were represented by sophisticated counsel with significant experience in class actions — and significant experience in the industry at hand. The class was represented by counsel with decades of experience in complex litigation generally and class actions in particular. *See* Broshuis Decl. at ¶ 3. Indeed, Plaintiffs' counsel regularly works on some of the most complex cases in the country. One of the lead members of the team even had prior experience as a Division I baseball player that had a coach in the volunteer role, so he knows first-hand what is at stake and has an intimate understanding of the business. *Id.* at Ex. 1 at 3. (Broshuis bio).

Plaintiffs' counsel carefully evaluated all aspects of the agreement and, without hesitation, believes that this settlement is a terrific result for class members. Broshuis Decl. at ¶ 23. Plaintiffs' counsel are of the firm opinion that they have obtained the best possible outcome for the class. *Id.* It will not only secure meaningful compensation for class members, but will make them nearly whole for the damages they suffered. This *Churchill* factor therefore weighs in favor of approval.

**F.   Government participation and reaction of class members are inapplicable.**

The final two *Churchill* factors are neutral at this time. There is no government participant in this case. And the reaction of class members is best assessed at the final approval hearing where the Court can consider any objections. *Sandoval Ortega*, 2021 WL 5584761, at *8.

**G.   Attorneys' Fees.**

"If a negotiated class action settlement includes an award of attorney's fees, that fee award must be evaluated in the overall context of the settlement." *Kabasele*, 2023 WL 4747691, at *9 (citing *Knisely v. Network Assocs.*, 312 F.3d 1123, 1126 (9th Cir. 2002)). At preliminary approval, the Court considers whether the attorneys' fee amount is within the range of reasonableness. *Id.* (citing *In re Bluetooth Headseat Prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011)).

Plaintiffs' counsel plans to file their fee petition by 30 days before the deadline to object or opt-out, which will provide further details about the resources and costs expended by counsel and the reasonableness of the fee sought. As in *Kabasele*, the Settlement Agreement here provides that Plaintiffs' counsel may seek a fee award not to exceed 33% of the gross settlement amount, and the Settlement Agreement is effective even if the Court does not award that amount. *Id.; see also* Settlement Agreement at § 7.8.4. Although the Settlement Agreement permits Plaintiffs' counsel to seek up to 33% of the common fund as fees, counsel intends to petition for 30% of the common fund, along with reimbursement of their incurred costs and expenses up to

1  $1.5 million. While 25% is the benchmark for fees in the Ninth

2  Circuit where a settlement produces a common fund, *In re*

3  *Bluetooth*, 654 F.3d at 943, a higher rate may be awarded when

4  merited, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th

5  Cir. 2002). This Court has often exceeded 25%. *See Kabasele*, 2024

6  WL 477221, at *7 (Shubb, J.) (final approval order awarding

7  33.33% fee); *Griffin v. Consol. Commc's*, No. 2:21-cv-0885, 2023

8  WL 3853643, at *7 (E.D. Cal. June 6, 2023) (Shubb, J.) (final

9  approval order awarding 35% fee); *Evans v. Zions Bancorporation,*

10 *N.A.*, No. 2:17-cv-01123, 2022 WL 16815301, at *1 (E.D. Cal. Nov.

11 8, 2022) (Shubb, J.) (final approval order awarding 30% fee).

12     Here, awarding Plaintiffs' counsel 30% of the common fund

13 would be well within the Court's discretion given the particulars

14 of this case. As noted earlier, the settlement amount that

15 Plaintiffs' counsel successfully negotiated *pre*-class

16 certification is outstanding. It is exceptional to achieve nearly

17 100% of potential damages in an antitrust settlement at any stage

18 of a case, and particularly noteworthy to achieve that before

19 class certification takes place. The result speaks not merely to

20 the overall strength of Plaintiffs' overall case theory but to

21 their counsel's skills in developing a compelling evidentiary

22 record and negotiating an impressive settlement.

23     In assessing value to the class, the Court should also keep

24 in mind that the volunteer coach rule at issue was repealed only

25 *after* Plaintiffs and their counsel filed this lawsuit in 2022 in

26 which both monetary and injunctive relief was sought. Before

27 that, the rule harmed hundreds of volunteer coaches each year

28

**Motion for Preliminary Approval of Settlement**

1   since it was enacted in 1992. And while a proposal had been made

2   to eliminate the rule shortly before Plaintiffs filed this case,

3   all prior efforts to repeal the rule, including in 2018, had

4   failed. After Plaintiffs filed this case, the repeal effort

5   finally succeeded, which brought forth meaningful and lasting

6   industry change.

7       A 30% award of the common fund is also reasonable in light

8   of the significant risks Plaintiffs' counsel took on. As noted

9   earlier, Plaintiffs faced a risk that they would not prevail on

10  their contested motion for class certification, and that the NCAA

11  would later prevail on its procompetitive justification

12  affirmative defense. These risks are particularly acute for

13  Korein Tillery, LLC, which practices mostly on contingency fee

14  cases, Broshuis Decl. at ¶ 3, worked on a contingent basis in

15  this case, *id.* at ¶ 20, self-funded this case, *id.*, and was

16  opposed by one of the largest, well-funded athletic associations

17  in the world. This Court has previously noted that "[t]he nature

18  of contingency work inherently carries risks that counsel will

19  sometimes recover very little to nothing at all, even for cases

20  that may be meritorious. Where counsel do succeed in vindicating

21  statutory and employment rights on behalf of a class of

22  employees, they depend on recovering a reasonable percentage-of-

23  the-fund fee award to enable them to take on similar risks in

24  future cases." *Mejia*, 2021 WL 1122390, at *8 (citing *Kimbo*, 2021

25  WL 492493, at *7). Plaintiffs' counsel has worked for several

26  years in this case without pay and should be fairly compensated

27  for their significant risks.

28

Again, Plaintiffs' counsel will file the motion for attorneys' fees at a later date, but for now, the import is that the fee request is well within the bounds of what has been traditionally approved. This factor likewise supports preliminary approval. Thus, all relevant factors strongly point towards the Court granting this Motion.

**III. The Court Should Set a Schedule for Final Approval.**

Plaintiffs request that the Court set a schedule for final approval of the settlement and proposes the following:

- Deadline for administrator to disseminate notice to class members: 14 days from the date of an order granting preliminary approval;
- Deadline for class members to opt out or object: 60 days after dissemination of notice;
- Deadline for motion for attorneys' fees and costs and for incentive awards: 30 days before notice period ends;
- Deadline for motion for final approval: 15 days after notice period ends;
- Hearing on motions for final approval and for attorneys' fees and costs: 35 days after motion for final approval filed.

**CONCLUSION**

"At the preliminary approval stage, the court is simply determining whether it is 'likely' the substantive standards for settlement approval will be met at the final approval stage." [4]

Newberg on Class Actions § 13.15 (5th ed.). The pertinent factors show that standard is easily met here.

Plaintiffs request that the Court: (a) grant preliminary approval of the proposed class action settlement; (b) certify the proposed (b)(3) Settlement Class; (c) appoint Plaintiffs Taylor Smart and Michael Hacker as class representatives; (d) appoint Korein Tillery, LLC, Garrett R. Broshuis, and Steven M. Berezney as Class Counsel; (e) authorize the distribution of notice to the class; and (f) set the above-proposed deadlines.

DATED: March 24, 2025             Respectfully submitted,


                                        /s/ *Garrett R. Broshuis*
                                  KOREIN TILLERY, LLC
                                  Stephen M. Tillery (*pro hac vice*)
                                  Steven M. Berezney
                                  Garrett R. Broshuis

                                  *Attorneys for Plaintiffs*


### CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record registered for electronic filing.


                                  /s/ *Garrett R. Broshuis*
                                     Garrett R. Broshuis