STEPHEN M. TILLERY *(pro hac vice)*
    stillery@koreintillery.com
STEVEN M. BEREZNEY (Bar No. 329923)
    sberezney@koreintillery.com
GARRETT R. BROSHUIS (Bar No. 329924)
    gbroshuis@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Attorneys for Plaintiffs Taylor Smart and
Michael Hacker, Individually and on Behalf
of All Those Similarly Situated

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| TAYLOR SMART AND MICHAEL HACKER, Individually and on Behalf of All Those Similarly Situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association;<br><br>        Defendant. | CASE NO. 2:22-cv-02125-WBS-CSK<br><br>**CLASS ACTION**<br><br>**DECLARATION OF GARRETT R. BROSHUIS IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL**<br><br>Date:  April 14, 2025<br>Time:  1:30 p.m.<br>Courtroom: 5, 14th Floor<br>Judge:  The Honorable William B. Shubb |

I, Garrett R. Broshuis, hereby declare as follows:

1.    I am one of the attorneys principally responsible for handling of this matter. I submit this Declaration in support of Plaintiffs' Motion for Preliminary Approval of the Settlement.

2.    I am personally familiar with the facts set forth in this Declaration. If called as a witness, I could and would competently testify to the matters stated herein.

3.    I am a partner at the law firm of Korein Tillery, LLC (hereafter "Korein Tillery" or "Plaintiffs' Counsel"), which specializes in complex litigation, including antitrust litigation. With only a few small exceptions (none applicable here), nearly all of Korein Tillery's work is done on a contingency fee basis. A true and accurate copy of our firm résumé is attached as Exhibit 1 to this Declaration, which includes biographies for me and the firm's other attorneys primarily responsible for this case, and includes a summary of the firm's relevant work.

4.    Attached as Exhibit 2 to this Declaration is a true and accurate copy of the Settlement Agreement that all parties recently executed in this case.

5.    This case has been pending since November 2022. Korein Tillery has vigorously represented the interests of Division I "volunteer coaches" for baseball since this case's inception. This case was completely novel in that nobody had ever challenged the volunteer coach bylaw at issue since it was enacted in 1992. Litigation was contentious at every stage. Defendant unsuccessfully attempted to transfer this case from this Court to

**Decl. of Garrett R. Broshuis in Support of Motion for Preliminary Approval**

Indianapolis. Defendant then unsuccessfully moved to dismiss the case. Named Plaintiff Michael Hacker attended the hearing on Defendants' motion to dismiss.

6.    Discovery was then extensive. Plaintiffs served and received responses to interrogatories and request for admissions. Plaintiffs also responded to Defendant's three sets of interrogatories.

7.    Document production and review was robust. Plaintiffs' Counsel collected both e-mails and text messages from the named Plaintiffs. Taylor Smart produced 752 documents totaling 1,382 pages. Mr. Hacker produced 129 documents totaling 351 pages. Plaintiffs' Counsel reviewed those documents before production for relevance and privilege. The NCAA produced 11,750 documents containing 278,132 pages, which Plaintiffs' Counsel reviewed.

8.    After Magistrate Judge Newman denied Plaintiffs' motion to compel the NCAA to produce relevant records (ECF No. 55 at 11), Plaintiffs issued over 300 subpoenas to member schools for 2023-24 information. Plaintiffs so far have received complete responses from over 200 schools, including over 8,000 documents that Plaintiffs also reviewed. Plaintiffs recently issued a similar number of subpoenas for 2024-25 information. Based on this data and other research that Plaintiffs' Counsel has done, we have identified around 1,000 potential class members at this time.

9.    The parties also deposed most of the key fact witnesses. The NCAA deposed both Mr. Smart and Mr. Hacker. Plaintiffs deposed two of the NCAA employees most knowledgeable

1  about the volunteer coach rule and the efforts by the NCAA to

2  repeal it after Plaintiffs filed this lawsuit — Jenn Fraser and

3  Lynda Tealer. Plaintiffs also deposed Matt Boyer — the SEC

4  employee most directly responsible for an earlier failed effort

5  in 2018 to repeal the volunteer coach rule. Plaintiffs then

6  deposed Jeremiah Carter — a member of the NCAA Modernization of

7  Rule Subcommittee tasked with recommending the repeal of

8  unnecessary bylaws, including the volunteer coach rule.

9  Plaintiffs' Counsel also attended the six depositions of the

10  named plaintiffs in the related *Ray v. NCAA* case, No. 1:23-cv-

11  00425 WBS (E.D. Cal.) (hereafter "*Ray*") challenging the same

12  volunteer coach rule in sports other than baseball.

13      10.  The parties also deposed the expert witnesses.

14  Plaintiffs submitted an expert declaration from Dr. Daniel

15  Rascher in support of their motion for class certification. NCAA

16  deposed Dr. Rascher and filed a motion to exclude him under

17  *Daubert* (ECF No. 67), attaching a report from its sole rebuttal

18  expert, Dr. Jee-Yeon Lehmann (ECF No. 67-5). Plaintiffs deposed

19  Dr. Lehmann on January 23, 2025.

20      11.  The parties attempted mediation with a mediator in

21  summer 2024, but were unsuccessful. The parties resumed

22  settlement discussions after engaging in robust discovery and

23  after class certification briefing began. The settlement

24  discussions were hard-fought and always done at arms-length, with

25  both sides zealously representing the interests of their clients.

26  After extensive negotiations, the parties settled this case on

27  January 31, 2025 — the same day that Plaintiffs' reply brief in

28

1  support of their motion for class certification and their *Daubert*

2  opposition brief were due. Mr. Smart and Mr. Hacker were

3  consulted about the settlement offer that was ultimately

4  accepted, and both approved.

5      12.  Both sides had represented their clients for years in

6  this litigation and were aware of the relative strengths and

7  weaknesses of the case. The Settlement Agreement is a byproduct

8  of those strengths and weaknesses.

9      13.  Plaintiffs' Counsel worked vigorously to ensure that

10  class members would receive as much compensation as possible,

11  that no claim form would be needed to receive that compensation,

12  and that class members would receive the best practicable notice

13  of the Settlement Agreement.

14      14.  The Settlement Agreement calls for a payment of $49.25

15  million by the NCAA to a common settlement fund. According to Dr.

16  Rascher, this is approximately 99% of the total estimated actual

17  damages for the class. If approved, the settlement will fairly

18  compensate class members when taking into consideration the legal

19  issues in this case and the uncertainties of trial and appeal.

20      15.  None of the common settlement fund will revert to

21  Defendant. If at some point it becomes impracticable to re-

22  distribute unclaimed funds to class members, the residue will go

23  to a related charity — the American Baseball Coaches Association

24  ("ABCA") — under the doctrine of *cy pres*. Plaintiffs' Counsel has

25  no financial or other interests in the charity. According to its

26  website, ABCA has over 15,000 members in all 50 states and 41

27  countries focusing on amateur baseball coaching at the college,

28

**Decl. of Garrett R. Broshuis in Support of Motion for Preliminary Approval**

1  high school, youth, and travel levels. *See*

2  https://www.abca.org/ABCA/ABCA/Who_We_Are/About_the_ABCA.aspx?hke

3  y=88a075b3-7b58-4aea-a74d-cb49678bc58a (last visited Feb. 10,

4  2025). ABCA's purposes are, *inter alia*, "to assist in the

5  educational development of amateur baseball coaches" and to

6  "promote excellence in the coaching of baseball." *See*

7  https://www.abca.org/ABCA/ABCA/Who_We_Are/ABCA_Constitution__Byl

8  aws.aspx?hkey=d08d48bd-09de-44c1-a239-15cd6f20b245 (last visited

9  Feb. 10, 2025).

10      16.  To administer the settlement, Plaintiffs' Counsel

11  engaged in a robust vetting process. Plaintiffs' Counsel

12  requested bids from three experienced settlement administrators

13  and participated in a conference call with each to address needs,

14  capabilities, and questions. Plaintiffs' Counsel carefully

15  assessed the bids received from all firms. In deciding which firm

16  to endorse, counsel considered not only each firm's estimated

17  cost, but also its staffing, years of experience, and expertise

18  in administering class actions of this size and nature.

19  Plaintiffs' Counsel determined that Kroll Settlement

20  Administration was best-suited. Kroll Settlement Administration

21  has estimated administration costs of $30,150, which in counsel's

22  experience is reasonable and in line with administration costs in

23  other class actions of this size and nature. Kroll Settlement

24  Administration intends to work with Dr. Daniel Rascher to

25  determine the payment amounts; while Dr. Rascher has completed

26  much of this work, Dr. Rascher estimates that his firm's ongoing

27

28

**Decl. of Garrett R. Broshuis in Support of Motion for Preliminary Approval**

1  costs will amount to around $35,000, which Plaintiffs' Counsel
2  believes to be reasonable.

3      17.  As of March 10, 2025, Plaintiffs' Counsel has expended
4  approximately 7,441 hours prosecuting this case, with the bulk of
5  the legal work performed by myself (over 1,700 hours) and my
6  partner Steven Berezney (over 1,500 hours).

7      18.  Considering the length, complexity, and novelty of the
8  case, that is a very reasonable number of hours in Plaintiffs'
9  Counsel's experience. It results in a current lodestar of
10  approximately $5,009,705, a number that will increase as more
11  work is completed. More detailed information regarding the hours
12  worked, hourly rates, and tasks performed will be provided in the
13  formal motion for an award of attorneys' fees, which will be
14  filed if preliminary approval is granted. In that petition,
15  Plaintiffs intend to request 30% for their attorneys' fees.

16      19.  More detailed information to support the amount of
17  litigation costs, along with information supporting the petition
18  for incentive awards, will be provided at that time as well. As
19  of now, though, Plaintiffs have expended approximately $1.32
20  million on costs, most of which stems from expert costs.
21  Plaintiffs will petition for reimbursement of their actual costs,
22  and will also petition for incentive payments of $7,500 for each
23  of the two named plaintiffs.

24      20.  Plaintiffs' Counsel performed all that work on a self-
25  funded, contingency basis, against a well-funded organization
26  represented by a large, prestigious law firm. Plaintiffs' Counsel
27  took on considerable risk in doing so.

28

1    21.  The class and Plaintiffs' Counsel faced considerable

2  risks if this case did not settle when it did. That included

3  remaining risks at class certification, summary judgment, trial,

4  and possibly on appeal. A loss at any stage would have left the

5  class with nothing. While I am confident that Plaintiffs would

6  have prevailed and strongly believe in the positions asserted,

7  the NCAA is a well-funded opposing party represented by

8  experienced counsel, and it had raised several defenses

9  (including their alleged procompetitive justifications) and had

10  contested class certification.

11    22.  While Plaintiffs' Counsel remains fully confident in

12  Plaintiffs' positions, and remained ready and eager to try the

13  case, there was no guarantee of success and certainly no

14  guarantee of (a) class certification, (b) defeating a motion for

15  summary judgment, and (c) obtaining a favorable judgment at trial

16  equaling the benefits provided by the Settlement Agreement. Any

17  win at trial would still have been subject to appeal, which

18  presents another layer of risk and also delay.

19    23.  For these reasons, Plaintiffs' Counsel has a highly

20  favorable view of the Settlement Agreement and believe it merits

21  the Court's approval. That opinion is premised on a number of

22  considerations:

23        a. The Settlement Agreement creates a common

24           settlement fund that is nearly 100% of the class's

25           actual damages.

26

27

28

**Decl. of Garrett R. Broshuis in Support of Motion for Preliminary Approval**

b. No claim form is needed for class members to receive their payments, and no part of the settlement fund is reversionary.

c. The settlement avoids the uncertainty of class certification, summary judgment, a lengthy trial, and a long appeal.

d. Plaintiffs' Counsel knows very well the strengths and weaknesses of Plaintiffs' claims and Defendants' defenses. Taking those into account, Plaintiffs' Counsel — without hesitation — believes the Settlement Agreement to be fair and reasonable for all class members.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 24, 2025, in St. Louis, Missouri

*/s/ Garrett R. Broshuis*

**Decl. of Garrett R. Broshuis in Support of Motion for Preliminary Approval**

# EXHIBIT 1



Korein Tillery—with offices in Chicago, St. Louis, San Diego, and Naples—is one of the country's most successful plaintiffs' complex-litigation firms, representing a broad array of clients in high-stakes lawsuits and delivering over $18 billion in verdicts and settlements over the last 14 years. Most of our attorneys have represented both plaintiffs and defendants at some point in their careers, and, combined, we've handled cases covering virtually every conceivable substantive area of the law. We've litigated cases for clients ranging from individuals and certified classes to governmental entities and billion-dollar, multi-national corporations. Collectively, we've tried hundreds of cases to verdict, with several verdicts exceeding 10 figures. Our attorneys have been nominated for numerous regional and national trial lawyer awards, and we've won many landmark decisions in state and federal appellate courts, including the Supreme Court of the United States.

The National Law Journal has repeatedly honored Korein Tillery as one of the country's top plaintiffs' firms by naming it to its "Plaintiffs' Hot List" seven times in the past 15 years.  In 2014 and 2015, Korein Tillery was named by the NLJ as a member of its top 50 Elite Trial Lawyers. The American Bar Association's Securities Litigation Journal deemed two of Korein Tillery's cases, *Kircher v. Putnam Funds Trust,* 547 U.S. 633 (2006) and *Merrill Lynch Pierce Fenner & Smth, Inc. v. Dabit,* 547 U.S. 71 (2006), the two most important securities law decisions in 2006. Securities Litigation Journal, *Top 10 Securities Law Decisions of 2006* (Winter 2006). In *Kircher,* Korein Tillery served as lead counsel for the plaintiffs' class from the initial trial court filing to the Supreme Court of the United States, where the Court reversed the Seventh Circuit in a 9-0 decision.

Korein Tillery has been appointed as class counsel in more than fifty class actions and has successfully negotiated some of the country's largest class action settlements. *See, e.g., Parker v. Sears Roebuck & Co.,* Case No. 04-L-716 (Ill. Cir. Ct. Jan. 16, 2008) (settlement valued at $544.5 million); *Cooper v. The IBM Pers. Pension Plan,* 2005 WL 1981501, 35 Employee Benefits Cas. 2488 (S.D. Ill. Aug. 8, 2005) ($325 million settlement); *Sparks v. AT&T Corp.,* 96-LM-983 (Ill. Cir. Ct. Nov. 4, 2002) ($350 million settlement); *Sullivan v. DB Investments, Inc.,* 04-2819 (D.N.J. May 22, 2008) ($323 million settlement); *Folkerts v. Illinois Bell Tel. Co.,* 95-L-912 (Ill. Cir. Ct. July 7, 1998) ($252 million settlement); *Berger v. Xerox Corp. Ret. Income Guar. Plan,* 2004 WL 287902, 32 Employee Benefits Cas. 1362 (S.D. Ill. Jan. 22, 2004) ($240 million settlement); *Malloy v. Ameritech,* 98-488-GPM (S.D. Ill. July 21, 2000) ($180 million settlement); *City of Greenville v. Syngenta Crop Prot., Inc.,* 3:10-CV-188-JPG-PMF, 2012 WL 1948153 (S.D. Ill. May 30, 2012) ($105 million settlement); *In Re: MCI Non-Subscriber Tel. Rates Litig.,* MDL 1275 (S.D. Ill. Apr. 19, 2001) ($99 million settlement); and *Dunn v. BOC Group Pension Plan,* 01-CV-382-DRH (S.D. Ill. Mar. 12, 2004) ($70 million settlement).

**Key Team Members:**

*Stephen M. Tillery*
Stephen Tillery is the senior and founding member of the firm. With more than 35 years of trial experience, Mr. Tillery has acted as lead counsel in hundreds of complex cases at both the trial and appellate levels that have resulted in some of the largest trial verdicts and settlements in the United States.

Mr. Tillery completed his undergraduate studies at Illinois College (B.A. *magna cum laude*, Phi Beta Kappa) in 1972. Thereafter he attended Saint Louis University School of Law (J.D. *cum laude*, Order of the Woolsack, 1976). While obtaining his law degree, Mr. Tillery was a law clerk for the Honorable James L. Foreman, United States District Court for the Southern District of Illinois. Following graduation from law school, he was a law clerk to the Honorable George J. Moran, Fifth District Court of Appeals of Illinois.

Mr. Tillery is a member of the Illinois Trial Lawyers Association, where he has been one of the elected Board of Managers since 1987, and for which he has chaired and served on numerous committees. Mr. Tillery is also a member of the Illinois Bar Association, the Missouri Association of Trial Attorneys, the St. Louis Metropolitan Bar Association, the St. Clair County Bar Association, and the American Association for Justice. He serves as a board member of Public Justice. Mr. Tillery was named one of the National Law Journal's 2023 Plaintiffs' Lawyer Trailblazers, in recognition of his 11 years of work to secure a massive settlement from Syngenta and Chevron for clients who developed Parkinson's disease and other neurological defects as a result of exposure to the weed killer Paraquat. He was also named Litigation Daily's Litigator of the Week on May 1, 2014, for successfully reinstating the trial court's $10.1 billion verdict in *Price v. Philip Morris, Inc.*, 2014 IL App (5th) 130017, 2014 WL 1696280 (Ill. App. Ct. Apr. 29, 2014).

Mr. Tillery has written numerous legal articles and has served as lecturer, moderator, and panel member at dozens of legal seminars relating to litigation and trial practice. He was an adjunct professor at Saint Louis University School of Law for eleven years, and was Co-Director of the Advanced Trial Advocacy Program there from 1983 to 1988.

*Garrett Broshuis*
Garrett Broshuis is a nationally-recognized attorney who has performed prominent roles in some of the most complex cases in the country. He was the lead attorney in a landmark case challenging the pay scheme for minor league baseball players, which settled for $185 million in what is believed to be the largest settlement for minimum wage violations in history. Garrett led the case through a successful class certification appeal, *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 922 (9th Cir. 2019), and through summary judgment proceedings.

He was also part of a trial team that won a $40 million judgment in a class action against a major telecommunications company, which was affirmed on appeal. He currently represents

classes of municipalities in several actions against Fortune 500 and other large companies, and has successfully represented cities in various appeals, including successful arguments before the Seventh Circuit and Eighth Circuit Courts of Appeals. He represents a class of retirees challenging the termination of their defined benefit plans by a Fortune 500 company that recently succeeded at summary judgment, and represents a putative class of college athletes in an antitrust case.

Garrett's work was recently recognized by the national labor group Jobs with Justice for its Eleanor Roosevelt Human Rights Award. The Daily Journal named him a Leading Commercial Litigator, and the National Law Journal named him to its Plaintiffs' Lawyers Trailblazers List in 2023. His work is regularly profiled in media outlets across the country, including HBO's Real Sports with Bryant Gumbel, MSNBC's various shows, NPR's various programs, The Washington Post, The Wall Street Journal, and many other publications.

He is an adjunct professor at Saint Louis University School of Law and often speaks at conferences and law school symposia. He received his J.D. from Saint Louis University, where he graduated valedictorian and served as Editor-in-Chief of the Law Journal. He is licensed in California, Missouri, Illinois, and New York, as well as the United States Supreme Court and many other federal courts.

Before law school, Garrett played six years as a pitcher in the San Francisco Giants' organization, working at all levels of minor league baseball. Garrett received his undergraduate degree from the University of Missouri, where he graduated summa cum laude and was inducted into the prestigious Phi Beta Kappa honors society. He earned both All-American and Academic All-American honors in baseball after recording a perfect 11-0 record in his final year at Mizzou. He was a finalist for the Big 12 Conference Male Athlete of the Year and also earned the school's Total Person Program Excellence Award three times.

### Steven M. Berezney

Steven Berezney is a partner at Korein Tillery's St. Louis office. Mr. Berezney received his J.D. from the University of Illinois Urbana-Champaign College of Law in 2003 (*magna cum laude*), where he served as Editor-in-Chief of the Law Review. He is licensed in Illinois, California, New York, Missouri, and the District of Columbia, as well as the Supreme Court of the United States, the U.S. Court of Appeals for the Second, Fifth, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits, and nine federal district courts.

Since joining Korein Tillery in 2012, Mr. Berezney managed and litigated all aspects of multi-billion dollar cases in federal trial and appellate courts against Wall Street investment banks arising from misrepresentations made about residential mortgage-backed securities ("RMBS") in violation of the federal 1933 Securities Act and state law. Mr. Berezney played a significant role in obtaining over $5 billion in recoveries for NCUA and CUNA Mutual, including running or co-running several of the cases.

3

Mr. Berezney also helped develop and litigate Sherman Act price fixing conspiracy claims raised against 16 investment bank defendants in *In re: Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-07789-LGS (S.D.N.Y.), resulting in $2.3 billion in recoveries. Mr. Berezney cross-examined one witness at trial against the sole nonsettling defendant in 2022.

Mr. Berezney is currently serving as court-appointed co-lead class counsel in two class action cases filed in Missouri seeking unpaid franchise fees from video streaming services such as Netflix, Hulu, DIRECTV, DISH Network, and Sling TV. *City of Creve Coeur v. Netflix, Inc. & Hulu, LLC,* No. 18SL-CC02819 (St. Louis County Mo.); *City of Creve Coeur v. DIRECTV LLC, DISH Network Corp., DISH Network LLC, and Sling TV L.L.C.,* No. 18SL-CC02821 (St. Louis County Mo.). Mr. Berezney is also pursuing similar cases in Indiana and Texas. *City of Fishers et al. v. Netflix, Inc. et al.,* 49D01-2008-PL-026436 (Marion County Ind.); *City of Dallas v. Disney DTC, LLC,* No. DC-22-09128 (Dallas County Tex.). The *City of Creve Coeur* cases were the first of their kind in the nation and the first to obtain a substantive ruling recognizing the viability of the claims.

Before joining Korein Tillery, Mr. Berezney served as a judicial law clerk for Judge Laura Denvir Stith of the Supreme Court of Missouri immediately after graduating law school. Upon completing his clerkship, Mr. Berezney joined Husch Blackwell in 2004 and became a Partner in 2012. While at Husch Blackwell, Mr. Berezney represented clients in the agriculture, retail, tax, financial, and consumer goods industries, including Fortune 500 companies, in complex litigation involving contract disputes and business torts in both trial and appellate courts. Mr. Berezney was part of the team that won a $1 billion judgment that, at the time, was the fourth largest patent infringement jury verdict in U.S. history, according to Bloomberg. *Monsanto Co. v. E.I. DuPont de Nemours & Co.,* 4:09-cv-00686-ERW (E.D. Mo. Aug. 1, 2012). He also served as either lead or co-lead on bench and jury trials on behalf of both plaintiffs and defendants. *E.g., TVI, Inc. v. InfoSoft Technologies, Inc.,* 4:06-cv-697-JCH, 2008 WL 239784 (E.D. Mo. 2008) (obtained a plaintiff's verdict in a bench-tried breach of contract case involving undelivered hardware equipment and a terminated software license); *Intertel, Inc. v. Sedgwick Claims Mgmt. Servs., Inc.,* 02CC-000772 (Mo. Cir. Ct., Apr. 29, 2008) (obtained a favorable defense jury verdict on behalf of a claims management company in which plaintiff sought more than $50 million in damages based on an alleged failure under a contract to refer claims for investigation).

**The Firm's Recent Work:**

***In re GSE Bonds Antitrust Litig.***: Korein Tillery, along with co-counsel, alleged antitrust violations arising from coordinated price-fixing in the secondary market for bonds issued by the government-sponsored entities Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Federal Farm Credit Banks, and Federal Home Loan Banks ("GSE Bonds"). Plaintiffs defeated two motions to dismiss and reached a settlement with all defendants, including Deutsche Bank Securities Inc., First Tennessee Bank, N.A., FTN Financial Securities Corp., Goldman Sachs & Co. LLC, Barclays Capital Inc., BNP Paribas

4

Securities Corp., Cantor Fitzgerald & Co., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, HSBC Securities (USA) Inc., J. P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., Morgan Stanley & Co., LLC, Nomura Securities International, Inc., SG Americas Securities LLC, TD Securities (USA) LLC, and UBS Securities LLC. The combined settlement provided $386.5 million to class members and was approved by the court on June 18, 2020.

### *Senne v. The Office of the Comm'r of Baseball*, No. 14-CV-00608-JCS (N.D. Cal.).

In this action, Korein Tillery was co-lead counsel for a class of minor league baseball players who alleged that MLB and MLB's member franchises failed to pay the players minimum wage, required overtime pay, or sometimes any wages at all. The players asserted two claims under the federal Fair Labor Standards Act ("FLSA") and an additional thirty-one under the wage-and-hour laws of several states.

On October 20, 2015, the Court granted the players conditional certification of a collective under the Fair Labor Standards Act. *Senne*, 2015 WL 6152476 (N.D. Cal. Oct. 20, 2015). A court-directed notice was sent, and around 2,300 players joined the collective. In March 2017, the court certified a Rule 23 class of minor leaguers who played in California. *Senne*, 2017 WL 897338 (N.D. Cal. Mar. 7, 2017).

The parties cross-appealed, with MLB arguing that no class should have been certified, and the players arguing that the court should have certified additional classes. On August 16, 2019, the Ninth Circuit agreed with the players. It affirmed the certification of the class of players who worked in California, and it certified additional classes for players who worked during spring training and other periods in Arizona and Florida. MLB petitioned the Ninth Circuit for an en banc re-hearing, which was denied, and then petitioned the U.S. Supreme Court for review, which was also denied. 934 F.3d 918 (9th Cir. 2019), cert. denied, 141 S. Ct. 248 (2020).

On March 29, 2023, the Court granted final approval of a $185 million settlement in the case, one of the largest wage-and-hour settlements in history.

### *In re: Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-07789-LGS (S.D.N.Y.) (Schofield, J.)

The global foreign exchange ("FX") market for currency is a $1-trillion-per-day market, with the dominant dealers representing over 90 percent of the global FX market. Beginning as early as 2003 and continuing through 2013, these dealers used communications in multiple secret chat rooms to conspire to fix spot prices in dozens of currency pairs, manipulate FX benchmark rates, and exchange key confidential customer information in an attempt to trigger client stop loss orders and limit orders. These dealers constituted some of the largest financial institutions in the world, including Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan Chase & Co., Morgan Stanley, Royal Bank of Scotland, and UBS.

Korein Tillery, working with co-counsel Scott+Scott Attorneys at Law, LLP and Hausfeld LLP, developed and filed a class action on behalf of individuals who entered into FX transactions in over-the-counter exchanges and/or on exchanges with these dealers, alleging violations of Sections 1 and 3 of the Sherman Antitrust Act and violations of the Commodity Exchange Act. As a result of nearly 6 years of work by Korein Tillery and its co-counsel costing the firms nearly $30 million in case-related expenses, $2.3 billion in court-approved settlements were reached with 15 of the 16 defendants, constituting one of the largest antitrust class action recoveries in history. Mediator Kenneth Feinberg concluded that this settlement would "represent[ ] some of the finest lawyering toward a negotiated resolution that I have witnessed in my career" and described Korein Tillery and its co-counsel as "superlative, sophisticated, and determined plaintiffs' lawyers."

***In re Google Digital Publisher Antitrust Litigation:*** Korein Tillery has been appointed interim co-lead counsel representing a class of online publishers that sell ad space on their websites using tools that they purchase from Google. Plaintiffs allege that Google engaged in a series of mutually reinforcing anticompetitive acts in adjoining markets to acquire and maintain monopoly power over the markets for these tools, in violation of the Sherman Act and California's Unfair Competition Law.

***In re: Google Play Consumer Antitrust Litigation:*** Korein Tillery, working with co-counsel, filed the first consumer class action in the nation alleging that Google's operation of Google Play Store and Google Play Billing, among other actions, created a wrongful monopoly over the distribution of applications and payment for in-application purchases in the Android ecosystem. Over ten similar complaints followed and are now consolidated before Judge James Donato in the Northern District of California, where Korein Tillery serves as a member of the consumer class steering committee.

***National Credit Union Administration Mortgage-Backed Securities Litigation.***
The National Credit Union Administration ("NCUA") is the independent federal agency created by the U.S. Congress to regulate, charter, and supervise federal credit unions. On behalf of the NCUA, Korein Tillery and co-counsel Kellogg, Hansen, Todd, Figel & Frederick filed approximately 20 federal lawsuits throughout 2011-2013 alleging that Wall Street investment banks misled credit unions about the quality of certain residential mortgage-backed securities ("RMBS"), causing billions of dollars of losses that the NCUA insured. More specifically, NCUA alleged that these banks violated the Federal Securities Act by representing in federally-regulated offering documents that all loans backing the RMBS complied with originator underwriting guidelines or had sufficient compensating factors to allow exceptions to the guidelines when in fact the majority of the loans did not.

Throughout several years of contentious litigation, involving several successful appeals, Korein Tillery and Kellogg Hansen obtained more than $5.1 billion in legal settlements on NCUA's behalf, including but not limited to:

- *NCUA v. JP Morgan Chase Bank*, 2:13-cv-02012-JWL (D. Kan.) (obtained $1.4 billion settlement in Dec. 2013);
- *NCUA v. RBS Sec., Inc.*, 1:13-cv-06726-DLC (S.D.N.Y.) (accepted offer of judgment for $129.6 million plus fees in Sept. 2015);
- *NCUA v. Barclays Capital, Inc.*, 1:13-cv-06727-DLC (S.D.N.Y.) & 2:12-cv-02631-JWL (D. Kan.) (obtained $325 million combined settlement in Oct. 2015);
- *NCUA v. Wachovia Capital Markets LLC*, 1:13-cv-06719-DLC (S.D.N.Y.) & 2:11-cv-02649-JWL (D. Kan.) (obtained $53 million combined settlement in Oct. 2015);
- *NCUA v. Morgan Stanley & Co., Inc.*, 1:13-cv-06705-DLC (S.D.N.Y.) & 2:13-cv-02418-JWL (D. Kan.) (obtained $225 million combined settlement in Dec. 2015);
- *NCUA v. Goldman Sachs and Co.*, 1:13-cv-06721-DLC (S.D.N.Y.) & 2:11-cv-06521-GW-JEM (C.D. Cal.) (obtained $575 million combined settlement in Apr. 2016);
- *NCUA v. RBS Sec., Inc. et al.*, 11-cv-2340- JWL-JPO (D. Kan.) & 2:11-cv-05887 GW-JEM (C.D. Cal.) (obtained $1.1 billion combined settlement in Sept. 2016);
- *NCUA v. UBS Securities, LLC*, 2:12-cv-02591-JWL (D. Kan.) (obtained $445 million settlement in Mar. 2017); and
- *NCUA v. Credit Suisse Sec. (USA) LLC*, 2:12-cv-02648-JWL (D. Kan.) (obtained $400 million settlement in Mar. 2017).

NCUA was the first federal regulatory agency for depository institutions to recover losses from investments in these securities on behalf of failed financial institutions. NCUA uses the net proceeds to reduce Temporary Corporate Credit Union Stabilization Fund (Stabilization Fund) assessments charged to federally insured credit unions to pay for the losses caused by the failure of five corporate credit unions.

Korein Tillery and Kellogg Hansen continue to prosecute several lawsuits on behalf of the NCUA against certain RMBS trustees regarding their alleged failure to perform their duties.

***Sullivan v. DB Investments, Inc.:*** Korein Tillery represented a nationwide class of diamond purchasers in an antitrust case against the country's largest diamond distributor. That case was consolidated with others in the Eastern District of Pennsylvania and Korein Tillery was appointed co-lead counsel. In that role, the firm helped negotiate injunctive relief and a nationwide settlement that created a $323 million fund to compensate diamond purchasers.

***United States ex rel. Garbe v. Kmart Corp.***, **3:12-cv-00881-NJR-PMF (S.D. Ill.).**
Since 2004, Kmart pharmacies have charged low, flat-rate prices for certain generic drug prescriptions when those drugs are purchased by customers who paid entirely out of their own pockets with no insurance coverage. Since the beginning of the Medicare Part D drug program on January 1, 2006, however, Kmart has charged higher prices—often significantly higher prices—to customers with Medicare Part D coverage than it charges self-paying customers for the same prescription. For example, Kmart charged cash customers $10 for a 60-day supply of 500 mg Naproxen (available in non-prescription strength as Aleve®), but charged the Government $58.79 for the same prescription.

Korein Tillery and co-counsel Phillips & Cohen filed a False Claims Act case against Kmart after the Government declined to intervene. In the litigation, Kmart never disputed that it charges cash-paying customers lower prices than it charges to the Government. Instead, Kmart contended that it was never required to charge the Government the lower prices because those are not the prices Kmart charges to "the general public." Rather, Kmart claimed its cash-customers are not the "general public" but rather members of an exclusive "club" through which they are offered the discount prices, even though as a practical matter the discount prices are the prices Kmart charges to all its cash customers. Kmart also has no record of denying any cash-paying customer "membership" in Kmart's "club." The U.S. District Court for the Southern District of Illinois rejected Kmart's arguments and denied its motions for summary judgment. Kmart appealed, but the Seventh Circuit affirmed the district court in large part. *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016). After remand, the case settled in late 2017 with Kmart agreeing to pay approximately $59 million.

### *Lightfoot v. Arkema, Inc. Ret. Benefits Plan,* CIV. 12-773 JBS/JS (D.N.J.).

After the court certified a class of present and former retirement benefits plan participants, plaintiffs filed a motion for partial summary judgment on the issue of whether the COLAs the Plan promised to participants who elected annuities were part of participants' "accrued benefit" under ERISA. The Plan countered with a motion for summary judgment arguing the statute of limitations had run on all class members' claims owing to statements in a 1994 Summary Plan Description (SPD) and other plan documents. Although the same judge had previously ruled that the statements in the SPD and Plan were "clear repudiations" in a companion case, Korein Tillery convinced the court to deny the Plan's motion for summary judgment and to grant plaintiffs' motion for partial summary judgment, finding that the COLAs promised annuitants were accrued benefits. 2013 WL 3283951 (D.N.J. June 27, 2013). The case settled in 2014 with the average class member receiving $11,000 in cash that could be rolled into a retirement account.

### *City of Greenville v. Syngenta Crop Prot., Inc.,* 3:10-CV-188-JPG-PMF (S.D. Ill.).

On October 23, 2012, the U.S. District Court for the Southern District of Illinois entered an order approving a $105 million class-action settlement designed to compensate Community Water Systems throughout the United States for the cost of removing the pesticide atrazine from public drinking water. The litigation between class members and Syngenta dated back to July 2, 2004, when Holiday Shores Sanitary District filed six separate lawsuits against manufacturers and distributors of atrazine and atrazine-containing products in the Illinois Circuit Court in Madison County.

Atrazine is used to control broadleaf and grassy weeds in a variety of crops, but is applied primarily to corn fields. Atrazine has been one of the most heavily used pesticides in the U.S. Two of atrazine's key chemical characteristics—that it does not readily bind to soil and that it persists in the environment—dramatically increase atrazine's effectiveness as an herbicide. However, because atrazine does not bind to soil, it easily runs off of fields with rainfall and

contaminates surface waters such as rivers, lakes, and reservoirs that act as drinking-water supplies for public water providers.

Plaintiffs alleged that atrazine had continuously entered their water supplies, and, as a result of this contamination, they had to filter atrazine from their water sources. After eight years of litigation, Korein Tillery secured a $105 million settlement fund to be distributed to several hundred community water systems for costs of filtration of atrazine from their drinking-water supplies. *City of Greenville v. Syngenta Crop Prot., Inc.,* No. 3:10-CV-188-JPG-PMF, 2012 WL 1948153 (S.D. Ill. May 30, 2012); *see also* 904 F. Supp. 2d 902 (S.D. Ill. 2012) (granting final approval of settlement and attorneys' fees). The settlement amounted to approximately 76 percent of the $139 million estimated to be the Class's maximum potential recovery.

To facilitate the settlement claims process, Korein Tillery lawyers collected 20 years of atrazine testing data into a database that was made available to each class member through a settlement website. From there, Claimants were able to view the test data already collected for their system and provide additional evidence of atrazine contamination to claim their share of the settlement fund. Although many class actions experience claims rates of less than 15 percent, in this case virtually all settlement funds were distributed to class members.

Public Justice honored the Korein Tillery lawyers representing the plaintiffs in this case as finalists for its Trial Lawyer of the Year award.

### Missouri Utility Tax Litigation

Since 2007, Korein Tillery has represented Missouri municipalities in class action litigation that sought to recover unpaid license taxes. In suits against wireless and wireline carriers, Korein Tillery attorneys recovered hundreds of millions of dollars of license tax revenues—both retrospectively and prospectively—for more than 350 cities throughout Missouri. Korein Tillery has recovered more than $1 billion for Missouri municipalities. As a result of their work in these cases, the Missouri Lawyers Weekly recognized Korein Tillery partners John W. Hoffman and Douglas R. Sprong with awards in the "largest plaintiff wins" category in 2007, 2009, 2010, 2015, and 2017.

In 2012, Korein Tillery was successful in persuading the Supreme Court of Missouri to issue an extraordinary writ (mandamus) declaring unconstitutional a state statute that sought to sweep away this litigation by barring cities and towns from serving as class representatives. *State ex rel. Collector of Winchester v. Jamison,* 357 S.W.3d 589 (Mo. 2012).

### Mansfield v. ALPA, 06-c-6869 (N.D. Ill.).

Beginning in 2001, United Airlines encountered financial difficulties that ultimately culminated in its filing for bankruptcy protection. During the course of United's reorganization in bankruptcy, United sought to terminate its pilots' defined benefit pension plan. In exchange for ALPA's agreement not to oppose the termination of the pension plan, United agreed to provide ALPA with $550 million in convertible notes. ALPA, through its

United Airlines Master Executive Council ("MEC"), was tasked with allocating the proceeds from the sale of the convertible notes among the pilots. The MEC selected an allocation method that divided the note proceeds based upon each pilot's lost accrued benefits and lost projected benefits.

Korein Tillery filed this case in 2006 contending that ALPA breached its duty of fair representation in discriminating between its members in allocating the proceeds from the sale of $550 million in convertible notes. Korein Tillery prevailed on a number of complex and novel issues in the trial court. For example, ALPA moved to exclude retirees from the class, arguing that a union owes no duties to retired pilots under the Railway Labor Act. The court denied ALPA's motion, agreeing with plaintiffs that because ALPA represented the retirees when it negotiated the convertible notes, it owed them a duty even though the retirees were no longer a part of the bargaining unit. *Mansfield v. ALPA*, 2007 WL 2903074 (N.D. Ill. Oct. 1, 2007). After Korein Tillery also successfully opposed motions for summary judgment, 2009 WL 2386281 (N.D. Ill. Jul. 29, 2009), and to decertify the class, 2009 WL 2601296 (N.D. Ill. Aug. 20, 2009), the parties reached a settlement two weeks before trial. Per the settlement, ALPA funded an aggregate settlement fund of $44 million to be paid directly to class members. *Mansfield v. ALPA*, No. 06C6869 (N.D. Ill. Dec. 14, 2009). The settlement is believed to be one of the largest ever in a duty of fair representation case, in which unions are sued over their responsibility to fairly represent their members.

**Williams v. Rohm & Haas Pension Plan, 4:04-cv-0078-SEB-WGH (S.D. Ind.).**
Korein Tillery filed this class action in 2002 alleging that the Rohm & Haas Pension Plan violated ERISA by failing to include the value of future cost-of-living adjustments (COLA) in calculating lump-sum distributions from the Plan. After eight years of litigation, Korein Tillery obtained one of the largest settlements in the history of ERISA—$180 million. In 2006, the case was certified and Korein Tillery won summary judgment convincing the district court that the terms of the Plan violated ERISA because a COLA is an "accrued benefit" requiring that it be included in lump-sum distributions. The district court's decision was affirmed on interlocutory appeal. *Williams v. Rohm & Haas Pension Plan*, 497 F.3d 710, 714 (7th Cir. 2007) ("If a defined benefit pension plan entitles an annuitant to a COLA, it must also provide the COLA's actuarial equivalent to a participant who chooses instead to receive his pension in the form of a one-time lump sum distribution."), *cert. denied*, 128 S. Ct. 1657 (2008). Settlement approval and the fee award were later affirmed. 658 F.3d 629 (7th Cir. 2011).

**Parker v. Sears, Roebuck & Co., Case No.: 04-L-716 (Ill. Cir. Ct. Sept. 18, 2007).**
Korein Tillery brought this action against Sears in 2004 to remedy Sears's failure to install anti-tip safety devices, which prevent ranges from tipping over and severely burning or injuring unsuspecting consumers, on ranges that it sold, delivered, and set-up in customers' homes. In the 1960s and 1970s, kitchen range manufacturers started reducing the weight of metal in an effort to competitively lower the price of kitchen ranges. Over the course of several years, advances in materials allowed manufacturers to produce ranges which were durable and light weight. However, because the oven doors on the front of the ranges serve

as a lever and fulcrum, the light weight of the new ranges created an extremely dangerous tipping hazard. For example, if a person were to place a turkey roaster on an open and horizontal oven door, the added weight would cause these newly designed ranges to tip forward, spilling the hot contents onto anyone standing in the vicinity.  Children who opened the range and used the door as a step could unwittingly tip boiling liquids onto themselves. Dozens of people had been killed and hundreds had been maimed as a result of this problem.

Recognizing the need for a solution to this dangerous hazard, manufacturers and regulators began requiring installation of an anti-tip bracket that could be attached to the wall or floor at the back end of the range, preventing any forward tipping and maintaining complete stability. The installation is simple and the lightweight bracket costs pennies. The rule making bodies of most codes (BOCA Code, National Electrical Code; numerous other industry codes) thereafter required the installation of anti-tip brackets in all range installations in the United States. Even Sears acknowledged that a properly installed anti-tip bracket completely eliminates the hazards of tipping stoves.

Sears, Roebuck & Company at the time was the largest retail seller of kitchen ranges in the United States—averaging more than 800,000 ranges sold every year. When selling a gas or electric range, Sears generally includes delivery, installation, and hookup in customers' homes; thus, Sears became the largest installer of kitchen ranges in the United States. To increase its profits, Sears adopted a policy of refusing to install anti-tip brackets during normal installation unless the customer agreed to incur a substantial cost. At the same time, Sears failed to disclose the hazards associated with forgoing anti-tip bracket installation.

In January 2008, the Court granted final approval of a settlement which provided complete relief to the class by requiring Sears to install anti-tip brackets for the affected members of the class as well as requiring the installation of such brackets in the future. The settlement is valued at more than $544.5 million.

This settlement was touted by the public interest organization Public Citizen as an example of how consumer class actions benefit society. Public Citizen nominated Stephen Tillery as Trial Lawyers for Public Justice's Trial Lawyer of the Year based upon his role in this case.

**Hoormann v. SmithKline Beecham Corp., 04-L-715 (Ill. Cir. Ct. May 17, 2007).**
In July 2004, Korein Tillery filed suit on behalf of a nationwide class of purchasers alleging that SmithKline Beecham promoted Paxil® and Paxil CR™ for prescription to children and adolescents despite having actual knowledge that these drugs exposed children and adolescents to dangerous side effects while failing to treat their symptoms. Following three years of litigation, Korein Tillery obtained a settlement that established a $63.8 million dollar fund to reimburse class members 100 percent of their out-of-pocket expenses. This case was featured in The American Lawyer, Aruna Viswanatha, *King & Spalding Lawyer Stirs State Judge's Ire*, [29] 1 Am.Law., Jan. 2007, at 50, and mentioned in the National Law Journal. *The Plaintiffs' Hot List*, 30 Nat'l L.J. S8 (Nov. 22, 2007).

11

***CUNA Mutual Mortgage-Backed Securities Litigation.***
CMFG Life Insurance Company, CUMIS Insurance Society, Inc., and MEMBERS Life Insurance Company (collectively referred to as "CUNA Mutual") are financial services and insurance firms that offer insurance, investment, and retirement products and services to credit unions and their members. Korein Tillery and Kellogg Hansen filed a series of individual lawsuits in 2011 and 2013 on behalf of CUNA Mutual against eight Wall Street investment banks seeking to recover losses on $300 million of RMBS purchases using the novel common-law theory of contract rescission.

As in NCUA, CUNA Mutual alleged that the banks misrepresented in offering documents that all loans backing the RMBS complied with originator underwriting guidelines or had sufficient compensating factors to allow exceptions to the guidelines. CUNA Mutual also alleged that the banks misrepresented that it conducted due diligence to verify the accuracy of its offering document representations. In mid-2015, an appellate court issued a favorable opinion in CUNA Mutual's bellwether case approving of CUNA Mutual's primary litigation arguments. *CMFG Life Ins. Co. v. RBS Sec., Inc.*, 799 F.3d 729 (7th Cir. 2015). On remand, the case settled in December 2015 for a confidential amount. CUNA Mutual eventually settled its remaining RMBS cases over the next two years for confidential amounts. *See, e.g., CMFG Life Ins. Co. v. Credit Suisse Sec. (USA) LLC*, 3:14-cv-00249-wmc (W.D. Wis.) (settled in Oct. 2017); *CMFG Life Ins. Co. v. Morgan Stanley & Co., LLC*, 3:13-cv-00577-jdp (W.D. Wis.) (settled in Sept. 2017); *CMFG Life Ins. Co. v. J.P. Morgan Sec, LLC*, 3:13-cv-00580-wmc (W.D. Wis.) (settled in Mar. 2016).

***Axiom Investment Advisors, LLC v. Barclays Bank PLC,*** **No. 15-cv-9323-LGS (S.D.N.Y.).**
From 2008 to 2015, Barclays Bank PLC acted as both a buyer and seller of various foreign and domestic currencies through various trading platforms. Instead of executing foreign exchange orders placed by Barclays' customers on these platforms, Barclays instituted a secret "last look" policy that delayed execution of matched trades for several hundred milliseconds or even several seconds which allowed Barclays to determine through its algorithms whether the trade would be unfavorable to its position. If the matched trade would be unfavorable, Barclays reneged on the agreed price and rejected the trade or placed the order at a worse price. Barclays used last look to reject millions of trades that would otherwise have been executed.

Korein Tillery, along with its co-counsel Scott+Scott, Attorneys at Law, LLP and Hausfeld LLP, filed a class action against Barclays Bank PLC regarding its use of "last look," raising breach of contract and other claims. The court appointed Korein Tillery and Scott+Scott as class counsel. Counsel was successful in securing a $50 million settlement from Barclays on behalf of the class, which the court ultimately approved.

# EXHIBIT 2

## SETTLEMENT AGREEMENT

This Settlement Agreement is made and entered into, subject to Final Approval of the Court, as of January 31, 2025, by and between Plaintiffs Taylor Smart and Michael Hacker, individually and on behalf of all those similarly situated including Class Members (hereinafter "Plaintiffs"), and Defendant National Collegiate Athletic Association (hereinafter "Defendant" or "NCAA").

## 1. RECITALS

**1.1.** WHEREAS, the Settlement (as hereinafter defined) has been reached, subject to the Final Approval of the Court as provided herein, after extensive, arm's-length negotiations between Plaintiffs' and Defendant's Counsel extending for many months; and

**1.2.** WHEREAS, the Parties previously participated in a mediation session before professional mediator Fouad Kurdi. The Parties did not reach a settlement at mediation but resumed arms' length negotiations after further developments in the case, including the filing of briefs and expert declarations regarding class certification.

**1.3.** WHEREAS, the Plaintiffs and their Counsel have concluded, after a thorough investigation and after carefully considering the relevant circumstances, including, without limitation, the claims asserted, the legal and factual defenses thereto, and the applicable law, the burdens, risks, uncertainties, and expense of litigation, as well as the fair, cost-effective, and assured method of resolving the claims, that it would be in the best interests of the Settlement Class to enter into this Settlement Agreement in order to avoid the uncertainties of litigation and to assure that the benefits reflected herein are obtained for the Settlement Class, and further, that Plaintiffs and their Counsel consider the Settlement set forth herein to be fair, reasonable, and adequate and in the best interests of the Settlement Class; and

**1.4.** WHEREAS, Defendant, while continuing to deny any violation, wrongdoing, or liability with respect to any and all claims asserted in the Litigation, either on its part or on the part of any of the Released Parties, have nevertheless concluded that it will enter into this Settlement Agreement in order, among other things, to avoid the expense, inconvenience, and uncertainty of further litigation.

**1.5.** NOW, THEREFORE, the undersigned agree, on behalf of Defendant and Plaintiffs, that subject to the Final Approval of the Court, the Litigation be settled, compromised, and dismissed with prejudice in accordance with the terms of this Settlement Agreement, and without costs against the Settlement Class or Defendants (except as provided below), on the following terms and conditions:

## 2. DEFINITIONS. As used in this Agreement and its Exhibits, the following capitalized terms shall have the respective meanings set forth below.

**2.1. Acceptance Period.** The term "Acceptance Period" means the 120 days that a

1

participating Class Member has to sign and negotiate a Settlement Payment.

**2.2. Agreement.** The term "Agreement" or "Settlement Agreement" shall mean and refer to this document evidencing a mutual settlement and release of disputed claims, and it shall also incorporate those other documents exhibited to, contemplated by, and/or identified in this Agreement including, but not limited to, the Notice.

**2.3. Business Day.** Shall mean any day other than a Saturday, Sunday, or legal holiday in the United States of America as defined by Fed. R. Civ. P. 6(a)(6).

**2.4. Class Counsel.** "Class Counsel" shall mean and refer to Garrett R. Broshuis and Steven M. Berezney and the law firm of Korein Tillery LLC, 505 North 7th Street, Suite 3600, St. Louis, Missouri, 63101, United States of America (hereinafter "Korein Tillery").

**2.5. Class Member.** The term "Class Member" shall mean and refer to an individual member of the Settlement Class.

**2.6. Class Period.** November 29, 2018 through the period ending on the date ninety (90) calendar days after the date on which the Court grants Preliminary Approval of the Settlement.

**2.7. Court.** The term "Court" shall mean and refer to the United States District Court for the Eastern District of California, or of any other court, who presides over the Litigation or this Agreement.

**2.8. Cy Pres Awardee.** The term "Cy Pres Awardee" means the American Baseball Coaches Association, on the condition that any funds disbursed to the Cy Pres Awardee must be exclusively used for the benefit of college baseball coaches.

**2.9. Defendant.** "Defendant" shall mean and refer to the National Collegiate Athletic Association ("NCAA").

**2.10. Defendant's Counsel.** "Defendant's Counsel" shall mean and refer to Carolyn Hoecker Luedtke, Justin P. Raphael, Megan McCreadie, and the law firm of Munger Tolles & Olson LLP, 560 Mission Street, 27th Floor, San Francisco, CA 94105.

**2.11. Defendant Released Claims.** "Defendant Released Claims" shall mean all claims and counterclaims that Defendant asserted or could have asserted against Plaintiffs arising out of the facts alleged in the Litigation, known or unknown.

**2.12. Effective Date.** "Effective Date" shall mean and refer to the calendar day after the judgment becomes final, as defined *infra* in Section 2.15.

**2.13. Final Approval.** "Final Approval" shall mean the entry by the Court of the Order Granting Final Approval of the Settlement.

**2.14. Final Fairness Hearing.** The "Final Fairness Hearing" will be a hearing set by the Court where, among other things, the Court, in its discretion, will provide an opportunity for any Class Member who wishes to object to the fairness, reasonableness

or adequacy of the Settlement an opportunity to be heard, provided that the Class Member complies with the requirements for objecting to the Settlement as set out in Section 7.4. The date of the Final Fairness Hearing shall be set by the Court and communicated to the Settlement Class in a Court-approved Settlement Notice under Federal Rule of Civil Procedure 23(c)(2).

2.15. **Final Judgment.** The judgment in this case shall become final on the earliest date on which all of the following events shall have occurred: The Settlement is approved in all respects by the Court in this case as required by Fed R. Civ. P. 23(e); the Court enters a Judgment that certifies the class, terminates this action, extinguishes all Plaintiff Released Claims and Defendant Released Claims, and satisfies the requirements of Fed. R. Civ. P. 58; and the time for appeal of the Court's approval of this Settlement and entry of the Final Order and Judgment under Fed. R. App. P. 4 has expired or, if appealed, approval of this Settlement has been affirmed by the court of last resort to which such appeal has been taken and such affirmance has become no longer subject to further review (Fed. R. App. P. 40) or appeal (U.S. Sup. Ct. R. 13) or the appeal is voluntarily dismissed. (Fed. R. App. P. 42).

2.16. **Litigation.** The Litigation means *Smart et al. v. National Collegiate Athletic Association*, Case No. 2:22-cv-02125 in the United States District Court for the Eastern District of California.

2.17. **Notice.** "Notice" shall mean any form through which Class Members are notified of their rights with respect to this Agreement in accordance with Section 7.2 of this Agreement.

2.18. **Notice Plan.** "Notice Plan" shall mean the plan for distribution of the Notice, including direct mail and publication, as appropriate, which is subject to the approval of the Court as provided in Section 7.1 of this Agreement.

2.19. **Objection.** "Objection" shall have the meaning ascribed to that term by Section 7.4 of this Agreement.

2.20. **Order Granting Final Approval.** The "Order Granting Final Approval" shall mean and refer to the order entered by the Court approving the terms and conditions of this Agreement, including the manner and timing of providing Notice, and certifying a Settlement Class.

2.21. **Order Granting Preliminary Approval.** "Order Granting Preliminary Approval" shall mean and refer to the order entered by the Court conditionally approving the terms and conditions of this Agreement, including among other things, the conditional certification of the proposed class, the manner and timing of providing Notice, the time period for opting out and filing objections, and the date of the Final Fairness Hearing.

2.22. **Parties.** "Parties" shall mean and refer to Defendant, Plaintiffs, on behalf of the Settlement Class, as defined herein, and to the extent that the Defendant, Plaintiffs on behalf of the Settlement Class discharge any of their obligations under this Agreement through agents, the actions of those agents shall be considered the actions of the Parties.

3

**2.23.**    **Plaintiffs.** "Plaintiffs" shall mean the Plaintiffs Taylor Smart and Michael Hacker, and anyone acting on their behalf, including in a representative or derivative capacity.

**2.24.**    **Plaintiff Released Claims.** "Plaintiff Released Claims" shall mean any and all claims of the Plaintiffs and Class Members who do not opt out of the Settlement that were asserted or could have been asserted against Released Parties for the Class Period arising out of the facts alleged in the Litigation, known or unknown, including for avoidance of doubt, any claim for unpaid wages, benefits, or bonuses, or any claim for damages for lost opportunities, interference with contract, or restraint of trade. Plaintiff Released Claims include, without limitation, any claims for compensation, benefits, penalties or any other recovery on the theory that Plaintiffs or Class Members who do not opt out of the Settlement were employees of, or contractors for, any Released Parties, and thus include, without limitations, claims under state and federal minimum wage laws, the federal Fair Labor Standards Act, state and local wage and hour statutes and laws, including without limitation any claims under the California Labor Code and California Labor Code section 2698 et seq. specifically as well as California Business & Professions Code section 17200 and equivalent statutes from other states that could have been asserted based on the facts alleged in the Litigation.

**2.25.**    **Preliminary Approval.** "Preliminary Approval" shall mean and refer to the entry by the Court of the Order Granting Preliminary Approval of the Settlement.

**2.26.**    **Released Parties.** "Released Parties" shall mean Defendant, all of Defendant's respective past or present members with Division I baseball programs during the Class Period as well as all of the directors, trustees, officers, employees, subsidiaries, parents, legal representatives, predecessors, successors, affiliates, agents, attorneys, shareholders, related entities and divisions, and their successors and assigns of the Defendant and its past or present members with Division I baseball programs during the Class Period.

**2.27.**    **Settlement.** "Settlement" shall mean the settlement of the Litigation which is provided for by this Agreement.

**2.28.**    **Settlement Administrator.** "Settlement Administrator" means Kroll Settlement Administration, or any other third-party settlement administrator agreed to by the Parties and approved by the Court for the purposes of administering the Settlement.

**2.29.**    **Settlement Class.** "Settlement Class" shall mean and refer to:

All persons who, pursuant to NCAA Division I Bylaw 11.7.6, served as a "volunteer coach" in college baseball at an NCAA Division I school from November 29, 2018 to July 1, 2023.

**2.30.**    **Settlement Fund.** "Settlement Fund" shall mean the fund in the gross total amount of  $49,250,000.00 U.S. Dollars which is provided for by Section 5.1.1 of this Agreement.

4

3.  **REPRESENTATIONS and WARRANTIES**

   **3.1.** Plaintiffs and Defendant represent that they have all requisite power and authority to execute, themselves or respectively by Class Counsel or Defendant's Counsel, deliver and perform this Agreement and to consummate the transactions contemplated herein, that the execution, delivery and performance of this Agreement have been duly authorized by all necessary action, and that this Agreement has been duly and validly executed as aforesaid and delivered by Plaintiffs and Defendant and constitutes their legal, valid, and binding obligation.

4.  **CERTIFICATION FOR SETTLEMENT PURPOSES**

   **4.1. Settlement Class.** For the sole purpose of effectuating this Settlement, Plaintiffs and Defendant agree jointly to request that the Court certify a Settlement Class as defined in Section 2.29 of this Settlement Agreement. Plaintiffs understand and agree that if this Settlement is not approved or if the Litigation resumes for any other reason, Plaintiffs shall not argue or contend that this Settlement and agreement to class certification for settlement purposes only shall have any effect on a disputed motion for class certification in the Litigation or any other litigation.

5.  **CONSIDERATION**

   **5.1.** Under the terms of this Agreement, Defendant agrees to provide the following relief to the Settlement Class:

   **5.1.1.    The Settlement Fund**

      **5.1.1.1.**    Defendant will pay the gross sum of $49,250,000.00 U.S. Dollars (the "Settlement Fund"), which will fully and finally resolve the Action. This amount is non-reversionary, meaning none of the Settlement Fund shall revert to Defendant if an Order Granting Final Approval is entered by the Court in the Litigation.

      **5.1.1.2.**    Any and all of Plaintiffs' attorneys' fees, litigation or court costs, settlement administration costs, and individual damages payments shall be made from the Settlement Fund. No additional payment or amount of any kind shall be due or owed by Defendant or the Released Parties as part of this Settlement or the resolution of this Action.

      **5.1.1.3.**    By no later than thirty (30) calendar days after the Final Approval, Defendant shall deposit the Settlement Fund into an interest-bearing qualified settlement fund ("QSF") established by the Settlement Administrator. The Settlement Administrator will act as escrow agent and will have the authority to release the Settlement Fund from escrow for purposes of administering the Settlement reflected in, and per the terms of, this Agreement immediately following the Effective Date. The Settlement Administrator shall be responsible for establishing, administering, and otherwise operating the QSF, including the preparation and filing of any needed tax returns.

      **5.1.1.4.    Contingency fund.** The Settlement Administrator shall set aside

$100,000 U.S. Dollars of the QSF to cover any correctable errors or omissions and satisfy any claim for relief allowed pursuant to Fed. R. Civ. P. 60(b)(1) or 60(d). Any amount remaining 180 calendar days after the Effective Date will be redistributed pro rata among the Class Members who have timely accepted payment or, if the amount remaining is small enough that a redistribution is not sensible in the discretion of Class Counsel, the unclaimed will be donated to the Cy Pres Awardee under the *cy pres* doctrine.

### 5.1.1.5 Tax Treatment of Settlement Fund.

**5.1.1.5.1**. The Settlement Fund shall be treated as being at all times a "qualified settlement fund" within the meaning of Treas. Reg. § 1.468B-1.  The Settlement Administrator shall timely make such elections as necessary or advisable  to carry out the provisions of this Section 5.1.1.2, including the "relation-back election" (as defined in Treas. Reg. § 1.468B-1), back to the earliest permitted date.  Such elections shall be made in compliance with  the procedures and requirements contained in such regulations. It shall be the sole responsibility of the Settlement Administrator to timely and properly prepare and deliver any necessary documentation or returns under applicable regulations.

## 6. ADMINISTRATION

**6.1.** All fees and expenses of administration of the Settlement incurred by the Settlement Administrator shall be paid out of the Settlement Fund upon approval by the Court.

## 7. APPROVAL AND NOTICE

**7.1.**     **Preliminary Approval.** By March 24, 2025, Plaintiffs shall submit to the Court a motion seeking (a) certification, for settlement purposes only, of the Settlement Class as defined in Section 4.1; (b) approval of the form of Notice requested in the motion; (c) approval of the Notice Plan described in the motion and outlined in Section 7.2 *infra* ; (d) appointment of Class Counsel and (e) preliminary approval of the Settlement.

**7.2.**     **Notice Plan.** Plaintiffs will prepare a list of Class Members, including contact information for Class Members, in advance of the filing of the motion for preliminary approval, and Plaintiffs will provide the class list to the Settlement Administrator within five calendar days of the Order Granting Preliminary Approval.  Notice of the Settlement shall be given as soon as practicable after entry of the  Order Granting Preliminary Approval in accordance with the timeline established by the Order Granting Preliminary approval.  The Settlement Administrator will e-mail a Court-approved notice to each Class Member for which an e-mail address is available.  A Court-approved short-form Postcard Notice shall also be provided by the Settlement Administrator to the Settlement Class by first-class U.S. mail where available and by publication elsewhere. Defendant shall take all necessary steps to comply with 28 U.S.C. § 1715(b).

**7.3.** The Settlement Administrator shall provide to Defendant's Counsel and Class Counsel on a weekly basis a status report informing them of the number of Notices sent via e-mail, the number of Postcard Notices sent via physical mail, the number of Notices and Postcard Notices returned as undeliverable, the number of re-mailings, and the number of

timely and valid requests for opt-outs and notices of objections received.

**7.4. Objections to Settlement.** Any Class Member who has not opted out of the Settlement and who wishes to object to the Settlement or an award of fees, costs, or expenses to Class Counsel must file with the Clerk of the Court, with service on all Parties in accordance with Fed. R. Civ. P. 5 and E.D. Cal. Local Rules 133–135, a written and signed statement, designated "Objection." Service on the Court and all Parties must be completed by the date for doing so designated in the Notice.

    **7.4.1.** All Objections must certify in accordance with 28 U.S.C. § 1746, under penalty of perjury, that the filer has been legally authorized to object on behalf of the Class Member and provide an affidavit or other proof of the Class Member's standing; must provide the name, address, telephone and facsimile number, and e-mail address (if available) of the filer and the Class Member; the name, address, telephone and facsimile number, and e-mail address (if available) of any counsel representing the Class Member; must state all objections asserted by the Class Member and the specific reason(s) for each objection, and include all legal support and evidence the Class Member wishes to bring to the Court's attention; must indicate if the Class Member wishes to appear at the Final Fairness Hearing; and, identify all witnesses the Class Member may call to testify.

    **7.4.2.** Class Members may object either on their own or through any attorney hired at their own expense. If a Class Member is represented by counsel, the attorney must: file a notice of appearance with the Clerk of Court no later than the date ordered by the Court for the filing of Objections and serve all Parties in accordance with Fed. R. Civ. P. 5 and E.D. Cal. Local Rules 133–135 within the same time period.

    **7.4.3.** Any Class Member who fully complies with the provisions of Sections 7.4 through 7.4.2 may, in the Court's discretion, appear at the Final Fairness Hearing to object to the Settlement or the award of fees, costs, and expenses to Class Counsel. Any Class Member who fails to comply with the provisions of Sections 7.4 through 7.4.2 shall waive and forfeit any and all rights and objections the Class Member may have asserted in this action, and shall be bound by all the terms of the Agreement and by all proceedings, orders, and judgments with respect to the Settlement.

    **7.4.4.** Neither the Parties nor their respective counsel will seek, solicit, or otherwise encourage directly or indirectly any Class Member to object to the Settlement or appeal from the Order Granting Final Approval.

**7.5. Opt-outs.** Any Class Member who wishes to opt out of the Settlement must file with the Settlement Administrator (via U.S. mail), with service on all Parties in accordance with Fed. R. Civ. P. 5 and E.D. Cal. Local Rules 133–135, a written and signed statement, entitled "Request for Exclusion." Service on the Settlement Administrator and all Parties must be completed by the date designated for that purpose in the Notice.

    **7.5.1.** The Request for Exclusion must (1) provide the Class Member's name, address, telephone number, and e-mail address (if available) (2) indicate that the Class Member does not wish to participate in or be bound by the Settlement, (3) be signed individually by the Class Member, (4) identify the schools and approximate dates the Class Member

7

served as a volunteer coach, and (5) be postmarked no later than the date designated for such purpose in the Notice. No Request for Exclusion may be made on behalf of a group.

**7.5.2.** Neither the Parties, nor their respective counsel will seek, solicit, or otherwise encourage anyone to exclude themselves from the Settlement.

**7.6. Termination.** Defendant may terminate this Agreement prior to Final Approval if, based upon application of the Parties' agreed method for calculating gross possible damages (*see infra* section 8.4.2), either (a) more than ▮ of Class Members opt out of the Settlement Class or (b) gross possible damages for timely opt-out Class Members are more than ▮ of the Settlement Fund. To illustrate with an example, if Coach A had $100,000 gross possible damages under the theory set forth in the Declaration of Daniel A. Rascher in Support of Motion for Class Certification, ECF No. 63-60, before the gross possible damages were scaled to be a proportionate share of the Settlement Fund (i.e., reduced to $91,520) and before attorneys' fees and costs were deducted, and Coach A opted out, this would amount to $100,000 towards the calculation of ▮ of the Settlement Fund for Section 7.6(b).

**7.6.1.** Provided that Plaintiffs or the Settlement Administrator notify Defendants of any opt outs from the Settlement within one week of receiving notice that any Class Member has opted out, Defendant's right of termination is waived unless Defendant executes this termination right by notice in writing to the Plaintiffs served within ten (10) Business Days of the date on which Defendant and Defendant's Counsel are notified in writing by the Settlement Administrator that the termination conditions have been met, or the Parties mutually agree to extend this time.

**7.6.2.** Upon Defendant's timely exercise of its right of termination, the Parties shall work in good faith to try to negotiate a new settlement that takes into account the opt-out rate.

**7.6.3.** If the parties are unable to reach a new settlement, the Settlement Administrator shall, within seven (7) calendar days of receiving written request from Defendant, repay to Defendant the Settlement Fund (including interest accrued thereon) less the sum of the notice, administrative, and any other Court-approved costs of notice actually paid or due and payable from the Settlement Fund as of the date on which notice is received (the "Termination Refund") and this Agreement shall thereupon terminate. In the event of such a termination, no class will be deemed certified as a result of this Agreement, and the Litigation for all purposes will revert to its status as of January 31, 2025. In such event, Defendant will not be deemed to have consented to certification of any class, and will retain all rights to oppose, appeal, or otherwise challenge, legally or procedurally, class certification or any other issue in this case. Likewise, the participation in the Settlement by any Plaintiff or Class Member cannot be raised as a defense to their claims.

**7.6.4.** The Parties agree that, if there is a termination pursuant to this provision, then the fact and amount of the settlement and the terms of this Agreement shall not be used or admitted into evidence in the Litigation or any subsequent litigation absent

a court order requiring disclosure.

**7.6. Entry of Order of Final Approval.** At the time the Court considers the Order Granting Preliminary Approval, the Parties will request that the Court set the Final Fairness Hearing to take place approximately one hundred and ten (110) calendar days after Notice is mailed pursuant to Section 7.2 above. At the Final Fairness Hearing, the Parties will request that the Court, among other things: (a) enter an Order Granting Final Approval in accordance with this Agreement; (b) certify the Settlement Class; (c) approve the Settlement Agreement as final, fair, reasonable, adequate, and binding on all Class Members; (d) enter a Final Judgment; and (e) permanently enjoin any Class Member who has not opted out from bringing any Plaintiff Released Claims in any court. In addition, prior to the Final Fairness Hearing, Class Counsel shall petition the Court for an award of attorneys' fees in an amount not to exceed 33 ⅓ % of the gross amount awarded to the Settlement Class plus costs and expenses to be paid out of the Settlement Fund. Class Counsel shall also petition the Court for named Plaintiffs (Taylor Smart and Michael Hacker) to each receive a reasonable service award not to exceed $7,500.00 to be paid out of the Settlement Fund.

**7.7.** Class Counsel shall be responsible for drafting the application for attorneys' fees, costs, expenses, and for service awards at least fourteen (14) calendar days before the notice period expires (i.e., the deadline for Class members to object or to exclude themselves).

**7.8. Effect of Failure of Approval.** In the event the Court fails to enter an Order Granting Final Approval in accordance with the terms of this Agreement, the Parties shall proceed as follows:

**7.8.1.** If the Court declines to enter the Order Granting Final Approval as provided for in this Agreement, the Parties will work together, diligently and in good faith, to remedy any issue(s) leading to such denial, or if they are unable to remedy those issues, to consider seeking appellate review of the order denying the motion or Court approval of a renegotiated settlement without any change to the Settlement Fund. Litigation will resume unless within thirty (30) calendar days the Parties mutually agree in writing to do one of the following: (a) seek reconsideration or appellate review of the decision denying entry of the Order Granting Final Approval; or (b) attempt to renegotiate the Settlement and seek Court approval of the renegotiated settlement.

**7.8.2.** In the event the Litigation resumes or the Parties seek reconsideration and/or appellate review of the decision denying entry of the Order Granting Final Approval and such reconsideration and/or appellate review is denied, the Settlement Administrator shall, within seven (7) calendar days of receiving written notice of the resumption of the Litigation or the denial of reconsideration or appellate review, repay to Defendant the Termination Refund and this Agreement shall thereupon terminate.

**7.8.3.** If, for any reason, the Settlement is not approved by the Court or does not become subject to Final Approval, then no class will be deemed certified as a result of this Agreement, and the Litigation for all purposes will revert to its status as of January 31, 2025. The Parties agree that, if the Settlement is not approved, then the fact and amount of the settlement and the terms of this Agreement shall not be used or admitted into evidence in the Litigation or any subsequent litigation absent a court

9

order requiring disclosure. In such event, Defendant will not be deemed to have consented to certification of any class, and will retain all rights to oppose, appeal, or otherwise challenge, legally or procedurally, class certification or any other issue in this case. Likewise, if the Settlement is not approved by the Court or does not become subject to Final Approval, then the participation in the Settlement by any Plaintiff or Class Member cannot be raised as a defense to their claims. Plaintiffs will thereafter be entitled to finish briefing on their motion for class certification and other associated briefs that had otherwise been due on January 31, 2025.

**7.8.4.** It shall not be deemed a failure to enter the Order Granting Final Approval for the Court to deny, all or in part, the attorneys' fees and cost award requested by Class Counsel. In such case, this Agreement shall be deemed valid and enforceable, notwithstanding the Court's order awarding less than the requested amount of attorneys' fees and costs. However, Class Counsel shall retain all rights of appellate review to such an order without affecting the finality of any award to the Settlement Class.

**7.9. Effect of Failure of Order Granting Final Approval to Become a Final Judgment.** In the event the Order Granting Final Approval does not become a Final Judgment because an appeal is taken of the Order Granting Final Approval, the Parties shall proceed as follows:

**7.9.1.** If the Order Granting Final Approval is reversed by the appellate court, the Parties will work together, diligently and in good faith, to remedy any issue(s) leading to such a reversal, or if they are unable to remedy those issues, to consider seeking further appellate review of the order denying the motion or Court approval of a renegotiated settlement without any change to the Settlement Fund. Otherwise, the Litigation will resume unless within thirty (30) calendar days of the appellate court ruling the Parties mutually agree in writing to do one of the following: (a) seek further reconsideration or appellate review of the appellate decision reversing the Order Granting Final Approval; or (b) attempt to renegotiate the Settlement and seek Court approval of the renegotiated settlement.

**7.9.2.** In the event the Litigation resumes or the Parties seek further reconsideration and/or appellate review of the appellate decision reversing the Order Granting Final Approval and such further reconsideration and/or appellate review is denied, the Settlement Administrator shall, within seven (7) calendar days of receiving written notice of the resumption of the Litigation or the denial of further reconsideration or appellate review, repay to Defendant the Termination Refund, and this Agreement shall thereupon terminate.

**7.9.3.** If, for any reason, the Settlement does not become subject to Final Judgment, then no class will be deemed certified as a result of this Agreement, and the Litigation for all purposes will revert to its status as of January 31, 2025. In such event, Defendant will not be deemed to have consented to certification of any class, and will retain all rights to oppose, appeal, or otherwise challenge, legally or procedurally, class certification or any other issue in this case. Likewise, if the Settlement does not become subject to Final Judgment, then the participation in the Settlement by any Plaintiff or Class Member cannot be raised as a defense to their claims. Plaintiffs will thereafter be entitled to finish briefing on their motion

for class certification and other associated briefs that had otherwise been due on January 31, 2025.

## 8. DISTRIBUTIONS

**8.1. Notice and Administration.** All costs of notice and administration of the Settlement shall be paid from the Settlement Fund subject to and in accordance with the provisions of Section 6.1. The Parties agree to cooperate in the settlement administration process and to make all reasonable efforts to control and minimize the costs incurred in the administration of the Settlement.

**8.2. Attorneys' Fees and Costs**

**8.2.1.** Any award of attorneys' fees, expenses, or costs under the Order Granting Final Approval or such other order of the Court, shall be paid from the Settlement Fund by the Settlement Administrator to Class Counsel, upon production to the Settlement Administrator of a copy of the Order, fourteen (14) calendar days after the Effective Date.

**8.3. Service Awards.** Any service awards granted by the Court in the Order Granting Final Approval or such other order of the Court, shall be paid from the Settlement Fund by the Settlement Administrator at the same time and in the same fashion as the Class Member payments.

**8.4. Class Member Payments**

**8.4.1.** The deduction of the amounts in Section 8.1, 8.2, and 8.3 from the Settlement Fund, plus the deduction of the reserve set aside for the Contingency Fund, will result in a Net Settlement Amount. Any Class Member who fails to submit a timely and valid Request for Exclusion shall receive the payment due to them from the Net Settlement Fund within thirty (30) calendar days from the Effective Date so long as required W-9 information is provided.

**8.4.2.** A Class Member's proportionate share of the Net Settlement Fund will be determined by the Settlement Administrator, with assistance from consultants chosen by Class Counsel, pursuant to the following formula:

- Records produced or obtained during the Litigation, along with public records, will be used to ascertain the years worked by the Class Member as a volunteer coach within the relevant period of the Litigation;

- A Class Member's gross possible damages will be determined in accordance with the method described by Plaintiffs' expert, Dr. Daniel Rascher, in the Declaration of Daniel A. Rascher in Support of Motion for Class Certification, ECF No. 63-60, but in no event will any Class Member be credited with less than $5,000.00 in gross possible damages per full academic year worked within the relevant period;

- Each Class Member's proportional share of the Net Settlement Fund

11

will be determined by dividing the individual Class Member's gross possible damages by the aggregate total of all Class Members' gross possible damages by the calculated according to that method.

**8.4.3.** The Settlement Administrator shall electronically transfer or physically mail all class member payments within thirty (30) calendar days after the Effective Date, or as soon as reasonably practicable. The Settling Parties agree that Settlement Class Members who have not properly opted out of the settlement will, by negotiating or otherwise accepting these payments to them, be deemed to have opted into the Litigation, to the extent necessary to effectuate the release of claims under the FLSA contained herein. The Settlement Administrator shall then provide written certification of the electronic transfer or physical mailing of checks to Class Counsel and Defendant's Counsel. Class Members will have one hundred and twenty (120) calendar days to cash any physical checks, and the Settlement Administrator will send a reminder to Class Members who have not cashed their checks thirty (30) calendar days before the check is scheduled to expire. Following the period of 120 calendar days after issuance of a Class Member's check, the Class Member will have thirty (30) calendar days to request a re-issuance of a check. Any checks not cashed within 120 calendar days may be automatically canceled, and if the Class Member does not seek a re-issue within 30 calendar days, the Class Member's right to recover a payment under the Settlement Agreement will be deemed void and of no further force and effect.

**8.4.4.** If at the conclusion of the 30-day period for check re-issuances any funds remain from checks that are returned as undeliverable or not negotiated, these funds will be redistributed among Class Members who have timely cashed their checks pro rata, or if, in the sole discretion of Class Counsel, the amount remaining is too small to justify the expense of a redistribution, the unclaimed funds will be donated to the Cy Pres Awardee under the *cy pres* doctrine.

**8.4.5.** No person shall have any claim against Defendant, Plaintiffs, Class Counsel, or Defendant's Counsel based on distributions or payments made in accordance with this Agreement.

## 9. RELEASE AND COVENANT NOT TO SUE

**9.1.** Upon entry of the Final Judgment, Plaintiffs and all Class Members who have not opted out of the Settlement (i) release the Released Parties from all Plaintiff Released Claims, and (ii) covenant not to sue the Released Parties based on any Plaintiff Released Claims.

**9.2.** Upon entry of the Final Judgment, the Defendant (i) releases the Plaintiffs from all Defendant Released Claims, and (ii) covenant not to sue the Plaintiffs based on any Defendant Released Claims.

**9.3.** In accordance with the foregoing release and covenant not to sue, all pending litigation brought by or on behalf of a Class Member involving Plaintiff Released Claims, including the Litigation, shall be dismissed with prejudice, with each party bearing their own fees, costs, and expenses within 30 calendar days of the Effective

Date.

**9.4. Waiver of Statutory Provisions**. On the Effective Date, Plaintiffs and all Class Members who have not opted out of the Settlement shall be deemed to have, and by operation of this Agreement shall have, with respect to the subject matter of the Litigation and limited to the scope of the Plaintiff Released Claims, expressly waived the benefits of any statutory provisions or common law rule that provides, in substance or effect, that a general release does not extend to claims which the party does not know or suspect to exist in its favor at the time of executing the release, which if known by it, would have materially affected its settlement with any other party. In particular, but without limitation, Plaintiffs and all Class Members who have not opted out of the Settlement waive the provisions of California Civil Code § 1542 (or any like or similar statute or common law doctrine in California or any other state), and do so understanding the significance of that waiver. Section 1542 provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Plaintiffs and all Class Members who have not opted out of the Settlement may hereafter discover facts in addition to or different from those which he or she or they now know or believe to be true with respect to the subject matter of the Released Claims, but the Plaintiffs and all Class Members who have not opted out of the Settlement, upon the Effective Date, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released any and all Plaintiff Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which then exist, or heretofore have existed upon any theory of law or equity now existing or coming into existence in the future. The named Plaintiffs acknowledge, and the Class Members shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the settlement of which this release is a part. The Settling Parties agree that this release of unknown claims extends only to claims that meet the definition of Plaintiff Released Claims and does not extend to claims that do not meet that definition, such as, for example, claims for workplace harassment or physical injury.

## 10. MISCELLANEOUS PROVISIONS

**10.1.** **No Admission of Liability**. Defendant expressly denies any liability or wrongdoing, and nothing in this Agreement or the subsequent Final Judgment constitutes an admission by Defendant or finding of liability by the Court regarding any claim or defense.

**10.2.** **Conditional Pending Final Approval.** This Agreement is made for the sole purpose of attempting to consummate settlement of the Litigation on a class basis. This Stipulation and the settlement it evidences is made in compromise of disputed

claims. Because this Stipulation would settle the Litigation as a class action, this settlement must receive preliminary and final approval from the Court. Accordingly, the Settling Parties enter into this Agreement and associated settlement on a conditional basis that the Court enter a Final Approval Order of the settlement. In the event that the Court does not execute and file a Final Approval Order as discussed above, or in the event that the associated Judgment for the Settlement Class does not become Final for any reason, this Agreement shall be deemed null and void *ab initio*, it shall be of no force or effect whatsoever; it shall not be referred to or utilized for any purpose whatsoever except as needed during appellate proceedings related to approval of this Agreement or absent a court order; and the negotiation, terms, and entry of the Stipulation shall remain subject to the provisions of Federal Rule of Evidence 408 and related settlement privileges, except that the documents filed in support of the motion for preliminary approval and/or final approval shall remain part of the public record.

10.3.    **No Waiver of Right to Challenge.** Defendant denies all of the allegations and claims, including as to liability, damages, fees, and all other forms of relief asserted in the Litigation. Defendant has agreed to resolve the Litigation via this Agreement, but to the extent this Agreement is disapproved by the Court, deemed void, or does not otherwise take effect, the Parties do not waive, but rather expressly reserve, all rights to challenge or prosecute all such claims and allegations in the Litigation upon all procedural and factual grounds, including without limitation the ability to proceed with or challenge class and/or representative action treatment on any grounds or assert any and all defenses or privileges. The Parties and their counsel of record agree that the Parties retain and reserve these rights, and agree not to take positions to the contrary; specifically, the Parties and their counsel of record agree not to argue or present any argument, and hereby waive any argument, that this Agreement estops or otherwise precludes a Party from proceeding with or contesting class and/or representative treatment on any grounds if this Litigation were to proceed.

10.4.    **Continuing Jurisdiction.** The United States District Court for the Eastern District of California shall have and retain jurisdiction over the interpretation and implementation of this Agreement, as well as any and all matters arising out of, or related to, the interpretation or implementation of the Agreement.

10.5.    **Cooperation Between the Parties.** The Parties shall cooperate fully with each other and shall use all reasonable efforts to obtain Court approval of the Settlement and all of its terms. Defendant shall provide all information reasonably available to Defendant and reasonably necessary to assist Plaintiffs in the filing of any brief supporting approval of the Settlement. Defendant will reasonably cooperate with Plaintiffs to try to help identify remaining class members that have not yet been identified by Plaintiffs from school document productions and public sources. However, nothing in this Agreement shall require Defendant to obtain or provide information that is in the possession, custody and control of one of its members. Plaintiffs, Class Counsel, Defendant, and Defendant's Counsel agree to recommend approval of and to support this Settlement Agreement to the Court and to use all reasonable efforts to give force and effect to its terms and conditions. Neither Plaintiffs, Class Counsel, Defendant, nor Defendant's Counsel shall in any way encourage any objections to the Settlement (or any of its terms or provisions) or encourage any Class Member to elect to opt out.

10.6.    **Good Faith Pleadings.** The Parties agree not to assert in any forum that the Lawsuit was brought or defended in bad faith or without a reasonable basis, or that any Party or its counsel committed any violation of any provision of the Federal Rules of Civil Procedure or any law or ethical rule relating to the prosecution or defense of the Lawsuit.

10.7.    **Investigation; Advice of Counsel; Authority**

10.7.1.  Plaintiffs, as well as their counsel signing this Agreement, represent, warrant, and agree that Plaintiffs: (i) have made such investigation of the facts pertaining to this Settlement and this Agreement and of all the matters pertaining thereto as they deem necessary; (ii) have had the opportunity to have counsel of their choosing review this Agreement; (iii) have read this Agreement, understand its contents, and have executed it voluntarily and without duress or undue influence from any person or entity; (iv) have duly and validly authorized the execution and delivery of this Agreement by their counsel; and (v) have full power and authority to enter into and perform all actions or transactions contemplated by this Agreement. Without limiting the generality of the foregoing in any way, Plaintiffs represent and warrant that they (i) are the sole legal owners of, and have full right, title and interest in, the claims asserted in the Lawsuit; (ii) prior to the Execution Date, they have not assigned and will not assign to any third party their right, title, and interest in any of the Plaintiff Released Claims; and (iii) they have full right, power, and legal authority to release, relinquish, settle, and discharge the Plaintiff Released Claims (including without limitation the claims they asserted in the Lawsuit) on behalf of Plaintiffs.

10.7.2.  Defendant, as well as its counsel signing this Agreement, represent, warrant, and agree that Defendant: (i) has made such investigation of the facts pertaining to this settlement and this Agreement and of all the matters pertaining thereto as it deems necessary; (ii) has had the opportunity to have counsel of its choosing review this Agreement; (iii) has read this Agreement, understands its contents, and has executed it voluntarily and without duress or undue influence from any person or entity; (iv) has duly and validly authorized the execution and delivery of this Agreement by its counsel; and (v) has full power and authority to enter into and perform all actions or transactions contemplated by this Agreement. Without limiting the generality of the foregoing in any way, Defendant represents and warrants that it has the full right, power, and legal authority to release Defendant Released Claims.

10.8.    **Entire Agreement.** This Agreement contains the entire agreement and understanding between the Parties concerning the subject matter hereof, and supersedes any prior or contemporaneous discussion or agreements thereon. The Parties acknowledge and agree that: (i) no promises, representations, or agreements have been made in connection with this Agreement other than those set forth herein; and (ii) in deciding to enter this Agreement, they have not relied on any promise, statement, or representation of fact or law except for those that are expressly stated in this Agreement.

10.9.    **Modification of Agreement.** No waiver, modification, or amendment of the terms of this Agreement, made before or after Final Approval, shall be valid or binding

unless in writing, signed by Plaintiffs and by duly authorized signatories of Defendant, and then only to the extent set forth in such written waiver, modification, or amendment, and subject to any required Court approval.

10.10.    **Construction of Agreement**. The terms, provisions, and conditions of this Agreement are the result of negotiations in good faith and at arm's length between Plaintiffs and Defendant. Plaintiffs and Defendant have all been represented by legal counsel of their own choosing and have contributed substantially and materially to the preparation of this Agreement. Accordingly, the terms, provisions and conditions of this Agreement shall be interpreted and construed in accordance with their usual and customary meanings, without application of any rule of interpretation or construction providing that ambiguous or conflicting terms, conditions, or provisions shall be interpreted or construed against the Party whose legal counsel prepared the executed version or any prior drafts of the Agreement. Any captions and headings contained in this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

10.11.    **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the Parties, the Settlement Class, and their respective heirs, successors, and assigns. This Agreement shall inure to the benefit of Defendant's members. The individual signing this Agreement on behalf of Defendant hereby represents and warrants that he/she has the power and authority to enter into this Agreement on behalf of Defendant, on whose behalf he has executed this Agreement, as well as the power and authority to bind Defendant to this Agreement. Likewise, Plaintiffs and Class Counsel executing this Agreement represent and warrant that they have the authority to enter into this Agreement on behalf of Plaintiffs and the Settlement Class, and to bind Plaintiffs and the Settlement Class subject to Court approval.

10.12.    **Waiver.** Any failure by any of the Parties to insist upon the strict performance by any of the other Parties of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions of this Agreement and such Party, notwithstanding such failure, shall have the right thereafter to insist upon the specific performance of any and all of the provisions of this Agreement.

10.13.    **When Agreement Becomes Effective; Counterparts.** This Agreement shall become effective upon its execution by Defendant, Class Counsel, and Plaintiffs. The Parties may execute this Agreement in counterparts and execution in one or more counterparts shall have the same force and effect as if all Parties had signed the same instrument.

10.14.    **Captions.** The captions or headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and shall have no effect upon the construction or interpretation of any part of this Agreement.

10.15.    **Electronic and Counterpart Signatures.** This Agreement may be executed simultaneously in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument. Signatures by electronic means shall be deemed to constitute original signatures. Each person executing the Agreement on behalf of a Party hereby represents and warrants that he or she is duly authorized to do so and that his or her signature to the Agreement binds the Party for

which the signature is provided to all the terms of the Agreement.

10.16.    **Exhibits.** Any exhibits hereto are incorporated herein by reference as if set forth herein verbatim, and the terms of any exhibits are expressly made a part of this Agreement.

10.17.    **Notices to Parties.**  All notices, requests, demands, or other communications required or contemplated hereunder or relating hereto shall be in writing and forwarded by registered or certified mail, postage prepaid, return receipt requested, and overnight delivery with a copy by e-mail, and addressed as follows:

If to Plaintiffs:

> Garrett R. Broshuis, Esq.
> Steven M. Berezney, Esq.
> Korein Tillery LLC
> 505 North 7th Street, Suite 3600
> St. Louis, MO 63101
> gbroshuis@koreintillery.com
> sberezney@koreintillery.com

If to Defendant:

> Scott Bearby
> Senior Vice President and General Counsel
> National Collegiate Athletic Association
> Sbearby@ncaa.org
>
> -and-
>
> Carolyn Hoecker Luedtke
> Justin P. Raphael
> Megan McCreadie
> Munger Tolles & Olson LLP
> 560 Mission Street, 27th Floor
> San Francisco, CA  94105
> Carolyn.Luedtke@mto.com
> Justin.Raphael@mto.com

10.18.    **Governing Law.** This Agreement, and all claims, causes of action (whether in contract, tort, or statute) that may be based upon, arise out of, or relate to this Agreement, or the negotiation, execution, or performance of this Agreement (including any claim or cause of action based upon, arising out of, or related to any representation or warranty made in or in connection with this Agreements or as an inducement to enter into this Agreement) shall be construed in accordance with and governed by the laws of the State of California, including its statutes of limitations, without regard to that State's conflicts of laws principles. The Parties expressly submit to the exclusive jurisdiction of the United States District Court for the Eastern District of California for all purposes related to this Agreement, and agree that any order, process, notice of motion, or other application to or by such court or a judge thereof

may be served within or without such court's jurisdiction by overnight delivery or by hand, with copies thereof sent by e-mail, to the address specified in Section 10.15, Notices to Parties.

*-Rest of Page Intentionally Left Blank*

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement and Release as follows:

Dated: 3/24/25

_____
Garrett R. Broshuis, Korein Tillery, LLC
On behalf of the Class

Dated: _____

_____
Taylor Smart

Dated: _____

_____
Michael Hacker

Dated: _____

_____
By: Charles Baker
On behalf of Defendant NCAA

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement and Release as follows:

Dated: _____

_____
Garrett R. Broshuis, Korein Tillery, LLC
On behalf of the Class

Dated: 03/24/2025 _____

*Taylor Smart*
_____
Taylor Smart

Dated: _____

_____
Michael Hacker

Dated: _____

_____
By: Charles Baker
On behalf of Defendant NCAA

19

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement and Release as follows:

Dated: _____

_____
Garrett R. Broshuis, Korein Tillery, LLC
On behalf of the Class

Dated: _____

_____
Taylor Smart

Dated: 03/24/2025

_____
Michael Hacker

Dated: _____

_____
By: Charles Baker
On behalf of Defendant NCAA

19

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement and Release as follows:

Dated: _____

_____
Garrett R. Broshuis, Korein Tillery, LLC
On behalf of the Class

Dated: _____

_____
Taylor Smart

Dated: _____

_____
Michael Hacker

Dated: 03/24/2025_____

_____
By: Charles Baker
On behalf of Defendant NCAA

19