STEPHEN M. TILLERY *(pro hac vice)*
    stillery@koreintillery.com
STEVEN M. BEREZNEY (Bar No. 329923)
    sberezney@koreintillery.com
GARRETT R. BROSHUIS (Bar No. 329924)
    gbroshuis@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Attorneys for Plaintiffs Taylor Smart and
Michael Hacker, Individually and on Behalf
of All Those Similarly Situated

### UNITED STATES DISTRICT COURT

#### EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| TAYLOR SMART AND MICHAEL HACKER, Individually and on Behalf of All Those Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association; <br><br> Defendant. | CASE NO. 2:22-cv-02125-WBS-CSK <br><br> **CLASS ACTION** <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF SETTLEMENT AND FOR INCENTIVE AWARDS TO CLASS REPRESENTATIVES; MEMORANDUM IN SUPPORT** <br><br> Date:  September 15, 2025 <br> Time:  1:30 p.m. <br> Courtroom: 5, 14th Floor <br> Judge:  The Honorable William B. Shubb |

**NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF SETTLEMENT AND FOR INCENTIVE AWARDS TO CLASS REPRESENTATIVES**

Please take notice that, on September 15, 2025 at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 5 of this Court, located at 501 I Street, Sacramento, California, Plaintiffs Taylor Smart and Michael Hacker ("Plaintiffs") will, and hereby do, move for final approval of the settlement reached in this case, and also move for incentive awards. This Motion is made pursuant to Federal Rule of Civil Procedure 23. This Motion is based upon this Notice of Motion and the accompanying Memorandum in Support; the Declaration of Garrett Broshuis in Support of Final Approval ("Broshuis Final Approval Decl."); the Declaration of Taylor Smart in Support of Final Approval ("Smart Decl."); the Declaration of Michael Hacker in Support of Final Approval ("Hacker Decl."); the Declaration of Patrick M. Passarella of Kroll Settlement Administration in Connection with Final Approval of Settlement ("Passarella Final Approval Decl."); the records on file in this action; and upon additional argument as may be presented at or before the hearing on this Motion.

DATED: August 11, 2025          Respectfully submitted,


                                     /s/ *Garrett R. Broshuis*
                                KOREIN TILLERY, LLC
                                Stephen M. Tillery (*pro hac vice*)
                                Steven M. Berezney
                                Garrett R. Broshuis

                                *Attorneys for Plaintiffs*

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF SETTLEMENT
    AND FOR INCENTIVE AWARDS TO CLASS REPRESENTATIVES...........i

Introduction.....................................................1

Factual and Procedural Background................................2

Legal Standard...................................................8

Argument.........................................................9

  I.    A Certifiable Settlement Class Exists Under Rule 23. ......9

        A. Rule 23(a)is Satisfied. ............................ 10

        B. Rule 23(b)is Satisfied. ............................ 10

        C. Rule 23(c)is Satisfied. ............................ 11

        D. Rule 23(e)is Satisfied. ............................ 14

                1.   Adequate Representation. ....................... 15

                2.   Negotiation of the Settlement Agreement. ........ 15

                3.   Relief provided by the settlement. .............. 18

                4.   Equitable treatment of class members. ........... 27

                5.   Government participation. ....................... 28

                6.   Reaction of class members. ..................... 28

II.    The Court Should Approve $7,500 Incentive Awards to
       Each Class Representative...................................29

CONCLUSION.......................................................32

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Apple Inc. Device Performance Litig.*,
  50 F.4th 769 (9th Cir. 2022) ...............................25

*Carlin v. DairyAmerica, Inc.*, 380 F. Supp. 3d 998, 1011
  (E.D. Cal. 2019) ......................................19, 20

*In re Cathode Ray Tube (Crt) Antitrust Litig.*,
  MDL No. 1917, 2015 WL 9266493 (N.D. Cal. Dec. 17,
  2015) ....................................................21

*Churchill Vill. v. Gen. Elec.*,
  361 F.3d 566 (9th Cir. 2004) ..................11, 14, 23, 26

*Edwards v. Nat'l Milk Producers Federation*,
  No. 11-cv-04766, 2017 WL 3623734 (N.D. Cal. June 26,
  2017) ....................................................21

*In re Endosurgical Prods. Direct Purchaser Antitrust
  Litig.*,
  No. SACV 05-8809, 2008 WL 11504857 (C.D. Cal. Dec.
  31, 2008) ................................................23

*Evans v. Zions Bancorporation, N.A.*,
  No. 2:17-cv-01123, 2022 WL 16815301 (E.D. Cal. Nov.
  8, 2022) .........................................12, 20, 29

*Evans v. Zions Bancorporation, N.A.*,
  No. 2:17-cv-01123, 2022 WL 3030249 (E.D. Cal. Aug. 1,
  2022) ....................................................23

*Four in One Co., Inc. v. S.K. Foods, L.P.*,
  No. 2:08-cv-3017, 2014 WL 4078232 (E.D. Cal. Aug. 18,
  2014) ....................................................21

*In re Glumetza Antitrust Litig.*,
  No. C 19-05822, 2022 WL 327707 (N.D. Cal. Feb. 3,
  2022) ....................................................21

*In re Google Play Developer Antitrust Litig.*,
  No. 20-cv-05792, 2024 WL 150585 (N.D. Cal. Jan. 11,
  2024) ....................................................21

*Griffin v. Consol. Commc's*,
    No. 2:21-cv-0885, 2023 WL 3853643 (E.D. Cal. June 6,
    2023) ...............................................*passim*

*In re GSE Bonds Antitrust Litig.*,
    No. 19-cv-1704, 2019 WL 6842332 (S.D.N.Y. Dec. 16,
    2019) ...................................................21

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) .............................1

*In re High-Tech Employee Antitrust Litig.*,
    No. 11-cv-02509, 2015 WL 5159441 (N.D. Cal. Sept. 2,
    2015) ...................................................21

*Il Fornaio (America) Corp. v. Lazzari Fuel Co., LLC*,
    2015 WL 2406966 (N.D. Cal. May 20, 2015) ...................13

*Kabasele v. Ulta Salon, Cosmetics & Fragrance, Inc.*,
    No. 2:21-cv-1639, 2023 WL 4747691 (E.D. Cal. July 25,
    2023) ...............................................19, 29

*Kabasele v. Ulta Salon, Cosmetics & Fragrance, Inc.*,
    No. 2:21-cv-1639, 2024 WL 477221 (E.D. Cal. Feb. 7,
    2024) ...............................................*passim*

*Kim v. Allison*,
    8 F.4th 1170 (9th Cir. 2021) .............................15

*Kimbo v. MXD Group, Inc.*,
    No. 2:19-cv-00166, 2020 WL 4547324 (E.D. Cal. Aug. 6,
    2020) ...................................................12

*Kimbo v. MXD Group, Inc.*,
    No. 2:19-cv-00166, 2021 WL 492493 (E.D. Cal. Feb. 10,
    2021) ...............................................23, 29, 30

*In re LDK Solar Sec. Litig.*,
    No. C 07-5182, 2010 WL 3001384 (N.D. Cal. July 29,
    2010) ...................................................22

*Martinelli v. Johnson & Johnson*,
    No. 2:15-cv-01733, 2022 WL 4123874 (E.D. Cal. Sept.
    9, 2022) ...............................................24

*McIntosh v. Katapult Holdings, Inc.*,
    No. 21-cv-07251, 2024 WL 5118192 (S.D.N.Y. Dec. 13,
    2024) ...................................................22

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) ...............................22

*Mejia v. Walgreen Co.*,
   No. 2:19-cv-00218, 2021 WL 1122390 (E.D. Cal. Mar.
   24, 2021) .......................................20, 29, 30

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) .............................25

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004) ........................16, 25

*Navarro v. Servisair*,
   No. C 08-02716 MHP, 2010 WL 1729538 (N.D. Cal. Apr.
   27, 2010) ..................................................30

*Park v. Carlyle/Galaxy San Pedro, L.P.*,
   No. CV 09-00793, 2009 WL 10669742 (C.D. Cal. Oct. 8,
   2009) .....................................................23

*Rodriguez v. W/ Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ..........................*passim*

*Sandoval Ortega v. Aho Enters., Inc.*,
   No. 19-cv-00404, 2021 WL 5584761 (N.D. Cal. Nov. 30,
   2021) .....................................................23

*In re Syncor ERISA Litig.*,
   516 F.3d 1095 (9th Cir. 2008) ...............................8

*In re Tableware Antitrust Litig.*,
   No. C-04-3514, 2007 WL 4219394 (N.D. Cal. Nov. 28,
   2007) .....................................................21

*In re Toys R Us-Del., Inc.-Fair & Accurate Credit
   Transactions Act (FACTA) Litig.*,
   295 F.R.D. 438 (C.D. Cal. 2014) ...........................22

*Vasquez v. Coast Valley Roofing, Inc.*,
   266 F.R.D. 482 (E.D. Cal. 2010) ...........................23

*In re Warner Commc's Sec. Litig.*,
   618 F. Supp. 735 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35
   (2d Cir. 1986) ............................................25

v        NO.  2:22-cv-02125-WBS-CSK
─────────────────────────────────────
**Motion for Final Approval of Settlement**

**Court Rules**

Fed. R. Civ. P. 23(a)..................................10, 11, 15

Fed. R. Civ. P. 23(b)..................................10, 11

Fed. R. Civ. P. 23(c).............................11, 12, 13, 14

Fed. R. Civ. P. 23(e)..................................9, 14, 15

**Other Authorities**

Connor & Lande, *Not Treble Damages: Cartel Recoveries are Mostly Less than Single Damages*, 100 IOWA L. REV. 1997, 1998 (2015) .........................................22

Fed. Jud. Ctr., *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010), *available at* https://www.fjc.gov/sites/default/files/2012/NotCheck .pdf .....................................................13

# Introduction

The fundamental question for this motion is whether the settlement, as a whole, is fair. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). The settlement in this case, reached after 17 months of discovery, easily passes that test. The total settlement amount — $49.25 million — is over **90%** of the class's total actual damages and will provide the average class member close to $36,000 *per year* that they coached in the volunteer role. That result is orders of magnitude better than typical class action settlements, which often involve just 10-20% of total damages. *See infra* at pp. 20-22.

With a recovery this large, class member reaction has been exactly what one would expect: enthusiastic. After a robust notice process, in which nearly 99% of the class appears to have been notified, no class member objected and no class member opted out. By contrast, Class Counsel and the settlement administrator have received a steady stream of messages from class members seeking more details on how they can participate and conveying effusive support for the settlement. The Court should approve this settlement so the coaches can receive the payments they are owed.

The Court should also approve incentive awards of $7,500 to each of the two named plaintiffs. For three decades, the NCAA had maintained this rule, and no coach had challenged it, likely because of the reputational risk and great effort that bringing such a case would entail. These individuals chose to act when none before them had done so, and their efforts resulted in a great benefit to the class. Incentive awards are thus warranted.

1    **Factual and Procedural Background**

2         Plaintiffs previously summarized this case's factual and

3    procedural background when moving for preliminary approval, ECF

4    No. 73 at 3-7, which the Court granted, ECF No. 80, and in

5    Plaintiffs' motion for fees and costs, *see* ECF No. 82-1 at 1-14

6    (declaration detailing the work done in the case). To avoid a

7    lengthy repetition, Plaintiffs incorporate by reference those

8    prior summaries here. Yet for the Court's ease of reference,

9    Plaintiffs will restate a summary of the settlement itself and

10   some additional relevant facts.

11        ***The Class to be Settled***. The Court certified the following

12   Rule 23(b)(3) class for settlement purposes only:

13       All persons who, pursuant to NCAA Division I Bylaw
         11.7.6, served as a "volunteer coach" in college baseball
14       at an NCAA Division I school from November 29, 2018 to
         July 1, 2023.[1]
15
         ***The Settlement Fund and Plan of Allocation***. The NCAA has
16
     agreed to pay $49.25 million into a common settlement fund from
17
     which class members will be paid after deduction for court-
18
     approved attorneys' fees, costs, expenses, and incentive awards.[2]
19
     If approved, and assuming the off-the-top deductions sought in
20
     the motion for fees and costs, ECF No. 82, the $49.25 million
21
     settlement fund will be allocated as follows: (a) an amount
22
     allocated for payments to class members of $32,917,797.61; (b)
23
     $14,775,000 for Plaintiffs counsel's fees and $1,377,052.39 for
24

25   _____

     [1] ECF No. 80 at 19.
26
     [2] *See* Settlement Agreement § 5.1.1, ECF No. 73-1 at 28. The
27   Settlement Agreement is found at Exhibit 2 to the March 24, 2025
     Broshuis Declaration. ECF No. 73-1 at 24.
28

1  costs and expenses incurred; (c) an estimated amount of $30,150
2  to pay the settlement administrator and $35,000 to pay the
3  economist for work on settlement administration; (d) incentive
4  awards for the two class representatives of $7,500 each; and (e)
5  a contingency fund of $100,000.

6      Each class member's settlement payment will vary according
7  to the number of years worked and the school for which he worked.
8  Plaintiffs' expert, Dr. Rascher, will calculate individual
9  settlement recovery amounts using a methodology substantially
10  similar to the one he used to calculate damages in his
11  declaration filed in support of Plaintiffs' motion for class
12  certification.[3] Vastly simplified, Dr. Rascher first estimated
13  base salaries using "actual base salaries for the third assistant
14  coach position in 2023," making sure to "deflate the base salary
15  amount based on" how much the compensation changed for the other
16  two paid assistants over time.[4] If a school did not produce
17  sufficient data, Dr. Rascher uses data from peer schools; to do
18  this, he places schools within peer deciles.[5] That ensures that
19  the estimate of damages is school-specific.

20      To account for one additional employment benefit that the
21  third assistant coaches likely would have received, Dr. Rascher
22  estimates the value of health benefits that were not provided but
23  that likely would have been provided.[6] As with the base salary

24
_____

25  [3] ECF No. 64-2.

26  [4] *Id.* ¶ 181; *see also id.* ¶ 184.

27  [5] *Id.* ¶ 183.

28  [6] *Id.* ¶ 186.

1    computation, he deflates the value of these benefits to ensure

2    that he is measuring the value that would have been provided

3    during the relevant year.[7]

4        No claim form will be needed to receive the money owed. The

5    default is to send checks to a class member's last known address.

6    Pasarella Final Approval Decl. ¶ 15. But class members have been

7    (and will continue to be) provided with a chance to update their

8    mailing address or select an electronic payment, and to provide

9    W-9 information to better facilitate the payments. To date,

10   nearly 700 class members have done so. *Id.* For paper checks,

11   FedEx will be used as an added safeguard because of the large

12   amount being sent.

13       The parties desire to pay every class member what they are

14   owed under the settlement. Yet in the event certain class members

15   cannot be paid (if, for example, they do not cash their checks),

16   their allocated share will be paid *pro rata* to class members who

17   did cash their checks in a second distribution. *See* Settlement

18   Agreement ¶ 8.4.4. If that process at some point becomes

19   impracticable, the residue will go to a related charity under the

20   doctrine of *cy pres*. *Id.* The parties have selected the American

21   Baseball Coaches Association ("ABCA") as the *cy pres* recipient.

22   Settlement Agreement at ¶ 2.8. ABCA has over 15,000 members in

23   all 50 states and 41 countries focusing on amateur baseball

24   coaching at the college, high school, youth, and travel levels.

25   *See* Broshuis Prelim. Approval Decl., ECF No. 73-1, at ¶ 15.

26

27   [7] *Id.*; *See also* Rascher Prelim. Approval Decl. at ¶¶ 4-12
     (explaining allocation formula).

28

1  ABCA's purposes are, *inter alia*, "to assist in the educational

2  development of amateur baseball coaches" and to "promote

3  excellence in the coaching of baseball." *Id.* ABCA has assisted

4  Class Counsel in notifying class members of the settlement by

5  sending an email encouraging class members to submit the

6  paperwork to receive their share of the settlement. Broshuis

7  Final Approval Decl. ¶ 5. Not a penny of the $49.25 million fund

8  will revert to the NCAA.

9      ***The Releases***. In exchange for the benefits provided under

10  the settlement, participating Rule 23(b)(3) class members agree

11  to release the NCAA from:

12      any and all claims of the Plaintiffs and Class Members
        who do not opt out of the Settlement that were asserted
13      or could have been asserted against Released Parties for
        the Class Period arising out of the facts alleged in the
14      Litigation, known or unknown, including for avoidance of
        doubt, any claim for unpaid wages, benefits, or bonuses,
15      or any claim for damages for lost opportunities,
        interference with contract, or restraint of trade.
16      Plaintiff Released Claims include, without limitation,
        any claims for compensation, benefits, penalties or any
17      other recovery on the theory that Plaintiffs or Class
        Members who do not opt out of the Settlement were
18      employees of, or contractors for, any Released Parties,
        and thus include, without limitations, claims under state
19      and federal minimum wage laws, the federal Fair Labor
        Standards Act, state and local wage and hour statutes and
20      laws, including without limitation any claims under the
        California Labor Code and California Labor Code section
21      2698 et seq. specifically as well as California Business
        & Professions Code section 17200 and equivalent statutes
22      from other states that could have been asserted based on
        the facts alleged in the Litigation.
23  Settlement Agreement ¶ 2.24.

24      The NCAA also agrees to release participating Rule 23(b)(3)

25  class members from: "all claims and counterclaims that Defendant

26  asserted or could have asserted against Plaintiffs arising out of

27

28
                                    5      NO.  2:22-cv-02125-WBS-CSK

1  the facts alleged in the Litigation, known or unknown."

2  Settlement Agreement ¶ 2.11.

3      The releases are limited to claims relating to the volunteer

4  coach rule and the claims that "could have been asserted" based

5  on the facts of the operative complaint.

6      ***Incentive Awards***. Plaintiffs petition for incentive awards

7  of $7,500 for the two class representatives. If approved, the

8  incentive awards will be in addition to any distribution that

9  they are otherwise entitled to under the settlement to reflect

10 the time and effort that each put into representing the class, as

11 well as the professional and reputational risk incurred by

12 bringing this litigation. At preliminary approval, the Court

13 noted that while $7,500 exceeds the presumptively reasonable

14 amount, "the incentive awards are considerably lower than the

15 average recovery of each class member and constitute

16 approximately one-third of one percent of the gross settlement

17 amount," and cited the efforts expended by Plaintiffs during

18 discovery. ECF No. 80 at 8-9.

19     ***Attorneys' Fees, Costs, and Expenses.*** As discussed in

20 Plaintiffs' separate motion for attorneys' fees, Class Counsel

21 petitions for fees of 30%, along with actual costs and expenses.

22 *See* ECF No. 82. That motion remains pending.

23     ***Settlement Administration Fees and the Administrator***. The

24 Court accepted Plaintiffs' recommendation that the professional

25 class action administration firm Kroll Settlement Administration

26 serve as the "Settlement Administrator" to assist Plaintiffs'

27

28

1  counsel in effectuating the notice program and handling claims

2  administration. ECF No. 80 at 13–14.

3       Kroll estimated that administration costs will be $30,150.

4  Its current costs total approximately $10,025.47. In Class

5  Counsel's experience, that is reasonable and in line with

6  administration costs in other class actions of this size and

7  nature. Broshuis Final Approval Decl. ¶ 8. Class Counsel requests

8  that Kroll be reimbursed the $10,025.47 already expended, and

9  that the remainder of the $30,150 ($20,124.53) be set aside for

10  further administration expenses that will likely be incurred.

11      Kroll has worked with Dr. Daniel Rascher to determine the

12  payment amounts. Dr. Rascher originally estimated that his firm's

13  costs will amount to $35,000. Rascher Prelim. Approval Decl., ECF

14  No. 73-2, at ¶ 13. His current actual unpaid costs total

15  approximately $4,080. Broshuis Final Approval Decl. ¶ 9.

16  Plaintiffs request that Dr. Rascher be paid $4,080 in costs

17  already incurred, and that the remainder of the $35,000 ($30,920)

18  be set aside to pay further administration-related work performed

19  by Dr. Rascher.

20      ***The Form and Manner of Notice***. The Court approved the form

21  and content of the proposed Notices of Class Action Settlement.

22  (ECF No. 80 at 20.) The class was notified as ordered by the

23  Court on May 14, 2025 by the Settlement Administrator via email,

24  a postcard summary notice via first-class U.S. mail, and the

25  long-form notice posted on the settlement website. Passarella

26  Final Approval Decl. ¶¶ 10-11. Via the website, class members

27  were able to update their addresses as well, or enter information

28

1  allowing an electronic payment. *Id.* ¶ 15. As of August 7, at

2  least 694 class members have already logged into the website and

3  provided payment information, and the portal remains open for

4  further submissions (which continue to be received). *Id.* Over the

5  last month, Class Counsel has been proactively contacting class

6  members who have not provided W-9 information to ensure they know

7  about the settlement and to encourage them to provide information

8  through the portal. Broshuis Final Approval Decl. ¶ 5. Class

9  Counsel will continue those efforts with the goal of ensuring

10  that every class member who desires a payment will receive it.

11  *Id.* Class Counsel has also asked the ABCA to notify its member-

12  coaches about the settlement, and the ABCA has done so. *Id.*

13      ***The Positive Response from Class Members***. Throughout the

14  notice period, class members responded with overwhelming support

15  for the settlement. Class Counsel responded to over 300 emails

16  and phone calls, and class members frequently provided thankful

17  and supportive comments. Broshuis Final Approval Decl. ¶ 5. Kroll

18  received approximately 313 calls and 134 emails from potential

19  class members expressing their interest in receiving the benefits

20  of this agreement. Passarella Final Approval Decl. ¶¶ 7, 16. Zero

21  class members opted out after receiving the settlement notice.

22  *Id.* at ¶ 18. No objections were received. *Id.*

23                         **Legal Standard**

24      "[T]here is a strong judicial policy that favors

25  settlements, particularly where complex class action litigation

26  is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101

27  (9th Cir. 2008) (citing *Class Plaintiffs v. City of Seattle*, 955

28

1  F.2d 1268, 1276 (9th Cir. 1992)); *see also Rodriguez v. W/ Publ'g*

2  *Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of

3  stock in the product of an arms-length, non-collusive negotiated

4  resolution.") (citation omitted). Rule 23(e) says that "[t]he

5  claims, issues or defenses of a certified class may be settled

6  only with the court's approval." Fed. R. Civ. P. 23(e).

7       "Approval under 23e involves a two-step process in which the

8  Court first determines whether a proposed class action settlement

9  deserves preliminary approval and then, after notice is given to

10 class members, whether final approval is warranted." *Kabasele v.*

11 *Ulta Salon, Cosmetics & Fragrance, Inc.*, No. 2:21-cv-1639, 2024

12 WL 477221, at *1 (E.D. Cal. Feb. 7, 2024) (Shubb, J.) (quoting

13 *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523,

14 525 (C.D. Cal. 2004)); *Griffin v. Consol. Commc's*, No. 2:21-cv-

15 0885, 2023 WL 3853643, at *1 (E.D. Cal. June 6, 2023) (Shubb,

16 J.). Once preliminary approval has been given, as is the case

17 here, the Court then evaluates: "(1) the treatment of this

18 litigation as a class action; and (2) the terms of the

19 settlement." *Kabasele*, 2024 WL 477221, at *1 (citing *Diaz v. Tr.*

20 *Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)).

21                              **Argument**

22 **I.   A Certifiable Settlement Class Exists Under Rule 23.**

23      When this Court has certified a preliminary settlement class

24 at preliminary approval, and where the Court is unaware of any

25 changes or developments that would affect that prior ruling, this

26 Court has quickly determined that Rule 23 is satisfied for

27 purposes of granting final approval to a class action settlement

28

without engaging in a lengthy repeat analysis. *Kabasele*, 2024 WL 477221, at *2. Like *Kabasele*, nothing has changed here, and the Court should certify the class in the final approval order.

### A.    Rule 23(a) is Satisfied.

Rule 23(a) restricts class actions to cases where numerosity, commonality, typicality, and adequacy are proven. *See* Fed. R. Civ. P. 23(a). In the Court's order granting preliminary approval of the settlement, the Court found that the settlement class satisfied the Rule 23(a) requirements and issued a detailed analysis supporting that conclusion. ECF No. 80 at 4-10.

There are no changes or developments that should cause the Court to change its mind that Rule 23(a) is satisfied. For the reasons previously found, the class is still sufficiently numerous; still contains common issues that can be resolved in one stroke; is still represented by representatives with claims typical of the class claims; and is still represented by adequate class representatives and counsel. *See* ECF No. 73 at 15-22 (incorporated by reference and further addressing the Rule 23(a) requirements). The Court should therefore find that the class definition proposed by Plaintiffs meets the Rule 23(a) requirements for the settlement class.

### B.    Rule 23(b) is Satisfied.

After satisfying Rule 23(a), Plaintiffs must also satisfy one of the three subdivisions of Rule 23(b). The Court's order granting preliminary approval of the settlement previously found that Plaintiffs satisfied the predominance and superiority aspects of Rule 23(b)(3). ECF No. 80 at 10-12.

There are no changes or developments that should cause the Court to change its mind that Rule 23(b) is satisfied. Common issues continue to predominate, as several key liability issues present common questions, and a class action remains a superior device to resolve hundreds of claims in one swoop. *See* ECF No. 73 at 22-28 (incorporated by reference and further addressing the Rule 23(b) requirements). The Court should therefore find that the class definition proposed by Plaintiffs meets the Rule 23(b) requirements for the settlement class.

### C.    Rule 23(c) is Satisfied.

Once Rule 23(a) and (b) are satisfied, the class must be properly notified. The Court already approved of Plaintiffs' proposed form and method of notice, as well as the selection of Kroll as the Settlement Administrator. ECF No. 80 at 12-14.

"Rule 23(c)(2) governs both the form and content of a proposed notice." *Kabasele*, 2024 WL 477221, at *2; *Griffin*, 2023 WL 3853643, at *2. With regard to the form of notice, "[n]otice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

The notice forms sent to class members did just that. *See* ECF No. 73-4, Exs. A-C; *see also* Passarella Final Approval Decl., Exs. C-E. They explained the proceedings, defined the scope of the class, informed class members of the binding effect of the class action, and explained what the settlement provides and how much each class member can expect to receive in compensation. The

1  forms further explained the opt-out procedure, the procedure for

2  objecting to the settlement, and the date and locations of the

3  final approval hearing. This Court has approved of class notices

4  containing these things. *Kabasele*, 2024 WL 477221, at *2 (Shubb,

5  J.); *Griffin*, 2023 WL 3853643, at *2 (Shubb, J.); *Evans v. Zions*

6  *Bancorporation, N.A.*, No. 2:17-cv-01123, 2022 WL 16815301, at *3

7  (E.D. Cal. Nov. 8, 2022) (Shubb, J.); *Kimbo v. MXD Group, Inc.*,

8  No. 2:19-cv-00166, 2020 WL 4547324, at *6 (E.D. Cal. Aug. 6,

9  2020) (Shubb, J.). In short, the notice forms provided class

10  members with everything they needed to make an informed decision.

11      With regard to the method of notice, Rule 23 requires "the

12  best notice that is practicable under the circumstances,

13  including individual notice to all members who can be identified

14  through reasonable effort." Rule 23(c)(2)(B). "Although that

15  notice must be 'reasonably certain to inform the absent members

16  of the plaintiff class,' actual notice is not required."

17  *Kabasele*, 2024 WL 477221, at *2 (quoting *Silber v. Mahon*, 18 F.3d

18  1449, 1454 (9th Cir. 1994)); *Griffin*, 2023 WL 3853643, at *2

19  (final approval order stating same).

20      Kroll Settlement Administration serves as the Settlement

21  Administrator. Pursuant to the notice plan, the Settlement

22  Administrator directed a longform notice to all class members

23  with a last-known email address (786 class members). *See*

24  Pasarella Final Approval Decl. ¶ 11. Given that the class is

25  comprised largely of younger men born and raised in the age of

26  computer technology, electronic communications are well-suited

27

28

1  for the case. *See* Fed. R. Civ. P. 23(c)(2)(B) (expressly

2  contemplating notice via "electronic means").

3      The administrator also sent a first-class U.S. mail postcard

4  notice to each class member at his or her last known address

5  based on the records obtained via document subpoenas, from

6  performing additional searches, and from following best practices

7  to identify updated addresses. Pasarella Final Approval Decl. ¶¶

8  10, 12-13. In total, Kroll sent notice by mail to 893 class

9  members, using standard industry technology to try to identify

10  changes of address. *Id*. The USPS returned 102 as undeliverable.

11  *Id.* ¶ 13. After conducting address verification searches, 67 were

12  re-mailed. *Id.* ¶ 13. Kroll also re-sent notice to many class

13  members who emailed Kroll to update their contact information.

14  Between the email notice and the postcard notice, Kroll has

15  reason to believe that nearly every class member (approximately

16  98.82%) received direct notice. *Id.* ¶ 14. The campaign thus was a

17  success, and it performed much better than what has been deemed

18  sufficient. *See Il Fornaio (America) Corp. v. Lazzari Fuel Co.,*

19  *LLC*, 2015 WL 2406966, at *1-*2 (N.D. Cal. May 20, 2015)

20  (approving notice when approximately 13% of notices were

21  undeliverable); *see also* Fed. Jud. Ctr., *Judges' Class Action*

22  *Notice and Claims Process Checklist and Plain Language Guide*

23  (2010), at 3, *available at*

24  https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf ("the

25  median reach calculation on approved notice plans was 87%").

26      Kroll also created a settlement website containing the full

27  longform notice, a Q&A section, relevant pleadings, Class

28

**Motion for Final Approval of Settlement**

1  Counsel's motion for attorneys' fees, and a toll-free number for

2  class members to ask questions and learn about the settlement.

3  *See* Pasarella Final Approval Decl. ¶¶ 7, 15-16. Approximately

4  7,163 people visited the website, and 313 called the toll-free

5  number. *Id*. Also, 694 class members submitted their W-9

6  information and confirmed their contact information via the

7  website. *Id.* ¶ 15. These numbers confirm that the notice reached

8  its targets.

9       These many methods of notice described above reached as many

10 class members as is "practicable under the circumstances." The

11 Court should find that proper notice has been given to the class

12 under Rule 23(c).

13      **D.  Rule 23(e) is Satisfied.**

14      Once the Court determines that class treatment is warranted,

15 it next determines whether the settlement's terms appear fair,

16 adequate, and reasonable. *Kabasele*, 2024 WL 477221, at *3. In

17 doing so, Rule 23(e) requires the Court to consider four factors:

18 "(1) the class representatives and class counsel have adequately

19 represented the class; (2) the proposal was negotiated at arm's

20 length; (3) the relief provided for the class is adequate; and

21 (4) the proposal treats class members equitably relative to each

22 other." *Id*. The Ninth Circuit's "*Churchill*" factors provide

23 additional factors the Court may consider:

24      (1) The strength of the plaintiff's case; (2) the risk,
        expense, complexity, and likely duration of further
25      litigation; (3) the risk of maintaining class action
        status throughout the trial; (4) the amount offered in
26      settlement; (5) the extent of discovery completed and
        the stage of the proceedings; (6) the experience and
27      views of counsel; (7) the presence of a governmental

28
                                    14        NO.  2:22-cv-02125-WBS-CSK
                          **Motion for Final Approval of Settlement**

1    participant; and (8) the reaction of the class members
     of the proposed settlement.

2  *Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021) (citing

3  *Churchill*, 361 F.3d 566); *Kabasele*, 2024 WL 477221, at *3 (noting

4  that many of these factors "overlap substantially with Rule

5  23(e)'s four factors").

6         **1. Adequate Representation.**

7         The Court must first consider whether Class Counsel and the

8  two class representatives have adequately represented the class —

9  an inquiry that is redundant of Rule 23(a)(4). *Kabasele*, 2024 WL

10  477221, at *4; *Griffin*, 2023 WL 3853643, at *3. Because the

11  proposed class satisfies Rule 23(a)(4) for purposes of class

12  certification as described above, which is consistent with the

13  Court's earlier decision to preliminarily approve the settlement

14  after adequacy was deemed satisfied (ECF No. 80 at 7-10, 20), the

15  adequacy factor under Rule 23(e)(2)(A) is also met. *Kabasele*,

16  2024 WL 477221, at *4; *Griffin*, 2023 WL 3853643, at *4.

17         **2. Negotiation of the Settlement Agreement.**

18         In other cases, the Court has found this element of Rule

19  23(e) satisfied on final approval based on a combination of

20  counsel's representation that negotiations were conducted at

21  arms-length, involvement of a mediator, and discovery taking

22  place. *See Kabasele*, 2024 WL 477221, at *4; *Griffin,* 2023 WL

23  3853643, at *4. While an arms-length negotiation can easily exist

24  without the second and third items, all of those things are

25  present here.

26         The settlement was reached as a result of an over 6-month

27  arms-length negotiation process. *See* Broshuis Prelim. Approval

28

Decl., ECF No. 73-1, at ¶ 11. In July 2024 when the parties were in the middle of discovery, the parties attempted mediation with a respected mediator (Fouad Kurdi[8]) but were unsuccessful. *See id.* at ¶ 11. Later, Plaintiffs continued to have additional discussions with the mediator, but it still bore no fruit. Broshuis Final Approval Decl. ¶ 10.

With both sides zealously representing the interests of their clients, real movement did not occur until class certification briefs and expert reports were exchanged. *Id.* By then, substantial discovery had taken place over the course of 17 months, and the parties had all the information needed to make an informed decision.[9] Both Mr. Smart and Mr. Hacker had produced documents. *See* Broshuis Prelim. Approval Decl., ECF No. 73-1, at ¶ 7. The NCAA had produced over 278,132 pages of documents, which Plaintiffs reviewed. *Id.* Plaintiffs had served and received responses to interrogatories and requests for admissions. *Id.* at ¶ 6. Plaintiffs had issued over 300 subpoenas to member schools for information on baseball coaches compensation and had received complete responses from over 200, resulting in over 8,000 documents. *Id.* at ¶ 8. Using that information, Dr. Rascher had

---

[8] Mr. Kurdi is a mediator at Resolutions, LLC with experience mediating complex antitrust disputes. His online biography is here: https://resolutionsllc.com/fouad-kurdi/.

[9] The extent of discovery is also sometimes relevant in that a court is more likely to approve of a settlement if most of the discovery is completed because it suggests the parties reached a compromise based on a full understanding of the legal and factual issues. *DIRECTV*, 221 F.R.D. at 527 (quoting 5 Moore's Federal Practice, § 23.85[2][e] (Matthew Bender 3d ed.)).

run a regression model aimed at proving both antitrust injury and damages classwide. *See* ECF No. 64-2. In response, the NCAA's rebuttal expert, Dr. Jee-Yeon Lehmann, had likewise provided a detailed analysis. ECF No. 67-5. Both experts had been deposed, and *Daubert* briefing had begun.

And the parties had already deposed most of the key fact witnesses. The NCAA deposed both Mr. Smart and Mr. Hacker. *See* Broshuis Prelim. Approval Decl., ECF No. 73-1, at ¶ 9. Plaintiffs deposed Jenn Fraser and Lynda Tealer, two of the NCAA employees most knowledgeable about the volunteer coach rule and its recent repeal. *Id.* Plaintiffs also deposed Matt Boyer — the SEC employee most directly responsible for an earlier failed repeal effort in 2018. Plaintiffs deposed Jeremiah Carter — a member of the NCAA Modernization of Rule Subcommittee tasked with recommending the repeal the volunteer coach rule. *Id.*

In January 2025, the parties resumed settlement discussions. Armed with more information from discovery and from class certification filings, and armed with knowledge gained from the prior mediation, they this time proceeded without the mediator. Broshuis Final Approval Decl. ¶ 10. From Plaintiffs' perspective, renewing settlement talks without the mediator allowed for a quicker, more efficient dialogue with the NCAA — putting the class in a better position to build momentum and strike at exactly the right moment. *Id.* That ultimately resulted in a successful result that saved the class time and money. Building on the prior negotiations conducted with the mediator, the parties talked and exchanged positions, offers, and counteroffers

several times over the course of a week. *Id.* The expert analyses derived from the subpoenaed school data, along with the class certification briefing, greatly informed the renewed settlement discussions. The parties settled this case on January 31, 2025 — the same day that Plaintiffs' reply brief in support of their motion for class certification and their *Daubert* opposition brief were due.

In short, there is no hint that collusion or self-interest infected this settlement because it did not. Both sides continued to zealously represent their parties' interests until an agreement was inked, and the results speak for themselves: the settlement provides class members with over 90% of their actual damages while eliminating all risk.

### 3. Relief provided by the settlement.

"In determining whether a settlement agreement provides adequate relief for the class, the court must 'take into account (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any [other] agreement[s]' made in connection with the proposal." *Kabasele*, 2024 WL 477221, at *4 (quoting Fed. R. Civ. P. 23(e)(2)(C)); *Griffin*, 2023 WL 3853643, at *4 (same).

When assessing the relief provided by the settlement, there is no "particular formula" to be used. *Rodriguez*, 563 F.3d at 965. Instead, the "court's determination is nothing more than an

amalgam of delicate balancing, gross approximations and rough

justice." *Id.* "In determining whether a settlement agreement is

substantively fair to the class, the court must balance the value

of expected recovery against the value of the settlement offer.

This inquiry may involve consideration of the uncertainty class

members would face if the case were litigated to trial." *Kabasele*

*v. Ulta Salon, Cosmetics & Fragrance, Inc.*, No. 2:21-cv-1639,

2023 WL 4747691, at *8 (E.D. Cal. July 25, 2023) (Shubb, J.). The

Court also compares the settlement amount to the maximum amount

of damages recoverable in a successful litigation. *Id.* Some

courts have considered the amount recovered as the "most

important consideration[ ] of any class settlement." *Carlin v.*

*DairyAmerica, Inc.*, 380 F. Supp. 3d 998, 1011 (E.D. Cal. 2019).

           a)    **The settlement amount.**

     The settlement fund provides exceptional relief for an

antitrust case and makes the class members nearly whole. The

settlement fund is $49.25 million. Dr. Rascher previously

calculated potential damages of $53.8 million; his model remains

largely the same for purposes of settlement, but when alleged

violations after the July 2023 rule change are excluded (which

posed some additional steps to prove), he estimates that the

Settlement Class's overall actual damages would amount to

approximately $49.79 million. Rascher Prelim. Approval Decl., ECF

No. 73-2, ¶¶ 9-10. That includes any additional coaches who were

not in the original class definition proposed at class

certification, who had low potential damages because they coached

at schools with the lowest baseball budgets (which also generally

had the lowest coaching salaries). The $49.25 million settlement
fund amounts to 91.5% of his original damages number, or
approximately 99% of his revised number. *Id.* It amounts to an
average of about $36,000 *per year* per class member. *Id.* ¶ 12. And
since coaches often served in this role for multiple years, many
coaches will receive six-figure payments. *See id.* ¶ 12 (providing
estimates for Plaintiffs, who coached for two years).

That recovery is far better than the typical settlement.
"Courts regularly approve class settlements where class members
recover less than one quarter of the maximum potential recovery
amount." *Carlin*, 380 F. Supp. 3d at 1011. Examples from this
Court include:

- *Griffin*, 2023 WL 3853643, at *5 (Shubb, J.) (granting
  final approval to settlement that was around 8.3% of
  potential damages);
- *Evans*, 2022 WL 16815301, at *4 (Shubb, J.) (granting
  final approval to settlement that was approximately 25%
  of potential damages);
- *Mejia v. Walgreen Co.*, No. 2:19-cv-00218, 2021 WL
  1122390, at *4 (E.D. Cal. Mar. 24, 2021) (Shubb, J.)
  (granting final approval to settlement that was around
  22.37% of potential damages);
- *Kabasele*, 2024 WL 477221, at *5 (Shubb, J.) (granting
  final approval to settlement that was around 27.22% of
  potential damages).

Antitrust cases in particular often settle for far less:

- *Rodriguez*, 563 F.3d at 964–65 (affirming approval: 30% of single estimated damages);

- *Four in One Co., Inc. v. S.K. Foods, L.P.*, No. 2:08-cv-3017, 2014 WL 4078232, at *9 (E.D. Cal. Aug. 18, 2014) (Mueller, J.) (final approval: 2.4% of damages);

- *In re Google Play Developer Antitrust Litig.*, No. 20-cv-05792, 2024 WL 150585, at *2 (N.D. Cal. Jan. 11, 2024) (final approval: 36–38% of single damages);

- *In re Glumetza Antitrust Litig.*, No. C 19-05822, 2022 WL 327707, at *3–*4 (N.D. Cal. Feb. 3, 2022) (final approval: 0.43–0.77% of single damages from Assertio; 16.7–30% from Lupin; and 33–60% from Bausch);

- *Edwards v. Nat'l Milk Producers Federation*, No. 11-cv-04766, 2017 WL 3623734, at *7 (N.D. Cal. June 26, 2017) (final approval: 28.7% of damages);

- *In re Cathode Ray Tube (Crt) Antitrust Litig.*, MDL No. 1917, 2015 WL 9266493, at *5–*6 (N.D. Cal. Dec. 17, 2015) (final approval: 0.4875% of damages);

- *In re High-Tech Employee Antitrust Litig.*, No. 11-cv-02509, 2015 WL 5159441, at *4 (N.D. Cal. Sept. 2, 2015) (final approval: 14% of single damages estimate);

- *In re Tableware Antitrust Litig.*, No. C-04-3514, 2007 WL 4219394, at *3 (N.D. Cal. Nov. 28, 2007) (final approval: 4.2% of single damages);

- *In re GSE Bonds Antitrust Litig.*, No. 19-cv-1704, 2019 WL 6842332, at *4 (S.D.N.Y. Dec. 16, 2019) (10.9% to 21.3% of total possible recovery was reasonable);

1      •   Connor & Lande, *Not Treble Damages: Cartel Recoveries*

2         *are Mostly Less than Single Damages*, 100 Iowa L. Rev.

3         1997, 1998 (2015) (analyzing settlements in 71 private

4         cartel cases decided in 1990–2014 and finding median

5         average settlement was 37% of single damages).[10]

6      Unlike in some class cases, this settlement provides

7 impressive monetary relief that will substantially help hundreds

8 of hardworking people. The $49.25 million settlement fund is non-

9 reversionary. All money will be distributed to class members

10 after payment of attorneys' fees and costs. After the first

11 distribution, if any money remains in the fund because some class

12 members cannot be located or some checks remain uncashed, the

13 remainder will be distributed *pro rata* to class members who

14 cashed their initial checks. If at some point that process

15 becomes economically infeasible, the remainder will be donated to

16 a related charity — the American Baseball Coaches Association —

17 under the doctrine of *cy pres*.

18

19

20

21 [10]  Courts in non-antitrust cases approve settlements for even less amounts. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d

22 454, 459 (9th Cir. 2000) (finding settlement providing plaintiffs 16.6% of their potential recovery to be "fair and adequate"); *In*

23 *re Toys R Us-Del., Inc.-Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 453–54 (C.D. Cal. 2014) (final

24 approval: 3% of possible recovery ($391 million value on exposure up to $13.05 billion)); *In re LDK Solar Sec. Litig.*, No. C 07-

25 5182, 2010 WL 3001384, at *2 (N.D. Cal. July 29, 2010) (final approval: 5% of damages); *McIntosh v. Katapult Holdings, Inc.*,

26 No. 21-cv-07251, 2024 WL 5118192, at *10 (S.D.N.Y. Dec. 13, 2024)

27 (collecting securities class action cases approving settlements of 3.8% to 7% of total damages).

28

1

      **b)**    **The strength of Plaintiffs' case and the risks, expense, and complexity of continued litigation.**

2

    "Another relevant factor is the risk of continued litigation

3

balanced against the certainty and immediacy of recovery from the

4

Settlement." *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D.

5

482, 489 (E.D. Cal. 2010) (Wanger, J.). "It has been held proper

6

to take the bird in hand instead of a prospective flock in the

7

bush." *Id.* In determining risk, numerous courts have recognized

8

that "antitrust class actions are notoriously complex,

9

protracted, and bitterly fought." *Park v. Carlyle/Galaxy San*

10

*Pedro, L.P.*, No. CV 09-00793, 2009 WL 10669742, at *6 (C.D. Cal.

11

Oct. 8, 2009); *In re Endosurgical Prods. Direct Purchaser*

12

*Antitrust Litig.*, No. SACV 05-8809, 2008 WL 11504857, at *7 (C.D.

13

Cal. Dec. 31, 2008) (quotations omitted).

14

    This case is no different. Because Plaintiffs' motion for

15

class certification was contested, certification was far from

16

certain. Whatever ruling this Court made would almost certainly

17

be appealed by the losing party, which would have caused

18

additional expense and delay. *Evans v. Zions Bancorporation,*

19

*N.A.*, No. 2:17-cv-01123, 2022 WL 3030249, at *7 (E.D. Cal. Aug.

20

1, 2022) (Shubb, J.) (citing similar factors in risk analysis);

21

*Kimbo*, 2021 WL 492493, at *5 (Shubb, J.) (same).

22

    The first two *Churchill* factors "weigh in favor of approving

23

settlement when the defendant has plausible defenses that could

24

have ultimately left class members with a reduced or non-existent

25

recovery." *See Sandoval Ortega v. Aho Enters., Inc.*, No. 19-cv-

26

00404, 2021 WL 5584761, at *6 (N.D. Cal. Nov. 30, 2021) (citing

27

28

1  *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993,

2  999 (N.D. Cal. 2015)).

3      The NCAA had alleged three procompetitive justifications for

4  the volunteer coach rule: preserving competition between members,

5  increasing coaching resources available to student athletes, and

6  expanding coaching opportunities for prospective coaches. ECF No.

7  63-10 at p. 20. Plaintiffs do not believe that any of these

8  justifications would have prevailed, but the entire class would

9  have recovered nothing had the NCAA nevertheless prevailed on any

10  one of these three theories.

11      The NCAA's *Daubert* motion seeking to exclude Plaintiffs'

12  expert, Dr. Rascher, created additional litigation risk. The NCAA

13  attacked his damages model at the class certification stage and

14  presumably would have raised the same arguments at summary

15  judgment and trial. Plaintiffs again do not believe that the

16  NCAA's attacks would have persuaded the Court or a jury. But

17  Plaintiffs acknowledge there was at least some risk that the NCAA

18  would prevail in some or all of their attacks on the damages

19  model at any of the three major remaining stages of this case. If

20  that had happened, the Court or the jury could have found that

21  Plaintiffs had not proven any damages at all, or could have

22  reduced the damages to a much lower amount than the current

23  settlement figure. *Martinelli v. Johnson & Johnson*, No. 2:15-cv-

24  01733, 2022 WL 4123874, at *4 (E.D. Cal. Sept. 9, 2022) ("[B]oth

25  sides have retained expert witnesses, which, should this case go

26  to trial, makes it virtually impossible to predict with any

27  certainty which testimony would be credited, and ultimately,

28

1  which expert version would be accepted by the jury.") (England,

2  Jr., J.).[11] "Indeed, the history of antitrust litigation is

3  replete with cases in which antitrust plaintiffs succeeded at

4  trial on liability, but recovered no damages, or only negligible

5  damages, at trial, or on appeal." *In re NASDAQ Market-Makers*

6  *Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998) (citing

7  examples). Plaintiffs are confident they would have succeeded,

8  but success at trial, let alone on class certification and

9  summary judgment, was not assured.

10          c)    **Proposed award of attorneys' fees.**

11      As discussed in Plaintiffs' pending motion for attorneys'

12  fees (ECF No. 82), the requested 30% fee is well in line with

13  fees granted in other antitrust cases that have achieved less

14  impressive results.

15          d)    **Experience and views of Class Counsel.**

16      While Class Counsel's recommendations are not presumed to be

17  reasonable because this case was settled prior to class

18  certification, *In re Apple Inc. Device Performance Litig.*, 50

19  F.4th 769, 783 (9th Cir. 2022), "great weight' is accorded to the

20  recommendation of counsel, who are most closely acquainted with

21  the facts of the underlying litigation," *DIRECTV*, 221 F.R.D. at

22  528. Indeed, "[p]arties represented by competent counsel are

23  _____

[11] *See also In re Warner Commc's Sec. Litig.*, 618 F. Supp. 735,
24  744-45 (S.D.N.Y. 1985) ("Undoubtedly, expert testimony would be
needed to fix not only the amount, but the existence of actual
25  damages. In this 'battle of experts,' it is virtually impossible
to predict with any certainty which testimony would be credited,
26  and ultimately, which damages would be found to have been caused
by actionable, rather than the myriad nonactionable factors . . .
27  .") (citation omitted), *aff'd*, 798 F.2d 35 (2d Cir. 1986).

28

better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *Rodriguez*, 563 F.3d at 967.

All parties here were represented by sophisticated counsel with significant experience in class actions — and significant experience in the industry at hand. The class was represented by counsel with decades of experience in complex litigation generally and class actions in particular. *See* Broshuis Prelim. Approval Decl., ECF No. 73-1, at ¶ 3. Indeed, Class Counsel regularly works on some of the most complex cases in the country. One of the lead members of the team even had prior experience as a Division I baseball player that had a coach in the volunteer role, so he knows first-hand what is at stake and has an intimate understanding of the business. *Id.* at Ex. 1 at 3 (Broshuis bio).

Class Counsel carefully evaluated all aspects of the agreement and, without hesitation, believes that this settlement is a terrific result for class members. Broshuis Final Approval Decl. at ¶¶ 4-5. Class Counsel are of the firm opinion that they have obtained the best possible outcome for the class. *Id.* It will not only secure meaningful compensation for class members, but will make them nearly whole for the damages they suffered. This *Churchill* factor therefore weighs in favor of approval.

*    *    *    *    *    *    *    *    *    *    *

In short, this is an outstanding result. The settlement provides more than adequate relief for the class, and this factor strongly favors approval.

**Motion for Final Approval of Settlement**

1        **4. Equitable treatment of class members.**

2        The Court next considers whether the settlement "improperly

3   grants preferential treatment to class representatives or

4   segments of the class." *Kabasele*, 2024 WL 477221, at *6.

5        Here, the settlement does neither of those things. Each

6   class member's individual recovery will be calculated via the

7   same formula using data regarding the number of years worked, the

8   schools at which they worked, and average salaries for other paid

9   assistant coaches at that school and other similar schools within

10  their conference based on program expenditures. *See* Rascher

11  Prelim. Approval Decl. (ECF No. 73-2) at ¶¶ 4-5, 8. All class

12  members are treated equitably under Dr. Rascher's model, and no

13  class members will unfairly benefit at the expense of others.

14       While the Settlement Agreement allows Mr. Smart and Mr.

15  Hacker to seek incentive payments, they have submitted evidence

16  describing their time and effort spent on this case, *see infra* at

17  pp. 29-31, that justifies their request for incentive payments

18  and does not cause inequitable treatment. *Kabasele*, 2024 WL

19  477221, at *6 (finding the same). Moreover, this Court previously

20  said that no conflict or inequitable treatment existed here

21  because the requested incentive awards "constitute approximately

22  one-third of one percent of the gross settlement amount" and

23  "represent neither an unreasonably high proportion of the overall

24  settlement amount nor an amount disproportionate relative to the

25  recovery of other class members." ECF No. 80 at 8. That remains

26  true today.

27

28

1          **5. Government participation.**

2          There is no government participant in this case, so this

3   factor is neutral.

4          **6. Reaction of class members.**

5          Finally, the reaction of class members to the settlement has

6   been nothing short of ebullient. Class Counsel has heard from

7   hundreds of class members expressing strong support for the

8   settlement. Broshuis Decl. ¶ 5. The undersigned has personally

9   heard from over 100 class members eager to participate. *Id.* The

10  activity on the settlement website reflects that: as of August 7,

11  at least 694 class members, or approximately 75%, have already

12  submitted W-9 and other information to expedite their payments.

13  Passarella Final Approval Decl. ¶ 15. The administrator has

14  responded to 134 emails and 313 phone calls. *Id.* ¶¶ 7, 16. And

15  importantly, zero class members opted out, and zero class members

16  objected. *Id.* ¶ 18.

17         When a college baseball writer posted on social media about

18  the settlement, the post was liked 674 times and viewed by nearly

19  200,000 people. Broshuis Final Approval Decl. ¶ 6. The ABCA

20  likewise expressed support of the settlement to its member

21  coaches, and Class Counsel has heard from supportive head coaches

22  as well. *Id.* So not only have class members reacted positively —

23  the entire college baseball coaching community has reacted

24  positively.

25

26

27

28

**Motion for Final Approval of Settlement**

II.  **The Court Should Approve $7,500 Incentive Awards to Each Class Representative.**

"Incentive awards are fairly typical in class action cases." *Kabasele*, 2024 WL 477221, at *8 (quoting *Rodriguez*, 563 F.3d at 958); *Griffin*, 2023 WL 3853643, at *8 (same). "The Ninth Circuit has specifically approved the award of 'reasonable incentive payments,'" and other courts in this Circuit have found $5,000 to be "presumptively reasonable." *Kabasele*, 2023 WL 4747691, at *4 (citing *Staton v. Boeing Co.*, 327 F.3d 938, 977-78 (9th Cir. 2003); *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008) (Shubb, J.); and others); *Evans*, 2022 WL 16815301, at *8 (same); *Kimbo v. MXD Group, Inc.*, No. 2:19-cv-00166, 2021 WL 492493, at *11 (E.D. Cal. Feb. 10, 2021) (Shubb, J.) (granting final approval of $5,000 incentive payment). This Court has awarded incentive payments of $7,500 in prior cases. *Griffin*, 2023 WL 3853643, at *8 (Shubb, J.) (granting final approval to $7,500 incentive payment); *Mejia*, 2021 WL 1122390, at *10 (Shubb, J.) (same).

Incentive awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Kabasele*, 2024 WL 477221, at *8 (quoting *Rodriguez*, 563 F.3d at 958-59); *Griffin*, 2023 WL 3853643, at *8 (same). Here, the proposed $7,500 incentive payment to each named plaintiff is appropriate in light of their discovery efforts and the significant reputational risk that Mr.

1  Smart and Mr. Hacker faced by bringing this lawsuit alleging a

2  wage-fix conspiracy between the high-profile NCAA and its member

3  schools. *Kabasele*, 2024 WL 477221, at *8 (named plaintiff exposed

4  to reputational and professional risk by tying name to a class

5  action against former employer); *Mejia*, 2021 WL 1122390, at *10

6  (same); *Kimbo*, 2021 WL 492493, at *10 (same).

7       The bylaw at issue had been in place since 1992, and yet

8  there was a reason this case had never been brought: it was

9  risky. With a few exceptions, volunteer coaches were often the

10 lowest coaches on the ladder and were trying to make a name for

11 themselves in their respective sports. Suing the NCAA or member

12 schools who might employ them as coaches might be a career

13 killer. These were real risks faced by Mr. Smart and Mr. Hacker

14 when they decided to do what nobody before them did in *any* sport

15 — file this lawsuit. They did so despite knowing that their names

16 would not just be in the Court's public record, but would also

17 likely appear in the media. *See* Smart Decl. ¶ 17; Hacker Decl. ¶

18 17. They are quite proud to have their names attached to this

19 case and are proud of the result achieved, *id.* ¶ 18, but at the

20 same time, the risk was (and is) quite real given the NCAA's

21 power, and since any prospective employer can easily determine

22 they participated in this case. Indeed, "[a]n employee who lends

23 his name to a lawsuit against a current or former employer is

24 placed in a financially vulnerable position." *Navarro v.*

25 *Servisair*, No. C 08-02716 MHP, 2010 WL 1729538, at *4 (N.D. Cal.

26 Apr. 27, 2010).

27

28
**Motion for Final Approval of Settlement**

For decades, volunteer coaches have simply moved on with their lives after their time as a volunteer coach ended, leaving a new crop of coaches to inherit an unchanged, unfair, and antiquated work environment. It would have been much easier for these named plaintiffs to take that same path — to go on with their lives and to allow someone else to deal with the problem. But these named plaintiffs made the bold choice to not take that path. They bravely attached their names to a lawsuit that has blazed a trail towards better conditions for today's coaches.

Each named plaintiff also put in the work needed to create this fund and to affect change. They each had pre-complaint meetings with Class Counsel and they each reviewed the complaint before it was filed. Smart Decl. ¶¶ 3-7; Hacker Decl. ¶¶ 3-7. For nearly three years, they have had routine calls and meetings with Class Counsel keeping them abreast on proceedings in the case. *Id.* ¶ 16. They each spent several hours searching for documents and otherwise assisting in document collection and production. *Id.* ¶¶ 8-10. They each spent significant time reviewing multiple sets of interrogatories, discussing them, and verifying the answers. *Id.* ¶ 11. They each spent many hours over multiple meetings preparing for their depositions, and then sat for depositions that consumed most of a day. *Id.* ¶¶ 12-15.

In short, Mr. Smart and Mr. Hacker served as exemplary class representatives, and their work and their willingness to take on risk ushered in a great result for the class. Thus, Plaintiffs respectfully request that the Court grant the requested incentive awards of $7,500 each.

**Motion for Final Approval of Settlement**

1

**CONCLUSION**

2      For the foregoing reasons, the Court should grant

3 Plaintiffs' motion for final approval and motion for incentive

4 awards.

5

DATED: August 11, 2025        Respectfully submitted,

6

7                              _/s/ Garrett R. Broshuis_
                               KOREIN TILLERY, LLC
8                              Stephen M. Tillery (*pro hac vice*)
                               Steven M. Berezney
9                              Garrett R. Broshuis

10                             *Attorneys for Plaintiffs and Class*

11

12

13                    **CERTIFICATE OF SERVICE**

14      I hereby certify that on August 11, 2025, I electronically

15 filed the foregoing with the Clerk of the Court using the CM/ECF

16 system, which will send notification of such filing to all

17 attorneys of record registered for electronic filing.

18
                               _/s/ Garrett R. Broshuis_
19                             Garrett R. Broshuis

20

21

22

23

24

25

26

27

28

**Motion for Final Approval of Settlement**